IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF NORTH CAROLINA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF MINNESOTA, STATE OF OREGON, STATE OF TENNESSEE, and STATE OF WASHINGTON, | |
| *Plaintiffs*, | |
| vs. | Case No. 1:24-cv-00710-LCB-JLW |
| REALPAGE, INC., | |
| *Defendant*. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER**

## INTRODUCTION

This public antitrust enforcement action seeks to end RealPage's ongoing scheme to stifle competition in apartment rental markets using anticompetitive pricing algorithms. Like Americans across the country, renters in North Carolina have been impacted by RealPage's anticompetitive conduct. Indeed, RealPage's rental pricing algorithms have been adopted by a substantial share of landlords in more major metropolitan areas within North Carolina than in any other state—specifically, Durham-Chapel Hill, Charlotte, and Raleigh—as well as other communities across North Carolina. As alleged in the Complaint, RealPage implements its anticompetitive conduct with at least six large property management companies that operate buildings and set rents in this District and across North Carolina. Given the reach and scope of RealPage's conduct throughout North Carolina as well as the continuing harm to tens of thousands of North Carolinians, the State of North Carolina, acting by and through its Attorney General, stands together with the United States and seven other State Co-Plaintiffs, acting by and through their respective Attorneys General, in making the considered judgment to bring this action here. Not only does this choice merit "substantial weight[,]" *Trustees of the Plumbers & Pipefitters Nat. Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 444 (4th Cir. 2015), but to disturb this choice would also require a substantial showing—both under the law and on the facts. That showing has not been made here.

RealPage does not dispute that venue properly lies within this District. RealPage also does not dispute—because it cannot—that its alleged conduct impacts North

1

Carolinians and the reach of that impact extends across North Carolina. RealPage may prefer to litigate elsewhere but it has not carried its burden of demonstrating that transfer to its preferred venues—the Middle District of Tennessee or the North District of Texas—is justified. These alternative options fail under the law and based on the factual record before the Court.

In seeking to transfer this case to Tennessee, RealPage focuses on the purported value of proceeding in the same courthouse that is separately managing a private multidistrict litigation. But that sort of purported efficiency has already been directly rejected by Congress when it acted to exempt public antitrust enforcement actions from multidistrict consolidation to ensure their expeditious resolution. *See* 28 U.S.C. § 1407(g). RealPage has not made out the "strong showing" needed to "override the legislative intent behind" the antitrust consolidation exemption and "the clear public policy favoring the expeditious resolution of government antitrust enforcement actions." *United States v. Google LLC*, 661 F. Supp. 3d 480, 490 (E.D. Va. 2023). Moreover, the multidistrict class actions in question may not proceed to trial until 2028 at the earliest. And even if those actions were tried, the trials will be dissimilar to the case at hand given the fact that the multidistrict claims primarily seek damages on a class-wide basis, rather than the equitable relief sought in this action. Such an outcome would incur the very "delays that might be caused by consolidation with private suits" that Congress sought to avoid. *Id.* at 488.

2

RealPage's alternative request for transfer to the Northern District of Texas based on convenience factors rings hollow given its acceptance of—if not its preference for—a different venue (the Middle District of Tennessee) where it is *not* headquartered. Defendants generally prefer to litigate in venues where they are headquartered, but that cannot override the "substantial weight" afforded to *plaintiffs'* choice of forum. Worse, RealPage's request would shift this enforcement action from the home state of one of the Plaintiffs to one that is not a plaintiff, forcing Plaintiff States to obtain local counsel. As for witnesses, RealPage has not offered any details regarding the location of third-party witnesses. Its vague overtures about greater convenience do not overcome the paramount interest of Plaintiffs, including Plaintiff North Carolina, in securing the prompt resolution of their government antitrust claims and expeditious relief to renters in North Carolina and elsewhere. RealPage's motion should therefore be denied.

## STATEMENT OF FACTS

RealPage sells revenue management software to landlords in local markets in North Carolina and across the country. Compl. ¶¶ 14, 200, App. A & B. For two of RealPage's revenue management software products, AI Revenue Management (AIRM) and YieldStar, RealPage amasses and uses a trove of nonpublic, competitively sensitive data to generate pricing recommendations. *Id.* ¶¶ 17–27, 225. Landlords agree to share this data with RealPage, and through RealPage share with one another, in order to exploit this data to harm renters. *Id.* ¶¶ 19–20, 23–25. Landlords also agree with RealPage to use AIRM and YieldStar to align pricing with their competitors. *Id.* ¶¶ 28–33, 241.

3

Renters feel the effects of these unlawful agreements in local markets within this District and throughout North Carolina. Multiple landlords, including six identified in the Complaint, have entered into agreements to use AIRM or YieldStar on properties within this District. *Id.* ¶ 222. Plaintiffs allege that these agreements have hurt competition in multiple markets within this District, as well as other local markets within North Carolina and other states. *Id.* ¶¶ 186–204, 220–21, App. A & B.

