**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., | |
| *Plaintiffs*, | |
| v. | **No. 1:24-cv-00710-LCB-JLW** |
| REALPAGE, INC., et al., | |
| *Defendants*. | |

## COMPETITIVE IMPACT STATEMENT

In accordance with the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)–(h) (the "APPA" or "Tunney Act"), the United States of America files this Competitive Impact Statement related to the proposed Final Judgment against Defendant Cortland Management, LLC, which has been filed in this civil antitrust proceeding (ECF No. 49-1).

## I.    NATURE AND PURPOSE OF THE PROCEEDING

On August 23, 2024, the United States filed a civil antitrust Complaint against RealPage, Inc. ("RealPage"). On January 7, 2025, the United States amended its civil Complaint (the "Complaint") to add Cortland Management, LLC ("Cortland") and five other landlords as Defendants. Until January 1, 2025, Cortland licensed a revenue management software called YieldStar from RealPage. RealPage also licenses YieldStar and its other revenue management software to Cortland's competitors, including the other landlords named in the United States' Complaint. The Complaint alleges that Cortland's

licensing and use of RealPage's YieldStar was unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1.

The Complaint alleges that, by unlawfully sharing its confidential and competitively sensitive information with RealPage for use in its and competing landlords' pricing, Cortland violated Section 1 of the Sherman Act, 15 U.S.C. § 1. Under their licensing agreements with RealPage, Cortland and competing landlords have provided RealPage with daily, competitively sensitive, nonpublic information relating to their leasing businesses, including details like how many leases have been renewed, for what terms, and at what price. The transactional data that Cortland and other landlords have agreed to provide to RealPage includes current, forward-looking, granular, and highly competitively sensitive information. RealPage has used Cortland's competitively sensitive, nonpublic information to influence rental prices and other recommendations across rental properties managed by competing landlords. Cortland's rental prices and related recommendations were also influenced by its competitors' competitively sensitive, nonpublic information. In each relevant market, RealPage and participating landlords, including Cortland, have sufficient market power, including market and data penetration, to harm renters and the competitive process through this unlawful sharing of confidential and competitively sensitive information. Moreover, Cortland and other landlords can achieve any procompetitive objective of revenue management software without sharing this kind of information.

The Complaint also alleges that Cortland and other landlords, by adopting and using RealPage's revenue management software, have agreed with RealPage and each

other to align their pricing and thereby violate Section 1 of the Sherman Act, 15 U.S.C. § 1. RealPage has entered into agreements with Cortland and its competing landlords relating to how to price rental units, including through the licensing of its revenue management software—AI Revenue Management ("AIRM"), YieldStar, and Lease Rent Options ("LRO")—to landlords, and the provision by landlords of their competitively sensitive, nonpublic transactional data to RealPage for training and running its revenue management software. Adoption and use of RealPage's revenue management software by Cortland and other landlords has the likely effect of aligning their pricing processes, strategies, and pricing responses, and Cortland and other landlord users understand this likely effect.

The Complaint alleges monopolization and attempted monopolization claims against RealPage, but not against Cortland or any of its competing landlords. Through its licensing agreements, RealPage has amassed a massive reservoir of competitively sensitive data from competing landlords. RealPage has ensured that other providers of revenue management software cannot compete on the merits unless they enter into similar agreements with landlords, thereby obstructing them from competing with products that do not harm the competitive process.

At the same time the Complaint against Cortland was filed, the United States filed a proposed Final Judgment and a Stipulation and Order ("Stipulation and Order"), which are designed to remedy the loss of competition alleged in the Complaint due to Cortland's conduct.

