# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### Civil Action No.: 1:24-cv-00710-LCB-JLW

| | |
|---|---|
| UNITED STATES OF AMERICA; STATE OF NORTH CAROLINA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MINNESOTA; STATE OF OREGON; STATE OF TENNESSEE; and STATE OF WASHINGTON, | |
| **Plaintiffs,** | |
| v. | **ORAL ARGUMENT REQUESTED** |
| REALPAGE, INC.; CAMDEN PROPERTY TRUST; CORTLAND MANAGEMENT, LLC; CUSHMAN & WAKEFIELD, INC.; GREYSTAR REAL ESTATE PARTNERS, LLC; LIVCOR, LLC; PINNACLE PROPERTY MANAGEMENT SERVICES, LLC; WILLOW BRIDGE PROPERTY COMPANY, LLC, | |
| **Defendants.** | |

## BRIEF IN SUPPORT OF DEFENDANT REALPAGE, INC.'S MOTION TO DISMISS UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

# TABLE OF CONTENTS

Page

STATEMENT OF THE CASE ................................................................... 1

BACKGROUND ...................................................................................... 5

    1.    AIRM and YieldStar recommended competitive prices in part by using highly aggregated and anonymized nonpublic data in a limited way. ........................................................................................ 6

    2.    Prior Lawsuits Against RealPage ................................................ 7

    3.    Plaintiffs sue RealPage under new theories and amend their complaint. ................................................................................... 9

QUESTION PRESENTED ...................................................................... 9

ARGUMENT........................................................................................... 10

    1.    Plaintiffs have failed to state a claim under Sherman Act § 1. ................... 10

        A.    Plaintiffs do not allege direct evidence of anticompetitive effects. ........................................................................... 11

        B.    Plaintiffs likewise fail to allege anticompetitive effects indirectly................................................................................. 12

            i.    Plaintiffs fail to allege market power. .................................. 12

            ii.    Plaintiffs have not plausibly alleged evidence of harm to competition...................................................................... 16

    2.    Plaintiffs have failed to state a claim under Sherman Act § 2. ................... 17

        A.    Plaintiffs have failed to allege exclusionary conduct....................... 17

            i.    Data collection is not exclusionary conduct. ......................... 18

            ii.    RealPage's business model is not exclusionary.................... 19

        B.    RealPage neither has nor is dangerously close to having monopoly power................................................................................. 23

            i.    The claimed commercial revenue management software market is implausibly narrow.................................. 24

            ii.    Plaintiffs fail to allege that RealPage has a sufficient share of a relevant market with significant entry barriers................................................................... 27

    3.    Plaintiffs' state law claims fail. ............................................. 28

CONCLUSION ......................................................................................... 29

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abcor Corp. v. AM Int'l, Inc.*,
916 F.2d 924 (4th Cir. 1990) ............................................................. 28

*Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*,
910 F.2d 139 (4th Cir. 1990) ............................................................. 17

*Alarm Detection Sys., Inc. v. Orlando Fire Protect. Dist.*,
129 F. Supp. 3d 614 (N.D. Ill. 2015) ................................................. 12

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
2023 WL 6006525 (S.D.N.Y. July 31, 2023) ..................................... 13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................... 24

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985) ........................................................................... 18

*Bennett v. VISA U.S.A., Inc.*,
198 S.W.3d 747 (Tenn. Ct. App. 2006) ............................................. 29

*Bennett v. Wal-Mart Stores, Inc.*,
2011 WL 3878330 (E.D.N.Y. Sept. 2, 2011) ..................................... 29

*Bepco, Inc. v. Allied-Signal, Inc.*,
106 F. Supp. 2d 814 (M.D.N.C. 2000) ......................................... 23, 27

*Bridgeport Harbour Place I, LLC v. Ganim*,
32 A.3d 296 (Conn. 2011) ................................................................. 29

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ........................................................................... 11

*Brown v. Hartford Healthcare Corp.*,
2023 WL 7150051 (Conn. Super. Ct. Oct. 26, 2023) ......................... 29

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ........................................................................... 25

*Consul, Ltd. v. Transco Energy Co.*,
805 F.2d 490 (4th Cir. 1986) ............................................................. 24

*Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002) .....................................................*passim*

*Dreamstime.com v. Google LLC*,
54 F.4th 1130 (9th Cir. 2022) ........................................................... 19

Case 1:24-cv-00710-LCB-JLW    Document 74    Filed 02/04/25    Page 3 of 38

# TABLE OF AUTHORITIES

*Drug Emporium, Inc. v. Blue Cross of W. N.Y., Inc.*,
104 F. Supp. 2d 184 (W.D.N.Y. 2000) ........................................................... 13

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
111 F.4th 337 (4th Cir. 2024) ............................................................... 18, 22

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
637 F.3d 435 (4th Cir. 2011) ............................................................... 24, 26

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ........................................................ 12, 20, 25

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) ..................................................................... 21

*Hannah's Boutique, Inc. v. Surdei*,
112 F. Supp. 3d 758 (N.D. Ill. 2015) .......................................................... 29

*Hicks v. PGA Tour, Inc.*,
897 F.3d 1109 (9th Cir. 2018) .................................................................... 29

*It's My Party, Inc. v. Live Nation, Inc.*,
811 F.3d 676 (4th Cir. 2016) .................................................................. 5, 26

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
626 F.3d 1327 (11th Cir. 2010) ................................................................. 16

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984) .............................................................................. 12, 14

*Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*,
748 F.3d 160 (4th Cir. 2014) ............................................................... 17, 27

*Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*,
924 F.2d 539 (4th Cir. 1991) ..................................................................... 18

*M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*,
981 F.2d 160 (4th Cir. 1992) ..................................................................... 27

*Metro Mobile CTS, Inc. v. NewVector Commc'ns, Inc.*,
892 F.2d 62 (9th Cir. 1989) ....................................................................... 27

*Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*,
5 F. Supp. 2d 694 (D. Minn. 1998) ............................................................ 13

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*,
889 F.2d 524 (4th Cir. 1989) ..................................................................... 24

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) ................................................................. 18

# TABLE OF AUTHORITIES

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018) ................................................................................ *passim*

*Oksanen v. Page Mem'l Hosp.*,
   945 F.2d 696 (4th Cir. 1991) .......................................................... 11, 16

*PBTM LLC v. Football Nw., LLC*,
   511 F. Supp. 3d 1158 (W.D. Wash. 2021) ............................................ 29

*In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*,
   709 F. Supp. 3d 478 (M.D. Tenn. 2023) ....................................... 8, 11, 15, 16

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ............................................................ 23, 27

*R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*,
   199 F. Supp. 2d 362 (M.D.N.C. 2002) ............................................ 14, 29

*Shah v. VHS San Antonio Partners*,
   985 F.3d 450 (5th Cir. 2021) .................................................................. 24

*Smalley & Co. v. Emerson & Cuming, Inc.*,
   808 F. Supp. 1503 (D. Colo. 1992) ........................................................ 29

*Spectrum Sports, Inc. v. McQuillan*,
   506 U.S. 447 (1993) ................................................................................ 21

*State of New York by Abrams v. Anheuser-Busch, Inc.*,
   811 F. Supp. 848 (E.D.N.Y. 1993) ........................................................ 13

*Sunbeam Television Corp. v. Nielsen Media Rsch., Inc.*,
   763 F. Supp. 2d 1341 (S.D. Fla. 2011) ................................................. 22

