IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF NORTH CAROLINA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF ILLINOIS, COMMONWEALTH OF MASSACHUSETTS, STATE OF MINNESOTA, STATE OF OREGON, and STATE OF TENNESSEE, | |
| *Plaintiffs*, | |
| vs. | Case No. 1:24-cv-00710-LCB-JLW |
| REALPAGE, INC.; CAMDEN PROPERTY TRUST; CORTLAND MANAGEMENT, LLC; CUSHMAN & WAKEFIELD, INC.; GREYSTAR REAL ESTATE PARTNERS, LLC; LIVCOR, LLC; PINNACLE PROPERTY MANAGEMENT SERVICES, LLC; and WILLOW BRIDGE PROPERTY COMPANY, LLC, | |
| *Defendants*. | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT REALPAGE'S
MOTION TO DISMISS**

# TABLE OF CONTENTS

FACTUAL BACKGROUND ........................................................................................ 1

LEGAL STANDARDS ............................................................................................. 3

ARGUMENT ........................................................................................................ 4

   I.  The Amended Complaint States Plausible Claims for Relief
      under Section 1 of the Sherman Act ...................................................... 4

      A.  Claims 1 and 2 Plausibly Allege Indirect Evidence
          of Anticompetitive Effects .................................................................. 5

      B.  Claims 1 and 2 Plausibly Allege Direct Evidence
          of Anticompetitive Effects .................................................................. 12

  II.  The Amended Complaint States Plausible Claims for Relief
      under Section 2 of the Sherman Act ...................................................... 15

      A.  The Amended Complaint Plausibly Alleges Commercial
          Revenue Management Software Is a Relevant Product Market ...................... 15

      B.  Direct and Indirect Evidence Demonstrates That RealPage Enjoys
          Monopoly Power Over Commercial Revenue Management Software ............ 21

      C.  The Amended Complaint Plausibly Alleges RealPage Harmed
          Competition for Commercial Revenue Management Software ...................... 23

  III.  The State-Law Claims Should Not Be Dismissed ................................................. 28

# TABLE OF AUTHORITIES

**Cases**

*Advanced Health-Care Servs., Inc. v. Radford Community Hosp.*,
  910 F.2d 139 (4th Cir. 1990).............................................................................. 14

*Am. Column & Lumber Co. v. United States*,
  257 U.S. 377 (1921) .............................................................................. 7, 11, 12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................... 1

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985) .................................................................................. 24

*Biddle v. Walt Disney Co.*,
  2024 WL 3171860 (N.D. Cal. June 25, 2024)............................................. 30

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
  1995 WL 455969 (E.D. Pa. July 27, 1995) .................................................. 9

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) .................................................................................. 15

*Cal. Dental Ass'n v. FTC*,
  526 U.S. 756 (1999) .................................................................................... 5

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
  404 U.S. 508 (1972) .................................................................................. 25

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*,
  148 F.3d 1080 (D.C. Cir. 1998) ................................................................. 25

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
  20 Cal. 4th 163 (1999).............................................................................. 29

*Ciardi v. F. Hoffmann LaRoche, Ltd.*,
  762 N.E.2d 303 (Mass. 2002).................................................................... 29

*Cont'l Airlines, Inc. v. United Air Lines, Inc.*,
  120 F. Supp. 2d 556 (E.D. Va. 2000)........................................................... 5

*Conwood Co., L.P. v. U.S. Tobacco Co.*,
  290 F.3d 768 (6th Cir. 2002)............................................................... 25, 27

*Dale v. Deutsche Telekom AG,*
    2023 WL 7220054 (N.D. Ill. Nov. 2, 2023) ................................................... 14

*Dickson v. Microsoft Corp.,*
    309 F.3d 193 (4th Cir. 2002).............................................................. 4, 8, 21

*Dreamstime.com v. Google LLC,*
    54 F.4th 1130 (9th Cir. 2022)................................................................... 26

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC,*
    111 F.4th 337 (4th Cir. 2024)......................................................... 4, 15, 24

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,*
    637 F.3d 435 (4th Cir. 2011)............................................................... passim

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
    504 U.S. 451 (1992) ......................................................................... 6, 24

*Epic Games, Inc. v. Apple, Inc.,*
    67 F.4th 946 (9th Cir. 2023) ........................................................... 17, 29

*Fed. Nat'l Mortgage Ass'n v. Quicksilver LLC,*
    155 F. Supp. 3d 535 (M.D.N.C. 2015) ...................................................... 16

*Felder v. Casey,*
    487 U.S. 131 (1988) ............................................................................ 29

*Freeman Indus., LLC v. Eastman Chem. Co.,*
    172 S.W.3d 512 (Tenn. 2005) ................................................................. 29

*FTC v. Facebook, Inc.,*
    560 F. Supp. 3d 1 (D.D.C. 2021) ............................................................. 17

*FTC v. Ind. Fed'n of Dentists,*
    476 U.S. 447 (1986) ......................................................................... 5, 14

*FTC v. Syngenta Crop Protection AG,*
    711 F. Supp. 3d 545 (M.D.N.C. 2024) ................................................ passim

*FTC v. Tapestry, Inc.,*
    2024 WL 4647809 (S.D.N.Y. Nov. 1, 2024) .................................. 15, 19, 20

*In re RealPage, Inc. Rental Software Antitrust Litig. (No. II),*
    709 F. Supp. 3d 478 (M.D. Tenn. 2023) ................................................ 8, 9

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde,*
    466 U.S. 2 (1984) ................................................................................. 8

*Klein v. Facebook, Inc.*,
   580 F. Supp. 3d 743 (N.D. Cal. 2022) ....................................................25, 27

*Koch Agronomic Servs., LLC v. Eco Agro Res. LLC*,
   2015 WL 5712640 (M.D.N.C. Sept. 29, 2015) ..........................................16

*L.C. Williams Oil Co. v. Exxon Corp.*,
   625 F. Supp. 477 (M.D.N.C.1985) .............................................................29

*Lumber Liquidators, Inc. v. Cabinets To Go, LLC*,
   415 F. Supp. 3d 703 (E.D. Va. 2019) ...........................................................5

*Marshall v. Miller*,
   302 N.C. 539 (N.C. 1981) ...........................................................................29

*Metro Mobile CTS, Inc. v. NewVector Commc'ns, Inc.*,
   892 F.2d 62 (9th Cir. 1989)..........................................................................23

*NCAA v. Alston*,
   594 U.S. 69 (2021) .........................................................................................5

*NCAA v. Bd. of Regents of Univ. of Okla.*,
   468 U.S. 85 (1984) .........................................................................................6

*Newcal Indus., Inc. v. Ikon Office Sol.*,
   513 F.3d 1038 (9th Cir. 2008).......................................................................7

*Occupy Columbia v. Haley*,
   738 F.3d 107 (4th Cir. 2013).......................................................................16

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018) ............................................................................5, 10, 12

*People v. North Ave. Furniture & Appliance, Inc.*,
   645 P.2d 1291 (Colo. 1982) (en banc) ........................................................30

*RealPage, Inc. v. Yardi Sys., Inc.*,
   852 F. Supp. 2d 1215 (C.D. Cal. 2012) .......................................................21

*Regeneron Pharms., Inc. v. Novartis Pharma AG*,
   96 F.4th 327 (2d Cir. 2024)..........................................................................15

*Republican Party of N.C. v. Martin*,
   980 F.2d 943 (4th Cir. 1992)..........................................................................4

