# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### Civil Action No.: 1:24-cv-00710-LCB-JLW

UNITED STATES OF AMERICA; STATE
OF NORTH CAROLINA; STATE OF
CALIFORNIA; STATE OF COLORADO;
STATE OF CONNECTICUT; STATE OF
ILLINOIS; COMMONWEALTH OF
MASSACHUSETTS; STATE OF
MINNESOTA; STATE OF OREGON; and
STATE OF TENNESSEE,

     Plaintiffs,

     v.

REALPAGE, INC.; CAMDEN
PROPERTY TRUST; CORTLAND
MANAGEMENT, LLC; CUSHMAN &
WAKEFIELD, INC.; GREYSTAR REAL
ESTATE PARTNERS, LLC; LIVCOR,
LLC; PINNACLE PROPERTY
MANAGEMENT SERVICES, LLC;
WILLOW BRIDGE PROPERTY
COMPANY, LLC,

     Defendants.

## REALPAGE, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

ARGUMENT ........................................................................................................ 2

1.  Plaintiffs have failed to state a claim under Sherman Act § 1. .................... 2

    A.  Plaintiffs fail to allege direct evidence of anticompetitive
        effects. ............................................................................................ 2

    B.  Plaintiffs fail to allege anticompetitive effects indirectly. ................. 5

2.  Plaintiffs have failed to state a claim under Sherman Act § 2. .................... 8

    A.  Plaintiffs fail to allege exclusionary conduct. .................................... 8

    B.  Plaintiffs fail to allege monopoly power. ........................................... 12

        i.  Relevant Market ..................................................................... 12

        ii.  Monopoly Power ................................................................... 14

3.  Plaintiffs state-law claims fail. ................................................................... 15

CONCLUSION .................................................................................................... 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*1-800 Contacts, Inc. v. FTC*,
 1 F.4th 102 (2d Cir. 2021) ................................................................................................. 3

*Advanced Health-Care Services., Inc. v. Radford Community Hospital*,
 910 F.2d 139 (4th Cir. 1990) ............................................................................................. 5

*American Column & Lumber Co. v. United States*,
 257 U.S. 377 (1921) ...................................................................................................... 6, 8

*Arkansas Nursing Home Acquisition, LLC v. CFG Community Bank*,
 460 F. Supp. 3d 621 (D. Md. 2020) ............................................................................. 4, 14

*Association of Surgical Assistants v. National Board of Surgical Technology &
 Surgical Assisting*,
 127 F.4th 178 (10th Cir. 2025) ......................................................................................... 13

*Atlantic Richfield Co. v. USA Petroleum Co.*,
 495 US 328 (1990) ........................................................................................................... 10

*Brokerage Concepts, inc. v. U.S. Healthcare, Inc.*,
 140 F.3d 494 (3d Cir. 1998) ............................................................................................... 6

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
 1995 WL 455969 (E.D. Pa. July 27, 1995) ....................................................................... 6

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
 429 U. S. 477 (1977) ........................................................................................................ 11

*Chapman v. New York State Division for Youth*,
 546 F.3d 230 (2d Cir. 2008) ............................................................................................. 13

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
 491 F.3d 380 (8th Cir. 2007) ............................................................................................. 3

*Dickson v. Microsoft Corp.*,
 309 F.3d 193 (4th Cir. 2002) ..................................................................................... 2, 5, 7

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
 111 F. 4th 337 (4th Cir. 2011) ......................................................................................... 11

*E.I. du Pont de Nemours & Co. v. Kolon Industries, Inc.*,
 637 F.3d 435 (4th Cir. 2011) ............................................................................................. 7

*Epic Games, Inc. v. Apple, Inc.*,
 67 F.4th 946 (9th Cir. 2023) ....................................................................................... 5, 12

*FTC v. Indiana Federation of Dentists*,
    476 U.S. 447 (1986)......................................................................3

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) .......................................................9, 10

*FTC v. Syngenta Crop Protection AG*,
    711 F. Supp. 3d 545 (M.D.N.C. 2024) .......................................6

*FTC v. Tapestry, Inc.*,
    2024 WL 4647809 (S.D.N.Y. Nov. 1, 2024) ...............................13

*Gamboa v. Apple Inc.*,
    2025 WL 660190 (N.D. Cal. Feb. 28, 2025) ...............................14

*In re Graphics Processing Units Antitrust Litigation*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ......................................8

