| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF NORTH CAROLINA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF ILLINOIS, COMMONWEALTH OF MASSACHUSETTS, STATE OF MINNESOTA, STATE OF OREGON, and STATE OF TENNESSEE, <br><br> Plaintiffs, <br><br>        v. <br><br> REALPAGE, INC., CAMDEN PROPERTY TRUST, CORTLAND MANAGEMENT, LLC, CUSHMAN & WAKEFIELD, INC., GREYSTAR REAL ESTATE PARTNERS, LLC, LIVCOR, LLC, PINNACLE PROPERTY MANAGEMENT SERVICES, LLC, and WILLOW BRIDGE PROPERTY COMPANY, LLC <br><br> Defendants. | Case No. 1:24-cv-00710-WO-JLW <br><br> **MEMORANDUM OF LAW IN SUPPORT OF CUSTOMER DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** <br><br> **ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF CUSTOMER DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION.......................................................1

QUESTION PRESENTED.................................................5

BACKGROUND........................................................5

I.   Customer Defendants Independently License AIRM or
     YieldStar and Use Them in Different Ways.....................5

II.  Class Action Plaintiffs Sue RealPage and Its Customers
     for Purportedly Fixing Rental Prices Through
     RealPage's RMS..............................................9

III. Plaintiffs Sue RealPage and Add Customer Defendants
     Months Later...............................................10

ARGUMENT.........................................................11

I.   THE FAC FAILS TO PLEAD THE FACTS NECESSARY TO ALLEGE
     AN ANTITRUST CONSPIRACY....................................13

     A.   Plaintiffs Fail to Plead "When" the Alleged
          Conspiracy Began......................................14

     B.   Plaintiffs Fail to Allege "Who" Joined the
          Alleged Conspiracy....................................14

     C.   Plaintiffs Fail to Allege "What" Was Agreed Upon.....15

II.  PLAINTIFFS DO NOT PLAUSIBLY PLEAD ANY AGREEMENT TO
     EXCHANGE INFORMATION OR ALIGN PRICES.......................18

     A.   Count 1 Fails to Allege an Agreement Among
          Customer Defendants to Exchange Information..........19

          1.   Plaintiffs Allege No Direct Evidence of Any
               Agreement Among Customer Defendants to
               Exchange Information............................20

          2.   Plaintiffs Offer No Circumstantial Evidence
               of an Agreement Among Customer Defendants to
               Exchange Information............................21

               a.   Plaintiffs Fail to Plead Parallel
                    Conduct....................................21

i

            b.    Plaintiffs Fail to Plead "Plus Factors"....28

      B.    Count 2 Fails to Allege an Agreement Between
            Each Customer Defendant and RealPage to Align
            Prices.............................................32

III.  PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE ANTICOMPETITIVE
      EFFECTS................................................35

      A.    Plaintiffs Do Not Even Try to Allege
            Anticompetitive Effects Through "Direct Evidence"....35

      B.    Plaintiffs Fail to Allege Anticompetitive Effects
            Through "Indirect Evidence"........................36

      C.    Count 2's Market Share Theory Defies Fourth
            Circuit Law........................................37

IV.   PLAINTIFFS' STATE LAW CLAIMS (COUNTS 5-12) FALL WITH
      THEIR FEDERAL LAW CLAIMS................................39

      CONCLUSION..............................................41

# TABLE OF AUTHORITIES

Page(s)

## CASES

*49er Chevrolet, Inc. v. General Motors Corp.*,
 803 F.2d 1463 (9th Cir. 1986)............................34

*Acquaire v. Canada Dry Bottling Co. of New York*,
 24 F.3d 401 (2d Cir. 1994)...............................34

*In re Amazon.com, Inc. eBook Antitrust Litigation*,
 2023 WL 6006525 (S.D.N.Y. July 31, 2023).................38

*American Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
 367 F.3d 212 (4th Cir. 2004)..........................19, 20

*Amory Investments LLC v. Utrecht-America Holdings, Inc.*,
 74 F.4th 525 (7th Cir. 2023).............................12

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)......................................12

*Ass'n of American Physicians & Surgeons, Inc. v. American
 Board of Medical Specialties*,
 2020 WL 5642941 (N.D. Ill. Sept. 22, 2020)...............37

*Ass'n of Surgical Assistants v. National Board of Surgical
 Technology & Surgical Assisting*,
 127 F.4th 178 (10th Cir. 2025)...........................40

*Bell Atlantic Corp. v. Twombly*,
 550 U.S. 544 (2007)...................................18, 29

*Burtch v. Milberg Factors, Inc.*,
 662 F.3d 212 (3d Cir. 2011)..............................18

*California Crane School, Inc. v. Google LLC*,
 722 F. Supp. 3d 1026 (N.D. Cal. 2024)....................39

*Ciardi v. F. Hoffmann-La Roche, Ltd.*,
 762 N.E.2d 303 (2002)....................................40

*City of Pontiac Police & Fire Retirement System v. BNP
 Paribas Securities Corp.*,
 92 F.4th 381 (2d Cir. 2024)...............17, 25, 28, 31

Case 1:24-cv-00710-WO-JLW    Document 129    Filed 04/10/25    Page 4 of 52

*Cornish-Adebiyi v. Caesars Entertainment, Inc.*,
    2024 WL 4356188 (D.N.J. Sept. 30, 2024)...................22

*In re Crop Inputs Antitrust Litigation*,
    749 F. Supp. 3d 992 (E.D. Mo. 2024)......................13

*Davis v. HCA Healthcare, Inc.*,
    2022 WL 4354142 (N.C. Super. Ct. Sept. 19, 2022).........39

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002)..........................*passim*

*Duffy v. Yardi Systems, Inc.*,
    2024 WL 4980771 (W.D. Wash. Dec. 4, 2024).........26, 27, 28

*Erie County, Ohio v. Morton Salt, Inc.*,
    702 F.3d 860 (6th Cir. 2012)..............................22

*Federal Trade Commission v. Sperry & Hutchinson Co.*,
    405 U.S. 233 (1972).......................................40

*Federal Trade Commission v. Syngenta Crop Protection AG*,
    711 F. Supp. 3d 545 (M.D.N.C. 2024)......................41

*Freeman Industries, LLC v. Eastman Chemical Co.*,
    172 S.W.3d 512 (Tenn. 2005)..............................41

*Gibson v. Cendyn Group, LLC*,
    2024 WL 2060260 (D. Nev. May 8, 2024)................*passim*

*Gibson v. MGM Resorts International*,
    2023 WL 7025996 (D. Nev. Oct. 24, 2023).............*passim*

*Great Western Mining & Mineral Co. v. Fox Rothschild LLP*,
    615 F.3d 159 (3d Cir. 2010)..............................14

*Hackman v. Dickerson Realtors, Inc.*,
    520 F. Supp. 2d 954 (N.D. Ill. 2007).....................40

*Hall v. United Air Lines, Inc.*,
    296 F. Supp. 2d 652 (E.D.N.C. 2003)......................28

*In re Insurance Brokerage Antitrust Litigation*,
    618 F.3d 300 (3d Cir. 2010)...........................29, 30

*Jien v. Perdue Farms, Inc.*,
    2020 WL 5544183 (D. Md. Sept. 16, 2020)..................30

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008)..........................12, 14

*King v. Rubenstein*,
    825 F.3d 206 (4th Cir. 2016)..............................41

*Laughlin v. Evanston Hospital*,
    550 N.E.2d 986 (Ill. 1990)................................40

*Liggett Group, Inc. v. Brown & Williamson Tobacco Corp.*,
    964 F.2d 335 (4th Cir. 1992)..............................32

*LiveUniverse, Inc. v. MySpace, Inc.*,
    304 F. App'x 554 (9th Cir. 2008)..........................39

*Maple Flooring Manufacturers' Ass'n v. United States*,
    268 U.S. 563 (1925)........................................29

*Masco Contractor Services East, Inc. v. Beals*,
    279 F. Supp. 2d 699 (E.D. Va. 2003)...................13, 38

*Mayor & City Council of Baltimore v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013)...............................31

*Merck-Medco Managed Care, Inc. v. Rite Aid Corp.*,
    22 F. Supp. 2d 447 (D. Md. 1998)..........................28

*In re Musical Instruments & Equipment Antitrust Litigation*,
    798 F.3d 1186 (9th Cir. 2015).........................17, 23

*Northwestern Medicine Laboratories v. Blue Cross & Blue
    Shield of Oregon*,
    794 P.2d 428 (Or. 1990)...................................41

*Ohio v. American Express Co.*,
    585 U.S. 529 (2018)...................................35, 36

*Okavage Group, LLC v. United Wholesale Mortgage, LLC*,
    2022 WL 17478298 (M.D. Fla. July 27, 2022)................37

*In re Passenger Vehicle Replacement Tires Antitrust
    Litigation*,
    2025 WL 606533 (N.D. Ohio Feb. 25, 2025)......16, 22, 24, 26

