# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **UNITED STATES OF AMERICA, *et al.*** | No. 1:24-cv-00710—WO-JLW |
| Plaintiffs, | |
| **v.** | **DEFENDANT CAMDEN PROPERTY TRUST'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT** |
| **REALPAGE, INC., *et al.*** | |
| Defendants. | **[ORAL ARGUMENT REQUESTED]** |

## TABLE OF CONTENTS

I.    INTRODUCTION ...........................................1

II.   STATEMENT OF FACTS AND RELEVANT ALLEGATIONS ...........5

      A. Camden Chooses RealPage's YieldStar Long Ago........5

      B. Camden Discloses Rent and Occupancy Data...........5

      C. Camden Keeps Rents Down During COVID...............8

III.  QUESTION PRESENTED ....................................9

IV.   LEGAL STANDARD ........................................9

V.    ARGUMENT ..............................................9

      A. Plaintiffs Do Not Plausibly Allege That Camden
         Entered Into An Unlawful Agreement. .................9

      B. Plaintiffs Do Not Distinguish Between Public and Non-
         Public Information. ...............................12

      C. Plaintiffs Fail to Allege Camden Harmed Competition.
         ...................................................15

      D. The State Claims Should Also Be Dismissed..........16

VI.   CONCLUSION ...........................................16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cornish-Adebiyi v. Caesars Ent., Inc.*,
  No. 1:23-CV-02536-KMW-EAP, 2024 WL 4356188
  (D.N.J. Sept. 30, 2024) .................................1

*Gibson v. Cendyn Grp., LLC*,
  No. 2:23-cv-00140-MMD-DJA, 2024 WL 2060260 (D.
  Nev. May 8, 2024) ....................................1, 3

*Gibson v. MGM Resorts Int'l*,
  No. 2:23-cv-001410-MMD-DJA, 2023 WL 7025996 (D.
  Nev. Oct. 24, 2023) ....................................11

*In re Pork Antitrust Litigation*,
  Case No. 18-cv-01776 (D. Minn.), ECF No. 2616
  Statement of Interest of the United States ......3, 14, 16

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008) ......................2, 10

*Maple Flooring Mfrs.' Ass'n. v. U.S.*,
286 U.S. 563 (1925) ....................................12

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
  801 F.3d 412 (4th Cir. 2015) ...................... 2, **10**

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) ...........................12

*United States v. U.S. Gypsum Co.*,
  438 U.S. 422 (1978) ...............................12, 14

**Statutes**

Sherman Act 15 U.S.C. § 1 ..........................1, 9, 13

**Other Authorities**

https://investors.camdenliving.com ........................6

Second Quarter 2020 Earnings Call
    (https://s28.q4cdn.com/425223795/files/doc_event
    s/2020/07/CPT-2Q20-Transcript.pdf) .......................6

Third Quarter 2021 Earnings Call
    (https://s28.q4cdn.com/425223795/files/doc_finan
    cials/2021/q3/3Q21-Transcript.pdf) .....................6

Fourth Quarter 2021 Earnings Call
    (https://s28.q4cdn.com/425223795/files/doc_finan
    cials/2021/q4/4Q21-CPT-Transcript.pdf) ..................6

Case 1:24-cv-00710-WO-JLW   Document 134   Filed 04/10/25   Page 4 of 23

## I.  <u>INTRODUCTION</u>

Camden should not be part of the case against RealPage. Camden is just one of many RealPage customers and cannot give Plaintiffs the relief they seek—further changes to RealPage's revenue management products. Plaintiffs' claims against Camden, the only publicly traded Real Estate Investment Trust ("REIT") named in the complaint ("FAC"), are deficient for multiple reasons.[1]

**<u>First</u>**, Plaintiffs do not allege how or when Camden entered into any unlawful agreement. Using the same revenue management tool as competitors is not illegal. *Cornish-Adebiyi v. Caesars Ent., Inc.*, No. 1:23-CV-02536-KMW-EAP, 2024 WL 4356188, at *7 (D.N.J. Sept. 30, 2024); *Gibson v. Cendyn Grp., LLC*, No. 2:23-cv-00140-MMD-DJA, 2024 WL 2060260, at *6 (D. Nev. May 8, 2024). Plaintiffs nevertheless appear to claim that all RealPage customers violated the Sherman Act simply by using YieldStar or AIRM.

