# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### Civil Action No.: 1:24-CV-00710-WO-JLW

UNITED STATES OF AMERICA;
STATE OF NORTH CAROLINA;
STATE OF CALIFORNIA; STATE
OF COLORADO; STATE OF
CONNECTICUT; STATE OF
ILLINOIS; COMMONWEALTH OF
MASSACHUSETTS; STATE OF
MINNESOTA; STATE OF OREGON;
and STATE OF TENNESSEE,

        Plaintiffs,

   v.

REALPAGE, INC.; CAMDEN
PROPERTY TRUST; CORTLAND
MANAGEMENT, LLC; CUSHMAN &
WAKEFIELD, INC.; GREYSTAR
REAL ESTATE PARTNERS, LLC;
LIVCOR, LLC; PINNACLE
PROPERTY MANAGEMENT
SERVICES, LLC; and WILLOW
BRIDGE PROPERTY COMPANY, LLC

        Defendants.

## MEMORANDUM IN SUPPORT OF DEFENDANTS
### CUSHMAN & WAKEFIELD, INC. AND
### PINNACLE PROPERTY MANAGEMENT SERVICES, LLC'S
### MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

### ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

INTRODUCTION ........................................... 1

BACKGROUND ............................................ 3

QUESTION PRESENTED .................................... 4

LEGAL STANDARD ....................................... 5

ARGUMENT ............................................. 7

I.    ALL COUNTS AGAINST C&W: THE COMPLAINT
      NEITHER PLAUSIBLY ALLEGES C&W CONSPIRED
      NOR ESTABLISHES PERSONAL JURISDICTION AND
      VENUE OVER C&W ................................. 7

      A.   No Plausible Allegation C&W Joined a
           Conspiracy ................................ 7

      B.   No Personal Jurisdiction Over C&W .......... 9

      C.   Venue is Not Proper for C&W ............... 12

II.   ALL COUNTS AGAINST C&W AND PINNACLE:
      LIMITED ALLEGATIONS ABOUT PINNACLE DO NOT
      PLAUSIBLY SUPPORT A CONSPIRACY AGAINST
      EITHER C&W OR PINNACLE ........................ 13

      A.   Allegations Against "Landlords" Do
           Not Apply ................................ 14

      B.   The Few Specific Allegations Do Not
           Plausibly Support Conspiracy ............. 15

III.  ALL COUNTS AGAINST C&W AND PINNACLE: NO
      PLAUSIBLE ALLEGATIONS OF ANTICOMPETITIVE
      EFFECTS ...................................... 21

IV.   STATE LAW CLAIMS ALSO FAIL ................... 23

V.    THE DISMISSAL SHOULD BE WITH PREJUDICE ....... 23

CONCLUSION ........................................... 24

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arnold Chevrolet, LLC v. Tribune Company*,
418 F.Supp.2d 172 (E.D.N.Y. 2006) ...................... 8

*Bartholomew, D.C. v. Va. Chiropractors Ass'n, Inc.*,
612 F.2d 812 (4th Cir.1979) ........................... 5

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .................................. 5-6

*Cannon Mfg. Co. v. Cudahy Packing Co.*,
267 U.S. 333 (1925) ................................... 10

*City of Pontiac & Fire Ret. Sys. v. BNP Paribas
Securities Corp.*,
92 F.4th 381 (2d Cir. 2024) ........................ 16, 21

*Daimler AG v. Bauman*,
571 U.S. 117 (2014) ................................... 9

*Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002) .......................... 22

*ESAB Grp. v. Centricut, Inc.*,
126 F.3d 617 (4th Cir. 1997) .......................... 11

*Hackos v. Sparks*,
378 F.Supp.2d 632 (M.D.N.C. 2005) ..................... 5

*Hawkins v. i-TV Digitalis Tavkozlesi zrt*,
935 F.3d 211 (4th Cir. 2019) .......................... 10

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999) ........................ 17, 21

*In re Celotex Corp.*,
124 F.3d 619 (4th Cir. 1997) .......................... 5

*In re Musical Instruments & Equipment Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) .......................6, 18

*In re Passenger Vehicle Replacement Tires Antitrust Litig.*,
  No. 24-md-3107, 2025 WL 606533 (N.D. Ohio Feb. 25, 2025) ...........................................18, 19

