IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>CORTLAND MANAGEMENT, LLC,<br><br>    Defendant. | No. 1:24-cv-00710-WLO-JLW |

## **RESPONSE OF PLAINTIFF UNITED STATES TO PUBLIC COMMENT ON THE PROPOSED FINAL JUDGMENT**

Pursuant to the Antitrust Procedures and Penalties Act (the "APPA" or "Tunney Act"), 15 U.S.C. § 16(b)–(h), the United States submits this response to the one public comment received regarding the proposed Final Judgment in this case as to Defendant Cortland Management, LLC (Doc. 49-1).

After careful consideration of the submitted comment, the United States continues to believe that the proposed Final Judgment will provide an effective and appropriate remedy for the antitrust violations alleged in the Complaint against Cortland and is therefore in the public interest.

After this Response has been published in the Federal Register, pursuant to 15 U.S.C § 16(d), the United States will move that the Court enter the proposed Final Judgment.

## I. PROCEDURAL HISTORY

On August 23, 2024, the United States and eight states ("Plaintiffs") filed a civil antitrust Complaint against RealPage, Inc. ("RealPage") (Doc. 1). On January 7, 2025, Plaintiffs amended their civil Complaint (the "Complaint") to add Cortland Management, LLC ("Cortland") and five other landlords as Defendants (Doc. 47) alleging that Cortland Management, LLC's ("Cortland") agreements with RealPage and other landlords to share information and align pricing violate Section 1 of the Sherman Act, 15 U.S.C. § 1. The Complaint seeks to enjoin Defendants from sharing and exploiting competitively sensitive data.

Along with the amended Complaint, the United States filed a proposed Final Judgment (Doc. 49-1) as to Cortland, which is designed to remedy the loss of competition alleged in the Complaint due to Cortland's conduct, and a Stipulation and Proposed Order (Doc. 49), in which Cortland consented to entry of the proposed Final Judgment after compliance with the requirements of the Tunney Act.[1] On January 23, 2025, the United

---

[1] The Stipulation and Proposed Order, and the proposed Final Judgment, pertain only to Cortland's conduct. They do not propose to resolve the anticompetitive conduct alleged in the Complaint against any other Defendant. Nor do they resolve the claims of any other Plaintiff besides the United States.

States filed a Competitive Impact Statement describing the proposed Final Judgment as to Cortland. (Doc. 63)

The United States arranged for the publication of the Complaint, proposed Final Judgment, and Competitive Impact Statement in the Federal Register on January 30, 2005, see 15 U.S.C. § 16(b)-(c); 90 Fed. Reg. 8560 (January 30, 2025), and caused notice regarding the same, together with directions for the submission of written comments relating to the proposed Final Judgment, to be published in the Washington Post from January 29 to February 4, 2025, and in the Greensboro News and Record from January 29 to February 3, 2025, and on March 1, 2025. The 60-day period for public comment has now ended. The United States received one comment in response, which is described below and attached as Exhibit 1 hereto.

## II. STANDARD OF JUDICIAL REVIEW

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in cases brought by the United States under the antitrust laws be subject to a 60-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the Court, in accordance with the statute as amended in 2004, is required to consider:

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B).

In considering these statutory factors, the Court's inquiry is necessarily a limited one, because the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." United States v. Microsoft Corp., 56 F.3d 1448, 1461 (D.C. Cir. 1995); United States v. U.S. Airways Grp., Inc., 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (explaining that the "court's inquiry is limited" in Tunney Act settlements); United States v. InBev N.V./S.A., No. 08-1965 (JR), 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that a court's review of a consent judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the

- 4 -

mechanism to enforce the final judgment are clear and manageable"); United States v. Keyspan Corp., 763 F. Supp. 2d 633, 637–38 (S.D.N.Y. 2011); see SEC v. Citigroup Global Markets Inc., 673 F.3d 158, 168 (2d Cir. 2012) ("We are bound in such matters to give deference to an executive agency's assessment of the public interest.").

