Exhibit 1



# Comments of Center for Democracy & Technology
# United States v. RealPage, Inc., et al
# No. 1:24-cv-00710-LCB-JLW
# United States District Court for the Middle District of North Carolina
# Proposed Consent Decree with Cortland Management, LLC

# March 24, 2025

Aaron Hoag
Chief, Technology and Digital Platforms Section
Antitrust Division
United States Department of Justice
450 Fifth St. NW, Suite 7100
Washington DC  20530

*By email – aaron.hoag@usdoj.gov*

Dear Mr. Hoag:

      The Center for Democracy & Technology (CDT)[1] respectfully submits these comments in support of the Justice Department's proposed consent decree with Cortland Management, Inc. In our view, the proposed decree would effectively and appropriately restore competition in Cortland's apartment rental activities, guard against recurrence of anticompetitive conduct by Cortland, and secure Cortland's assistance with the Department's continuing investigation of and enforcement against RealPage and the other apartment landlord defendants.  It is therefore in the public interest, consistent with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b) - (h) (APPA), also known as the Tunney Act.

---

[1] The Center for Democracy & Technology is a non-profit organization founded 30 years ago, when the commercial internet was just getting underway, to fight for democratic values and human rights in the digital age. Protecting and enabling an online marketplace where competition can thrive, and enhance choice for all and encourage innovation, is essential to that objective, as well as to the broader objective of fostering a strong economy and widely-shared prosperity.

The Department's antitrust enforcement action,[2] filed August 23, 2024, along with eight states, charged RealPage with using an algorithm to organize and coordinate a scheme among apartment landlords to inflate rental prices in violation of the section 1 of the Sherman Act. The allegations set forth what appears to be a textbook example of using artificial intelligence to supercharge anticompetitive collusion,[3] a capability that CDT has written about previously.[4] The Department also charged RealPage with monopolizing multi-family apartment revenue management software in violation of section 2 of the Sherman Act.

In the amended complaint,[5] filed January 7, the Department and plaintiff states added seven major multi-family apartment landlords as defendants. The amended complaint and the February 25 Response[6] in Opposition to Defendant RealPage's Motion to Dismiss also added new factual allegations and analysis in support of the charges. As stated in the Response, the amended complaint clearly sets forth the requisite "plausible claim for relief."[7]

## The Unlawful Anticompetitive Scheme Charged Under Section 1 of the Sherman Act

As charged in the complaint, RealPage has created and advertised to apartment landlords an algorithm-powered system to collect and analyze, on a daily basis, current rental prices and planned future prices, and current availabilities and projected future availabilities, for all participating landlords. This information is separately categorized for each individual rental unit, according to size, floor plan, layout, and amenities. RealPage makes explicitly clear to the landlords that it will analyze this information and provide pricing recommendations to each landlord based on this information. This kind of information is competitively sensitive, and in a lawfully competitive marketplace it is closely guarded, not shared.

RealPage's alleged system has the hallmarks of a classic anticompetitive "hub-and-spoke"[8] arrangement, under which competitors coordinate pricing and output decisions through a central clearinghouse "hub." This kind of arrangement has been found to violate section 1 of the Sherman Act, which prohibits contracts, combinations, or conspiracies in restraint of trade, provided that the evidence sufficiently demonstrates that the competitors along the "rim" had a

---

[2] www.justice.gov/d9/2024-08/424422.pdf. Eight states joined the complaint as co-plaintiffs. These comments often refer to the Department's complaint or allegations or enforcement action.
[3] *See* www.cdt.org/insights/justice-department-goes-after-algorithm-fueled-price-fixing-in-apartment-rentals/.
[4] www.cdt.org/insights/is-artificial-intelligence-a-new-gateway-to-anticompetitive-collusion/.
[5] www.justice.gov/atr/media/1383471/dl.
[6] www.justice.gov/atr/media/1390941/dl?inline.
[7] *See* Robertson v. Sea Pines Real Estate Companies, Inc., 679 F.3d 278, 284(4th Cir. 2012) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)).
[8] *E.g.*, United States v. Apple, Inc., 791 F.3d 290, 314 (2d Cir. 2015).

"conscious commitment to a common scheme designed to achieve an unlawful objective."[9] It is not necessary that the competitors along the "rim" have direct communication with each other regarding the anticompetitive scheme, because they are communicating effectively through the "hub" as "spokes."

Here, per the Department's allegations, RealPage created the "hub" and advertised it to landlords, encouraging them to join up. RealPage explained that it would calculate pricing recommendations for them, based on pricing data submitted on a daily basis by every participating landlord in the market area. And RealPage further explained that the recommendations would be guided by the highest prices being charged, which would enable each landlord to confidently increase its own rental prices in line with the high end of prices being charged by its competitors.

So, per those allegations, the landlords were well aware that they would be "spokes" to RealPage's "hub," participating along with their competitors, and that the result would be pricing recommendations that would result in inflated prices. Or, as RealPage regularly put it, would "raise all ships." A RealPage revenue management vice president elaborated that this phrase means that "there is greater good in everybody succeeding versus essentially trying to compete against one another in a way that actually keeps the industry down." And even more pointedly, that landlords using RealPage's software would "likely move in unison versus against each other."

