IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF NORTH CAROLINA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF ILLINOIS, COMMONWEALTH OF MASSACHUSETTS, STATE OF MINNESOTA, STATE OF OREGON, and STATE OF TENNESSEE, | |
| Plaintiffs, | |
| vs. | No. 1:24-cv-00710-WLO-JLW |
| REALPAGE, INC.; CAMDEN PROPERTY TRUST; CORTLAND MANAGEMENT, LLC; CUSHMAN & WAKEFIELD, INC.; GREYSTAR REAL ESTATE PARTNERS, LLC; LIVCOR, LLC; PINNACLE PROPERTY MANAGEMENT SERVICES, LLC; and WILLOW BRIDGE PROPERTY COMPANY, LLC, | |
| Defendants. | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION.............................................. 1

FACTUAL BACKGROUND........................................ 2

LEGAL STANDARDS........................................... 6

ARGUMENT.................................................. 7

I.   Claim One States a Plausible Claim for Relief
     Against Defendants for Agreeing with RealPage
     and Each Other to Share Information for Use
     in Pricing........................................... 9

     A.   The Complaint Alleges Concerted Action
          Among Defendants and RealPage................... 9

          1.   Direct Allegations of an Agreement
               to Share Information...................... 10

          2.   Allegations Supporting an Inference
               of an Agreement to Share Information....... 14

     B.   The Complaint Plausibly Alleges
          the Anticompetitive Effects of
          the Information-Sharing Agreement............... 18

          1.   Direct Evidence of Anticompetitive Harm
               from Information Sharing................... 20

          2.   Indirect Evidence of Anticompetitive Harm
               from Information Sharing................... 23

     C.   Defendants Create a Strawman Agreement.......... 30

          1.   Defendants Challenge a Straw Man Agreement
               Not Actually Alleged in the Complaint...... 30

          2.   Defendants Misstate or Misapply Precedent... 31

          3.   Defendants Are Wrong on the Plus Factors.... 36

     D.   Individual Defendants' Arguments Also Fail
          to Justify Dismissal............................ 39

          1.   Camden..................................... 40

               a.   Camden Improperly Relies on Numerous
                    Factual Allegations and Public
                    Statements Outside the Complaint........ 40

　　　　　　b.　Camden Fails to Address the Alleged
　　　　　　　　Agreement to Share Information with
　　　　　　　　RealPage and Other Landlords............ 41

　　　　2.　LivCor..................................... 42

　　　　3.　Pinnacle................................... 45

　　　　4.　Willow Bridge.............................. 49

II.　Claim Two States a Plausible Claim Against
　　Defendants for Agreeing with RealPage
　　to Align Pricing................................... 51

　　A.　The Agreement Between Each Defendant
　　　　and RealPage to Use AIRM or YieldStar
　　　　in Setting Rental Prices Constitutes
　　　　Concerted Action............................... 51

　　B.　Collectively, the Agreements Between Each
　　　　Defendant and RealPage to Use AIRM
　　　　or YieldStar in Setting Rental Prices
　　　　Impose an Unreasonable Restraint of Trade....... 56

　　C.　Defendants' Attacks on Claim Two
　　　　Miss the Mark.................................. 63

　　D.　Individual Defendants' Arguments
　　　　Against Claim Two Also Fail.................... 68

　　　　1.　Camden..................................... 68

　　　　2.　LivCor..................................... 68

　　　　3.　Pinnacle................................... 70

　　　　4.　Willow Bridge.............................. 70

III.　The State-Law Claims Should Not Be Dismissed........ 71

　　A.　The Complaint States Plausible Claims
　　　　for Relief Under State Laws..................... 71

　　B.　LivCor's Arguments Regarding
　　　　Connecticut Markets Fail....................... 77

　　　　1.　Plaintiffs' Claims Against LivCor
　　　　　　Relating to Connecticut Markets
　　　　　　Should Not Be Dismissed.................... 77

　　　　2.　Connecticut's State-Law Claim
　　　　　　Against LivCor Relating
　　　　　　to Connecticut Markets
　　　　　　Should Not Be Dismissed.................... 81

## TABLE OF AUTHORITIES

**Cases**

Am. Column & Lumber Co. v. United States,
 257 U.S. 377 (1921) ................................... 24, 27

Am. Needle, Inc. v. NFL,
 560 U.S. 183 (2010) ..................................... 7, 9

Am. Philatelic Soc'y v. Claibourne,
 3 Cal. 2d 689 (1935) ...................................... 74

Am. Tobacco Co. v. United States,
 328 U.S. 781 (1946) ........................................ 9

Ashcroft v. Iqbal,
 556 U.S. 662 (2009) ........................................ 8

Barquis v. Merchs. Collection Assn.,
 7 Cal. 3d 94 (1972) ....................................... 74

Bell Atl. Corp. v. Twombly,
 550 U.S. 544, 570 (2007) ............................ 6, 9, 14

Bus. Elecs. Corp. v. Sharp Elecs. Corp.,
 485 U.S. 717 (1988) ....................................... 57

Cal. Dental Ass'n v. FTC,
 526 U.S. 756 (1999) ....................................... 19

Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,
 20 Cal. 4th 163 (1999)) ................................... 75

Ciardi v. F. Hoffmann-La Roche, Ltd.,
 762 N.E.2d 303 (Mass. 2002) ........................... 75, 76

City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Secs.
 Corp.,
 92 F.4th 381 (2d Cir. 2024) ............................... 43

City of Tuscaloosa v. Harcros Chems., Inc.,
 158 F.3d 548 (11th Cir. 1998) ............................. 80

Consol. Metal Prods., Inc. v. Am. Petroleum Institute,
 846 F.2d 284 (5th Cir. 1988) .............................. 44

Cont'l Airlines, Inc. v. United Air Lines, Inc.,
  120 F. Supp. 2d 556 (E.D. Va. 2000) ......................... 19

Cont'l Airlines, Inc. v. United Airlines, Inc.,
  277 F.3d 499 (4th Cir. 2002) ................................ 19

Cont'l T.V., Inc. v. GTE Sylvania Inc.,
  433 U.S. 36 (1977) .......................................... 58

Continental Ore Co. v. Union Carbide & Carbon Corp.,
  370 U.S. 690 (1962) ......................................... 78

Copperweld Corp. v. Indep. Tube Corp.,
  467 U.S. 752 (1984) ......................................... 46

Cornish-Adebiyi v. Caesars Entm't., Inc.,
  2024 WL 4356188 (D.N.J. Sept. 30, 2024) .................... 33

Duffy v. Yardi Sys., Inc.,
  758 F. Supp. 3d 1283 (W.D. Wash. 2024) ..................... 47

E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,
  637 F.3d 435 (4th Cir. 2011) .................... 1, 6, 24, 25

Epic Games, Inc. v. Apple, Inc.,
  67 F.4th 946 (9th Cir. 2023) ................. 52, 72, 74, 75

FDIC v. Saphir,
  2011 WL 3876918 (N.D. Ill. Sept. 1, 2011) ................... 7

Felder v. Casey,
  487 U.S. 131 (1988) ......................................... 72

Fortner Enters., Inc. v. U.S. Steel Corp.,
  394 U.S. 495 (1969) ......................................... 67

Freeman Indus., LLC v. Eastman Chem. Co.,
  172 S.W.3d 512 (Tenn. 2005) ................................. 76

FTC v. Ind. Fed'n of Dentists,
  476 U.S. 447 (1986) .................................... passim

FTC v. Syngenta Crop Protection AG,
  711 F. Supp. 3d 545 (M.D.N.C. 2024) .............. 6, 75, 76, 77

Gibson v. Cendyn Grp., LLC,
  2024 WL 2060260 (D. Nev. May 8, 2024) ........... 33, 34, 35, 37

Case 1:24-cv-00710-WO-JLW   Document 145   Filed 05/29/25   Page 5 of 98

Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.,
  642 N.E.2d 470 (Ill. 1994) ................................... 73

Goines v. Valley Cmty. Servs. Bd.,
  822 F.3d 159 (4th Cir. 2016) .............................. 41

Illinois Brick Co. v. Illinois,
  431 U.S. 720 (1977)) ........................................ 75

In re Air Cargo Shipping Servs. Antitrust Litig.,
  2010 WL 10947344 (E.D.N.Y. Sept. 22, 2010) .................. 7

In re Flat Glass Antitrust Litig.,
  385 F.3d 350 (3d Cir. 2004) ...................... 15, 16, 17

In re Passenger Vehicle Replacement Tires Antitrust Litig.,
  2025 WL 606533 (N.D. Ohio Feb. 25, 2025) ................... 34

In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)
  ("RealPage MDL"),
  709 F. Supp. 3d 478 (M.D. Tenn. 2023) ................. passim

Interstate Circuit, Inc. v. United States,
  306 U.S. 208 (1939) ...................................... 14, 32

L.C. Williams Oil Co. v. Exxon Corp.,
  625 F. Supp. 477 (M.D.N.C. 1985) .......................... 72

LaFlamme v. Societe Air France,
  702 F. Supp. 2d 136 (E.D.N.Y. 2010) ....................... 15

Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,
  551 U.S. 877 (2007) ....................................... 58

Liggett Group, Inc. v. Brown & Williamson Tobacco Corp.,
  964 F.2d 335 (4th Cir. 1992) .............................. 39

Logar v. W. Virginia Univ. Bd. of Governors,
  493 F. App'x 460 (4th Cir. 2012) .......................... 48

Lumber Liquidators, Inc. v. Cabinets To Go, LLC,
  415 F. Supp. 3d 703 (E.D. Va. 2019) ....................... 19

Maple Flooring Mfrs.' Ass'n v. United States,
  268 U.S. 563 (1925) ....................................... 37

Marshall v. Miller,
  302 N.C. 539 (N.C. 1981) .................................. 72

Miller's Pond Co., LLC v. City of New London,
  273 Conn. 786 (2005) ........................................ 73

Milliken & Co. v. CAN Holdings, Inc.,
  2011 WL 3444013 (W.D.N.C. Aug. 8, 2021) .................... 33

Mr. Dee's Inc. v. Inmar, Inc.,
  2022 WL 825995 (M.D.N.C. Mar. 18, 2022) ................ 14, 15

N.C. State Bd. of Dental Exam'rs v. FTC,
  717 F.3d 359 (4th Cir. 2013), aff'd, 574 U.S. 494 (2015) .... 53

NCAA v. Alston,
  594 U.S. 69 (2021) ......................................... 19

NCAA v. Bd. of Regents of Univ. of Okla.,
  468 U.S. 85 (1984) ......................................... 23

Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,
  591 F.3d 250 (4th Cir. 2009) ................................ 6

Ohio v. Am. Express Co.,
  585 U.S. 529 (2018) .................................... passim

Oksanen v. Page Mem. Hosp.,
  945 F.2d 696 (4th Cir. 1991) ........................... 51, 56

People v. N. Ave. Furniture & Appliance, Inc.,
  645 P.2d 1291 (Colo. 1982) (en banc) ....................... 72

Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.,
  998 F.2d 1224 (3d Cir. 1993) ............................... 14

Republican Party of N.C. v. Martin,
  980 F.2d 943 (4th Cir. 1992) ....................... 6, 40, 41

Robertson v. Sea Pines Real Estate Cos.,
  679 F.3d 278 (4th Cir. 2012) .......................... passim

SD3, LLC v. Black & Decker (U.S.), Inc.,
  801 F.3d 412 (4th Cir. 2015) .......................... passim

Segal v. Amadeus IT Group, S.A.,
  2025 WL 963751 (N.D. Ill. Mar. 31, 2025) ................... 34

Shea v. First Fed. Sav. & Loan Assoc.,
  184 Conn. 285 (1981) ....................................... 82

Case 1:24-cv-00710-WO-JLW    Document 145    Filed 05/29/25    Page 7 of 98

Starr v. Sony BMG Music Entm't,
  592 F.3d 314 (2d Cir. 2010) ................................. 33

State v. Anthem Health Plans, Inc.,
  2010 WL 2196520 (Conn. Super. Ct. Apr. 20, 2010) .... 81, 82, 83

State v. Hossan-Maxwell, Inc.,
  181 Conn. 655 (1980) ....................................... 73

Systemcare, Inc. v. Wang Labs. Corp.,
  117 F.3d 1137 (10th Cir. 1997) ............................. 52

Tampa Elec. Co. v. Nashville Coal Co.,
  365 U.S. 320 (1961) ........................................ 67

Teradata Corp. v. SAP SE,
  124 F.4th 555 (9th Cir. 2024) .............................. 57

Todd v. Exxon Corp.,
  275 F.3d 191 (2d Cir. 2001) ........................... passim

United States v. Am. Linseed Oil Co.,
  262 U.S. 371 (1923) ........................................ 27

United States v. Brewbaker,
  87 F.4th 563 (4th Cir. 2023) ............................... 57

United States v. Container Corp. of America,
  393 U.S. 333 (1969) ........................... 12, 13, 21, 27

United States v. Foley,
  598 F.2d 1323 (4th Cir. 1979) .............................. 47

United States v. Socony-Vacuum Oil Co.,
  310 U.S. 150 (1940) ........................................ 78

United States v. Topco Assocs.,
  405 U.S. 596 (1972) ........................................ 81

United States v. U.S. Gypsum Co.,
  438 U.S. 422 (1978) ........................... 20, 27, 44, 45

United States v. Visa U.S.A., Inc.,
  344 F.3d 229 (2d Cir. 2003) ................................ 25

United States v. Wise,
  370 U.S. 405 (1962) ........................................ 47

- viii -

Westport Taxi Serv. v. Westport Transit Dist.,
  235 Conn. 1 (1995) ......................................... 73

**Statutes**

15 U.S.C. § 1 (2018)...................................... 7, 52

15 U.S.C. § 24 (2018)......................................... 47

15 U.S.C. § 45(a)(1) (2018)................................... 75

740 Ill. Comp. Stat. Ann. 10/11 (West 2024)................... 73

Cal. Bus. & Prof. Code § 17200 (West 2025)................... 74

Colo. Rev. Stat. Ann. § 6-4-101, et seq. (West 2023).......... 72

Conn. Gen. Stat. Ann. § 35-25 (West 2025).................... 83

Conn. Gen. Stat. Ann. § 35-30 (West 2025).................... 83

Conn. Gen. Stat. Ann. § 35-44b (West 2025).................... 73

Mass. Gen. Laws Ann. ch. 93, § 1 (West 2024)................. 76

Mass. Gen. Laws Ann. ch. 93, § 14A (West 2024)............... 76

Mass. Gen. Laws Ann. ch. 93A, § 2 (West 2024)................ 76

Mass. Gen. Laws Ann. ch. 93A, et seq. (West 2024)............ 75

N.C. Gen. Stat. Ann. § 75-1.1 (West 2024).................... 72

Or. Rev. Stat. Ann. § 646.715(2) (West 2024)................. 73

**Other Authorities**

D. Belt, "The Connecticut Anti-Trust Act: A Guide to
  Interpretation,"
  54 Conn. B.J. 348 (1980) ................................... 83

**INTRODUCTION**

The question before the Court is simple: Is Plaintiffs'
Complaint "plausible on its face," after "draw[ing] all
reasonable inferences in [their] favor"? <u>E.I. du Pont de Nemours
& Co. v. Kolon Indus., Inc.</u>, 637 F.3d 435, 440 (4th Cir. 2011).
The answer is yes. In their 333-paragraph Complaint (Doc. 47),
Plaintiffs have pled more than sufficient facts to support their
two claims against Defendants Camden Property Trust ("Camden"),
Greystar Management Services, LLC ("Greystar"), LivCor, LLC
("LivCor"), Pinnacle Property Management Services, LLC
("Pinnacle"), and Willow Bridge Property Company, LLC ("Willow
Bridge") (collectively "Defendants").[1] As the Complaint explains,
Defendants agreed with RealPage, Inc. ("RealPage")[2] and each
other to share their nonpublic, competitively sensitive data for
use by RealPage's revenue management software products known as
AI Revenue Management (AIRM) and YieldStar in generating pricing

---

[1] Through separately filed stipulations with the relevant
Defendants (Docs. 143 & 144), Plaintiffs are (1) dismissing
Greystar Real Estate Partners, LLC from this action without
prejudice and substituting Greystar Management Services, Inc. in
its place as a Defendant, and (2) dismissing Cushman &
Wakefield, Inc. from this action without prejudice. As used in
this brief, the term "Defendants" assumes that these changes to
the parties will take effect once the Court reviews the
stipulations and enters the proposed orders.

