IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **UNITED STATES OF AMERICA, *et al.*** <br><br> Plaintiffs, <br><br> v. <br><br> **REALPAGE, INC., *et al.*** <br><br> Defendants. | No. 1:24-cv-00710—WO-JLW <br><br> **DEFENDANT CAMDEN PROPERTY TRUST'S REPLY IN SUPPORT OF CAMDEN'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT** |

# TABLE OF CONTENTS

I. Plaintiffs Do Not Identify Camden Confidential Information Shared With Competitors................................... 2

II. Plaintiffs Do Not Allege When Camden Transformed from Customer to Conspirator.................................. 5

III. Plaintiffs Do Not Allege Camden Raised Prices............. 8

IV. Camden Cannot Give Plaintiffs The Relief They Seek........ 9

CONCLUSION.................................................... 10

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th
   Cir. 2002) ..........................................5

*Gibson v. MGM Resorts Int'l*,
   No. 2:23-cv-001410-MMD-DJA, 2023 WL 7025996
   (D. Nev. Oct. 24, 2023) ............................7

*Interstate Circuit, Inc. v. United States*,
   306 U.S. 208 (1939) .............................6, 7

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
   19 F.4th 601 (4th Cir. 2021) .......................3

Plaintiffs cannot state claims against Camden, a publicly-traded REIT. Unlike any of the other four remaining customers, Camden discloses detailed information regarding rent, occupancy, and strategies to investors. Plaintiffs premise some or all of their case against Camden on four paragraphs (AC ¶¶ 90-92, 94) suggesting that Camden provided confidential Camden information to competitors in order to raise prices and reduce output. But they do not actually allege in those paragraphs what Camden information was non-public. Without those allegations, there is no reason for Camden to be in the case.

The case against Camden also is deficient because Camden began using revenue management software many years before any alleged conspiracy. And Camden helped tenants during COVID, keeping rents down. Blocked by these facts, Plaintiffs were unable to make necessary allegations regarding Camden. Plaintiffs do not allege any detail regarding when Camden began violating the antitrust laws or how the communications in the Camden paragraphs harmed competition.

Plaintiffs' meager allegations against Camden are not surprising given that Plaintiffs' original case attacked

1

RealPage's software. That theory strains plausibility, so Plaintiffs filed an amended complaint adding a handful of customers and communications. But Plaintiffs cannot push the allegations against Camden over the plausibility threshold. Group pleading of alleged plus factors, without specific allegations against Camden, is not enough for a case against Camden.

## I. Plaintiffs Do Not Identify Camden Confidential Information Shared With Competitors.

Camden's motion challenged Plaintiffs to identify Camden confidential information disclosed to competitors in the COVID-era emails. (Mot. at 12-15). Plaintiffs refused the challenge.

Plaintiffs do not identify any information in the Camden paragraphs (AC ¶¶ 90-92, 94) that was competitively sensitive for a publicly-traded company. Camden's motion pointed Plaintiffs to portions of Camden's website showing Camden disclosed the types of information in the emails to the public. (Mot. at 5-8). Plaintiffs' response (Opp. at 40-42) says nothing except to claim there is a factual dispute.

Plaintiffs are wrong. There is no dispute for three reasons. First, nothing in Camden's public disclosures[1] is necessary to see the problems with the claims against Camden. Paragraphs 90-92 and 94 do not, on their face, identify any Camden confidential, competitively sensitive information shared by Camden. This is a pleading problem, not a factual dispute. Second, considering Camden's public disclosures does not require the Court to wade into any factual disputes. Plaintiffs allege Camden is publicly-traded (AC ¶ 238), meaning Camden must make extensive disclosures to investors. The fact that Camden disclosed more granular information than is included in the Complaint, contradicts Plaintiffs' arguments that the COVID emails support an inference of an agreement to exchange non-public information. Third, even if the case moves forward as to Camden, Plaintiffs will have to concede that Camden makes extensive public disclosures of

---

[1] The Court can take judicial notice of Camden's public filings. *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 607 (4th Cir. 2021) (taking judicial notice in securities case of SEC filings and other publicly available documents). Again, however, it is not necessary because Plaintiffs do not make any allegations that would need to be contradicted.

property performance, and in the COVID emails provided publicly available types of information.

