# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>STATE OF NORTH CAROLINA,<br>STATE OF CALIFORNIA,<br>STATE OF COLORADO,<br>STATE OF CONNECTICUT,<br>STATE OF ILLINOIS,<br>COMMONWEALTH OF<br>MASSACHUSETTS,<br>STATE OF MINNESOTA,<br>STATE OF OREGON, and<br>STATE OF TENNESSEE,<br><br>Plaintiffs,<br><br>      v.<br><br>REALPAGE, INC.,<br>CAMDEN PROPERTY TRUST,<br>CORTLAND MANAGEMENT, LLC,<br>GREYSTAR MANAGEMENT<br>SERVICES, LLC,<br>LIVCOR, LLC,<br>PINNACLE PROPERTY<br>MANAGEMENT SERVICES, LLC,<br>and<br>WILLOW BRIDGE PROPERTY<br>COMPANY, LLC<br><br>Defendants. | Case No. 1:24-cv-00710-WO-JLW<br><br>**REPLY MEMORANDUM OF LAW IN SUPPORT OF CUSTOMER DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |

## REPLY MEMORANDUM OF LAW IN SUPPORT OF CUSTOMER DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ............................................... 1

ARGUMENT ................................................... 4

I.    THE FAC FAILS TO PLEAD THE FACTS NECESSARY TO
      ALLEGE AN ANTITRUST CONSPIRACY ....................... 4

II.   PLAINTIFFS FAIL TO SHOW THEY PLAUSIBLY ALLEGED
      COUNT 1 .............................................. 6

      A.    Plaintiffs Identify No Alleged Direct or
            Circumstantial Evidence of an Agreement Among
            All RealPage Customers to Exchange Information ... 7

            1.    Plaintiffs Have No Direct Evidence .......... 7

            2.    Plaintiffs Have No Indirect Evidence ....... 10

                  a.    No parallel conduct ................... 11

                  b.    "Plus Factors" cannot rescue
                        plaintiffs' claim ..................... 12

      B.    Plaintiffs Identify No Anticompetitive Effects .. 16

            1.    By Mischaracterizing Fourth Circuit Law,
                  Plaintiffs Concede They Allege No Direct
                  Evidence of Anticompetitive Effects ........ 16

            2.    Plaintiffs Identify No Indirect Evidence
                  of Anticompetitive Effects ................. 17

III.  PLAINTIFFS FAIL TO ESTABLISH THAT THEY ADEQUATELY
      PLEADED COUNT 2 ..................................... 20

      A.    Plaintiffs Identify No Allegations Plausibly
            Suggesting an Agreement to "Align Pricing" ...... 21

      B.    Plaintiffs Fail to Identify Anticompetitive
            Effects ......................................... 25

IV.   PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED ..... 28

CONCLUSION ................................................ 29

i

# TABLE OF AUTHORITIES

## CASES

*1-800 Contacts, Inc. v. FTC*,
    1 F.4th 102 (2d Cir. 2021) .......................17, 26

*In re Air Cargo Shipping Services Antitrust Litigation*,
    2010 WL 10947344 (E.D.N.Y. Sept. 22, 2010) ............5

*In re Amazon.com, Inc. eBook Antitrust Litigation*,
    2023 WL 6006525 (S.D.N.Y. July 31, 2023) .............19

*American Chiropractic Association v. Trigon Healthcare, Inc.*,
    367 F.3d 212 (4th Cir. 2004) .......................7, 8

*American Column & Lumber Co. v. United States*,
    257 U.S. 377 (1921) ..................................20

*In re Baby Food Antitrust Litigation*,
    166 F.3d 112 (3d Cir. 1999) .........................15

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012) .......................17

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ..............................17, 23

*Burtch v. Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011) .........................13

*In Re: Concrete & Cement Additives Antitrust Litigation*,
    24-md-03097(S.D.N.Y June 25, 2025) ..................12

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) ....................*passim*

*In re Elevator Antitrust Litigation*,
    502 F.3d 47 (2d Cir. 2007) ..........................14

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) ........................22

*In re Flat Glass Antitrust Litigation*,
    385 F.3d 350 (3d Cir. 2004) ......................13, 15

*Fortner Enterprises Inc. v. U.S. Steel Corp.*,
    394 U.S. 495 (1969) ...................................27

*Gibson v. Cendyn Group, LLC*,
    2024 WL 2060260 (D. Nev. May 8, 2024) .......11, 12, 22

*Gibson v. MGM Resorts International*,
    2023 WL 7025996 (D. Nev. Oct. 24, 2023) ..............6

*Hackman v. Dickerson Realtors, Inc.*,
    520 F. Supp. 2d 954 (N.D. Ill. 2007) ................29

*Honey Bum, LLC v. Fashion Nova, Inc.*,
    2022 WL 385185 (C.D. Cal. Jan. 6, 2022) ..............7

*In re Insurance Brokerage Antitrust Litigation*,
    618 F.3d 300 (3d Cir. 2010) .........................12

*Interstate Circuit, Inc. v. United States*,
    306 U.S. 208 (1939) ...............................8, 10

*Johnson v. American Towers, LLC*,
    781 F.3d 693 (4th Cir. 2015) .........................5

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ........................6

*In re Local TV Advertising Antitrust Litigation*,
    2022 WL 3716202 (N.D. Ill. Aug. 29, 2022) ...........19

*Ohio v. American. Express Co.*,
    585 U.S. 529 (2018) ..............................17, 26

*Parducci v. Overland Solutions, Inc.*,
    399 F. Supp. 3d 969 (N.D. Cal. 2019) ................29

*In re RealPage, Inc., Rental Software Antitrust
    Litigation*,
    709 F. Supp. 3d 478 (M.D. Tenn. 2023) ...........10, 15

*Robertson v. Sea Pines Real Estate Cos.*,
    679 F.3d 278 (4th Cir. 2012) .....................6, 16

iii

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
    801 F.3d 412 (4th Cir. 2015) ....................1, 4, 11

