**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

---

UNITED STATES OF AMERICA, et al.,

        *Plaintiffs*,

        v.

GREYSTAR MANAGEMENT SERVICES, LLC,

        *Defendant*.

**No. 1:24-cv-00710-WLO-JLW**

---

**COMPETITIVE IMPACT STATEMENT**

In accordance with the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) (the "APPA" or "Tunney Act"), the United States of America files this Competitive Impact Statement related to the proposed Final Judgment against Defendant Greystar Management Services, LLC, which has been filed in this civil antitrust proceeding (ECF No. 152-1).

**I.    NATURE AND PURPOSE OF THE PROCEEDING**

On August 23, 2024, the United States, along with co-plaintiff States, filed a civil antitrust Complaint (the "Complaint") against RealPage, Inc. ("RealPage"). On January 7, 2025, the United States and its co-plaintiff States amended the Complaint to add Greystar Management Services, LLC ("Greystar") and five other property management companies ("property managers") as Defendants. Greystar licenses a revenue management

product called AI Revenue Management ("AIRM") from RealPage. RealPage also licenses AIRM and its other revenue management products to Greystar's competitors, including the other property managers or property owners (collectively, "landlords") named in the Complaint. Greystar and other landlords use RealPage's revenue management products to determine how to price floor plans and units for the conventional multifamily rental housing that they each manage and lease, in competition with each other in numerous local rental housing markets around the country.

The Complaint alleges that Greystar violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by unlawfully sharing its confidential and competitively sensitive information with RealPage for use in its and competing landlords' pricing. Under their licensing agreements with RealPage, Greystar and competing landlords have provided RealPage with daily, competitively sensitive, nonpublic information relating to their leasing businesses, including details like how many leases have been renewed, for what terms, and at what price. The transactional data that Greystar and other landlords have agreed to provide to RealPage includes current, forward-looking, granular, and highly competitively sensitive information. As reflected in the design, development, and operation of its revenue management products, RealPage has used Greystar's competitively sensitive, nonpublic information to influence rental prices and other recommendations

2

across conventional multifamily rental housing managed by competing landlords. Through RealPage's revenue management products, Greystar's rental prices and related recommendations for conventional multifamily housing rentals were likewise influenced by its competitors' competitively sensitive, nonpublic information. In each relevant market, RealPage and participating landlords, including Greystar, collectively have sufficient market power, as indicated by market and data penetration, to harm renters and the competitive process through their unlawful sharing of confidential and competitively sensitive information with each other.

The Complaint also alleges that Greystar and other landlords, by adopting and using RealPage's revenue management products, have agreed with RealPage to align their pricing, thereby violating Section 1 of the Sherman Act, 15 U.S.C. § 1. RealPage has entered into agreements with Greystar and its competing landlords relating to how to price floor plans and rental units by licensing its revenue management products, AIRM and YieldStar, to landlords, and by training and running its revenue management products using competitively sensitive, nonpublic transactional data shared by landlords. Adoption and use of RealPage's revenue management products by Greystar and other landlords has the likely effect of aligning their pricing processes, strategies, and pricing responses, and Greystar and

3

other landlord users understand this likely effect.

The Complaint also alleges monopolization and attempted monopolization claims against RealPage, but not against Greystar or any of its competing landlords. Through its licensing agreements, RealPage has amassed a massive reservoir of competitively sensitive data from competing landlords. RealPage has ensured that other providers of revenue management products cannot compete on the merits unless they enter into similar agreements with landlords, thereby obstructing them from competing with products that do not harm the competitive process.

On August 8, 2025, the United States filed a proposed Final Judgment and a Stipulation and Order ("Stipulation and Order"), which are designed to remedy the loss of competition alleged in the Complaint due to Greystar's conduct.