RealPage's conduct has independently spurred private antitrust litigation against it and dozens of landlords. In April 2023, the United States Judicial Panel on Multidistrict Litigation ("JPML") transferred twenty-one such actions to the Middle District of Tennessee for coordinated or consolidated pretrial proceedings. *In re RealPage, Inc.*, 669 F. Supp. 3d 1372 (J.P.M.L. 2023). Under the case management order governing the RealPage MDL, trial is not scheduled to begin until 2028 at the earliest. Case Mgmt. Order at 7–8, *In re RealPage, Inc. Rental Software Antitrust Litig. (No. II)*, No. 3:23-MDL-3071 (M.D. Tenn.) ("*RealPage MDL Dkt.*"), ECF No. 818 (attached as Ex. A).

As part of its role vindicating public rights, the United States may file statements of interest—akin to amicus briefs—in actions where it is not a party. *See* 28 U.S.C. § 517. Such limited appearances do not otherwise compromise the rights of the United States in its independent enforcement activity. Consistent with that practice, in November 2023, the U.S. Department of Justice filed a statement of interest in the RealPage MDL. Stmt. of Interest of the United States, *RealPage MDL Dkt.*, ECF No. 627. The United States's appearance in the RealPage MDL was limited to filing a legal brief providing its

4

perspective on the law, Mem. Supp. Stmt. of Interest, *RealPage MDL Dkt.*, ECF No. 628, and participating at oral argument, Transcript of Proceedings at 189–202, Dec. 11, 2023, *RealPage MDL Dkt.*, ECF No. 673.

## LEGAL STANDARD

A "plaintiff's choice of forum is often the most important factor in a transfer of venue analysis." *Triad Int'l Maint. Corp. v. Aim Aviation, Inc.*, 473 F. Supp. 2d 666, 669 (M.D.N.C. 2006). That decision "is entitled to substantial weight," *Trustees of the Plumbers & Pipefitters*, 791 F.3d at 444, and "should rarely be disturbed," *Collins v. Straight, Inc.*, 748 F.2d 916, 921 (4th Cir. 1984). That is particularly true where the plaintiff's chosen forum is the location of the operative events giving rise to the suit, *Speed Trac Techs., Inc. v. Estes Express Lines, Inc.*, 567 F. Supp. 2d 799, 803–04 (M.D.N.C. 2008), and the location of harm, *Google*, 661 F. Supp. 3d at 491.

This principle carries even greater weight considering Congress's conscious—and recently reaffirmed—decision to exempt public antitrust actions from multidistrict consolidation, thereby permitting government antitrust enforcers to continue to file antitrust actions in their chosen venues. 28 U.S.C. § 1407(g). To "override the legislative intent behind" Congress's statutory exemption "and the clear public policy favoring the expeditious resolution of government antitrust enforcement actions," *Google*, 661 F. Supp. 3d at 490, RealPage must make a "compelling showing on the remaining [transfer] factors" under 28 U.S.C. § 1404(a)—namely, (1) convenience of the parties (2) witness convenience and access, and (3) the interest of justice, *Trustees of the Plumbers &*

5

*Pipefitters*, 791 F.3d at 444; *Google*, 661 F. Supp. 3d at 490 ("strong showing").[1] A defendant cannot make out a showing under these factors by trying to "simply shift[] the inconvenience from the defendant to the plaintiff." *N.C. Mut. Life Ins. Co. v. Stamford Brook Cap., LLC*, 2019 WL 4747851, at *8 (M.D.N.C. Sept. 27, 2019).

## ARGUMENT

RealPage has failed to prove that the convenience of the parties and witnesses or the interest of justice favors transfer to the Middle District of Tennessee or, alternatively, the Northern District of Texas. *See Progressive Cas. Ins. Co. v. Future Van Lines, LLC*, 2021 WL 4413319, at *1–2 (M.D.N.C. Sept. 27, 2021). Plaintiffs are public antitrust enforcers filing in a home state of one plaintiff and in a forum that has suffered harm from RealPage's anticompetitive conduct—factors that weigh heavily against transfer. And RealPage has not carried the burden of demonstrating that the convenience of the parties and the witnesses justifies transfer to either of the proposed venues. Because RealPage cannot offer "compelling" proof that the other factors justify a transfer, *Trustees of the Plumbers & Pipefitters*, 791 F.3d at 444; *Google*, 661 F. Supp. 3d at 487, there is no basis for upsetting Plaintiffs' choice of forum and RealPage's motion should be denied.

---

[1] Courts in this District sometimes apply a test with eleven, more specific factors. This test overlaps with the Fourth Circuit's broader factors. *See, e.g.*, *Freeman v. Davon Shaquille Calhoun & Heartland Express, Inc.*, 2023 WL 5833725, at *4 n.3 (M.D.N.C. Sept. 9, 2023).

Case 1:24-cv-00710-LCB-JLW  Document 38  Filed 10/17/24  Page 7 of 31

## I.    The Middle District of North Carolina Is the Proper Forum for This Case

In bringing their public antitrust enforcement action in this District, Plaintiffs seek expeditious relief for the people of North Carolina, along with other renters across the country. The anticompetitive harm caused by RealPage's unlawful agreements with landlords operating in this District has had a significant impact on North Carolina renters. Recognizing that fact, the State of North Carolina has joined as a Plaintiff in this litigation. These facts illustrate this case's meaningful connection to this District, which militates in favor of deferring to Plaintiffs' choice of forum and keeping this action here. *See, e.g., Parham v. Weave Corp.*, 323 F. Supp. 2d 670, 674 (M.D.N.C. 2004) (deference to a plaintiff's chosen forum is "proportionate to the relation between the forum and the cause of action").