The proposed Final Judgment, which is explained more fully below, imposes several requirements and restrictions on Cortland that address the United States' anticompetitive concerns regarding Cortland's conduct alleged in the Complaint. Specifically:

i.   Cortland must move from RealPage revenue management software to its proprietary revenue management software within 30 days of entry of the Stipulation and Order;

ii.  Cortland's revenue management software cannot use any third-party nonpublic data, including in training its models or in the run-time operation;

iii. Cortland's revenue management software cannot pool pricing information across its different owners;

iv.  The supply and demand models for Cortland's revenue management software cannot be trained using rental pricing, concessions, discounts, occupancy rates or capacity, or other rental pricing terms data across different owners;

v.   Cortland cannot disclose, solicit, or use competitively sensitive information from competitors that can be used to set rental prices or generate pricing;

vi.  Cortland must cooperate in this civil antitrust proceeding (*United States et al. v. RealPage et al.*) with respect to its prior use of RealPage's products and the monopolization and attempted monopolization claims against RealPage;

4

vii.   Cortland must adopt a written antitrust compliance policy and designate a chief antitrust compliance officer who will train Cortland employees on the policy, enforce the policy, and perform annual audits for compliance with the policy;

viii.  Cortland must allow the United States to perform inspections of its documents, code, and pseudocode relating to its proprietary revenue management software as well as to interview its employees to ensure compliance with the Final Judgment.

ix.    Cortland cannot license or use any third-party revenue management software without the appointment of a compliance monitor who will have the ability to seek information from Cortland's employees to ensure compliance with certain restrictions related to use of third-party revenue management software and communications between Cortland and other property management companies;

x.     Even with the oversight of a compliance monitor, Cortland cannot license or use any third-party revenue management software that (i) uses third-party nonpublic data to recommend or set prices or (ii) pools information across Cortland properties with different owners; and

xi.    Cortland will also be subject to the appointment of a compliance monitor if the Court finds that Cortland has violated the terms of the proposed Final Judgment.

Under the terms of the Stipulation and Order, Cortland must abide by and comply with the provisions of the proposed Final Judgment until it is entered by the Court or until the time for all appeals of any Court ruling declining entry of the proposed Final Judgment has expired.

The United States and Cortland have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the APPA. Entry of the proposed Final Judgment will terminate this action with respect to Cortland, except that the Court will retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof by Cortland.

## II.      DESCRIPTION OF EVENTS GIVING RISE TO THE ALLEGED SHERMAN ACT VIOLATIONS

RealPage is a provider of commercial revenue management and property management software to property management companies, including Cortland, who have used that software to set rental prices for the properties that they manage and/or own. RealPage currently licenses three revenue management software products including its legacy product, YieldStar, to landlords. YieldStar uses confidential, competitively sensitive data collected from competing landlords as a critical input to generate price recommendations for competing landlords. This data includes rental applications, executed new leases, renewal offers and acceptances, and forward-looking occupancy. The data is pulled from property management software, such as RealPage's OneSite product. Landlords use property management software to collect and track rental

payments, manage leases, property maintenance, accounting, and other property management functions.

When deciding where to live, renters often visit numerous properties that are owned and managed by competing landlords so that they can compare rental offerings and select their best housing option considering price and other terms. When competing landlords do not have access to each other's nonpublic data, or recommendations informed by competitors' nonpublic data, they are more likely to act independently and compete more vigorously on price and better leasing terms to secure new leases and renewals from renters. RealPage, however, provides landlords who use its revenue management software with pricing recommendations and pricing based on competitors' competitively sensitive data. Widespread adoption of RealPage's revenue management software leads to pricing decisions by landlords such as Cortland that are based on recommendations coming from a common pricing model and powered by competitively sensitive, nonpublic data, harming the ability of renters to obtain a competitive price for their housing. The use of competitors' competitively sensitive data in this manner thus harms renters as well as the competitive process itself.