*Suzuki of W. Mass., Inc. v. Outdoor Sports Expo, Inc.*,
   126 F. Supp. 2d 40 (D. Mass. 2001) ...................................................... 29

*Tops Markets, Inc. v. Quality Markets, Inc.*,
   142 F.3d 90 (2d Cir. 1998) ..................................................................... 16

*United States v. Brewbaker*,
   87 F.4th 563 (4th Cir. 2023) ............................................................. 2, 10

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966) .......................................................................... 19, 22

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ............................................................ 18, 23

*United States v. Sungard Data Sys., Inc.*,
   172 F. Supp. 2d 172 (D.D.C. 2001) ....................................................... 25

*United States v. U.S. Gypsum Co.*,
438 U.S. 422 (1978) ................................................................................ 10, 19

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) ....................................................................................... 18

*Victus, Ltd. v. Collezione Europe U.S.A., Inc.*,
26 F. Supp. 2d 772 (M.D.N.C. 1998) ......................................................... 26

*Volm v. Legacy Health Sys., Inc.*,
237 F. Supp. 3d 1166 (D. Or. 2022) ............................................................ 29

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
382 U.S. 172 (1965) ...................................................................................... 21

**Statutes**

15 U.S.C. § 2 .................................................................................................... 17

**Other Authorities**

OECD, Algorithms & Collusions - Note by the United States
(2017), https://one.oecd.org/document/DAF/COMP/WD
(2017)41/en/pdf .............................................................................................. 6

*RealPage Receives Antitrust Clearance for the Acquisition of Lease Rent
Options, LRO* (Nov. 28, 2017), https://www.realpage.com/news/
realpage-receives-antitrust-clearance-lro/ ..................................................... 2

Case 1:24-cv-00710-LCB-JLW    Document 74    Filed 02/04/25    Page 6 of 38

## STATEMENT OF THE CASE

This case is the latest in a series of baseless antitrust lawsuits concerning certain revenue management software ("RMS") sold by RealPage. In earlier filed class actions now centralized in the Middle District of Tennessee, the court rejected the theory that the use of RealPage's RMS amounts to a price-fixing conspiracy that is *per se* unlawful under the antitrust laws. Further, over the past few years, RealPage has produced data and other discovery to the Plaintiffs here—in their pre-filing investigations—that disproves multiple false allegations made in prior lawsuits. Accordingly, Plaintiffs have been forced to try to plead around these events, leaving them with claims that fall short of alleging any antitrust violation—even after amending their allegations in response to RealPage's motion to dismiss their original complaint. The Court should dismiss Plaintiffs' Amended Complaint with prejudice.

RealPage sells three different RMS products: YieldStar, AI Revenue Management ("AIRM"), and Lease Rent Options ("LRO"). Am. Compl. ¶ 14.[1] AIRM is the successor to YieldStar, with both products using the same codebase and operating similarly. *Id.* The Amended Complaint challenges only AIRM and YieldStar ("AIRM/YieldStar"). Plaintiffs concede that LRO does not necessarily raise antitrust concerns. ¶ 269. RealPage RMS helps apartment lessors offer competitive rents by recommending prices for different apartment floorplans. Each user customizes the software to recommend prices that align with its individual strategy and is free to—and frequently does—reject the software's

---

[1] All citations to "¶" are to the Amended Complaint. Dkt. 47. Solely for this motion, and under Rule 12(b)(6), RealPage accepts Plaintiffs' well-pled factual allegations as true.

recommendations.  Although lessors have used RealPage's software for decades—and despite Plaintiff DOJ raising no concerns about RealPage RMS after extensively reviewing it before granting government approval of RealPage's acquisition of LRO in 2017[2]—class action lawyers began filing cases in 2022, alleging that RealPage and its customers conspired to use RealPage's software to fix prices in violation of Section 1 of the Sherman Act.  According to these class actions, lessors of multifamily residential housing allegedly agreed with each other and RealPage to fix rents by using RealPage's RMS products.  After RealPage moved to dismiss these cases, Plaintiff DOJ appeared and urged the court to evaluate the antitrust claims as a *per se* price-fixing conspiracy.[3]  The court, however, rejected the *per se* theory and dismissed *with prejudice* one of the two complaints before it, finding that RealPage customers' alleged use of RMS was not price-fixing or any other *per se* violation of antitrust law.

Having been forced to scrap this position, Plaintiffs now accept that the antitrust claims against RealPage are governed by the "rule of reason," which requires Plaintiffs to plausibly allege that RealPage's conduct had anticompetitive effects in a relevant antitrust market.  The Amended Complaint fails to clear this bar.

---

[2] *RealPage Receives Antitrust Clearance for the Acquisition of Lease Rent Options, LRO* (Nov. 28, 2017), https://www.realpage.com/news/realpage-receives-antitrust-clearance-lro/.

[3] "There are two dominant ways to determine whether a restraint is unreasonable:  the rule of reason and the *per se* rule."  *United States v. Brewbaker*, 87 F.4th 563, 573 (4th Cir. 2023).  The rule of reason "is the default" and requires inquiry into an alleged "restraint's actual competitive impact."  *Id.*  The *per se* rule is the exception—applying "only . . . to restraints that already have been held to be devoid a competitive effects"—and deems an alleged restraint unreasonable "without inquiry into . . . anticompetitive impact."  *Id.* at 573–74.

**Section 1 Claims.** Plaintiffs' Section 1 claims fail because their Amended Complaint lacks factual allegations that RealPage's conduct caused anticompetitive effects in any alleged relevant market. Plaintiffs try to meet this obligation by claiming that lessors using AIRM/YieldStar collectively have market power to raise rents above the competitive level. Among other requirements to do so, however, Plaintiffs must allege facts showing that more than 30% (per longstanding Supreme Court precedent), and generally over 40% (per recent case law), of the units in a particular housing market use AIRM/YieldStar (not LRO or any other company's RMS). Plaintiffs fail to meet this requirement. First, Plaintiffs concede that in many of their alleged markets, fewer than 30% of units use AIRM/YieldStar. Second, for the balance of their alleged markets, Plaintiffs inexplicably allege only that AIRM/YieldStar's share equals or exceeds 30%, which makes it impossible to tell which markets, if any, exceed not only 30%, but also the 40% threshold required under recent case law.

Plaintiffs try to salvage their deficient pleading by alleging alternative market shares that are not limited to units using AIRM/YieldStar, but instead also include the use of an entirely different RealPage product—OneSite. OneSite, however, is not RMS, does not recommend rents, and Plaintiffs do not challenge it as anticompetitive. Plaintiffs' deficient allegations are especially problematic because they had access to troves of granular data about the use of AIRM/YieldStar in each of their alleged relevant markets through RealPage's productions in their pre-filing investigations. If Plaintiffs could have alleged legally sufficient shares in each alleged market, they would have—especially after RealPage identified these same deficiencies in its motion to dismiss Plaintiffs' original

complaint. Plaintiffs also fail to allege any evidence of harm to competition in any of the hundreds of alleged markets. Plaintiffs' approach is legally deficient and—as the Amended Complaint demonstrates—cannot be cured. Dismissal with prejudice is warranted.