*Robertson v. Sea Pines Real Estate Companies, Inc.*,
   679 F.3d 278 (4th Cir. 2012)..............................................................1, 4, 14

*Scooter Store, Inc. v. SpinLife.com, LLC,*
    777 F. Supp. 2d 1102 (S.D. Ohio 2011) ........................................................... 7

*Todd v. Exxon Corp.,*
    275 F.3d 191 (2d Cir. 2001) ............................................................... 6, 11, 12

*United States v. Brown Univ.,*
    5 F.3d 658 (3d Cir. 1993) ............................................................................. 14

*United States v. Cavera,*
    550 F.3d 180 (2d Cir. 2008) (en banc) ........................................................... 23

*United States v. Container Corp. of Am.,*
    393 U.S. 333 (1969) ...................................................................................... 11

*United States v. E.I. du Pont de Nemours & Co.,*
    351 U.S. 377 (1956) ...................................................................................... 21

*United States v. Grinnell Corp.,*
    384 U.S. 563 (1966) ................................................................................. 4, 17

*United States v. H & R Block, Inc.,*
    833 F. Supp. 2d 36 (D.D.C. 2011) ........................................................... 17, 19

*United States v. Microsoft Corp.,*
    253 F.3d 34 (D.C. Cir. 2001) (en banc) .......................................................... 21

*United States v. Sungard Data Sys., Inc.,*
    172 F. Supp. 2d 172 (D.D.C. 2001) ............................................................... 17

*United States v. U.S. Gypsum Co.,*
    438 U.S. 422 (1978) ...................................................................................... 10

*United States v. Visa U.S.A., Inc.,*
    344 F.3d 229 (2d Cir. 2003) ............................................................................ 7

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,*
    382 U.S. 172 (1965) ...................................................................................... 25

**Statutes**

15 U.S.C. § 1 ...................................................................................................... 4

15 U.S.C. § 2 ...................................................................................................... 4

Cal. Bus. & Prof. Code § 17200 ......................................................................... 29

Colo. Rev. Stat. § 6-4-101, et seq. ...................................................................... 29

- vi -

Conn. Gen. Stat. § 35-44b ........................................................................... 30

Mass. Gen. Laws ch. 93 .............................................................................. 29

Mass. Gen. Laws ch. 93A ........................................................................... 29

N.C. Gen. Stat. § 75.1.1 ............................................................................. 29

Or. Rev. Stat. § 646.715(2) ........................................................................ 30

Tenn. Code Ann. § 47-25-101 .................................................................... 30

**Other Authorities**

U.S. Dep't of Justice & Fed. Trade Comm'n, Merger Guidelines (2023) ........................ 19

The question before the Court is simple: Does the complaint "state 'a plausible claim for relief'"? *Robertson v. Sea Pines Real Estate Companies, Inc.*, 679 F.3d 278, 284 (4th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). It does. The complaint (ECF No. 47 ("AC")) contains robust allegations—which must be accepted as true for purposes of RealPage's motion—that RealPage violates Section 1 of the Sherman Act by (1) collecting landlord customers' granular, nonpublic, competitively sensitive pricing data, and using it to power its pricing software that recommends how much to charge for rent, and (2) teaching its landlord customers to use that software, together with the pricing data, to set rents in a uniform way. And RealPage violates Section 2 of the Sherman Act by using its position at the center of this illegal information exchange to capture and entrench monopoly power in the market for commercial revenue management software. Because the complaint plausibly alleges violations of both sections of the Sherman Act, RealPage's motion should be denied.

## FACTUAL BACKGROUND

The United States and a coalition of States bring two claims for relief under Section 1 of the Sherman Act challenging RealPage's scheme with landlords to exchange their nonpublic, proprietary pricing data with each other and to use RealPage's pricing software to align their rental pricing (Claims 1 and 2), and two claims for relief under Section 2 of the Sherman Act to end RealPage's resulting monopolization of the commercial revenue management software market (Claims 3 and 4). Eight Plaintiff States also bring claims against RealPage under state law.

In a horizontal scheme with landlords who are knowing and willing participants, RealPage collects pricing data for every visit, application, and signed new or renewed lease at their properties across the country. (*See* AC ¶¶ 34, 262.) RealPage's software products, including YieldStar and AIRM, analyze that data and determine how much, in turn, the landlords should charge for rent. (*Id.* ¶¶ 260–61.) Under its agreement with landlords, RealPage can use a landlord's pricing data to recommend rents not just for that landlord's own properties, but also for those properties' *competitors* in a local rental housing market. (*Id.*) RealPage has taken full advantage of this unlawful information sharing arrangement under Claim 1: competitors' pricing data is a "critical input" to almost every step of AIRM's and YieldStar's rent recommendation algorithms. (*Id.* ¶¶ 15, 40–58.)

Access to RealPage's vast reservoir of nonpublic pricing data is a key reason why landlords agree to use YieldStar or AIRM. RealPage advertises—and participating landlords believe—that by exploiting competitors' pricing data, YieldStar and AIRM can help landlords achieve higher revenues. (*See, e.g.*, AC ¶¶ 32, 167–71.) On top of that, RealPage designed YieldStar and AIRM to align users' pricing processes, strategies, and pricing responses, and minimize discounts, which is the subject of Claim 2. (*Id.* ¶¶ 142–52, 157–62.)

These agreements among RealPage and landlords are as pervasive as they are pernicious. In hundreds of rental markets nationwide, YieldStar and AIRM are used to set rents for roughly 30 percent or more of all units, and RealPage collects and uses pricing

- 2 -

data from an even greater share of units. (AC ¶¶ 208–11, App. A & B.) The agreements'
natural effect is to frustrate the predictable forces of competition in these rental markets
by reducing the number of independent centers of decision-making, i.e., landlords
competing with each other by deciding what rents to offer and what deals to make with
prospective or renewing renters. (*Id.* ¶¶ 1, 266, 276–77.)

RealPage has also used its position at the center of this illegal information
exchange to monopolize or attempt to monopolize the market for commercial revenue
management software. (*See* AC ¶¶ 280–89.) By its own estimates, RealPage controls
more than 80 percent of that market, (*id.* ¶ 224), wielding its power by dramatically
increasing the prices of AIRM and YieldStar, (*id.* ¶ 228). Landlords absorb these
increases because, in return, RealPage leverages the shared pricing data to enable them to
extract higher revenues from the rental markets where they use RealPage's
anticompetitive products. RealPage thus induces landlords to use YieldStar and AIRM
instead of switching to a competitor's products, preventing rival software providers from
competing on the merits unless they similarly facilitate the illegal exchange and use of
competitor data and pricing alignment. As a result, landlords lack comparable
alternatives. (*Id.* ¶ 282.)

## LEGAL STANDARDS

To survive a motion to dismiss, Plaintiffs need only "state a claim that is 'plausible
on its face,'" after "draw[ing] all reasonable inferences in [their] favor." *E.I. du Pont de
Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). A court is "not

- 3 -

asked to consider whether defendants actually violated" the antitrust laws, *Robertson,* 679 F.3d at 284, or to "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses,'" *FTC v. Syngenta Crop Protection AG*, 711 F. Supp. 3d 545, 562 (M.D.N.C. 2024) (quoting *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)).

Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits (1) any "contract, combination, or conspiracy" (2) "that impose[s] an unreasonable restraint of trade." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002). Monopolization under Section 2, 15 U.S.C. § 2, requires (1) the possession of monopoly power, and (2) willful acquisition or maintenance of that power through anticompetitive conduct. *See Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 353 (4th Cir. 2024) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966)).