*United States v. Grinnell Corp*,
    384 U.S. 563 (1966)......................................................................12

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978)......................................................................11

*Jefferson Parish Hospital District No. 2 v. Hyde*,
    466 U.S. 2 (1984)..........................................................................5

*M&M Medical Supplies & Service, Inc. v. Pleasant Valley Hospital, Inc.*,
    981 F.2d 160 (4th Cir. 1992) .......................................................12, 14

*Maple Flooring Manufacturers' Association v. United States*,
    268 U.S. 563 (1925)......................................................................8

*Mylan Pharmaceuticals Inc. v. Warner Chilcott Public Ltd. Co.*,
    838 F.3d 421 (3d Cir. 2016)..........................................................14, 15

*Ohio v. American Express Co.*,
    585 U.S. 529 (2018)......................................................................2, 4, 5

*Philadelphia Taxi Association v. Uber Technologies*,
    886 F. 3d 332 (3rd Cir. 2018) ......................................................11

*Procaps S.A. v. Patheon, Inc.*,
    843 F.3d 1072 (8th Cir. 2016) .....................................................3

*Rambus Inc. v. FTC*,
    522 F. 3d 456 (D.C. Cir. 2008) ...................................................10

*In re RealPage, Inc. Rental Software Antitrust Litigation (No. II)*,
    709 F. Supp. 3d 478 (M.D. Tenn. 2023).....................................7

Page(s)

*Robertson v. Sea Pines Real Estate Cos., Inc.,*
679 F.3d 278 (4th Cir. 2012) ..................................................................4

*Scooter Store, Inc. v. SpinLife.com, LLC,*
777 F. Supp. 2d 1102 (S.D. Ohio 2011) ..................................................7

*Sea-Roy Corp. v. Parts R Parts, Inc.,*
1997 WL 1046282 (M.D.N.C. 1997)........................................................3

*In re Southeastern Milk Antitrust Litigation,*
801 F. Supp. 2d 705 (E.D. Tenn. 2011)..................................................15

*Todd v. Exxon Corp.,*
275 F.3d 191 (2d Cir. 2001)................................................................7, 8

*United States v. Container Corp. of America,*
393 U.S. 333 (1969).................................................................................7

*United States v. Sungard Data Systems, Inc.,*
172 F. Supp. 2d 172 (D.D.C. 2001) .......................................................12

*United States v. Visa U.S.A., Inc.,*
344 F.3d 229 (2d Cir. 2003)................................................................5, 6

*Virgin Atlantic Airways Ltd. v. British Airways PLC,*
257 F.3d 256 (2d Cir. 2001)....................................................................3

**Other Authorities**

Areeda & Hovenkamp, Antitrust Law ¶525e (1995).................................12

Areeda & Hovenkamp, Fundamentals of Antitrust Law § 6.04(i)
(4th ed., 2025-1 Supp. 2011). ................................................................10

Case 1:24-cv-00710-WO-JLW    Document 122    Filed 03/11/25    Page 5 of 23

## INTRODUCTION

Plaintiffs' Opposition fails to overcome the fatal defects in the Amended Complaint, which puts forward novel theories of liability that are devoid of both plausible factual allegations and legal support. They suggest that the Court's role on this motion is extremely limited to accepting their theories regardless of how conclusory or internally inconsistent their allegations are. But that is not the law.

As to their Section 1 claims, Plaintiffs fail to plausibly plead anticompetitive effects in any well-defined relevant markets. The Opposition's anecdotal snippets are insufficient to establish direct evidence of anticompetitive effects, both because they are not economic indicators of harm in any alleged relevant market, and because they are contradicted by the Amended Complaint's repeated concessions that RealPage's software recommends competitive, or "market," prices. *See* ¶¶ 33, 48–49.[1] Plaintiffs' allegations of indirect evidence of anticompetitive effects fare no better. They try to explain away their failure to allege specific market shares above 30% in their delineated geographic markets by relying on two incorrect positions of law: (1) that a 30% (or less) market share is sufficient to allege market power indirectly; and (2) that allegations of market share are not required at the pleading stage. Both propositions are wrong.