*Procaps S.A. v. Patheon, Inc.*,
    845 F.3d 1072 (11th Cir. 2016)............................32

v

*R. J. Reynolds Tobacco Co. v. Philip Morris Inc.,*
       199 F.Supp.2d 362 (M.D.N.C. 2002)..........................39

*Real Estate Exchange Inc. v. Zillow Group, Inc.,*
       2025 WL 670967 (9th Cir. Mar. 3, 2025)....................34

*In re RealPage, Inc., Rental Software Antitrust Litigation*
       *(No. II)*,
       709 F. Supp. 3d 478 (M.D. Tenn. 2023)..........9, 10, 26, 27

*Rojas v. Delta Airlines, Inc.,*
       425 F. Supp. 3d 524 (D. Md. 2019).................13, 28, 29

*SD3, LLC v. Black & Decker (U.S.) Inc.,*
       801 F.3d 412 (4th Cir. 2015).........................*passim*

*Segal v. Amadeus IT Group, S.A.,*
       2025 WL 963751 (N.D. Ill. Mar. 31, 2025).................24

*Stand Energy Corp. v. Columbia Gas Transmission Corp.,*
       2008 WL 3891219 (S.D. W. Va. Aug. 19, 2008)..............38

*Thompson Everett, Inc. v. National Cable Advertising, L.P.,*
       850 F. Supp.  470 (E.D. Va. 1994).........................28

*Toscano v. Professional Golfers Ass'n,*
       258 F.3d 978 (9th Cir. 2001)..............................34

*United States v. Brewbaker*,
       87 F.4th 563 (4th Cir. 2023)..............................19

*Washington County Health Care Authority, Inc. v. Baxter*
       *International Inc.,*
       328 F. Supp. 3d 824 (N.D. Ill. 2018).....................32

**STATUTES**

15 U.S.C. § 1.................................................1

740 Ill. Comp. Stat. Ann. § 10/11...........................40

Conn. Gen. Stat. § 35-44b...................................40

CRS §6-4-119................................................40

Or. Rev. Stat. § 646.715....................................41

vi

## INTRODUCTION

The Court should dismiss this case against a belatedly added handful of RealPage customers ("Customer Defendants") because plaintiffs do not sufficiently allege any element of their claims against them.[1] Plaintiffs contend that RealPage's revenue management software ("RMS") is a walking conspiracy, theorizing that licensing it—as any apartment owner or manager can do—violates the Sherman Act by agreeing to a hub-and-spoke conspiracy to exchange information with every RealPage customer throughout the country (Count 1), and to a vertical conspiracy to "align" rental prices with RealPage (Count 2). But to support a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, plaintiffs must allege that "the defendants . . . specifically made a conscious commitment to a common scheme designed to achieve an unlawful objective" by "agree[ing] to restrain trade." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 424 (4th Cir. 2015). Plaintiffs cannot "establish the required agreement" by alleging conduct that "is equally consistent with lawful conduct." *Id.*

Plaintiffs fail those pleading tests here, as they do not plausibly allege that Customer Defendants agreed with one another

---

[1] Customer Defendants are: Camden Property Trust, Cushman & Wakefield, Inc., Greystar Real Estate Partners, LLC, LivCor, LLC, Pinnacle Property Management Services, LLC, and Willow Bridge Property Company, LLC.

to use any RMS product because their allegations suggest only lawful, unilateral conduct. Instead, plaintiffs seek to infer an agreement just because each Customer Defendant allegedly licenses RealPage's RMS. But the Fourth Circuit already has held that customers licensing software from the same vendor does not suggest a conspiracy among those customers. *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002). *Dickson* applies equally when competitors license revenue management software like RealPage's because the "mere use of algorithmic pricing based on artificial intelligence by . . . competitors . . . <u>does not</u> plausibly allege an illegal agreement" among users of the software. *Gibson v. Cendyn Grp., LLC*, 2024 WL 2060260, at *6 (D. Nev. May 8, 2024) ("*Gibson II*") (emphasis added). Plaintiffs' claims are especially defective because they allege that Customer Defendants have many independent unilateral reasons to license RealPage's RMS.

**First**, plaintiffs resort to group pleading rather than answer the "who, what, when[,] and where of the claimed antitrust misconduct." *SD3*, 801 F.3d at 430.[2] Plaintiffs fail to identify "when" <u>each</u> Customer Defendant—or <u>any</u> of the properties it owns or manages—even began subscribing to RealPage's RMS, much less when these subscriptions supposedly morphed into an agreement among <u>all</u>

---

[2] All internal quotation marks, citations, footnotes, and original alterations are omitted unless specified otherwise.

of them. Plaintiffs also fail to explain "what" Customer Defendants did to form this alleged agreement. After all, Customer Defendants allegedly licensed different RealPage RMS products, and plaintiffs fail to allege Customer Defendants ever discussed any information provided by any RealPage RMS.

Plaintiffs' claim that each Customer Defendant formed a separate vertical conspiracy with RealPage to "align" rental prices is also unsupported. While customers may have software licenses with RealPage, plaintiffs fail to identify anything in those licenses that "aligns" rental prices. Plaintiffs allege no facts supporting "alignment" because the complaint does not allege that any Customer Defendant was required to adopt any rental price suggested by RealPage's RMS. Rather than allege "alignment," plaintiffs allege that Customer Defendants rejected RealPage's pricing suggestions 50-60% of the time.

**Second**, plaintiffs do not plausibly allege the existence of either a conspiracy among Customer Defendants (Count 1) or conspiracies between each Customer Defendant and RealPage (Count 2). As to Count 1, plaintiffs plead no direct evidence of agreement, and their circumstantial allegations do not plausibly suggest that Customer Defendants agreed with each other to license RealPage's RMS. Nor do plaintiffs plausibly allege that subscribing to RealPage's RMS ran against any Customer Defendant's

3

individual self-interest. Instead, plaintiffs allege the opposite: each Customer Defendant subscribed to RealPage's software because it was in each Customer Defendant's self-interest, particularly since RealPage's RMS is the leading RMS on the market and offers significant benefits to each Customer Defendant.

No more plausible are Count 2's allegations that the vertical software licenses between each Customer Defendant and RealPage are designed to "align" prices. Fatally, plaintiffs identify no Customer Defendant's rental prices, much less facts suggesting they became "aligned" after licensing RealPage's RMS. In addition, "[i]t is axiomatic that," to violate the Sherman Act, an agreement "must be in restraint of trade," but Customer Defendants "have not agreed to restrain their ability to price [apartments] in any way by licensing" RealPage RMS. *Gibson II*, 2024 WL 2060260, at *9. To the contrary, plaintiffs allege that Customer Defendants are free to "override" any and every price suggested by RealPage's RMS, FAC ¶ 62—and suggest they did so at least half the time, *id*. ¶ 73.

**Third**, plaintiffs fail to plausibly allege that any Customer Defendant's conduct caused anticompetitive effects in any relevant market. Having failed to plead rental prices charged by Customer Defendant, plaintiffs also plead nothing showing that these unspecified rental prices were above a competitive level. Nor do plaintiffs even identify any Customer Defendant's market share in

any market, let alone allege that any Customer Defendant has market power.  Count 2, moreover, fails as a matter of law because the Fourth Circuit has squarely rejected plaintiffs' attempt to aggregate the effects associated with the separate vertical agreements they allege for purposes of Count 2.  *Dickson*, 309 F.3d at 203.

**Finally**, the Court should dismiss plaintiffs' tag-along state law claims (Counts 5-13) because they fail for the same reasons as their Sherman Act claims.

**QUESTION PRESENTED**

Whether plaintiffs have stated plausible antitrust claims against Customer Defendants for licensing software that aids revenue management at multifamily apartments.

**BACKGROUND[3]**

**I.    Customer Defendants Independently License AIRM or YieldStar and Use Them in Different Ways**

Customer Defendants (or their affiliates) purportedly own or manage multifamily apartments in the United States.  FAC ¶¶ 237-39, 243-54.[4]  Among other things, multifamily apartment managers

---

[3]  Customer Defendants accept plaintiffs' factual allegations as true solely for purposes of this motion.

[4]  Defendants Cushman & Wakefield, Inc. and Greystar Real Estate Partners LLC do not belong in this case because they are alleged to manage or own multifamily apartment buildings only indirectly through subsidiaries.  FAC ¶¶ 243-48.

help manage building revenue based on each building owner's individual strategy. *See id.* ¶ 6. Managing an apartment building's revenue is a complicated exercise in balancing supply and demand. To maximize revenue, a manager must balance the number of occupied units, the timing of upcoming vacancies, fluctuating local demand, and rental prices. *See id.*

RMS provides technological solutions that help manage revenue. Plaintiffs allege that RealPage is the leading RMS provider, FAC ¶ 11, and offers several products, including AIRM and YieldStar, *id.* ¶ 14. AIRM and YieldStar suggest rental prices based on inputs customized for each subscriber and each property—including the property's individual supply and demand characteristics, and, sometimes, aggregated and anonymized data about other properties. *See id.* ¶¶ 46–49. Based on those customized inputs and data, RealPage's RMS offers tailored pricing recommendations along with many other features, including:

- Helping "improve . . . supply and demand modeling" by "provid[ing] a tool to further customize to each asset's needs," *id.* ¶ 170;

- Assisting lessors with "[m]anaging lease expirations," which "is an important element of revenue management," *id.* ¶ 54;

- "[F]orecast[ing] [] the number of leases" at subscribing buildings "over time," *id.* ¶ 47; and

- Providing "insight into advantageous demand drivers" and "revenue risk and opportunity," which lessors can leverage to make "informed pricing" decisions,

6

*id.* ¶ 172, achieve their individualized strategic goals[,] and "grow [their] revenue," *id.* ¶ 169; *see also id.* ¶ 49.