This sweeping theory makes no sense as to Camden, if any customer. Camden was using an earlier version of YieldStar

---

[1] Camden joins the Motion to Dismiss filed by the Customer-Defendants.

1

around 2005, long before the start of any claimed conspiracy. Camden continued to use YieldStar after the Antitrust Division in 2017 reviewed RealPage's acquisition of another revenue management product. Camden continues to use RealPage's primary revenue management product, now called AIRM, a product alleged to dominate the market. (FAC ¶¶ 280-284).[2] Detailed information regarding Camden's use of RealPage products is public or in voluminous pre-complaint productions made to the United States. Plaintiffs chose not to include this information in their FAC.

Plaintiffs' decision not to plead required details merits dismissal. *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 430 (4th Cir. 2015) (antitrust complaints survive dismissal when they contain detailed factual allegations regarding the conspiracy's "who, what, when, and where"); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (plaintiffs must allege "who, did what, to whom (or with whom), where, and when"). The omission of any information about when or how Camden entered the conspiracy is

_____

[2] Camden cites the FAC without conceding the truth of its allegations.

particularly glaring because Camden's "when" could complicate Plaintiffs' claims. If competitors adopt revenue management software over the course of many years, it is less plausible that there was an unlawful agreement to use the same software. *Gibson*, 2024 WL 2060260, at *4.

**Second**, Plaintiffs attempt to patch their claims by pointing to a small number of Camden communications as alleged evidence of an unlawful agreement. This theory also fails as to Camden. Camden's communication of high-level information during COVID (FAC ¶¶ 90-92, 94) was not illegal.

Plaintiffs do not allege that Camden communicated different types of information in the COVID emails than what it discloses publicly. Like other publicly traded RealPage customers, Camden discloses (in its SEC filings, on its website, and on earnings calls) detailed information about price, demand, occupancy, and market conditions.[3] Camden's public disclosures are a factor weighing against Plaintiffs' claims. *In re Pork Antitrust Litigation*, Case No. 18-cv-01776 (D. Minn.), ECF No. 2616 Statement of Interest of the United

---

[3] Plaintiffs allege that Camden is publicly traded. (FAC ¶ 238). Plaintiffs do not allege that any other defendant is publicly traded.

3

States ("*In re Pork* SOI") at p. 16 ("Another factor courts consider is whether the information shared is publicly available or disseminated only among the parties to the information exchange."); (FAC ¶ 17 (attacking AIRM because the data used is allegedly "far more detailed than any data publicly available to potential renters")). Plaintiffs do not allege what information in Camden's emails was public and what was not, despite having all the information necessary to make that fundamental distinction.

**<u>Third</u>**, Plaintiffs do not tie the few Camden emails to the rent paid by any Camden tenant at any time. Plaintiffs suggest that the Camden emails were part of some COVID price-gouging scheme. Nothing could be further from the truth. During COVID, Camden decided to keep many renewal rents below market level and provided $10 million in no-strings-attached payments to residents, rather than keep that money for Camden and its investors. Again, all those facts are publicly available or in documents already produced to the United States.

## II.  STATEMENT OF FACTS AND RELEVANT ALLEGATIONS

### A.  Camden Chooses RealPage's YieldStar Long Ago.

Camden piloted YieldStar at some of its properties around 2005.[4] Plaintiffs do not allege that YieldStar was unlawful in 2005. Plaintiffs also must have considered YieldStar to be lawful in 2017 when the Antitrust Division reviewed RealPage's purchase of revenue management product Lease Rent Options—a review that must have included scrutiny of YieldStar.[5] The Department of Justice did not alert customers to any antitrust issue with RealPage's products at that time. Plaintiffs do not specify when YieldStar crossed some unspecified antitrust line after 2017.

### B.  Camden Discloses Rent and Occupancy Data.

Plaintiffs allege that Camden exchanged "highly-sensitive" and "competitively sensitive" information in emails with competitors from 2020-2022. (FAC ¶¶ 90-92, 94). Plaintiffs do not state whether the information was publicly

---

[4] Plaintiffs do not provide the date or details regarding any Camden agreement with RealPage. Camden does not request judicial notice of any date but highlights that Plaintiffs do not make necessary allegations about the dates or terms of any agreement.
[5] Plaintiffs allege RealPage acquired LRO in 2017. (FAC ¶ 14).

available or what made it competitively significant. Plaintiffs describe the data in very general terms as including information about occupancy, demand, use of concessions, and renewal gains. (*Id.*) Plaintiffs know that Camden has publicly disclosed similar information.