*Int'l Union, United Mine Workers of Am. v. CONSOL Energy, Inc.*,
  465 F.Supp.3d 556 (S.D. W. Va. 2020) ...................11

*Just Puppies, Inc. v. Brown*,
  123 F.4th 652 (4th Cir. 2024) ..........................16

*King v. Johnson Wax Assocs.*,
  565 F.Supp. 711 (D. Md. 1983) ..........................12

*King v. Rubenstein*,
  825 F.3d 206 (4th Cir. 2016) ...........................23

*Krehl v. Baskin-Robbins Ice Cream Co.*,
  664 F.2d 1348 (9th Cir. 1982) .....................16, 21

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984) .....................................6

*Mylan Lab'ys Inc. v. Akzo, N.V.*,
  2 F.3d 56 (4th Cir. 1993) ...............................5

*Omega Homes, Inc. v. Citicorp Acceptance Co.*,
  656 F.Supp. 393 (W.D. Va. 1987) ........................11

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
  801 F.3d 412 (4th Cir. 2015) ....................6, 8, 14

*United States v. Bestfoods*,
  524 U.S. 51 (1998) ......................................8

*United States v. Scophony Corp. of Am.*,
  333 U.S. 795 (1948) ....................................12

*Universal Leather, LLC v. Koro AR, S.A.*,
 773 F.3d 553 (4th Cir. 2014) ...........................10

**Statutes**

28 U.S.C. § 1391 .....................................12-13

Clayton Act, 15 U.S.C. § 22 .............................12

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law:*
 *An Analysis of Antitrust Principles and Their*
 *Application* (last updated Sept. 2024) ..................19

**Other Authorities**

Fed. R. Civ. P. 11 ...................................3, 8

Fed. R. Civ. P. 12 ...............................*passim*

-iv-

## TABLE OF APPENDICES

| Exhibit No. | Title | Short Title |
|---|---|---|
| Ex. 1 | Declaration of Jessie Waller in Support of C&W, Inc.'s Motion to Dismiss the Complaint | Waller Decl. |
| Ex. 2 | Declaration of Joseph Kay in Support of C&W & Pinnacle's Motion to Dismiss the Complaint | Kay Decl. |
| | Ex. A – Email between Pinnacle Property Management, LLC employees | |

## INTRODUCTION

The Amended Complaint ("Complaint") asserts two federal antitrust claims against Cushman & Wakefield, Inc. ("C&W") and its indirect subsidiary Pinnacle Property Management Services, LLC ("Pinnacle"). Count I asserts that C&W and Pinnacle agreed with RealPage and other "landlords" to illegally exchange information. Count II asserts that C&W's and Pinnacle's usage of RealPage's software alone—absent any agreement with other "landlords"—illegally "aligns pricing." The Complaint also asserts state law claims predicated on the same conduct alleged under the federal claims.

C&W and Pinnacle join the joint motion to dismiss. This motion explains additional independent reasons that the Complaint is deficient as to C&W and Pinnacle and should be dismissed under Fed. R. Civ. P. 12(b)(2), (3), and (6).

Neither C&W nor Pinnacle is a landlord or owns any multifamily properties. C&W does not perform any multifamily services whatsoever. It is named only because it is an indirect parent of Pinnacle. The Complaint admits C&W only operates in multifamily through Pinnacle. Compl. ¶¶244-45. Thus, all the allegations relate to what Pinnacle supposedly

-1-

did, not what C&W did. Allegations against an indirect subsidiary cannot state a claim against C&W, establish personal jurisdiction, or establish proper venue.

This Complaint is not like a typical one filed before discovery. Instead, it follows a multi-year investigation. Thus, rigorous application of the pleading standards is critical given the Complaint already reflects the Plaintiffs' best evidence.

As to Pinnacle, the long Complaint offers only a few allegations about what Pinnacle supposedly did. These allegations do not support the Complaint's broad claims that Pinnacle participated in an ongoing RealPage-centered conspiracy. The bulk of the allegations about Pinnacle have nothing to do with RealPage. Other allegations about Pinnacle affirmatively undermine the alleged conspiracy: for example, the handful of allegations includes cites to a Pinnacle antitrust compliance policy and a Pinnacle document stating RealPage does *not* provide competitively sensitive information. *Id.* ¶140.