As the United States Court of Appeals for the District of Columbia Circuit has held, under the APPA, a court considers, among other things, the relationship between the remedy secured and the specific allegations in the government's complaint, whether the proposed Final Judgment is sufficiently clear, whether its enforcement mechanisms are sufficient, and whether it may positively harm third parties. See Microsoft, 56 F.3d at 1458–62; United States v. Apple, Inc., 889 F. Supp. 2d 623, 631 (S.D.N.Y. 2012) (citing Microsoft, 56 F.3d at 1458, 1461–62). With respect to the adequacy of the relief secured by the decree, a court may "not make de novo determination of facts and issues." United States v. W. Elec. Co., 993 F.2d 1572, 1577 (D.C. Cir. 1993) (quotation marks omitted); see also Microsoft, 56 F.3d at 1460–62; United States v. Alcoa, Inc., 152 F. Supp. 2d 37, 40 (D.D.C. 2001); United States v. Enova Corp., 107 F. Supp. 2d 10, 16 (D.D.C. 2000); InBev, 2009 U.S. Dist. LEXIS 84787, at *3. Instead, "[t]he balancing of competing social and

political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General." W. Elec. Co., 993 F.2d at 1577 (quotation marks omitted). "The court should bear in mind the <u>flexibility</u> of the public interest inquiry: the court's function is not to determine whether the resulting array of rights and liabilities is one that will <u>best</u> serve society, but only to confirm that the resulting settlement is within the <u>reaches</u> of the public interest." Microsoft, 56 F.3d at 1460 (quotation marks omitted); see also United States v. Deutsche Telekom AG, No. 19-2232 (TJK), 2020 WL 1873555, at *7 (D.D.C. Apr. 14, 2020). More demanding requirements would "have enormous practical consequences for the government's ability to negotiate future settlements," contrary to congressional intent. Microsoft, 56 F.3d at 1456. "The Tunney Act was not intended to create a disincentive to the use of the consent decree." Id.[2]

The United States' predictions about the efficacy of the remedy are to be afforded deference by the Court. See, e.g.,

---

[2] See also BNS, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); United States v. Gillette Co., 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass").

Microsoft, 56 F.3d at 1461 (recognizing courts should give "due respect to the Justice Department's . . . view of the nature of its case"); United States v. Iron Mountain, Inc., 217 F. Supp. 3d 146, 152-53 (D.D.C. 2016) ("In evaluating objections to settlement agreements under the Tunney Act, a court must be mindful that [t]he government need not prove that the settlements will perfectly remedy the alleged antitrust harms[;] it need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms.") (internal citations omitted); United States v. Republic Servs., Inc., 723 F. Supp. 2d 157, 160 (D.D.C. 2010) (noting "the deferential review to which the government's proposed remedy is accorded"); United States v. Archer-Daniels-Midland Co., 272 F. Supp. 2d 1, 6 (D.D.C. 2003) ("A district court must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case"). In determining whether a proposed settlement is in the public interest, a district court "is not permitted to reject the proposed remedies merely because the court believes other remedies are preferable." United States v. Morgan Stanley, 881 F. Supp. 2d 563, 567 (S.D.N.Y. 2012) (quoting United States v. Abitibi-Consol. Inc., 584 F. Supp. 2d 162, 165 (D.D.C. 2008)).

The ultimate question is whether "the remedies [obtained by the Final Judgment are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'" Microsoft, 56 F.3d at 1461 (quoting W. Elec. Co., 900 F.2d at 309).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." Microsoft, 56 F.3d at 1459; see also U.S. Airways, 38 F. Supp. 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); United States v. Keyspan Corp., 763 F. Supp. 2d 633 637–38 (S.D.N.Y. 2011) ("The Court's function is not to determine whether the proposed [d]ecree results in the balance of rights and liabilities that is the one that will best serve society, but only to ensure that the resulting settlement is 'within the reaches of the public interest.'" (quoting United States v. Alex. Brown & Sons, Inc., 963 F. Supp. 235, 238 (S.D.N.Y. 1997)); InBev, 2009 U.S. Dist. LEXIS 84787, at *20 ("the 'public interest' is not to be measured by comparing the violations

- 8 -

Case 1:24-cv-00710-WO-JLW   Document 140   Filed 05/01/25   Page 8 of 17

alleged in the complaint against those the court believes could have, or even should have, been alleged"). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. Microsoft, 56 F.3d at 1459-60. See also Heckler v. Chaney, 470 U.S. 821, 832 (1985) (quoting U.S. Const. art. II, § 3) (recognizing that the decision about which claims to bring "has long been regarded as the special province of the Executive Branch.").