Thus, based on the allegations, the landlords who joined up were consciously committing themselves to a common scheme not to compete. Their commitment includes paying RealPage a hefty fee in recognition of the value they are receiving.

In the words of the Department, the landlords are "knowing and willing participants."

But RealPage has allegedly gone beyond just creating and advertising the hub that enabled and facilitated a conscious commitment to unlawful pricing coordination. It has taken a number of calculated steps to make sure landlords follow through on that commitment. It constantly nudges landlords to follow each other's price increases. It actively monitors prices charged on literally millions of apartment units – not only to calculate new pricing recommendations, but also to determine which landlords are complying with its recommendations and which landlords are not.

---

[9] *E.g.*, *id.* at 315. *See* Interstate Circuit v. United States, 306 U.S. 208, 227 (1939) ("Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act."); American Column & Lumber Co. v. United States, 257 U.S. 377 (1921).

3

According to the complaint, each day, RealPage sends updated pricing recommendations to each landlord. RealPage makes it easy for the landlord to accept the recommendations in bulk – it can be done with a single keystroke, or even programmed for auto-accept, which RealPage strongly encourages landlords to adopt. Diverging from the recommendation, in contrast, requires more work: the landlord's property manager must affirmatively give RealPage a "strong sound business-minded" justification for each divergence, based on something the algorithm is not accounting for, such as local construction or renovations occurring in the building. Further, whenever RealPage disagrees with the proffered justification, which is usually, the matter is escalated to the property manager's supervisor, and upward, with increasing assertiveness.

The result, according to the amended complaint: more than 85% of final floor plan prices are within 5% of RealPage's recommendation.

The Department further charges that RealPage reinforces its algorithm-driven coordinated upward pricing recommendations by discouraging landlords from offering renters discount "concessions" – such as a free month's rent or waived fees – as landlords in a healthy competitive marketplace would naturally have incentives to offer. In its "best practices" for landlords, RealPage's guidance is simple: "Eliminate concessions." Each landlord's agreement to refuse to offer concessions is bolstered by its awareness that competing landlords are receiving the same advice from RealPage.

**Cortland Management's Proposed Agreement**

Cortland Management, LLC is one of the participating apartment landlords added as defendants in the amended complaint. Headquartered in Atlanta, Georgia, it is one of the largest apartment managers in the United States – managing, as of 2024, more than 80,000 units and more than 220 properties in the United States.

Taking the Department's well-supported allegations as correct, as the law requires,[10] the proposed consent decree with Cortland materially advances the public interest by helping to ensure that rents that Cortland charges to consumers will be set based on market factors, rather than based on a conspiracy leading to inflated rents.

To remove itself from RealPage's anticompetitive scheme, Cortland has agreed:

- to stop using RealPage revenue management software, and switch to using only its own proprietary revenue management software;

---

[10] *E.g.*, Advanced Health-Care Servs., Inc. v. Radford Community Hosp., 910 F.2d 139, 145 (4th Cir. 1990).

- to stop using any non-public data in its possession obtained or derived from RealPage; and

- not to use in its own software any third-party nonpublic data, including from RealPage.

To guard against any relapse into anticompetitive pricing, Cortland has further agreed:

- not to disclose, solicit, or use competitively sensitive information from competitors, or between Cortland properties with different owners, that could be used to set or generate rental prices.

- not to train its own proprietary software using rental pricing, concessions, discounts, occupancy rates, capacity, or other rental pricing terms data from Cortland properties with different owners;

- not to license or use any third-party revenue management software that (1) uses third-party nonpublic data to recommend or set prices or (2) pools information across Cortland properties with different owners;

- not to license or use any third-party revenue management software that (1) generates a rental price floor or a limit on rental price decreases or (2) requires or incentivizes Cortland to accept any recommended rental prices;

- certify at the outset and annually that any such third-party software is in compliance;

- not to license or use *any* third-party revenue management software until after court appointment of an independent compliance monitor, who will have full authority to seek information from Cortland's employees to ensure compliance with specified restrictions to ensure that the software will not be used to anticompetitively coordinate pricing, amenities, or availability;

- to adopt a written antitrust compliance policy, and designate a chief antitrust compliance officer who will train Cortland employees on the policy, enforce the policy, and perform annual audits for compliance with the policy;

- for its general counsel to certify to the Department annually, under penalty of perjury, its compliance with the policy and with the consent decree; and

- to allow the Department to perform inspections of its documents, and its algorithmic code and descriptions for its proprietary revenue management software, and to interview its employees, to ensure compliance.

And, also importantly, Cortland agrees to fully and actively cooperate with the Department's investigation and enforcement as it continues.

These obligations are carefully designed to end Cortland's involvement with RealPage; to ensure that it makes its own independent business decisions regarding rental prices and availability, immediately becoming a strong competitive force in the markets where it operates; and to ensure that it materially helps the Department pursue the investigation and enforcement action to conclusion. In all these respects, the decree can be expected to have a significant positive impact for consumers, who will have the benefit of apartment rental prices determined by competition rather than collusion.

**Conclusion**

For the foregoing reasons, the Proposed Final Judgment appropriately addresses the anticompetitive concerns underlying this enforcement action, is in the public interest, and should be approved by the Court.

Respectfully,



George P. Slover
Senior Counsel for Competition Policy
Center for Democracy & Technology