[2] Unless the text otherwise makes clear, Defendant RealPage is
referred to separately and by name in this brief.

recommendations (Claim One). Defendants further agreed with RealPage to align their pricing by licensing and using AIRM and YieldStar, which RealPage designed to have the effect of aligning users' pricing processes, strategies, and pricing responses (Claim Two).

Confronted with these factual allegations, Defendants' Motions to Dismiss resort to attacking agreements that are <u>not</u> alleged, ignoring the allegations, improperly attempting to add <u>new</u> facts at the pleading stage, and misstating or mischaracterizing the applicable law.[3] The Court should deny their motions.

## FACTUAL BACKGROUND

This case concerns a scheme to manipulate, distort, and subvert competition in the multifamily rental housing industry, orchestrated by RealPage and participated in by numerous companies that own and/or manage rental properties and set rental prices for the units at those properties. (Compl. ¶¶ 5–

---

[3] This brief responds to Defendants' joint motion and brief (Docs. 128 & 129), Camden's motion and brief (Docs. 133, 134), LivCor's motion and brief (Docs. 135 & 136), Pinnacle's motion and brief (Docs. 137 & 138), and Willow Bridge's motion and brief (Docs. 132, 132-1 & 139). Through the stipulations referenced in footnote 1 <u>supra</u>, Plaintiffs separately resolve Greystar Real Estate Partners' motion and brief (Docs. 130 & 131) and Cushman & Wakefield, Inc.'s motion and brief (Docs. 137 & 138).

10.) The Complaint (and likewise this brief) refers to these companies generically as "landlords," and they include each Defendant.

RealPage's anticompetitive scheme has two parts. The first part involves RealPage's daily collection of nonpublic, competitively sensitive lease transaction data from participating landlords, including their rental prices from executed leases, lease terms, and future occupancy, and RealPage's use of that data to train and run pricing algorithms that underlie its revenue management software. (Compl. ¶ 5.) The second part of the scheme involves RealPage's design, development, and licensing of its revenue management software, known as AIRM and YieldStar. (Id. ¶ 6.) Using the shared data, RealPage's software runs on algorithms that recommend the rental prices that landlords should set, and the software also instructs landlords on a specific way to price their units that aligns with how their competitors are setting prices in local rental markets. (Id. ¶ 6.) Plaintiffs seek to hold landlords who participate in RealPage's orchestrated scheme equally accountable for the anticompetitive consequences of their conduct.

Plaintiffs' two claims against RealPage and Defendants under Section 1 of the Sherman Act center on two sets of

- 3 -

agreements that underlie the anticompetitive scheme described above. The first set of agreements, which forms the basis of Claim One, involves the sharing of nonpublic, competitively sensitive lease transaction data by each participating landlord, including Defendants, with RealPage. (Compl. ¶¶ 18, 21–24.) Each landlord that agrees to share its data with RealPage explicitly or implicitly understands and agrees that this arrangement involves other landlords likewise sharing their data with RealPage. Furthermore, participating landlords understand that they collectively benefit from this arrangement because it is unambiguously a mutual exchange of information among competitors. (Id. ¶¶ 19–20, 25–26.)

Notably, effectuating this mutual exchange of information does not require each participating landlord to hand their data directly to each and every competitor. Instead, each landlord, including Defendants, knows that it only has to give RealPage nightly access to its data. RealPage in turn ensures that other participating landlords automatically benefit from that data through their licensing and use of AIRM or YieldStar to help with strategic decision-making on rental prices. Moreover, no landlord has to guess how its shared data might be used by competing landlords. AIRM and YieldStar do all the hard work for them, leveraging the shared data in generating recommendations

- 4 -

on rental prices and related competitive levers. It therefore makes no difference that competing landlords do not get to see each other's individual shared data; they need not do so to reap the intended economic benefits of the exchange.

The second set of agreements, which forms the basis of Claim Two, involves the licensing of AIRM and YieldStar revenue management software by landlords, including Defendants, from RealPage for use in making competitive decisions on rental prices. (Compl. ¶¶ 28-29.) As already explained, licensing and use of AIRM and YieldStar is one way that landlords can reap the intended economic benefits of their sharing of data with RealPage and each other. When they decide to license AIRM or YieldStar, they know that the software makes use of their shared data. But that is not the only reason that licensing and use of AIRM and YieldStar negatively impacts competition in multifamily rental housing markets.

Importantly, RealPage has designed AIRM and YieldStar to provide a common set of processes, responses, and strategies for setting rental prices to all landlords who license and use the software, including Defendants. Although each landlord still has flexibility regarding the rental prices it ultimately sets and offers on any given day, the fact remains that its strategic decision-making leading to those rental prices has been shaped

- 5 -

and steered by the software as designed, and the software likewise shapes and steers the decision-making of competing landlords, leading to greater alignment of their pricing behavior. This software-enabled alignment of pricing behavior unquestionably harms the competitive process and therefore violates Section 1 of the Sherman Act.

## LEGAL STANDARDS

To survive a motion to dismiss, Plaintiffs need only "state a claim that is 'plausible on its face,'" after the court "'draw[s] all reasonable inferences in [their] favor.'" <u>Kolon Indus.</u>, 637 F.3d at 440 (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007), and <u>Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.</u>, 591 F.3d 250, 253 (4th Cir. 2009)). The court is "not asked to consider whether defendants actually violated" the antitrust laws, <u>Robertson v. Sea Pines Real Estate Cos.</u>, 679 F.3d 278, 284 (4th Cir. 2012), or to "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses,'" <u>FTC v. Syngenta Crop Protection AG</u>, 711 F. Supp. 3d 545, 562 (M.D.N.C. 2024) (quoting <u>Republican Party of N.C. v. Martin</u>, 980 F.2d 943, 952 (4th Cir. 1992)).

Moreover, Plaintiffs do not face a higher standard on a motion to dismiss simply because they had access to precomplaint discovery. <u>In re Air Cargo Shipping Servs. Antitrust Litig.</u>,

2010 WL 10947344, at *10 (E.D.N.Y. Sept. 22, 2010) ("Having access to more information does not require the plaintiffs to plead with greater factual specificity than before. . . . The inquiry is whether the complaint states a plausible claim, and not whether the plaintiffs could have or should have amplified their claims by adding more specifics." (citations omitted)); FDIC v. Saphir, 2011 WL 3876918, at *5 (N.D. Ill. Sept. 1, 2011) ("Without citing to any supporting case law, Defendants suggest that the FDIC should be held to a higher pleading standard because it conducted significant pre-suit discovery. . . . The court . . . finds no support for the notion that it somehow elevates the FDIC's pleading standard.").

## ARGUMENT

As Plaintiffs lay out in extensive detail, Defendants have participated in a (1) "contract, combination, or conspiracy"—that is, "concerted action"—(2) that "unreasonably retrains trade." Am. Needle, Inc. v. NFL, 560 U.S. 183, 186 (2010); see 15 U.S.C. § 1 (2018); Robertson, 679 F.3d at 284. Defendants have agreed to pool their nonpublic, competitively sensitive data with RealPage to run common pricing algorithms. These algorithms combine Defendants' pooled, competitively sensitive data with several anticompetitive rules to generate pricing recommendations, which they are taught to use as a basis for

- 7 -

setting their apartment prices. These interrelated forms of concerted action harm competition. Through detailed allegations, the Complaint provides "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Robertson, 679 F.3d at 288 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). Nothing more is required.

Unable to contest that straightforward agreement, Defendants resort to misconstruing Plaintiffs' agreements and precedent. And they improperly attempt to use the basic plausibility standard to "require . . . [Plaintiffs] to prove [their] case in the complaint." Robertson, 679 F.3d at 291. None of their arguments provides a basis for the Court to dismiss Plaintiffs' claims.

Part I below explains how Claim One states a plausible claim under Section 1 of the Sherman Act for Defendants' agreement to share information with RealPage and other landlords for use in pricing. It further lays out how Defendants' arguments fail. Part II explains how Claim Two states a plausible claim under the Section 1 of the Sherman Act for Defendants' agreements with RealPage to align pricing by licensing and using AIRM and YieldStar, and addresses why Defendants' arguments fail as to this claim. Part III explains

why Defendants' motions to dismiss the state-law claims should be denied.

## I.  Claim One States a Plausible Claim for Relief Against Defendants for Agreeing with RealPage and Each Other to Share Information for Use in Pricing

### A.  The Complaint Alleges Concerted Action Among Defendants and RealPage

The first element of a Section 1 claim, concerted action, broadly encompasses any arrangement that joins "'separate economic actors pursuing separate economic interests,' such that the agreement 'deprives the marketplace of independent centers of decisionmaking.'" Robertson, 679 F.3d at 285 (quoting Am. Needle, 560 U.S. at 195). Concerted action includes "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." Am. Tobacco Co. v. United States, 328 U.S. 781, 810 (1946). To plausibly allege concerted action, a complaint need only plead "enough factual matter (taken as true) to suggest that an agreement was made." Robertson, 679 F.3d at 289 (quoting Twombly, 550 U.S. at 556). Plaintiffs easily meet this standard (1) through direct allegations of an agreement and, alternatively, (2) through a "context that raises a suggestion of a preceding agreement," from which the court may infer an agreement was made. Id. (citing Twombly, 550 U.S. at 557).

1.    Direct Allegations of an Agreement to Share
      Information

The Complaint alleges that RealPage enters into a written
agreement with every landlord that uses any of the following
RealPage software products: AIRM, YieldStar, OneSite,
Performance Analytics with Benchmarking (PAB), or Business
Intelligence (BI). (Compl. ¶¶ 18, 20-21, 23.) Each Defendant has
entered into this agreement with RealPage. (Id. ¶¶ 238 (Camden),
244 (Pinnacle), 247 (Greystar), 250 (LivCor), 253 (Willow
Bridge), 257 (all Defendants).) This written agreement
stipulates that the landlord is sharing its confidential,
nonpublic data with RealPage. (Id. ¶¶ 18-20, 23.) That data
includes granular, timely, comprehensive lease-level information
on each unit's effective rent, rent discounts, rent term, lease
status, and unit characteristics, as well as information on
potential future renters. (Id. ¶ 18.) These allegations
establish concerted action between each Defendant and RealPage
regarding the sharing of information.

But that is not all. When each Defendant signs this
agreement with RealPage, it knows that RealPage will use its
individual, nonpublic, competitively sensitive data to generate
pricing recommendations not only for itself, but also for its
competitors. (Compl. ¶¶ 16, 18-20, 23, 25—26, 260-64.) The
Complaint provides several examples of Defendants' knowledge

- 10 -

that their agreement to share data is a reciprocal exchange with other landlords. For instance, RealPage's sales pitches to landlords highlight the importance of competitors' "lease transaction data" as one of three "building blocks of price." (Id. ¶ 16.) A Greystar revenue management director testified that she understood Greystar and other landlords agreed with RealPage to share their data with RealPage, which was combined into a single data pool. (Id. ¶ 19.) A Willow Bridge executive noted that one benefit from using YieldStar was getting "shared data" from other properties in the local submarket. (Id.) RealPage explains to its landlord clients—including Defendants—that access to nonpublic, transactional data from the clients' competitors through AIRM and YieldStar is a meaningful tool to achieve claimed outperformance over non-users. (Id. ¶ 20.) Each example illustrates that Defendants' agreement to share their information is made with the knowledge that they and their competitors will mutually benefit from each other's data. (Id.)[4]

_____

[4] Defendants argue that there was no sharing of nonpublic data because they did not "receive information specific to other users." (Doc. 129 ("Joint Br.") at 16.) But they cite only one example of information sharing facilitated by RealPage, (id.), insert new facts about the level of aggregation, (id.), and—most importantly—ignore the allegations that AIRM and YieldStar use the unaggregated data to provide pricing recommendations and prices, (Compl. ¶ 42). Defendants do not need to see every

The fact that Defendants have agreed to share information with each other through RealPage draws additional support from other instances in which they have shared competitively sensitive information directly with one another and other landlords to inform their pricing. (Compl. ¶¶ 78, 263.) These direct exchanges of information include market surveys, (id. ¶¶ 82-84, 98), shared Google drive documents, (id. ¶¶ 83, 85), emails, (id. ¶¶ 89-94), videoconferences, (id. ¶¶ 96-97), and RealPage user group meetings, (id. ¶¶ 102-05, 108-11). Defendants exchanged nonpublic, competitively sensitive information on guest traffic, occupancy, and net effective rents (id. ¶¶ 82-85, 98, 263), corporate protocols for concessions and rent increases (id. ¶ 89), future pricing strategies (id. ¶¶ 90-92, 94, 97, 108-09, 111), and compliance with RealPage pricing recommendations (id. ¶ 110).

These allegations plausibly plead a horizontal agreement among Defendants to share nonpublic, competitively sensitive information for use in setting rental prices. United States v. Container Corp. of America, 393 U.S. 333 (1969), is instructive. In that case, multiple producers of corrugated containers

_____

nonpublic lease of their competitors when the pricing software that they use "sees" it and makes use of it for them.

contacted one another "for information as to the most recent price charged or quoted, whenever it needed such information and whenever it was not available from another source." Id. at 335. Each company provided this information "with the expectation that it would be furnished reciprocal information when it wanted it." Id. Even though these price exchanges were marked by "infrequency and irregularity," the Court concluded that this sharing of information, with the expectation of reciprocity, constituted concerted action. Id. ("Yet the essence of the agreement was to furnish price information whenever requested.").

Here, the information sharing among landlords is even more pervasive and coordinated than in Container Corp. Instead of infrequent or irregular exchanges, Defendants share their sensitive data daily with RealPage, knowing that it will be used to generate pricing recommendations and prices for their competitors daily. (Compl. ¶¶ 18-20, 42, 52.) They do this because they know that they too will benefit from their competitors' sharing of nonpublic data for their own pricing purposes. (Id. ¶¶ 19-20.) This knowledge of reciprocity establishes concerted action among Defendants to share information. See Container Corp., 393 U.S. at 335.