The opposition accuses Camden of mischaracterizing the COVID email paragraphs. (Opp. at n. 11). Plaintiffs do not explain this accusation——they simply use a compare signal to instruct Camden to figure out the alleged mischaracterization itself. Plaintiffs refuse to identify one word in paragraphs 90-92 or 94 identifying Camden confidential information.[2]

Plaintiffs' failure makes both Claims I and II implausible as to Camden. It remains difficult to decipher the difference between these theories, but it appears that Claim II alleges an information-sharing agreement based on the use of AIRM and exchange of confidential information (AC ¶ 263) outside of AIRM. Claim II appears to allege agreements to "align prices" through a series of bilateral, vertical licensing agreements. (AC ¶ 272).

Claim I fails as to Camden because there are no allegations that Camden provided competitively sensitive data

---

[2] The closest Plaintiffs come is when they cite examples of communications involving "future pricing strategies." (Opp. at 12). Plaintiffs leave Camden to guess as to what strategies they mean. Plaintiffs ignore that Camden publicly disclosed information about pricing strategies. (Mot. at 6-8).

4

to competitors. Again, Plaintiffs ignore that Camden tells the public about pricing, occupancy, and strategies on its website, in SEC filings, and during earnings calls. Claim II also fails as to Camden, even if Plaintiffs' theory is that every single company that used AIRM automatically violated the Sherman Act. That would be an unfair theory, given that Plaintiffs in Claim III allege that RealPage is a monopolist and customers had few other choices besides using AIRM. It also fails because Plaintiffs provide no plausible theory or motivation as to why a publicly-traded company would join a conspiracy to "align" pricing. And it also fails under Fourth Circuit law for all the reasons set forth in the other briefs. *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002).

## II. Plaintiffs Do Not Allege When Camden Transformed from Customer to Conspirator.

Camden's motion to dismiss faulted Plaintiffs for refusing to identify how and when Camden joined the conspiracy. Plaintiffs again do not respond. Their sections on Camden (only pages 40-42 and 68) are silent on this point. Plaintiffs nevertheless continue to emphasize the importance of the timing of the agreement. Plaintiffs argue that "[e]ach landlord that agrees to share its data with RealPage

5

explicitly or implicitly understands and agrees that this arrangement involves other landlords likewise sharing their data with RealPage." (Opp. at 4). And, again focusing on timing of customer understanding, Plaintiffs allege that "[w]hen they decide to license AIRM or YieldStar, they know that the software makes use of their shared data." (Opp. at 5).

Timing matters because of the Supreme Court's decision in *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939). Plaintiffs rely on this case for the theory that competitors can violate the Sherman Act when they adopt strategies knowing that their competitors will do the same. In that case, the facts were straightforward beause the hub of the conspiracy (a movie distributor) sent the same letter (copying all the competitors in the address line) on the same day to competitors (movie theater operators), and then the competitors adopted the strategy dictated by the letter for the upcoming season. *Id.* at 216-18. The terms and timing of, and invitation to join, the hub-and-spoke conspiracy were crystal clear.

6

Plaintiffs have a problem fitting this theory on Camden because they cannot allege that Camden chose RealPage for the same reasons or at the same time as other customers. Plaintiffs cite *Interstate Circuit* to say that "simultaneous" agreement is not required. (Opp. at 32). But Camden is not quibbling about a slight timing gap, it is pointing to a gap of years, maybe a decade or more. And more recent law emphasizes the importance of alleging coordinated timing. *Gibson v. MGM Resorts Int'l*, No. 2:23-cv-001410-MMD-DJA, 2023 WL 7025996, at *4 (D. Nev. Oct. 24, 2023) (Mot. at 11).

The problem for Plaintiffs is they do not provide the "when" for Camden—never identifying when Camden first agreed to use RealPage RMS and what it intended and understood at that time. Camden cannot defend against claims that it joined an unlawful agreement unless the complaint provides the minimum level as to when and how it did so.

This failure poses another plausibility problem unique to Camden. As set forth above, Claims I and II are not plausible as to Camden because it is a publicly-traded REIT that is transparent about pricing and strategies. Claim II is

7

not plausible as to Camden because it is not alleged to have even acted in parallel with competitors.