*Sea-Roy Corp. v. Parts R Parts, Inc.*,
    1997 WL 1046282 (M.D.N.C. 1997), *aff'd*, 173 F.3d
    851 (4th Cir. 1999) ..................................17

*Standard Oil Co. of California v. United States*,
    337 U.S. 293 (1949) ..............................27, 28

*Synopsys, Inc. v. ATopTech, Inc.*,
    2015 WL 4719048 (N.D. Cal. Aug. 7, 2015) .............28

*Systemcare, Inc. v. Wang Laboratories Corp.*,
    117 F.3d 1137 (10th Cir. 1997) .......................22

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) ..................................28

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ......................18, 20

*United States v. Container Corp. of America*,
    393 U.S. 333 (1969) ...................8, 9, 10, 18, 19

iv

## INTRODUCTION

As Customer Defendants explained in their motion, Fourth Circuit precedent defeats both Count 1 (alleged conspiracy to exchange information through RealPage) and Count 2 (alleged vertical agreements between each customer and RealPage to "align pricing"). In response, plaintiffs double down on their theory that RealPage is a walking conspiracy by insisting that Count 1 reaches every landlord that ever licensed any RealPage product—most of which have nothing to do with revenue management. And they try reframing Count 2, shifting their focus away from aligning prices to abstract "process," while inviting the Court to contradict controlling precedent. Plaintiffs' response confirms they have no viable claims against Customer Defendants.

First, rather than demonstrate that the FAC answers the "who, what, when[,] and where of the claimed antitrust misconduct," *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 430 (4th Cir. 2015),[1] plaintiffs insist they need not answer them because they pleaded an "information-sharing

---

[1] All internal quotation marks, citations, footnotes, and original alterations are omitted unless specified otherwise.

1

claim" (Opp.31).  But the Fourth Circuit requires plaintiffs to answer these questions in <u>all</u> cases, and plaintiffs do not do so here.

Second, plaintiffs assert they alleged evidence of a horizontal information-sharing agreement among all RealPage customers and anticompetitive effects, but they pleaded neither.  Plaintiffs claim they alleged direct evidence of an agreement because they identified "written" vertical software licenses between each customer and RealPage.  (Opp.10.)  But <u>vertical</u> software licenses are not direct evidence of a <u>horizontal</u> conspiracy among all RealPage's customers.  *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002).  Nor are they evidence of parallel conduct, necessary to plead a circumstantial case, because plaintiffs failed to allege that any Customer Defendant licensed any RealPage product around the same time as another Customer Defendant.  (Opp.32.)

Plaintiffs' arguments that they pleaded anticompetitive effects based on the supposed information-sharing agreement are doomed because they concede:  (1) they allege no rental price at any apartment (Opp.23); (2) no customer "get[s] to see" another's "individual . . . data" through RealPage (*id*.5);

2

and (3) they inflated the alleged market shares by including every RealPage customer, even those that never subscribed to RealPage's RMS (*id.*25-36).

Third, Count 2 is similarly flawed. Plaintiffs' argument that they pleaded an agreement to "align pricing" between each Customer Defendant and RealPage by identifying written RMS licenses (Opp.51-52) fails because plaintiffs identify no provision in those licenses that "aligns" or restrains any customer's prices. Instead, plaintiffs concede those licenses do not restrain any customer's "discretion" to set prices unilaterally (*id.*64) and identify no facts plausibly suggesting any customer's prices became "aligned."

Recognizing they cannot allege any pricing alignment, plaintiffs recast Count 2 as challenging vertical agreements to "align pricing processes." (Opp.71.) But plaintiffs' pivot cannot save their claim because their allegations contradict this theory: Customer Defendants' pricing processes remained independent because Customer Defendants rejected the RMS's suggested prices <u>more than half the time</u>. (Mot.33.)

3

Count 2 should also be dismissed because plaintiffs aggregate the effects of all RealPage customers' licenses to plead anticompetitive effects, which the Fourth Circuit forbids. *Dickson*, 309 F.3d at 210. Plaintiffs ask for an exemption from *Dickson*'s anti-aggregation rule, but offer no argument that does not contradict that controlling precedent.

Finally, plaintiffs argue their state law claims should survive even if the Court dismisses their Sherman Act claims (Opp.72), but identify no substantive differences between state and federal law.

## ARGUMENT

## I. THE FAC FAILS TO PLEAD THE FACTS NECESSARY TO ALLEGE AN ANTITRUST CONSPIRACY

The FAC should be dismissed because plaintiffs do not meaningfully dispute that they failed to answer "the who, what, when[,] and where of the claimed" conspiracies. (Mot.13 (quoting *SD3*, 801 F.3d at 430).) Plaintiffs primarily argue they need not answer these basic questions because they pleaded an "information-sharing claim" and "facts about . . . a written agreement." (Opp.31-33.) But they identify no basis for different pleading burdens based on the type of claim alleged. Nor could they: The Fourth Circuit has held

4

that <u>all</u> complaints must answer "who, did what, to whom (or with whom), where, and when." *Johnson v. Am. Towers, LLC*, 781 F.3d 693, 709 (4th Cir. 2015).[2]

The "written agreement[s]" plaintiffs identify are "<u>vertical</u>" software "license[s] . . . between RealPage and [each Customer Defendant]" (Opp.57) that do not establish Count 1's alleged <u>horizontal</u> agreement among RealPage customers to exchange information. *See infra* 7-8. Those licenses also do not excuse plaintiffs' Count 2 pleading failures because nothing in them "aligns" any Customer Defendant's prices. *See infra* 21-22.