The proposed Final Judgment, which is explained more fully below, imposes several requirements and restrictions on Greystar that address the United States' concerns regarding Greystar's anticompetitive conduct alleged in the Complaint. Specifically:

  i. Greystar cannot license or use any revenue management product that uses third-party nonpublic data to recommend or set prices;

ii.  Greystar cannot license or use any revenue management product that pools information across Greystar properties with different owners;

iii. Greystar cannot disclose, solicit, or use competitively sensitive information from competitors that can be used to set rental prices or generate pricing;

iv.  Greystar must cooperate in this civil antitrust proceeding (<u>United States et al. v. RealPage et al.</u>) with respect to the monopolization and attempted monopolization claims against RealPage;

v.   Greystar must adopt a written antitrust compliance policy and designate a chief antitrust compliance officer who will train Greystar employees on the policy;

vi.  Greystar must allow the United States to inspect its documents and to interview its employees to ensure compliance with the Final Judgment;

vii. If Greystar uses a revenue management product, Greystar will be subject to a monitor unless Greystar obtains a certification that meets certain requirements, including affirming, among other things, that the product complies with all required limitations regarding use of competitors'

5

competitively sensitive data in its runtime operation or model training; and

viii. Greystar will also be subject to a monitor if the Court finds that Greystar has violated the terms of the proposed Final Judgment.

Under the terms of the Stipulation and Order, Greystar must abide by and comply with the provisions of the proposed Final Judgment until it is entered by the Court or until the time for all appeals of any Court ruling declining entry of the proposed Final Judgment has expired.

The United States and Greystar have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the APPA. Entry of the proposed Final Judgment will terminate this action with respect to Greystar, except that the Court will retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof by Greystar.

## II. DESCRIPTION OF EVENTS GIVING RISE TO THE ALLEGED SHERMAN ACT VIOLATIONS

Greystar has been a user of commercial revenue management and property management products that RealPage licenses to landlords, and it has used RealPage's revenue management software to help set rental prices for the properties it manages and/or owns. RealPage currently licenses three revenue

6

management products, including AIRM, to landlords. AIRM, which Greystar uses, leverages confidential, competitively sensitive data collected from competing landlords as a critical input to generate price recommendations for competing landlords. This data includes rental applications, executed new leases, renewal offers and acceptances, and occupancy estimates and projections. The data is pulled from property management software, such as RealPage's OneSite product, that Greystar and other landlords use to collect and track rental payments, manage leases, property maintenance, accounting, and other property management functions.

When deciding where to live, renters often visit numerous properties that are owned and managed by competing landlords so that they can compare rental offerings and select their best housing option considering price and other terms. When competing landlords do not have access to each other's nonpublic data, or recommendations informed by competitors' nonpublic data, they are more likely to act independently and compete more vigorously on price and better leasing terms to secure new leases and renewals from renters. RealPage, however, provides landlords who use its revenue management products with pricing recommendations and pricing based on competitors' competitively sensitive data. Widespread adoption and use of RealPage's revenue management products leads to pricing decisions by competing landlords such

7

as Greystar that are based on recommendations coming from a common pricing model and powered by competitively sensitive, nonpublic data, harming the ability of renters to obtain a competitive price for their housing. The use of competitors' competitively sensitive data in this manner thus harms renters as well as the competitive process itself.

Greystar, headquartered in Charleston, South Carolina, is one of the largest apartment managers in the United States. As of 2025, Greystar managed approximately 950,000 in the United States. As an apartment manager, Greystar makes strategic and competitive decisions for the apartments it manages, including determination of new lease and renewal terms, such as rental price. Greystar licenses AIRM from RealPage. Per the licensing agreement, Greystar relies on AIRM to recommend rental prices for its units, which is informed by competitively sensitive data provided by Greystar's competitors. Greystar also provides its competitively sensitive data to RealPage, to be used to inform the rental prices that RealPage's software recommends to Greystar's competitors. Further, Greystar has agreed with RealPage to use AIRM pricing software as RealPage designed it. It reviews AIRM floor plan price recommendations daily and uses the software to set scheduled floor plan rents and even unit-level prices.