<u>RealPage's Anticompetitive Agreements with Landlords Have Stifled Competition and Hurt Renters in This District and Throughout North Carolina</u>

"A substantial part of the activities and conduct giving rise to the claims . . . occurred within [the Middle] District [of North Carolina]." Compl. ¶ 223. Specifically, RealPage entered into illegal agreements with at least six landlords that own or manage properties in this District. *Id.* ¶ 222. These agreements provide for the sharing of the landlords' detailed, private data about properties, tenants, and applicants, which RealPage filters back to competing landlords to reduce competition and increase prices for renters. *Id.* ¶¶ 18, 222 (alleging exchange of "lease-level" information as well as information on renters' apartment tours).

7

Moreover, Plaintiffs identify numerous local rental markets in this District where RealPage's conduct has harmed residents, including renters in Durham and Orange Counties. *Id.* ¶¶ 221, 223 & App. A (alleging harm to local markets). The fact that markets *outside* the District have also been affected, Def. Br. at 12, does not diminish the ongoing harm occurring here or the strong connection between Plaintiffs' claims and this forum.

RealPage is wrong that the "nationwide scale" of its challenged conduct creates an "insufficient factual nexus" between this District and the Plaintiffs' case. Def. Br. at 10–13. In the only two cases RealPage cites in support of that argument, the plaintiff had alleged that conduct *outside of the forum* would cause general *nationwide* harm. *See id.* (citing *FTC v. Illumina, Inc.*, No. CV 21-873 (RC), 2021 WL 1546542, at \*6–7 (D.D.C. Apr. 20, 2021); *FTC v. Cephalon, Inc.*, 551 F. Supp. 2d 21, 27 (D.D.C. 2008)). By contrast, Plaintiffs allege *localized* harm in specific rental markets, including multiple rental markets within this District, from conduct *within* these markets. Compl. ¶¶ 221–23. As the Complaint alleges, these rental markets are "inherently local" because "[r]enters are typically tied to a particular location for work, family or other needs." *Id.* ¶ 186. Thus, as to these local North Carolina rental markets, Plaintiffs allege a "localized controvers[y]" for which there is a "local interest in having . . . settled at home." *Oldham v. Penn. State Univ.*, 507 F. Supp. 3d 637, 647 (M.D.N.C. 2020); *see also Google*, 661 F. Supp. 3d at 491 (finding that allegations of specific harm within the district established a factual connection).

<u>The State of North Carolina Is Entitled to Home State Deference</u>

Plaintiffs' choice of the Middle District of North Carolina also deserves heightened respect because the State of North Carolina is suing in its "home state." *Progressive Casualty*, 2021 WL 4413319, at *2 ("This usual deference is heightened when a plaintiff sues in its home state. . . ."); *see also United States v. Agri Stats, Inc.*, 2024 WL 2728450, at *5 (D. Minn. May 28, 2024) (noting that the State of Minnesota is a plaintiff state and denying motion to transfer out of Minnesota).

RealPage argues that Plaintiffs, including North Carolina, are not entitled to "home state" deference because (i) Plaintiff North Carolina resides in the Eastern District of North Carolina, where the Attorney General's Raleigh offices are located, Def. Br. at 12–13, and (ii) Plaintiff Tennessee's residence is a countervailing consideration, *id.* at 13. Neither argument is correct.

First, the State of North Carolina, joined by other Plaintiffs, filed this action in a federal judicial district in its home state and satisfied the jurisdictional and venue requirements applicable to any litigant. Courts in this District have held that the deference accorded to a plaintiff's choice of forum is heightened when the plaintiff files in its home state. *See, e.g.*, *Progressive Casualty*, 2021 WL 4413319, at *2; *Cree, Inc. v. Watchfire Signs, LLC*, 2020 WL 7043868, at *5 (M.D.N.C. Dec. 1, 2020). Indeed, the Attorney General of North Carolina may file enforcement actions in any District of this State where, as here, a substantial part of the events giving rise to the action occurred in that District. *See* N.C. GEN. STAT. § 114-2(8) (2017). Thus, RealPage's argument that the State

9

of North Carolina is somehow a foreign plaintiff in this District is wrong under the applicable law and belied by the unremarkable instances in which the facts and circumstances of an action not only supported the State of North Carolina's choice of venue in this District, but also deference to that choice.

Second, the State of Tennessee's joinder as a Plaintiff here has no bearing on "home state" deference. The fact that there are multiple State plaintiffs with—naturally— multiple home fora does not undercut the Plaintiffs' collective choice of where to file because "it would not have been possible for plaintiffs to select one forum where they all reside." *See Sleepy Lagoon, Ltd. v. Tower Grp., Inc.*, 809 F. Supp. 2d 1300, 1313 (N.D. Okla. 2011) (granting deference despite only three of eight plaintiffs residing in forum because state "does have an interest in providing a forum for its residents"). If anything, Tennessee's choice to litigate this particular public enforcement action in North Carolina counsels against transferring it to Tennessee.