Cortland, headquartered in Atlanta, Georgia, is one of the largest apartment managers in the United States. As of 2024, Cortland managed more than 80,000 units and more than 220 properties in the United States. As an apartment manager, Cortland makes strategic and competitive decisions for the apartments it manages, including determination of new lease and renewal terms, such as rental price. Before January 1, 2025, Cortland licensed YieldStar from RealPage. Per the licensing agreement, Cortland

7

relied on YieldStar to recommend rental prices for its units, which was informed by competitively sensitive data provided by Cortland's competitors. Cortland also provided its competitively sensitive data to RealPage, to be used to inform the rental prices that RealPage's software recommended to Cortland's competitors. Further, Cortland agreed with RealPage to use YieldStar pricing software as RealPage designed it. It reviewed YieldStar floor plan price recommendations daily and used the software to set scheduled floor plan rents or even unit-level prices.

In summary, the Complaint alleges that Cortland unlawfully shared its competitively sensitive information for use in pricing by competing landlords that also license RealPage's software, and that Cortland agreed to align its pricing with that of its competitors by using RealPage's software in the way that the software has been designed. Until January 1, 2025, Cortland used RealPage's revenue management software to inform its setting of rental prices and discounts—such as concessions of a free month of rent— and to make other competitive and strategic decisions relating to rental prices and terms.

## III.  EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The relief required by the proposed Final Judgment will remedy the loss of competition alleged in the Complaint by precluding Cortland from sharing competitively sensitive, nonpublic information, directly or indirectly, with competing property management companies and from forming agreements, directly or indirectly, to align prices with its competitors. The terms described below provide prompt, certain, and effective remedies to ensure that Cortland has terminated its alleged illegal conduct and

8

prevent Cortland from engaging in the same or similar conduct in the future.

## A. Cortland's Use of Proprietary Revenue Management Product(s)

Cortland has agreed to stop licensing and using YieldStar and will instead use its own proprietary revenue management software in all of its properties within 30 days of the entry of the Stipulation and Order. It has further agreed that it will transfer any future properties it will manage from third-party revenue management software to its proprietary revenue management software within 30 days from the date it begins managing such property.

The proposed Final Judgment requires Cortland to limit the type of data it uses in its proprietary software. Paragraph IV.A of the proposed Final Judgment precludes Cortland's proprietary revenue management software from using other landlords' competitively sensitive data to set rental prices. Paragraph IV.A also prevents Cortland from pooling different property owners' competitively sensitive data even if they are Cortland clients. This prohibition ensures that property owners who compete in the multifamily rental housing industry are not using their relationship with Cortland to gain access to each other's data.

Paragraph IV.B prohibits Cortland from training its revenue management software's models using certain competitively sensitive data from other landlords. A model is a set of rules or instructions that software relies on to calculate a defined output which, in this case, is a recommended rental price for a floorplan or unit. Models are trained using data to define and refine the rules or instructions by which it operates. Paragraph IV.B restricts Cortland from pooling or combining data on rental pricing,

9

concessions, discounts, occupancy rates or capacity, or other rental pricing terms from Cortland properties for different property owners. The restriction on pooling competitors' data thus also prohibits Cortland from training its software models using pricing and occupancy data from competing property owners, therefore reducing concerns about competitors benefiting from each other's competitively sensitive data to plan their pricing.

Paragraph IV.C prohibits Cortland's proprietary revenue management software from disclosing any of Cortland's property data to any other property management company or property owner.

## B. Restrictions Concerning Use of Third-Party Revenue Management Software

The decree prohibits Cortland from using third-party revenue management software without an independent, court-appointed monitor and without satisfying additional conditions. By shifting to proprietary software, which it does not license or otherwise provide to other property management companies, Cortland will no longer use revenue management software to align prices with its competitors. Additionally, Cortland will no longer participate in RealPage-sponsored meetings, in which sensitive data has been or may be shared. If Cortland decides to use third-party revenue management software, Paragraph V.A requires Cortland to select a software product that does not (1) use competitively sensitive data from other landlords to set rental prices or generate rental pricing recommendations, (2) use data from different Cortland owners to set rental prices or generate rental pricing recommendations, (3) disclose data from a Cortland property to a rival property management company or property owner, (4) pool or

10

combine data from different owners, or (5) contain or use a pricing algorithm that has been trained using non-Cortland data. Paragraph V.A also prohibits Cortland from selecting and using a third-party revenue management software product that has rental floors or limits rental pricing recommendation decreases based on competing properties' rental prices.