**Section 2 Claims.** Plaintiffs' Section 2 monopolization and attempted monopolization claims also fail; they are predicated on allegations that simply do not meet black-letter legal standards. To violate Section 2, a defendant must be a monopolist and have engaged in some kind of "exclusionary" conduct with respect to rivals. But Plaintiffs do not allege that RealPage has prevented any rival RMS supplier from competing in any manner whatsoever. Plaintiffs do not allege, for example, that RealPage has prevented its competitors from gathering data, soliciting customers, designing their software the way they want, or running their business however they wish. Plaintiffs nonetheless insist that RealPage excludes "honest" rivals because they cannot employ RealPage's supposedly "unlawful" business model, but this circular argument fails out of the gate: there are no allegations in the Amended Complaint plausibly alleging that competitors are prevented— much less *by RealPage*—from adopting the same model.

Plaintiffs have also failed to plausibly allege that RealPage is a monopolist. Plaintiffs contend that RealPage has an over 80% share of an alleged market for commercial RMS. But a market must include all reasonably interchangeable substitutes, and this ignores two obvious and significant ones: proprietary RMS solutions developed inhouse by lessors and traditional methods for pricing apartments, which the Amended Complaint acknowledges are used at the vast majority of apartment buildings. Plaintiffs cannot "gerrymander [their] way to an antitrust victory without due regard for market

realities." *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016).

RealPage pointed out these flaws in its motion to dismiss Plaintiffs' original complaint, yet Plaintiffs have not cured them despite their years-long pre-filing investigations. The Court should also dismiss these claims with prejudice.

**State Law Claims.** Plaintiffs also assert state law claims, which are based on the same conduct, and governed by the same standards, as Plaintiffs' Sherman Act claims. They should therefore also be dismissed with prejudice.

## BACKGROUND

RMS helps businesses efficiently balance supply and demand for their inventory. RMS has been used in a variety of industries, including the rental real estate industry, for decades.

RealPage's RMS products, AIRM/YieldStar and LRO, help lessors of multifamily residential housing forecast how many apartments for each floorplan (e.g., one-bedroom/one-bathroom apartments) are likely to be available at each "subject" property owned or managed by that lessor, and they provide individualized recommendations to that lessor as to whether to maintain, decrease, or increase rent to address a projected "imbalance between a property's actual and forecasted leasing." ¶ 47. RealPage's software merely recommends rents where supply better meets expected demand for a particular floorplan at a particular property. Plaintiff DOJ has recognized that "[a]lgorithmic pricing can, of course, be highly competitive by facilitating rapid competitive response," which

"[a]ntitrust law views . . . as generally procompetitive."[4]  RealPage's RMS not only facilitates such responses, but also helps its customers offer prospective renters competitive pricing that increases occupancy of rental units at the customer's property while also helping to eliminate "errors" and "inefficien[cies]" by building managers.  ¶ 176.

## 1. AIRM and YieldStar recommended competitive prices in part by using highly aggregated and anonymized nonpublic data in a limited way.

The starting point for AIRM/YieldStar's price recommendations is the historical "internal transaction data" for the lessor's subject property (*not* any data from other properties), which the software uses to project the number of available apartments in each floorplan for that property.  ¶¶ 46–47.  RealPage's RMS considers the customer's strategic objectives, software parameters the customer sets, and the relevant property's own internal supply and demand characteristics in developing an individualized recommendation whether to change the rent to offer for an available apartment.  *See id.*

Only if AIRM/YieldStar determined that a price change was recommended did it use highly aggregated, anonymized nonpublic rent data, blended with publicly available data, to determine the magnitude of the recommended change.  ¶ 49.  As Plaintiffs know from their pre-suit investigations, most of the rents used in this step were publicly available, and the nonpublic rents used were, on average, lower in price than the public rents and so were more likely to pull the rents down.  Further, Plaintiffs nowhere allege that users of

---

[4]  OECD, Algorithms & Collusions - Note by the United States 3 (2017) https://one.oecd.org/document/DAF/COMP/WD(2017)41/en/pdf.

AIRM/YieldStar could access or reverse engineer any of the nonpublic data that the software uses or that users received, or could infer prices recommended to others.

Plaintiffs allege that by having "'the best set of transactional data available'" and "'receiving more accurate and time sensitive data,'" AIRM/YieldStar can recommend prices that better match available supply with demand (the very definition of a competitive market). ¶¶ 167–69.[5] RealPage obtains the highly aggregated, anonymized nonpublic rent data that AIRM/YieldStar use in part from AIRM/YieldStar's users themselves. ¶ 18. RealPage also allegedly obtains the data from users of certain of its other software products: OneSite, Performance Analytics with Benchmarking ("PAB"), and Business Intelligence ("BI"). ¶ 21.

According to Plaintiffs, RealPage has only "4.8M units on revenue management," with "3 million units using AIRM and YieldStar." ¶ 24, 173. When LRO, OneSite, PAB, and BI, none of which Plaintiffs contend violates the antitrust laws, are included, RealPage allegedly has access to data from "over 16 million units across the country." ¶ 24. Thus, *fewer than 20%* of the 16 million rental units from which RealPage allegedly gathers the data—and an even smaller percentage of all rental units in the United States—use AIRM/YieldStar for rent recommendations.

## 2. Prior Lawsuits Against RealPage

In 2022, an advocacy group, ProPublica, published an article speculating that RealPage's RMS was responsible for the rising cost of rental housing. Just days later, class

---

[5] All quotations, citations, and footnotes are omitted, and emphases added, unless specified otherwise.

action lawyers began filing lawsuits in federal courts nationwide accusing RealPage and its customers of a rent-fixing conspiracy in *per se* violation of Section 1 simply because RealPage's customers licensed RealPage's RMS. These lawsuits were consolidated into a multidistrict litigation in Tennessee. *See In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, No. 23-md-3071(M.D. Tenn. Apr. 12, 2023), Dkt. 1 at 2. The central allegation in these cases is that RealPage and its RMS customers have "engaged in a nationwide conspiracy to fix and inflate the price of multifamily rental housing" by collectively "agree[ing] to adopt RealPage RMS pricing up to 80%-90% of the time." *Id.*, Dkt. 530 ¶¶ 1, 15.

After RealPage moved to dismiss, DOJ filed a Statement of Interest and appeared at oral argument, urging the MDL court to find that the defendants had engaged in "horizontal price fixing" that was "per se unlawful under Section 1." *Id.*, Dkt. 628 at 15, 22–23; *see also id.*, Dkt. 627.

The MDL court disagreed, finding that, even accepting the class action plaintiffs' extreme allegations as true, the alleged conspiracy was "not the straightforward form of horizontal price-fixing conspiracy for which courts apply the *per se* standard." *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 519–20 (M.D. Tenn. 2023). The MDL court instead held that the "rule of reason" standard, which requires proving "anticompetitive effects within relevant product and geographic markets," governed. *Id.* at 521. At the same time, the MDL court dismissed Section 1 claims asserted by a class of student housing renters for failing plausibly to allege anticompetitive effects in any relevant market. *See id.* at 529–31. Those plaintiffs had "no allegations specific to

any of the[ir] [alleged] regional submarkets," and they had "not allege[d] . . . supracompetitive pric[es]." *Id.* at 531, 533.