## ARGUMENT

RealPage's motion to dismiss fails both factually and legally. It attempts to dispute—often by mischaracterizing—the well-supported factual allegations in the complaint, which must be accepted as true at this stage. It also advances non-existent legal rules to argue the complaint is insufficient. The complaint is well pleaded, and the motion should be denied.

## I. The Amended Complaint States Plausible Claims for Relief under Section 1 of the Sherman Act

RealPage challenges only the second element of Plaintiffs' Section 1 claims: whether the complaint plausibly alleges an "unreasonable" restraint on trade. (ECF No.

- 4 -

74 ("Br.") at 10–17.[1]) A restraint's unreasonableness is "presumptively" measured under the "rule of reason . . . looking to the circumstances, details, and logic of a restraint" to assess its competitive effects. *NCAA v. Alston*, 594 U.S. 69, 81, 97 (2021) (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 781 (1999)).[2]

To satisfy the rule of reason, a plaintiff can establish anticompetitive effect either "indirectly" or "directly." *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018). The indirect approach requires first, "proof of market power," and, second, "some evidence that the challenged restraint harms competition." *Id.* at 542. The direct approach requires "proof of actual detrimental effects [on competition]." *Id.* at 542 (quoting *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986)). The complaint satisfies either approach.

**A.** **Claims 1 and 2 Plausibly Allege Indirect Evidence of Anticompetitive Effects**

As shown below, the complaint plausibly alleges indirect evidence of anticompetitive effects.

---

[1] RealPage does not question whether the complaint alleges "concerted action" cognizable under Section 1 or that the challenged conduct affects interstate commerce.

[2] Contrary to what RealPage argues, (Br. at 9–10), Plaintiffs do not concede what mode of analysis applies. The Court need not decide on the pleadings, however, because the complaint satisfies the full rule of reason. *See Lumber Liquidators, Inc. v. Cabinets To Go, LLC*, 415 F. Supp. 3d 703, 714 (E.D. Va. 2019) (collecting cases); *Cont'l Airlines, Inc. v. United Air Lines, Inc.*, 120 F. Supp. 2d 556, 565 (E.D. Va. 2000).

- 5 -

## 1. Market Power

Market power is the "ability to alter the interaction of supply and demand in the market."[3] *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 109 (1984). "One traditional way to demonstrate market power is by defining the relevant . . . market and showing defendants' percentage share of that market." *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001) (Sotomayor, J.). A relevant market consists of at least one product and geographic market. *Kolon*, 637 F.3d at 441.

The complaint alleges extensive, unchallenged facts supporting both the relevant product market (conventional multifamily rentals, including by different bedroom counts) and two types of geographic markets (RealPage-defined local markets and core-based statistical areas). (AC ¶¶ 183–99, 204–18.) Plaintiffs then calculate market share two ways: (1) the percentage of rental units that are priced using RealPage's challenged anticompetitive pricing software (AIRM and YieldStar) and (2) the percentage of units managed by landlords using AIRM, YieldStar, and OneSite that contribute data to the horizontal scheme. Using these methodologies, the complaint lists markets across the country where RealPage's market share ranges from 26% to over 80%. (*Id.* ¶¶ 209 (App'x A), 211 (App'x B), 214 (Table 1), 216 (Table 2).)

---

[3] "Market power" under Section 1 should not be confused with the "greater" showing needed to establish "monopoly power" under Section 2. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992).

These market share allegations easily satisfy the pleading requirements for market power. In *American Column & Lumber Co. v. United States*, 257 U.S. 377 (1921), the Supreme Court held that a plan among competing hardwood lumber manufacturers to share "daily, weekly, and monthly reports of the minutest details of their business to their rivals" through a "central clearing house" violated Section 1 of the Sherman Act. *Id.* at 393, 410–11. The Court was satisfied that the participating manufacturers controlled a sufficient share of the aggregate production of hardwood lumber in the United States, *id.* at 385, an admitted fact that the dissent confirmed was "about 30 per cent.," *id.* at 413 (Brandeis, J., dissenting).

Lower courts have likewise held market shares around or below 30% to be sufficient. *See, e.g.*, *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 240 (2d Cir. 2003) (affirming trial court finding that company had market power with 26% share). Moreover, contrary to RealPage's assertion, (Br. at 14), there is no requirement to plead market share with specificity at the motion-to-dismiss stage. *See Kolon*, 637 F.3d at 452 n.12 (holding that a plaintiff need not allege "a specific percentage of market foreclosure"); *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008); *Scooter Store, Inc. v. SpinLife.com, LLC*, 777 F. Supp. 2d 1102, 1117 (S.D. Ohio 2011) ("plaintiff does not have to allege an exact, percentage-based market share"). A percentage range therefore suffices. Indeed, in the *RealPage* multidistrict litigation case, the district court concluded that plaintiffs, having alleged market shares in the range of 25% to 53% in 33 of the 45 alleged submarkets, "ha[d] met their burden of alleging market power prior to

- 7 -

discovery." *In re RealPage, Inc. Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 526–27 (M.D. Tenn. 2023). The court held that plaintiffs had met their burden even for markets where estimated shares were below 30%. *Id.* at 527.

RealPage's arguments to the contrary are legally and factually incorrect. *First*, RealPage asserts that "there is no market power as a matter of law" if the challenged scheme has "less than 30%" market share (Br. at 14), shoehorning a discussion from the Supreme Court's opinion in *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2 (1984), that discussed the application, after a full trial, of the per se rule to a tying claim (a type of antitrust claim not alleged here). There, in declining to apply the per se rule, the Court observed that a 30% "market share alone" did not establish "the kind of market power that justifies condemnation of tying" without "further inquiry into actual competitive conditions" in a particular hospital services market. *Id.* at 26–27. In other words, the Court declined to conclusively condemn a tying claim under the per se rule based solely on a 30% share in anesthesiology services and instead proceeded to analyze the claim under the rule of reason. *Id.* at 29–30. This case does not concern tying at all, let alone seek to invoke a per se rule against tying. The decision therefore simply does not apply.[4]

---

[4] RealPage also relies on a truncated "cf." parenthetical citation to *Jefferson Parish* buried in a footnote in *Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002). (Br. at 14.) But the Fourth Circuit cited *Jefferson Parish* there as a point of comparison with the court's hypothetical that a "five percent" market share where every competitor "possess[ed] four percent" would not suffice. *Dickson*, 309 F.3d at 209 n.20.

RealPage's purported more-than-30% rule also conflicts with decisions that have found market power given the circumstances as alleged or have rejected a firm legal cutoff. *See Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 1995 WL 455969, at *3–4 (E.D. Pa. July 27, 1995) (*Jefferson Parish* court "did not broaden its statement to hold that a 30 percent share always, in and of itself, precludes market power"); *RealPage*, 709 F. Supp. 3d at 527 ("Discovery will reveal the appropriate percentage of market share needed to presume market power and the actual percentage RealPage enjoys in each of Plaintiffs' alleged submarkets."). In sum, there is no set market share threshold that Plaintiffs must allege, as demonstrated by the cases RealPage fails to cite.[5]

*Second*, RealPage demands more detail about "the specific competitive landscape—such as the presence or absence of significant entry barriers," (Br. at 3)—in the hundreds of markets where RealPage's market share equals or exceeds 30%. But Plaintiffs allege many features of competition common to markets across the country, including barriers to entry. (AC ¶ 218.) Beyond that, such "deeply fact-intensive inquir[ies]" into the "commercial realities faced by [renters]," *Kolon*, 637 F.3d at 442, do not provide a basis for dismissing a robust complaint. *See Syngenta*, 711 F. Supp. 3d

---

[5] RealPage itself seems unsure of its position. In the brief supporting its prior motion to dismiss, it asserted that "Plaintiffs must allege facts that at least 30% (per longstanding Supreme Court precedent) or 40% (per recent case law) of the units in a particular housing market use AIRM/YieldStar specifically[.]" (ECF No. 44 at 3.) Now, however, it insists that the law requires that "more than 30% … and generally over 40%" of the units use AIRM or YieldStar. (Br. at 3.)