Plaintiffs' Section 2 claims also fail. First, Plaintiffs fail to allege exclusionary conduct—that RealPage did ***anything*** to ***exclude*** its competitors from doing business. The Opposition pins its hopes on Plaintiffs' alleged Section 1 violations for the requisite

---

[1] All "¶" citations are to the Amended Complaint. Dkt. 47.

exclusionary conduct, but this effort does not survive scrutiny. The alleged Section 1 conduct occurs in different alleged markets than the Section 2 claims and is non-exclusionary in nature—nothing about RealPage's alleged business model or software excludes RealPage's competitors. Second, Plaintiffs' Section 2 market definition and monopoly power allegations are implausibly narrow and contradictory, including because they selectively exclude millions of rental units for which RealPage allegedly collects "benchmarking" data. ¶ 24.

## ARGUMENT

**1. Plaintiffs have failed to state a claim under Sherman Act § 1.**

### A. Plaintiffs fail to allege direct evidence of anticompetitive effects.

Plaintiffs say they need not "make a case" at this stage, *see* Opp. at 14, but to survive dismissal, Plaintiffs must plead sufficient facts to make plausible "all the elements that comprise the theory for relief," and cannot "assume that the defendants have violated the antitrust laws in ways that have not been alleged," *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002) (cleaned up).

Direct evidence requires "actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market," based on a comparison of conditions against the "***competitive level***." *Ohio v. Am. Express Co.*, 585 U.S. 529, 542, 549 (2018) ("*Amex*") (cleaned up; emphasis added) (even increased prices insufficient "[w]here … output is expanding" such that "rising prices are equally consistent with growing product demand"). The Opposition concedes Plaintiffs do not allege reduced output, decreased quality, or increased prices above a competitive level. *See* Opp. at 12–

- 2 -

13 (objecting to RealPage focusing on these indicia).

Instead, Plaintiffs contend they need only label that RealPage "stifled competition." *Id.* (quoting *Amex*, 585 U.S. at 547). But *Amex* makes clear that the conclusory label "stifled competition" is not enough. Rather, "stifled competition" itself requires "an increase in … prices above the competitive level," "a reduction in overall … output," or "some other economic indicator that the [relevant] industry as a whole suffered anticompetitive consequences due to the" challenged conduct. *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380, 390 (8th Cir. 2007) (no detrimental effects "above the competitive level"); *Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001) (requiring "factors like reduced output, increased prices and decreased quality"); *Sea-Roy Corp. v. Parts R Parts, Inc.*, 1997 WL 1046282, at *18–19 (M.D.N.C. 1997) (rejecting Section 1 claims; "no evidence comparing prices … before and after the alleged restraints").[2] Here, the Amended Complaint alleges no such anticompetitive effects.

Direct evidence of anticompetitive effects must be "empirical" not "anecdotal." *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 118 (2d Cir. 2021). This is fatal to Plaintiffs' attempted reliance on alleged snippets from documents. Notably, none of these alleged snippets address what allegedly happened in any of Plaintiffs' Section 1 markets—not one. Instead, they allege only the opinions of certain RealPage customers that the software will increase their revenues. But none of the snippets say any Defendant will raise rents above

---

[2] *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986), found anticompetitive effects based on market-wide effects on output, with "insurers entirely unable to obtain x rays." *See Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1087 (11th Cir. 2016).

competitive levels, take units off the market, or decrease quality in any alleged multifamily-rental market. Further, these alleged snippets are contradicted by factual admissions in the Amended Complaint. For example, Plaintiffs rely on the phrase a "rising tide raises all ships," Opp. at 13, but the Amended Complaint makes clear this refers to prices moving "in a 'similar manner' to how the top and bottom of the market move," based on "market trends," ¶ 33, which is equally consistent with competitive pricing. The Opposition also argues that RealPage's software helps landlords "avoid normal competition" (a conclusory allegation if there ever was one), Opp. at 13, but Plaintiffs elsewhere allege factually that the software enables "more sophisticated, 'high-quality competition'" among "smart[er]" landlords. ¶ 33. And the Opposition relies on the software's alleged "hard floor[s]" and "guardrails," Opp. at 13, but the Amended Complaint itself alleges that these prevent recommendations from falling below "[t]he market minimum," ¶ 143, and that the software "recommend[s] a market position that is tied to the bottom and top of the market," ¶ 150, n.8. Plaintiffs repeatedly concede recommendations are tied to the market price, the essence of competition. *See* Mot. at 5–6 & n.4 (citing DOJ; "Algorithmic pricing can, of course, be highly competitive by facilitating rapid competitive response."). Especially where, as here, "when a complaint contains inconsistent and self-contradictory statements, it fails to state a claim." *See Ark. Nursing Home Acquisition, LLC v. CFG Cmty. Bank*, 460 F. Supp. 3d 621, 637 (D. Md. 2020).