Customer Defendants are just six of hundreds, if not thousands, of entities "[a]cross America" that found AIRM's or YieldStar's features attractive and began licensing them. *Id.* ¶ 5. Plaintiffs do not identify any characteristics differentiating Customer Defendants from other RealPage licensees. Plaintiffs also do not identify when any Customer Defendant licensed AIRM or YieldStar. And they do not allege that any Customer Defendant coordinated its decision to license RealPage's RMS with any other Customer Defendant. Plaintiffs do not even allege that Customer Defendants use the same RealPage product, instead alleging that defendant Pinnacle "use[s] YieldStar" *id.* ¶ 244, while other Customer Defendants "use[] AIRM," *e.g.*, *id.* ¶ 250.

Plaintiffs concede Customer Defendants are free "to override every price recommend[ed]" by RealPage's RMS, *id.* ¶ 57, and exercise their pricing discretion "[e]very morning" by "choos[ing] whether to accept [RealPage's] . . . recommendation, keep the previous day's rent, or override the recommendation," *id.* ¶ 62. Plaintiffs do not identify the rate at which any Customer Defendant accepts prices suggested by AIRM or YieldStar at any apartment building or how Customer Defendants' acceptance rates compare to each other. Instead, they concede that "average acceptance rate[s]

7

across all landlords nationally for new leases" are "between [only] 40–50%." *Id.* ¶ 73. Thus, recommended prices are <u>rejected</u> 50 to 60% of the time.

Plaintiffs also describe different "parameters" and options that users "can change . . . [,] disable[,] or enable" in AIRM or YieldStar, *id.* ¶ 66, that alter how each subscriber uses the products as well as the rental prices the products suggest for each building:

- **Market Seasonality.** "[L]andlord[s] can choose" to use a "market seasonality" setting—which plaintiffs allege "adjusts . . . prices based on" future vacancies, *id.* ¶ 159—"to manage lease expirations for [their] units," *id.* ¶ 56.

- **Auto-Accept.** Some "landlord[s]" use RealPage's "auto-accept" setting that can be overridden, "disabled," or "partial[ly]" enabled. *Id.* ¶¶ 66– 68.

- **Amenity Optimization.** Some "landlords" use "an amenity optimization feature" that "provide[s] market values for specific amenities." *Id.* ¶ 58.

- **Surrogate Properties.** Some landlords use "surrogate properties" in AIRM or YieldStar to help them generate pricing recommendations. *Id.* ¶ 51.

- **Pricing Advisory Services.** Some "landlords," employ RealPage's pricing advisory services as a supplement to AIRM or YieldStar, while others "use internal or in-house revenue management advisors." *Id.* ¶¶ 69, 72.

Plaintiffs do not identify which RealPage RMS parameters and options any Customer Defendant uses at <u>any</u> property, much less

8

allege that each Customer Defendant uses the same parameters and options in the same way at <u>every</u> property. Plaintiffs also do not identify any rental price that any Customer Defendant charges at any building.

## II. Class Action Plaintiffs Sue RealPage and Its Customers for Purportedly Fixing Rental Prices Through RealPage's RMS

In 2022, class action lawyers filed lawsuits against RealPage and more than 40 RealPage customers. The complaints, which were consolidated in the Middle District of Tennessee, alleged that RealPage and its customers violated Section 1 of the Sherman Act by supposedly agreeing to a per se unlawful "nationwide conspiracy to fix and inflate the price of multifamily rental housing." *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)* ("*RealPage MDL*"), No. 3:23-md-03071 (M.D. Tenn. filed Sept. 7, 2023)*, ECF No. 530 ¶¶ 1, 15. Although the Department of Justice ("DOJ") filed a statement of interest arguing the plaintiffs had plausibly alleged "horizontal price fixing" that was "per se unlawful" under the Sherman Act, *RealPage MDL,* No. 3:23-md-03071 (M.D. Tenn. filed Nov. 15, 2023), ECF No. 628 at 15, the court declined to conclude that purported use of RealPage's RMS was per se unlawful. *RealPage MDL*, 709 F.Supp.3d 478, 519-20 (M.D. Tenn. 2023). And although the court allowed one group of plaintiffs' claims to proceed under the "rule of reason," *id.* at 528, it relied on allegations that RealPage subscribers "accept[ed] RealPage's

9

price recommendations upwards of 80-90% of the time," *see id.* at 493—allegations that plaintiffs do not plead here.

### III. Plaintiffs Sue RealPage and Add Customer Defendants Months Later

In August 2024, after a multiyear investigation in which plaintiffs obtained millions of documents and conducted pre-suit depositions, plaintiffs filed this case against only RealPage. Rather than allege the price-fixing theory DOJ unsuccessfully pressed in the *RealPage MDL*, plaintiffs alleged that RealPage violated: (1) Section 1 of the Sherman Act by facilitating information-sharing among its customers and "align[ing] pricing" with each customer, ECF No. 1 ¶¶ 224-43; and (2) Section 2 of the Sherman Act by monopolizing a purported market for "commercial revenue management software," *id.* ¶¶ 244-53. After RealPage moved to dismiss, plaintiffs amended to add state law claims and assert Section 1 claims against six of many RealPage customers. FAC ¶¶ 259-79.

To support their claims that RealPage's RMS is a walking conspiracy, plaintiffs rely largely on allegations that AIRM and YieldStar subscribers provide non-public data to RealPage and that RealPage, in limited circumstances, uses non-public data to recommend prices in AIRM and YieldStar. *Id.* ¶¶ 260, 271. But plaintiffs do not allege that AIRM or YieldStar revealed any customer's non-public data to any other customer.

10

Plaintiffs also point to "'user group' meetings" that "RealPage holds monthly" so that customers can provide feedback on its software. *Id.* ¶¶ 102-03. But plaintiffs do not allege that all Customer Defendants attended any of these meetings, or that only Customer Defendants attended these meetings. Instead, plaintiffs allege that attendees typically "include[d] a wide mix of" customers, *id.* ¶ 102, that RealPage publicly shared the topics discussed, and that the "[r]ecurring topics" at these meetings were "product enhancements" and "potential changes to the products," *id.* ¶ 103. Nor do plaintiffs allege that <u>any</u> Customer Defendants discussed AIRM or YieldStar with each other before licensing those products or implementing any price recommended by those products. They also do not allege that any Customer Defendants agreed to use any specific settings or features offered by any RealPage RMS. Plaintiffs reference communications among local apartment managers unrelated to RealPage's software—including "market surveys" and "call arounds" about market conditions in local apartment markets. *See id.* ¶¶ 82-101. But they do not allege these communications even relate to RealPage.

## ARGUMENT

Plaintiffs allege "a relatively novel antitrust theory premised on algorithmic pricing" without pleading "factual allegations that could support it." *Gibson II*, 2024 WL 2060260,

11

at *3.  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This standard applies with extra force here because "plaintiffs had the benefit of discovery"—including pre-suit depositions and millions of documents—before they amended their complaint.  *Amory Invs. LLC v. Utrecht-Am. Holdings, Inc.*, 74 F.4th 525, 527 (7th Cir. 2023).  "So if there is a plausible claim to be made, plaintiffs should not have had any trouble making it."  *Id.*

Despite plaintiffs' extensive pre-suit discovery, their FAC fails from the get-go because it does not answer the threshold questions of "who, did what, to whom (or with whom), where, and when."  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008); *accord SD3*, 801 F.3d at 430.  Plaintiffs fail to plead facts showing when or how any Customer Defendant began using RealPage's RMS, whether Customer Defendants ever shared any information they received from RealPage's RMS, or how rents changed at any apartment building managed or owned by a Customer Defendant after it began licensing RealPage's RMS.  The FAC likewise fails to plead any evidence of an agreement among Customer Defendants to exchange information or an agreement between any Customer Defendant and RealPage to align prices.  And plaintiffs plead no facts suggesting

12

any Customer Defendant's conduct caused any anticompetitive effects. Thus, plaintiffs' federal antitrust claims fail and, by extension, so do their state law claims.