Camden is a REIT traded on the New York Stock Exchange under the symbol CPT. Camden's Investor Relations page includes quarterly earnings releases, webcasts, and presentations, with earnings releases going back to 2000.[6] Each recent earnings release contains detailed financial information, including property-level occupancy and rental rates. Camden also is transparent with analysts on earnings calls, providing additional information on occupancy, demand, performance, and strategies. Examples of Camden's regular disclosures include:

---

[6] *See* Camden Property Trust, Investor Relations (April 9, 2025, 11:07 AM), https://investors.camdenliving.com, which includes the disclosures referenced: (1) Second Quarter 2020 Earnings Call; (2) Third Quarter 2021 Earnings Call; (3) Fourth Quarter 2021 Earnings Call. Camden does not request judicial notice of these materials. Camden's point is that Plaintiffs do not allege what non-public information Camden allegedly exchanged with competitors.

- **Second Quarter 2020 Earnings Call**. Camden detailed performance in specific markets: "Houston continues to be one of our weaker markets. . . . Our overall renewal offer increase across our markets for July renewals went out around 1.8% across the platform. It's as high as 4% for renewals in Austin, and the low end of that would be Houston at basically flat."

- **Third Quarter 2021 Earnings Call**. Answering a question about when Camden would recover losses, Camden responded: "If you're trying to think about the impact and how long it will take for us to recoup all that, you have to remember that we're generally not bringing our renewals fully up to market. We're doing that in order to make sure that we can keep up our resident retention."

- **Fourth Quarter 2021 Earnings Call**. Camden told the public that renewal rates for February and March were sent out with "average increases in the mid-14% range." Later in the call, Camden again provided the "mid-14% range" detail. Camden also said during

7

the call that "our guidance has new leases at 11%
over the course of the year and renewals at 7%."

C.  **Camden Keeps Rents Down During COVID**.

Plaintiffs do not allege that Camden raised rents above
market levels at any particular property during COVID.
Instead, Plaintiffs attempt to create the general impression
that Camden took advantage of tenants in those years. (FAC ¶¶
90-92, 94). That is wrong.

The publicly available facts show that Camden committed
to helping and retaining residents during COVID, giving up
short-term profits in favor of competing for residents using
a trust-based culture and brand. Camden had to disclose these
losses to investors. And in Camden's Second Quarter 2020
earnings call, Camden CEO Ric Campo described how Camden chose
residents over profits, unlike some competitors:

> To Keith's point, we could have renewed leases
> during the first part of the pandemic at decent
> rates, but we chose not to. There are some people
> in our industry that didn't do that, and they did
> raise rents. That's just not our culture. I think
> most of the industry followed those principles of
> trying to help their customers in a very, very
> uncertain and complicated time. . . . When you think
> about how you treat your customers, it's all about
> building your brand long-term and making sure that

8

customers understand that you actually care about them.

Plaintiffs do not cite these materials or anything specific about Camden's rents during COVID.

## III. <u>**QUESTION PRESENTED**</u>

Whether Plaintiffs state plausible claims against Camden.

## IV. <u>**LEGAL STANDARD**</u>

Plaintiffs attempt to assert two Sherman Act Section 1 claims against Camden and other customers. Claim 1 attempts to allege an unlawful information exchange agreement among RealPage customers to exchange confidential information. Plaintiffs focus on the theory that customers broke the law by providing data to RealPage. Claim 2 attempts to allege a conspiracy among RealPage and customers achieved through vertical agreements between RealPage and its customers.

## V. <u>**ARGUMENT**</u>

### A. <u>**Plaintiffs Do Not Plausibly Allege That Camden Entered Into An Unlawful Agreement**</u>.

Plaintiffs' unlawful agreement claims—whether under an "information exchange" or "align pricing" label—fail because Plaintiffs do not allege the details of any agreement

9

involving Camden. Despite having the documents necessary to allege specific facts about each defendant, Plaintiffs do not provide the "who, did what, to whom (or with whom), where, and when" regarding any customer agreement. *SD3*, 801 F.3d at 430; *Kendall*, 518 F.3d at 1048. Plaintiffs' claims therefore fail as to all customers for the reasons set forth in the joint brief.