All claims also fail because the Complaint does not plausibly allege that Pinnacle's alleged conduct had

-2-

anticompetitive effects. It alleges nothing about where Pinnacle operates, its share of the alleged local market, what conduct alleged occurred in any local market, or whether rents at Pinnacle-managed properties went up or down.

## BACKGROUND

C&W and Pinnacle are not landlords, and Plaintiffs cannot, consistent with Rule 11, allege otherwise. The complaint admits that C&W is involved in multifamily only "through its subsidiary Pinnacle." Compl. ¶244. Pinnacle only manages properties for third-party landlords and does not own any buildings. The Complaint tries to obscure this fact by alleging Pinnacle "owns *or* manages multifamily rental units," *id.* ¶245 (emphasis added), carefully using the preposition "or" to avoid falsehood.

RealPage offers revenue management software for multifamily buildings. The Complaint challenges RealPage's YieldStar and AIRM software, alleging they provide each user with daily rent recommendations for each apartment based in part on data from other RealPage users. *See, e.g.*, *id.* ¶¶15, 61. Recommendations can be to lower, raise, or maintain rent. *Id.* ¶49. Users are not required to accept any recommendations,

-3-

and the Complaint ***admits users reject 50-60% of recommendations***. *Id.* ¶¶62, 73.[1] The Complaint also admits users adjust RealPage software to customize recommendations, including by setting a "target occupancy" or adjusting for "market seasonality." *Id.* ¶¶49, 159.

Although the Complaint alleges RealPage receives access to confidential data from users, it does not allege RealPage actually shares confidential data of one user with other users. Instead, the Complaint includes an illustration showing a user sees only its ***own*** rents and highly aggregated, anonymized marketwide maximum and minimums. *Id.* ¶45.

## QUESTION PRESENTED

Whether jurisdiction and venue are proper where C&W does not operate, and whether Plaintiffs have plausibly stated claims based on generalized pleadings as opposed to specific allegations against C&W and Pinnacle.

---

[1] Plaintiffs try to explain away this fact by saying "more than 85%" of prices end up "within 5% of RealPage's recommendation." Compl. ¶73. But that is unsurprising: unless rent regularly changes more than 5% per day, actual rents and recommended rents will likely be similar to the prior day's rent.

-4-

## LEGAL STANDARD

Under Rule 12(b)(2), Plaintiffs must prove personal jurisdiction over each defendant. *See Mylan v. Akzo*, 2 F.3d 56, 60-61 (4th Cir. 1993). Plaintiffs must at a minimum "make a prima facie showing of a sufficient jurisdictional basis in order to survive the jurisdictional challenge." *In re Celotex*, 124 F.3d 619, 628 (4th Cir. 1997) (cleaned up). As a rule, a parent-subsidiary relationship is "insufficient to justify the exercise of personal jurisdiction" over the parent. *Mylan*, 2 F.3d at 60-64.

Under Rule 12(b)(3), "the burden is upon plaintiff to establish venue." *Bartholomew v. Va. Chiropractors Ass'n*, 612 F.2d 812, 816 (4th Cir. 1979); *see also Hackos v. Sparks*, 378 F.Supp.2d 632, 634 (M.D.N.C. 2005) (plaintiff must "establish that venue is proper in the judicial district in which the plaintiff has brought the action").

Under Rule 12(b)(6), a complaint must plead specific facts to "state a claim … that is plausible on its face," not merely *possible*. *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007). In an antitrust conspiracy, that requires "enough factual matter (taken as true) to suggest that an agreement

-5-

was made." *Id.* at 556. Conspirators must share "a conscious commitment to a common scheme." *Monsanto v. Spray-Rite*, 465 U.S. 752, 764 (1984). "Parallel conduct and a bare assertion of conspiracy will not suffice." *Twombly*, 550 U.S. at 556.

In addition, group pleading that lumps together different defendants cannot state a plausible claim. A complaint must "allege particular facts against a particular defendant" that "specify how these defendants were involved in the alleged conspiracy, without relying on indeterminate assertions against all defendants." *SD3 v. Black & Decker (U.S.)*, 801 F.3d 412, 422 (4th Cir. 2015) (cleaned up). If a complaint "fails to allege particular facts against a particular defendant, then the defendant must be dismissed." *Id.*

In short, a complaint must plausibly allege "who is alleged to have conspired with whom, what exactly they agreed to, and how the alleged conspiracy was organized and carried out." *In re Musical Instruments Antitrust Litig.*, 798 F.3d 1186, 1193 n.5 (9th Cir. 2015).