In its 2004 amendments to the APPA, Congress made clear its intent to preserve the practical benefits of using consent judgments proposed by the United States in antitrust enforcement, Pub. L. 108-237, § 221, and added the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); see also U.S. Airways, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). This language made explicit what Congress intended

when it first enacted the Tunney Act in 1974. As Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). "A court can make its public interest determination based on the competitive impact statement and response to public comments alone." U.S. Airways, 38 F. Supp. 3d at 76 (citing Enova Corp., 107 F. Supp. 2d at 17) *see also United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); S. Rep. No. 93-298 93d Cong., 1st Sess., at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.").

**III. THE COMPLAINT AND THE PROPOSED FINAL JUDGMENT**

The Complaint alleges that, by unlawfully sharing its confidential and competitively sensitive information with RealPage for use in its and competing landlords' pricing, Cortland violated Section 1 of the Sherman Act, 15 U.S.C. § 1. Under their licensing agreements with RealPage, Cortland and

- 10 -

competing landlords have provided RealPage with daily, competitively sensitive, nonpublic information relating to their leasing businesses, including details like how many leases have been renewed, for what terms, and at what price. The transactional data that Cortland and other landlords have agreed to provide to RealPage includes current, forward-looking, granular, and highly competitively sensitive information. RealPage has used Cortland's competitively sensitive, nonpublic information to influence rental prices and other recommendations across rental properties managed by competing landlords. Cortland's rental prices and related recommendations were also influenced by its competitors' competitively sensitive, nonpublic information. In each relevant market, RealPage and participating landlords, including Cortland, have sufficient market power, including market and data penetration, to harm renters and the competitive process through this unlawful sharing of confidential and competitively sensitive information. Moreover, Cortland and other landlords can achieve any purported procompetitive objective of revenue management software without sharing this kind of information.

The Complaint also alleges that Cortland and other landlords, by adopting and using RealPage's revenue management software, have agreed with RealPage and each other to align

their pricing and thereby violate Section 1 of the Sherman Act, 15 U.S.C. § 1. RealPage has entered into agreements with Cortland and its competing landlords relating to how to price rental units, including through the licensing of its revenue management software — AI Revenue Management ("AIRM"), YieldStar, and Lease Rent Options ("LRO") — to landlords, and the provision by landlords of their competitively sensitive, nonpublic transactional data to RealPage for training and running its revenue management software. Common adoption and use of RealPage's revenue management software by Cortland and other landlords has the likely effect of aligning their pricing processes, strategies, and pricing responses, and Cortland and other landlord users understand this likely effect.

The Complaint also alleges monopolization and attempted monopolization claims in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, against RealPage, but not against Cortland or any of its competing landlords. Through its licensing agreements, RealPage has amassed a massive reservoir of competitively sensitive data from competing landlords. RealPage has ensured that other providers of revenue management software cannot compete on the merits unless they enter into similar anticompetitive agreements with landlords, thereby obstructing

them from competing with products that do not harm the competitive process.