- 13 -

In short, Defendants accepted RealPage's invitation to use its software that, by nature and design, contemplated information sharing among competitors and which would be used to harm competition and renters. (Compl. ¶¶ 1-3, 15-26.) Interstate Circuit, Inc. v. United States, 306 U.S. 208, 226-27 (1939) (finding concerted action where "knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it").

### 2. Allegations Supporting an Inference of an Agreement to Share Information

Even though the Complaint explicitly pleads an agreement among Defendants to share information with other participating landlords, it also pleads sufficient facts from which the Court may, in the alternative, infer an agreement among them. Under governing case law, courts infer agreements from (1) parallel conduct and (2) "further circumstance[s] pointing toward a meeting of the minds," often characterized as "plus factors." SD3, LLC v. Black & Decker (U.S.), Inc., 801 F.3d 412, 424 (4th Cir. 2015) (quoting Twombly, 550 U.S. at 557); Mr. Dee's Inc. v. Inmar, Inc., 2022 WL 825995, at *7 (M.D.N.C. Mar. 18, 2022). Parallel conduct is established by pleading facts that "the defendants acted 'similarly.'" SD3, 801 F.3d at 427 (quoting Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1243 (3d Cir. 1993)). Parallel conduct "need

- 14 -

not be exactly simultaneous and identical in order to give rise to an inference of agreement." Id. at 429 (quoting LaFlamme v. Societe Air France, 702 F. Supp. 2d 136, 151 (E.D.N.Y. 2010)).

Plus factors include allegations of (1) motive to enter into the agreement and (2) acts contrary to the defendants' independent self-interest. See, e.g., SD3, 801 F.3d at 431 (motive); In re Flat Glass Antitrust Litig., 385 F.3d 350, 360-61 (3d Cir. 2004) (motive and action against self-interest); Mr. Dee's, 2022 WL 825995, at *8 (same). Plus factors must be evaluated holistically. SD3, 801 F.3d at 424-25.

Here, each Defendant agrees in parallel to share nonpublic, competitively sensitive data daily with RealPage. (Compl. ¶ 18.) See SD3, 801 F.3d at 427 (explaining that parallel conduct is established when "similar" acts are pleaded and holding that plaintiff alleged parallel conduct by pleading that none of the defendants license or used plaintiff's technology). Each Defendant knows that RealPage will use its data to generate pricing recommendations for its competitors that use AIRM or YieldStar. (Compl. ¶ 19.) Each Defendant likewise knows that RealPage will use its competitors' data to generate pricing recommendations for itself, if it uses AIRM or YieldStar. (Id. ¶ 20.)

- 15 -

Along with parallel conduct, the Complaint pleads at least three plus factors that holistically support an inference of an agreement among Defendants to share information. First, there are alleged actions contrary to self-interest. Sharing granular, transaction-level data to be used to help a competitor price its floor plans and units would typically be against each Defendant's independent self-interest because in a competitive market, a profit-making business has no reason to help its marketplace rivals. (Compl. ¶ 19.) See Flat Glass Antitrust Litig., 385 F.3d at 360-61 ("Evidence that the defendant acted contrary to its interests means evidence of conduct that would be irrational assuming that the defendant operated in a competitive market.").

Second, there are allegations of motive. Defendants, who should otherwise be competing, are motivated to share their nonpublic data so they can better exploit AIRM and YieldStar, which are designed to "stretch and pull pricing" and "to always test the top of the market." (Compl. ¶ 122.) They view the pooled nonpublic data in RealPage's products as a key feature to help them outperform the market. (Id. ¶¶ 20, 42, 44, 48-50.)

Third, the Complaint alleges a high level of communications among Defendants and with other landlords to share, or facilitate the sharing of, competitively sensitive information.

- 16 -

For example, Defendants shared information on the use of
concessions, rent increases, pricing strategies, and rates of
accepting RealPage's pricing recommendations. (Compl. ¶¶ 82–84,
89, 90–92, 94, 97–98, 108–10.) These allegations also go to
motive because they show "that the industry is conducive to
[information exchanges], either interdependently or through a
more express form of collusion." <u>Flat Glass Antitrust Litig.</u>,
385 F.3d at 360.

The district court overseeing the pending MDL litigation
against RealPage and various landlords has drawn similar
inferences, albeit to support the existence of a horizontal
price-fixing conspiracy alleged by the private plaintiffs, which
is not alleged here. Specifically, the court found that the
"most persuasive evidence of horizontal agreement is the simple
undisputed fact that each RMS Client Defendant provided RealPage
its proprietary commercial data, knowing that RealPage would
require the same from its horizontal competitors and use all of
that data to recommend rental prices to its competitors." <u>In re</u>
<u>RealPage, Inc., Rental Software Antitrust Litig. (No. II)</u>
<u>("RealPage MDL")</u>, 709 F. Supp. 3d 478, 510 (M.D. Tenn. 2023).
That is because "the contribution of sensitive pricing and
supply data for use by RealPage to recommend prices for
competitor units is in Defendants' economic self-interest if and

- 17 -

only if Defendants know they are receiving in return the benefit of their competitors' data in pricing their own units." <u>Id.</u> So too here. (Compl. ¶¶ 19-20, 260.)

In summary, the Complaint pleads concerted action among RealPage and Defendants through a written agreement by which each Defendant shares nonpublic, competitively sensitive information with RealPage, with the understanding and expectation that this information would be shared reciprocally with competitors to generate daily pricing recommendations and unit prices. Alternatively, the Court may infer the existence of the horizontal agreement among Defendants. When Defendants signed written agreements with RealPage to share nonpublic, competitively sensitive information, they knew and understood that their AIRM- and YieldStar-using competitors would get the benefit of that data in their pricing recommendations and prices. And that was fine with them because they in turn got the benefit of their competitors' data when they received their own pricing recommendations and prices from RealPage. Under either approach, the Complaint plausibly alleges concerted action among Defendants as well as concerted action with RealPage.

**B. The Complaint Plausibly Alleges the Anticompetitive Effects of the Information-Sharing Agreement**

The second element of a Section 1 claim involves showing that the contract, combination, or conspiracy "imposed an

- 18 -

unreasonable restraint of trade." <u>Robertson</u>, 679 F.3d at 284. A restraint's unreasonableness is "presumptively" measured under the "rule of reason . . . looking to the circumstances, details, and logic of a restraint" to assess its competitive effects. <u>NCAA v. Alston</u>, 594 U.S. 69, 81, 97 (2021) (quoting <u>Cal. Dental Ass'n v. FTC</u>, 526 U.S. 756, 781 (1999)).[5]

To satisfy the rule of reason, a plaintiff can establish anticompetitive effect either "indirectly" or "directly." <u>Ohio v. Am. Express Co.</u>, 585 U.S. 529, 542 (2018). At the pleading stage, the direct approach requires allegations of "actual detrimental effects [on competition]." <u>Id.</u> at 542 (quoting <u>FTC v. Ind. Fed'n of Dentists</u>, 476 U.S. 447, 460 (1986)). The

––––––––––––––––––––

[5] As the Fourth Circuit has observed, there are three recognized methods of analysis regarding the unreasonableness of a restraint: "(1) <u>per se</u> analysis, for obviously anticompetitive restraints, (2) quick-look analysis, for those with some procompetitive justification, and (3) the full 'rule of reason,' for restraints whose net impact on competition is particularly difficult to determine." <u>Cont'l Airlines, Inc. v. United Airlines, Inc.</u>, 277 F.3d 499, 508-09 (4th Cir. 2002). At the pleading stage, however, the Court need not decide what method of analysis applies because the Complaint satisfies the full rule of reason. <u>See Lumber Liquidators, Inc. v. Cabinets To Go, LLC</u>, 415 F. Supp. 3d 703, 713-14 (E.D. Va. 2019) ("[I]t would be premature to determine which antitrust standard—whether the 'rule of reason' or 'per se'—applies at this procedural posture.") (collecting cases); <u>Cont'l Airlines, Inc. v. United Air Lines, Inc.</u>, 120 F. Supp. 2d 556, 565 (E.D. Va. 2000) ("This factual inquiry [as to whether to apply a <u>per se</u> or rule of reason analysis] is inappropriately performed at the pleading stage. . . .").

indirect approach requires first, allegations of market power, and, second, "some evidence that the challenged restraint harms competition." Id. at 542. For an information-sharing claim, the evaluation of the restraint focuses on (1) the "nature of the information exchanged," and (2) the "structure of the industry involved." United States v. U.S. Gypsum Co., 438 U.S. 422, 441 n.16 (1978); Todd v. Exxon Corp., 275 F.3d 191, 207, 211 (2d Cir. 2001) (Sotomayor, J.).

To withstand a motion to dismiss under either approach, "[i]t is sufficient that the alleged anticompetitive effects are economically plausible in light of the . . . restrictions recounted in the complaint." Robertson, 679 F.3d at 291 (emphasis added). The Complaint satisfies both approaches.

### 1. Direct Evidence of Anticompetitive Harm from Information Sharing

The Complaint alleges direct evidence of harm to competition. Direct evidence can include allegations plausibly suggesting that the defendants increased prices above a competitive level, reduced output, or "otherwise stifled competition." Am. Express, 585 U.S. at 547.

As the Complaint explains, AIRM and YieldStar are designed to avoid routine, everyday competition among landlords and instead lead to a "greater good in everybody succeeding versus essentially trying to compete against one another in a way that

actually keeps the industry down." (Compl. ¶ 32.) To achieve
this, the software runs on shared nonpublic data to create a
property's "market response curve," to identify "peer"
properties that set upper and lower bounds on pricing, to keep
landlord users in line with their competitors, to determine the
degree of pricing elasticity, and to limit exposure to enable
users to maintain pricing power. (See id. ¶¶ 42-55.) This shared
data also underlies multiple software features in AIRM and
YieldStar known as "guardrails," including the "hard floor" and
"revenue protection mode." (Id. ¶¶ 142-44.) Defendants' sharing
of competitively sensitive information for use in a software
tool designed for pricing unquestionably stifles competition.
See Container Corp., 393 U.S. at 338 ("Price is too critical,
too sensitive a control to allow it to be used even in an
informal manner to restrain competition."). Far from
unintentional or attenuated, Defendants share their
competitively sensitive information for the direct purpose of
influencing prices and output. (Compl. ¶¶ 16-20, 40-58.)

    This information—shared in near real time—is used to
determine elasticity and thereby enable Defendants to push
pricing higher than they otherwise would. (Compl. ¶¶ 122 ("[W]e
may have a $50 increase instead of a $10 increase."), 136 (The
model does not lower prices if "there isn't much elasticity

- 21 -

between the recommended position and the current one" and "the model would recommend the highest possible position [i.e., price] without affecting demand.").) The shared information "'eliminate[s] the guessing game' on rent" and provides landlords more certainty that they can raise prices without triggering a competitive response. (Id. ¶¶ 123-25.) That information asymmetry disadvantages renters, who pay higher prices than they would without the exchange of information. (Id. ¶ 125-26.)

The recurrent sharing of information also creates a feedback loop whereby price increases prompted by the software's recommendations lead other landlords to follow suit. (Compl. ¶¶ 127-28.) The shared information helps the software set "boundaries" on the range of prices set by landlords. (Id. ¶ 129.) Landlords use the information to manage lease expirations, maintain pricing power, and charge higher prices. (Id. ¶¶ 157-62.) And the information is also used to implement revenue protection mode, an operating mode in which the software "reduces the target number of leases"—that is, target output—and therefore "tends to reduce price decreases or increase rental prices." (Id. ¶ 144.)

Brushing aside these well-pleaded allegations, Defendants demand an "analysis of output or prices" in Plaintiffs'

Complaint. (Joint Br. at 36.) This misstates the pleading standard. "Iqbal and Twombly do not require a plaintiff to prove his case in the complaint." Robertson, 679 F.3d at 291. Indeed, the Fourth Circuit has rejected the same argument Defendants now make. Id. (rejecting defendants' argument that the complaint must show "whether prices went up, down, or stayed the same"). The Complaint alleges "economically plausible" output and price effects from the exchange of competitively sensitive information (Compl. ¶¶ 121–31, 136–39, 142–48, 152, 157–62.) Nothing more is required. The Defendants' argument also overlooks the extensive allegations of stifled competition, (id. ¶¶ 121–31, 153–56), which can independently satisfy the direct approach. Am. Express, 585 U.S. at 547 (showing that defendants "otherwise stifled competition").

### 2. Indirect Evidence of Anticompetitive Harm from Information Sharing

Under the indirect approach, the Complaint sufficiently pleads market power and "some evidence" that Defendants' agreement to share information harms competition.

First, market power is the "ability to alter the interaction of supply and demand in the market." NCAA v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 109 (1984). "One traditional way to demonstrate market power is by defining the relevant product market and showing defendants' percentage share

- 23 -

of that market." Todd, 275 F.3d at 199. A relevant market consists of at least one product market and one geographic market. Kolon Indus., 637 F.3d at 441.

The Complaint alleges extensive, unchallenged facts supporting both the relevant product market and two types of geographic markets. (Compl. ¶¶ 183–99, 204–18.) Plaintiffs calculate market share in two ways. One method, which is especially relevant to the information-sharing claim, is the percentage of units managed by landlords using AIRM, YieldStar, and OneSite, and for which nonpublic, competitively sensitive information is shared with RealPage and other landlords.[6] Using this method, the Complaint lists markets across the country where RealPage's penetration rate ranges from 30% to over 80%. (Id. ¶¶ 209 (App'x A), 211 (App'x B), 214 (Table 1), 216 (Table 2).)

These market share allegations easily satisfy the pleading requirements for market power. See Am. Column & Lumber Co. v. United States, 257 U.S. 377, 413 (1921) (Brandeis, J.

---

[6] The other method is the percentage of rental units that are priced using AIRM and YieldStar. However, this measure undercounts the collective market power of the landlords (including Defendants) that have agreed to share information as alleged in Claim One because not all landlords that share their data with RealPage also license AIRM or YieldStar.

dissenting) (noting that the participating manufacturers controlled "about thirty per cent" of the market); <u>United States v. Visa U.S.A., Inc.</u>, 344 F.3d 229, 240 (2d Cir. 2003) (affirming trial court finding that MasterCard had market power with 26% share); <u>RealPage MDL</u>, 709 F. Supp. 3d at 527 (holding that plaintiffs adequately alleged market power with market shares between 25% and 53%); <u>cf.</u> <u>Kolon Indus.</u>, 637 F.3d at 452 n.12 (holding that a plaintiff need not allege "a specific percentage of market foreclosure").

Defendants do not challenge these allegations as insufficient to show market power. Rather, they claim that these market shares do not plead market power because they include units of landlords who are not, according to Defendants, "co-conspirators." (Joint Br. at 37.) In making this argument, Defendants misunderstand the nature of the concerted action alleged by Claim One. It is an agreement to share competitively sensitive data, agreed to by every landlord that uses AIRM, YieldStar, OneSite, PAB, and BI. (Compl. ¶¶ 260-62.) The calculated market shares reflect the market power of <u>all</u> the landlords who have used AIRM, YieldStar, and OneSite, and

participated in the alleged concerted action.[7] These aggregate
numbers for each local rental market represent the extent of the
information exchange, both in terms of the landlords who are
participating and the number of units for which data is being
shared with everyone.