**III. Plaintiffs Do Not Allege Camden Raised Prices.**

Camden's motion to dismiss challenged Plaintiffs to point to any support for their suggestion of some relationship between Camden's COVID emails and a harm to competition. (Mot. at 15-16). Plaintiffs again stepped back. Plaintiffs do not say anything about what Camden did during COVID (or any other time) to raise prices above competitive levels or otherwise harm competition. And Plaintiffs are of course aware that Camden gave millions of dollars to tenants and froze rents during COVID, which allowed it to compete on price and quality.

Particularly glaring is Plaintiffs' silence on the four Camden paragraphs. (AC ¶¶ 90-92, 94). Plaintiffs had to allege that the Camden communications caused Camden to raise prices above competitive levels or otherwise harm competition. Plaintiffs—again blocked by the fact of Camden's public disclosures and pro-tenant conduct during COVID—do not even try.

8

More broadly, the allegations of anticompetitive harm are deficient for all the reasons set forth in the joint customer brief. And the Antitrust Division's decision not to challenge RealPage's acquisition of LRO further supports the conclusion that using revenue management software is not inherently anti-competitive.

**IV. Camden Cannot Give Plaintiffs The Relief They Seek.**

Plaintiffs alleged that "[l]ess restrictive alternatives are available to RealPage and the market," citing recent changes by RealPage to its software. (AC ¶ 269). Plaintiffs do not, however, allege that Camden failed to accept these changes.

Nor have Plaintiffs asked Camden to stop analyzing its data or making robust public disclosures, which would harm competition by prohibiting the use of technology that facilitates reductions in price and compliance with fair housing laws.

Plaintiffs demand additional changes to RealPage's software. Only RealPage can make those changes.

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice as to Camden.

Dated: June 26, 2025     Respectfully submitted,

By: /s/ *Caroline M. Gieser*

Caroline M. Gieser (NC Bar No. 51610)
Shook, Hardy & Bacon LLP
1230 Peachtree St., Ste. 1200
Atlanta, GA 30309
Tel: (470) 867-6013
cgieser@shb.com

**Local Civil Rule 83.1(d) Counsel for Defendant Camden Property Trust**

By: /s/ *Ryan M. Sandrock*

Ryan M. Sandrock (CA Bar No. 251781)
*Appearing Under Rule 83.1(d)*
Shook, Hardy & Bacon LLP
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900
rsandrock@shb.com

Laurie A. Novion (MO Bar No. 50390)
*Appearing Under Rule 83.1(d)*
Shook, Hardy & Bacon LLP
2555 Grand Blvd.
Kansas City, MO 64108-2613
Tel: (816) 474-6550
lnovion@shb.com

Mehgan Keeley (IL Bar No. 6336155)
Maveric Searle (IL Bar No. 6336737)

*Appearing Under Rule 83.1(d)*
Shook, Hardy & Bacon LLP
111 S. Wacker Dr., Ste. 4700
Chicago, IL 60606
Tel: (312) 704-7700
mkeeley@shb.com
msearle@shb.com

Richard Powers (D.C. Bar 90016042)
*Appearing Under Rule 83.1(d)*
Kressin Powers LLC
400 7th Street NW, Suite 300
Washington, D.C. 20004
Tel: (202) 464-2905
richard@kressinpowers.com

**Attorneys for Defendant Camden Property Trust**

11

## CERTIFICATE OF WORD COUNT

I certify that this Camden Property Trust's Reply in Camden's Motion to Dismiss (the "Reply") complies with the applicable word limits excluding the caption, signature line, and any cover page or index in accordance with this Court's March 13, 2025 Order extending the word limitation, Dkt. 123, and Local Civil Rule 7.3(d)(1). This certification is made in accordance with Local Civil Rule 7.3(d)(1). The undersigned relied upon the word count feature provided by word-processing software and the Reply contains approximately 1,695 words.

This 26th day of June, 2025.

By: /s/ *Caroline M. Gieser*

Caroline M. Gieser (NC Bar No. 51610)
Shook, Hardy & Bacon LLP
1230 Peachtree St., Ste. 1200
Atlanta, GA 30309
Tel: (470) 867-6013
cgieser@shb.com