Plaintiffs' hand-waving that they answered the who, what, when, and where of the alleged conspiracies just underscores the FAC's deficiencies. Plaintiffs identify the "who" as every "landlord[] using AIRM, YieldStar, OneSite, PAB, or BI." (Opp.32.) But that fails because it references hundreds of

---

[2] Plaintiffs insist they "do not face a higher standard on a motion to dismiss simply because they had access to precomplaint discovery." (Opp.6.) But the authority on which plaintiffs rely just highlights the FAC's shortcomings. *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2010 WL 10947344, at *11 (E.D.N.Y. Sept. 22, 2010) ("The allegations establish who Sanfilippo spoke with, what was discussed and agreed upon, and provide a general time frame.").

Case 1:24-cv-00710-WO-JLW    Document 148    Filed 06/26/25    Page 10 of 38

landlords that licensed one of those five RealPage products. *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047-48 (9th Cir. 2008) (rejecting allegations that "banks" entered into alleged conspiracy because banks "are large institutions with hundreds of employees entering into contracts . . . daily"). Plaintiffs also cannot identify when the alleged conspiracies started, arguing only that they started at some unidentified time when "landlords . . . signed agreements with RealPage." (Opp.32.) *See Gibson v. MGM Resorts Int'l*, 2023 WL 7025996, at *4 (D. Nev. Oct. 24, 2023) (dismissing claim because plaintiffs "d[id] not know when the purported conspiracy began").[3]

## II. PLAINTIFFS FAIL TO SHOW THEY PLAUSIBLY ALLEGED COUNT 1

Plaintiffs fail to establish they adequately pleaded direct or circumstantial evidence of (A) the supposed agreement to exchange information and (B) anticompetitive effects.

---

[3] Contrary to plaintiffs' argument (Opp.33), *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278 (4th Cir. 2012) does not exempt them from identifying when the conspiracy started. It reached a much narrower conclusion: Plaintiffs need not identify "times and locations of [] allegedly conspiratorial meetings." *Id.* at 289.

**A. Plaintiffs Identify No Alleged Direct or Circumstantial Evidence of an Agreement Among All RealPage Customers to Exchange Information**

**1. <u>Plaintiffs Have No Direct Evidence</u>**

Plaintiffs identify no allegations that directly establish the alleged conspiracy with "no inferences." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004). Instead, plaintiffs argue that vertical licenses between RealPage "and every landlord that uses any . . . RealPage software product[] . . . to shar[e] its confidential . . . data" with RealPage constitute direct evidence. (Opp.10.) But RealPage's <u>vertical</u> licenses with customers are not evidence (much less direct evidence) of a <u>horizontal</u> agreement among those customers. *See Dickson*, 309 F.3d at 203 (refusing to infer conspiracy among software users based on vertical licenses with Microsoft); *Honey Bum, LLC v. Fashion Nova, Inc.*, 2022 WL 385185, at *3 (C.D. Cal. Jan. 6, 2022) (declining "to deem an agreement horizontal based only on evidence of vertical agreements").

In fact, plaintiffs identify nothing in any RealPage license describing how RealPage would use any customer's data. *See Am. Chiropractic*, 367 F.3d at 227 ("coverage policies" were "not direct evidence" because they required "inferential

7

**A. Plaintiffs Identify No Alleged Direct or Circumstantial Evidence of an Agreement Among All RealPage Customers to Exchange Information**

**1. <u>Plaintiffs Have No Direct Evidence</u>**

Plaintiffs identify no allegations that directly establish the alleged conspiracy with "no inferences." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004). Instead, plaintiffs argue that vertical licenses between RealPage "and every landlord that uses any . . . RealPage software product[] . . . to shar[e] its confidential . . . data" with RealPage constitute direct evidence. (Opp.10.) But RealPage's <u>vertical</u> licenses with customers are not evidence (much less direct evidence) of a <u>horizontal</u> agreement among those customers. *See Dickson*, 309 F.3d at 203 (refusing to infer conspiracy among software users based on vertical licenses with Microsoft); *Honey Bum, LLC v. Fashion Nova, Inc.*, 2022 WL 385185, at *3 (C.D. Cal. Jan. 6, 2022) (declining "to deem an agreement horizontal based only on evidence of vertical agreements").

In fact, plaintiffs identify nothing in any RealPage license describing how RealPage would use any customer's data. *See Am. Chiropractic*, 367 F.3d at 227 ("coverage policies" were "not direct evidence" because they required "inferential

7

**A. Plaintiffs Identify No Alleged Direct or Circumstantial Evidence of an Agreement Among All RealPage Customers to Exchange Information**

**1. <u>Plaintiffs Have No Direct Evidence</u>**

Plaintiffs identify no allegations that directly establish the alleged conspiracy with "no inferences." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004). Instead, plaintiffs argue that vertical licenses between RealPage "and every landlord that uses any . . . RealPage software product[] . . . to shar[e] its confidential . . . data" with RealPage constitute direct evidence. (Opp.10.) But RealPage's <u>vertical</u> licenses with customers are not evidence (much less direct evidence) of a <u>horizontal</u> agreement among those customers. *See Dickson*, 309 F.3d at 203 (refusing to infer conspiracy among software users based on vertical licenses with Microsoft); *Honey Bum, LLC v. Fashion Nova, Inc.*, 2022 WL 385185, at *3 (C.D. Cal. Jan. 6, 2022) (declining "to deem an agreement horizontal based only on evidence of vertical agreements").

In fact, plaintiffs identify nothing in any RealPage license describing how RealPage would use any customer's data. *See Am. Chiropractic*, 367 F.3d at 227 ("coverage policies" were "not direct evidence" because they required "inferential

7

leap that [defendant] drafted . . . the policies only after reaching an agreement with" third parties).  And plaintiffs admit that the licenses "stipulate[]" only "that the landlord is sharing its confidential, nonpublic data with RealPage" (Opp.10), <u>not</u> other landlords.

Plaintiffs argue that RealPage's licenses are nevertheless direct evidence because each customer knew that its license's "nature and design" (Opp.14) could create "a reciprocal [information] exchange" (Opp.11).  The Fourth Circuit rejected this same argument in *Dickson*, when the plaintiffs tried to bootstrap vertical software licenses to infer a horizontal conspiracy among Microsoft licensees.  309 F.3d at 217 (Gregory, J., dissenting) (faulting majority for not inferring a conspiracy among licensees where plaintiff alleged that "the <u>nature</u> of the conspiracy, <u>by design</u> and by necessity, was broader <u>than any one agreement</u> between Microsoft and a[] [licensee]").