8

In summary, the Complaint alleges that Greystar unlawfully shared its competitively sensitive information for use in pricing by competing landlords that also license RealPage's software, and that Greystar agreed to align its pricing with that of its competitors by using RealPage's software in the way the software was designed and with the data it uses. Greystar uses RealPage's revenue management products to inform its setting of rental prices and discounts—such as concessions of a free month of rent—and to make other competitive and strategic decisions relating to rental prices and terms.

## III. EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The relief required by the proposed Final Judgment will remedy the loss of competition in the conventional multifamily rental housing market[1] alleged in the Complaint by precluding Greystar from sharing competitively sensitive, nonpublic information, directly or indirectly, with competing landlords and from forming agreements, directly or indirectly, to align prices with its competitors. The terms described below are designed to ensure that Greystar ends its anticompetitive conduct and to prevent Greystar from engaging in the same or

---

[1] As stated in the Complaint, the conventional multifamily rental housing market includes apartments available to the general public in properties that have five or more living units. It does not include student housing, affordable housing, age-restricted or senior housing, or military housing. (Am. Compl. ¶ 183).

similar conduct in the future.

**A. Greystar's Use of Revenue Management Products**

The proposed Final Judgment imposes requirements on Greystar related to the type of data in any revenue management product Greystar licenses or uses. Paragraph IV.A.1 of the proposed Final Judgment requires Greystar to select a software that does not (1) use competitively sensitive data from different property managers, unless from the same property owner of the subject property, to set rental prices or generate rental pricing recommendations, (2) use data from different property owners to set rental prices or generate rental pricing recommendations, (3) disclose data from a Greystar property to a rival landlord or property owner, (4) pool or combine data from different property owners, or (5) contain or use a pricing algorithm that has been trained using nonpublic data from different property owners.

The restrictions regarding the use of competitively sensitive data from other landlords and different Greystar property owners require Greystar and each client Greystar serves (whether it be a property manager or property owner) to individually use their own data to make pricing decisions for conventional multifamily rental housing units. The restriction is designed to restore the competitive pressure among landlords.

10

The prohibition against pooling data from different owners prohibits property owners who compete in the conventional multifamily rental housing industry from using their relationship with Greystar to gain access to each other's data.

Additionally, the proposed Final Judgment prohibits Greystar from licensing or using a revenue management product in which the software's model has been trained using data from different owners. A model is a set of rules or instructions that software relies on to calculate a defined output which, in this case, is a recommended rental price for a floorplan or unit. Models are trained using data to define and refine the rules or instructions by which it operates. The restriction on pooling competitors' data thus also prohibits Greystar from training its software models using pricing and occupancy data from competing property owners, therefore reducing concerns about competitors benefiting from using each other's competitively sensitive data to plan their pricing.

If Greystar decides to use a commercially available revenue management product, Paragraph V.A.2 also prohibits Greystar from selecting and using a revenue management product that sets rental floors or limits rental pricing recommendation decreases based on competing properties' rental prices.

The proposed Final Judgment includes an additional restriction on Greystar's ability to make agreements with non-

11

clients regarding revenue management products. Specifically, Paragraph IV.A.3 prohibits Greystar from agreeing with a non-client property owner or a competing landlord to use a particular revenue management product. This provision reduces the risk of competitors agreeing with each other to use the same revenue management product across their clients.

In the event that the United States and RealPage, Inc. enter into a consent decree in this matter, and such consent decree permits RealPage to offer a Revenue Management Product, Paragraph IV.D allows Greystar to license or use such product.