<u>The Convenience of Witnesses and Parties Does Not Justify a Transfer</u>

RealPage emphasizes convenience factors to support a transfer, Def. Br. at 16–18, but its motion does not satisfy its burden to provide sufficient details regarding witness or party inconvenience. As "[t]he party asserting witness inconvenience," RealPage "has the burden to proffer, by affidavit or otherwise, sufficient details respecting the witnesses and their potential testimony to enable the court to assess the materiality of evidence and the degree of inconvenience." *Pacchiana v. Pacchiana*, 2021 WL 2312538, at *9 (M.D.N.C. June 7, 2021), *adopted*, 2021 WL 2646982 (M.D.N.C. June 28, 2021). When assessing

10

witness convenience, the location of party witnesses generally receives little weight because defendants "have sufficient control over their employees . . . to minimize, if not eliminate, any burden with respect to the production of witnesses." *See, e.g.*, *Mkt. Am. v. Optihealth Prod., Inc.*, 2008 WL 5069802, at *9 (M.D.N.C. Nov. 21, 2008), *adopted*, 2009 WL 10715396 (M.D.N.C. Jan. 6, 2009). Under these principles, RealPage has not demonstrated witness inconvenience, much less demonstrated that it warrants a transfer.

    1. <u>RealPage Offers No Evidence That the Middle District of Tennessee Would Be More Convenient for Witnesses</u>

RealPage offers no specific facts to support its subsidiary argument that the Middle District of Tennessee would be a more convenient forum for parties and witnesses. *See United States v. $43,660.00 in U.S. Currency*, 2015 WL 3890646, at *1 (M.D.N.C. June 24, 2015) (recognizing that movant "'fail[ed] to demonstrate the requisite inconvenience'" when it "presented no facts to indicate the quality or materiality" of witnesses' testimony). RealPage fails to identify any source of proof that would more easily be accessed in the Middle District of Tennessee than in this District. Its headquarters are outside of Tennessee, it identifies no employees who reside in the Middle District of Tennessee, and it identifies no third-party witness, material or not, for whom that district is more convenient than this District. *See* Def. Br. at 17, 20.

Instead, RealPage attempts to shortcut its burden to show real, demonstrable facts by simply invoking the pendency of a private multidistrict litigation in the Middle District of Tennessee. As discussed later, such an argument, without specific facts and evidence, would circumvent Congress's judgment to exempt public enforcement actions

11

from multidistrict consolidation. 28 U.S.C. § 1407(g). The Judicial Panel on Multidistrict Litigation's selection of Nashville, Tennessee as the venue for its pretrial MDL proceedings under a different procedural standard does not translate to the distinct posture before this Court: a public enforcement action and a discretionary motion to transfer under section 1404.

2. The Northern District of Texas Is Inconvenient for Plaintiff States and RealPage's Assertions of Convenience Are Conclusory and Unpersuasive

RealPage similarly has failed to show that the Northern District of Texas would be a more convenient forum. Transfer to the Northern District of Texas burdens Plaintiff States. Texas is not a Plaintiff State, and eight Plaintiff States would be required under that district's local rules to obtain local counsel. *See* N.D. TEX. CIV. L.R. 83.11 (exempting only the United States Department of Justice and the Attorney General of the State of Texas from the local counsel requirement under Civil Local Rule 83.10).

RealPage's contrary assertions of Dallas's convenience (or second-most, after Nashville) are either irrelevant or too conclusory to merit any weight. Without sufficient details or further explanation, RealPage summarily asserts that "many of the likely witnesses reside" in the Northern District of Texas. Def. Br. at 20. While many RealPage employees may live near RealPage's headquarters in Richardson, Texas, "the convenience of witnesses who are employed by the parties [does] not substantively factor into" a Court's determination of witness convenience. *Cree*, 2020 WL 7043868, at *6 (recognizing that party witnesses' "participation will be obtained as a part of their

12

employment"). Moreover, there likely will be RealPage employees outside of Texas who may be witnesses. For example, in its Rule 26 disclosures made in the RealPage MDL, RealPage identified three potential individual witnesses, "two of whom reside in the Northern District of Illinois." Def. Br. at 6.