In the event that Cortland chooses in the future to use third-party revenue management software, then pursuant to Paragraph IX.A the Court will appoint an independent monitor. Paragraph IX.B provides that the monitor will be responsible for ensuring that Cortland complies with the requirements for licensing third-party revenue management software, as stated in Paragraph V.A. Further, the monitor will have the authority to take such steps that may be necessary to ensure compliance with these requirements. These steps may include interviewing Cortland employees and collecting Cortland documents.

The proposed Final Judgment includes an additional restriction on Cortland's ability to make agreements with non-clients regarding revenue management software. Specifically, Paragraph V.B prohibits Cortland from agreeing with a non-client property owner or a competing property management company to use a particular revenue management software. This provision reduces the risk of competitors agreeing with each other to use the same revenue management software across their clients.

If Cortland chooses to use third-party revenue management software in the future, Paragraph V.C requires Cortland to notify the United States 30 days prior to switching to that product. Cortland must also submit to the United States a certification from the third-

11

party revenue management software vendor that the product complies with the requirements in Paragraph V.A of the proposed Final Judgment.

## C. Other Prohibited Conduct

In addition to restrictions and conditions on Cortland's use of revenue management software, the proposed Final Judgment also limits Cortland's ability to communicate with competitors regarding certain competitively sensitive information for the purpose of setting prices. Paragraph VI.A prohibits Cortland from disclosing, soliciting, or using any competitively sensitive data from competitors as part of setting rental prices or generating rental price recommendations except for the property owner of a particular Cortland property. Paragraph VI.A clarifies that the restrictions include any data obtained through any form of communication, including call arounds or market surveys, meetings, calls, text messages, emails, or shared documents.

Paragraph VI.B prevents Cortland from using any competitively sensitive data belonging to other landlords, whether Cortland derived that non-Cortland data from revenue management software or obtained it from direct communications with other landlords. Cortland must also identify to the United States the existence and location of any such data. This does not apply to any data for Cortland properties maintained in OneSite.

## D. Cooperation

Under the terms of the proposed Final Judgment, Cortland must cooperate with the United States relating to Cortland's prior use of RealPage's revenue management products and the United States' monopolization and attempted monopolization claims

against RealPage, as described above. The cooperation includes voluntary interviews with 10 employees for up to 40 hours, making witnesses available to the United States before trial, proffers of knowledge, and the production of documents and other information.

### E. Compliance Terms

Pursuant to Paragraph X.A, Cortland must provide the United States with access to Cortland's books, records, data, and documents, including communications with other property managers, to enable the United States to assess Cortland's compliance with the terms of the Final Judgment. Cortland must also permit the United States to interview Cortland's officers, employees, or agents relating to any matters contained in this Final Judgment. Cortland must also provide the United States with documents describing how Cortland's proprietary revenue management software is trained and how it determines prices for properties it manages, as well as changes to these processes. Cortland must also allow the United States to inspect Cortland's software code and pseudocode of that software for independent verification.

Additionally, Paragraph VII.A requires Cortland's chief antitrust officer to audit Cortland's operations. The annual audits must, at a minimum, include employees in Cortland's revenue management group and a randomly selected group of employees who manage property operations. Paragraph VI.B requires Cortland to submit an annual certification from its General Counsel that Cortland has established and maintained the annual antitrust compliance policy and training, that Cortland's revenue management software continues to satisfy the requirements in the proposed Final Judgment, and that

13

Cortland has complied with the requirements in Paragraph VI.A to not disclose, solicit, or share competitively sensitive data.