During the instant Plaintiffs' pre-suit investigations, RealPage produced data disproving many of the central allegations in the MDL complaint, including data showing that users of AIRM/YieldStar accept the software's recommendations far less than 80-90% of the time. Plaintiffs now acknowledge that the allegations in the MDL are false and admit that the average user actually ***rejects*** 50-60% of recommendations—even when a deviation within 1% of the recommendation is treated as an acceptance. ¶ 73.

### 3. Plaintiffs sue RealPage under new theories and amend their complaint.

Given the MDL court's rejection of the *per se* standard and uncontroverted data disproving the central allegations in the MDL, Plaintiffs here have pivoted to asserting claims under Sections 1 and 2 of the Sherman Act that are governed by the rule-of-reason standard, which require particular affirmative allegations of fact. Plaintiffs' original complaint failed to include such allegations so RealPage moved to dismiss. Dkt. 43. Plaintiffs then filed the Amended Complaint in an attempt to cure these deficiencies. The Amended Complaint also adds nine state law claims and joins two new plaintiffs and seven new defendants. The Amended Complaint nonetheless still fails to state a claim and should be dismissed.

## QUESTION PRESENTED

Whether Plaintiffs have stated a claim.

**ARGUMENT**

**1. Plaintiffs have failed to state a claim under Sherman Act § 1.**

"To establish a violation of § 1 of the Sherman Act, [the plaintiff] must prove the following elements: (1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002). Plaintiffs' first Section 1 claim alleges that certain of RealPage's customers have agreed with each other "through RealPage . . . to exchange nonpublic, competitively sensitive data." ¶ 263. The Supreme Court has long held that because "[t]he exchange of price data and other information among competitors does not invariably have anticompetitive effects," but can instead "in certain circumstances increase economic efficiency and render markets more, rather than less, competitive," "such exchanges of information do not constitute a *per se* violation of the Sherman Act." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978). Plaintiff DOJ itself thus recognizes that "[s]tandalone information-sharing claims are evaluated under the rule of reason." *See* Statement of Interest at 8, *In re Pork Antitrust Litig.*, No. 0:18-cv-01776 (D. Minn. Oct. 1, 2024), Dkt. 2616. Plaintiffs' second Section 1 claim challenges RealPage's alleged vertical agreements with each AIRM/YieldStar customer. *See* ¶ 271. Alleged "[v]ertical restraints . . . are subject to the rule of reason." *Brewbaker*, 87 F.4th at 571.

Under the rule of reason, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) ("*Amex*"). Plaintiffs must meet this burden "directly or indirectly. Direct evidence of anticompetitive effects

- 10 -

would be proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market. Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." *Id.* at 542. Here, because Plaintiffs have failed to allege anticompetitive effects in any specific relevant market, their Section 1 claims fail.

### A. Plaintiffs do not allege direct evidence of anticompetitive effects.

Plaintiffs fail to allege any direct evidence of anticompetitive effects in any alleged relevant market. They instead allege merely that AIRM/YieldStar "influence" prices by "ensur[ing] that the 'tide' flows primarily one way—higher rental prices," and that they "extract more money from renters," "reveal 'hidden yield,'" and "place landlords in a better negotiating position." ¶¶ 73, 121–122, 124–125. To start, these vague allegations are contradicted by others in the Amended Complaint—for example, Plaintiffs acknowledge that RealPage's software recommends rent *decreases* when needed to balance supply and demand at a subject property. *See* ¶ 49 (acknowledging the software "recommend[s] . . . price decrease[s]"). But even accepting these allegations as true, they do not show that the software has caused prices to be "above a competitive level" in any alleged relevant market, which is what it means for prices to be anticompetitive. *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 709 (4th Cir. 1991); *see also Amex*, 585 U.S. at 549 (prices must be "above a competitive level" to "infer competitive injury"); *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993) ("[A] price increase does not in itself permit a rational inference of . . . supracompetitive pricing."); *RealPage*, 709 F. Supp. 3d at 525 ("Plaintiffs . . . fail to show a supracompetitive increase in rent prices that indicates

price increases that cannot be explained by normal market forces").  In fact, Plaintiffs concede that AIRM/YieldStar recommend "the highest price that the market will bear," which is *competitive* pricing.  ¶ 126; *see Alarm Detection Sys., Inc. v. Orlando Fire Prot. Dist.*, 129 F. Supp. 3d 614, 635 (N.D. Ill. 2015) ("[C]ompetition . . . can only mean that the price . . . will settle at whatever price the market will bear.").

Plaintiffs also fail to compare the alleged prices charged by AIRM/YieldStar customers with lessors that do not use these products, which is necessary to allege direct evidence of anticompetitive conduct.  *See Amex*, 585 U.S. at 549 (finding no direct evidence of anticompetitive effects where the plaintiffs had failed to "show that [the defendant] charged more than its competitors").  Notably, despite having extensive data about LRO price recommendations and not challenging LRO as anticompetitive, Plaintiffs do not allege that AIRM/YieldStar users charge higher rents than LRO users.

**B. Plaintiffs likewise fail to allege anticompetitive effects indirectly.**

Plaintiffs' attempt to plead anticompetitive effects indirectly, which requires alleging "proof of market power plus some evidence that the challenged restraint harms competition," also falls short.  *Amex*, 585 U.S. at 542.

**i. Plaintiffs fail to allege market power.**

"Market power is generally inferred from the defendant's possession of a high market share and the existence of significant barriers to entry."  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983 (9th Cir. 2023).  The Supreme Court has long held that "as a matter of law . . . thirty percent share of the relevant market is insufficient to confer market power."  *Dickson*, 309 F.3d at 209 n.20 (citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,

- 12 -

466 U.S. 2, 26 & n.43 (1984)). In fact, courts generally deem shares between 30-40%

insufficient to confer market power.[6]

The Amended Complaint fails to allege AIRM/YieldStar's market share in each

alleged market.[7] Instead, Plaintiffs rely on a blanket allegation that AIRM/YieldStar's

market share, or "penetration rate," in the more than 130 alleged markets in Appendix A

of the Amended Complaint "*ranges* from at least around 26% to 69%." ¶ 209. In turn,

Appendix A identifies whether AIRM/YieldStar's alleged market share equals or exceeds

30% in each alleged market. Am. Compl., App. A. For many of the alleged markets,

Plaintiffs have left "YS/AIRM 30% or More" blank, meaning AIRM/YieldStar's alleged

penetration is less than 30%. *See id.* Alternatively, Plaintiffs allege that AIRM/YieldStar's

penetration drops to "around 26% to 37%" when considering a different set of 10 alleged

markets, two with alleged AIRM/YieldStar penetration under 30%. ¶ 214, Table 1.

Plaintiffs also offer two additional AIRM/YieldStar market share ranges, this time for

alleged submarkets divided by the number of bedrooms. *See* ¶ 211, App. B; ¶ 216, Table

2. The first range is "from at least around 30% to over 80%" for the more than 260 alleged

markets in Appendix B of the Amended Complaint, many with penetration under 30%. ¶

---

[6] *See, e.g.*, *In re Amazon.com, Inc. eBook Antitrust Litig.*, 2023 WL 6006525, at *26 n.22 (S.D.N.Y. July 31, 2023) ("[A] market share of between 30 and 40% does not lead to an inference of market power."); *Drug Emporium, Inc. v. Blue Cross of W. N.Y., Inc.*, 104 F. Supp. 2d 184, 189 (W.D.N.Y. 2000) (collecting cases and holding that "courts have rejected even higher market shares between 30 percent and 40 percent as inadequate to demonstrate market power"); *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 5 F. Supp. 2d 694, 710 (D. Minn. 1998) (34.6% share insufficient); *State of New York by Abrams v. Anheuser-Busch, Inc.*, 811 F. Supp. 848, 873 (E.D.N.Y. 1993) (39% share insufficient").
[7] While Plaintiffs' alleged markets are infirm, RealPage accepts them solely for purposes of this motion.