- 9 -

at 568 (rejecting defendants' contention that plaintiffs "must explain in their complaint why certain AIs or crop-protection products are excluded from the markets").

*Third*, RealPage protests that one of Plaintiffs' two market share methodologies includes users of OneSite, a property management software that does not, on its own, provide pricing recommendations. (Br. at 15.) RealPage's argument is essentially a factual dispute, unsuitable for a motion to dismiss. And, as the complaint explains, OneSite is appropriately included because it is one mechanism by which landlords—who may be using AIRM or YieldStar at other properties they own or manage—share their pricing data with RealPage, understanding that RealPage in turn will use it to generate pricing recommendations for competitors, benefiting all landlords as their prices move together. (AC ¶¶ 23, 26, 32–33, 261.)

## 2. *Tendency to Harm Competition*

Contrary to RealPage's argument, Plaintiffs robustly allege that the agreement by landlords to share information for use in pricing and the landlords' pricing alignment scheme tend to harm competition. *See Am. Express*, 585 U.S. at 542 (only "some evidence" required). The complaint describes in detail the structure of the multifamily housing market, the sensitivity and granularity of the data RealPage collects, and RealPage's use of the pricing data to set prices for competing landlords. (*See* AC ¶¶ 17–27, 75–101, 120–52.) These details establish that RealPage's agreements harm competition under applicable case law. *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16, 446–47 n.22 (1978); *Todd*, 275 F.3d at 208–13.

- 10 -

As the complaint alleges, several characteristics of the multifamily property industry increase its susceptibility to coordination: Landlords regularly communicate privately through calls, chat messages, emails, meetings, and shared drives with their direct competitors about current and future prices and occupancy and sometimes consult with other landlords about future pricing strategies. (AC ¶¶ 82–117.) These communications, which involve senior executives to property managers, foster interdependence among would-be competitors. *See Am. Column*, 257 U.S. at 409 (noting extensive meetings among the participants). In addition, demand for housing is relatively inelastic, (*id.* ¶¶ 75, 77), *see United States v. Container Corp. of Am.*, 393 U.S. 333, 337 (1969), and RealPage's software enables competing landlords to compare floor plans, units, and amenities, *see Todd*, 275 F.3d at 209–10.

Participating landlords agree to provide RealPage with "detailed data … that are private, updated nightly, and granular" and that "includes lease-level information on each unit's effective rent (rent net of discounts), rent discounts, rent term, and lease status, as well as unit characteristics such as layout and amenities." (AC ¶¶ 18, 21.) The shared lease transaction data covers not only new leases but also renewals, about which no information is publicly available. (*Id.* ¶¶ 34, 178.) The granularity, contemporaneity, and sensitivity of this price and output data all indicate that RealPage's scheme is anticompetitive. *Am. Column*, 257 U.S. at 398–99; *Container Corp.*, 393 U.S. at 336; *Todd*, 275 F.3d at 211–13.

Landlords share pricing data understanding that RealPage uses it in AIRM and YieldStar to recommend prices not just for its units but also those of its competitors. (AC ¶¶ 1, 17, 19, 23, 25.) The attraction of RealPage's products is that the landlord can leverage not just its own data but also its competitors'. (*Id.* ¶¶ 20, 26.) As RealPage has touted to its clients, the combined effect of competing landlords using AIRM or YieldStar can be likened to a "rising tide [that] raises all ships," meaning that prices for competing units move in a similar manner from using the software. (*Id.* ¶¶ 32–33.) Such "specially and confidentially informed" pricing advice, based on "the minutest details" of competitors' businesses, tends to restrain competition. *Am. Column*, 257 U.S. at 410. Conversely, RealPage does not make its data publicly available or use it to develop products for renters, further evincing harm to competition. (AC ¶ 156 (cautioning landlords not to share the rent matrix with renters).) *See Todd*, 275 F.3d at 213 (exchanging data with competitors but not others suggests anticompetitive effect); *Am. Column*, 257 U.S. at 411 (similar conclusion). Taking these factors together, the complaint is more than sufficient to satisfy the pleading standard.

**B.** **Claims 1 and 2 Plausibly Allege Direct Evidence of Anticompetitive Effects**

As previewed above, the complaint alleges extensive direct evidence from RealPage's own documents and testimony illustrating a scheme to suppress competition. Direct evidence can include allegations that RealPage increased prices above a competitive level, reduced output, or "otherwise stifled competition." *Am. Express*, 585 U.S. at 547. In attacking the complaint, RealPage inappropriately focuses only on the

- 12 -

first category of evidence—supracompetitive prices, (Br. at 11–12)—and wholly ignores the complaint's extensive allegations of other evidence of stifled competition. (*See, e.g.*, AC ¶¶ 17–33, 260–79.)

For instance, the complaint quotes one RealPage executive saying that the software made participating landlords "likely move in unison versus against each other," evidence of which was "see[ing] the trajectory of performance and trends be eerily similar" across ostensible competitors. (AC ¶ 128.) Another RealPage executive explained that RealPage's "rising tide raises all ships" mantra means "there is greater good in everybody succeeding versus essentially trying to compete against one another in a way that actually keeps the industry down." (*Id.* ¶ 32.) In other words, RealPage's software is intended to help all landlords succeed and avoid normal competition among them. The complaint also explains how RealPage's software applies several rules— "guardrails"—that override the software's normal operations and inhibit landlords' competitive price cuts, to the detriment of consumers. (*Id.* ¶¶ 142–52.) Imposing a "hard floor" prevents price recommendations from falling below a blended average of its competitors. (*Id.* ¶¶ 44, 143.) This is quintessential stifling of competition.

Discounting these allegations, RealPage contends that Plaintiffs must "show that the software has caused prices to be 'above a competitive level' in any alleged relevant market." (Br. at 11.) As an initial matter, Plaintiffs need not "show" anything; merely plausibly alleging facts to support the claims is enough. "At this point, … allegations of

adverse effects on competition must be accepted as true[.]" *Advanced Health-Care Servs., Inc. v. Radford Community Hosp.*, 910 F.2d 139, 145 (4th Cir. 1990).

Nor are Plaintiffs required to show proof of price increases to succeed under the direct approach. In *Robertson*, the Fourth Circuit rejected RealPage's argument that a complaint must show "whether prices went up, down, or stayed the same" during a given time frame. 679 F.3d at 291. It held that a "complaint need not 'make a case' against a defendant or 'forecast evidence sufficient to prove an element' of the claim." *Id.* The bar has been easily met as long as the complaint's "alleged anticompetitive effects are economically plausible in light of the . . . restrictions recounted in the complaint." *Id.* Similarly, in *FTC v. Indiana Federation*, the Supreme Court held that the challenged anticompetitive agreement was "likely enough to disrupt the proper functioning of the price-setting mechanism of the market that it may be condemned even absent proof that it resulted in higher prices or, as here, the purchase of higher priced services, than would occur in its absence." 476 U.S. at 461–62. *See also United States v. Brown Univ.*, 5 F.3d 658, 674 (3d Cir. 1993) (noting that "actual dollar amount effects do not necessarily reflect the harm to competition which Congress intended to eliminate in enacting the Sherman Act"). Judged against these standards, Plaintiffs' complaint independently satisfies the rule of reason based on direct evidence of anticompetitive effects. *See, e.g.*, *Dale v. Deutsche Telekom AG*, 2023 WL 7220054, at *15 (N.D. Ill. Nov. 2, 2023).