Plaintiffs cite *Robertson v. Sea Pines Real Estate Cos., Inc.*, 679 F.3d 278, 291 (4th Cir. 2012), to argue they need not plead the *Amex* indicia. Opp. at 14. But in *Robertson*, the plaintiffs specifically alleged inflated prices and exclusion of "innovative, lower-priced

competitors" (reduced output), leading the court to hold that plaintiffs did not also have to allege what prices "were before, during, or after" the alleged class period. *Id*. at 283, 291. And *Robertson* excused certain conclusory allegations based on "recognition that a plaintiff may only have so much information at his disposal at the outset." *Id.* at 291; *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 145 (4th Cir. 1990) (plaintiff had taken no discovery). Here, in sharp contrast, Plaintiffs have had over ***800,000 documents, terabytes of data, source code, and transcripts of seven depositions*** from the Government's multi-year pre-suit investigation. Had direct evidence of anticompetitive effects existed in this material, Plaintiffs surely would have alleged it.

### B. Plaintiffs fail to allege anticompetitive effects indirectly.

The Amended Complaint also fails to plausibly allege indirect evidence of anticompetitive effects: "market power" plus "evidence that the challenged restraint harms competition." *Amex*, 585 U.S. at 542.

**Market Power.** Market power requires adequate market share and significant barriers to entry. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983 (9th Cir. 2023). In the Fourth Circuit, "***thirty percent share of the relevant market is insufficient to confer market power***" "as a matter of law." *Dickson*, 309 F.3d at 209 n.20 (emphasis added).[3] Plaintiffs do not dispute they allege market shares below this threshold. Plaintiffs rely almost entirely on *United States v. Visa U.S.A., Inc.*, but there the Second Circuit affirmed a market-power finding in the "highly concentrated [credit card] market," where Visa (with

---

[3] The 30% threshold from *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2 (1984), has been applied repeatedly in antitrust conspiracy cases, including *Dickson*.

47% share) was alleged to have conspired with MasterCard (with 26% share) for a combined 73% of the market. 344 F.3d 229, 239–40 (2d Cir. 2003).[4]

Here, by contrast, the Amended Complaint alleges myriad participants in the alleged multifamily-housing markets, and none individually accounts for appreciable market share. Even aggregated, Plaintiffs concede RealPage's customers account for sub-30% share in a number of their alleged markets. *See* Mot. at 13–14 (identifying allegations of under 30% market share).[5] These markets should be rejected out of hand.

Moreover, the weight of authority requires ***40%*** market share for market power. *See* Mot. at 13 n.6 (collecting cases). Plaintiffs dispute that they must "plead market share with specificity at the motion-to-dismiss stage." Opp. at 7. But Plaintiffs were able to calculate alleged shares for each of their markets, claiming that some are "30% or More," Am. Compl., App'x A & B, because RealPage provided "detailed data on the usage of AIRM/YieldStar in each geography they allege" during the pre-suit investigation. Mot.

---

[4] Plaintiffs cite *American Column* (Opp. at 7), but the 1921 Court did not conduct an exacting market-power analysis, and Plaintiffs quote the dissent's "about 30 per cent" rather than the majority's "one-third"—*i.e.*, over 30%—market share. *Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 391, 410 (1921). And *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.* involved a pre-discovery *per se* claim, 1995 WL 455969, at *3–4 (E.D. Pa. July 27, 1995), and the Third Circuit ultimately held the defendant's market share could not establish market power, *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 517 (3d Cir. 1998).

[5] Plaintiffs fail to justify including OneSite data in market-share estimates even though they concede OneSite is not revenue management software. *See FTC v. Syngenta Crop Prot. AG*, 711 F. Supp. 3d 545, 560 (M.D.N.C. 2024) (calculating market share in terms of relevant product market).

at 15.[6]  But despite having calculated specific market shares, Plaintiffs identify no market with 40% share (or more), and offer no market-specific reasons to depart from a 40% threshold.  Plaintiffs' ploy—alleging whether market shares reach 30% but withholding the actual shares—betrays Plaintiffs' awareness that these markets do not meet the 40% threshold.

Plaintiffs also do not contest (*see* Opp. at 9) their failure to allege entry barriers in any specific market, alleging only vague truisms without analysis as to how/why those generalities apply to any alleged market.  ¶ 218.  That is insufficient.  *See* Mot. at 14.