## I. THE FAC FAILS TO PLEAD THE FACTS NECESSARY TO ALLEGE AN ANTITRUST CONSPIRACY

The FAC should be dismissed because it fails to answer the mandatory pleading questions established by the Fourth Circuit. As a threshold requirement "[i]n the Fourth Circuit, in order to adequately allege an antitrust conspiracy," *Masco Contractor Servs. E., Inc. v. Beals*, 279 F.Supp.2d 699, 706 (E.D. Va. 2003), plaintiffs must allege facts sufficient to answer "the who, what, when[,] and where of the claimed antitrust misconduct," *SD3*, 801 F.3d at 430; *see also Rojas v. Delta Airlines, Inc.*, 425 F.Supp.3d 524, 543 (D. Md. 2019) (dismissing complaint for "fail[ure] to identify the particular time, place, and manner in which" conspiracy "initially formed"). Efforts to sidestep these requirements with "group pleading"—where plaintiffs lump together defendants and unidentified co-conspirators—is insufficient because "each defendant is entitled to know how it is alleged to have conspired, with whom, and for what purpose." *In re Crop Inputs Antitrust Litig.*, 749 F.Supp.3d 992, 1007 (E.D. Mo. 2024). Here, "[e]ven after [plaintiffs' pre-suit investigation]," plaintiffs' complaint is far from "answer[ing] the basic questions:

who, did what, to whom (or with whom), where, and when?" *Kendall*, 518 F.3d at 1048.

## A. Plaintiffs Fail to Plead "When" the Alleged Conspiracy Began

Plaintiffs do not allege "when" any Customer Defendant started subscribing to RealPage's RMS nor "when" they supposedly agreed to exchange information with each another or to "align pricing" with RealPage. *See Gibson v. MGM Resorts Int'l*, 2023 WL 7025996, at *4, *7–8 (D. Nev. Oct. 24, 2023) ("*Gibson I*") (dismissing Section 1 claim where plaintiffs alleged one defendant "began using" a pricing algorithm in 2012 but did not allege when other defendants "began using . . . pricing algorithms"); *see also Great W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159, 179–80 (3d Cir. 2010) (plaintiff's "fail[ure] to allege except in general terms the approximate time when [a supposed] agreement was made" warranted dismissal). Plaintiffs also fail to allege when RealPage's RMS started providing any Customer Defendant with pricing recommendations based on other customers' non-public information or any date when any Customer Defendant's rental prices became "aligned" through RealPage.

## B. Plaintiffs Fail to Allege "Who" Joined the Alleged Conspiracy

Plaintiffs also fail to adequately allege "who" formed the supposed conspiracies to exchange information and to align pricing.

14

Plaintiffs suggest the conspirators include RealPage and anybody that ever licensed its RMS—including Customer Defendants and hundreds of unidentified "landlords." FAC ¶¶ 260-69, 271-79. But courts routinely hold that "[a] plaintiff in a § 1 case cannot assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group." *SD3*, 801 F.3d at 422; *see also Gibson I*, 2023 WL 7025996, at *4 ("The Complaint also does not say who entered into the purported agreement to use the same pricing algorithms beyond 'Hotel Operators.'"). And plaintiffs' allegations are especially deficient because they concede that two of the six Customer Defendants (the named Greystar defendant and Cushman & Wakefield, Inc.) do not even manage multifamily apartments. FAC ¶¶ 244, 248.

### C. **Plaintiffs Fail to Allege "What" Was Agreed Upon**

Plaintiffs fail to allege "what" Customer Defendants did to form any agreement to exchange information or align prices, how any such agreement operated, or how defendants enforced compliance with those supposed agreements. Instead, plaintiffs' allegations leave Customer Defendants guessing as to the way they purportedly carried out the supposed conspiracies. As to the alleged information-exchange agreement, plaintiffs fail to allege that Customer Defendants ever communicated before licensing RealPage's RMS, that Customer Defendants discussed any information provided

15

to or received from RealPage's RMS, or that any Customer Defendant even received non-public information from RealPage's RMS that was specific to another Customer Defendant.  *See In re Passenger Vehicle Replacement Tires Antitrust Litig.*, 2025 WL 606533, at *20 (N.D. Ohio Feb. 25, 2025) ("[P]laintiffs do not explain [how] non-public information . . . was . . . used to make sure that each [defendant] acted in accordance with the agreement.").  In fact, the complaint alleges that users do not receive information specific to other users because it provides a screenshot demonstrating that a user sees only that user's own rent against highly aggregated market minimum and maximum average rent.  FAC ¶ 45 & p.19.

As to the alleged agreement to "align prices," plaintiffs identify no rental price at any apartment managed or owned by a Customer Defendant, much less allege facts showing that rental prices became "aligned."  Indeed, plaintiffs fail to allege "all [Customer Defendants] use the same pricing algorithm." *Gibson I*, 2023 WL 7025996, at *3; *see also Passenger Vehicle*, 2025 WL 606533, at *19.  Instead, plaintiffs allege some Customer Defendants licensed YieldStar, FAC ¶ 244, while others licensed AIRM, *id*. ¶¶ 238, 247, 250, 253.  And plaintiffs concede that each AIRM and YieldStar subscriber customizes the information and pricing

16

recommendations it receives, *id.* ¶ 66, yet plaintiffs identify no settings or parameters selected by any Customer Defendant.

To try to paper over their failure to provide basic facts about the alleged agreements, plaintiffs rely on unrelated allegations that "landlords" discussed local rent conditions in "market surveys" and "call arounds" and provided customer feedback in RealPage's "user groups." *See* FAC ¶¶ 82–117. Plaintiffs do not allege that these "market surveys" and "call arounds" have any connection to RealPage. *See id.* Plaintiffs also repeatedly try to impute to Customer Defendants actions by unspecified "landlords." *E.g.*, *id.* ¶¶ 30, 82–86, 96–100. These "unspecific" allegations, unrelated to what any Customer Defendant did, cannot support their claims. *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 403 (2d Cir. 2024).

Plaintiffs' references to RealPage's "user group" meetings, FAC ¶¶ 102–17, meanwhile, suggest only that customers provided RealPage feedback about its RMS, not that they engaged in a conspiracy. Plaintiffs admit that "[r]ecurring topics" at RealPage's "user group" meetings concerned "product enhancements." *Id.* ¶ 103. "[M]ere participation" in meetings that "serve legitimate functions" "does not suggest an illegal agreement." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015); *see also SD3*, 801 F.3d at 435–36 (refusing

17

"to infer malfeasance" where some defendants "served on the relevant standard-setting panel" and discussed safety). While plaintiffs assert these discussions also covered "competitively sensitive topics," FAC ¶ 103, they do not identify anything sensitive about the information discussed, and their "conclusory and non-specific" buzzwords cannot state a claim, *SD3*, 801 F.3d at 437; *see also Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 224-25 (3d Cir. 2011) (alleging defendants "regularly and unlawfully shared highly confidential information" is too "conclusory").

## II. PLAINTIFFS DO NOT PLAUSIBLY PLEAD ANY AGREEMENT TO EXCHANGE INFORMATION OR ALIGN PRICES

On top of plaintiffs' failure to answer the basic pleading questions, the Court should also dismiss the FAC because it fails to plead facts plausibly suggesting Customer Defendants agreed among themselves to share information or that any Customer Defendant agreed with RealPage to align pricing. For Section 1 claims, "[t]he crucial question is whether the challenged anticompetitive conduct stem[s] from independent decision or from an agreement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007). "To be actionable," plaintiffs must allege facts plausibly suggesting "the defendants . . . specifically made a conscious commitment to a common scheme designed to achieve an unlawful objective." *SD3*, 801 F.3d at 424. Satisfying these standards requires plaintiffs to allege "direct or circumstantial evidence"

18

of an agreement. *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 225–26 (4th Cir. 2004).

Different types of agreements may be the subject of a Section 1 claim. "A horizontal [agreement] is one between competitors, while a vertical [agreement] is one between firms at different levels of distribution." *United States v. Brewbaker*, 87 F.4th 563, 571 (4th Cir. 2023). In "so-called hub-spoke-and-rim conspiracies, competitors agree to restrain trade and are encouraged to do so by a shared vertical" supplier. *Id.* at 577–78. Blackletter law holds there is no hub-and-spoke conspiracy without a horizontal agreement among competitors; alleging "various defendants enter[ed] into separate agreements with a common defendant" does not plausibly suggest a horizontal agreement among the spokes. *Dickson*, 309 F.3d at 203–04.

Plaintiffs fail to plausibly allege any actionable agreement because they fail to allege direct or circumstantial evidence that Customer Defendants agreed among themselves to exchange information or that any Customer Defendant agreed to align prices with RealPage.

### A. Count 1 Fails to Allege an Agreement Among Customer Defendants to Exchange Information

Count 1 should be dismissed because plaintiffs fail to allege direct or circumstantial evidence that Customer Defendants agreed to exchange information. Plaintiffs presume such an agreement

19

among Customer Defendants because they each "agreed with RealPage to provide RealPage daily nonpublic, competitively sensitive data . . . , knowing or learning that RealPage [would] use [that] data" to generate rental price recommendations, FAC ¶ 260. But these allegations provide no direct or circumstantial evidence plausibly suggesting any agreement among Customer Defendants. Instead, plaintiffs' allegations suggest each Customer Defendant subscribed to RealPage's RMS because doing so was in its unilateral interest.