The allegations against Camden are particularly weak because they ignore Camden's "when"—roughly twenty years ago. Plaintiffs' theory appears to be that merely using AIRM with knowledge that other customers also use it constitutes an illegal agreement. (FAC ¶ 263). Plaintiffs allege that every RealPage customer "uses (or has used) RealPage software, knowing or learning that RealPage will use this data to train its models and provide floor plan price recommendations and unit-level pricing not only for the landlord, but for the landlord's competitors (and vice versa) . . .". (FAC ¶ 260).

No allegations in the FAC support this theory with respect to Camden's decades-old decision to use RealPage

revenue management.[7] There are no allegations as to what
Camden knew about RealPage's products or other customers
around 2005 or how RealPage's products worked back then. In
fact, there are no allegations as to when an agreement to use
RealPage transformed into an agreement by any customer to
"align prices." *Gibson v. MGM Resorts Int'l*, No. 2:23-cv-
001410-MMD-DJA, 2023 WL 7025996, at *4 (D. Nev. Oct. 24, 2023)
("Plaintiffs mention that Treasure Island began using
GuestRev in 2012, but do not allege when MGM began using any
software that includes pricing algorithms on the Las Vegas
Strip (much less GuestRev), or when Caesars or Wynn began
using any software that includes pricing algorithms. Thus,
the Court cannot plausibly infer that all Hotel Operators
began using particular pricing software at or around the same
time, which could potentially allow the Court to draw the
inference that they entered into an agreement to do so.")
(internal citations omitted).

---

[7] It is possible that Plaintiffs are not focusing on the 2005
period, but some other date. This shows the problem with
Plaintiffs' failure to include the "who, did what, to whom
(or with whom), where, and when." Camden can only guess
Plaintiffs' theory.

The obvious alternative explanation for Camden's use of RealPage's products is that Camden had a relationship with RealPage and continued to use its products as RealPage allegedly monopolized the market for "commercial revenue management software." (FAC ¶¶ 221, 280-84). Plaintiffs simply do not explain how choosing a vendor years ago and continuing with the vendor is illegal. Plaintiffs in fact say that companies like Camden now have no other viable option besides RealPage.

### B. Plaintiffs Do Not Distinguish Between Public and Non-Public Information.

Plaintiffs' claims also fail to the extent they are premised on the alleged "information exchanges" identified in paragraphs 90-92 and 94. The exchange of price data and other information does not always harm competition. *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978); *Maple Flooring Mfrs.' Ass'n. v. U.S.*, 268 U.S. 563, 582-83 (1925). Discussing publicly available information with competitors is generally lawful. "Public dissemination is a primary way for data exchange to realize its procompetitive potential. . . . A court is therefore more likely to approve a data exchange

12

where the information is made public." *Todd v. Exxon Corp.*, 275 F.3d 191, 213 (2d Cir. 2001).

Plaintiffs' allegations about a few Camden emails suggest at most that Camden talked with competitors about the same type of information Camden provided to the public. Plaintiffs accuse Camden of breaking the law in September 2020 by talking with alleged competitors about "highly sensitive information on occupancy—including in specific markets—demand, and the strategic use of concessions." (FAC ¶¶ 90-92).

Plaintiffs do not allege that any information provided by Camden was non-public or different than the type of information Camden regularly disclosed. Camden's occupancy in specific markets and properties is publicly available on Camden's website, and market information is often discussed on analyst calls. *Compare id.* (reporting discussions of "renewal pricing" and "occupancy—including in specific markets") *with* Camden's Second Quarter 2020 Earnings Call ("Our overall renewal offer increase across our markets for July renewals went out around 1.8% across the platform. It's as high as 4% for renewals in Austin, and the low end of that would be Houston at basically flat.").

13

Plaintiffs also accuse Camden of violating the Sherman Act by communicating with LivCor starting in November 2021 about "respective strategies on maximum increases to lease renewal prices," "increase limits in specific markets," and "what price increases they were able to achieve." (FAC ¶ 94). Again, Plaintiffs do not allege what information was non-public, even though they know Camden disclosed similar strategies and rate increases in its public earnings calls and releases around the same period. *See* Camden's Fourth Quarter 2021 Earnings Call ("[O]ur guidance has new leases at 11% over the course of the year and renewals at 7%," and in response to a question regarding future renewal lease levels, "Mid-14% range"). And, as set forth below, Plaintiffs do not specifically allege how these communications raised Camden's rents or changed its "renewal philosophy" to harm tenants.