-6-

**ARGUMENT**

## I. ALL COUNTS AGAINST C&W: THE COMPLAINT NEITHER PLAUSIBLY ALLEGES C&W CONSPIRED NOR ESTABLISHES PERSONAL JURISDICTION AND VENUE OVER C&W

The Complaint is about multifamily, but C&W does not own or manage multifamily rental properties. The Complaint admits C&W's only connection with multifamily rental is "***through its subsidiary Pinnacle.***" Compl. ¶244 (emphasis added); *id.* ¶245 ("***Through Pinnacle***, Cushman & Wakefield owns or manages multifamily rental units.") (emphasis added). But C&W having an indirect subsidiary involved in multifamily is not enough to state a claim against C&W, establish personal jurisdiction, or establish proper venue. Thus, the Complaint against C&W should be dismissed under Fed. R. Civ. P. 12(b)(2), (3), and (6).

### A. No Plausible Allegation C&W Joined a Conspiracy

The Complaint does not include any allegations about C&W's own conduct.[2] But as a matter of law, Plaintiffs must

---

[2] Confusingly, the Complaint defines "Cushman & Wakefield" as just including C&W, and not Pinnacle, yet makes all of its substantive allegations against "Cushman & Wakefield," not "Pinnacle," despite conceding C&W operated in multifamily only via Pinnacle. This motion assumes the intent was for "Cushman & Wakefield" to cover Pinnacle. If not, the Complaint must be dismissed as to Pinnacle because there are no

-7-

"separately identify each defendant's involvement in the conspiracy." *SD3*, 801 F.3d at 423.

This principle applies with full force to a parent and its subsidiaries. In *SD3*, the Fourth Circuit affirmed dismissal of antitrust claims against parents where "no factual allegations are made against them" other than alleged involvement of subsidiaries. *Id.* The Fourth Circuit emphasized "antitrust law doesn't recognize guilt by mere association" and "two separate legal entities" having "a corporate affiliation does not alter the pleading requirement to separately identify each defendant's involvement." *Id.* (cleaned up); *see also United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (cleaned up) ("It is … deeply ingrained in our economic and legal systems that a parent corporation … is not liable for the acts of its subsidiaries."); *Arnold Chevrolet v. Tribune*, 418 F.Supp.2d 172, 178 (E.D.N.Y. 2006) ("Absent allegations of anticompetitive conduct by the parent, there is no basis for holding a parent liable for the alleged antitrust violation of its subsidiary.").

---

allegations about Pinnacle itself. The Complaint would also violate Rule 11 because no good faith basis exists to allege C&W itself engaged in any of the alleged conduct.

-8-

Thus, the Complaint's attempt to attribute Pinnacle's conduct to C&W fails to state a claim against C&W under Rule 12(b)(6) and so the claims must be dismissed.

**B. No Personal Jurisdiction Over C&W**

The Complaint against C&W should also be dismissed because Plaintiffs do not establish personal jurisdiction over C&W. The Complaint asserts that "The Court has personal jurisdiction over Cushman & Wakefield, Inc." Compl. ¶243. But the Complaint does not allege a single fact supporting this conclusory statement.

The Complaint cannot claim general jurisdiction over C&W, as it admits C&W is "organized under the laws of the State of New York and is headquartered in Chicago, Illinois." Compl. ¶244. Thus, Cushman is not "at home" in North Carolina as necessary for general jurisdiction. *Daimler v. Bauman*, 571 U.S. 117, 137 (2014).

The Complaint also does not allege the minimum contacts necessary for specific personal jurisdiction. Specific jurisdiction exists only "if the defendant's qualifying contacts with the forum state also constitute the basis for the suit," considering "(1) the extent to which the defendant

-9-

purposefully availed itself of the privilege of conducting activities in the forum state; (2) whether the plaintiff's claims arose out of those activities; and (3) whether the exercise of personal jurisdiction is constitutionally reasonable." *Universal Leather v. Koro*, 773 F.3d 553, 559 (4th Cir. 2014) (cleaned up).