The proposed Final Judgment provides effective and appropriate remedies for this competitive harm. These include several requirements and restrictions on Cortland that address the United States' anticompetitive concerns regarding Cortland's conduct alleged in the Complaint. Among other terms:

  i. Cortland must move from RealPage revenue management software to its proprietary revenue management software within 30 days of entry of the Stipulation and Order;
 ii. Cortland's revenue management software cannot use any third-party nonpublic data, including in training its models or in the runtime operation;
iii. Cortland's revenue management software cannot pool pricing information across its different owners;
 iv. The supply and demand models for Cortland's revenue management software cannot be trained using rental pricing, concessions, discounts, occupancy rates or capacity, or other rental pricing terms data across different owners;
  v. Cortland cannot disclose, solicit, or use competitively sensitive information from competitors

- 13 -

that can be used to set rental prices or generate pricing;

vi. Cortland must cooperate in this civil antitrust proceeding (<u>United States et al. v. RealPage et al.</u>) with respect to its prior use of RealPage's products and the monopolization and attempted monopolization claims against RealPage;

vii. Cortland must adopt a written antitrust compliance policy and designate a chief antitrust compliance officer who will train Cortland employees on the policy, enforce the policy, and perform annual audits for compliance with the policy;

viii. Cortland must allow the United States to perform inspections of its documents, code, and pseudocode relating to its proprietary revenue management software as well as to interview its employees to ensure compliance with the Final Judgment;

ix. Cortland cannot license or use any third-party revenue management software without the appointment of a compliance monitor who will have the ability to seek information from Cortland's employees to ensure compliance with certain restrictions related to use of third-party revenue management software and

- 14 -

Case 1:24-cv-00710-WO-JLW    Document 140    Filed 05/01/25    Page 14 of 17

communications between Cortland and other property management companies;

x. Even with the oversight of a compliance monitor, Cortland cannot license or use any third-party revenue management software that (i) uses third-party nonpublic data to recommend or set prices or (ii) pools information across Cortland properties with different owners; and

xi. Cortland will also be subject to the appointment of a compliance monitor if the Court finds that Cortland has violated the terms of the proposed Final Judgment.

The proposed Final Judgment provides that it will expire four years from the date of its entry.

Under the terms of the Stipulation and Proposed Order, Cortland agreed to abide by and comply with the provisions of the proposed Final Judgment during the pendency of the Tunney Act proceedings, until the Final Judgment is entered by the Court or until the time for all appeals of any Court ruling declining entry of the proposed Final Judgment has expired.

The United States and Cortland have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the Tunney Act. Entry of the proposed Final Judgment will terminate this action with respect to Cortland,

except that the Court will retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof by Cortland.

**IV.  SUMMARY OF THE PUBLIC COMMENT AND THE UNITED STATES' RESPONSE**

The United States received one public comment in response to the proposed Final Judgment from the Center for Democracy & Technology ("CDT"). CDT expresses concern over the use of "algorithm-powered systems to collect and analyze" current and future prices and occupancy from competing landlords to then provide recommendations to all participating landlords. CDT notes that "this kind of information is competitively sensitive" and should be "closely guarded, not shared." (Exhibit 1 at 2). CDT explains that, in its view, the proposed Final Judgment's "carefully designed" obligations aim to "ensure that it makes its own independent business decisions regarding rental prices" and "materially help[]" the Division's "investigation and enforcement action." (Exhibit 1 at 6).

Having carefully reviewed CDT's comment, the United States continues to believe that the proposed Final Judgment "appropriately addresses the anticompetitive concerns underlying this enforcement action" against Cortland and, therefore, "is in the public interest." Nothing in this comment warrants a change

to the proposed Final Judgment or indicates that the proposed Final Judgment is not in the public interest. As required by the APPA, the comment and this response will be published in the *Federal Register*.

V. **CONCLUSION**

After reviewing the public comment, the United States continues to believe that the proposed Final Judgment, as drafted, provides an effective and appropriate remedy for the antitrust violations alleged in the Complaint against Cortland, and is therefore in the public interest. The United States will move this Court to enter the proposed Final Judgment after the comment and this response are published in the Federal Register.

Dated: May 1, 2025       Respectfully submitted,

By:  s/ Henry C. Su

Henry C. Su
David A. Geiger
Danielle Hauck
Kris A. Pérez Hicks

Attorneys
United States Department of Justice
Antitrust Division
450 Fifth Street N.W.,
Suite 7100
Washington, DC 20530
Telephone: (202) 307-6200
Email: henry.su@usdoj.gov