Second, the nature of the information exchanged and the
industry structure speak to the likely anticompetitive effects
of the information sharing, i.e., the degree to which it
distorts competition in each local rental market. Defendants do
not challenge this point.

Defendants have agreed to share information on net prices,
occupancy, new leases, renewal offers and acceptances, lease
terms, and guest traffic. (Compl. ¶¶ 5, 15, 18, 34.) The
information is granular, current, and future-looking. (Id.
¶¶ 18, 34.) It is shared daily and is "among the most
competitively sensitive data a landlord maintains." (Id. ¶ 15,
18.)

"Exchanges of current price information, of course, have
the greatest potential for generating anticompetitive effects

---

[7] If anything, the market shares alleged in the Complaint
understate the participants' market power because these shares
do not include units of landlords using PAB and BI who thereby
participate in the information sharing. (Compl. ¶ 209 n.11.)

and although not _per se_ unlawful have consistently been held to violate the Sherman Act." U.S. Gypsum, 438 U.S. at 441 n.16 (emphases added) (citing Am. Column & Lumber, supra; United States v. Am. Linseed Oil Co., 262 U.S. 371 (1923); Container Corp., supra). Here, Defendants are exchanging current price information and more. The facts are uncannily similar to those in American Column & Lumber.

There, the defendant lumber manufacturers shared with a trade association employee six reports, including a daily report of executed sales and sales prices and a daily shipping report. Am. Column & Lumber, 257 U.S. at 394–95. Every week, that trade association employee, referred to euphemistically as a "manager of statistics," provided the manufacturers a report showing sales, including pricing information, and shipments of the other manufacturers. Id. at 396. Monthly meetings were also held for discussions of "all subjects of interest." Id. at 397. In holding that the defendants had violated the Sherman Act, the Court highlighted that "[g]enuine competitors do not make daily, weekly, and monthly reports of the minutest details of their business to their rivals, as the defendants did." Id. at 410.

In the same fashion, Defendants share competitively sensitive information on a daily basis with RealPage, which then analyzes that information and shares the resulting analysis

among Defendants and other landlords. That information includes pricing recommendations, prices, and visualizations such as market range charts and amenity valuations. (Compl. ¶¶ 44–58.) Additionally, landlords, including Defendants, participate in monthly RealPage user group meetings where competitively sensitive information is discussed. (See id. ¶¶ 102–111.) Still other Defendants shared competitively sensitive information directly with each other. (See id. ¶¶ 82–99.)

In Todd, then-Judge Sotomayor identified three pertinent factors regarding the nature of the information shared: the time frame of the data, the specificity of the information, and whether the data is made public. 275 F.3d at 211–13. Here, all three factors point to a high risk of anticompetitive harm. The shared data in this case is current or future-looking, contains information on individual leases and guest visits, and is nonpublic. As in Todd, "[t]he characteristics of the data exchange in this case are precisely those that arouse suspicion of anticompetitive activity under the rule of reason." Id. at 213.

The industry structure further supports the susceptibility of the alleged conventional multifamily rental markets to anticompetitive conduct. Todd, 275 F.3d at 207–08. Demand for multifamily housing is inelastic because everyone needs a place

to live. (Compl. ¶¶ 75–77.) Cf. Todd, 275 F.3d at 211. Many areas are highly concentrated. (Compl. ¶¶ 79–80.) See also Todd, 275 F.3d at 208–09 (explaining that information sharing may also be unlawful "despite a relatively large number of sellers"). RealPage's software is designed to make the pricing of rental units more comparable between landlords: AIRM and YieldStar provide price recommendations at a floor plan level that is typically determined by bedroom count and bathrooms; they identify peer properties by bedroom count; and they take steps to standardize amenity nomenclature so that landlords can more easily track each other's amenity valuations. (Compl. ¶¶ 22, 42, 118–19.) See Todd, 275 F.3d at 209–11 (defendants "manufactured a form of fungibility through sophisticated comparison techniques").

Moreover, the analysis of industry structure and the nature of the shared information help courts ascertain whether the information can be used by competitors to coordinate with each other. See Todd, 275 F.3d at 209, 211. Here that linkage is even more direct. The information is shared for the purpose of pricing, through software that is designed to "increase prices as much as possible and minimize price decreases." (Compl. ¶ 264.)

In summary, the Complaint plausibly alleges both direct and indirect evidence of the anticompetitive effects of the information exchange among Defendants and RealPage. Claim One therefore satisfies both elements of Section 1 and survives dismissal.

### C. Defendants Create a Strawman Agreement

#### 1. Defendants Challenge a Strawman Agreement Not Actually Alleged in the Complaint

Instead of challenging the agreement alleged in Claim One, Defendants attack a strawman. Specifically, Defendants argue that the Complaint does not allege that they "agreed among themselves to use RMS." (Joint Br. at 22.) (See also Joint Br. at 21 (Plaintiffs "do not plead that Customer Defendants licensed or used RealPage's RMS in suspiciously similar ways."), 23 ("Rather than allege Customer Defendants coordinated their decisions to license RealPage's RMS . . ."), 24 ("[F]ar from alleging Customer Defendants use RealPage's RMS in the same way . . ."),[8] 25 ("Plaintiffs also fail to allege that Customer Defendants used RealPage's RMS in the same way.") (emphases added).)

_____

[8] The information-sharing agreement does not require that Defendants use the same revenue management software, or even use such software. Here, however, all Defendants use AIRM or YieldStar, and AIRM and YieldStar both share a common pool of nonpublic, competitively sensitive data. (Compl. ¶¶ 19, 260.)

Contrary to Defendants' characterization, Claim One alleges a horizontal agreement among Defendants, as well as an agreement with RealPage, to share nonpublic, competitively sensitive information that they know would be used by AIRM and YieldStar to generate pricing recommendations and prices. (Compl. ¶ 260–63.) The Complaint explicitly alleges a written agreement with RealPage to share nonpublic, competitively sensitive data with RealPage, and Defendants' mutual knowledge and assent that RealPage would use that shared data to create pricing recommendations and prices for their competitors and them. (Compl. ¶¶ 15–20.) Alternatively, the Court can infer a horizontal agreement among Defendants from their parallel actions in entering into agreements with RealPage and the plus factors explained above. See supra Parts I.A.1. and I.A.2.

### 2. Defendants Misstate or Misapply Precedent

Defendants misapply precedent to overstate the requirements for pleading an agreement.

First, Defendants contend that SD3 requires Plaintiffs to plead the "when, who, what" of an agreement. (Joint Br. at 14–19.) But SD3 did not establish such a requirement for the group boycott claim alleged there, let alone the information-sharing claim alleged here. Rather, the Fourth Circuit concluded that allegations about the "time, place, and manner in which the

boycott initially formed" provided the "requisite 'more'" beyond parallel conduct to plausibly allege a group boycott claim. SD3, 801 F.3d at 429–30. But the Fourth Circuit did not suggest that such allegations were necessary for all antitrust claims. Indeed, the court also pointed to additional "plus factors," including meetings and communications among the defendants, as plausibly suggesting an agreement. Id. at 432.

Here, the Complaint alleges that each Defendant signed an agreement with RealPage to share information that would be used to generate pricing recommendations and prices for its competitors, knowing that they would receive the same benefit in return. (Compl. ¶¶ 18–20, 260–63.) The information is used to increase rental prices and minimize price decreases. (Id. ¶¶ 264, 266.) The Complaint identifies the parties subject to the information-sharing agreement as Defendants, RealPage, and other landlords using AIRM, YieldStar, OneSite, PAB, or BI. (Id. ¶¶ 18–23.) The information sharing began when Defendants signed agreements with RealPage, each knowing that the information would be shared with and from competitors. (Id. ¶¶ 18–20.) See Interstate Circuit, 306 U.S. at 227 (simultaneous action or agreement is not required for Section 1).

Where, as here, "the concerted conduct is both plainly documented and readily available," additional factual

- 32 -

allegations about the concerted action are not necessary. Robertson, 679 F.3d at 290 (rejecting defendants' argument that plaintiffs needed to plead "factual detail such as the times and locations of the allegedly conspiratorial meetings" where the plaintiffs pleaded facts about the contents of a written agreement). See also, e.g., Starr v. Sony BMG Music Entm't, 592 F.3d 314, 325 (2d Cir. 2010) (rejecting argument that complaint must "identify the specific time, place, or person related to each conspiracy allegation" where the complaint alleges parallel conduct); Milliken & Co. v. CAN Holdings, Inc., 2011 WL 3444013, at *5 & n.5 (W.D.N.C. Aug. 8, 2021) (rejecting argument that plaintiff must identify the "who, what, when and where," and holding that the complaint must simply make the claim "plausible on its face").

Second, Defendants rely on three other district court decisions relating to algorithmic pricing. These cases do not support their motions to dismiss for two simple reasons: all involved price-fixing claims and two of them (Gibson and Cornish-Adebiyi) disclaimed any sharing of competitively sensitive information among the alleged conspirators. See Gibson v. Cendyn Grp., LLC, 2024 WL 2060260, at *3-4 (D. Nev. May 8, 2024); Cornish-Adebiyi v. Caesars Entm't., Inc., 2024 WL 4356188, at *1 (D.N.J. Sept. 30, 2024); In re Passenger

- 33 -

Vehicle Replacement Tires Antitrust Litig., 2025 WL 606533, at *1 (N.D. Ohio Feb. 25, 2025).[9] None alleged a written agreement to share confidential, competitively sensitive information as a separate and distinct concerted action in violation of the antitrust laws.

Gibson is instructive. Defendants rely on the case repeatedly, citing it roughly 20 times across 16 pages. There, the district court dismissed claims that hotel operators agreed to use the same software to fix hotel room prices. 2024 WL 2060260, at *1, *3. The decision turned on the plaintiffs' "failure to plausibly allege the exchange of confidential information," which the court considered a "fatal defect." Id. at *5 (emphasis added). The Gibson court relied on this shortcoming to distinguish the RealPage MDL decision. 2024 WL 2060260 at *4. The Gibson court even acknowledged that "exchanging confidential data with your competitors" through revenue management software "would be more suggestive of an

_____

[9] Defendants cite a fourth case, Segal v. Amadeus IT Group, S.A., 2025 WL 963751 (N.D. Ill. Mar. 31, 2025). That court dismissed the complaint without prejudice after noting that the plaintiff abandoned a price-fixing claim and asserted contradictory theories of anticompetitive effects related to information sharing of occupancy data (but not pricing data). Id. at *5-6 & n.5. By contrast, Plaintiffs' Complaint does not contain such contradictions as to how the shared information harms competition.

- 34 -

agreement" to fix prices. Id. at *7 (emphasis added). What the Gibson plaintiffs failed to allege, i.e., the exchange of confidential, competitively sensitive data, the Complaint alleges in abundant detail. (Compl. ¶¶ 15-27, 40-58 (explaining how AIRM and YieldStar use nonpublic data from Defendants and other landlords to generate pricing recommendations and prices for competing landlords).)

While leaning heavily on Gibson, Defendants offer no persuasive rationale for distinguishing the RealPage MDL decision. Defendants make only two arguments. (Joint Br. at 26.) First, they note that the RealPage MDL complaint alleged different acceptance rates. This ignores the Complaint's allegations regarding the influence of AIRM and YieldStar on pricing. (Compl. ¶¶ 73-74.) More importantly, the acceptance rate argument is a red herring. Each Defendant agreed to share competitively sensitive data with RealPage and its competitors. That information was shared and used for pricing by AIRM and YieldStar regardless of how frequently that Defendant accepted a pricing recommendation from the software for a particular floor plan on a given day.

Second, Defendants attempt to distinguish the RealPage MDL decision on the ground that using revenue management software serves their self-interest. (Joint Br. at 27.) This argument

- 35 -

conflates two distinct issues: (1) the use of some type of revenue management software without others' participation; and (2) the sharing of competitively sensitive information to run revenue management software, which evinces a collective endeavor. Plaintiffs acknowledge, and indeed allege, that there are less restrictive alternatives available to RealPage and Defendants that do not involve the exchange of competitively sensitive data for use in pricing. (Compl. ¶ 269.) Defendants cannot defend their agreement to share their competitively sensitive information as serving their independent self-interest.

### 3. Defendants Are Wrong on the Plus Factors

Finally, Defendants argue that there are no plus factors supporting an inferred agreement from parallel conduct. (Joint Br. at 28-32.) That is wrong. As explained above, the Court need not infer an agreement because the Complaint alleges a written agreement to share information among RealPage, Defendants, and other landlords. Nevertheless, as also explained above, the Complaint pleads plus factors supporting the inference of an agreement.

First, Defendants say the Complaint pleads no acts against their self-interest. (Joint Br. at 29-30.) That ignores the detailed allegations that Defendants agree to share their

- 36 -

nonpublic, competitively sensitive information with competitors
so that those competitors can use it to price their units, which
is against their independent self-interest unless they receive
shared information in return. (Compl. ¶¶ 15–16, 18–20, 23–27.)
See RealPage MDL, 709 F. Supp. 3d at 510 ("Put another way, the
contribution of sensitive pricing and supply data for use by
RealPage to recommend prices for competitor units is in
Defendants' economic self-interest if and only if Defendants
know they are receiving in return the benefit of their
competitors' data in pricing their own units.").

Defendants again mischaracterize the Complaint, arguing
that Plaintiffs do not plead that "using RealPage's RMS is
against any Customer Defendant's self-interest." (Joint Br.
at 29–30 ("[T]here are many independent reasons why a Customer
Defendant would license RealPage's RMS . . . .") (emphases
added).) Claim One challenges an unlawful agreement to share
information for use in pricing, not an agreement among
Defendants to license or use AIRM or YieldStar. Defendants also
rely on cases that do not involve the sharing of nonpublic data.
See Maple Flooring Mfrs.' Ass'n v. United States, 268 U.S. 563,
585–86 (1925) (holding that the sharing of certain information
that was openly published in trade journals and by the federal
government was not unlawful); Gibson, 2024 WL 2060260, at *7

- 37 -

("In sum, the Court does not find that Plaintiffs have plausibly alleged that Hotel Defendants exchange confidential information with each other–directly or indirectly–by using GuestRev.").

Second, Defendants argue that there were "no unusual communications" among them. (Joint Br. at 30-31.) That argument ignores detailed allegations of improper communications of competitively sensitive data across 14 pages and more than 30 paragraphs. (Compl. ¶¶ 82-117.) They try to justify this willful blindness by cabining the scope of improper communications to ones "about using RealPage." (Joint Br. at 30.) But that gives short shrift to the many allegations just on that topic. (See, e.g., Compl. ¶¶ 88-90, 93, 97, 105-06, 110-11, 113.) To say it again, the alleged agreement among Defendants is to share competitively sensitive information, not to use AIRM or YieldStar. Defendants therefore miss the mark.