Plaintiffs next argue they pleaded direct evidence under *United States v. Container Corp. of America*, 393 U.S. 333 (1969), and *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939) (Opp.13-14), but neither provides support.

8

In *Container Corp.*, "the essence of the [defendants'] agreement was to furnish price information whenever requested." 393 U.S. at 335. The Court held that three key facts established that agreement:

- Each defendant directly "request[ed]" from its competitor "specific" prices charged to "identified customers." *Id.* at 334-35.

- The information exchanged concerned "specific sales to identified customers, not a statistical report on the average cost to all members." *Id.*

- Once a defendant had its competitors' specific pricing information, the defendant quoted the same price to customers in the "majority of instances." *Id.* at 339 (Fortas, J., concurring).

Those allegations are missing here. First, rather than allege RealPage customers directly provided each other with "specific" prices, *id.* at 334, plaintiffs admit customers "do not [receive] each other's individual . . . data" from RealPage. (Opp.4.) Indeed, plaintiffs allege that other customers' information is "pooled" by RealPage with the customer's own data (Opp.7) but do not allege that any customer could identify any other customer's data after pooling.

Second, plaintiffs do not allege Customer Defendants quoted the same price to customers in the "majority of"

9

instances." *Container Corp.*, 393 U.S. at 339 (Fortas, J., concurring).  Quite the opposite: Plaintiffs admit Customer Defendants overrode prices suggested by RealPage's RMS in most instances (Opp.35) and that the prices suggested by RealPage's RMS are also individualized based on user customizations (Mot.6-7).

Finally, plaintiffs' reliance on *Interstate Circuit* to argue they pleaded direct evidence based on RealPage's "invitation to use its software" (Opp.14) is misplaced.  Even the *RealPage MDL* court recognized that RealPage's invitation to use its software "is not . . . direct evidence of a horizontal conspiracy" because it "requires the Court to infer that RealPage's . . . clients worked together as competitors."  *In re RealPage, Inc., Rental Software Antitrust Litig.*, 709 F. Supp. 3d 478, 504 (M.D. Tenn. 2023).

### 2.  <u>Plaintiffs Have No Indirect Evidence</u>

Plaintiffs also argue they pleaded an agreement through parallel conduct and "plus factors" (Opp.14-17), but they identify no allegations plausibly suggesting parallel conduct. And their "plus factors" are irrelevant and also insufficient as a matter of law.

10

### a.  No parallel conduct

Plaintiffs do not dispute they fail to allege that Customer Defendants licensed any RealPage product around the same time or received the same information from RealPage, or that any Customer Defendant conditioned its decision to license a RealPage product on another Customer Defendant providing information to RealPage. (Mot.21-28.)  Rather than supply key timing allegations from pre-complaint discovery, plaintiffs invoke *SD3* to suggest they need only establish that Customer Defendants <u>eventually</u> started "shar[ing] nonpublic, competitively sensitive data daily with RealPage." (Opp.15.)  But close-in-time decisions by the defendants were crucial to the Fourth Circuit's holding that the defendants in *SD3* acted in parallel.  801 F.3d at 420 (explaining "it took only . . . months for" all defendants to act).

Plaintiffs argue *Gibson v. Cendyn Group, LLC*, 2024 WL 2060260 (D. Nev. May 8, 2024) ("*Gibson II*") "is instructive" and "turned on the plaintiffs' failure to plausibly allege the exchange of confidential information." (Opp.34.)  But *Gibson II* concluded that it was equally "determinative" that customer defendants there "began licensing [the same RMS] at

11

different times over an approximately 10-year period." 2024 WL 2060260, at *3-4. Plaintiffs' allegations here are even more deficient because they do not allege when any Customer Defendant began licensing any RealPage product. *See In Re: Concrete & Cement Additives Antitrust Litig.*, 24-md-03097, ECF No. 300 at 23, 30 (S.D.N.Y June 25, 2025) (holding that "unseasonably long delays between the allegedly parallel acts will refute rather than support allegations of conspiracy" and refusing to infer conspiracy from defendants' price increases over "a ten-month period").

Plaintiffs also try to plead parallel conduct by alleging that Customer Defendants "know[]" that other customers provide data to RealPage. (Opp.15.) But "allegations that each [Customer Defendant] knew about" the information "the other [Customer Defendants]" provided to RealPage "manifestly do not describe a horizontal conspiracy." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 331 (3d Cir. 2010).

### b. "Plus Factors" cannot rescue plaintiffs' claim

Plaintiffs' "plus factors" are irrelevant given their failure to plead parallel conduct (Mot.28) and insufficient under settled law.

**No motive.** Plaintiffs incorrectly argue that Customer Defendants were motivated to agree to an information-exchange conspiracy with every other RealPage customer so they could "better exploit" RealPage's RMS to charge higher prices. (Opp.16.) These allegations are "legally insufficient" because "all entrepreneurs have a legitimate understandable motive to increase profits." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 229 (3d Cir. 2011); *see also In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004) (defendants' motivation to "set[] their prices at a profit-maximizing" level is not a plus factor) (Opp.16). Meanwhile, plaintiffs concede many reasons why Customer Defendants unilaterally wish to use RealPage's RMS. (Mot.6-7.) And they identify no allegations plausibly suggesting that any Customer Defendant charged higher prices after licensing RealPage's RMS, or why unidentified RealPage customers would join the alleged conspiracy even though they do not license RealPage's RMS.