### B. Other Prohibited Conduct

In addition to restrictions and conditions on Greystar's use of revenue management products, the proposed Final Judgment also limits Greystar's ability to communicate with competitors regarding certain competitively sensitive information for the purpose of setting prices. Paragraph V.A prohibits Greystar from disclosing, soliciting, or using any competitively sensitive data from competitors as part of setting rental prices or generating rental price recommendations except for the property owner of a particular Greystar property. Paragraph V.A clarifies that the restrictions include any data obtained through any form of communication, including call arounds or market surveys, meetings, calls, text messages, emails, or shared documents.

In addition, the proposed Final Judgment prohibits Greystar from attending or participating in RealPage meetings, which include steering committees, RealPage subcommittees, RealPage user groups, and RealPage Idea Exchange. Paragraph V.B. provides that if Greystar attends a RealPage meeting, it must notify the United States within 30 days and provide a description of the content and any documents shown during the meeting. Additionally, Greystar must produce to the United States any chats or documents associated with the meeting.

Paragraph V.C prevents Greystar from using any competitively sensitive data belonging to other landlords, whether Greystar derived that non-Greystar data from a revenue management product or obtained it from direct communications with other landlords. Greystar must also identify to the United States the existence and location of any such data. This does not apply to any data for Greystar properties maintained in OneSite.

### C. Cooperation

Under the terms of the proposed Final Judgment, and subject to reaching settlement with certain States, Greystar must cooperate with the United States relating to the United States' monopolization and attempted monopolization claims against RealPage, as described above and included in the Complaint. This required cooperation includes voluntary interviews with at least

13

10 employees for up to 40 hours. In addition, Greystar must provide cooperation to the United States related to all claims alleged in United States et al. v. RealPage et al., including by making witnesses available before trial, providing testimony, proffering evidence, and producing documents and other information.

### D. Compliance Terms

Pursuant to Paragraph IX.A, Greystar must provide the United States with access to Greystar's books, records, data, and documents, including communications with other property managers, to enable the United States to assess Greystar's compliance with the terms of the Final Judgment. Greystar must also permit the United States to interview Greystar's officers, employees, or agents relating to any matters contained in this Final Judgment. Paragraph IX.C provides that if Greystar elects to use a proprietary revenue management product, Greystar must also provide the United States with documents describing how Greystar's proprietary software is trained and how it determines prices for properties it manages, as well as changes to these processes. Greystar must also allow the United States to inspect Greystar's software code and pseudocode of that software for independent verification.

Additionally, Paragraph VI.B requires Greystar's chief antitrust officer to implement and enforce Greystar's antitrust

compliance policy and annual training. Paragraph VI.C requires
Greystar to submit an annual certification from its General
Counsel that Greystar has established and maintained this annual
antitrust compliance policy and training, that vendors of the
revenue management products Greystar licenses or uses have
provided certifications that the product satisfies the
requirements in the proposed Final Judgment, and that Greystar
has complied with the requirements in Paragraph VI.A to not
disclose, solicit, or share competitively sensitive data.
Finally, Greystar must provide a report to the United States
that identifies each Greystar property that uses a commercially
available revenue management product. The report must further
identify who is responsible for setting prices for each Greystar
property and whether Greystar provides revenue management
services for that property.

**E. Appointment of a Monitor**

The proposal Final Judgment requires that Greystar be
subject to an appointed compliance monitor in certain
circumstances.

First, Paragraph VIII.B requires that a monitor be
appointed if a Court determines that Greystar has violated the
proposed Final Judgment.

In addition, Paragraph IV.C requires Greystar to notify the
United States if it chooses to license or use any commercially

available revenue management product at any of its properties.
In that circumstance, Paragraph VIII.B requires that Greystar be
subject to a monitor unless Greystar obtains a certification for
such product, as required by Paragraph IV.E: (a) for a non-
RealPage revenue management product, the product's vendor must
certify that the product does not use competitors' competitively
sensitive data to determine rental prices and satisfies other
software requirements; (b) for a RealPage revenue management
product, a monitor appointed pursuant to other terms of the
proposed Final Judgment must certify that the product complies
with the proposed Final Judgment's requirements.