RealPage's convenience analysis also gives short shrift to third-party witnesses, some of whom may be implicated in RealPage's anticompetitive conduct. This omission is glaring. Because RealPage offers no additional detail on the identities or locations of likely third-party witnesses, including their quality or materiality, *$43,660.00 in U.S. Currency*, 2015 WL 3890646, at *1, this Court should give "little weight to their possible inconvenience." *Cree*, 2020 WL 7043868, at *6, n.6 (minimizing consideration of third-party witnesses' convenience where parties had not "specified who exactly those witnesses are"). RealPage vaguely proffers that it "may" call "some" of its 60 MDL co-defendants as witnesses in this action and that many of them have connections to Texas. Def. Br. at 20. But it does not identify *which* of these MDL co-defendants could be material witnesses (and if those entities have ties to this District) and ignores the prospect of any other third-party witnesses, leaving Plaintiffs and this Court to speculate. Nor does RealPage provide "sufficient details" about those unnamed individuals' "potential testimony" or "demonstrate" that they are not "willing to travel" here, as it is required to do to obtain a transfer based on witness convenience. *Pacchiana*, 2021 WL 2312538, at *9; *see also, e.g.*, *Triangle Grading & Paving, Inc. v. Rhino Servs., LLC*, 2020 WL 2086188, at *19 (M.D.N.C. Apr. 30, 2020) (denying transfer where defendant "d[id] not

13

offer the court a specific example of any [out-of-state] witness who is unwilling to travel to North Carolina"); *see also* 15 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FED. PRAC. & PROC. Juris. § 3851 (4th ed. 2024) ("If the moving party merely has made a general allegation that necessary witnesses are located in the transferee forum, without identifying them and providing sufficient information to permit the district court to determine what and how important their testimony will be, the motion to transfer should be denied."). Having made no proffer in its opening brief, RealPage cannot deprive Plaintiffs of the opportunity to respond by attempting to meet its burden for the first time in a reply. *See, e.g.*, *Hooker v. Citadel Salisbury LLC*, 2023 WL 3020967, at *5 n.6 (M.D.N.C. Apr. 20, 2023).

Even assuming that the Northern District of Texas would be more convenient for some hypothetical unknown third-party witness, RealPage ignores that Texas may be *less* convenient for other potential witnesses. By RealPage's own reckoning, more than three-quarters of the unidentified entities whom it *might* call are headquartered outside of Texas. Def. Br. at 20. At the same time, all of the landlords enumerated in the Complaint operate buildings within the District and North Carolina. Compl. ¶ 222. RealPage does not address these landlords' operations within this District, nor their corporate presence in or near North Carolina.

That the corporate employers of some of RealPage's unidentified potential witnesses "have operations and/or own property" in the Northern District of Texas, Def. Br. 20, bears little on the convenience of individual witnesses. Many of the large

14

landlords named as defendants in the RealPage MDL likely own or operate properties in this District as well because at least six large landlords operating in this District reached illegal agreements with RealPage. *See* Compl. ¶¶ 195, 222 & App. A (alleging RealPage agreements touching 29 percent or more of the units in multiple submarkets in this District).

RealPage additionally argues that its software code base, and less than a quarter of its documentary custodians from the United States' pre-suit investigation, reside in the Northern District of Texas. Def. Br. at 2, 7. But RealPage has thus far produced documents and other information electronically, and it does not argue that it would do differently in this litigation. In modern discovery, electronic productions can be made from anywhere to anywhere without any additional burden, and therefore the physical location of such materials should have little, if any, bearing on the transfer analysis. *See, e.g., Aloft Media, LLC v. Adobe Sys. Inc.*, 2008 WL 819956, at *4 (E.D. Tex. Mar. 25, 2008) ("Any convenience or burden associated with electronic discovery bears little, if any, relation to the physical location of the underlying document."). Because RealPage offers no evidence that the Northern District of Texas would be more convenient for other sources of proof, including third-party witnesses, this factor weighs against transfer.

## II. The Multidistrict Litigation in the Middle District of Tennessee Does Not Justify Transfer

Given its otherwise thin convenience arguments for transfer, RealPage relies heavily on the private multidistrict litigation in the Middle District of Tennessee despite Congress's exemption of public antitrust enforcement actions from coordination or

15

consolidation with multidistrict litigation. 28 U.S.C. § 1407(g). RealPage should not be able to use section 1404 to circumvent that clear proscription. Plaintiffs' overriding interest as public antitrust enforcers in obtaining a prompt resolution of their claims against RealPage and expeditious relief to renters in North Carolina and elsewhere tips this factor decidedly in favor of this District as the chosen venue. Relative court congestion in the Middle District of Tennessee likewise counsels in favor of keeping the case here.

1. <u>Congress's Decision to Exempt Public Antitrust Enforcement Actions from MDL Coordination Merits Deference</u>

RealPage's justifications for transfer to the Middle District of Tennessee rely almost entirely on the supposed efficiencies of coordinating this public enforcement action with the private lawsuits consolidated in the MDL. Def. Br. at 15–16 (listing proposed efficiencies of adjudication by the RealPage MDL's judge). Such justifications are contrary to Congress's considered judgment about how to balance such purported efficiencies. When Congress passed the Multidistrict Litigation Act of 1968, it explicitly exempted federal antitrust enforcers from transfer to a multidistrict litigation, 28 U.S.C. § 1407(g), recognizing that public antitrust actions would "almost certainly be substantially delayed" if forced to coordinate or consolidate with private actions. H.R. Rep. No. 90-1130 (1968) (statement of Ramsey Clark, Deputy Att'y General of the United States) (acknowledging incongruity in priorities and needs of public and private antitrust actions). Thus, although Congress acknowledged that exempting federal antitrust enforcers from the Multidistrict Litigation Act "may occasionally burden defendants," it

16

nonetheless believed these burdens were "justified by the importance to the public of securing relief in antitrust cases as quickly as possible." *Id.*; *see also Google*, 661 F. Supp. 3d at 488 (collecting legislative history).