### F. Compliance Monitor

Paragraph IX.A requires that if Cortland decides to use third-party revenue management software rather than its own propriety revenue management software (as described above), or if a Court finds that Cortland has violated the terms of the proposed Final Judgment, Cortland agrees to the appointment of an independent third-party antitrust compliance monitor selected by the United States in its sole discretion and approved by the Court.

The monitor will assess Cortland's compliance with the Final Judgment, in particular, its use of revenue management software and communications with other property management companies. Paragraph IX.B provides the monitor the authority to select up to 15 Cortland employees to investigate their and Cortland's compliance with the Final Judgment, such as by interviewing these employees and reviewing their files.

The compliance monitor will serve at Cortland's expense, on such terms and conditions as the United States approves, in its sole discretion, and Cortland must assist the compliance monitor in fulfilling his or her obligations. Among other responsibilities, the compliance monitor will provide an annual report to the United States setting forth Cortland's efforts to comply with its obligations under the Final Judgment. The compliance monitor will not have any responsibility or obligation for the operation of Cortland's businesses. The compliance monitor will serve for the remainder of the term of the consent decree.

14

### G. Other Provisions

The proposed Final Judgment also contains provisions designed to promote compliance with and make enforcement of the Final Judgment as effective as possible. Paragraph XIII.A provides that the United States retains and reserves all rights to enforce the Final Judgment, including the right to seek an order of contempt from the Court. Under the terms of this paragraph, Cortland has agreed that in any civil contempt action, any motion to show cause, or any similar action brought by the United States regarding an alleged violation of the Final Judgment, the United States may establish the violation and the appropriateness of any remedy by a preponderance of the evidence and that Cortland has waived any argument that a different standard of proof should apply. This provision aligns the standard for compliance with the Final Judgment with the standard of proof that applies to the underlying offense addressed by the Final Judgment.

Paragraph XIII.B provides additional clarification regarding the interpretation of the provisions of the proposed Final Judgment. Pursuant to Paragraph XIII.B of the proposed Final Judgment, Cortland agrees that it will abide by the proposed Final Judgment and that it may be held in contempt of the Court for failing to comply with any provision of the proposed Final Judgment that is stated specifically and in reasonable detail, as interpreted in light of its procompetitive purpose.

Paragraph XIII.C provides that if the Court finds in an enforcement proceeding that Cortland has violated the Final Judgment, the United States may apply to the Court for an extension of the Final Judgment, together with such other relief as may be appropriate. In addition, to compensate American taxpayers for any costs associated with

15

investigating and enforcing violations of the Final Judgment, Paragraph XIII.C provides that in any successful effort by the United States to enforce the Final Judgment against Cortland, whether litigated or resolved before litigation, Cortland must reimburse the United States for attorneys' fees, experts' fees, and other costs incurred in connection with that effort to enforce this Final Judgment, including the investigation of the potential violation.

Paragraph XVI.D of the proposed Final Judgment states that the United States may file an action against a Cortland for violating the Final Judgment for up to four years after the Final Judgment has expired or been terminated. This provision is meant to address circumstances such as when evidence that a violation of the Final Judgment occurred during the term of the Final Judgment is not discovered until after the Final Judgment has expired or been terminated, or when there is not sufficient time for the United States to complete an investigation of an alleged violation until after the Final Judgment has expired or been terminated. This provision therefore makes clear that, for four years after the Final Judgment has expired or been terminated, the United States may still challenge a violation that occurred during the term of the Final Judgment.

Finally, Section XIV of the proposed Final Judgment provides that the Final Judgment will expire four years from the date of its entry, except that after two years from that date, the Final Judgment may be terminated upon notice by the United States to the Court and to Cortland that continuation of the Final Judgment is no longer necessary or in the public interest.

16

## IV.    REMEDIES AVAILABLE TO POTENTIAL PRIVATE PLAINTIFFS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment neither impairs nor assists the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against Cortland.