211, App. B.  The second is "from at least around 27% to nearly 42%" when using an alternative set of 20 alleged markets, two with alleged AIRM/YieldStar penetration under 30%.  ¶ 216, Table 2.

Plaintiffs' blanket allegations fail to allege market power.  First, there is no market power as a matter of law in the numerous alleged markets where Plaintiffs concede that AIRM/YieldStar has less than 30% penetration.  *See Dickson*, 309 F.3d at 209 n.20 (citing *Jefferson Parish*, 466 U.S. at 26 & n.43).  Second, in every other alleged market, Plaintiffs allege only whether AIRM/YieldStar's penetration equals or exceeds 30%, which makes it impossible to discern whether AIRM/YieldStar's share is a mere 30%, which "is insufficient to confer market power," *id.*, between 30% and 40%, which courts generally deem insufficient to confer market power, *see supra* at 13, or above 40%, which may, in select circumstances[8], plausibly allege market power.  Inexplicably, Plaintiffs do not allege a specific market share for, or present information on the specific competitive landscape— such as the presence or absence of significant entry barriers—in *any* of their hundreds of alleged markets, even though RealPage's initial motion to dismiss identified this obvious deficiency.  *See* Dkt. 44 at 12–16.

Plaintiffs' inadequate, blanket market share allegations cannot be excused on the ground that they lacked the data necessary to calculate AIRM/YieldStar's penetration in each alleged market.  During their extensive pre-suit investigations, RealPage provided

---

[8] A share exceeding 40% does not necessarily show market power.  *See, e.g.*, *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 383 (M.D.N.C. 2002) (51.3% share insufficient).

Plaintiffs with detailed data on the usage of AIRM/YieldStar in each geography they allege.

Rather than alleging shares by market, however, Plaintiffs elected to obfuscate.[9]  The MDL

court has already rejected a similar pleading approach.  There, a putative class of student

housing plaintiffs attempted to allege Section 1 violations in 27 regional markets, but did

not include market share allegations "specific to any of the regional submarkets"; the Court

thus concluded it could not infer market power in those markets.  *RealPage*, 709 F. Supp.

3d at 529–31.  After finding that—like here—the complaint did not include any plausible

allegations of direct anticompetitive effects, the MDL court concluded that the student

housing plaintiffs had failed to allege any anticompetitive effects and dismissed their

claims.  *Id.* at 531–34.

The Court should also reject Plaintiffs' alternative market share allegations, *see* ¶

209, App. A; ¶ 214, Table 1; ¶ 197, App. B; ¶ 216, Table 2, which purport to allege

penetrations for not just the two products at issue—AIRM/YieldStar—but also OneSite, a

different software product that Plaintiffs acknowledge is not RMS and does not recommend

rents, and that they do not challenge as anticompetitive.  *See* ¶ 22.  "The relevant focus of

the § 1 inquiry . . . is the anticompetitive effects of the conspiracy qua conspiracy; therefore,

the plaintiff must demonstrate that *the conspiratorial agreement itself* affected competition

in ways that would not have obtained absent the agreement."  *Dickson*, 309 F.3d at 210.

The agreements Plaintiffs challenge are between "[e]ach landlord using AIRM and

---

[9] Plaintiffs' penetration ranges also improperly aggregate the shares of AIRM/YieldStar customers.  *See, e.g.*, *Dickson*, 309 F.3d at 210.  Reserving this issue, RealPage treats AIRM/YieldStar users' shares as aggregated for this motion.

YieldStar, including each Defendant Landlord," and "RealPage." ¶¶ 260, 277. The relevant penetration for Plaintiffs' Section 1 claims accordingly cannot include OneSite. Plaintiffs' inclusion of OneSite adoption is particularly problematic because they admit that "many" of OneSite's users "do not use [RealPage's] revenue management products," and that the inclusion of OneSite therefore "meaningfully multipl[ies]" the penetration rates. ¶ 24.[10] Plaintiffs' alternative market share allegations—which still do not include any specific market share for any individual market—therefore also fail.

### ii. Plaintiffs have not plausibly alleged evidence of harm to competition.

Simply alleging that penetration may exceed 30% is not legally sufficient. *See, e.g., Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1339–40 (11th Cir. 2010) (market-share allegations alone insufficient); *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 96–97 (2d Cir. 1998) (same). Plaintiffs must also allege "some evidence that the challenged restraint harms competition," *Amex*, 585 U.S. at 542, which requires "that harm is not only possible but likely and significant." *Dickson*, 309 F.3d at 206. But Plaintiffs allege merely that AIRM/YieldStar "influence" prices, ¶ 71, which at most suggests that *higher* prices might be "possible," not that *supracompetitive* prices are "likely and significant." *Dickson*, 309 F.3d at 206; *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 183 (2d Cir. 2016) (deeming "the potential for genuine adverse effects on competition" insufficient); *Oksanen*, 945 F.2d at 709 (rejecting claim where "far from clear" that "any anticompetitive effects exist"). Thus, even for the unidentified markets in

---

[10] The same is true for BI and PAB, *see* ¶ 209 n.11, many users of which do not use RealPage's RMS. ¶ 24.

which AIRM/YieldStar's share allegedly exceeds 40%, Plaintiffs' allegations are legally insufficient.

### 2. Plaintiffs have failed to state a claim under Sherman Act § 2.

Sherman Act Section 2 makes it unlawful to "monopolize, or attempt to monopolize, . . . any part of the trade or commerce." 15 U.S.C. § 2. "The elements of [actual and attempted monopolization] claims are very similar." *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 147 (4th Cir. 1990). To allege monopolization, "a plaintiff must show possession of monopoly power in a relevant market, [and] willful acquisition or maintenance of that power in an exclusionary manner." *Id.* "To prove attempted monopolization, the plaintiff must prove a specific intent to monopolize a relevant market, predatory or anticompetitive acts, and a dangerous probability of successful monopolization." *Id.* Both claims require allegations of exclusionary conduct, and the "same basic definition of exclusionary conduct should apply to both monopolization and attempt claims." *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 178 (4th Cir. 2014) ("*Kolon*"). RealPage's prior motion to dismiss demonstrated that the Court should dismiss Plaintiffs' Section 2 claims because they had failed to plead exclusionary conduct and actual or dangerously probable monopoly power. *See* Dkt. 44 at 16–27. Despite amending their allegations in response, Plaintiffs still fail to allege either of these basic requirements. The Court should accordingly dismiss Plaintiffs' Section 2 claims with prejudice.

### A. Plaintiffs have failed to allege exclusionary conduct.

Plaintiffs have not alleged that RealPage has engaged in "exclusionary" conduct.

*Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*, 924 F.2d 539, 544 (4th Cir. 1991); *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001). As the word signifies, "exclusionary" conduct must *exclude* competitors—it is "conduct intended to 'exclude rivals on some basis other than efficiency.'" *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 353 (4th Cir. 2024) (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985)). Further, mere exclusion or foreclosure of competitors is not enough unless there is an *anticompetitive* effect in the relevant market. *Dickson*, 309 F.3d at 211 ("The offense of monopolization requires a showing of 'anticompetitive effect.'" (citing *Microsoft*, 253 F.3d at 58)). As the Supreme Court has emphasized, conduct cannot be deemed exclusionary under Section 2 just because "some other approach might yield greater competition." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 415–16 (2004) ("*Trinko*") (Section 2 "does not give judges *carte blanche* to insist that a monopolist alter its way of doing business").

### i. Data collection is not exclusionary conduct.

"[S]ection 2 misconduct usually involves some assay by the monopolist into the marketplace" so as "to limit the abilities of third parties to deal with rivals." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013). But Plaintiffs do not so allege here. The Amended Complaint asserts none of the judicially recognized "common forms of alleged misconduct" under Section 2. *Id.* Rather, Plaintiffs advance the novel theory that RealPage's misconduct is that its rivals cannot "match RealPage's access to landlords' nonpublic, competitively sensitive rental data." ¶ 11; *see also* ¶ 165. But whatever access rivals may or may not have to landlords' data is not a consequence of anything RealPage

has done, nor do Plaintiffs even attempt to allege as much.

"Collecting user data, on its own, is not unlawful under the Sherman Act. That is because, standing alone, it is an example of a company using a competitive advantage gained from 'establishing an infrastructure that renders [it] uniquely suited to serve its customers,' or from 'a consequence of a superior product,' neither of which is anticompetitive." *Dreamstime.com v. Google LLC*, 54 F.4th 1130, 1142 (9th Cir. 2022) (quoting *Trinko*, 540 U.S. at 407, and *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966)). Rivals of RealPage are free to seek the same advantage. Plaintiffs' allegation that entrants may face "hurdles" in doing so, ¶ 181, says nothing about conduct (much less exclusionary conduct) by RealPage. Plaintiffs do not even deny that RealPage faced the same hurdles. The Amended Complaint is simply bereft of any hint that RealPage has taken any step to limit or foreclose rivals from collecting and accessing data.

### ii. RealPage's business model is not exclusionary.

Plaintiffs cannot redeem their failure to allege exclusionary conduct by labeling RealPage's "business model" as exclusionary based on the argument that "honest" rivals who strive to "compet[e] on the merits in a lawful manner" cannot enter "similar unlawful agreements" or "offer to share competitively sensitive information among rival landlords." ¶¶ 11–12, 166, 172, 282, 287. To start, this argument is circular, assuming its own conclusion: that software products incorporating nonpublic information must be unlawfully exclusionary because they are necessarily unlawful (or somehow dishonest). As detailed earlier, the Supreme Court has rejected this fallacy. *See Gypsum*, 438 U.S. at 441 n.16 (exchanging "price data and other information among competitors does not

- 19 -

Case 1:24-cv-00710-LCB-JLW    Document 74    Filed 02/04/25    Page 25 of 38

invariably have anticompetitive effects," can "render markets more . . . competitive" and "do[es] not constitute a *per se* violation"). Nor does the Amended Complaint identify any legal bar that would keep rivals from competing using a business model involving nonpublic information. RealPage's model itself is not alleged to be *per se* unlawful in *any* market. And Plaintiffs admit that RealPage's business model includes LRO software, which Plaintiffs concede does not necessarily "harm competition." ¶ 269 n.12. As such, Plaintiffs themselves contend that rivals *can* compete "on the merits in a lawful manner" using "revenue management products that do not harm the competitive process." ¶ 282, 287. In fact, in their original complaint, Plaintiffs deemed LRO to be "a less restrictive alternative" to AIRM/YieldStar, Dkt. 1 ¶ 153, which means it is "virtually as effective in serving the [defendant's] procompetitive purposes" as AIRM/YieldStar. *Epic*, 67 F.4th at 990 (alteration in original). While Plaintiffs amended their LRO allegations to excise this concession after RealPage pointed out its damaging consequences, *see* Dkt. 44 at 19, it underscores the lack of any basis for asserting that RealPage's business model is somehow exclusionary. Indeed, other than deleting the concession that LRO is a less restrictive alternative, the allegations to which Plaintiffs point for their new contention that LRO could be used anticompetitively, *see* ¶ 269 n.12 (citing ¶¶ 59–60, 100), are *unchanged* from the original complaint. *Compare* ¶¶ 59-60, 100 *with* Dkt. 1 ¶¶ 58–59, 91.

Moreover, Plaintiffs' theory is that RealPage's business model violates Section 1 *not* in the alleged national software market, but in a set of local housing markets populated by *wholly different products and competitors*. Previously, Plaintiffs had alleged that "RealPage's anticompetitive acts [under Section 2] have harmed . . . *renters*" in various

local apartment rental markets. Dkt. 1 ¶¶ 247, 252. RealPage demonstrated, however, that a monopolization claim cannot rest on purported harm outside the allegedly monopolized market. *See* Dkt. 44 at 19–20. "It is well-settled that it is 'necessary to appraise the exclusionary power of the [allegedly illegal conduct under Section 2] in terms of *the relevant market for the product involved*,' otherwise 'there is *no way* to measure [defendant's] ability to lessen or destroy competition.' *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965); *see also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993) (defendant's conduct must 'monopolize a particular market')." *Id.* at 20. "Plaintiffs' reliance on 'impacts outside the relevant antitrust market' accordingly fail[ed] as a matter of law. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 1001 (9th Cir. 2020) (government failed to "articulate[] a cogent theory of anticompetitive harm" to competitors in the relevant market)." *Id.*

In response, Plaintiffs tried to cure this deficiency with amended allegations that "RealPage's anticompetitive acts [under Section 2] have harmed the competitive process and reduced feasible and less restrictive alternatives for landlords, which alternatives thereby pose less risk of competitive harm to renters." ¶¶ 283, 288. But this cosmetic amendment still pins the alleged harm on "renters" in local housing markets, and therefore fails to remedy the prior allegations' defect. *Id.* Such out-of-market impacts—including claimed higher rental prices—"even if real, are not 'anticompetitive' in the antitrust sense—at least not *directly*—because they do not involve . . . exclusionary conduct in 'the area of effective competition.'" *Qualcomm*, 969 F.3d at 992 (emphasis in original)

(quoting *Amex*, 585 U.S. at 543).[11]

At its core, the Amended Complaint alleges that certain *product features* of AIRM/YieldStar may provide a competitive advantage over rivals whose software lacks or fails to prioritize those features, but such an advantage reflects "business acumen" and a "superior product," *not* exclusionary conduct. *Grinnell*, 384 U.S. at 571. RealPage may have pursued a business model that creates "substantial data advantages," ¶ 11, but Plaintiffs plead that "better data = better outcomes," "more data … enable[s] . . . better decisions," and "the lack of access to transactional data [is] a significant shortcoming in other commercial revenue management software." ¶¶ 167–68, 171; *see also, e.g.*, ¶ 178 ("'unequaled ability to stress test renewals *nightly* and drive amenity optimization'"). And courts have consistently held that introducing new or different product features, without associated conduct that excludes competition, cannot support a Section 2 claim. *See, e.g.*, *Sunbeam Television Corp. v. Nielsen Media Rsch., Inc.*, 763 F. Supp. 2d 1341, 1352 (S.D. Fla. 2011) ("[C]ourts and jurors are generally ill-suited to the task of adjudicating the relative merits of complex products and services, a task more appropriately undertaken by the market.").