- 14 -

## II. The Amended Complaint States Plausible Claims for Relief under Section 2 of the Sherman Act

The complaint plausibly alleges in Claim 3 that RealPage has (1) "monopoly power in the relevant market" of commercial revenue management software (2) that it "willfully acquired or maintained . . . through anticompetitive conduct.'" *Duke Energy* 111 F.4th at 353 (citation omitted). Attempted monopolization, as alleged in Claim 4, has a lower threshold of power in the market—sufficient to constitute a "dangerous probability of success"—but adds specific intent. *See Kolon*, 637 F.3d at 453.

### A. The Amended Complaint Plausibly Alleges Commercial Revenue Management Software Is a Relevant Product Market

RealPage improperly challenges the facts underlying Plaintiffs' alleged national market for commercial revenue management software for conventional multifamily housing rentals. (AC ¶¶ 220, 229.) A product market may be defined using "*Brown Shoe* factors," that is "such practical indicia as industry or public recognition of the [market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024) (discussing the "practical indicia" factors from *Brown Shoe*); *FTC v. Tapestry, Inc.*, 2024 WL 4647809, at *12–24 (S.D.N.Y. Nov. 1, 2024) (applying *Brown Shoe* factors and holding that FTC's alleged market was a relevant product market).

RealPage recognizes Plaintiffs' market, referring to itself as the "market leader in commercial revenue management for multifamily." (AC ¶ 222.) It has noted its dominant share of the "market" for commercial revenue management software, touting its domination of the competition—two commercial revenue management providers—within that market. (*Id.* ¶¶ 175–78, 223–225.) It even told a prospective customer that it has no "true competitors" because of its access to nonpublic transactional lease data. (*Id.* ¶ 180.) Landlords similarly recognize this market and RealPage's power over it. When RealPage refused to decrease its price for AIRM, one landlord bemoaned RealPage's "monopoly on a *product category*." (*Id.* ¶ 228 (emphasis added).)

      1. *RealPage Improperly Disputes the Alleged Facts That Define a Relevant Market*

RealPage argues that inhouse software and manual pricing (pricing such as using Excel) must, as a matter of law, be included in the relevant market.[6] (Br. at 24.) The caselaw imposes no such rule. Relevant market definition is "a fact-intensive exercise centered on the commercial realities of the market and competition." *Kolon*, 637 F.3d at

---

[6]  RealPage cites the United States' proposed Final Judgment with Cortland to argue that inhouse software must be included. That document is not properly considered because it is outside the complaint. *See, e.g.*, *Occupy Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013); *Fed. Nat'l Mortgage Ass'n v. Quicksilver LLC*, 155 F. Supp. 3d 535, 546 (M.D.N.C. 2015) (same); *see also Koch Agronomic Servs., LLC v. Eco Agro Res. LLC*, 2015 WL 5712640, at *9 (M.D.N.C. Sept. 29, 2015) ("[T]o further confuse the issues by referring to matters outside the pleadings and not in evidence is not an appropriate tactic."). Nor does the document explain Cortland's years of efforts to develop the referenced solution—exactly why it is not properly considered at this stage, much less construed to be representative of other uniquely situated landlords.

- 16 -

442. Both decisions on which RealPage relies are *post-trial* decisions. (Br. at 25 (citing *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 978 (9th Cir. 2023) and *United States v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172, 186 (D.D.C. 2001)).) Contrary to RealPage's argument, these cases demonstrate the need for the factfinder to have evidence—not allegations and arguments of the parties—to make such a fact-dependent decision. *See also Grinnell*, 384 U.S. at 574 (concluding that proprietary security systems "can be used only by a very large business or by government and are not realistic alternatives for most concerns," and thus are not interchangeable with "central station" services); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 54–60 (D.D.C. 2011) (concluding that "self-supply" services, such as assisted tax preparation and manual tax preparation, were not in the same product market as "digital do-it-yourself" tax preparation services).

Furthermore, the complaint contains all that is required at this stage: a "plausible explanation as to why users would not switch, even if they technically could." *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 17 (D.D.C. 2021). As one landlord explained, manual pricing does not compete because it "cannot solve at the level a revenue management tool can." (AC ¶ 227.) With respect to the supposed "inhouse solution," the complaint quotes another landlord expressing the industry's desire for a new product to compete with AIRM, noting that it had "no options besides RealPage," and yet another noting the need for a new competitor and plans to help incubate one. (*Id.* ¶ 228.) "[E]conomic actors usually have accurate perceptions of economic realities." *Syngenta*, 711 F. Supp. 3d at

567. Here, that reality is that inhouse solutions are not so readily available to RealPage's customers such that they could "compete" with RealPage's products. *See id.* at 566 (explaining that a relevant product market requires more than "technical interchangeability").

If RealPage wants to argue that Plaintiffs' market must include inhouse software and manual pricing, the appropriate stage is at trial with evidence. *Kolon*, 637 F.3d at 443 ("[D]ismissal of an antitrust claim for failure to adequately plead the relevant market can be problematic."); *Syngenta*, 711 F. Supp. 3d at 568–69 (rejecting defendants' argument that "Plaintiffs must explain in their complaint" why the market excluded certain products). At this stage of the case, Plaintiffs have pled a relevant market, well supported by evidence, that must be accepted as true.

### 2. *RealPage Misapplies the Law to Argue for a Different Market*

RealPage also misapplies the law to argue that Plaintiffs' market implausibly excludes "traditional non-software-based methods for informed pricing" (*i.e.*, manual pricing). (Br. at 24–26.) RealPage argues that because some conventional multifamily units do not use commercial revenue management software, a market for commercial revenue management software is implausible. (*Id.*) That argument is both another factual dispute—ignoring the allegations in the complaint (AC ¶¶ 221–28)—and a misstatement of the law.

In addition to *Brown Shoe*'s practical indicia, a market may be defined using the Hypothetical Monopolist Test (HMT), as set forth in the 2023 Merger Guidelines.

*Syngenta*, 711 F. Supp. 3d at 567; U.S. Dep't of Justice & Fed. Trade Comm'n, Merger Guidelines § 4.3 (2023), *available at* https://www.justice.gov/atr/2023-merger-guidelines.[7] The HMT asks whether a hypothetical monopolist of a proposed market could profitably worsen terms for consumers by, for example, raising what would be the competitive price by 5%. Merger Guidelines §§ 4.3, 4.3.B. If it can, the market is properly defined. *Syngenta*, 711 F. Supp. 3d at 567. A relevant product market "should ordinarily be defined as the smallest product market that will satisfy the hypothetical monopolist test." *H & R Block*, 833 F. Supp. 2d at 59 ("[i]nclusion of all possible methods of tax preparation, including pen-and-paper, in the relevant product market" not required).