**Harm to Competition.**  Allegations that the multifamily-property industry is "suscept[able] to coordination," that RealPage collects "granular" data, and that RealPage uses the data "to set prices for competing landlords," Opp. at 10–12, do not amount to "likely and significant" harm to competition, *Dickson*, 309 F.3d at 206, and are equally compatible with competition enhancing rapid competitive response to market conditions, *see* Mot. at 5–6.

Plaintiffs' cases are distinguishable.  In *United States v. Container Corp. of America*, the alleged agreement involved exchange of specific pricing information ***directly*** between competitors "whenever requested."  393 U.S. 333, 334–35 (1969).  *Todd v. Exxon*

---

[6]  This is unlike Plaintiffs' cases.  *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc*., 637 F.3d 435, 452 n.12 (4th Cir. 2011) ("at the pre-discovery, motion-to-dismiss stage, ... [Plaintiff] likely has insufficient information to calculate a precise number"); *Scooter Store, Inc. v. SpinLife.com, LLC*, 777 F. Supp. 2d 1102, 1117 (S.D. Ohio 2011) (similar); *Brokerage*, 1995 WL 455969, at *3–4 (similar); *In re RealPage, Inc. Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 527 (M.D. Tenn. 2023) (motion-to-dismiss holding on market power was "prior to discovery").

*Corp.* involved **direct** exchange of disaggregated salary data. 275 F.3d 191, 196 (2d Cir. 2001). And in *American Column*, while there was an intermediary, competitors received "each member['s]" "sales and prices" and "what the production of each will be for the next two months." 257 U.S. at 398–99. Here, Plaintiffs never allege RealPage furnished any customer-specific data to/between competing landlords because they cannot do so. *See Maple Flooring Mfrs. Assn. v. United States*, 268 U.S. 563, 572 (1925) (upholding reports aggregating cost information among members).

Plaintiffs' argument that rental prices "move in a similar manner" (Opp. at 12) likewise fails to allege competitive harm. "Similar" pricing movement is entirely consistent with a healthy, competitive market. *See, e.g.*, *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1022 (N.D. Cal. 2007) ("competitive market forces will tend to drive the prices of like goods to the same level"). And Plaintiffs concede that AIRM/Yieldstar recommend "market" prices. Mot. at 12.

Additionally, Plaintiffs argue that RealPage "does not make its data publicly available or use it to develop products for renters," Opp. at 12, but RealPage "does not make its data [] available" **at all**, *cf.* ¶¶ 42–52, and RealPage has no affirmative obligation to create software products for any particular customer-base.

**2. Plaintiffs have failed to state a claim under Sherman Act § 2.**

**A. Plaintiffs fail to allege exclusionary conduct.**

Plaintiffs contend the alleged Section 1 violations suffice to plead the exclusionary

conduct element for their Section 2 claims.[7]  This is wrong as a matter of law.

First, in conceding "that the Section 2 claims have different relevant markets than the Section 1 claims," Opp. at 27, Plaintiffs walk into a fatal defect: they seek to allege competitive harm ***to rivals*** in the allegedly relevant national market for software by relying on "competitive harm ***to renters***" in entirely distinct (and local) markets for apartment rentals.  ¶¶ 283, 288 (emphasis added).  Plaintiffs declare that there is "no inconsistency between two sets of claims under two different sections of the Sherman Act impacting different markets," Opp. at 27, but the inconsistency lies in relying on supposed "impact" in one set of markets to show "impact" in a different market for a different product sold by different competitors.  *See* Mot. at 20–22 & n.11 (mismatch in product and geographic markets).  Plaintiffs have no answer to this.  Nor do they contest that reliance on allegations of out-of-market harms is untenable as a matter of law.  Mot. at 21–22.

Second, Plaintiffs have not satisfied the higher standard governing Section 2 conduct claims.  "[P]roving an antitrust violation under § 2 of the Sherman Act is more exacting than proving a § 1 violation."  *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991–92 (9th Cir. 2020).  Plaintiffs' Section 1 theory relies almost exclusively on concededly ***indirect*** evidence, Opp. at 5–12, but "a plaintiff may not use indirect evidence to prove unlawful monopoly maintenance via anticompetitive conduct under § 2."  *Qualcomm*, 969 F.3d at

---

[7] *See, e.g.,* Opp. at 1 ("RealPage violates Section 2 of the Sherman Act by using its position at the center of this illegal information exchange"); *id*. at 3 (same); *id*. at 24 (RealPage "harmed the competitive process by entering into an agreement ... with landlords" that is "unlawful under Section 1"); *id*. at 25 ("Illegal conduct, such as RealPage's Section 1 violations, can support a monopolization claim").  Plaintiffs do ***not*** allege that the Section 1 agreement is a conspiracy to monopolize.  ¶¶ 282, 287.