> ### 1. Plaintiffs Allege No Direct Evidence of Any Agreement Among Customer Defendants to Exchange Information

Plaintiffs fail to allege direct evidence of an agreement among Customer Defendants to exchange information through AIRM or YieldStar. "Direct evidence is extremely rare in antitrust cases and is usually referred to as the 'smoking gun.'" *Am. Chiropractic*, 367 F.3d at 226. It "is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Id.* Far from pleading a "smoking gun," plaintiffs do not allege that any Customer Defendant even communicated with any other Customer Defendant about RealPage's RMS prior to licensing it, much less that they all discussed and agreed to license it. Nor do plaintiffs allege that Customer Defendants ever discussed the

20

information they were providing to, or receiving from, RealPage's RMS.

### 2. Plaintiffs Offer No Circumstantial Evidence of an Agreement Among Customer Defendants to Exchange Information

Plaintiffs also fail to allege circumstantial evidence plausibly suggesting that Customer Defendants agreed to exchange information. "For a [Section] 1 claim to survive" through allegations of circumstantial evidence, "a plaintiff must plead [both] parallel conduct and something more." *SD3*, 801 F.3d at 424 (emphasis omitted). The "something more" are "plus factors" showing that the "parallel behavior would probably not result from chance . . . or mere interdependence unaided by an advance understanding among the parties." *Id.* Plaintiffs plead neither parallel conduct nor "plus factors."

### a. Plaintiffs Fail to Plead Parallel Conduct

Plaintiffs do not plausibly allege parallel conduct because they do not plead that Customer Defendants licensed or used RealPage's RMS in suspiciously similar ways. Pleading parallel conduct requires the plaintiff to "plead[] facts indicating that the defendants" undertook "similar or uniform actions," *id.* at 427—*e.g.*, by setting prices at the same level or through alleged "conduct that indicates the sort of restricted freedom of action . . . that one generally associates with agreement," *Erie*

*Cnty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 868 (6th Cir. 2012). Plaintiffs allege nothing like that here.

Plaintiffs primarily try to infer an agreement among Customer Defendants based on their separate decisions to subscribe to RealPage's RMS at different, unidentified times. FAC ¶ 260. But plaintiffs "hurriedly infer collusion" from "lawful and ordinary business practices," as "there is nothing inherently illegal or suspicious about the use of [RMS]." *Passenger Vehicle*, 2025 WL 606533, at *19. Multiple courts have held that it is "too implausible to infer that each [subscriber] was signing up for a . . . conspiracy when it agreed to license and use [RMS]." *Gibson II*, 2024 WL 2060260, at *3; *see also Cornish-Adebiyi v. Caesars Entm't, Inc.*, 2024 WL 4356188, at *5 (D.N.J. Sept. 30, 2024) (questioning "how . . . the[] mere use of" RMS could be "suggestive of culpable conspiracy").

Courts are especially skeptical of inferring that competitors agreed among themselves to use RMS when plaintiffs do not allege competitors began using it around the same time or use it in the same way. For example, the plaintiffs in *Gibson II* tried—and failed—to allege that hotels <u>agreed</u> among themselves to use a particular RMS simply because they all <u>subscribed</u> to it. 2024 WL 2060260, at *3. The court identified "three key deficiencies that . . . are . . . alternative and determinative reasons why

22

[p]laintiffs have not plausibly alleged a[n] . . . agreement," *id.*, among hotels to use RMS:

- The defendants "licensing [RMS] . . . over an approximately 10-year period . . . does not raise the specter of collusion." *Id.* at *5.

- The plaintiffs did "not allege that [the] [d]efendants" used the software in the same way because some hotels "accepted the pricing recommendations sometimes" while others "overr[o]de pricing recommendations." *Id.* at *7.

- And the "[p]laintiffs fail[ed] to plausibly allege the exchange of confidential information from one of the [hotel defendants] to the other through the hub's algorithms." *Id.* at *5.

The FAC contains similar defects. In fact, plaintiffs' allegations are even weaker than those in *Gibson II* because, rather than allege Customer Defendants "began licensing [RealPage's RMS] at different times over . . . 10[] year[s]," 2024 WL 2060260, at *4, plaintiffs fail to identify when any Customer Defendant began subscribing to RealPage's RMS at any property it manages or owns in the 20 years since YieldStar's launch in 2005, *see Musical Instruments*, 798 F.3d at 1196 (adopting pricing "policies over . . . several years . . . does not raise the specter of collusion").

Rather than allege Customer Defendants coordinated their decisions to license RealPage's RMS, plaintiffs try to infer an agreement just because Customer Defendants licensed software that sometimes recommends rents based on other customers' non-public

23

data.  But as a court recently held in *Segal v. Amadeus IT Grp., S.A.*, 2025 WL 963751, (N.D. Ill. Mar. 31, 2025), alleging Customer Defendants "began using [the same software] at various times knowing that they would receive access to forward-looking data of their competitors" fails to plead an agreement among those competitors because it does not plausibly suggest those customers "recognized that they were a part of the greater arrangement" and "coordinated . . . their duties as part of the broader group." *Id.* at *5.

In fact, far from alleging Customer Defendants use RealPage's RMS in the same way, plaintiffs concede Customer Defendants do not even use the same RealPage RMS. *Passenger Vehicle*, 2025 WL 606533, at *19 (classifying plaintiffs' claim as "particularly" weak because "plaintiffs d[id] not even allege that defendants all use[d] the same pricing software").  Plaintiffs allege defendant Pinnacle "use[s] YieldStar," FAC ¶ 244, while other Customer Defendants "use[] AIRM," *id.* ¶ 250.  Plaintiffs also fail to allege that Customer Defendants use the same RealPage RMS as one another in each alleged geographic submarket or even that each individual Customer Defendant uses the same RealPage RMS across all the buildings that it owned or managed. *See Gibson I*, 2023 WL 7025996, at *3 (faulting plaintiffs for alleging defendants used RMS that was "not within [p]laintiffs' defined market area").  Because "the

24

[FAC] lacks allegations [that each Customer Defendant] uses . . . the same pricing algorithm[] . . . [,] the Court [cannot] infer that they entered into an agreement." *Id.*

Plaintiffs also fail to allege that Customer Defendants used RealPage's RMS in the same way. Instead, Plaintiffs admit "the average acceptance rate across all landlords . . . is between 40–50%," FAC ¶ 73—meaning that recommendations are rejected more than half the time. These <u>average</u> statistics say nothing about the acceptance rate at any <u>individual</u> apartment managed or owned by a Customer Defendant, much less suggest a uniform acceptance rate across different Customer Defendants. *See Gibson I*, 2023 WL 7025996, at *3 (explaining that average acceptance rates "d[id] not speak to the [defendants'] acceptance rate[s]"); *see also BNP*, 92 F.4th at 399 (characterizing as "fundamentally flawed" statistics that "d[id] not focus on . . . [d]efendants"). In fact, plaintiffs state that Customer Defendants exercise their pricing discretion "[e]very morning" by choosing whether to "override" prices recommended by RealPage's RMS, FAC ¶ 62, without alleging how often any Customer Defendant adopts those suggested prices, *see Gibson II*, 2024 WL 2060260, at *7 (dismissing complaint that contained "specific allegations regarding" acceptance rates of only one defendant, which plaintiffs conceded "accepted [] pricing recommendations [only] sometimes").

Plaintiffs also admit there are many different "parameters" that subscribers "can change" in RealPage's RMS, FAC ¶ 66, which "change[]" how that software operates and the rental prices it suggests, *id.* ¶ 160. They concede that only some subscribers use particular parameters and features. *Id.* ¶ 56. And they fail to plead that Customer Defendants use the same parameters in any market, much less that all Customer Defendants use the same features at competing buildings.

Despite the consensus reached by *Gibson*, *Cornish-Adebiyi*, and *Passenger Vehicle*, plaintiffs may seek to rely on the *RealPage MDL* decision and *Duffy v. Yardi Systems, Inc.*, 2024 WL 4980771, at *4 (W.D. Wash. Dec. 4, 2024), but neither applies. The class action plaintiffs in the *RealPage MDL* and *Yardi* asserted price fixing claims against a large number of RealPage or Yardi customers.

The *RealPage MDL* decision denying defendants' motion to dismiss is inapplicable because plaintiffs here—who, unlike the MDL plaintiffs, are saddled with the facts they obtained from their pre-suit depositions and the millions of documents they have already received—pleaded a much different case. While the plaintiffs in the *RealPage MDL* alleged that subscribers "accept[ed] RealPage's price recommendations upwards of 80-90% of the time," 709 F.Supp.3d at 493, the FAC recognizes that subscribers' acceptance rates are about half that, FAC ¶ 73. Moreover, the

26

*RealPage MDL* denied defendants' motion because the plaintiffs alleged that it "clearly [would] not be in any individual [d]efendant's economic self-interest to contribute its data to RealPage without knowing that it would benefit from its horizontal competitors doing the same." 709 F.Supp.3d at 510. By contrast, plaintiffs here allege facts that make it entirely plausible that using RealPage's RMS was in each Customer Defendant's economic self-interest—including because RealPage's RMS was the leading software available and offers subscribers many benefits. *See supra* at 6.