Plaintiffs ignore the Antitrust Division's own statements by treating a publicly-traded REIT the same as any other AIRM user. *See In re Pork* SOI at p. 16. Plaintiffs only allege that Camden disclosed the same types of information it discloses to investors. That does not support the inference that these emails were designed to achieve "either an unlawful

14

purpose or an anticompetitive effect." *See Gypsum*, 438 U.S. at 436 n.13. For this reason, the type of information shared in Camden's emails is not a plus factor supporting the allegations in Claims 1 and 2. Exchanging information with competitors that is otherwise public, or of the same type that is made public, is not illegal.

Plaintiffs might concede in opposition that the Camden emails are not a necessary part of their information exchange claim and that Plaintiffs' theory really is that using AIRM without anything more is illegal. The theory that it is illegal merely to use the market-leading revenue management product is flawed for all the reasons set forth in this motion, the customer defendants' joint motion, and RealPage's motion, but identifying Plaintiffs' core theory against RealPage would at least focus this litigation on the proper parties and issues.

C.    <u>**Plaintiffs Fail to Allege Camden Harmed Competition**</u>.

The other motions highlight Plaintiffs' failure to allege direct or indirect evidence of anticompetitive effects to support their claims. Plaintiffs' allegations of anticompetitive harm are particularly lacking as to Camden.

15

Plaintiffs suggest some relationship between Camden's COVID emails and higher pricing but do not allege any facts to support that conclusion. At most, Plaintiffs say that one email led Camden to "raise a renewal cap." (FAC ¶ 91). Plaintiffs also show a disregard for the "full factual circumstances," *In re Pork* SOI at pp. 7-8, by taking communications during a historic crisis about when the world might get back to normal as an indication of a long-running conspiracy.

### D.  **The State Claims Should Also Be Dismissed**.

Camden agrees with the arguments in the RealPage and joint customer brief regarding the state claims, which fail for the same reasons as the federal claims.

## VI.  **CONCLUSION**

For the foregoing reasons, the FAC should be dismissed with prejudice.


Dated: April 10, 2025   Respectfully submitted,

By: /s/  *Caroline M. Gieser*

Caroline M. Gieser (NC Bar No. 51610)
Shook, Hardy & Bacon LLP
1230 Peachtree St., Ste. 1200

16

Atlanta, GA 30309
Tel: (470) 867-6013
cgieser@shb.com

**Local Civil Rule 83.1(d) Counsel for Defendant Camden Property Trust**
By: */s/ Ryan M. Sandrock*

Ryan M. Sandrock (CA Bar No. 251781)
*Appearing Under Local Civil Rule 83.1(d)* Shook, Hardy & Bacon LLP
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900
rsandrock@shb.com

Laurie A. Novion (MO Bar No. 50390)
*Appearing Under Local Civil Rule 83.1(d)* Shook, Hardy & Bacon LLP
2555 Grand Blvd.
Kansas City, MO 64108-2613
Tel: (816) 474-6550
lnovion@shb.com

Mehgan E.H. Keeley
(IL Bar No. 6336155)
Maveric Ray Searle
(IL Bar No. 6336737)
*Appearing Under Local Civil Rule 83.1(d)*
Shook, Hardy & Bacon LLP
111 S. Wacker Dr., Ste. 4700
Chicago, IL 60606
Tel: (312) 704-7700
mkeeley@shb.com
msearle@shb.com

Richard A. Powers
(D.C. Bar No. 90016042)
*Appearing Under Local Civil Rule 83.1(d)*
Kressin Powers LLC

17

400 7th Street NW, Suite 300
Washington, D.C. 20004
Tel: (202) 464-2905

**Attorneys for Defendant Camden Property Trust**

18

## CERTIFICATE OF WORD COUNT

I certify that this Memorandum of Law in Support of Defendant Camden Property Trust's Motion to Dismiss (the "Memorandum of Law") complies with the applicable word limits excluding the caption, signature line, and any cover page or index in accordance with this Court's March 13, 2025 Order extending the word limitation, Dkt. 123, and Local Civil Rule 7.3(d)(1). This certification is made in accordance with Local Civil Rule 7.3(d)(1). The undersigned relied upon the word count feature provided by word-processing software and the Memorandum of Law contains 2,993 words.

This 10th day of April, 2025.

By: /s/ *Caroline M. Gieser*

Caroline M. Gieser (NC Bar No. 51610)
Shook, Hardy & Bacon LLP
1230 Peachtree St., Ste. 1200
Atlanta, GA 30309
Tel: (470) 867-6013
cgieser@shb.com