Here, Plaintiffs do not allege that C&W conducted any activities in North Carolina. Nor could they: C&W has no presence in North Carolina and is not registered to do business with the North Carolina Secretary of State.[3] *See* Ex. 1, Waller Decl. ¶7.[4]

Although the Complaint alleges Pinnacle "manages multifamily rental units across the United States, including within this District," Compl. ¶245, Pinnacle's actions do not establish jurisdiction over its parent C&W. *See Cannon Mfg.*

---

[3] Plaintiffs allege "Cushman & Wakefield U.S., Inc. is … registered to do business in the State of North Carolina." Compl. ¶244 (emphasis added). But C&W and Cushman & Wakefield U.S., Inc. are different entities. The Complaint does not allege anything else about Cushman & Wakefield U.S., Inc. and it is also uninvolved in multifamily.

[4] "Unlike under Rule 12(b)(6), the court may also consider affidavits submitted by both parties." *Hawkins v. i-TV Digitalis Tavkozlesi*, 935 F.3d 211, 226 (4th Cir. 2019) (cleaned up).

-10-

*v. Cudahy Packing*, 267 U.S. 333, 336-38 (1925) (subsidiary operations in a state did not establish jurisdiction over parent); *Omega Homes v. Citicorp*, 656 F.Supp. 393, 398 (W.D. Va. 1987) (holding in antitrust case that "parent/subsidiary status … insufficient to prove … jurisdiction").

The state law claims must also be dismissed for lack of personal jurisdiction. The states offer no independent basis for personal jurisdiction over C&W, and without personal jurisdiction over the federal claims, supplemental jurisdiction is inappropriate.[5] *See ESAB Grp. v. Centricut*, 126 F.3d 617, 628 (4th Cir. 1997) (supplemental jurisdiction requires "personal jurisdiction over a defendant by reason of a federal claim"); *Int'l Union, United Mine Workers of Am. v. CONSOL Energy*, 465 F.Supp.3d 556, 581 (S.D. W. Va. 2020) (no supplemental personal jurisdiction after dismissal of jurisdiction-creating claim).

---

[5] Plaintiffs do not actually invoke supplemental jurisdiction anywhere in the Complaint, but presumably that is the basis for bringing the state law claims in this court.

-11-

### C. Venue is Not Proper for C&W

Venue in this district is also improper as to C&W. Plaintiffs allege that "venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391." Compl. ¶243. But neither statute's requirements are met.

Venue is not proper under Clayton Act Section 12 because it provides venue only (1) "in the judicial district whereof [the corporation] is an inhabitant," and (2) "in any district wherein it may be found or transacts business." 15 U.S.C. § 22. C&W is not an "inhabitant" of this district because it is "organized under the laws of the State of New York and is headquartered in Chicago, Illinois." Compl. ¶244. *See King v. Johnson Wax Assocs.*, 565 F.Supp. 711, 715 (D. Md. 1983) ("A corporation is an inhabitant only of the state of its incorporation."). C&W also is not "found" and does not "transact business" in this district. A corporation is "found" where it is "carrying on business," and it "transacts business" where it carries on business "of any substantial character." *United States v. Scophony Corp. of Am.*, 333 U.S. 795, 807 (1948); *see also King*, 565 F.Supp. at 715 (cleaned

up) ("To be found within a district, a corporation must be present in the district by its officers and agents carrying on the business of the corporation."). But C&W does not conduct any business in North Carolina or in this district. *See* Section I.B, *supra*.

Venue is also improper under 28 U.S. Code § 1391(b). Section 1391(b)(1) provides for venue where the defendant is subject to personal jurisdiction, but C&W is not subject to personal jurisdiction. *See* Section I.B, *supra*. Section 1391(b)(2) provides for venue in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." But Plaintiffs do not plausibly allege any conduct by C&W in this district—or any conduct anywhere for that matter—much less conduct giving rise to the claims.