Third, Defendants ignore the Complaint's allegations about their motive to enter into an information-sharing agreement to increase their profits. (See, e.g., Compl. ¶¶ 16, 20.) See SD3, 801 F.3d at 431 ("Motivation for common action is a key circumstantial fact" (quotation omitted)). They instead attack the allegations about industry structure but fail to address the relevant factors as set forth in Todd, including inelastic demand, 275 F.3d at 207-11, and the steps RealPage and

Defendants take to facilitate comparisons among their rental units (Compl. ¶¶ 118-19). And, as Todd keenly observed, players in a less concentrated market may be "most in need of . . . data exchange arrangements in order to facilitate price coordination." 275 F.3d at 209.[10]

In summary, Defendants fail in their joint brief to assail the plausibility of the Complaint's allegations regarding the information-sharing claim.

## D. Individual Defendants' Arguments Also Fail to Justify Dismissal

Several Defendants submitted individual motions and briefs in which they adopted the same arguments as in their joint brief and, in some cases, made additional arguments. The individual motions to dismiss Claim One fail for the same reasons explained above. And, as explained below, the additional reasons raised in individual briefs fail to muster any independent basis to dismiss the Complaint. These individual motions should be denied as well.

_____

[10] Defendants cite Liggett Group, Inc. v. Brown & Williamson Tobacco Corp., 964 F.2d 335 (4th Cir. 1992), for the proposition that "mere participation in an oligopolistic market" is not illegal. (Joint Br. at 32.) But Plaintiffs do not allege "mere participation." Claim One alleges Defendants and other landlords actively share nonpublic, competitively sensitive information for the purpose of enabling them to extract higher rents from renters. (Compl. ¶¶ 259-64.)

- 39 -

### 1.  Camden

Camden's motion is, at its core, an improper attempt to create factual disputes by introducing evidence outside the Complaint rather than challenge the sufficiency of the allegations as pled.

### a.  Camden Improperly Relies on Numerous Factual Allegations and Public Statements Outside the Complaint

Camden's brief—including almost all of Camden's four-page "Statement of Facts and Relevant Allegations"—asserts purported facts not alleged in the Complaint, including many that contradict it.[11] In so doing, the motion improperly attempts to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of North Carolina, 980 F.2d at 952. None of Camden's assertions falls within the narrow exceptions for extrinsic evidence

---

[11] (See Doc. 134 ("Camden Br.") at 1, 5 (discussing Camden's business practices fifteen years before AIRM existed); at 2-3, 13 (quoting investor relations materials—SEC filings, website pages, and earnings calls—as "factor[s] weighing against Plaintiffs' claims"); at 3 (alluding to "pre-complaint productions"-but failing to identify them in any way); at 3 (pace of product adoption refutes existence of a conspiracy); at 4, 8 (offering statements about Camden's intent and actions regarding rental pricing during COVID); at 5 (alleging facts regarding RealPage's acquisition of LRO); at 6-7 (alleging facts about Camden's public disclosures).) (Compare Camden Br. at 5-6 with Compl. ¶¶ 90-92, 94 (mischaracterizing statements in the Complaint).)

(1) explicitly incorporated by reference or (2) attached to the complaint. Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 165-66 (4th Cir. 2016). Because Camden's approach is inconsistent with black-letter law governing Rule 12(b)(6) motions, its motion should be denied.[12]

> b. Camden Fails to Address the Alleged Agreement to Share Information with RealPage and Other Landlords

After raising numerous arguments outside the Complaint, Camden's brief is notable for what it does not contain: any legal reason why the well-pled allegations are insufficient to survive a motion to dismiss. Camden deploys the same strategy as Defendants in their joint brief. It argues that there was no "unlawful agreement to use the same software." (Camden Br. at 3.) But that is not what Claim One alleges. See supra Part I.A. (See Compl. ¶ 238.) Camden fails to show why the

---

[12] In particular, Camden argues that it did not share nonpublic data and that the examples of its communications in the Complaint are "the same type of information Camden provided to the public." (Camden Br. at 13.) This argument improperly relies on extrinsic evidence and misconstrues the Complaint, both ineffectual to warrant dismissal for the reasons stated. Moreover, Camden attempts to generate a factual dispute over whether its supposed public statements disclosed the same information as it exchanged privately with competitors. That is precisely the kind of issue that courts are barred from resolving on a Rule 12(b)(6) motion. Republican Party of North Carolina, 980 F.2d at 952.

allegations are insufficient, and it also mischaracterizes the Complaint to suggest that its participation consisted of only a few communications. For these reasons, Camden's motion should be denied as well.[13]

### 2. LivCor

LivCor reiterates that Plaintiffs failed to allege that it "agreed with any competitors to use RealPage products." (Doc. 136 ("LivCor Br.") at 1-2.) LivCor further contends that Plaintiffs failed to allege supracompetitive prices. (Id. at 2.) These arguments fail for the same reasons already discussed. See supra Part I.C.

Moreover, bolstering the allegations of a horizontal agreement, the Complaint details LivCor's participation in RealPage-sponsored user group meetings and sharing of competitively sensitive information, such as managing lease expirations, pricing amenities, the use of concessions, pricing strategies, and strategies for managing the COVID-19 pandemic. (Compl. ¶¶ 103, 106, 108-11.) Far from being "sparse," (LivCor

---

[13] Camden argues in passing that it "cannot give Plaintiffs the relief they seek." (Camden Br. at 1.) That makes no sense. The Complaint alleges Camden participated in an illegal information exchange facilitated by RealPage's software platform. Camden may therefore cease its participation in this exchange as part of any relief obtained in this action.

Br. at 6), these allegations paint a picture of LivCor as an active participant in the information exchange. (Id. ¶¶ 18, 20, 106, 108-11.) LivCor further attempts to distinguish between conversations in the user group meetings and conversations with competitors outside of this context. (LivCor Br. at 6-10.) Both channels of information sharing, however, demonstrate motive among Defendants to enter into an agreement to share competitively sensitive information with each other through RealPage.

LivCor's reliance on City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Secs. Corp., 92 F.4th 381 (2d Cir. 2024), is woefully misplaced. There, the plaintiffs relied on "five bilateral chat excerpts confined to one full year" to allege an agreement. Id. at 399. Here, however, the core of the Complaint alleges systemic and pervasive information-sharing by LivCor, among others. See supra Part I.B. And the additional allegations specific to LivCor are far more regular, numerous, and enduring than in Pontiac Police & Fire. (Compl. ¶¶ 102, 111.) Additionally, the Complaint explains that LivCor provided future-looking information to a competing landlord, Camden, which resulted in Camden deciding to raise renewal caps to equal LivCor's. (Id. ¶ 91.)

- 43 -

LivCor fares no better in relying on <u>Consolidated Metal</u> <u>Products, Inc. v. Am. Petroleum Institute</u>, 846 F.2d 284 (5th Cir. 1988), for the proposition that a "'mere exchange of information' without alleging that LivCor charged supracompetitive prices . . . 'is insufficient to establish a conspiracy under section 1.'" (LivCor Br. at 5 (quoting <u>Consol.</u> <u>Metal Prods.</u>, 846 F.2d at 294 n.30).) But the Fifth Circuit did not limit the harms cognizable under the rule of reason to supracompetitive prices, as LivCor asserts. And even if it had, a <u>summary judgment</u> decision has no bearing on whether Plaintiffs, on a <u>motion to dismiss</u>, have plausibly pleaded the unreasonableness element under Section 1.

LivCor miscites <u>U.S. Gypsum</u>, 438 U.S. at 443 n.16, to claim that an "information exchange [is] not necessarily anticompetitive and thus insufficient for antitrust liability." (LivCor Br. at 5.) That turns <u>U.S. Gypsum</u> on its head. In observing that information exchanges standing alone were not <u>per</u> <u>se illegal</u>, the Supreme Court did not suggest that they were <u>per</u> <u>se legal</u>. To the contrary, in the very footnote that LivCor cites, the Court explained that "[e]xchanges of current price information, of course, have the <u>greatest potential</u> for generating anticompetitive effects and although not <u>per se</u> unlawful have <u>consistently been held to violate</u> the Sherman

Act." 438 U.S. at 443 n.16 (emphases added). LivCor ignores the allegations in the Complaint explaining how this information-sharing agreement falls squarely within the category of exchanges that the U.S. Gypsum Court viewed as anticompetitive. See supra Part I.B.

### 3. Pinnacle

Pinnacle argues that the Complaint relies on impermissible group pleading, that the Complaint does not show an agreement between Pinnacle and its competitors and RealPage, and that the Complaint does not allege anticompetitive effects. (Doc. 138 ("Pinnacle Br.") at 13-15.)[14] Pinnacle is wrong on all counts.

As explained, the Complaint plausibly alleges an agreement to share information for use in pricing among each Defendant (including Pinnacle) and RealPage. See supra Part I.A. (Compl. ¶¶ 15-23.) In addition, the Complaint provides additional details about Pinnacle's involvement in regular landlord exchanges of competitively sensitive information with competitors. For example, Pinnacle encouraged its employees to

---

[14] Pinnacle is a subsidiary of defendant Cushman & Wakefield, Inc., which Plaintiffs have voluntarily dismissed from the Complaint. Pinnacle does business as Cushman & Wakefield throughout the United States. The dismissal of Cushman & Wakefield, Inc. renders moot the motions it submitted in the same brief to dismiss under Rules (12)(b)(2)(personal jurisdiction) and 12(b)(3) (venue).

call competitors to gain insight "into the very specific handful of competitors closest to the subject property"; admitted that information sharing among competitors was "prevalent in our industry for a long time"; shared tips with other landlords for meeting regularly and collecting information about concessions and net effective rents; and planned with Willow Bridge to hold revenue management executive calls, and other similar activity. (Id. ¶¶ 83-85, 88-89, 98.) These allegations meet the Twombly standard. See supra Part I.A. The Complaint also alleges the anticompetitive effects of these agreements. See Part I.B. To the extent Pinnacle claims the Complaint alleges only that it exchanged the information contained in the communications cited in Paragraphs 83-89 and 140, it is mistaken. Pinnacle would have the Court overlook the remainder of the Complaint.

Second, Pinnacle pulls out a red herring: it argues that it is not a landlord because it does not own properties, claiming that the Complaint's allegations therefore do not apply to it. (Pinnacle Br. at 14-15.) This argument draws "'an artificial distinction' at the expense of substance." Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 763 (1984). The Complaint defines "landlord" to include not only property owners, but also management and operating companies that set rents and other lease terms at multifamily properties such as Pinnacle. (Compl.

¶ 5 n.1.) The antitrust laws do not limit liability to property
owners. <u>United States v. Wise</u>, 370 U.S. 405, 416 (1962) (holding
that antitrust liability adheres to knowing participants
"regardless of whether he is acting in a representative
capacity"); 15 U.S.C. § 24 (2018) (providing that liability
extends to "agents"). Nor does every conspirator need to harbor
the exact same motive or behave identically for liability to
attach. <u>See</u> <u>United States v. Foley</u>, 598 F.2d 1323, 1332-34 (4th
Cir. 1979). The Sherman Act requires only proof that a defendant
entered into an agreement that imposed an unreasonable restraint
of trade, <u>SD3</u>, 801 F.3d at 424, which the Complaint alleges
Pinnacle did.[15]

Pinnacle, like other Defendants, asks this Court to go
beyond the Complaint and make factual determinations, such as
assessing the incentives of property managers. These are
extrinsic factual inquiries inappropriate for consideration at

_____

[15] Similarly, property managers are among the defendants in the
RealPage MDL and remained in the case after the motion to
dismiss was decided. <u>See</u> <u>RealPage MDL</u>, 709 F. Supp. 3d at 494
(noting that RealPage's "RMS" clients "include owners of
residential properties, companies that serve as both owners and
operators of residential properties, and property management
companies"). Property managers are also among the defendants in
another case against a different revenue management provider.
<u>Duffy v. Yardi Sys., Inc.</u>, 758 F. Supp. 3d 1283, 1288 (W.D.
Wash. 2024).

the Rule 12(b)(6) stage. <u>See</u> <u>SD3</u>, 801 F.3d at 425–26; <u>Logar v.</u>
<u>W. Virginia Univ. Bd. of Governors</u>, 493 F. App'x 460, 461 (4th
Cir. 2012). That holds for other requests to consider alleged
extraneous factual material. For example, Pinnacle speculates
that the Complaint's reference to its expectation that its
properties continue undertaking "traditional" market surveys of
close competitors, (Compl. ¶ 84), must mean that these are
surveys of publicly available information. That contradicts the
allegations in the Complaint, however. (<u>Id.</u> ¶¶ 82–84 ("Landlords
regularly solicit and obtain nonpublic information about
inquiries by prospective renters, occupancy, and rents from
their direct competitors.").)

Third, Pinnacle misstates or tries to avoid several of the
allegations in the Complaint. (Pinnacle Br. at 15-21.) The
allegations support the "plus factors" in the Plaintiffs'
information-sharing claim, by showing broad communications and
exchanges of competitively sensitive information among
landlords. <u>See</u> <u>supra</u> Part I.A. The Complaint also points to
Pinnacle's recognition of the anticompetitive potential of
sharing detailed landlord competitor data. (Compl. ¶ 140.)

Finally, Pinnacle pretends Plaintiffs claim only that
Pinnacle's individual agreement with RealPage was
anticompetitive and that Plaintiffs must allege specific

anticompetitive effects of that agreement. (Pinnacle Br. at 22.)
But as explained in Part I.B., the Complaint alleges an
agreement among Pinnacle and other landlords to share
competitively sensitive information through RealPage and among
themselves, and describes clearly the granular information
exchanged. The Complaint alleges direct and indirect evidence
that this conduct in the aggregate had anticompetitive effects,
see supra Part I.B., and the relevant markets in which
competition has been harmed. (Compl. ¶¶ 209-11, 214-17, and
App'xs A & B.) Plaintiffs are not required to plead with hyper-
specificity in the way that Pinnacle desires. See supra
Part I.C.2 (discussing pleading standards).

        4.   Willow Bridge

Willow Bridge not only mischaracterizes Claim One but, like
other Defendants, ignores the factual allegations describing the
alleged agreements. It misreads Claim One to allege that it
"licensed or used RealPage's RMS in a suspiciously similar way
to another Customer-Defendant." (Doc. 139 ("Willow Bridge Br.")
at 6.) As with other Defendants, however, the Complaint
unambiguously alleges that Willow Bridge entered into an
agreement with RealPage to share its detailed transactional data
and agreed for this data to be shared with other landlords.
(Compl. ¶¶ 260, 263.)

Willow Bridge attempts to reframe its use of competitors'
data as "unilateral business conduct." (Willow Bridge Br. at 4.)
But what Willow Bridge characterizes as "unilateral business
conduct"—such as having and leveraging competitors' "behind the
scenes" data—simply describes its motivations for engaging in
concerted action with its competitors. (Id. at 4; Compl. ¶¶ 19,
26.)