**No unusual communications.** Plaintiffs do not dispute that their references to "so-called 'market surveys'" and "call arounds" have nothing to do with RealPage's products. (Mot.31.) Instead, they argue the Court should infer an

13

agreement among Customer Defendants to share information through RealPage because they allegedly shared different information in other contexts. (Opp.17.) But absent "evidence of linkage between" market surveys, call arounds, and RealPage products, plaintiffs "merely" suggest that "if it happened there, it could have happened here"—and that falls short. *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (affirming dismissal of antitrust claims). While plaintiffs reference a few communications among Customer Defendants about RealPage's products, plaintiffs do not dispute those communications were only about "product enhancements." (Mot.17-18.)

**No acts against self-interest**. Plaintiffs do not dispute that courts have routinely held that competitors exchanging aggregated information through a third-party platform is in their self-interest. (Mot.29-30.) Instead, plaintiffs twist their allegations to argue it was against Customer Defendants' self-interest to share "granular, transaction-level data" with each other. (Opp.16.) But plaintiffs elsewhere admit Customer Defendants (1) provided "granular" information <u>only</u> to RealPage and (2) "do not get to see each other's individual

14

shared data" through RealPage. (*Id*.5.) Moreover, plaintiffs allege it was in each customer's self-interest to use a revenue management product that could help them adjust prices (including downward) to reflect market conditions. (*See* FAC ¶¶ 47, 170, 172.)

Plaintiffs rely on *Flat Glass* and the *RealPage MDL*, but neither lends support. *Flat Glass* observed in a footnote that a defendant "unilateral[ly]" providing "confidential price information" to competitors could be against that defendant's self-interest. 385 F.3d at 361 n.12. It did not disturb Third Circuit precedent holding that "[g]athering competitors' price information can be consistent with independent competitor behavior." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 126 (3d Cir. 1999). And the *RealPage MDL* is distinguishable because, unlike there, plaintiffs here allege that providing data to RealPage was a condition to licensing RealPage's products, and that agreeing to that condition was in each Customer Defendant's self-interest. (Mot.6.)

15

**B.  Plaintiffs Identify No Anticompetitive Effects**

By distorting controlling law and inflating their market share allegations, plaintiffs' opposition only reinforces their failure to plausibly allege that Count 1's supposed information exchange caused anticompetitive effects in each relevant market.

      1. <u>**By Mischaracterizing Fourth Circuit Law, Plaintiffs Concede They Allege No Direct Evidence of Anticompetitive Effects**</u>

Plaintiffs identify no allegations of direct evidence plausibly suggesting Customer Defendants' prices increased above competitive levels because they licensed RealPage's products, but instead insist that *Robertson v. Sea Pines Real Est. Cos.,* 679 F.3d 278, does not require them to allege prices increased.  (Opp.23.)  Plaintiffs misread *Robertson:* It says nothing about the standard for pleading direct evidence because the plaintiffs there relied only on indirect evidence.  679 F.3d at 290-91.

Plaintiffs' "direct evidence" theory falls apart further from there.  Plaintiffs point only to theoretical possibilities that data in RealPage's RMS could "enable Defendants to push pricing higher," including by "creat[ing] a [positive] feedback loop."  (Opp.20-22.)  Yet plaintiffs do

16

not allege the data provided by RealPage's products <u>caused</u> Customer Defendants' prices to behave this way and such "theoretical" possibilities are "not 'direct'" evidence. *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 118 (2d Cir. 2021); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) ("mere possibility" that conduct occurred insufficient to state a claim); *Sea-Roy Corp. v. Parts R Parts, Inc.*, 1997 WL 1046282, at *18-19 (M.D.N.C. 1997) (rejecting Section 1 claims absent "evidence comparing prices . . . before and after the alleged restraints"). And even if plaintiffs could point to higher prices, plaintiffs would still fail to plead direct evidence because higher prices can be "fully consistent with a free, competitive market." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012).

### 2. <u>Plaintiffs Identify No Indirect Evidence of Anticompetitive Effects</u>

Plaintiffs also fail to allege indirect evidence of anticompetitive effects because they identify no "proof of market power" or "evidence that the challenged restraint harms competition." *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018).

17

**Plaintiffs inflate market shares.** Recognizing they cannot allege Customer Defendants (or even RealPage RMS subscribers) have market power, plaintiffs inflate market shares by expanding the conspiracy to include every RealPage customer that ever licensed one of five RealPage products, including OneSite. (Opp.25-26.) This tactic fails for two reasons.

First, plaintiffs allege no basis for including customers that licensed only OneSite in plaintiffs' market share calculations. Indeed, plaintiffs admit that RealPage did not provide those customers with any nonpublic information from other customers. (FAC ¶ 22.) And the cases on which plaintiffs rely involved market shares held by the parties to a reciprocal exchange. *See e.g.*, *Container Corp.*, 393 U.S. at 336 ("90%" share of market among firms that engaged in "reciprocal exchange of prices"); *Todd v. Exxon Corp.*, 275 F.3d 191, 199, 208-09 (2d Cir. 2001) ("80-90%" share of market among reciprocal data exchange participants).

Second, even after inflating market shares by including every RealPage customer, plaintiffs still offer only conclusory allegations that RealPage customers account for at

18

least 30% of all markets, and "thirty percent share of the relevant market is insufficient to confer market power" "as a matter of law" in any event. *Dickson*, 309 F.3d at 209 n.20. In fact, courts have held that even 40% is not enough. *See, e.g.*, *In re Amazon.com, Inc. eBook Antitrust Litig.*, 2023 WL 6006525, at *26 n.22 (S.D.N.Y. July 31, 2023) ("[A] market share of between 30 and 40% does not lead to an inference of market power.").