In the event a monitor is appointed, the monitor will
assess Greystar's compliance with the Final Judgment, in
particular, its use of a revenue management product and
communications with other landlords. Paragraph VIII.F provides
the monitor with authority to investigate Greystar's compliance
with the Final Judgment, including by selecting up to 15
Greystar employees to interview and giving the monitor access to
review their files. Further, per Paragraph VIII.D, the monitor
will have the authority to take steps necessary to ensure
compliance with the Final Judgment. These steps may include
interviewing Greystar employees and collecting Greystar
documents. The monitor will also provide an annual report to the

16

United States setting forth Greystar's efforts to comply with its obligations under the Final Judgment.

If appointed, the monitor will serve at Greystar's expense, on such terms and conditions as the United States approves in its sole discretion. Greystar will be required to assist the compliance monitor in fulfilling his or her obligations. The monitor will serve for the remainder of the term of the Final Judgment or until Greystar obtains a certification, as described above.

### F. Other Provisions

The proposed Final Judgment also contains provisions designed to promote compliance with and make enforcement of the Final Judgment more effective. Paragraph XII.A provides that the United States retains and reserves all rights to enforce the Final Judgment, including the right to seek an order of contempt from the Court. Under the terms of this paragraph, Greystar has agreed that in any civil contempt action, any motion to show cause, or any similar action brought by the United States regarding an alleged violation of the Final Judgment, the United States may establish the violation and the appropriateness of any remedy by a preponderance of the evidence and that Greystar has waived any argument that a different standard of proof should apply. This provision aligns the standard for compliance

17

with the Final Judgment with the standard of proof that applies to the underlying offense addressed by the Final Judgment.

Paragraph XII.B provides additional clarification regarding the interpretation of the provisions of the proposed Final Judgment. Pursuant to Paragraph XII.B of the proposed Final Judgment, Greystar agrees that it will abide by the proposed Final Judgment and that it may be held in contempt of the Court for failing to comply with any provision of the proposed Final Judgment that is stated specifically and in reasonable detail, as interpreted in light of its procompetitive purpose.

Paragraph XII.C provides that if the Court finds in an enforcement proceeding that Greystar has violated the Final Judgment, the United States may apply to the Court for an extension of the Final Judgment, together with such other relief as may be appropriate. In addition, to compensate American taxpayers for any costs associated with investigating and enforcing violations of the Final Judgment, Paragraph XII.C provides that in any successful effort by the United States to enforce the Final Judgment against Greystar, whether litigated or resolved before litigation, Greystar must reimburse the United States for attorneys' fees, experts' fees, and other costs incurred in connection with that effort to enforce this Final Judgment, including the investigation of the potential violation.

Paragraph XII.D of the proposed Final Judgment states that the United States may file an action against Greystar for violating the Final Judgment for up to four years after the Final Judgment has expired or been terminated. This provision is meant to address circumstances such as when evidence that a violation of the Final Judgment occurred during the term of the Final Judgment is not discovered until after the Final Judgment has expired or been terminated, or when there is not sufficient time for the United States to complete an investigation of an alleged violation until after the Final Judgment has expired or been terminated. This provision therefore makes clear that, for four years after the Final Judgment has expired or been terminated, the United States may still challenge a violation that occurred during the term of the Final Judgment.

Finally, Section XIII of the proposed Final Judgment provides that the Final Judgment will expire five years from the date of its entry, except that after two years from that date, the Final Judgment may be terminated upon notice by the United States to the Court and to Greystar that continuation of the Final Judgment is no longer necessary or in the public interest.

## IV. REMEDIES AVAILABLE TO POTENTIAL PRIVATE PLAINTIFFS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court

19

to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment neither impairs nor assists the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against Greystar.