In 2022, Congress expanded this exemption to include state antitrust enforcers. Consolidated Appropriations Act, Pub. L. No. 117-328, 136 Stat. 4459, 5970 (2023) (also known as the State Antitrust Enforcement Venue Act). In doing so, Congress reiterated its desire to avoid the transfer of a public antitrust enforcement action to a private MDL because doing so almost always delays the public enforcement action. H.R. Rep. No. 117-494 (2022) (exemption will "eliminate unnecessary inefficiencies and delays and enable more timely and cost-efficient resolutions of state antitrust claims while also ensuring that a state can litigate claims in an appropriate venue of its choice").

Congress's policy justifications for exempting public antitrust enforcement actions from MDL coordination are clear and compelling: these actions serve the critical purpose of protecting the economy from the harms of anticompetitive behavior. Allowing them to be mired in private multidistrict litigation impedes public law enforcement's ability to seek timely relief from anticompetitive conduct that harms the American people.

The recent decision in *United States v. Google LLC*, 661 F. Supp. 3d 480 (E.D. Va. 2023), from the Eastern District of Virginia is on all fours with this case. When faced with a public antitrust lawsuit brought by both state and federal enforcers, Google moved for discretionary transfer to a venue where it faced a private MDL. *Id.* at 484. The court denied that motion, holding that transfer "for coordination with the pending MDL

17

actions, *even as a standalone civil action without consolidation in the MDL*, would effectively circumvent the exclusion in § 1407(g) and would subvert Congress's intent to eliminate unnecessary delay caused by coordination with private antitrust litigation." *Id.* at 490 (emphasis added). To avoid "overrid[ing] the legislative intent behind 28 U.S.C. § 1407(g)," the court held that transfer was disfavored absent a "strong showing of other factors that support the transfer of venue." *Id.* Similarly, in *United States v. Agri Stats*, the defendant moved to transfer a public antitrust enforcement action to the judge overseeing a private MDL in another district on grounds of "judicial economy," and the court rejected those arguments. 2024 WL 2728450, at *4–5; *cf. United States v. Live Nation Ent., Inc.*, 2024 WL 4381074, at *3 (S.D.N.Y. Oct. 3, 2024) (denying motion to transfer enforcement action to court overseeing prior consent decree).

The same reasoning applies here. Although RealPage disclaims that it is seeking a consolidation of this case with the RealPage MDL, it specifically requests transfer to the Honorable Waverly D. Crenshaw, Jr. so that he can oversee this action alongside the RealPage MDL. *See* Def. Br. at 2, 16 (asserting that transfer will "allow[] that Court to leverage its considerable expertise with the overlapping issues"). In other words, RealPage seeks the very "coordinated" proceedings, 28 U.S.C. 1407(g), from which Congress expressly exempted public antitrust enforcement actions. RealPage further attempts to distinguish this case from *Google* based on the stage of the proceeding. Def. Br. at 18. But contrary to its interpretation, and as the court noted in *Google*, 28 U.S.C. § 1407(g) supplies a straightforward, categorical prohibition on "coordinated or

18

consolidated pretrial proceedings" that leaves no room for case-by-case assessment about whether to litigate public and private antitrust actions in parallel before the same judge. Congress designed that bright-line rule to protect all public enforcement actions from the "almost certain[]" delay they would experience by being tethered to MDL practice. H.R. Rep. No. 90-1130; *see also Google*, 661 F. Supp. 3d. at 490 (asserting that "delays from coordination with the MDL would be unavoidable").

Even if the stage of the multidistrict litigation mattered under the statute, this case is not at a materially different stage than *Google*. There, as here, the multidistrict litigation had advanced past a motion to dismiss when the United States filed its enforcement action, *cf. In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346 (S.D.N.Y. 2022) (granting and denying in part a motion to dismiss), yet the court still recognized that a transfer to a multidistrict litigation would materially delay the public enforcement action.

In addition, RealPage's conjectured efficiencies rest on a series of unknowns. Even if this case were to be transferred to the Middle District of Tennessee, it would be transferred only to that court, and not to a specific judge. *See, e.g.*, *Trout Unlimited v. Lohn*, 2006 WL 2927737, at *3 (W.D. Wash. Oct. 10, 2006) (noting that § 1404(a) allows the transfer of an action "to any other district or division where it might have been brought" and not "to a specific judge as requested by defendants"). The ultimate assignment of a transferred case is the exclusive province of the transferee court. And if this case were by chance assigned to Judge Crenshaw, it would be within his discretion to

19

treat it as a related case to the RealPage MDL (or not) and to coordinate (or not) with the MDL.