## V.    PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and Cortland have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least 60 days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within 60 days of the date of publication of this Competitive Impact Statement in the Federal Register, or within 60 days of the first date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the U.S. Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any

17

time before the Court's entry of the Final Judgment. The comments and the responses of the United States will be filed with the Court. In addition, the comments and the United States' responses will be published in the *Federal Register* unless the Court agrees that the United States instead may publish them on the U.S. Department of Justice, Antitrust Division's internet website.

Written comments should be submitted in English to:

> Aaron Hoag
> Chief, Technology and Digital Platforms Section
> Antitrust Division
> United States Department of Justice
> 450 Fifth St. NW, Suite 7100
> Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI. ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

As an alternative to the proposed Final Judgment, the United States considered a full trial on the merits against Cortland. The United States could have continued its litigation against Cortland and brought the case to trial, seeking relief including an injunction against Cortland's sharing of its competitively sensitive, nonpublic data with RealPage and other landlords, an injunction against Cortland using AIRM, YieldStar, or similar products that use competing properties' nonpublic data to recommend prices, and an injunction preventing any communication with competitors that leads to alignment of prices. The United States is satisfied, however, that the relief required by the proposed

18

Final Judgment will remedy the anticompetitive effects alleged in the Complaint with respect to Cortland, preserving competition for multifamily rental housing. Thus, the proposed Final Judgment achieves all or substantially all of the relief the United States would have obtained through litigation but avoids the time, expense, and uncertainty of a full trial on the merits.

## VII.  STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

Under the Clayton Act and APPA, proposed Final Judgments, or "consent decrees," in antitrust cases brought by the United States are subject to a 60-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the Court, in accordance with the statute as amended in 2004, is required to consider:

   (A)    the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

   (B)    the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the Court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft*

*Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *United States v. U.S. Airways Grp., Inc.*, 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (explaining that the "court's inquiry is limited" in Tunney Act settlements); *United States v. InBev N.V./S.A.*, No. 08-1965 (JR), 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that a court's review of a proposed Final Judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanisms to enforce the final judgment are clear and manageable"); *United States v. Charleston Area Med. Ctr., Inc.,* No. CV 2:16-3664, 2016 WL 6156172, at *2 (S.D.W. Va. Oct. 21, 2016) (explaining that in evaluating whether the proposed final judgment is in the public interest, the inquiry is "a narrow one."); *United States v. Mountain Health Care*, 1:02-CV-288-T, 2003 WL 22359598, at *7 (W.D.N.C. 2003) ("[W]ith respect to the adequacy of the relief secured by the decree, a court may not 'engage in an unrestricted evaluation of what relief would best serve the public.'") *citing United Sates v. BSN*, 858 F.2d 456, 462-63 (9th Cir. 1988)).

As the U.S. Court of Appeals for the D.C. Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations in the government's Complaint, whether the proposed Final Judgment is sufficiently clear, whether its enforcement mechanisms are sufficient, and whether it may positively harm third parties. *See Microsoft*, 56 F.3d at 1458–62; *United States v. Math Works*, No. 02-888-A, 2003 WL 1922140, *17 (E.D. Va. 2003). With respect to the adequacy of the relief secured by the proposed Final Judgment, a court may not "make de novo determination of facts and issues." *United States v. W. Elec. Co.*, 993 F.2d 1572,

20

1577 (D.C. Cir. 1993) (quotation marks omitted); *see also Microsoft*, 56 F.3d at 1460–62;

*United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *United States v.*

*Enova Corp.*, 107 F. Supp. 2d 10, 16 (D.D.C. 2000); *InBev*, 2009 U.S. Dist. LEXIS

84787, at *3. Instead, "[t]he balancing of competing social and political interests affected

by a proposed antitrust decree must be left, in the first instance, to the discretion of the