While "anticompetitive conduct comes in many different forms that cannot always be categorized," *Duke Energy*, 111 F.4th at 354, this is not a case that meets any of the

_____

[11] Additionally, the alleged commercial RMS market is nationwide, ¶ 212, but RealPage's allegedly illegal business model could not plausibly exclude nationwide competition when Plaintiffs claim it violates Section 1 in only limited locations in the United States. *See* Am. Compl., App. A. On Plaintiffs' own theory, RealPage's competitors could lawfully compete in, for example, Los Angeles, Miami, New York City, Philadelphia, and Chicago because RealPage's agreements do not allegedly violate Section 1 there.

tests for exclusionary conduct. Far from alleging that RealPage engaged in "a broad range of anticompetitive conduct in various contexts [] to eliminate . . . competition," *id.* at 366, Plaintiffs identify *nothing* that RealPage has *done* to impede its rivals' abilities to compete. Nor do Plaintiffs identify a single rival that has been excluded by RealPage—certainly not Yardi or Entrata, the two RMS suppliers named in the Amended Complaint. ¶ 176.

**B. RealPage neither has nor is dangerously close to having monopoly power.**

Plaintiffs also fail to show that RealPage has monopoly power (required for monopolization) or is dangerously close to having it (required for attempted monopolization). A "firm is a monopolist if it can profitably raise prices substantially above the competitive level." *Microsoft*, 253 F.3d at 51. Direct evidence of such power is "rare[]," *id.*, and, in this case, unalleged. Plaintiffs do not allege, even in conclusory terms, that RealPage has raised prices of AIRM, YieldStar, and LRO, let alone that they exceed the competitive level now. Nor do Plaintiffs allege that RealPage has flexed monopoly power to restrict market output of RMS.

Plaintiffs also fail to establish monopoly power circumstantially, which requires allegations that RealPage "owns a dominant share of [a relevant] market," "there are significant barriers to entry" in that market, and "existing competitors lack the capacity to increase their output in the short run." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *see also Bepco, Inc. v. Allied-Signal, Inc.*, 106 F. Supp. 2d 814, 830–31 (M.D.N.C. 2000). Showing a defendant has a "dangerous probability of monopolization" for the attempted monopolization claim requires pleading essentially the same elements, albeit with a somewhat lower market share threshold. *See E.I. du Pont de*

*Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 453 (4th Cir. 2011) ("*du Pont*").

Plaintiffs have plausibly alleged none of these requirements.

### i. The claimed commercial revenue management software market is implausibly narrow.

Plaintiffs admit that RealPage's RMS is used by only a small fraction of rental properties in the United States, even when limited to multifamily rentals. According to Plaintiffs, however, commercially available RMS is "a relevant antitrust product market" because "[o]ther methods for pricing conventional multifamily housing units" do not "compete primarily" with commercial software and so "are not reasonable substitutes for" it. ¶¶ 220–21. But this exclusion from the market of non-"commercial" solutions— whether proprietary software developed by lessors in-house, or traditional non-software-based methods for informing pricing—rests on conclusory allegations that are "not entitled to be assumed true." *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009).

Those allegations are also predicated on false legal premises. Antitrust law does not limit the relevant market to "primar[y]" substitutes alone, ¶ 221, and a market definition that fails to encompass all reasonably interchangeable substitutes is legally defective because it "creates the illusion of market power where none may exist." *Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 495 (4th Cir. 1986); *see also, e.g.*, *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 455 (5th Cir. 2021). As a matter of law, "the relevant product market is defined by 'the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'" *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.,* 889 F.2d 524, 528 (4th Cir. 1989)

(quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).

Here, Plaintiffs make the fatal mistake of excluding from their relevant market the non-commercial solutions that the vast majority of lessors use. Plaintiffs' unfounded assumption that they need not account for products that are not sold commercially "flouts the Supreme Court's instruction that courts should conduct market-definition inquiries based not on 'formalistic distinctions' but on 'actual market realities.'" *Epic*, 67 F.4th at 978 (quoting *Amex*, 585 U.S. at 542). It is also "difficult to square with decisions defining a product market to include vertically integrated firms that self-provision the relevant product but make no outside sales." *Id.*; *see also, e.g.*, *United States v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172, 186 (D.D.C. 2001) (collecting cases) ("[C]ourts have generally recognized that when a customer can replace the services of an external product with an internally-created system, this captive output . . . should be included in the same market." (cleaned up)). Indeed, the Proposed Final Judgment with Defendant Cortland Management, LLC that DOJ filed with the Amended Complaint acknowledges "Cortland's internal proprietary revenue management software product" and prohibits Cortland from "us[ing] . . . Third-Party Revenue Management Products." Dkt. 49-1 at 3, 6.

Plaintiffs' own allegations powerfully demonstrate the implausibility of their market definition. Plaintiffs allege that RealPage gathers data from "over 16 million units across the country." ¶ 24. Assuming, *arguendo*, that these 16 million units are *all* the units in the United States, which is far from true, Plaintiffs concede that at least *two-thirds* (*i.e.*, at least 11 million) of them use non-commercial substitutes because Plaintiffs allege that only around 5 million units use commercial software sold by RealPage, Yardi, or Entrata.

- 25 -

*See* ¶¶ 24, 173, 176 (alleging that "over 16 million units across the country" use various RealPage software, "approximately 4.8M units" use RealPage's RMS, and "Yardi and Entrata have fewer than 250,000 units"). And when considering the *actual* number of units in the United States, not just the 16 million that allegedly use certain RealPage software, an even larger portion of units use non-commercial substitutes.

Plaintiffs cannot justify ignoring these manifestly obvious substitutes by relying on "[i]nternal documents from RealPage" that they claim "refer specifically to commercial revenue management for multifamily housing." ¶ 222. Of the few references Plaintiffs cite, *see* ¶¶ 222–24, only one mentions "commercial revenue management." ¶ 222. All that reference says, however, is that RealPage is "the market leader in commercial revenue management for multifamily." ¶ 222. Nor can Plaintiffs rely on an alleged statement by a single unidentified "executive" of a single unnamed "landlord" that "manual pricing does not compete with AIRM," ¶ 227. These allegations say nothing of commercial RMS supposedly competing "primarily against" itself, ¶ 221, nor do they address the "'reasonable interchangeability'" of that software with other software and non-software-based methods of pricing, *Victus, Ltd. v. Collezione Europe U.S.A., Inc.*, 26 F. Supp. 2d 772, 784 (M.D.N.C. 1998) (quoting *United States v. E.I. duPont de Nemours Co.*, 351 U.S. 377, 404 (1956)).

"No party can expect to gerrymander its way to an antitrust victory without due regard for market realities." *It's My Party*, 811 F.3d at 683. Having "fail[ed] even to attempt a plausible explanation as to why a market should be limited" to commercial software, Plaintiffs' effort to plead monopoly power fails. *du Pont*, 637 F.3d at 443.

### ii. Plaintiffs fail to allege that RealPage has a sufficient share of a relevant market with significant entry barriers.