Under both *Brown Shoe*'s practical indicia and the HMT, the complaint plausibly pleads a product market for commercial revenue management software for conventional multifamily housing rentals. For example, RealPage increased annual costs for revenue management for one landlord by 400% over a 5-year period; in response, that landlord considered only another commercial revenue management software product as a possible substitute. (AC ¶ 228.) RealPage charged for AIRM three times what a competing product cost. (*Id.* ¶ 179.) And another commercial revenue management software provider was unable to convince multiple customers to switch away from RealPage to its

_____

[7] Multiple appellate and district courts have endorsed or used the HMT as defined by the Merger Guidelines. *Syngenta*, 711 F. Supp. 3d at 567 (collecting cases); *Tapestry, Inc.*, 2024 WL 4647809, at *8 (same).

product even when giving it away *for free*. (*Id.* ¶ 179.)[8] These examples showcase RealPage's ability to profitably raise prices above a competitive level even absent hypothetical control over products from competitors such as Yardi and Entrata (*id.* ¶ 225); control over them would grant RealPage greater ability to raise prices, satisfying the HMT.

RealPage turns this analytical framework on its head. Rather than considering whether a hypothetical monopolist could increase the price to current customers in the alleged product market, RealPage points to a solution *outside* the market (manual pricing) and claims that its existence means Plaintiffs' product market is flawed. (Br. at 25–26.) This argument is logically and legally wrong. "[T]he mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes." *Tapestry*, 2024 WL 4647809, at *8.

RealPage ignores the commercial realities of this market, references documents outside the pleadings, and misunderstands the motion-to-dismiss standard. If RealPage wishes to challenge the factual bases for this market, it must do so at trial and with evidence. At this stage, RealPage "impermissibly asks the Court to summarily resolve the 'fact intensive' question of reasonable substitutability at the pleading stage." *RealPage,*

---

[8] RealPage seizes upon a single word, "primarily," to argue that commercial revenue management software products face meaningful competition from inhouse and manual pricing, and that these are reasonable substitutes. (Br. at 24.) That is wrong. As the complaint alleges, to the extent that RealPage faces competitive pressure, it is from other providers of commercial revenue management software, and other methods of pricing are not reasonable substitutes. (AC ¶¶ 174, 179, 181, 227.)

*Inc. v. Yardi Sys., Inc.*, 852 F. Supp. 2d 1215, 1222–24 (C.D. Cal. 2012) (agreeing with RealPage that defendant impermissibly challenged RealPage's alleged proposed market on motion to dismiss by arguing for inclusion of self-hosted software).

### B. Direct and Indirect Evidence Demonstrates That RealPage Enjoys Monopoly Power Over Commercial Revenue Management Software

RealPage enjoys monopoly power—the "power to control prices or exclude competition," *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)—within the relevant product market. (AC ¶ 219.) Monopoly power can be demonstrated through either direct evidence of power over prices by the defendant profitably raising prices substantially above the competitive level, or indirect evidence of a "dominant share of a relevant market that is protected by entry barriers." *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (en banc); *see also Dickson*, 309 F.3d at 199 n.1. The complaint plausibly pleads monopoly power through direct and indirect evidence.

With respect to direct evidence, RealPage charges a substantial premium for AIRM and retains customers despite a refusal to negotiate prices and its imposition of significant price increases. (*See* AC ¶¶ 169, 179–80, 225, 228 (alleging direct evidence of power to control price).) The complaint also alleges ample indirect evidence of RealPage's monopoly power. By its own reckoning, RealPage has a durable market share greater than 80%. (*Id.* ¶¶ 223–24.) Multiple barriers to entry include RealPage's data scale advantage and its related unlawful use of competing landlords' nonpublic, competitively sensitive data to provide revenue management services to landlords. (*Id.*

- 21 -

¶¶ 172–79, 182, 226.) Without violating Section 1 as RealPage has done, competitors cannot match RealPage's data scale and the performance of AIRM and YieldStar (and, depending on how landlords use it, RealPage's revenue management product LRO). Two years after a landlord discussed helping "incubate" an alternative to AIRM, that alternative commercial revenue management provider had less than a 0.5% market share. (*Id.* ¶ 228.) Fourth Circuit precedent holds that these allegations more than sufficiently plead monopoly power. *Kolon*, 637 F.3d at 451 (holding that plaintiffs adequately pled monopoly power where the complaint alleged a durable 70% market share and barriers to entry).

RealPage does not challenge the direct evidence in the complaint of its power to control prices and therefore its motion fails on that basis alone. Its arguments against indirect evidence of monopoly power are flawed in the same manner as its market definition arguments. RealPage acknowledges that its alleged 80% market share exceeds the requisite threshold and merely repeats its contention that its share is only 30%. (Br. at 27.) It goes further, relying on unsupported factual allegations that "11 million units are ripe targets for expanding the alleged commercial RMS market" to essentially advocate for a different market. (Br. at 27–28.) As explained above, RealPage's factual challenge to market definition is both substantively wrong and improper on a motion to dismiss. In addition, RealPage's argument that there are no entry barriers is yet another factual argument, ignoring the allegations that the law bars its competitors from collecting and using nonpublic data, as it has in AIRM and YieldStar. (AC ¶¶ 181, 226.) *Cf. United*

- 22 -

Case 1:24-cv-00710-LCB-JLW    Document 106    Filed 02/25/25    Page 29 of 44

*States v. Cavera*, 550 F.3d 180, 196 & n.14 (2d Cir. 2008) (en banc) (noting that laws regulating or prohibiting products can create higher barriers to entry for that market). Landlords understand and prize RealPage's illegal use of competitively sensitive data in AIRM and YieldStar, choosing RealPage over competing revenue management providers because they cannot offer the same profit boost using their competitors' data. (AC ¶¶ 167–71.)  In other words, other software companies would have to engage in the same Section 1 violations as RealPage to compete, a tremendous barrier to entry.

RealPage's reliance on *Metro Mobile CTS, Inc. v. NewVector Communications, Inc.*, 892 F.2d 62 (9th Cir. 1989), is likewise misplaced. *Metro Mobile* was the appeal of a summary judgment decision where there was evidence adduced in discovery that "barriers to entry were concededly low" and there was a "rapidly growing wholesale market." *Id.* at 63. The *Metro Mobile* court further discounted market share evidence because of the regulated nature of the cellular telephone market. *Id.* Those dispositive facts, supported by evidence, are absent here, where there are only allegations to the contrary that must be taken as true.

### C.     The Amended Complaint Plausibly Alleges RealPage Harmed Competition for Commercial Revenue Management Software

RealPage's argument that its conduct is not a "common form[] of alleged misconduct" and does not meet the categorized "tests for exclusionary conduct" is plainly wrong. (Br. at 18, 22–23.) The Fourth Circuit explicitly rejected this argument last year, stating that "anticompetitive conduct comes in many different forms that cannot always

- 23 -

be categorized," and that "Section 2 focuses on anticompetitive conduct, not on court-made subcategories of that conduct." *Duke Energy*, 111 F.4th at 354 (citation omitted).

Anticompetitive conduct is simply conduct "'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'" *Kolon*, 637 F.3d at 441 (quoting *Eastman Kodak*, 504 U.S. at 482–83); *see also Duke Energy*, 111 F.4th at 353. "[T]he means of illicit exclusion, like the means of legitimate competition, are myriad." *Id.* at 354 (citation omitted). It includes conduct that "tends to impair the opportunities of rivals" and "does not further competition on the merits." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985). Harm to the competitive *process* is anticompetitive harm. *Duke Energy*, 111 F.4th at 354–55. The complaint extensively alleges exactly this kind of harm, and so the motion fails.