991–92.  And Plaintiffs' meager, supposed "direct" evidence for Section 1 is not direct evidence of anything under Section 2, because it relates only to competition among property owners, Opp. at 12–14, ***not*** competition involving RealPage and its competitors.

Third, Plaintiffs misconstrue (at 23–24) RealPage's argument about exclusionary conduct; it is not about whether the alleged conduct is "categorizable."  Rather, the issue is that the alleged Section 1 violation is not exclusionary with respect to any of RealPage's competitors.  Even if conduct violates Section 1 (which RealPage disputes), this does not imply that the conduct is *exclusionary* in the same market (much less an entirely different market).  "Take, for example, a case in which a monopolist has imposed minimum resale price maintenance agreements on its distributors.  Such agreements were traditionally per se unlawful under § 1, but they do not create or enhance the monopolist's market power by curtailing the opportunities of its actual or potential competitors."  Areeda & Hovenkamp, Fundamentals of Antitrust Law § 6.04(i) at 6-45 (4th ed., 2025-1 Supp. 2011).  This is what Plaintiffs attempt to allege here—that by ***raising*** the prices charged by its ***customers*** above the competitive level, RealPage has somehow excluded its own ***competitors***.  That makes no sense.  It would instead create prime opportunities for RealPage's rivals to advise landlords to profitably undercut the RealPage recommendations.  *See, e.g.*, *Rambus Inc. v. FTC*, 522 F. 3d 456, 466 (D.C. Cir. 2008) ("high prices and constrained output tend to attract competitors, not to repel them").  As the Supreme Court has held, if Section 1 is violated in these circumstances, it is because of the conduct's impact on customers, "not because of its effect on ***competitors***."  *Atl. Richfield Co. v. USA Petrol. Co.*, 495 US 328, 336 (1990) (competitor could not allege antitrust injury from its rival's alleged *per se*

- 10 -

illegal vertical price fixing) (original emphasis).

Plaintiffs' argument would read "exclusionary conduct" out of Section 2 law. Plaintiffs say RealPage "uses the fruits of th[e] unlawful conduct [under Section 1] to foreclose competition," Opp. at 27, but they identify nothing RealPage has done to impair its rivals' efficiency and thereby impede their ability to compete.[8] Plaintiffs cannot revive the discredited theory that an "illegal presence in the market" necessarily inflicts anticompetitive harm on competitors. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U. S. 477, 489 (1977) (competitor must prove "more than injury causally linked to an illegal presence in the market"); *Phila. Taxi Ass'n v. Uber Techs.*, 886 F. 3d 332, 343–45 (3rd Cir. 2018) (affirming dismissal of Section 2 claim that "all vehicles-for-hire legally operating in Philadelphia" were "harmed by Uber's allegedly illegal presence"). Here, Plaintiffs admit they allege no recognized form of exclusionary conduct. Opp. at 23–24. They cite cases addressing fraud, tortious acts, and sham litigation, Opp. at 25, but these are recognized forms of exclusionary conduct ***against competitors*** that are not alleged here. Plaintiffs back away from their argument that data collection is inherently anticompetitive. Opp. at 26. They do not deny their arguments wrongly assume information exchanges are invariably unlawful. *See* Mot. at 19–20; *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441, n.16 (1978) (exchanging "price data and other information among competitors does

---

[8] Plaintiffs claim rather that "the Sherman Act and relevant State laws" are the "legal bar" that keeps rivals from competing. Opp. at 27. But this argument is essentially circular, Mot. at 19, and lacks any basis in law or fact since Plaintiffs do not invoke any *per se* rule of illegality or allege RealPage's rivals have the market power required to invoke Plaintiffs' rule-of-reason theory.