*Duffy* is even less applicable, for three reasons. First, while plaintiffs here allege that Customer Defendants exercise their independent discretion "[e]very morning," FAC ¶ 62, the *Duffy* plaintiffs alleged that subscribers "delegate[ed] their pricing" to the Yardi RMS, 2024 WL 4980771, at *4. Second, the *Duffy* plaintiffs alleged that subscribers "used an intermediary, Yardi, to compile their commercially sensitive data," *id.* at *5, and then used the information provided by Yardi in the same way by "adopt[ing] . . . price[s] [suggested by Yardi] with very little, if any, second guessing," *id.* at *4. By contrast, plaintiffs here do not allege any Customer Defendant received the same information or used it in the same way and suggest only that Customer Defendants rejected RealPage's pricing recommendations more than

27

half the time. *See supra* at 8, 25. Finally, the *Duffy* plaintiffs alleged that subscribers acted against their self-interest by "de-prioritizing occupancy in favor of algorithmic pricing," 2024 WL 4980771, at *4, while plaintiffs here allege many facts showing it was in each Customer Defendant's self-interest to license RealPage's RMS. *See supra* at 6.

### b. Plaintiffs Fail to Plead "Plus Factors"

Because plaintiffs have failed to plead parallel conduct that could suggest an agreement to exchange information, their alleged "plus factors" are "not relevant." *Gibson I*, 2023 WL 7005996, at *4; *accord BNP*, 92 F.4th at 401. But even if plaintiffs had plausibly alleged parallel conduct, they do not allege the necessary plus factors. Plus factors can include "actions . . . against . . . self-interest," *Rojas*, 425 F.Supp.3d at 543, that "show[] [that] the parties would benefit only through concerted action," *Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 850 F.Supp. 470, 480 (E.D. Va. 1994); unusual "interfirm communications among the defendants," *Merck-Medco Managed Care, Inc. v. Rite Aid Corp.*, 22 F.Supp.2d 447, 469 (D. Md. 1998); and "structural" market conditions like high concentration, *Hall v. United Air Lines, Inc.*, 296 F.Supp.2d 652, 674 (E.D.N.C. 2003). Plaintiffs allege none of those things.

28

**No actions against self-interest**. Plaintiffs allege no actions "so against [Customer Defendants'] self-interest" that they "can only be explained by concerted action." *Rojas*, 425 F.Supp.3d at 543. To plausibly allege a conspiracy, plaintiffs must allege that defendants' conduct was inconsistent "with . . . rational and competitive business strategy" such as "abrupt and unexplained shift[s] in behavior." *SD3*, 801 F.3d at 424, 428. For example, the complaint in *Twombly* failed because it rested only on "descriptions of parallel conduct" that could be just as easily explained by "natural, unilateral" conduct by each defendant. *Twombly*, 550 U.S. at 546. In the hub-and-spoke context, plaintiffs must plead that it would be "economically self-defeating" for the spokes to agree to the same vertical contracts with the hub "unless the other [spokes] did the same." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 331 (3d Cir. 2010).

Plaintiffs here do not plead facts suggesting that using RealPage's RMS is against any Customer Defendant's self-interest. Nor could they. Courts consistently recognize that licensing RMS and using aggregated competitor data are in a business's legitimate self-interest. *See, e.g.*, *Maple Flooring Mfrs.' Ass'n v. United States*, 268 U.S. 563, 582–83 (1925) ("gathering and dissemination" of market-level data leads to efficiency and transparency); *see also Gibson II*, 2024 WL 2060260, at *4 n.6 ("[E]ven [p]laintiffs

29

allege . . . that [RMS] has various features that might make it useful to [subscribers]."); *Jien v. Perdue Farms, Inc.,* 2020 WL 5544183, at *8 (D. Md. Sept. 16, 2020) ("That employers might set their wages . . . based off available benchmarking data is not surprising . . . nor evidence of companies acting . . . to comport with a conspiratorial agreement."). In fact, plaintiffs themselves allege there are many independent reasons why a Customer Defendant would license RealPage's RMS that have nothing to do with a conspiracy, including because RMS helps a subscriber predict supply and demand, as well as make more informed pricing decisions. *See* FAC ¶¶ 47, 49, 169, 170, 172. Defying any suggestion that it would be "economically self-defeating" for a Customer Defendant to license RealPage's RMS unless all Customer Defendants "did the same," *Brokerage Antitrust*, 618 F.3d at 331, some Customer Defendants allegedly unilaterally licensed RealPage's RMS years before other Customer Defendants, and some subscribers license it even when they are the only landlord in the market doing so, *see* FAC ¶ 24.

**No unusual communications.** Plaintiffs likewise do not plausibly allege unusual communications among Customer Defendants about using RealPage. While some Customer Defendants allegedly communicated at RealPage's "user group" meetings, plaintiffs concede that the purpose of those meetings was to discuss "product

30

enhancements." *Id.* ¶ 103. Plaintiffs' references to "so-called 'market surveys'" and "call arounds" among property owners and managers, *see id.* ¶¶ 82-101, also get plaintiffs nowhere. Plaintiffs admit that call arounds and market surveys have nothing to do with AIRM or YieldStar. *Id.* ¶ 100. And even if "market surveys" and "call arounds" had any relevance, they "stop well short of evincing any kind of agreement" because they "consist of market chatter, such as the [managers'] views" about conditions in local rental markets. *BNP*, 92 F.4th at 398.

**Industry structure does not suggest conspiracy.** While plaintiffs claim in conclusory fashion that "[t]here is significant concentration among landlords in local markets," FAC ¶ 75, their allegations belie that bald assertion. Plaintiffs acknowledge there are many more property owners and managers across the country than just the Customer Defendants. *Id.* ¶¶ 79-80 (explaining, in certain zip codes, "five or fewer landlords manage more than 50% of the multifamily units"). In their appendices, plaintiffs allege that only "30% or [m]ore," *id.* at 127-55, of the units in the alleged geographic submarkets even use AIRM or YieldStar—figures that are far from "significant concentration," *id.* ¶ 75. *See, e.g.*, *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 139 (2d Cir. 2013) (market was "highly concentrated" where "more than 90% of one market segment was

31

dominated by just three defendants"). In any event, "industry structure alone cannot get [a] complaint across the finish line." *Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F.Supp.3d 824, 841 (N.D. Ill. 2018); *see also Liggett Grp., Inc. v. Brown & Williamson Tobacco Corp.,* 964 F.2d 335, 342 (4th Cir. 1992) ("[N]o case suggests that mere participation in an oligopolistic market constitutes conduct illegal under the antitrust laws.").

Because plaintiffs fail to plead facts to support the existence of a cognizable agreement among the Customer Defendants, the Court should dismiss Count 1.

**B. Count 2 Fails to Allege an Agreement Between Each Customer Defendant and RealPage to Align Prices**

Plaintiffs also allege no facts plausibly suggesting any Customer Defendant agreed with RealPage to align prices through its RMS. First, plaintiffs' "unadorned conclusory allegations" about pricing alignment "are akin to no allegations at all." *SD3*, 801 F.3d at 423. While plaintiffs rest their claim on their ability to identify software licenses, "the simple existence of [a] contract . . . [,] standing alone, is [not] enough to satisfy the concerted action requirement." *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1081 (11th Cir. 2016). Plaintiffs must plausibly allege an agreement to "align" prices. Yet Plaintiffs plead no

32

facts plausibly suggesting that any Customer Defendant aligned rental prices through RealPage RMS.

Among other failures, plaintiffs identify no rents charged by any Customer Defendant at any apartment they manage or own, or even rents in the aggregate in the local markets they allege. Nor do they allege how each Customer Defendant's rents changed across their properties after they licensed RealPage's RMS or that the rents of different Customer Defendants "aligned" just by licensing RealPage's RMS. To the contrary, Customer "Defendants are <u>not</u> required to and often do not accept the pricing recommendations generated by [RealPage's] products." *Gibson II*, 2024 WL 2060260, at *1 (emphasis added). Here, plaintiffs allege Customer Defendants can—and do—"override" prices suggested "[e]very morning," FAC ¶ 62, and that "average" acceptance rates across all customers is between only "40–50%," *id.* ¶ 73.

<u>Second</u>, plaintiffs' admission that Customer Defendants can—and do—freely override prices suggested by RealPage's RMS shows that these recommendations and software licenses are not "restraints of trade" as required to support a Sherman Act claim. Pleading an antitrust claim requires the plaintiffs to plausibly allege that a contract restrained the other party's independent decision-making because "[i]t is axiomatic that [t]o constitute a Section 1 violation, the contract, combination, or conspiracy must

33

be in restraint of trade." *Gibson II*, 2024 WL 2060260, at *9.[5]
And an agreement under which one party provides "optional" pricing
suggestions to raise, lower, or maintain prices (which are rejected
most of the time) is "not . . . a Section 1 agreement" in restraint
of trade, especially when a party "independently cho[o]se[s]
whether to adopt the" suggested price. *Real Est. Exch. Inc. v.
Zillow Grp., Inc.*, 2025 WL 670967, at *1 (9th Cir. Mar. 3, 2025).
Indeed, "[e]vidence of pricing suggestions . . . is not sufficient
to . . . transgress § 1 of the Sherman Act" when the party receiving
them is not "require[d]" to accept them. *Acquaire v. Can. Dry
Bottling Co. of N.Y.*, 24 F.3d 401, 410 (2d Cir. 1994).