## II. ALL COUNTS AGAINST C&W AND PINNACLE: LIMITED ALLEGATIONS ABOUT PINNACLE DO NOT PLAUSIBLY SUPPORT A CONSPIRACY AGAINST EITHER C&W OR PINNACLE

The Complaint fails to plausibly allege that C&W or Pinnacle engaged in a conspiracy.[6] For simplicity, in

---

[6] As noted, the Complaint confusingly makes allegations against "Cushman & Wakefield"—defined as C&W only and not Pinnacle—but this motion assumes the intent was to include Pinnacle within "Cushman & Wakefield." *See supra* note 2.

addressing the substantive allegations, this motion uses the term "Pinnacle" given that C&W's involvement in multifamily is only through Pinnacle, *see supra*, and so the claims C&W are derivative of the claims against Pinnacle.

The Complaint primarily relies upon allegations about "landlords" in general. This group pleading is particularly improper as Pinnacle is not a landlord. The specific allegations about Pinnacle also do not plausibly support the alleged conspiracy and, indeed, undermine it. Thus, the Complaint should be dismissed under Rule 12(b)(6).

## A. Allegations Against "Landlords" Do Not Apply

The Complaint relies on impermissible group pleading. Almost all the allegations are against "landlords"—lower-case "l"—which could be any landlord anywhere. This problem is endemic, with the Complaint referring to "landlords" 362 times! But "a plaintiff … cannot assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group." *SD3*, 801 F.3d at 422.

Allegations about "landlords" on their face do not apply to Pinnacle because it is not a landlord. This distinction matters. Landlords set prices and strategy at their

-14-

properties and receive rent payments. A property manager like Pinnacle does not receive rent payments but rather receives a fee from landlords for management services. Thus, landlords and property managers are differently situated with different abilities and incentives to engage in the alleged conduct to exchange information on rents or "align" rents.

The Complaint's core allegations are about "landlords" and not Pinnacle. For example, the Complaint alleges "landlords agree to provide" RealPage information "because they understand they will be able to leverage" information from others, Compl. ¶20, but not that Pinnacle had this "understanding." It alleges "landlords" use RealPage pricing advisors and "auto-accept settings," *id.* ¶¶66-72, but not that Pinnacle did so. It alleges "landlords" coordinate via "user groups," but not that Pinnacle did. *Id.* ¶¶102-17.

In short, these general allegations about "landlords" cannot be attributed to Pinnacle and cannot support a plausible antitrust claim against it.

## B. The Few Specific Allegations Do Not Plausibly Support Conspiracy

The Complaint has only a few allegations about Pinnacle's purported involvement in the alleged ongoing conspiracy to

-15-

use RealPage to exchange information and "align prices."[7] These few allegations do not plausibly state a claim. *See, e.g.*, *Pontiac & Fire Ret. Sys. v. BNP Paribas*, 92 F.4th 381, 398-99 (2d Cir. 2024) ("five bilateral chat excerpts" do not plausibly support alleged agreement to "fix hundreds of Treasury auctions"); *Krehl v. Baskin-Robbins*, 664 F.2d 1348, 1357-58 (9th Cir. 1982) ("a dozen isolated communications regarding prices" did not support price fixing conspiracy).

First, the Complaint quotes from a Pinnacle antitrust compliance policy. Compl. ¶83. That policy ***prohibits*** sharing non-public information with competitors. Ex. 2, Kay Decl. Ex. A, at 1.[8] An antitrust compliance policy prohibiting information exchange does not support an allegation of Pinnacle's involvement in an ongoing information exchange conspiracy.

---

[7] Beyond what is discussed here, the Complaint cites two other Pinnacle documents, one to support its Section 2 claim against RealPage about RealPage's historical data and one to support local markets. These issues are not relevant to this motion.
[8] Courts can consider documents incorporated into the Complaint by reference. *See, e.g.*, *Just Puppies v. Brown*, 123 F.4th 652, 660 (4th Cir. 2024).

-16-

Second, the Complaint alleges "When a property owner asked for information on specific competitors, [Pinnacle]'s director of revenue management replied that the requested tool, RealPage's Performance Analytics with Benchmarking, *did not provide information on specific competitors*." Compl. ¶140 (emphasis added). An allegation that a RealPage product did *not* provide competitively sensitive information does not plausibly suggest Pinnacle was part of an ongoing information exchange conspiracy.