Willow Bridge's conduct detailed in the Complaint was not
unilateral. As an AIRM user, Willow Bridge agreed to share its
nonpublic, competitively sensitive data with RealPage and with
competing landlords. (Compl. ¶¶ 257, 260, 263.) Willow Bridge
also shared confidential information through meetings with other
landlords. As one example, Willow Bridge joined a call with
other landlords regarding the use of concessions and pricing
strategies. (Id. ¶ 97.) A Willow Bridge representative discussed
concessions in a user group meeting. (Id. ¶ 109.) In a different
user group meeting, a Willow Bridge employee suggested acting in
unison with other landlords to push rates above recommendations.
(Id. ¶ 110.) Finally, Willow Bridge agreed to participate in a
meeting with a "tight" group of other landlords to discuss
market conditions, their use of YieldStar, and strategy plans.
(Id. ¶ 88.) As explained above, all of these examples support

the existence of an agreement among landlords and RealPage to share competitively sensitive information. See supra Part I.A.

## II. Claim Two States a Plausible Claim Against Defendants for Agreeing with RealPage to Align Pricing

### A. The Agreement Between Each Defendant and RealPage to Use AIRM or YieldStar in Setting Rental Prices Constitutes Concerted Action

Claim Two alleges that Defendants agreed with RealPage to use AIRM and YieldStar, which are designed to align the pricing processes, strategies, and pricing responses of users, including Defendants. Like their agreements with RealPage to share their nonpublic, competitively sensitive lease transaction data with other landlords, each Defendant's agreement with RealPage to license and use AIRM or YieldStar also satisfies Section 1's concerted action requirement. (Compl. ¶¶ 28, 271.) As the Fourth Circuit has held, "[p]roof of concerted action requires evidence of a relationship between at least two legally distinct persons and entities." Oksanen v. Page Mem. Hosp., 945 F.2d 696, 702 (4th Cir. 1991). Accord Robertson, 679 F.3d at 284. Here, each Defendant and RealPage are unquestionably legally distinct entities, and an agreement to license and use AIRM or YieldStar unambiguously creates a relationship between them.

The fact that the relationship in question is between a seller/licensor and a buyer/licensee of revenue management

software does not take it out of the purview of Section 1. As noted earlier, Section 1 applies to "[e]very contract, combination . . ., or conspiracy." 15 U.S.C. § 1 (2018) (emphasis added). At issue here are contracts between Defendants and RealPage, plain and simple. There is no need to scour the allegations of the Complaint for a conspiracy when a contract suffices under Section 1.

Contracts for software and related services are no different than any other type of concerted action cognizable under Section 1. See, e.g., Systemcare, Inc. v. Wang Labs. Corp., 117 F.3d 1137, 1145 (10th Cir. 1997) (holding that a contract for the sale of hardware and software support services provided by Wang to Systemcare was subject to scrutiny as imposing unlawful tying arrangement); Epic Games, Inc. v. Apple, Inc., 67 F.4th 946, 982 (9th Cir. 2023) (reversing the district court's holding that Apple's developer program licensing agreement is "exempt from antitrust scrutiny simply because one party reluctant[ly] accepted its terms" because that "would . . . read the word[] 'contract' out of the statute" (quoting Systemcare, 117 F.3d at 1143) (internal quotations and brackets omitted)).

Importantly, the agreements between each Defendant and RealPage to license and use AIRM or YieldStar "deprives the

marketplace of independent centers of decisionmaking" by joining "separate economic actors pursuing separate economic interests." Robertson, 679 F.3d at 285. Stated another way, the agreements reflect "a unity of purpose or a common design and understanding, or a meeting of the minds." N.C. State Bd. of Dental Exam'rs v. FTC, 717 F.3d 359, 372 (4th Cir. 2013), aff'd, 574 U.S. 494 (2015).

As detailed in the Complaint, RealPage designed AIRM and YieldStar to restrain how landlords price their rental units in competition with one another. (Compl. ¶ 272.) In RealPage's own words, the software "helps curb [landlords'] instincts to respond to down-market conditions by either dramatically lowering price or by holding price when they are losing velocity and/or occupancy." (Id. ¶ 1.) It "ensures that [landlords] are driving every possible opportunity to increase price even in the most downward trending or unexpected conditions." (Id.)

Moreover, if enough landlords license and use AIRM and YieldStar, then they would "likely move in unison versus against each other" because "there is greater good in everybody succeeding versus essentially trying to compete against one another in a way that actually keeps the entire industry down." (Compl. ¶ 2; see also id. ¶ 32.) RealPage's competition-restraining approach to pricing rental units even comes with a

metaphor that aptly describes the common scheme to achieve an unlawful objective: "a rising tide raises all ships." (Id. ¶¶ 1, 32, 121.)

In choosing to license and use AIRM or YieldStar, Defendants consciously commit to this common scheme to achieve an unlawful objective—they each want their ship to be raised by the rising tide. (Compl. ¶¶ 28–33, 122, 129.) Some landlords, like Willow Bridge, even go so far as to reference RealPage's "rising tide" metaphor to explain how AIRM amplifies market trends and leads landlords to move pricing in a similar manner. (Id. ¶ 33.) Landlords that license AIRM or YieldStar understand the intended effect of using the software is to align their pricing of rental units, as RealPage has pitched to them, and it is a reason why they sign up to use the software. (Id. ¶ 273.) Landlord users discuss their usage with other landlord users in user group meetings and other joint settings. (Id. ¶¶ 102–17, 273.) They also send their employees to trainings and certification programs to ensure that their staff fully appreciate the objectives of and benefits from using AIRM and YieldStar, including the opportunity to leverage the lease transaction data that landlords have unlawfully shared with and through RealPage. (Id. ¶¶ 20, 122, 156, 167.)

In summary, RealPage has designed AIRM and YieldStar to restrain how landlords price their rental units. Those restraints are based in part on the software's analysis of the lease transaction data that landlords have shared directly with RealPage and indirectly with each other. (Compl. ¶¶ 40-58.) They also include a common set of tools and features, which are described more fully in the next section. (Id. ¶¶ 69, 72, 142-56.) Importantly, the software as designed causes each landlord user's pricing processes, strategies, and responses to be aligned with other landlord users. (Id. ¶¶ 272, 275, 277.) This reduces the need for landlords to directly communicate and coordinate with each other on pricing.

By licensing AIRM or YieldStar, each landlord, including Defendants, agrees with RealPage to use the software as it has been designed—understanding that other landlords are doing the same—and thereby realizes the objectives and benefits that RealPage has touted. (Compl. ¶¶ 271-73.) As alleged, the licensing agreements for AIRM and YieldStar satisfy the legal requirement of a conscious commitment to a common scheme to achieve an unlawful objective, a unity of purpose, or a common design and understanding between each landlord user and RealPage.

**B. Collectively, the Agreements Between Each Defendant and RealPage to Use AIRM or YieldStar in Setting Rental Prices Impose an Unreasonable Restraint of Trade**

As stated above, the second element of a Section 1 violation requires showing that the agreements between each landlord, including Defendants, and RealPage to license and use AIRM or YieldStar have "imposed an unreasonable restraint of trade." Robertson, 679 F.3d at 290. On a motion to dismiss, the question is whether the Complaint asserts facts "which plausibly suggest that [these agreements] harmed market competition." Id. The inquiry involves evaluating the reasonableness of a restraint "based on its impact on competition as a whole within the relevant market." Oksanen, 945 F.2d at 708.

If the license agreements between landlords and RealPage were horizontal restraints, they would be per se unlawful. Am. Express, 585 U.S. at 541. As the parties (landlords and RealPage) are not competitors in the relevant market, their agreements are considered vertical restraints, for which unreasonableness is typically judged under the "rule of reason." Id. at 540-41.[16] But contrary to Defendants' characterization, (Joint Br. at 37-38), while these agreements are vertical

---

[16] As explained in footnote 5 supra, the Court need not decide at this stage exactly what method of analysis should apply in the factual assessment of unreasonableness.

restraints, they are not "[t]he classic type" involving "'an agreement between firms at different levels of distribution,' such as between a manufacturer and its dealers." <u>Teradata Corp. v. SAP SE</u>, 124 F.4th 555, 572 (9th Cir. 2024) (quoting <u>Am. Express</u>, 585 U.S. at 541). <u>See</u> <u>Bus. Elecs. Corp. v. Sharp Elecs. Corp.</u>, 485 U.S. 717, 729 (1988); <u>United States v. Brewbaker</u>, 87 F.4th 563, 571 (4th Cir. 2023). Instead, as noted above, these agreements create a licensor/licensee or seller/buyer relationship between RealPage and a landlord with respect to AIRM or YieldStar.[17]

The distinction is important because courts have come to view the classic type of vertical restraints as potentially benefitting <u>interbrand</u> competition, <u>e.g.</u>, competition between manufacturers of different brands of competing products—even though they can harm <u>intrabrand</u> competition, <u>e.g.</u>, competition among wholesalers or retailers selling the same brand from a

---

[17] By way of further explanation, RealPage and landlords do not occupy different levels of distribution for landlords; they are not links in a distribution chain. RealPage does not develop conventional multifamily rental housing, nor is it a seller or broker of conventional multifamily rental housing. <u>See</u> <u>Brewbaker</u>, 87 F.4th at 571 n.3 (explaining a vertical agreement as between a manufacturer like Nike and retailers such as Foot Locker or Dick's Sporting Goods). Instead, RealPage designs and sells software for generating recommended floor plan prices and unit-level prices, which landlords license and buy <u>for their own use</u>, not for distribution and resale to renters.

particular manufacturer. See Cont'l T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 52 & n.19 (1977). Interbrand competition is the "primary concern of antitrust law." Id.; see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 890 (2007). The license agreements for AIRM and YieldStar are not vertical restraints in the classic sense, and the agreements here offer no potential benefits to interbrand competition.

Turning then to the anticompetitive effects of the AIRM and YieldStar license agreements, the Complaint plausibly alleges both direct and indirect evidence of such effects. As explained in Am. Express, "demonstrat[ing] anticompetitive effects" in a relevant market includes showing that the challenged restraints "otherwise stifled competition" in that market. 585 U.S. at 547. An agreement that limits consumer choice "by impeding the 'ordinary give and take of the market place,' . . . cannot be sustained under the Rule of Reason." Ind. Fed'n of Dentists, 476 U.S. at 459 (quoting Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679, 692 (1978)).

The Complaint alleges direct evidence of the anticompetitive effects comes from the very design of RealPage's software, which (1) constrains how landlords price their rental units, i.e., the processes, strategies, and responses they use to set floor-plan rates and unit-level rates, and (2) in so

- 58 -

doing, aligns their pricing in any given local rental market. (Compl. ¶¶ 120–162, 272, 277.) These are shown through five examples of anticompetitive conduct specifically alleged in Sections IV.A through IV.D of the Complaint.

First, AIRM and YieldStar use the lease transaction data shared by landlords to predict with more certainty the highest price that the market will bear for a particular unit. (Compl. ¶ 126.) As a result, a landlord is less likely to negotiate on price, and any potential negotiation with renters instead turns on lease term and move-in date, which AIRM and YieldStar adjust the pricing for to avoid "overexposure for the landlord in the future." (Id.) Landlords that license and use AIRM or YieldStar will tend to adopt the same approach to negotiating with renters, which leads to less competition.

Second, RealPage designed AIRM and YieldStar to place certain "guardrails" on the extent to which landlords can change their pricing. For example, there is a "hard floor" that ensures the recommended floor-plan price will not fall below what the software defines as the "market minimum effective rent." (Compl. ¶ 143.) This feature too relies on the lease transaction data that landlords share with each other through RealPage, and it also ensures that all landlords using AIRM or YieldStar in a given local rental market receive recommended floor-plan prices

- 59 -

that never fall below a set minimum for that market. (Id.)
Another guardrail is "revenue protection" mode. This mandatory
guardrail uses competitors' nonpublic data to effectively lower
target occupancy and reduce price decreases. (Id. ¶¶ 144-48.)

Third, the use of AIRM and YieldStar leads to alignment in
pricing through the active discouragement of "concessions,"
i.e., offering discounts in rent or waived fees as part of the
negotiation process between a landlord and a prospective renter.
(Compl. ¶ 153.) Instead, landlords are taught to negotiate using
a matrix of recommended prices generated by the software, and to
go into negotiations with the confidence that the software is
"managing your Price," taking the guesswork out of the process.
(Id. ¶ 156.)

Fourth, RealPage designed AIRM and YieldStar to leverage
the lease transaction data that landlords share with each other
through RealPage in "lease expiration management," i.e., setting
a landlord's unit-level pricing in a way that avoids too many
units becoming available in the market at the same time. (Compl.
¶¶ 157-58.) The intent behind this feature is self-evident: if
too many leases expire at the same time, then the landlord will
have too many vacant units on the market and may be incentivized
to lower rental prices to compete for renters. By using the
software, however, landlords can ensure that such scenarios do

not occur, thereby eliminating the risk of ruinous price competition in their local rental markets.

Fifth, AIRM and YieldStar commonly use nonpublic data from surrogates for many properties to construct a property's "market response curve." (Compl. ¶¶ 49, 51.) The market response curve estimates how renters' demand for a floor plan will respond to changes in rent. (Id. ¶ 49.) That curve is pivotal to determining the recommended floor plan price. (Id. ¶¶ 49, 51.) As the surrogate sets of two competing properties become closer, their market response curves become more aligned and AIRM and YieldStar will generate increasingly similar prices. (Id.)

All five examples above illustrate the myriad ways in which the use of AIRM or YieldStar limits pricing behavior of landlords that might otherwise prevail under competitive conditions, and in so doing, brings the pricing behavior of competing landlords into alignment. These are all classic anticompetitive effects proscribed by Section 1. Paraphrasing the Supreme Court, the licensing and use of AIRM and YieldStar by landlords "is likely enough to disrupt the proper functioning of the price-setting mechanism of the market that it may be condemned even absent proof that it resulted in higher prices . . . than would occur in its absence." Ind. Fed'n of Dentists, 476 U.S. at 461–62.

Additionally, the Complaint plausibly alleges indirect evidence of anticompetitive effects, i.e., "proof of market power plus some evidence that the challenged restraint harms competition." Am. Express, 585 U.S. at 542. Specifically, the use of AIRM and YieldStar affects not just the renters whose landlords use the products, but competition in certain local markets. (Compl. ¶¶ 183, 200, 208–11, 214–17, App'xs A and B, Tables 1 and 2 (identifying local markets and relevant penetration rates).) Put simply, in these identified markets, there are enough landlords and rental properties using AIRM and YieldStar for the software to achieve its intended objective of restraining normal price competition in favor of alignment, such that, to use RealPage's metaphor, "a rising tide raises all ships." (E.g., id. ¶¶ 1–2, 28–33, 121–33.)

Indirect evidence of anticompetitive effects also requires "some evidence" that the agreements to license and use AIRM and YieldStar harm competition. Am. Express, 585 U.S. at 542. The Complaint more than satisfies this requirement with the many allegations of how the software is designed to constrain the full range of pricing behavior that landlords would otherwise display under competitive conditions. (See, e.g., Compl. ¶¶ 121–37, 142–52, 153–56.) The natural tendency of this pricing alignment is to raise prices. (Id. ¶¶ 1–2, 33, 120–30, 142–48.)