**No plausible harm to competition**. Plaintiffs argue they meet their burden to plead "likely and significant" harm to competition, *Dickson*, 309 F.3d at 205-06, by invoking "the nature of the information exchanged" and "the structure of the industry" (Opp.20, 26-30). Not so. The "nature of the information exchanged" weighs against plaintiffs because they admit RealPage customers "do not get to see each other's individual shared data" (*id*.5). *See Container Corp.*, 393 U.S. at 334-35 (exchanging "statistical report[s] on [] average[s] . . . , without identifying the parties to specific transactions," is permissible); *In re Loc. TV Advert. Antitrust Litig.*, 2022 WL 3716202, at *3 (N.D. Ill. Aug. 29, 2022) ("Dissemination of aggregated information . . . is

19

favored in the antitrust context."). Plaintiffs' cited cases are inapplicable because they all involved direct competitor exchanges of detailed information. *See Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 398-99 (1921) (competitors received "each member['s]" "sales and prices"); *Todd*, 275 F.3d at 196 (direct exchange of salary data).

Plaintiffs' arguments about industry structure (Opp.28-29) also fail. Plaintiffs contend local markets for multifamily apartments are concentrated, offering random zip codes where "five or fewer landlords" purportedly manage more than "50% of the multifamily units." (FAC ¶ 79.) This says nothing about the shares held by RealPage customers (let alone its RMS customers), *see supra* 18-19, and is also far less than the concentration held sufficient in information-sharing cases, *see Todd*, 275 F.3d at 208 (fourteen firms with 80-90% market share).

## III. PLAINTIFFS FAIL TO ESTABLISH THAT THEY ADEQUATELY PLEADED COUNT 2

Plaintiffs identify no facts plausibly suggesting any Customer Defendant agreed with RealPage to "align pricing" through its RMS or anticompetitive effects stemming from those supposed agreements. Instead, plaintiffs try to recast

20

Count 2 as challenging agreements to shape pricing processes, but they cannot escape controlling law.

## A. Plaintiffs Identify No Allegations Plausibly Suggesting an Agreement to "Align Pricing"

Plaintiffs make multiple admissions that doom their attempt to plead an agreement between any Customer Defendant and RealPage to "align pricing":

- Customer Defendants "retain discretion to set rent and to accept or decline the price recommendations provided by AIRM and YieldStar" (Opp.64);

- Customer Defendants exercise that discretion by overriding RealPage's suggested prices daily (*id*.5);

- "[A]verage" acceptance rates across all RealPage RMS customers is only "40-50%" (Mot.33);

- RealPage software is customizable, so no two Customer Defendants are necessarily using the same software (*id*.6-7; *see also* FAC ¶¶ 49, 159, 170);

- The FAC does not allege that Customer Defendants' prices changed in any way after they licensed RealPage's RMS (Mot.33); and

- The FAC does not allege that Customer Defendants receive the same recommendations (*see* FAC ¶¶ 45-47, 51-53).

These admissions are fatal because they show that licensing RealPage's RMS does not restrain Customer Defendants' pricing. RealPage's licenses do not "deprive[] the marketplace of independent centers of decisionmaking"

21

(Opp.52-53), since plaintiffs admit Customer Defendants "ultimately set" rental prices independently from RealPage's RMS (*id*.5). And under *Gibson II*—which plaintiffs highlight as "instructive" (*id*.34)—plaintiffs' admission that Customer Defendants often reject RealPage's recommendations is dispositive because it "cannot be that the vertical agreements between [RealPage] and [Customer] Defendants to license [RealPage RMS] restrain trade." *Gibson II*, 2024 WL 2060260, at *9.

Plaintiffs wrongly argue that just identifying RealPage's software licenses "satisfies Section 1's concerted action requirement." (Opp.51-53.) Even the cases on which plaintiffs rely hold that just identifying a contract is insufficient: The court in *Systemcare, Inc. v. Wang Laboratories Corp.* focused on the "coercive" terms of the vertical contract at issue and observed that contracts providing "suggested price[s]," without more, fall outside Section 1 because they do not restrain "independent competitive judgment." 117 F.3d 1137, 1144 (10th Cir. 1997) (Opp.52). *Epic Games, Inc. v. Apple, Inc.* is similarly inapposite because the court identified "three provisions" in

22

those licenses that restricted licensees' independent decisionmaking. 67 F.4th 946, 968 (9th Cir. 2023) (Opp.52).

Plaintiffs try three tactics to escape their failure to identify any contractual terms in a Customer Defendant's licenses that would align pricing, but those arguments fail too. First, plaintiffs speculate that "RealPage designed AIRM and YieldStar to restrain how landlords price their rental units" and that "landlord[s] . . . use the software as it has been designed." (Opp.53-55.) But plaintiffs' speculation about "mere possibilit[ies]" of how Customer Defendants used RealPage's RMS is entitled to no weight. *Twombly*, 550 U.S. at 557. This is especially so because plaintiffs admit Customer Defendants retained significant discretion in how they used RealPage's RMS—and thus did not uniformly use RealPage's RMS "as designed." For instance, plaintiffs allege that RealPage "designed" its RMS for subscribers to "use [it] to set . . . unit-level prices" (FAC ¶ 28), but do not dispute that Customer Defendants rejected prices recommended by RealPage's RMS more than half the time (Mot.33). And plaintiffs do not dispute that each user can

23

custom "design" RealPage's RMS so that the information and pricing recommendations are unique to each user.  (Mot.16.)

Second, plaintiffs argue that the Court can infer vertical agreements to "align pricing" because landlords "understand" that if "enough" landlords license and use AIRM and YieldStar, then their rental prices will be "raised by the rising tide."  (Opp.53-54.)  But plaintiffs disclaim any theory for Count 2 based on a horizontal agreement among Customer Defendants to align pricing.  (Opp.17.)  And even if a landlord believed RealPage's RMS would eventually result in higher market prices, that says nothing about whether that landlord <u>agreed with RealPage</u> to "align" its pricing.