## V.    PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and Greystar have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least 60 days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within 60 days of the date of publication of this Competitive Impact Statement in the <u>Federal Register</u>, or within 60 days of the first date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be

considered by the U.S. Department of Justice, which remains free
to withdraw its consent to the proposed Final Judgment at any
time before the Court's entry of the Final Judgment. The
comments and the responses of the United States will be filed
with the Court. In addition, the comments and the United States'
responses will be published in the <u>Federal Register</u> unless the
Court agrees that the United States instead may publish them on
the U.S. Department of Justice, Antitrust Division's internet
website.

     Written comments should be submitted in English to:

          Danielle Hauck
          Acting Chief, Technology and Digital Platforms Section
          Antitrust Division
          United States Department of Justice
          450 Fifth St. NW, Suite 7100
          Washington, DC 20530

     The proposed Final Judgment provides that the Court retains
jurisdiction over this action, and the parties may apply to the
Court for any order necessary or appropriate for the
modification, interpretation, or enforcement of the Final
Judgment.

## VI. ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

     As an alternative to the proposed Final Judgment, the
United States considered a full trial on the merits against
Greystar. The United States could have continued its litigation
against Greystar and brought the case to trial, seeking relief

including an injunction against Greystar's sharing of its competitively sensitive, nonpublic data with RealPage and other landlords, an injunction against Greystar using AIRM, YieldStar, or similar products that use competing properties' nonpublic data to recommend prices, and an injunction preventing any communication with competitors that leads to alignment of prices. Under the circumstances present here, however, the United States concludes that entry of the proposed Final Judgment is in the public interest insofar as it avoids the time, expense, and uncertainty of a full trial on the merits.

## VII. STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

Under the Clayton Act and APPA, proposed Final Judgments, or "consent decrees," in antitrust cases brought by the United States are subject to a 60-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the Court, in accordance with the statute as amended in 2004, is required to consider:

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

22

>   (B) the impact of entry of such judgment upon
>   competition in the relevant market or markets, upon
>   the public generally and individuals alleging specific
>   injury from the violations set forth in the complaint
>   including consideration of the public benefit, if any,
>   to be derived from a determination of the issues at
>   trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the Court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." United States v. Microsoft Corp., 56 F.3d 1448, 1461 (D.C. Cir. 1995); United States v. U.S. Airways Grp., Inc., 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (explaining that the "court's inquiry is limited" in Tunney Act settlements); United States v. InBev N.V./S.A., No. 08-1965 (JR), 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that a court's review of a proposed Final Judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanisms to enforce the final judgment are clear and manageable"); United States v. Charleston Area Med. Ctr., Inc., No. CV 2:16-3664, 2016 WL 6156172, at *2 (S.D.W. Va. Oct. 21, 2016) (explaining that in evaluating whether the proposed final judgment is in the public interest, the inquiry is "a narrow one."); United States v. Mountain Health Care, 1:02-CV-288-T, 2003 WL 22359598, at *7 (W.D.N.C.

23

2003) ("[W]ith respect to the adequacy of the relief secured by the decree, a court may not 'engage in an unrestricted evaluation of what relief would best serve the public.'") *citing* United Sates v. BSN, 858 F.2d 456, 462-63 (9th Cir. 1988)).

As the U.S. Court of Appeals for the D.C. Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations in the government's Complaint, whether the proposed Final Judgment is sufficiently clear, whether its enforcement mechanisms are sufficient, and whether it may positively harm third parties. See Microsoft, 56 F.3d at 1458-62; United States v. Math Works, No. 02-888-A, 2003 WL 1922140, *17 (E.D. Va. 2003). With respect to the adequacy of the relief secured by the proposed Final Judgment, a court may not "make de novo determination of facts and issues." United States v. W. Elec. Co., 993 F.2d 1572, 1577 (D.C. Cir. 1993) (quotation marks omitted); see also Microsoft, 56 F.3d at 1460-62; United States v. Alcoa, Inc., 152 F. Supp. 2d 37, 40 (D.D.C. 2001); United States v. Enova Corp., 107 F. Supp. 2d 10, 16 (D.D.C. 2000); InBev, 2009 U.S. Dist. LEXIS 84787, at *3. Instead, "[t]he balancing of competing social and political interests affected by a proposed antitrust decree must be left, in the first instance, to the discretion of the Attorney General." W. Elec. Co., 993 F.2d at 1577 (quotation marks omitted). "The court