Most importantly, under the MDL's case management order, summary judgment motions are scheduled to be argued in July 2027—nearly three years away—and the actions originally filed in that district are not scheduled for trial until February 2028, at the earliest. *RealPage MDL Dkt.*, ECF No. 818 at 8 (Ex. A). The MDL will also not address class certification for over two years, a series of decisions that may draw appeals and cause further delay of a decision on the merits. *Id.* at 6; *see* Fed. R. Civ. P. 23(f). Tying this case to the MDL's pretrial schedule would marry Plaintiffs to a trial date more than three years in the future and saddle them with the conflicting priorities of scores of additional plaintiffs and defendants seeking different claims and remedies. The case management order dates, and the expected pretrial coordination with multiple private parties, claims, and defenses, do not advance the Plaintiffs' interest in securing prompt resolution of public antitrust claims and expeditious relief from the ongoing harm.

Nor does the United States' filing of a statement of interest in the multidistrict litigation change anything. Independent of its enforcement authority, the Justice Department may file statements of interest as part of its authority to "attend to the interests of the United States in [any] suit pending in a court of the United States." 28 U.S.C. § 517. Like amicus briefs, statements of interest are filed in litigation involving other parties over which the United States has no control. The United States therefore must file its statement of interest wherever the case is proceeding; it has no choice over

20

the forum. RealPage offers no authority holding that the venue where a statement of interest is submitted should countermand the United States's choice of forum for its own enforcement action—let alone the choice of eight states, including North Carolina, that did not participate in the statement of interest. RealPage's position would serve only to chill the protection of the United States's interests through the filing of statements of interest, contrary to congressional intent.

2.  Concerns about Court Congestion Favor This District

RealPage's unsupported assertion that transfer to the Middle District of Tennessee would expedite this action is contrary to the facts about the respective courts' dockets.

Setting aside the delays that would arise from coordination with an MDL set for trial in 2028, *see supra* Section II(A), transfer to the Middle District of Tennessee alone could delay this case. Although RealPage proffers comparative caseload statistics to support transfer to the Northern District of Texas, RealPage offers no similar evidence to support transfer to the Middle District of Tennessee. Def. Br. at 21–22. The reason is clear: the Middle District of Tennessee is slower and more congested than this District. The median time from filing to trial in civil cases in this District is 30.5 months, shorter than the 43.8 months in the Middle District of Tennessee.[2] This District also has 30% fewer pending cases per judge by weighted filings and 47% fewer civil cases older than

---

[2] *See United States District Courts – National Judicial Caseload Profile*, UNITED STATES COURTS (June 30, 2024), at https://www.uscourts.gov/file/78871/download.

three years than the Middle District of Tennessee.[3] When every district is facing the challenges of increasingly congested dockets and more protracted pretrial disputes, there is simply no fact-based reason to believe that this action would be resolved faster in Defendant's preferred districts.[4]

Transfer to the Middle District of Tennessee is also unlikely to lessen the risk of inconsistent judgments. RealPage recognizes, as it must, that this case will still be heard or tried in parallel to the RealPage MDL regardless of where it is litigated. Def. Br. at 2 n.1 ("RealPage does not and cannot seek consolidation of this case with the MDL."). Absent MDL consolidation, which Congress has prohibited, transfer therefore would not obviate the risk of inconsistent judgments. *See Bluestone Innovations, LLC v. LG Elecs., Inc.*, 940 F. Supp. 2d 310, 320 (E.D. Va. 2013) (attributing risk of inconsistent results to "trying these cases separately"). Moreover, if this case reaches final judgment before the private MDL lawsuits (as Plaintiffs believe would serve the interests of justice and the public), a judgment against RealPage here may be offered as probative evidence in the RealPage MDL, minimizing the risk of inconsistency. 15 U.S.C. § 16 (a final civil

---

[3] *United States District Courts – National Judicial Caseload Profile*, UNITED STATES COURTS (June 30, 2024), at https://www.uscourts.gov/file/78871/download.

[4] There are congestion issues in the Northern District of Texas as well. This District has fewer weighted civil filings (360), and more completed trials (24), than the Northern District of Texas (555 and 15 respectively). *United States District Courts – National Judicial Caseload Profile*, UNITED STATES COURTS (June 30, 2024), at https://www.uscourts.gov/file/78871/download. Moreover, this District has 45 civil cases (five percent of its civil docket) over three years old, compared to 443 civil cases (11 percent of its civil docket) in the Northern District of Texas. *Id.*

judgment against a defendant in a federal antitrust suit brought by the United States "shall be prima facie evidence against such defendant" in a related antitrust matter).

Given the relative speed and efficiency of this District, as well as the Plaintiffs' overriding interest in expeditious resolution of government antitrust claims, the interest of justice weighs against transfer.

\* \* \*

RealPage chose to work with landlords that rent to North Carolinians across the state and its anticompetitive conduct has impacted tens of thousands of North Carolinians. RealPage's motion to transfer seeks to diminish the scope and scale of that harm in favor of fora that it finds preferable. Such assertions fail as a matter of law. Venue is proper in this District. The considered judgment and choices of the United States as well as the State of North Carolina, along with States of California, Colorado, Connecticut, Minnesota, Oregon, Tennessee, and Washington, to file in this District should be afforded deference. Plaintiffs therefore respectfully request that RealPage's Motion to Transfer be denied.