Attorney General." *W. Elec. Co.*, 993 F.2d at 1577 (quotation marks omitted). "The court

should also bear in mind the *flexibility* of the public interest inquiry: the court's function

is not to determine whether the resulting array of rights and liabilities is the one that will

*best* serve society, but only to confirm that the resulting settlement is within the *reaches*

of the public interest." *Microsoft*, 56 F.3d at 1460 (quotation marks omitted); *see also*

*United States v. Deutsche Telekom AG*, No. 19-2232 (TJK), 2020 WL 1873555, at *7

(D.D.C. Apr. 14, 2020); *Math Works*, 2003 WL 1922140 at *18; *Mountain Health Care*,

2003 WL 22359598, at *7. More demanding requirements would "have enormous

practical consequences for the government's ability to negotiate future settlements,"

contrary to congressional intent. *Microsoft*, 56 F.3d at 1456. "The Tunney Act was not

intended to create a disincentive to the use of the consent decree." *Id.*

     The United States' predictions about the efficacy of the remedy are to be afforded

deference by the Court. *See, e.g.*, *Microsoft*, 56 F.3d at 1461 (recognizing courts should

give "due respect to the Justice Department's . . . view of the nature of its case"); *United*

*States v. Iron Mountain, Inc.*, 217 F. Supp. 3d 146, 152–53 (D.D.C. 2016) ("In evaluating

objections to settlement agreements under the Tunney Act, a court must be mindful that

[t]he government need not prove that the settlements will perfectly remedy the alleged

antitrust harms[;] it need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." (internal citations omitted)); *United States v. Republic Servs., Inc.*, 723 F. Supp. 157, 160 (D.D.C. 2010) (noting "the deferential review to which the government's proposed remedy is accorded"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) ("A district court must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case."). The ultimate question is whether "the remedies [obtained by the Final Judgment are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'" *Microsoft*, 56 F.3d at 1461 (*quoting W. Elec. Co.*, 900 F.2d at 309).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; *see also U.S. Airways*, 38 F. Supp. 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("[T]he 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged"); *Math Works*, 2003 WL 1922140 at *18; *Mountain Health Care* 2003 WL 22359598, at *8. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first

22

place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459–60.

In its 2004 amendments to the APPA, Congress made clear its intent to preserve the practical benefits of using judgments proposed by the United States in antitrust enforcement, Pub. L. 108-237 § 221, and added the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); *see also U.S. Airways*, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). This language explicitly wrote into the statute what Congress intended when it first enacted the Tunney Act in 1974. As Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). "A court can make its public interest determination based on the competitive impact statement and response to public comments alone." *U.S. Airways*, 38 F. Supp. 3d at 76 (citing *Enova Corp.*, 107 F. Supp. 2d at 17).

## VIII.  DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final

Judgment.


Dated: January 23, 2025

Respectfully submitted,

FOR PLAINTIFF
UNITED STATES OF AMERICA:


      /s/ Henry C. Su
Henry C. Su
David A. Geiger
Danielle Hauck
John J. Hogan
Kris A. Pérez Hicks

Attorneys
United States Department of Justice
Antitrust Division
Technology and Digital Platforms
Section
450 Fifth St. NW, Suite 7100
Washington DC 20530
Telephone: (202) 307-6200
Email: henry.su@usdoj.gov

24

## CERTIFICATE OF SERVICE

I hereby certify that on January 23, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

I further certify that on January 23, 2025, I served a file-stamped copy of the foregoing by email to the following counsel:

James W. Attridge, Esq.
Axinn, Veltrop & Harkrider LLP
1901 L Street, NW
Washington, DC 20036
jattridge@axinn.com

Todd R. Seelman, Esq.
Lewis Brisbois Bisgaard & Smith LLP
1700 Lincoln Street
Suite 4000
Denver, CO 80203
Todd.Seelman@lewisbrisbois.com

*Counsel for Cortland Management, LLC*

By:  s/ Henry C. Su
Henry C. Su