Pleading monopoly power circumstantially also requires "show[ing] that the defendant owns a dominant share of" the "relevant market." *Rebel Oil*, 51 F.3d at 1434. "Although there is no fixed percentage market share that conclusively resolves whether monopoly power exists, the Supreme Court has never found a party with less than 75% market share to have monopoly power." *Kolon*, 748 F.3d at 174; *see also Bepco*, 106 F. Supp. 2d at 830 ("Seventy (70%) to seventy-five (75%) per cent is the generally accepted floor."). While Plaintiffs allege that RealPage has had around 80% share of commercial RMS since 2019, ¶ 224, this figure is unreliable as it *excludes* the non-commercial revenue management solutions that serve at least two-thirds of U.S. conventional multifamily rental units. *See supra* at 25–26. RealPage's RMS's coverage of 4.8 million out of more than 16 million units, ¶¶ 24, 173, yields a share of less than 30%, which is below the minimum for even attempted monopolization. *See M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 168 (4th Cir. 1992) ("[C]laims of less than 30% market shares should presumptively be rejected."); *see also Rebel Oil*, 51 F.3d at 1438 ("When the claim involves attempted monopolization, most cases hold that a market share of 30 percent is presumptively insufficient."). And only "approximately 3 million units"—or less than 20%—allegedly use AIRM/YieldStar. ¶ 24.

But even taking the vastly inflated "80%" share at face value, Plaintiffs' allegations still would not suffice. If non-commercial revenue management solutions are excluded from the market because they are supposedly "inefficient," ¶ 176, then the landlords renting

- 27 -

those at least 11 million units are ripe targets for expanding the alleged commercial RMS market. "Because untapped potential provides a mouth-watering incentive for vigorous competition, it is axiomatic that monopoly power is unlikely to arise in dynamic industries marked by a rapidly expanding volume of demand and low barriers to entry." *Metro Mobile CTS, Inc. v. NewVector Commc'ns, Inc.*, 892 F.2d 62, 63 (9th Cir. 1989). Here, the only supposed entry barrier that Plaintiffs allege—RealPage's "data and scale advantage," ¶ 173; *see also* ¶ 226—is no barrier when rivals can collect their own data and when RealPage's scale, with only 3 million units allegedly using AIRM/YieldStar, is dwarfed by the at least 11 million—but actually far more—units open to rivals. An "over 80%" share —a share that includes LRO, which Plaintiffs admit is not necessarily anticompetitive— thus says nothing about RealPage's supposed market power. Plaintiffs' actual and attempted monopolization claims fail for these reasons, too.[12]

### 3. Plaintiffs' state law claims fail.

Plaintiffs also assert claims under North Carolina's Unfair or Deceptive Trade Practices Act; California's Unfair Competition Law; the Colorado, Connecticut, and Illinois Antitrust Acts; the Massachusetts and Washington Consumer Protection Acts; the Oregon Antitrust Law; and the Tennessee Trade Practices Act. ¶¶ 290–331. These claims are based on the same conduct, and governed by the same standards, as Plaintiffs' Sherman

---

[12] Plaintiffs have also failed to allege "a specific intent to destroy competition or build monopoly." *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 927 (4th Cir. 1990). Nor may specific intent be "inferred from the anticompetitive conduct," ¶ 289, because doing so would render attempted monopolization's anticompetitive conduct and specific intent elements redundant. Regardless, Plaintiffs have not alleged anticompetitive conduct. *See supra* § 2.A.

Act claims, and therefore fail for the same reasons. *See, e.g.*, *R.J. Reynolds*, 199 F. Supp. 2d at 386, 394–96; *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1124 (9th Cir. 2018); *Smalley & Co. v. Emerson & Cuming, Inc.*, 808 F. Supp. 1503, 1510–11, 1516, (D. Colo. 1992); *Bridgeport Harbour Place I, LLC v. Ganim*, 32 A.3d 296, 302 (Conn. 2011); *Brown v. Hartford Healthcare Corp.*, 2023 WL 7150051, at *11 (Conn. Super. Ct. Oct. 26, 2023); *Hannah's Boutique, Inc. v. Surdej*, 112 F. Supp. 3d 758, 765 n.7 (N.D. Ill. 2015); *PBTM LLC v. Football Nw., LLC*, 511 F. Supp. 3d 1158, 1178, 1182 (W.D. Wash. 2021); *Volm v. Legacy Health Sys., Inc.*, 237 F. Supp. 2d 1166, 1174 (D. Or. 2002); *Bennett v. Wal-Mart Stores, Inc.*, 2011 WL 3878330, at *6 (E.D.N.Y. Sept. 2, 2011); *Suzuki of W. Mass, Inc. v. Outdoor Sports Expo, Inc.*, 126 F. Supp. 2d 40, 50 (D. Mass. 2001). Plaintiffs' Tennessee claim also fails because it "applies only to tangible goods, not intangible services" such as using AIRM/YieldStar or leasing apartments. *Bennett v. VISA U.S.A., Inc.*, 198 S.W.3d 747, 751 (Tenn. Ct. App. 2006).

## CONCLUSION

The Court should dismiss the Amended Complaint with prejudice.

This 4th day of February, 2025.

/s/ *Adam K. Doerr*
Adam K. Doerr
N.C. Bar No. 37807
adoerr@robinsonbradshaw.com
Caroline H. Reinwald
N.C. Bar No. 58053
creinwald@robinsonbradshaw.com

ROBINSON, BRADSHAW & HINSON, P.A.
101 N. Tryon St., Ste. 1900
Charlotte, North Carolina 28246

- 29 -

Telephone:    704.377.2536
Facsimile:    704.378.4000

Stephen Weissman
(*LR 83.1(d) Counsel*)
sweissman@gibsondunn.com
Michael J. Perry
(*LR 83.1(d) Counsel*)
mjperry@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC  20036-4504
Telephone: (202) 955-8500

Ben A. Sherwood
(*LR 83.1(d) Counsel*)
bsherwood@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Telephone: (212) 351-2671

Daniel G. Swanson
(*LR 83.1(d) Counsel*)
dswanson@gibsondunn.com
Jay P. Srinivasan
(*LR 83.1(d) Counsel*)
jsrinivasan@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: (213) 229-7000

Chris Whittaker
(*LR 83.1(d) Counsel*)
cwhittaker@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive, Suite 1200
Irvine, CA  92612-4412

Telephone: (949) 451-4337

*Attorneys for Defendant RealPage, Inc.*

## WORD COUNT CERTIFICATION

I certify that this Brief in Support of Defendant RealPage, Inc.'s Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6) (the "Brief") complies with the applicable word limits excluding the caption, signature lines, certificate of service, and any cover page or index in accordance with this Court's October 30, 2024 Order extending the word limitation, Dkt. 40, and Local Civil Rule 7.3(d)(1). This certification is made in accordance with Local Civil Rule 7.3(d)(1). The undersigned relied upon the word count feature provided by word-processing software and the Brief contains 8,000 words.

This 4th day of February, 2025.

/s/ *Adam K. Doerr*
Adam K. Doerr
N.C. Bar No. 37807
adoerr@robinsonbradshaw.com

ROBINSON, BRADSHAW & HINSON, P.A.
101 N. Tryon St., Ste. 1900
Charlotte, North Carolina 28246
Telephone:    704.377.2536
Facsimile:    704.378.4000

*Attorneys for Defendant RealPage, Inc.*