RealPage is alleged to have engaged in precisely the type of unlawful conduct that provided it a competitive advantage, impaired the opportunities of rivals to compete on lawful merits, and harmed the competitive process by entering into an agreement (unlawful under Section 1) with landlords, including AIRM and YieldStar customers, to gather *and use* nonpublic, competitively sensitive data from competing landlords to offer price recommendations and prices that used their competitors' data. (AC ¶¶ 17–27, 260–61.) It further agreed unlawfully with AIRM and YieldStar users that they would use AIRM and YieldStar to align pricing. (*Id.* ¶¶ 28–33, 271–73.) In exchange for the promise of outperforming the market by 2–7%, landlords committed to use RealPage's revenue management products and pay RealPage's supracompetitive fees. (*E.g.*, *id.* ¶¶ 20,

179, 228.) In short, RealPage compensated landlords with the fruits of unlawful information sharing and coordination to maintain its monopoly over commercial revenue management software products.

Illegal conduct, such as RealPage's Section 1 violations, can support a monopolization claim where it has the requisite effect on competition. For instance, in *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965), the Supreme Court held that "the maintenance and enforcement of a patent obtained by fraud" supports a monopolization claim. *Id.* at 173–74. Likewise, the Supreme Court held in *California Motor Transportation Co. v. Trucking Unlimited*, 404 U.S. 508 (1972), that "illegal" or otherwise "reprehensible" sham litigation tactics support a monopolization claim. *Id.* at 513. *See also Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 783–88 (6th Cir. 2002) (affirming monopolization verdict where defendant engaged in tortious conduct to exclude a competitor); *Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1087 (D.C. Cir. 1998) (fraudulent misrepresentations to advertisers and sham objections to a government agency sufficed to allege anticompetitive conduct); *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 797–802 (N.D. Cal. 2022) (plaintiffs adequately alleged Facebook's false representations on data privacy constituted exclusionary conduct). If illegal or tortious conduct can undergird a monopolization claim, then *a fortiori* RealPage's violations of the antitrust laws (here, Section 1) can.

- 25 -

RealPage's illegal conduct impairs rivals' opportunities and harms the competitive process. For example, its primary selling point for AIRM was access to non-public data, even as it planned to sunset products like LRO that did not exploit nonpublic data at the same level. (AC ¶ 174–78.) RealPage claimed competing products lacking this data were like a "Ferrari without an engine" (*id.* ¶¶ 177–80), and affirmatively used this "data moat" to block new entry when its customers might have moved from LRO to a competitor, (*id.* ¶ 179–81). Competitors struggle to enter the market, often unable to win business away from AIRM or YieldStar by offering their products for half the price, one-third the price—or even for free. (*Id.* ¶¶ 169, 179, 228.) RealPage's market share continues to climb. (*Id.* ¶ 224.) In short, RealPage's illegal conduct has broken competition in this market and given it an unlawful competitive advantage.

RealPage also attacks a strawman by asserting that "data collection is not exclusionary conduct." (Br. at 18.) As explained already, Plaintiffs do not allege mere data collection under Claims 1 and 2. Rather, landlords (1) agreed to share competitively sensitive data with each other through RealPage *for use in pricing* and (2) agreed with RealPage to *align their pricing*. (*E.g.*, AC ¶¶ 260–64, 271–73.) The case that RealPage cites, *Dreamstime.com v. Google LLC*, 54 F.4th 1130 (9th Cir. 2022), held that Dreamstime's bare allegation of Google's monopolization of the online search advertising market in part by "unlawfully capturing data from users and advertisers" was insufficient because Dreamstime did not "plausibly allege *how* Google's data collection techniques are improper or unlawful." *Id.* at 1142 (emphasis added). By contrast,

RealPage's unlawful agreements with landlords to share and use competitively sensitive information in pricing, and to align pricing among competitors, serve to entrench its monopoly. (AC ¶¶ 176–82, 282–83, 287–89.)

RealPage's argument that Plaintiffs do not "identify any legal bar that would keep rivals from competing using a business model involving nonpublic information" likewise fails. (Br. at 20.) The legal bar to RealPage's competitors (and to RealPage) is the Sherman Act and relevant State laws. As the complaint alleges, "RealPage has become more entrenched and has stymied alternatives unless they too enter into similar unlawful agreements with landlords to obtain and use nonpublic transactional data to price units." (AC ¶ 166; *see also id.* ¶¶ 165, 182.) Nor does RealPage offer any legal basis—because there is none—for its erroneous argument that its conduct cannot be anticompetitive under Section 2 unless it is *per se* unlawful under Section 1. (Br. at 20.) *Cf. Conwood*, 290 F.3d at 783–88; *Klein*, 580 F. Supp. 3d at 797–802.

RealPage also tries to manufacture confusion over the fact that the Section 2 claims have different relevant markets than the Section 1 claims. (Br. at 20–21.) There is no inconsistency between two sets of claims under two different sections of the Sherman Act impacting different markets. RealPage enables unlawful information sharing and pricing alignment among landlords competing in local markets for conventional multifamily housing rentals, in violation of Section 1. At the same time, it uses the fruits of that unlawful conduct to foreclose competition for commercial revenue management

- 27 -

software, a national market, in violation of Section 2. As explained above in detail, its conduct harms the competitive process in the latter market.

Finally, with respect to the attempted monopolization claim, RealPage's conclusory arguments are wrong. As already discussed, the complaint adequately pleads RealPage's anticompetitive conduct and monopoly power for Claim 3, which satisfies the analogous elements for Claim 4. *Kolon*, 637 F.3d at 453. As for specific intent, RealPage summarily argues that Plaintiffs do not allege specific intent and that intent cannot be inferred. (Br. at 28 n.12.) RealPage is wrong on the law, *see Kolon*, 637 F.3d at 453 ("[S]pecific intent may be inferred from the defendant's anticompetitive practices."), and ignores the allegations that RealPage intends its (unlawful) use of nonpublic data to entrench its monopoly, (AC ¶¶ 174–77, 179 (RealPage's use of nonpublic data creates a "data moat" and a "major competitive advantage"), 181–82). RealPage's intent can be easily inferred from the wealth of allegations showing how it has worked to ensure it monopolizes the commercial revenue management software market.

In sum, RealPage's arguments amount to improper attempts to confuse or factually challenge the allegations and misapplications of the law. The Court should deny RealPage's motion to dismiss the Section 2 claims.

## III. The State-Law Claims Should Not Be Dismissed

RealPage does not make a separate argument about most of the state-law claims, contending only that they necessarily fail if the federal claims fail. (Br. at 28–29.) The States' claims under state law are not "governed by the same standards" as federal claims.

- 28 -

*Cf. Felder v. Casey*, 487 U.S. 131, 151 (1988). The state-specific claims are based on state-specific law that is either: (i) more protective of the States' interests than is the Sherman Act; or (ii) at least co-extensive with the Sherman Act claims. *E.g.*, *Epic Games*, 67 F.4th at 1000.

The States have invoked unfair business practice or antitrust statutes that are broader than federal laws. *See L.C. Williams Oil Co. v. Exxon Corp.,* 625 F. Supp. 477, 481 (M.D.N.C.1985) (North Carolina's section 75.1.1 "include[s] within its reach the federal antitrust laws" but also sanctions practices "beyond traditional antitrust concepts" (citing *Marshall v. Miller,* 302 N.C. 539, 549 (N.C. 1981))); *Syngenta*, 711 F. Supp. 3d at 591 (recognizing that California's Unfair Competition Law "covers conduct that 'violates the policy or spirit' of the antitrust laws 'or otherwise significantly threatens or harms competition'" (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180–87 (1999))); *Ciardi v. F. Hoffmann LaRoche, Ltd.*, 762 N.E.2d 303, 308–12 (Mass. 2002) (Massachusetts's Consumer Protection Act, Mass. Gen. L. c. 93A, "creates new substantive rights and provides new procedural devices for the enforcement of those rights" as compared to the Massachusetts Antitrust Act, Mass. Gen. L. c. 93); *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 519 (Tenn. 2005) ("Tennessee does not have a statutory 'harmony clause' mandating courts to interpret the TTPA consistently with federal law."). Colorado's 2023 Antitrust Act removed a harmonization provision, although federal decisions remain "helpful to an understanding" of Colorado's antitrust laws. *People v. North Ave. Furniture & Appliance, Inc.*, 645 P.2d 1291, 1295–96 (Colo.