- 11 -

not invariably have anticompetitive effects," can "render markets more ... competitive" and "do[es] not constitute a *per se* violation"). They do not address the settled law that competitive advantages due to product features reflect "business acumen" and a "superior product," not exclusionary conduct. Mot. at 22; *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966); *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F. 4th 337, 353 (4th Cir. 2011). In short, they nowhere explain how the alleged conduct is exclusionary under Section 2.[9]

### B. Plaintiffs fail to allege monopoly power.

#### i. Relevant Market

A plausible relevant market must include reasonably interchangeable substitutes based on "actual market realities," *Epic*, 67 F.4th at 978, including reasonable "self-supply alternatives," *see United States v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172, 186 (D.D.C. 2001); Areeda & Hovenkamp, Antitrust Law ¶ 525e (1995).

Plaintiffs' own allegations demonstrate their alleged commercial-revenue-management-software market fails to account for reasonable substitutes. Plaintiffs allege RealPage gathers data from "over 16 million units," ¶¶ 24, 167, that "approximately 4.8M units" use RealPage's revenue management software, ¶ 173, and that "Yardi and Entrata have fewer than 250,000 units," ¶ 176.[10] Assuming these 16 million units reflect the total

---

[9] Similarly, Plaintiffs cannot infer specific intent to monopolize, which requires "[i]mproper exclusion" "on some basis other than efficiency." *M&M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc*., 981 F.2d 160, 166 (4th Cir. 1992).

[10] The Amended Complaint is counterfactual in many ways, including ignoring numerous RealPage competitors. RealPage accepts Plaintiffs' allegations as true for purposes of this motion.

number of multifamily rental housing units in the United States (in reality, there are far more), then at least 11 million of these units—***over two-thirds*** of the customer base—use non-commercial substitutes. Mot. at 25–26. Despite alleging these 16 million units are relevant to RealPage's "data benchmarking," Plaintiffs do not plausibly explain why they should be excluded from the relevant market. *See* Opp. at 15–21.

Plaintiffs respond (at 20) that RealPage is pointing to a solution outside the market "[r]ather than considering whether a hypothetical monopolist could increase the price to current customers in the alleged product market." But this is another circular argument. RealPage does not point to a solution "outside" the relevant market; rather Plaintiffs' alleged market is "too narrow [and] unworkable," *Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*, 127 F.4th 178, 189 (10th Cir. 2025), and thus not a "market" for antitrust purposes, precisely because it does not consider alternatives used by at least 11 million units for which RealPage allegedly accesses information for "benchmarking."[11]

Plaintiffs call this a "fact-intensive exercise," Opp. at 16, 18, but Plaintiffs must allege a plausible product market to survive dismissal, *Surgical Assistants*, 127 F.4th at 187. A proposed market is "legally insufficient" where it defines its way "out of having to deal with the competition," *id.* at 188–89; *see also Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (affirming dismissal for legally insufficient market not

---

[11] *FTC v. Tapestry, Inc.*, 2024 WL 4647809 (S.D.N.Y. Nov. 1, 2024), addressed whether "well-defined submarkets may exist" "within [a] broad market," *id.* at *8, 35, but Plaintiffs allege no sub-markets.

"encompass[ing] all interchangeable substitute products"), and here the Amended Complaint itself identifies substitutes, ¶¶ 24, 176.

### ii. Monopoly Power

Plaintiffs have also not plausibly alleged that RealPage has monopoly power. To plead monopoly power by indirect evidence, Plaintiffs must allege that RealPage has "a dominant share of a relevant market that is protected by entry barriers." Opp. at 21. Plaintiffs' *own* allegations, taken as true, identify "16 million units" for which RealPage collects data for use in pricing, yet Plaintiffs allege only "4.8M units" use RealPage's revenue management software. *See* ¶¶ 24, 173, 176. A 30% share of the relevant market is presumptively insufficient. *M&M Med.*, 981 F.2d at 168. And regardless, if at least 11 million units are available as potential business for new entrants, then monopoly power is unlikely to arise or persist however the market is defined. Mot. at 27–28. Plaintiffs argue this presents a fact question, but the inconsistent allegations render the claim of monopoly power implausible. *See Ark. Nursing*, 460 F. Supp. 3d at 637.