As in *Gibson II*, "it cannot be that the vertical agreements
between [RealPage's RMS] and [its customers] to license [its
software] restrain trade" because those vertical agreements do not
"constrain [customers'] ability to unilaterally set prices." 2024
WL 2060260, at *7. Plaintiffs concede that Customer Defendants'
licenses with RealPage did not restrain their discretion over
pricing. *See supra* at 33. In fact, as in *Gibson II*, plaintiffs

---

[5] *See also Toscano v. Pro. Golfers Ass'n*, 258 F.3d 978, 984 (9th
Cir. 2001) (mere "agree[ment] to purchase a product" does not
suffice); *49er Chevrolet, Inc. v. Gen. Motors Corp.*, 803 F.2d
1463, 1467 (9th Cir. 1986) (declining to infer an antitrust
conspiracy from "[o]rdinary sales contracts," for "[t]he
antitrust laws are not offended by agreements as such, but only
by those with an anticompetitive content").

"do not allege that [Customer] Defendants are required to accept the prices that [the software] recommend[s] to them—and indeed allege that the recommendations are often rejected." 2024 WL 2060260, at *9.

Because plaintiffs fail to plead facts showing an agreement between any Customer Defendant and RealPage to restrain prices, Count 2 should be dismissed.

## III. PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE ANTICOMPETITIVE EFFECTS

Both Counts 1 and 2 should also be dismissed because plaintiffs fail to plausibly allege any anticompetitive effects stemming from Customer Defendants' conduct. To adequately plead Section 1 claims, "plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the [alleged] relevant market." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) ("*Amex*"). It must offer "direct" or "[i]ndirect evidence" of anticompetitive effects. *Id.* at 542. Plaintiffs fail to do so, and the Court should reject their attempt to evade settled Fourth Circuit law barring them from aggregating the supposed effects of vertical software licenses.

### A. Plaintiffs Do Not Even Try to Allege Anticompetitive Effects Through "Direct Evidence"

Plaintiffs allege no direct evidence of anticompetitive effects. Direct evidence of anticompetitive effects is "proof of

35

actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Amex*, 585 U.S. at 542; *see also SD3*, 801 F.3d at 433. Plaintiffs offer no analysis of output or prices. Instead, plaintiffs concede that RealPage's RMS often recommends price <u>decreases</u> or maintaining a price—meaning that merely using RealPage's RMS cannot provide direct evidence that prices increased. And even if price increases occurred, plaintiffs offer no indication that any purported price increases were <u>anticompetitive</u>—*i.e.*, above any price increase that would occur in a competitive market.

**B.    Plaintiffs Fail to Allege <u>Anticompetitive Effects Through "Indirect Evidence"</u>**

Plaintiffs likewise fail to plausibly allege anticompetitive effects through "indirect evidence." Indirect evidence consists of (1) "proof of market power plus" (2) "some evidence that the challenged restraint harms competition." *Amex*, 585 U.S. at 542; *see also Dickson*, 309 F.3d at 205-06 (requiring examination of "market power" and "harm to competition" that is "likely and significant").

Plaintiffs here do not allege <u>any</u> Customer Defendant's market share in <u>any</u> market. The closest plaintiffs come is alleging that AIRM and YieldStar, together, have 30% or greater penetration in some local markets. That dooms Count 2 under settled Fourth Circuit law as discussed below. *See infra* at 37-39. But properly

36

calculating market share must reflect the share held by <u>defendants and their alleged co-conspirators</u>—*i.e.*, those who purportedly agreed to restrain trade. *See, e.g.*, *Okavage Grp., LLC v. United Wholesale Mortg., LLC*, 2022 WL 17478298, at *17 (M.D. Fla. July 27, 2022) (plaintiff failed to allege market power where it failed to allege share of brokers that joined conspiracy); *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 2020 WL 5642941, at *7 (N.D. Ill. Sept. 22, 2020) (plaintiff failed to allege market power where it did not allege share of purported co-conspirators), *aff'd*, 15 F.4th 831 (7th Cir. 2021). Plaintiffs' figures fail that test because they include <u>all</u> AIRM and YieldStar customers, not just defendants and their supposed co-conspirators.

### C. Count 2's Market Share Theory Defies Fourth Circuit Law

Finally, plaintiffs' market share allegations are foreclosed by settled Fourth Circuit law because Count 2 alleges only a series of separate vertical agreements between RealPage and each one of its customers—agreements that cannot be aggregated to allege market power. Plaintiffs explicitly plead Count 2 as a "rimless wheel" conspiracy "in which various defendants enter into separate [vertical] agreements with a common defendant, but where the defendants have no connection with one another." *Dickson*, 309 F.3d at 203. "[A] rimless wheel conspiracy is not a single, general conspiracy" under the Sherman Act. *Id.* (citing *Kotteakos*

*v. United States*, 328 U.S. 750, 768–69 (1946)).  As a result, the Fourth Circuit has emphasized that courts cannot consider the cumulative harm that might result from the separate vertical agreements that make up a rimless wheel.  *Id.* at 210.  Instead, they must consider such agreements <u>individually</u> to evaluate <u>each agreement's</u> potential for anticompetitive effects.  *Dickson*, 309 F.3d at 210; *see also In re Amazon.com, Inc. eBook Antitrust Litig.*, 2023 WL 6006525, at *26 (S.D.N.Y. July 31, 2023) ("Plaintiffs have pointed to no case that would indicate that aggregation of each [defendant's] market share is appropriate to assess market power or the market-wide effect of conduct where, as here, [they challenge a] vertical restraint."); *Stand Energy Corp. v. Columbia Gas Transmission Corp.*, 2008 WL 3891219, at *17 (S.D. W. Va. Aug. 19, 2008) ("Each of the vertical conspiracies is a separate conspiracy and each must be demonstrated to result in an unreasonable restraint on trade.").

Here, plaintiffs do not even try to establish that "<u>any</u> [Customer Defendant] individually possesses . . . enough market share that an agreement between [RealPage] and one of them would have an anticompetitive effect."  *Masco*, 279 F.Supp.2d at 705–06 (emphasis added).  Instead, they take on the purported agreements "[c]ollectively," FAC ¶ 277: "Taken together," plaintiffs allege, "the [purported] agreements between each AIRM or YieldStar

38

landlord and RealPage to use AIRM or YieldStar, respectively, harm or are likely to harm the competitive process and renters." *Id.* ¶ 276. This attempt to aggregate the effects of various separate vertical agreements to show market power and anticompetitive effects contravenes settled Fourth Circuit law, and so Count 2 should be dismissed.

## IV. PLAINTIFFS' STATE LAW CLAIMS (COUNTS 5–12) FALL WITH THEIR FEDERAL LAW CLAIMS

The Court should dismiss plaintiffs' state law claims against Customer Defendants (Counts 5–12) for the same reasons as plaintiffs' Sherman Act claims because each state law statute instructs courts to dismiss those claims when their federal analogues fail:

- **North Carolina (Count 5).** *R. J. Reynolds Tobacco Co. v. Philip Morris Inc.,* 199 F.Supp.2d 362, 396 (M.D.N.C. 2002) (dismissing North Carolina state law claim "[b]ecause [p]laintiffs do not allege any facts that suggest that [d]efendant[s'] conduct is unlawful beyond the conduct that is the basis for their failed federal claims.") *aff'd*, 67 F.App'x 810, 812 (4th Cir. 2003); D*avis v. HCA Healthcare, Inc.*, 2022 WL 4354142, at *9 (N.C. Super. Ct. Sept. 19, 2022) (federal antitrust decisions instructive in considering North Carolina antitrust claims).

- **California (Count 6).** *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F.App'x. 554, 557 (9th Cir. 2008) ("Where . . . the same conduct is alleged to support both a plaintiff's federal antitrust claims and state-law unfair competition claim, a finding that the conduct is not an antitrust violation precludes a finding of unfair competition."); *Cal. Crane Sch., Inc. v. Google LLC*, 722 F. Supp. 3d 1026, 1041 (N.D.

Cal. 2024) (UCL "unlawful" prong requires showing of violation of another law).

- **Colorado (Count 7).** Colorado 1992 Antitrust Act, CRS §6-4-119 ("[T]he courts shall use as a guide interpretations given by federal courts to comparable federal antitrust laws."); *Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*, 127 F.4th 178, 189 & n.11 (10th Cir. 2025) (federal antitrust law still guides Colorado antitrust law after 2023 amendment to Colorado's Antitrust Act).

- **Connecticut (Count 8).** Conn. Gen. Stat. § 35-44b (instructing courts to be "guided by interpretations given by the federal courts to federal antitrust statutes").