Third, the Complaint alleges "At a February 2020 industry event, representatives from Cushman & Wakefield and two other landlords shared tips on collecting information on concessions and net effective rents from competitors." *Id.* ¶85. But one discussion by unidentified "representatives" at one industry event five years ago—if indeed it even took place—does not support the alleged conspiracy. It does not relate to RealPage. It does not specify who shared what "tips," whether the other "landlords" are relevant to this case, or whether the "representatives" were senior executives or junior leasing agents. *See, e.g.*, *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 125 (3d Cir. 1999) ("sporadic exchanges

of shop talk among field sales representatives" do not support a conspiracy). Trade associations have many "legitimate functions" and participation in them without more does not support a conspiracy. *See, e.g.*, *Musical Instruments*, 798 F.3d at 1196 (cleaned up) ("Trade associations often serve legitimate functions, such as providing information to industry members, conducting research to further the goals of the industry, and promoting demand for products and services."); *In re Passenger Vehicle Replacement Tires Antitrust Litig.*, No. 24-md-3107, 2025 WL 606533, at *17 (N.D. Ohio Feb. 25, 2025) ("Attendance at these trade association meetings contributes little, if anything, to the plausibility of the alleged conspiracy."). This allegation is also from before C&W acquired Pinnacle in March 2020. Compl. ¶244.

Fourth, the Complaint alleges a Pinnacle revenue manager told a client "We have always expected our properties to continue doing a traditional market survey" that "gives us insight into the very specific handful of competitors closest to the subject property." Compl. ¶84. Again this allegation has nothing to do with RealPage and thus does not support the claims in this case. Moreover, market surveys involve

gathering ***publicly available*** information, such as rents on building websites. *See* Kay Decl. Ex. A, at 1. The Pinnacle antitrust compliance policy incorporated in the Complaint, *see* Compl. ¶83, makes that clear and provides a list of public sources for use in market surveys.

Fifth, the Complaint includes two allegations of communications from March 2020, at the start of the COVID-19 pandemic about best practices for using RealPage software. Compl. ¶¶88-89. These allegations do not relate to prices, and a massive once-in-a-lifetime economy-wide disruption is a perfectly legitimate reason for industry participants to compare best practices. *See Tires*, 2025 WL 606533, at *31 (cleaned up) (dismissing antitrust claim because "impact of the global Covid-19 pandemic is an obvious alternative explanation"); *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶2111d1 (last updated Sept. 2024) ("The great majority of exchanges of information that do not pertain to either price or output … should be regarded as harmless."); *id.* ¶2114c (last updated Sept. 2024) (legitimate

-19-

for "firms to check the efficiency of their own operations against a relevant benchmark").

Even ignoring COVID-19, these allegations fail to support the alleged conspiracy. Two alleged contacts from five years ago that do not relate to prices do not support an ongoing conspiracy to exchange information about rents or "align rents." The Complaint alleges "In March 2020, [Pinnacle]'s director of revenue management reached out to Willow Bridge's director of revenue management" to suggest a call to compare notes about "market conditions, use of YieldStar, and strategy plans." Compl. ¶88. But it does not allege this call ever happened. The Complaint also alleges "in March 2020, a senior executive at Greystar obtained a copy of Willow Bridge's sensitive strategic plans regarding the COVID-19 pandemic" and forwarded it to Pinnacle. *Id.* ¶89. But it merely alleges Pinnacle was sent one document, not any agreement, nor does it allege what information this plan included or that Pinnacle took any action whatsoever based on it.

Finally, the Complaint also makes allegations about one Pinnacle property manager allegedly communicating with other buildings in Minnesota. *Id.* ¶98. But the Complaint does not

allege any relevant markets in Minnesota, so this allegation is irrelevant. It also does not relate to RealPage. Nor does it allege these purported communications resulted in an agreement or any price changes. In any event, these isolated communications do not support the broad claims. *See, e.g.*, *Pontiac*, 92 F.4th at 398-99; *Krehl*, 664 F.2d at 1357-58; *Baby Food*, 166 F.3d at 125.

In sum, even after a lengthy investigation with extensive production of documents and testimony, the Complaint offers only threadbare allegations against Pinnacle. The claims are about RealPage serving as a hub for information exchange and to "align prices," yet most of the allegations do not relate to RealPage at all or to prices. Moreover, the allegations undermine the Complaint, plainly have legitimate justifications, and reflect isolated incidents from years ago. As a matter of law, none of these few allegations support Pinnacle's involvement in the alleged ongoing conspiracy.