**C.   Defendants' Attacks on Claim Two Miss the Mark**

In their motions to dismiss, Defendants also resort to attacking Claim Two with strawman arguments—mischaracterizing the challenged agreements and invoking inapplicable case law. They first argue that Plaintiffs "allege no facts plausibly suggesting any Customer Defendant agreed with RealPage to align prices through its RMS." (Joint Br. at 32 (emphasis added).) But that is not what Claim Two alleges. The alignment caused by AIRM and YieldStar is in the process by which landlord users price their rental units, not necessarily in the ultimate prices they set for any given floor plan or unit. The harm to competition that follows, as explained by the Supreme Court in Ind. Fed'n of Dentists, comes from "impeding the 'ordinary give and take of the market place'" and "disrupt[ing] the proper functioning of the price-setting mechanism of the market." 476 U.S. at 459, 461–62.

AIRM and YieldStar disrupt the price-setting mechanism of normal competition among landlords. Where the competitive process has been harmed, Plaintiffs are not required to allege higher prices in every instance. The Supreme Court made clear that an illegal restraint on competition may be condemned under Section 1 "even absent proof that it resulted in higher prices . . . than would occur in its absence." Ind. Fed'n of

<u>Dentists</u>, 476 U.S. at 462.[18] In other words, the degree to which landlords retain discretion to set rent and to accept or decline the price recommendations provided by AIRM and YieldStar and raise their rents, is not the focus. Landlords may well retain some measure of discretion as to the prices they ultimately set. The competitive process nevertheless has been harmed by the fact that landlords using the software all approach the pricing of rental units in the same way—for example, by consulting a market range chart to determine the maximum and minimum rental prices it will offer, using the AIRM and YieldStar pricing matrix to print units, and by eliminating the use of concessions in negotiations. (Compl. ¶¶ 44-45, 53, 57, 129, 153-56, 271.)

Defendants next argue that the Complaint fails to plausibly allege either direct evidence or indirect evidence of anticompetitive effects. As pointed out above, direct evidence of anticompetitive effects is not limited to increased prices or decreased output, as Defendants maintain. (Joint Br. at 35-36.)

---

[18] Defendants' focus on higher rents also misapprehends the use of RealPage's software. For instance, in a market where all rents are declining due to oversupply, RealPage's software could help a landlord set the highest <u>possible</u> rent that might represent an actual decrease in rent (where all landlords are forced to decrease rent). Harm cannot be measured only by the amount of rent charged and if it moves up or down, but also by the effect of RealPage's software on competition.

The alleged alignment in the pricing behavior of competing landlords constitutes stifling of competition under Am. Express and Ind. Fed'n of Dentists. Am. Express, 585 U.S. at 547; Ind. Fed'n of Dentists, 476 U.S. at 459, 461–62.

As for indirect evidence, Defendants attack the Complaint's allegations of market power collectively exercised by landlords using AIRM and YieldStar in a given local rental market, using the penetration rates for AIRM and YieldStar. (Joint Br. at 36–37.) As a threshold matter, Defendants offer no cogent argument for why the penetration rates do not provide a reasonable indicator of the anticompetitive impact of the challenged agreements. After all, the gravamen of Claim Two is the collective effect of the use of AIRM and YieldStar by landlords in any given market. (Compl. ¶¶ 277–78.)

Next, Defendants attack the Complaint's market share allegations by invoking the Fourth Circuit's decision in Dickson v. Microsoft Corp., 309 F.3d 193 (4th Cir. 2002). They assert that Plaintiffs' "attempt to aggregate the effects of various separate vertical agreements to show market power and anticompetitive effects contravenes settled Fourth Circuit law." (Joint Br. at 37–39.) But the holding in Dickson has no application here.

Dickson dealt with classical vertical relationships between Microsoft and original equipment manufacturers (OEM) Compaq and Dell. 309 F.3d at 198-99. Microsoft developed and licensed certain software that Compaq and Dell each installed on the personal computers they manufactured, distributed, and sold to end users. Id. at 199. In its antitrust lawsuit, the plaintiff Gravity alleged that Microsoft's license agreements with Compaq and Dell amounted to separate vertical conspiracies with each OEM. Id. at 204. Given how Gravity pleaded the concerted action between Microsoft and each OEM, the Fourth Circuit concluded that the district court correctly held it could not consider the anticompetitive effects of the agreements with Compaq and Dell in the aggregate:

> The SAC, however, did not allege a conspiracy among Microsoft and all OEMs; it alleged discrete conspiracies between Microsoft and Compaq and Microsoft and Dell. Consequently, the district court correctly determined that it could not consider the cumulative harm of Microsoft's agreements with all OEMs but instead was required to consider—individually—Microsoft's agreements with Compaq and Dell to evaluate each agreement's potential for anticompetitive effects.

Id. at 210 (emphases added).

The holding in Dickson is limited to instances where plaintiffs plead separate "discrete conspiracies."[19] Unlike the vertical agreements in Dickson, AIRM and YieldStar are designed to raise the "ships" of landlords—together. (Compl. ¶ 32.) As a RealPage executive explained, AIRM and YieldStar are designed so that "there is greater good in everybody succeeding versus essentially trying to compete against one another in a way that actually keeps the industry down." (Id.) The software, through its operation and use, eliminates the need for direct communication and agreement between competing landlords regarding how they price their rental units.

The cumulative effect of multiple landlords adopting and using AIRM and YieldStar is the essence of the pricing alignment claim. A single landlord using AIRM or YieldStar cannot as

_____

[19] Defendants' overreading of Dickson conflicts with multiple Supreme Court decisions holding that the anticompetitive effects of vertical restraints are evaluated by looking at the total volume of sales affected across the agreements. See, e.g., Fortner Enters., Inc. v. U.S. Steel Corp., 394 U.S. 495, 502 (1969) ("For purposes of determining whether the amount of commerce foreclosed is too insubstantial to warrant prohibition of the practice, therefore, the relevant figure is the total volume of sales tied by the sales policy under challenge[.]"); Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 328-29 (1961) (describing Standard Oil as involving "a large number of gasoline stations—5,937 or 16% of the retail outlets in the relevant market—and the large number of contracts, over 8,000, together with the great volume of products involved").

readily or easily align its pricing with the approach taken by another landlord in a given relevant market if there are no other landlord users of the software in that market. (Compl. ¶¶ 154, 211, 215, 217, 277.) AIRM and YieldStar enable landlords to align their pricing based on their design and their use of competitively sensitive information exchanged by landlords.

### D.  Individual Defendants' Arguments Against Claim Two Also Fail

As with Claim One, the individual Defendants' motions to dismiss Claim Two also fail, for the reasons above and as explained below.

#### 1.  Camden

Camden also seeks dismissal of the Complaint for failing to allege a claim regarding pricing alignment. (See Camden Br. at 9, 15.) However, Camden raises no arguments to Claim Two beyond what it argued with respect to Claim One and what the Defendants jointly argued. As discussed in Parts II.A. and II.B., Plaintiffs' Complaint satisfies the required standards with regard to pricing alignment and Camden. Camden's motion to dismiss Claim Two should be denied.

#### 2.  LivCor

Regarding Claim Two, LivCor again misinterprets Plaintiffs' allegations. It asserts that Claim Two is an agreement "to adopt RealPage's recommendations." (LivCor Br. at 10-11.) This reading

is incorrect. The actual allegations in the Complaint are that Defendants, including LivCor, agreed "to use the AIRM or YieldStar pricing software as RealPage designed it." (Compl. ¶ 28.) By focusing on acceptance rates, LivCor ignores RealPage's stated goal. As RealPage regularly reminded its customers, "a rising tide rises [sic] all ships." (Id. ¶ 33.)

LivCor relies on Five Smiths, Inc. v. Nat'l Football League Players Ass'n, 788 F. Supp. 1042 (D. Minn. 1992), to minimize the use of RealPage's services as mere "advice." (LivCor Br. at 11-12.) Five Smiths is factually inapposite. There the plaintiffs alleged a horizontal price-fixing claim but the court found that the plaintiffs failed to allege what actions were taken to fix prices, what agreements were entered into, or how the agreement would function. 788 F. Supp. at 1048. Here, Plaintiffs have alleged a claim that identifies LivCor's agreement with RealPage and explains in detail how AIRM and YieldStar operate to align pricing. (Compl. ¶ 28-33.)

LivCor further argues that the Complaint fails to allege that it has market power in any relevant market. (LivCor Br. at 12-13.) Its reliance on Dickson, as explained in Part II.B., is misplaced. Ultimately, the pricing alignment claim alleges common use of AIRM and YieldStar by landlords. Therefore, the

aggregate impact is relevant, not LivCor's individual market
power.

For the reasons stated above, LivCor's motion to dismiss as
to Claim Two fails.

### 3.  Pinnacle

Pinnacle also seeks dismissal of the Complaint for failing
to allege a claim regarding pricing alignment. (Pinnacle Br. at
15-21.) As explained for the reasons discussed in Parts II.A.
and II.B., the Complaint satisfies the required standards with
regard to pricing alignment and Pinnacle. The Complaint alleged
that Pinnacle and other Defendants licensed RealPage's AIRM or
YieldStar to use in making rental pricing competitive decisions,
aligning its prices with those of other landlords. As explained
in Part II.B., Pinnacle's reliance on Dickson is misplaced.
Likewise, for the reasons stated above in Part I.D.3.,
Pinnacle's claim about not being a landlord is simply a
distraction.

### 4.  Willow Bridge

Willow Bridge argues that Claim Two should be dismissed
because Plaintiffs "rely upon Willow Bridge's mere license of
the RMS software, a widely available and customizable commercial
product." (Willow Bridge Br. at 6). Willow Bridge is incorrect
as Plaintiffs allege more than a "mere licensing" of the RMS

- 70 -

software. Rather, Plaintiffs allege that Willow Bridge agreed to use the RealPage software as intended and, therefore, it agreed to align pricing processes, strategies, and responses. (Compl. ¶¶ 28, 272.)

Plaintiffs allege that Willow Bridge knew the effect of using AIRM or YieldStar on prices. Borrowing a phrase from RealPage, Willow Bridge used RealPage's phrase "a rising tide raises all ships" to explain how AIRM would provide price recommendations to amplify market trends. (Compl. ¶ 33.) A Willow Bridge executive also noted that YieldStar is "designed to always test the top of the market whenever it feels it's safe to." (Id. ¶ 122.) These statements do not reflect mere "unilateral business conduct." (Willow Bridge Br. at 4.)

Plaintiffs have properly alleged Claim Two as it pertains to Willow Bridge.

III.   **The State-Law Claims Should Not Be Dismissed**

As explained below, both Defendants' arguments about the state-law claims, and LivCor's specific arguments about Connecticut markets, should be denied.

A.   **The Complaint States Plausible Claims for Relief Under State Laws**

Defendants do not make a separate argument about the state-law claims, contending only that each state law asserted in this

action "instructs courts to dismiss those claims when their federal analogues fail." (Joint Br. at 39.) There are no such instructions in the States' laws.

The States' claims under state law are not governed by the same standards as federal claims. Cf. Felder v. Casey, 487 U.S. 131, 151 (1988). The state-specific claims are based on state-specific law that is either: (i) more protective of the States' interests than is the Sherman Act; or (ii) at least co-extensive with the Sherman Act claims. See, e.g., Epic Games, 67 F.4th at 1000–02. In claims arising out of supplemental jurisdiction, federal courts must apply state substantive law. See Felder, 487 U.S. at 151.

North Carolina's section 75-1.1, N.C. Gen. Stat. Ann. § 75-1.1 (West 2024), "include[s] within its reach the federal antitrust laws" but also sanctions practices "beyond traditional antitrust concepts." See L.C. Williams Oil Co. v. Exxon Corp., 625 F. Supp. 477, 481 (M.D.N.C. 1985) (citing Marshall v. Miller, 302 N.C. 539, 548 (1981)).

Colorado's 2023 Antitrust Act, Colo. Rev. Stat. Ann. § 6-4-101, et seq. (West 2023), removed a harmonization provision, but federal decisions remain "helpful to an understanding" of Colorado's antitrust laws. People v. N. Ave. Furniture & Appliance, Inc., 645 P.2d 1291, 1295–96 (Colo. 1982) (en banc).

Oregon's state-law-based antitrust claims are merely guided by, but not beholden to, federal decisions. <u>See</u> Or. Rev. Stat. Ann. § 646.715(2) (West 2024).

Connecticut's state-law-based claims are also merely guided by, but not beholden to, federal decisions. <u>See</u> Conn. Gen. Stat. Ann. § 35-44b (West 2025); <u>see also</u> <u>Miller's Pond Co., LLC v. City of New London</u>, 273 Conn. 786, 809-10 (2005) *(*"[W]e must conclude that § 35-44b merely gave legislative imprimatur to what this court had been doing long before its enactment, namely, looking to case law construing relevant federal statutes as persuasive authority."), <u>abrogated on other grounds by</u>, <u>FuelCell Energy, Inc. v. Town of Groton</u>, 350 Conn. 1 (2024); <u>Westport Taxi Serv. v. Westport Transit Dist.</u>, 235 Conn. 1, 15 (1995) ("[O]ur construction of the Connecticut Antitrust Act is aided by reference to judicial opinions interpreting the federal antitrust statutes." (quoting <u>State v. Hossan-Maxwell, Inc.</u>, 181 Conn. 655, 660 (1980)).

Illinois's state-law-based antitrust claims are also merely guided by, but not beholden to, federal decisions. 740 Ill. Comp. Stat. Ann. 10/11 (West 2024); <u>Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.</u>, 642 N.E.2d 470, 472 (Ill. 1994) ("Federal case law interpreting . . . the Sherman Act is merely

- 73 -

a guide for Illinois courts. . . . The Federal decisions are not binding on our courts").

As to California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 (West 2025), Defendants ignore nearly a century of California state court decisions explaining the expansive reach of the statute. The California Supreme Court has long recognized that the UCL is broadly framed to address innumerable "new schemes which the fertility of man's invention would contrive." Am. Philatelic Soc'y v. Claibourne, 3 Cal. 2d 689, 698 (1935). Further, "[w]hen a scheme is evolved which on its face violates the fundamental rules of honesty and fair dealing, a court of equity is not impotent to frustrate its consummation because the scheme is an original one." Id. at 698-99. Courts consistently rejected narrowing interpretations of the UCL, underscoring instead the Legislature's intention "to permit tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur." Barquis v. Merchs. Collection Assn., 7 Cal. 3d 94, 111 (1972). The Ninth Circuit recognized that district courts apply the UCL standards set down by the California Supreme Court. Epic Games, 67 F.4th at 1000 (citing Am. Philatelic Soc'y, 3 Cal. 2d at 698). In affirming California's similarly framed UCL claims in another antitrust matter, this Court found the UCL indeed "covers conduct that

'violates the policy or spirit' of the antitrust laws 'or otherwise significantly threatens or harms competition.'" Syngenta, 711 F. Supp. 3d at 591 (quoting Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 187 (1999)); see also Epic Games, 67 F.4th at 1000. California's claims against Defendants, likewise, are plausible and actionable under the UCL.