Last, plaintiffs argue that Customer Defendants "mischaracterize[e]" Count 2 because it does not allege an agreement "to align prices" but instead an agreement to "align[] . . . the [pricing] process."  (Opp.63.)  But the FAC describes Count 2 as "**Violation of Section 1 of the Sherman Act Through Agreements to Align Pricing**" (*e.g.*, FAC ¶ 270) (emphasis in original), and insists that Count 2 challenges "AIRM and YieldStar users['] agree[ment] with RealPage to use the software to align pricing" (*id.* ¶ 28; *see*

24

*also id.* ¶ 29 (alleging that landlords "use AIRM or YieldStar to set unit-level prices")). Plaintiffs now abandon their claim as alleged, arguing that Count 2 is <u>solely</u> about supposed agreements to align "processes," "responses," and "strategies." (Opp.5.)

But plaintiffs fare no better in recasting Count 2 because they identify no facts plausibly suggesting any vertical agreement to align "pricing processes" with RealPage. Plaintiffs try to infer those agreements by speculating how unidentified "landlord[s] . . . use[] the software [to] approach the pricing of rental units" (Opp. 64), but do not allege any Customer Defendant used it in those ways. In fact, plaintiffs allege nothing about any Customer Defendant's "pricing process," except that each Customer Defendant "ultimately sets and offers" rental prices using its independent discretion (Opp.5), and exercised that discretion to reject pricing recommendations more than half the time (Mot.33).

## B. Plaintiffs Fail to Identify Anticompetitive Effects

Plaintiffs fail to plausibly allege anticompetitive effects for Count 2 for the same reasons as for Count 1: They

25

do not plead direct or indirect evidence of anticompetitive effects. Moreover, plaintiffs' entire anticompetitive effects theory depends on aggregating all RealPage customers, but the Fourth Circuit has foreclosed that theory by requiring that courts analyze the effects of each vertical agreement separately.

**No direct evidence.** Because the FAC does not identify any Customer Defendant's rental prices (much less allege they increased after licensing RealPage's RMS), plaintiffs again speculate by asserting RealPage's RMS could "bring[] the pricing behavior of competing landlords into alignment." (Opp.59-61.) "[T]heoretical and anecdotal" allegations like these are "not 'direct'" evidence. *1-800 Contacts*, 1 F.4th at 118. Plaintiffs' speculation that Customer Defendants' RMS licenses could affect some prices provides no indication as to whether those agreements "actual[ly]" "increased prices" across "the relevant market." *Am. Express*, 585 U.S. at 542.

**No Indirect Evidence.** According to plaintiffs, the "essence" of Count 2 is "[t]he cumulative effect" of a series of vertical agreements (Opp.67), but that claim is barred by the Fourth Circuit's decision in *Dickson*. Under *Dickson*,

26

each vertical agreement's potential for anticompetitive effects must be analyzed individually, and the effects of separate vertical agreements cannot be aggregated. (*See id*.)

Plaintiffs' only answer is to ask this Court to create an exception to *Dickson*, arguing that *Dickson*'s prohibition on aggregation should apply only to "discrete" and "classical vertical relationships." (Opp.67-68.) But *Dickson* draws no such distinction, plaintiffs cannot show that the software licenses in *Dickson* were "classical vertical relationships" in any event, and plaintiffs identify no case applying the exception they seek to create.

Instead, plaintiffs cite two cases they claim "conflict" with *Dickson* (Opp.67 n.19)—but neither case is even in tension with *Dickson*. *Dickson*'s anti-aggregation rule was not at issue in *Fortner Enterprises Inc. v. U.S. Steel Corp*. because the plaintiffs there did not seek to aggregate the effects of a <u>series</u> of vertical agreements, but instead sought to aggregate the effects of a <u>single</u> conspiracy on themselves and other customers. 394 U.S. 495, 496-97 (1969). Similarly, the aggregation in *Standard Oil Co. of California v. United States*, involved a claim under Section 3 of the Clayton Act;

27

the Court did not decide whether the Sherman Act reached the conduct at issue.  337 U.S. 293, 314 (1949); *see also Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328-29 (1961) (describing aggregation in *Standard Oil*).[4]

## IV.  PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED

Plaintiffs cursorily argue their state law claims could survive even if the Court dismisses their Sherman Act claims because those state laws could be broader than federal law. (Opp.72.)  Plaintiffs' contention falls flat because plaintiffs premise their state claims on the same conduct that underlies their federal claims (Mot.40-41), and plaintiffs identify no conduct that falls outside federal law but within state law. *See, e.g.*, *Synopsys, Inc. v. ATopTech, Inc.*, 2015 WL 4719048, at *10 (N.D. Cal. Aug. 7, 2015) (dismissing unfair competition claim because plaintiffs did not "point[] to any 'unusual' aspect . . . that would make [] conduct something that violate[d] the 'policy and spirit' of

---

[4] Even if plaintiffs' market share allegations could be aggregated, they would fail for the same reasons as plaintiffs' Count 1 market share allegations. (*See supra* 18-19.)

28

the antitrust laws without violating the actual laws themselves").

Plaintiffs' allegations show their state and federal claims fail together. For instance, plaintiffs bring a claim under California's UCL, but allege only that "[d]efendants' practices . . . violate the Sherman Act . . . and therefore constitute unlawful business practices under [the UCL]" (FAC ¶ 296). *See Parducci v. Overland Sols., Inc.*, 399 F. Supp. 3d 969, 982 (N.D. Cal. 2019) (dismissing UCL claim based on "unlawful" practices for same reasons as "other [underlying] claims"). Put simply: Plaintiffs' state claims often require them to allege the same elements that doom their Sherman Act claims: "that a conspiracy existed and that it unreasonably restrained trade." *E.g.*, *Hackman v. Dickerson Realtors, Inc.*, 520 F. Supp. 2d 954, 966 (N.D. Ill. 2007).

<u>CONCLUSION</u>

The Court should dismiss plaintiffs' FAC against Customer Defendants, and plaintiffs do not dispute that any dismissal should be with prejudice.