24

should also bear in mind the *flexibility* of the public interest inquiry: the court's function is not to determine whether the resulting array of rights and liabilities is the one that will *best* serve society, but only to confirm that the resulting settlement is within the *reaches* of the public interest." Microsoft, 56 F.3d at 1460 (quotation marks omitted); see also United States v. Deutsche Telekom AG, No. 19-2232 (TJK), 2020 WL 1873555, at *7 (D.D.C. Apr. 14, 2020); Math Works, 2003 WL 1922140 at *18; Mountain Health Care, 2003 WL 22359598, at *7. More demanding requirements would "have enormous practical consequences for the government's ability to negotiate future settlements," contrary to congressional intent. Microsoft, 56 F.3d at 1456. "The Tunney Act was not intended to create a disincentive to the use of the consent decree." Id.

The United States' predictions about the efficacy of the remedy are to be afforded deference by the Court. See, e.g., Microsoft, 56 F.3d at 1461 (recognizing courts should give "due respect to the Justice Department's . . . view of the nature of its case"); United States v. Iron Mountain, Inc., 217 F. Supp. 3d 146, 152-53 (D.D.C. 2016) ("In evaluating objections to settlement agreements under the Tunney Act, a court must be mindful that [t]he government need not prove that the settlements will perfectly remedy the alleged antitrust harms[;] it need only provide a factual basis for concluding that the

25

settlements are reasonably adequate remedies for the alleged harms." (internal citations omitted)); United States v. Republic Servs., Inc., 723 F. Supp. 2d 157, 160 (D.D.C. 2010) (noting "the deferential review to which the government's proposed remedy is accorded"); United States v. Archer-Daniels-Midland Co., 272 F. Supp. 2d 1, 6 (D.D.C. 2003) ("A district court must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case."). The ultimate question is whether "the remedies [obtained by the Final Judgment are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'" Microsoft, 56 F.3d at 1461 (quoting W. Elec. Co., 900 F.2d at 309).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." Microsoft, 56 F.3d at 1459; see also U.S. Airways, 38 F. Supp. 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); InBev, 2009 U.S. Dist. LEXIS 84787, at *20 ("[T]he 'public

26

interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged"); Math Works, 2003 WL 1922140 at *18; Mountain Health Care 2003 WL 22359598, at *8. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. Microsoft, 56 F.3d at 1459–60.

In its 2004 amendments to the APPA, Congress made clear its intent to preserve the practical benefits of using judgments proposed by the United States in antitrust enforcement, Pub. L. 108-237 § 221, and added the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); see also U.S. Airways, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). This language explicitly wrote into the statute what Congress intended when it first enacted the Tunney Act in 1974. As Senator Tunney explained: "[t]he court is nowhere compelled to

27

go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). "A court can make its public interest determination based on the competitive impact statement and response to public comments alone." U.S. Airways, 38 F. Supp. 3d at 76 (citing Enova Corp., 107 F. Supp. 2d at 17).

//

## VIII. DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated: August 25, 2025

Respectfully submitted,

FOR PLAINTIFF
UNITED STATES OF AMERICA:


/s/ Henry C. Su
Henry C. Su
David A. Geiger
Danielle G. Hauck
John J. Hogan
Kris A. Perez Hicks

Attorneys
United States Department of Justice
Antitrust Division
Technology and Digital Platforms Section
450 Fifth St. NW, Suite 7100
Washington DC 20530
Telephone: (202) 307-6200
Email: henry.su@usdoj.gov