23

Dated: October 17, 2024                     Respectfully submitted,


                                            By:  _s/ *Henry C. Su*_____
                                            Henry C. Su
                                            David A. Geiger
                                            Andrew Tisinger

                                            Attorneys
                                            United States Department of Justice
                                            Antitrust Division
                                            450 Fifth Street N.W., Suite 7100
                                            Washington, DC 20530
                                            Telephone: (202) 307-6200
                                            Email: henry.su@usdoj.gov


                                            FOR PLAINTIFF STATE OF NORTH
                                            CAROLINA:

                                            JOSHUA H. STEIN
                                            Attorney General of North Carolina

                                            */s/ Kunal J. Choksi*
                                            KUNAL J. CHOKSI
                                            Special Deputy Attorney General
                                            N.C. Bar. No. 55666
                                            JESSICA V. SUTTON
                                            Special Deputy Attorney General
                                            N.C. Bar No.  41652
                                            North Carolina Department of Justice
                                            114 W. Edenton Street
                                            Raleigh, NC 27603
                                            Telephone: 919-716-6032
                                            Email: kchoksi@ncdoj.gov

                                            *Attorneys for Plaintiff State of North Carolina*

FOR PLAINTIFF STATE OF CALIFORNIA:

ROB BONTA
Attorney General of California

*/s/ Pamela Pham*
DOAN-PHUONG (PAMELA) PHAM
QUYEN TOLAND
Deputy Attorneys General
Office of the Attorney General
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Tel: (213) 269-6000
Email: Pamela.Pham@doj.ca.gov

*Attorneys for Plaintiff State of California*

FOR PLAINTIFF STATE OF COLORADO:

PHILLIP J. WEISER
Attorney General of Colorado

*/s/ Bryn A. Williams*
Bryn A. Williams
First Assistant Attorney General
Colorado Department of Law
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Bryn.Williams@coag.gov

*Attorney for the Plaintiff State of Colorado*

25

FOR PLAINTIFF STATE OF
CONNECTICUT:

WILLIAM TONG
Attorney General of Connecticut

*s/ Julián A. Quiñones Reyes*
Julián A. Quiñones Reyes
Assistant Attorney General
Office of the Connecticut Attorney General
165 Capital Avenue
Hartford, CT 06106
860.808.5030 | Julian.Quinones@ct.gov

*Attorney for Plaintiff State of Connecticut*

FOR PLAINTIFF STATE OF MINNESOTA:

KEITH ELLISON
Attorney General of Minnesota

*s/Katherine A. Moerke*
KATHERINE A. MOERKE
ELIZABETH ODETTE
SARAH DOKTORI
Assistant Attorneys General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, MN 55101-2130
katherine.moerke@ag.state.mn.us
Telephone: (651) 757-1288
elizabeth.odette@ag.state.mn.us
Telephone: (651) 728-7208
sarah.doktori@ag.state.mn.us
Telephone: (651) 583-6694

*Attorneys for Plaintiff State of Minnesota*

FOR PLAINTIFF STATE OF OREGON

ELLEN F. ROSENBLUM
Attorney General of Oregon

*/s/ Timothy D. Smith*
Timothy D. Smith
Senior Assistant Attorney General
Antitrust and False Claims Unit
Oregon Department of Justice
100 SW Market St, Portland OR 97201
971.673.3885 | tim.smith@doj.oregon.gov

*Attorney for Plaintiff State of Oregon*

FOR PLAINTIFF STATE OF TENNESSEE:

JONATHAN SKRMETTI
Attorney General of Tennessee

*S. Ethan Bowers*
Senior Assistant Attorney General
Daniel Lynch
Assistant Attorney General
Consumer Protection Division
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
615.837.5582 | ethan.bowers@ag.tn.gov

*Attorneys for Plaintiff State of Tennessee*

27

FOR PLAINTIFF STATE OF
WASHINGTON:
ROBERT W. FERGUSON
Attorney General of Washington

*/s/ Rachel A. Lumen*
Rachel A. Lumen, Assistant Attorney General
Brian H. Rowe, Assistant Attorney General
Sarah Smith-Levy, Assistant Attorney General
Kendall Scott Cowles, Assistant Attorney
General
Washington Attorney General's Office
Complex Litigation Division and Antitrust
Division
800 Fifth Ave, Suite 2000
Seattle, WA 98104
206.464.5343 | rachel.lumen@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

## WORD COUNT CERTIFICATION

I certify that this Opposition complies with the applicable word limits excluding the caption, signature lines, certificate of service, and any cover page or index in accordance with Local Civil Rule 7.3(d)(1). This certification is made in accordance with Local Civil Rule 7.3(d)(1). The undersigned relied on the word count feature provided by word processing software. The Opposition contains 6,089 words.

Dated: October 17, 2024

By: _s/ Henry C. Su_
Henry C. Su

Attorney
United States Department of Justice
Antitrust Division
450 Fifth Street N.W., Suite 7100
Washington, DC 20530
Telephone: (202) 307-6200
Email: henry.su@usdoj.gov

*Attorney for Plaintiff United States of America*

**CERTIFICATE OF SERVICE**

     I hereby certify that on October 17, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

By:  <u>s/ Henry C. Su</u>
          Henry C. Su