1982) (en banc). Connecticut's and Oregon's state-law-based antitrust claims are merely guided by, but not beholden to, federal decisions. Conn. Gen. Stat. § 35-44b; Or. Rev. Stat. § 646.715(2). Additionally, for all the reasons stated above, the state-law claims survive even if they are co-extensive with the Sherman Act.

RealPage's lone argument about a specific state-law claim—attempting to argue that Tennessee's law does not apply to services (Br. at 29)—misses the mark entirely. RealPage ignores that the Tennessee Trade Practices Act, as amended last year, applies to "service[s]." Tenn. Code Ann. § 47-25-101; *Biddle v. Walt Disney Co.*, 2024 WL 3171860, at *17 (N.D. Cal. June 25, 2024).

The Court should deny RealPage's motion to dismiss Plaintiff States' claims predicated on state law.

Dated: February 25, 2025                    Respectfully submitted,

                                            By:  s/ *Henry C. Su*
                                            Henry C. Su
                                            David A. Geiger
                                            John J. Hogan
                                            Arshia Najafi
                                            Andrew Tisinger

                                            Attorneys
                                            United States Department of Justice
                                            Antitrust Division
                                            450 Fifth Street N.W., Suite 7100
                                            Washington, DC 20530
                                            Telephone: (202) 307-6200
                                            Email: henry.su@usdoj.gov

- 30 -

FOR PLAINTIFF STATE OF NORTH
CAROLINA:

JEFF JACKSON
Attorney General of North Carolina

*/s/ Kunal J. Choksi*
KUNAL J. CHOKSI
Senior Deputy Attorney General
N.C. Bar. No. 55666
ASA C. EDWARDS IV
Special Deputy Attorney General
N.C. Bar No. 46000
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27603
Telephone: 919-716-6000
Email: kchoksi@ncdoj.gov

*Attorneys for Plaintiff State of North
Carolina*

FOR PLAINTIFF STATE OF
CALIFORNIA:

ROB BONTA
Attorney General of California

*/s/ Pamela Pham*
DOAN-PHUONG (PAMELA) PHAM
QUYEN TOLAND
Deputy Attorneys General
Office of the Attorney General
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Tel: (213) 269-6000
Email: Pamela.Pham@doj.ca.gov

*Attorneys for Plaintiff State of California*

- 31 -

FOR PLAINTIFF STATE OF
COLORADO:

PHILLIP J. WEISER
Attorney General of Colorado

*/s/ Elizabeth W. Hereford*
Elizabeth. W. Hereford
Assistant Attorney General
Bryn A. Williams
First Assistant Attorney General
Colorado Department of Law
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Bryn.Williams@coag.gov

*Attorney for the Plaintiff State of Colorado*

FOR PLAINTIFF STATE OF
CONNECTICUT:

WILLIAM TONG
Attorney General of Connecticut

*s/ Julián A. Quiñones Reyes*
JULIÁN A. QUIÑONES REYES
Assistant Attorney General
Office of the Connecticut Attorney
General
165 Capitol Avenue
Hartford, CT 06106
Telephone: (860) 808-5030
Email: julian.quinones@ct.gov

*Attorney for Plaintiff State of Connecticut*

- 32 -

FOR PLAINTIFF STATE OF ILLINOIS

KWAME RAOUL
Attorney General of Illinois

*/s/ Daniel R. Betancourt*

DANIEL BETANCOURT, Assistant
Attorney General
JENNIFER M. CORONEL, Assistant
Attorney General
PAUL J. HARPER, Assistant Attorney
General
Office of the Illinois Attorney General
115 S. LaSalle St., Floor 23
Chicago, IL 60603
Tel: (312) 415-7945
Daniel.betancourt@ilag.gov
Paul.harper@ilag.gov
Jennifer.coronel@ilag.gov

*Attorneys for Plaintiff State of Illinois*

FOR PLAINTIFF COMMONWEALTH
OF MASSCHUSETTS:

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

*/s/ Katherine W. Krems*
KATHERINE W. KREMS
Assistant Attorney General
Office of the Massachusetts Attorney
General
One Ashburton Place
18th Floor
Boston, Massachusetts 02108
(617) 963-2189
Katherine.Krems@mass.gov

*Attorneys for Plaintiff Commonwealth of
Massachusetts*

- 33 -

FOR PLAINTIFF STATE OF
MINNESOTA:

KEITH ELLISON
Attorney General of Minnesota

*s/Katherine A. Moerke*
KATHERINE A. MOERKE
ELIZABETH ODETTE
SARAH DOKTORI
Assistant Attorneys General
Office of the Minnesota Attorney
General
445 Minnesota Street, Suite 600
St. Paul, MN 55101  55101-2130
katherine.moerke@ag.state.mn.us
Telephone: (651) 757-1288
elizabeth.odette@ag.state.mn.us
Telephone: (651) 728-7208
sarah.doktori@ag.state.mn.us
Telephone: (651) 583-6694

*Attorneys for Plaintiff State of Minnesota*

FOR PLAINTIFF STATE OF
OREGON

Dan Rayfield
Attorney General of Oregon

*/s/ Timothy D. Smith*
Timothy D. Smith
Attorney-in-Charge
Antitrust, False Claims, & Privacy
Section
Oregon Department of Justice
100 SW Market St, Portland OR  97201
503.798.3297 |
tim.smith@doj.oregon.gov

*Attorneys for Plaintiff State of Oregon*

- 34 -

FOR PLAINTIFF STATE OF
TENNESSEE:

JONATHAN SKRMETTI
Attorney General of Tennessee

*/s/ Daniel Lynch*
Daniel Lynch
Assistant Attorney General
S. Ethan Bowers
Senior Assistant Attorney General
Consumer Protection Division
Office of the Tennessee Attorney
General
P.O. Box 20207
Nashville, Tennessee 37202
daniel.lynch@ag.tn.gov
615.532.5732
ethan.bowers@ag.tn.gov
615.837.5582

*Attorneys for Plaintiff State of Tennessee*

- 35 -

# WORD COUNT CERTIFICATION

I certify that this Opposition complies with the applicable word limits excluding the caption, signature lines, certificate of service, and any cover page or index in accordance with Local Civil Rule 7.3(d)(1). This certification is made in accordance with Local Civil Rule 7.3(d)(1). The undersigned relied on the word count feature provided by word processing software. The Opposition contains 7,789 words. (*See* ECF No. 40 (enlarging word count limit to 8,000 words).)

Dated: February 25, 2025

By:  s/ Henry C. Su
Henry C. Su

Attorney
United States Department of Justice
Antitrust Division
450 Fifth Street N.W., Suite 7100
Washington, DC 20530
Telephone: (202) 307-6200
Email: henry.su@usdoj.gov

*Attorney for Plaintiff United States of America*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 25, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

By:   s/ Henry C. Su
Henry C. Su