Plaintiffs also fail to plead direct evidence of monopoly power. Plaintiffs' anecdotal snippets (Opp. at 21–22) do not suffice to allege RealPage has the power to control market prices much less restrict market output, and direct evidence requires "[b]oth." *Gamboa v. Apple Inc.*, 2025 WL 660190, at *9 (N.D. Cal. Feb. 28, 2025) (dismissing on this basis). Plaintiffs claim to allege "significant price increases," Opp. at 21, but they plead only that "RealPage increased annual costs for revenue management for one landlord." *Id*. at 19. That RealPage supposedly is a hard negotiator or charges a "substantial premium" for one product (AIRM), *id*. at 21, similarly fails to suffice. *See Mylan Pharm. Inc. v. Warner*

- 14 -

*Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 435 (3d Cir. 2016) (direct evidence lacking absent "substantiated quantitative analysis showing that Defendants maintained high price-cost margins or that Defendants markedly restricted output"); *In re Se. Milk Antitrust Litig.*, 801 F. Supp. 2d 705, 726–27 (E.D. Tenn. 2011) (no direct evidence where dairy purchaser set milk prices and was a "hard-nosed actor in the market"). Plaintiffs' own cited allegations demonstrate that RealPage's product is better than rivals'. *See* ¶ 169 (AIRM had "additional reporting capabilities" compared to competing products).[12] Plaintiffs' other "direct evidence" allegations, *see* ¶¶ 180, 225, do not reflect power to control price or output or exclude competitors.

**3.     Plaintiffs state-law claims fail.**

Plaintiffs premise each state claim on the exact conduct underlying the federal claims, *see* ¶¶ 292–93 (North Carolina), 296 (California), 299 (Colorado), 305 (Connecticut), 308 (Illinois), 311 (Massachusetts), 316 (Oregon), 320–23 (Tennessee), adding allegations only to meet *stricter* state-law elements, *see, e.g.*, ¶ 312. Because Plaintiffs do not plead conduct outside the ambit of federal law but within the scope of state law, their argument that state laws can be more protective than federal law is irrelevant. *See* Opp. at 29.

## CONCLUSION

The Court should dismiss the Amended Complaint with prejudice.

---

[12] Tellingly, Plaintiffs at no point allege RealPage's product is more attractive because it recommends higher rents than its rivals do. To the contrary, RealPage's "more accurate and time sensitive data," *id.*, and use of "machine learning to improve both the supply and demand modeling," ¶ 169, likely results in *more competitive* rent recommendations.

This 11th day of March, 2025.

/s/ *Adam K. Doerr*
Adam K. Doerr
N.C. Bar No. 37807
adoerr@robinsonbradshaw.com
Caroline H. Reinwald
N.C. Bar No. 58053
creinwald@robinsonbradshaw.com

ROBINSON, BRADSHAW & HINSON, P.A.
101 N. Tryon St., Ste. 1900
Charlotte, North Carolina 28246
Telephone:    704.377.2536
Facsimile:    704.378.4000

Stephen Weissman
(*LR 83.1(d) Counsel*)
sweissman@gibsondunn.com
Michael J. Perry
(*LR 83.1(d) Counsel*)
mjperry@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC  20036-4504
Telephone: (202) 955-8500

Ben A. Sherwood
(*LR 83.1(d) Counsel*)
bsherwood@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Telephone: (212) 351-2671

Daniel G. Swanson
(*LR 83.1(d) Counsel*)
dswanson@gibsondunn.com
Jay P. Srinivasan
(*LR 83.1(d) Counsel*)

- 16 -

jsrinivasan@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000

Chris Whittaker
(*LR 83.1(d) Counsel*)
cwhittaker@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive, Suite 1200
Irvine, CA 92612-4412
Telephone: (949) 451-4337

*Attorneys for Defendant RealPage, Inc.*

## WORD COUNT CERTIFICATION

I certify that this Reply in Support of Defendant RealPage, Inc.'s Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6) (the "Brief") complies with the applicable word limits excluding the caption, signature lines, certificate of service, and any cover page or index in accordance with this Court's October 30, 2024 Order extending the word limitation, Dkt. 40, and Local Civil Rule 7.3(d)(1). This certification is made in accordance with Local Civil Rule 7.3(d)(1). The undersigned relied upon the word count feature provided by word-processing software and the Brief contains 4,250 words.

This 11th day of March, 2025.

/s/ *Adam K. Doerr*

Adam K. Doerr
N.C. Bar No. 37807
adoerr@robinsonbradshaw.com

ROBINSON, BRADSHAW & HINSON, P.A.
101 N. Tryon St., Ste. 1900
Charlotte, North Carolina 28246
Telephone:   704.377.2536
Facsimile:   704.378.4000

*Attorneys for Defendant RealPage, Inc.*