- **Illinois (Count 9).** 740 Ill. Comp. Stat. Ann. § 10/11 (instructing courts to "use the construction of the federal law by the federal courts as a guide"); *Laughlin v. Evanston Hosp.*, 550 N.E.2d 986, 990 (Ill. 1990) (construing "section 3(2)"—the Illinois provision mirroring Section of the Sherman Act—"in accordance with the construction given its [f]ederal counterpart"); *Hackman v. Dickerson Realtors, Inc.*, 520 F. Supp. 2d 954, 966 (N.D. Ill. 2007) (courts interpret the Illinois Antitrust Act in light of federal antitrust law).

- **Massachusetts (Count 10).** *Ciardi v. F. Hoffmann-La Roche, Ltd.*, 762 N.E.2d 303, 309 (Mass. 2002) ("In analyzing what constitutes unfair methods of competition and unfair or deceptive acts or practices, which are not defined in G.L. c. 93A, this court looks to interpretations by the [FTC] and Federal courts of § 5(a)(1) of the [FTC Act], 15 U.S.C. § 45(a)(1). . . . [, through which the FTC enforces] the Sherman Act and the Clayton Act . . . ."); *see also F.T.C. v. Sperry & Hutchinson Co.*, 405 U.S. 233, 246–47 (1972) (explaining that a complaint that does not allege conduct to be unfair for any "considerations other than those at the root of the antitrust laws" should be analyzed under "classic antitrust rationale[s]").

40

- **Oregon (Count 11).** Or. Rev. Stat. § 646.715 ("The decisions of federal courts in construction of federal law relating to the same subject shall be persuasive authority in the construction of ORS 646.705 to 646.805 and 646.990."); *see also Nw. Med. Lab'ys. v. Blue Cross & Blue Shield of Or.*, 794 P.2d 428, 433 (Or. 1990) ("[W]e look to federal caselaw . . . .").

- **Tennessee (Count 12).** Tennessee claimants must make more than a "bare allegation" that the "alleged anticompetitive conduct affects Tennessee trade or commerce to a substantial degree." *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 523-24 (Tenn. 2005); *see also Fed. Trade Comm'n v. Syngenta Crop Prot. AG,* 711 F.Supp.3d 545, 590 (M.D.N.C. 2024). This "test is pragmatic, turning upon the particular facts of the case," *Freeman,* 172 S.W.3d at 523-24, but plaintiffs have offered no facts specific to Tennessee.

Plaintiffs' state law claims should therefore be dismissed.

## **CONCLUSION**

For these reasons, the Court should dismiss plaintiffs' FAC with prejudice. Dismissal with prejudice is warranted because plaintiffs already had an opportunity to amend their complaint based on depositions and the millions of documents obtained during their pre-suit investigation, and further amendment would be futile. *See King v. Rubenstein*, 825 F.3d 206, 225 (4th Cir. 2016).

Respectfully submitted,                         April 10, 2025

41

/s/ *Caroline M. Gieser*
Caroline M. Gieser
(NC Bar No.: 51610)
Shook, Hardy & Bacon LLP
1230 Peachtree St., Ste. 1200
Atlanta, GA 30309
Tel: (470) 867-6013
cgieser@shb.com

Ryan M. Sandrock
(LR 83.1(d) Counsel)
Shook, Hardy & Bacon LLP
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900
rsandrock@shb.com

Laurie A. Novion
(LR 83.1(d) Counsel)
Shook, Hardy & Bacon LLP
2555 Grand Blvd.
Kansas City, MO 64108-2613
Tel: (816) 474-6550
lnovion@shb.com

Maveric Ray Searle
(LR 83.1(d) Counsel)
Meghan E.H. Keeley
(LR 83.1(d) Counsel)
Shook, Hardy & Bacon LLP
111 S. Wacker Dr., Ste. 4700
Chicago, IL 60606
Tel: (312) 704-7700
msearle@shb.com
mkeeley@shb.com

*Attorneys for Defendant*
*Camden Property Trust*

/s/ *James P. McLoughlin*
James P. McLoughlin
N.C. Bar No. 13795
Moore & Van Allen PLLC
100 North Tryon Street
Charlotte, NC 28202
Phone: (704) 331-1000
Fax:  (704) 331-1159
mcloughlinj@mvalaw.com

Karen Hoffman Lent
(LR 83.1(d) Counsel)
Boris Bershteyn
(LR 83.1(d) Counsel)
Evan Kreiner
(LR 83.1(d) Counsel)
Sam Auld
(LR 83.1(d) Counsel)

SKADDEN, ARPS,
SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Phone: (212) 735-3000
Fax: (212) 735-2000
karen.lent@skadden.com
boris.bershteyn@skadden.com
evan.kreiner@skadden.com
sam.auld@skadden.com

*Attorneys for Defendant*
*Greystar Real Estate*
*Partners, LLC*

42

/s/ *Eric Steven Goodheart*
Eric Steven Goodheart
North Carolina Bar No. NC-53476
DLA PIPER LLP (US)
4141 Parklake Avenue, Suite 300
Raleigh, North Carolina 27612
eric.goodheart@us.dlapiper.com
Tel: (919) 786-2012
Fax: (919) 591-0412

Gregory J. Casas
 (LR 83.1(d) Counsel)
DLA PIPER LLP (US)
303 Colorado Street, Suite 3000
Austin, Texas 78701
greg.casas@us.dlapiper.com
Tel: (512) 457-7290
Fax: (512) 721-2390

Carsten M. Reichel
 (LR 83.1(d) Counsel)
DLA Piper LLP (US)
500 Eighth Street, NW
Washington, DC 20004
carsten.reichel@us.dlapiper.com
Tel: (202)799-4640
Fax: (202)799-5640

Becky L. Caruso
 (LR 83.1(d) Counsel)
DLA Piper LLP (US)
51 John F. Kennedy Parkway,
      Suite 120
Short Hills, NJ 07078-2704
becky.caruso@us.dlapiper.com
Tel: (973) 520-2550
Fax: (973) 520-2551

*Attorneys for Defendant*
*Willow Bridge Property Company,*
*LLC*

/s/ *Michael Montecalvo*
Michael Montecalvo
N.C. Bar No. 24943
Aaron J. Horner
N.C. Bar No. 56335
WOMBLE BOND DICKINSON (US)
LLP
One West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 721-3600
Facsimile: (336) 721-3660
aj.horner@wbd-us.com
michael.montecalvo@wbd-
us.com

Kenneth Reinker
      D.C. Bar No. 999958
Jeremy Calsyn
      D.C. Bar No. 467737
Cleary Gottlieb Steen and
      Hamilton LLP
2112 Pennsylvania Avenue, NW
Washington, D.C. 20037
Telephone: (202) 974-1522
Facsimile: (202) 974-1999
E-Mail: jcalsyn@cgsh.com
E-Mail: kreinker@cgsh.com

Joseph Kay
      N.Y. Bar No. 5410055
Cleary Gottlieb Steen and
      Hamilton LLP
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2745
Facsimile: (212) 225-3999
E-Mail: jkay@cgsh.com

*Attorneys for Defendants*
*Cushman & Wakefield, Inc.*
*and Pinnacle Property*
*Management Services, LLC*

43

_/s/ Kearns Davis_

Kearns Davis, NC Bar. No.
22014
Brooks, Pierce, McLendon,
     Humphrey & Leonard
2000 Renaissance Plaza
230 North Elm Street
Greensboro, NC 27401
Telephone:  336-373-8850
Facsimile:   336-378-1001
Email:kdavis@brookpierce.com

David Kiernan
(LR 83.1(d) Counsel)
JONES DAY
555 California Street
26th Floor
San Francisco, CA 94104
(415) 875-5745
dkiernan@jonesday.com

Michelle K. Fischer
(LR 83.1(d) Counsel)
JONES DAY
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586-7096
mfischer@jonesday.com

Peter J. Schwingler
(LR 83.1(d) Counsel)
JONES DAY
90 South Seventh Street
Suite 4950
Minneapolis, MN 55402
(612) 217-8866
pschwingler@jonesday.com

_Attorneys for Defendant_
_LivCor, LLC_

44

## CERTIFICATE OF WORD COUNT

I certify that this Memorandum of Law in Support of Customer Defendants' Motion to Dismiss the First Amended Complaint complies with the applicable word limits excluding the caption, signature line, and any cover page or index in accordance with this Court's March 13, 2025 Order extending the word limitation, Dkt. 123, and Local Civil Rule 7.3(d)(1). This certification is made in accordance with Local Civil Rule 7.3(d)(1). The undersigned relied upon the word count feature provided by word-processing software and the Memorandum of Law contains 8,951 words.

This 10th day of April, 2025.

/s/ James P. McLoughlin

James P. McLoughlin
N.C. Bar No. 13795
Moore & Van Allen PLLC
100 North Tryon Street
Charlotte, NC 28202
Phone: (704) 331-1000
Fax:  (704) 331-1159
mcloughlinj@mvalaw.com

Attorneys for Defendant
Greystar Real Estate
Partners, LLC

45