### III. ALL COUNTS AGAINST C&W AND PINNACLE: NO PLAUSIBLE ALLEGATIONS OF ANTICOMPETITIVE EFFECTS

As the joint brief explains, Plaintiffs must also plausibly allege anticompetitive effects in a relevant market and fail to do so.

The joint brief also explains that the Complaint merely alleges a series of individual agreements between RealPage and its users. But that means the Complaint must allege that Pinnacle's "***individual*** agreements with [RealPage] were likely to result in an anticompetitive effect." *Dickson v. Microsoft*, 309 F.3d 193, 211 (4th Cir. 2002) (emphasis added). The Complaint alleges nothing suggesting Pinnacle's individual agreements with RealPage had anticompetitive effects. It does not allege market shares for Pinnacle. It does not even allege where Pinnacle operates or where Pinnacle uses RealPage revenue management software. *Id.* (no plausible allegations of required anticompetitive effects "without alleging facts demonstrating [defendant's] power or share"). The Complaint also does not allege specific facts about which relevant markets Pinnacle allegedly exchanged information, what competitively sensitive information was exchanged, or with whom. Nor does the Complaint allege that Pinnacle-managed properties' rents went up due to use of RealPage software, much less that Pinnacle's use of RealPage software resulted in increase in rents in any relevant local market as a whole. To the contrary, the Complaint admits RealPage

-22-

recommendations can be to raise or lower prices. Thus, use of RealPage could have lowered prices at Pinnacle-managed buildings. Even if the Complaint had alleged price increases, that would not plausibly allege prices were anticompetitive as opposed to simply reflecting other market factors or more efficiently pricing to match supply and demand. In short, the Complaint does not allege anything suggesting Pinnacle's agreements individually caused anticompetitive harm.

## IV. STATE LAW CLAIMS ALSO FAIL

The joint brief explains the state law claims rise and fall with the federal claims. So the arguments in this motion also require dismissal of the state law claims.

## V. THE DISMISSAL SHOULD BE WITH PREJUDICE

Dismissal should be with prejudice because Plaintiffs already had an opportunity to amend their complaint and further amendment would be futile. *See King v. Rubenstein*, 825 F.3d 206, 225 (4th Cir. 2016). When Plaintiffs amended their Complaint, they simply tossed in C&W and Pinnacle as defendants without altering the core allegations. After a multi-year investigation, if Plaintiffs had a valid claim,

-23-

they should have had no trouble pleading facts to support it. The Court should not excuse their failure to do so.

## CONCLUSION

Cushman & Wakefield, Inc. and Pinnacle Property Management Services, LLC respectfully request the Complaint be dismissed with prejudice.

Respectfully submitted this 10th day of April 2025.

*/s/ Kenneth Reinker*
Kenneth Reinker
D.C. Bar No. 999958
Jeremy Calsyn
D.C. Bar No. 467737
Cleary Gottlieb Steen and
Hamilton LLP
2112 Pennsylvania Avenue, NW
Washington, D.C. 20037
Telephone: (202) 974-1743
Facsimile: (202) 974-1999
E-Mail: kreinker@cgsh.com
E-Mail: jcalsyn@cgsh.com

Joseph Kay
N.Y. Bar No. 5410055
Cleary Gottlieb Steen and
Hamilton LLP
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2745
Facsimile: (212) 225-3999
E-Mail: jkay@cgsh.com

-24-

/s/ Aaron J. Horner
Michael Montecalvo
N.C. Bar No. 24943
Aaron J. Horner
N.C. Bar No. 56335
Womble Bond Dickinson (US) LLP
One West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 721-3600
Facsimile: (336) 721-3660
E-Mail:
michael.montecalvo@wbd-us.com
E-Mail: aj.horner@wbd-us.com

*Attorneys for Defendants
Cushman & Wakefield, Inc. and
Pinnacle Property Management
Services, LLC*

-25-

## WORD COUNT CERTIFICATION

I certify that this brief complies with LR 7.3, as amended by the Court's March 13, 2025 Order (ECF No. 123), in that it contains 4,180 words as determined by Microsoft Word's word count feature.

*/s/Aaron J. Horner*
Aaron J. Horner

-26-

## CERTIFICATE OF SERVICE

This is to certify that on April 10, 2025, a copy of the foregoing was filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/Aaron J. Horner
Aaron J. Horner