As for Massachusetts state law, Defendants miscite Ciardi v. F. Hoffmann-La Roche, Ltd., 762 N.E.2d 303 (Mass. 2002), for the incorrect proposition that the reach of the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ann. ch. 93A, et seq. (West 2024), is cabined by federal Sherman Act jurisprudence. (See Joint Br. at 40.) In Ciardi, the Commonwealth's Supreme Judicial Court reached precisely the opposite conclusion. See 762 N.E.2d at 313–14 (indirect purchasers may recover for price-fixing violations under ch. 93A notwithstanding the holding of Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977)). While the Court noted that an interpretation of ch. 93A should be informed by jurisprudence on Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) (2018) ("FTC Act"), it did so for the specific purpose of explaining that although the FTC may enforce the Sherman and Clayton Acts, it is "not confined to [the] specific prohibitions" attendant to those two statutes. See

*Ciardi*, 762 N.E.2d at 309. Accordingly, the Court held, litigants suing under the Commonwealth's "little FTC Act," i.e., ch. 93A, are also not so confined. See id. at 312, 314. Moreover, that ch. 93A is "a statute of broad impact" unconstrained by the Sherman Act is reflected not only in *Ciardi*, see id. at 308, but also in the plain text of the statute itself as compared to Massachusetts's Sherman Act analog. Compare Mass. Gen. Laws Ann. ch. 93A, § 2 (West 2024) (providing that courts will be guided by the interpretations of the FTC Act, 15 U.S.C. 45(a)(1), with Mass. Gen. Laws Ann. ch. 93, § 1 (West 2024) (state antitrust act "shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable"); see also Mass. Gen. Laws Ann. ch. 93, § 14A (West 2024) (state antitrust act "shall have no effect upon the provisions of [ch. 93A] except as explicitly provided [therein]").

Defendants' federal harmonization argument with respect to Plaintiff State of Tennessee's claims is particularly confounding. Defendants cite to two cases, Freeman Indus., LLC v. Eastman Chem. Co., 172 S.W.3d 512, 519 (Tenn. 2005), and *Syngenta*, 711 F. Supp. 3d 545, (Joint Br. at 41), which state the opposite. To the extent that Defendants' masquerade is in fact a standing argument, that too fails. Defendants make this

argument with little explanation more than "plaintiffs have offered no facts specific to Tennessee." (Joint Br. at 41.) Yet as this Court found sufficient just last year in <u>Syngenta</u>, 711 F. Supp. 3d at 590-91, Plaintiff State of Tennessee (1) incorporated every preceding allegation in the complaint, which outlines Defendants' conduct that substantially affects each alleged market, (2) alleged that Defendants engaged in providing multifamily housing to consumers in Tennessee markets, and (3) alleged that Defendants' conduct harmed thousands of multifamily renters in the state. (Compl. ¶¶ 318-20.) Accordingly, Plaintiff State of Tennessee has stated a valid claim under its state laws.

Additionally, for all the reasons stated above, the state-law claims survive even if they are co-extensive with the Sherman Act.

The Court should deny Defendants' motion to dismiss Plaintiff States' claims predicated on state law.

**B.    LivCor's Arguments Regarding Connecticut Markets Fail**

1.    <u>Plaintiffs' Claims Against LivCor Relating to Connecticut Markets Should Not Be Dismissed</u>

LivCor argues that all claims against it should be dismissed as to markets within Connecticut because Plaintiffs "allege nothing to explain how LivCor could have participated in

anticompetitive agreements related to markets in which it never operated." (LivCor Br. at 14.)

The law requires that the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 698-99 (1962); see United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 253-54 (1940) ("sales by any one of the respondents in the Mid-Western area bound all.").

Plaintiffs allege that LivCor, along with the other Defendants, participated in a set of agreements that resulted in anticompetitive harms in Connecticut markets as well as other relevant markets outside of Connecticut. Plaintiffs' claims are not defeated solely because LivCor has never physically operated within Connecticut. Collectively, landlords using AIRM or YieldStar and/or sharing competitively sensitive information are alleged to have market power in each of the relevant markets alleged. (Compl. ¶ 209.)

Contrary to LivCor's assertion, Plaintiffs allege that LivCor and other Defendants collectively participated in anticompetitive agreements to share information and align pricing. (Compl. ¶¶ 260, 263, 271-73.) Those agreements affect markets in which a particular Defendant may not operate. Despite

- 78 -

being competitors, Defendants all contributed their nonpublic, competitively sensitive information to RealPage, understanding that RealPage's software used all their combined data to generate recommendations for themselves and their rivals, to employ machine learning to train models on this sensitive data, and ultimately to "raise the tide" in markets within each of the Plaintiff States. (Compl. ¶¶ 5, 16, 128, 132.)

Further, Plaintiffs allege that LivCor and other Defendants engaged in "user group" meetings, where they discussed market intelligence and competitively sensitive information concerning new and renewal rent increases, concessions, and renewal strategies, among other things. (Compl. ¶¶ 102, 103, 106, 108, 111.) The information exchanged in the "user group" meetings had an effect on markets across the country, including Connecticut, as LivCor and the other Defendants worked to collectively stifle competition and harm renters in the process. (Id. ¶¶ 263, 266, 305.) LivCor and the other Defendants did so for an improper, yet rational reason: it enabled them to outperform their competitors and artificially keep rents high in all alleged markets, including Connecticut markets. (Id. ¶¶ 20, 142.)

LivCor relies on an Eleventh Circuit decision for the proposition that there can be "no viable claims for conspiracy in [a state] market against defendants with 'zero or near-zero

market share in [that state] during the period of the alleged
conspiracy.'" (LivCor Br. at 14 (quoting City of Tuscaloosa v.
Harcros Chems., Inc., 158 F.3d 548, 568 (11th Cir. 1998)).)
Harcros does not support LivCor's argument.[20] The Harcros Chems.
court's conclusion was not based on the defendants' presence or
lack thereof in a state market; rather, the court concluded that
their "participation in a conspiracy that garnered them zero or
near-zero market shares would be irrational" because the
plaintiffs "put forward no evidence . . . to show any such quid
pro quo or even to show that [the defendants'] market shares
increased elsewhere" or, further, that the defendants made any
money from the alleged conspiracy. Id. (emphasis added)  Here,
the Complaint alleges benefits to LivCor in markets where it
operates. (E.g., Compl. ¶¶ 2, 20, 32-33, 121-30.) There is
nothing irrational about LivCor participating in a set of
agreements meant to create "a rising tide [that] raises all
ships," whether a particular ship is in a Connecticut market or
another relevant market. (Id. ¶ 1.) As RealPage's Vice President
of Revenue Management Advisory Services explained, "there is
greater good in everybody succeeding versus essentially trying

---

[20] Additionally, Harcros Chems. was an appeal from a decision on
summary judgment, not a motion to dismiss. 158 F.3d at 568.

to compete against one another in a way that actually keeps the entire industry down." (Id. ¶ 2.)

LivCor also argues that "Plaintiffs' allegations must be analyzed in discrete local markets because, under Plaintiffs' theory of the case, competition among landlords is 'inherently local.'" (LivCor Br. at 14 (quoting Compl. ¶ 200).) Plaintiffs do allege local markets, but they also allege that within each of those local markets RealPage uses the same set of AIRM models. (AC ¶ 41.) LivCor knowingly contributes its nonpublic, competitively sensitive data for the training of those models, which are used in markets in Connecticut. (Id. ¶¶ 41, App. A, App. B.) Thus, even if LivCor does not operate in Connecticut, the effects of its participation in the information-sharing agreement are felt there. See United States v. Topco Assocs., 405 U.S. 596, 607 (1972) ("An analysis of the reasonableness of particular restraints includes consideration of the facts peculiar to the business in which the restraint is applied, [and] the nature of the restraint and its effect . . . .").

> 2.  Connecticut's State-Law Claim Against LivCor Relating to Connecticut Markets Should Not Be Dismissed

LivCor further relies on State v. Anthem Health Plans, Inc., 2010 WL 2196520 (Conn. Super. Ct. Apr. 20, 2010), to incorrectly assert that the Connecticut Antitrust Act reaches

- 81 -

only agreements "entered into or effectuated" in Connecticut. (LivCor Br. at 14-15 (quoting 2010 WL 2196520, at *3).) LivCor mischaracterizes this case, which specifically related to a dispute concerning the Connecticut Attorney General's subpoena authority to engage in pre-complaint antitrust investigations. Id., at *1. Anthem Health Plans only held that the Connecticut Antitrust Act "does not explicitly indicate that the attorney general may subpoena documents or testimony dealing with out-of-state 'persons.'" Id. at *4. The notion that it in any way limits the scope of the Connecticut Antitrust Act to only agreements entered into or effectuated in Connecticut is wholly unfounded. See Shea v. First Fed. Sav. & Loan Assoc., 184 Conn. 285, 294-95 (1981) ("Our federal system generally allows state antitrust laws to apply to transactions which, although having interstate aspects, significantly affect state interests.").

In fact, Anthem Health Plans clearly observed the distinction stating that the Connecticut Antitrust Act "provides that it applies to every contract, combination or conspiracy in restraint of trade or to monopolize, to every attempt to monopolize, or to every monopolization of any part of trade or commerce 'when any part thereof was entered into or effectuated in whole or in part' in Connecticut." Anthem Health Plans,

2010 WL 2196520 at *3 (emphasis added) (quoting D. Belt, "The Connecticut Anti-Trust Act: A Guide to Interpretation," 54 <u>Conn. B.J.</u> 348, 350 (1980)).[21] Plaintiffs have amply alleged that LivCor participated in a set of agreements in restraint of trade and that part of those agreements was both entered into and effectuated in Connecticut, resulting in collective anticompetitive harms in Connecticut markets.

The Court should deny Defendants' motion to dismiss Plaintiff States' claims predicated on state law.

Dated: May 29, 2025                Respectfully submitted,

                                   By:  *s/ Henry C. Su*
                                   _____
                                   Henry C. Su
                                   David A. Geiger
                                   Jessica Butler-Arkow
                                   Kris Perez Hicks
                                   Christine Sommer

                                   Attorneys
                                   United States Department of
                                   Justice
                                   Antitrust Division

_____

[21] <u>See also</u> Conn. Gen. Stat. Ann. § 35-30 (West 2025) ("This chapter applies to every contract, combination, or conspiracy in restraint of any part of trade or commerce or every contract, combination or conspiracy to monopolize, or every attempt to monopolize, or every monopolization of <u>any part of trade or commerce</u> when any part thereof was entered into or <u>effectuated in whole or in part</u> in this state.") (emphasis added); Conn. Gen. Stat. Ann. § 35-25 (West 2025) ("'[t]rade or commerce' means intrastate as well as interstate trade or commerce.").

450 Fifth Street N.W., Suite
7100
Washington, DC 20530
Telephone: (202) 307-6200
Email: henry.su@usdoj.gov

/s/ *Kunal J. Choksi*
Kunal J. Choksi
Senior Deputy Attorney
General
N.C. Bar. No. 55666
ASA C. EDWARDS IV
Special Deputy Attorney
General
N.C. Bar
No.  46000

North Carolina Department of
Justice
114 W. Edenton St.
Raleigh, NC 27603
(919) 716-6000 |
kchoksi@ncdoj.gov

*Attorneys for Plaintiff State
of North Carolina*


/s/ *Pamela Pham*

DOAN-PHUONG (PAMELA) PHAM
QUYEN TOLAND
Deputy Attorneys General
Office of the Attorney
General
California Department of
Justice
300 South Spring Street,
Suite 1702
Los Angeles, CA 90013
(213) 269-6000 |
Pamela.Pham@doj.ca.gov

*Attorneys for Plaintiff State
of California*

– 84 –

*/s/ Elizabeth W. Hereford*
Elizabeth. W. Hereford
Assistant Attorney General
Bryn A. Williams
First Assistant Attorney
General
Colorado Department of Law
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email:
Elizabeth.Hereford@coag.gov

*Attorney for Plaintiff State of Colorado*

*s/ Julián A. Quiñones Reyes*
Julián A. Quiñones Reyes
Assistant Attorney General
Office of the Connecticut
Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5030 |
julian.quinones@ct.gov

*Attorney for Plaintiff State of Connecticut*

*/s/ Daniel R. Betancourt*

DANIEL BETANCOURT, Assistant
Attorney General
JENNIFER M. CORONEL,
Assistant Attorney General
PAUL J. HARPER, Assistant
Attorney General
Office of the Illinois
Attorney General
115 S. LaSalle St., Floor 23
Chicago, IL 60603
Tel: (312) 415-7945
Daniel.betancourt@ilag.gov

- 85 -

Paul.harper@ilag.gov
Jennifer.coronel@ilag.gov

*Attorneys for Plaintiff State of Illinois*


*/s/ Katherine W. Krems*
KATHERINE W. KREMS
Assistant Attorney General
JENNIFER E. GREANEY
Deputy Chief
Office of the Massachusetts
Attorney General
One Ashburton Place
18th Floor
Boston, Massachusetts 02108
(617) 963-2189
Katherine.Krems@mass.gov
Jennifer.Greaney@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts*

*s/Katherine A. Moerke*
KATHERINE A. MOERKE
ELIZABETH ODETTE
SARAH DOKTORI
Assistant Attorneys General
Office of the Minnesota
Attorney General
445 Minnesota Street, Suite 600
St. Paul, MN 55101  55101-2130
katherine.moerke@ag.state.mn.us
Telephone: (651) 757-1288
elizabeth.odette@ag.state.mn.us
Telephone: (651) 728-7208
sarah.doktori@ag.state.mn.us
Telephone: (651) 583-6694

*Attorneys for Plaintiff State of Minnesota*

- 86 -

*/s/ Timothy D. Smith*

Timothy D. Smith
Attorney-in-Charge
Antitrust, False Claims, &
Privacy Section
Oregon Department of Justice
100 SW Market St,
Portland OR  97201
503.798.3297 |
tim.smith@doj.oregon.gov

*Attorney for Plaintiff State
of Oregon*


*/s/ Daniel Lynch*
Daniel Lynch
Assistant Attorney General
Sophie Assadnia
Assistant Attorney General
S. Ethan Bowers
Senior Assistant Attorney
General
Consumer Protection Division
Office of the Tennessee
Attorney General
UBS Building, 20th Floor
315 Deaderick Street,
Nashville, Tennessee 37243
615.532.5732 |
Daniel.lynch@ag.tn.gov

*Attorneys for Plaintiff State
of Tennessee*

**WORD COUNT CERTIFICATION**

I certify that this Opposition complies with the applicable word limits excluding the caption, signature lines, certificate of service, and any cover page or index in accordance with Local Civil Rule 7.3(d)(1). This certification is made in accordance with Local Civil Rule 7.3(d)(1). The undersigned relied on the word count feature provided by word processing software. The Opposition contains 17,388 words. (See Doc. 123 (enlarging word count limit to 22,000 words).)

Dated: May 29, 2025

By: *s/ Henry C. Su*

Henry C. Su

Attorney
United States Department of Justice
Antitrust Division
450 Fifth Street N.W., Suite 7100
Washington, DC 20530
Telephone: (202) 307-6200
Email: henry.su@usdoj.gov

*Attorney for Plaintiff United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

By: *s/ Henry C. Su*

Henry C. Su