Respectfully submitted,                    June 26, 2025

29

/s/ *Caroline M. Gieser*
Caroline M. Gieser
(NC Bar No.: 51610)
Shook, Hardy & Bacon LLP
1230 Peachtree St., Ste. 1200
Atlanta, GA 30309
Tel: (470) 867-6013
cgieser@shb.com

Ryan M. Sandrock
(LR 83.1(d) Counsel)
Shook, Hardy & Bacon LLP
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900
rsandrock@shb.com

Laurie A. Novion
(LR 83.1(d) Counsel)
Shook, Hardy & Bacon LLP
2555 Grand Blvd.
Kansas City, MO 64108-2613
Tel: (816) 474-6550
lnovion@shb.com

Maveric Ray Searle
(LR 83.1(d) Counsel)
Meghan E.H. Keeley
(LR 83.1(d) Counsel)
Shook, Hardy & Bacon LLP
111 S. Wacker Dr., Ste. 4700
Chicago, IL 60606
Tel: (312) 704-7700
msearle@shb.com
mkeeley@shb.com


*Attorneys for Defendant*
*Camden Property Trust*

/s/ *James P. McLoughlin*
James P. McLoughlin
N.C. Bar No. 13795
Moore & Van Allen PLLC
100 North Tryon Street
Charlotte, NC 28202
Phone: (704) 331-1000
Fax: (704) 331-1159
mcloughlinj@mvalaw.com

Karen Hoffman Lent
(LR 83.1(d) Counsel)
Boris Bershteyn
(LR 83.1(d) Counsel)
Evan Kreiner
(LR 83.1(d) Counsel)
Sam Auld
(LR 83.1(d) Counsel)

SKADDEN, ARPS,
SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Phone: (212) 735-3000
Fax: (212) 735-2000
karen.lent@skadden.com
boris.bershteyn@skadden.com
evan.kreiner@skadden.com
sam.auld@skadden.com

*Attorneys for Defendant*
*Greystar Management*
*Services, LLC*

30

/s/ *Eric Steven Goodheart*
Eric Steven Goodheart
North Carolina Bar No. NC-53476
DLA PIPER LLP (US)
4141 Parklake Avenue, Suite 300
Raleigh, North Carolina 27612
eric.goodheart@us.dlapiper.com
Tel: (919) 786-2012
Fax: (919) 591-0412

Gregory J. Casas
(LR 83.1(d) Counsel)
DLA PIPER LLP (US)
303 Colorado Street, Suite 3000
Austin, Texas 78701
greg.casas@us.dlapiper.com
Tel: (512) 457-7290
Fax: (512) 721-2390

Carsten M. Reichel
(LR 83.1(d) Counsel)
DLA Piper LLP (US)
500 Eighth Street, NW
Washington, DC 20004
carsten.reichel@us.dlapiper.com
Tel: (202) 799-4640
Fax: (202) 799-5640

Becky L. Caruso
(LR 83.1(d) Counsel)
DLA Piper LLP (US)
51 John F. Kennedy Parkway,
  Suite 120
Short Hills, NJ 07078-2704
becky.caruso@us.dlapiper.com
Tel: (973) 520-2550
Fax: (973) 520-2551

*Attorneys for Willow*
*Bridge Property Company, LLC*

/s/ *Michael Montecalvo*
Michael Montecalvo
N.C. Bar No. 24943
Aaron J. Horner
N.C. Bar No. 56335
WOMBLE BOND DICKINSON (US)
LLP
One West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 721-3600
Facsimile: (336) 721-3660
aj.horner@wbd-us.com
michael.montecalvo@wbd-us.com

Kenneth Reinker
 D.C. Bar No. 999958
Jeremy Calsyn
 D.C. Bar No. 467737
Cleary Gottlieb Steen and
 Hamilton LLP
2112 Pennsylvania Avenue, NW
Washington, D.C. 20037
Telephone: (202) 974-1522
Facsimile: (202) 974-1999
E-Mail: jcalsyn@cgsh.com
E-Mail: kreinker@cgsh.com

Joseph Kay
 N.Y. Bar No. 5410055
Cleary Gottlieb Steen and
 Hamilton LLP
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2745
Facsimile: (212) 225-3999
E-Mail: jkay@cgsh.com

*Attorneys for Defendant*
*Pinnacle Property Management*
*Services, LLC*

31

/s/ *Kearns Davis*

Kearns Davis, NC Bar. No. 22014
Brooks, Pierce, McLendon,
 Humphrey & Leonard
2000 Renaissance Plaza
230 North Elm Street
Greensboro, NC 27401
Telephone:  336-373-8850
Facsimile:   336-378-1001
Email:kdavis@brookpierce.com

David Kiernan
(LR 83.1(d) Counsel)
JONES DAY
555 California Street
26th Floor
San Francisco, CA 94104
(415) 875-5745
dkiernan@jonesday.com

Michelle K. Fischer
(LR 83.1(d) Counsel)
JONES DAY
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586-7096
mfischer@jonesday.com

Peter J. Schwingler
(LR 83.1(d) Counsel)
JONES DAY
90 South Seventh Street
Suite 4950
Minneapolis, MN 55402
(612) 217-8866
pschwingler@jonesday.com

*Attorneys for Defendant*
*LivCor, LLC*

32

## CERTIFICATE OF WORD COUNT

I certify that this Reply Memorandum of Law in Support of Customer Defendants' Motion to Dismiss the First Amended Complaint complies with the applicable word limits excluding the caption, signature line, and any cover page or index in accordance with this Court's March 13, 2025 Order extending the word limitation, Dkt. 123, and Local Civil Rule 7.3(d)(1). This certification is made in accordance with Local Civil Rule 7.3(d)(1). The undersigned relied upon the word count feature provided by word-processing software and the Reply Memorandum of Law contains 5,018 words.

This 26th day of June, 2025.

/s/ James P. McLoughlin

James P. McLoughlin
N.C. Bar No. 13795
Moore & Van Allen PLLC
100 North Tryon Street
Charlotte, NC 28202
Phone: (704) 331-1000
Fax:  (704) 331-1159
mcloughlinj@mvalaw.com

*Attorneys for Defendant Greystar Real Estate Partners, LLC*