# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA,

        *Plaintiff*,

        v.

REALPAGE, INC.,

        *Defendant*.

**No. 1:24-cv-00710-WLO-JLW**

## COMPETITIVE IMPACT STATEMENT

The United States has obtained a settlement with RealPage that protects American renters by prohibiting the use of competitively sensitive information in RealPage's software to set rental prices, and by ending anticompetitive practices to align pricing among competing landlords. In accordance with the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) (the "APPA" or "Tunney Act"), the United States files this Competitive Impact Statement related to the proposed Final Judgment as to Defendant RealPage, which has been filed in this civil antitrust proceeding (ECF No. 159-1).

## I.  NATURE AND PURPOSE OF THE PROCEEDING

On August 23, 2024, the United States, along with co-plaintiff States, filed a civil antitrust Complaint (the "Complaint") against RealPage, Inc. ("RealPage"). On January 7, 2025, the United States and its co-plaintiff States amended the

Complaint to add six property management companies as Defendants.

RealPage licenses three revenue management products to property management companies and property owners (collectively, "landlords"). These software products are AI Revenue Management ("AIRM"), YieldStar, and Lease Rent Options ("LRO"). RealPage's revenue management products are used by landlords to determine how to price floor plans and units in conventional multifamily rental housing, i.e., multiunit apartments that they manage and lease.[1]

The Complaint alleges that RealPage, along with six landlords, violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by unlawfully agreeing to share and use competitively sensitive information for the properties that each landlord manages and leases. RealPage uses nonpublic, competitively sensitive data to train its algorithmic models ("models") that AIRM leverages, and to provide floor plan price recommendations and unit-level pricing to landlords when they are running AIRM or YieldStar. The sharing and use of nonpublic, competitively sensitive information harms or is likely to harm the competitive process,

---

[1]    As stated in the Complaint, the conventional multifamily rental housing market includes apartments available to the general public for lease in properties that have five or more living units. It does not include student housing, affordable housing, age-restricted or senior housing, or military housing. (Am. Compl. ¶ 183).

2

renters, and prospective renters.

The Complaint further alleges that RealPage and the landlords that use AIRM and YieldStar violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by unlawfully agreeing to use RealPage's software to align pricing among competing landlords. RealPage entered into individual agreements with landlords to use AIRM or YieldStar. By agreeing to use AIRM or YieldStar as it has been designed by RealPage, competing landlords align their pricing processes, strategies, and pricing responses, e.g., how they go about setting rents, pricing amenities, and managing occupancy levels in local rental markets. As alleged in the Complaint, both RealPage and landlords knew that the software was designed to align pricing. They used the phrase "a rising tide rises [sic] all ships" to explain that AIRM and YieldStar would move prices in a "similar manner" to how the top and bottom of the market moved. See Am. Compl. ¶33. Collectively, these agreements harm the competitive process and actual and prospective renters.

Finally, the Complaint alleges that RealPage violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by monopolizing or attempting to monopolize the commercial revenue management software market for conventional multifamily rental housing. Through its licensing agreements with landlords that use its software products, RealPage has amassed a massive reservoir of

3

competitively sensitive data from competing landlords. RealPage has ensured that other providers of revenue management products cannot compete on the merits unless they enter into similar agreements with landlords, thereby obstructing them from competing with products that do not harm the competitive process.

On November 24, 2025, the United States filed a proposed Final Judgment and a Stipulation and Order ("Stipulation and Order") (ECF Nos. 159 & 159-1), which are designed to remedy the loss of competition alleged in the Complaint due to RealPage's conduct.

The proposed Final Judgment, which is explained more fully below, imposes a number of requirements and restrictions on RealPage that address the United States' concerns regarding RealPage's anticompetitive conduct alleged in the Complaint.

First, the proposed Final Judgment imposes restrictions on how RealPage can use competitively sensitive data from landlords. The proposed Final Judgment identifies two discrete phases of how RealPage's revenue management products operate: runtime operation and model training. Runtime operation is a landlord's use of the software to provide pricing recommendations and prices for the specific floor plans and units in a particular rental property. Model training is any process of analyzing data to create a model or algorithm,

4

including the models that RealPage uses to predict supply and demand, which is then used in the runtime operation. Subject to limited exceptions, RealPage will not be allowed to use nonpublic data from competing properties in runtime operation. In training the models, RealPage will be limited to using backward-looking data that has been aged at least 12 months and is not from active leases, i.e., a unit with a rental agreement that is in effect.

Second, the proposed Final Judgement restricts RealPage's ability to source and share nonpublic information between landlords. The proposed Final Judgement imposes significant limitations on RealPage's ability to use, share, publish, disclose or provide competitors' nonpublic data to a landlord, including through RealPage's revenue management products or its pricing advisors. Relatedly, RealPage must not conduct any market surveys, the collection of potentially competitively sensitive nonpublic data through call arounds, emails, or other methods, for use in its revenue management products or to recommend a rental price or occupancy level during the term of the proposed Final Judgment. Finally, RealPage must not discuss or facilitate discussions among landlords about market analyses or trends based on nonpublic data, or about pricing strategies.

Third, the proposed Final Judgement limits RealPage's ability to use models trained using nonpublic, competitively

5

sensitive information to determine price and supply below a certain geographic level. RealPage may not train AI Demand, AI Supply I, and AI Supply II with a geographic variable narrower than a state. RealPage may not use nonpublic, competitively sensitive data to train any future models with a geographic variable narrower than the nation.

Fourth, RealPage must modify or ensure that certain software features are designed to address the allegations in the Complaint. For example, RealPage may not prohibit or impede a landlord's ability to reject or override a recommended price. Similarly, any software feature that automatically accepts recommended prices must require that a landlord individually sets the parameters regarding that acceptance. Any limit on price increases and decreases must be symmetrical, and a landlord must individually determine the limits.

Fifth, RealPage must adopt and comply with a series of compliance measures. A monitor will be appointed for a term of three years, which the United States may extend by up to 18 months if it deems appropriate. RealPage will also adopt a written antitrust compliance policy and train its employees on the policy. RealPage must allow the United States to inspect its documents and to interview its employees to ensure compliance with the Final Judgment.

Finally, RealPage must provide cooperation to the United

States in this civil proceeding (United States et al. v. RealPage et al.) with respect to the United States' Section 1 claims against the remaining landlord defendants.

Under the terms of the Stipulation and Order, RealPage must abide by and comply with the provisions of the proposed Final Judgment until it is entered by the Court or until the time for all appeals of any Court ruling declining entry of the proposed Final Judgment has expired.

The United States and RealPage have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the APPA. Entry of the proposed Final Judgment will terminate this action with respect to RealPage, except that the Court will retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof by RealPage.

## II. DESCRIPTION OF EVENTS GIVING RISE TO THE ALLEGED SHERMAN ACT VIOLATIONS

RealPage, headquartered in Richardson, Texas, is the largest provider of commercial revenue management software for conventional multifamily rental housing in the United States. Currently, RealPage offers three revenue management products: AIRM, YieldStar, and LRO. RealPage's software calculates a recommended rental price for floor plans and a rental price for units for landlords across the United States.

RealPage provides landlords who use its revenue management products with pricing recommendations and pricing based on competitors' competitively sensitive data. When they are running, AIRM and YieldStar leverage confidential, competitively sensitive data collected from landlords as critical inputs to generate price recommendations for competing landlords. These data include rental applications, executed new leases, renewal offers and acceptances, and occupancy estimates and projections. The data are pulled from property management software, such as RealPage's OneSite product, that landlords use to collect and track rental payments, manage leases, track property maintenance requests, perform accounting functions, and perform other property management functions. By contrast, LRO relies on data that a landlord manually inputs into the software. The sensitive nature of this information may vary by user. The data inputted by a licensee or user into LRO could potentially be—and has historically included—nonpublic, competitively sensitive information.

Widespread adoption and use of RealPage's revenue management products lead to pricing decisions by competing landlords that are based on recommendations coming from a common pricing model that is powered by competitively sensitive, nonpublic data, which harms the ability of renters to obtain a competitive price for their housing. The use of competitors'

competitively sensitive data in this manner harms current and prospective renters as well as the competitive process itself.

AIRM and YieldStar, additionally, incorporate certain product features that, as alleged in the Complaint, align pricing of competing landlord users. For example, AIRM and YieldStar incorporate special rules, called "guardrails," that override the ordinary functioning of the model in ways that tend to push rival landlords' rental prices higher than would occur in a competitive market.

In addition to information sharing that occurs through the running of the software, the Complaint alleges that competitively sensitive information was shared during RealPage revenue management software meetings ("RealPage RMS meetings") attended by competing landlord users of AIRM and YieldStar. During these meetings, competing landlords discussed pricing strategies and market trends based on nonpublic, competitively sensitive data.

In summary, the Complaint alleges that RealPage unlawfully used nonpublic, competitively sensitive information in software for pricing competitors' rental units; that RealPage designed its software to align pricing between competitors; and that by unlawfully using nonpublic, competitively sensitive information, RealPage has also unlawfully monopolized the commercial revenue

Case 1:24-cv-00710-WO-JLW    Document 160    Filed 11/24/25    Page 9 of 35

management software market for conventional multifamily rental housing.

**III. EXPLANATION OF THE PROPOSED FINAL JUDGMENT**

The relief required by the proposed Final Judgment is designed to remedy the loss of competition in the conventional multifamily rental housing markets alleged in the Complaint by significantly limiting RealPage from sharing competitively sensitive, nonpublic information, directly or indirectly, with competing landlords, and from offering software features that would align pricing between competing landlords. Additionally, the proposed Final Judgment is designed to remedy the loss of competition in the commercial revenue management software market for conventional multifamily rental housing by enabling competing revenue management software that does not illegally use confidential, competitively sensitive data to more effectively compete against RealPage's software. The terms described below are designed to ensure that RealPage ends its anticompetitive conduct and prevent RealPage from engaging in the same or similar conduct in the future.

**A. PROHIBITIONS REGARDING NONPUBLIC DATA**

The proposed Final Judgment imposes restrictions on how RealPage uses nonpublic data in its revenue management software during runtime operation and in model training. Determining the appropriate parameters for the use of nonpublic data requires an

10

industry- and fact-specific analysis. The agreed-upon terms in this settlement are guided by the specific facts and claims at issue here, including: (1) the specific characteristics of and competitive dynamics in the conventional multifamily rental housing industry; (2) how the data are used in the industry and the applicable software; and (3) the principle that firms should not make pricing decisions using insight drawn from their competitors' nonpublic, competitively sensitive data.

### 1. PROHIBITIONS REGARDING USE OF NONPUBLIC DATA IN RUNTIME OPERATION

Paragraph IV.A.1 generally prohibits RealPage from using competing landlords' data in the runtime operation of its revenue management software. Runtime operation refers to the process by which the software generates a recommended price for a floor plan or a unit-level price in a particular multifamily rental property. In other words, this is the execution of a model, including the application of a model to property-specific data, to generate a pricing recommendation. Runtime operation does not include the training of an underlying model. This Paragraph ensures that the software's floor plan price recommendation or unit-level price, as determined during the runtime operation, is solely based on a property owner's own nonpublic data or data available to the general public. The prohibition will help to restore competition between landlords.

11

Paragraph IV.B generally prohibits RealPage from sharing, publishing, disclosing, or otherwise providing or making accessible any nonpublic, competitively sensitive data in its revenue management products, including in their runtime operations. This Paragraph covers not only other landlords' data shared with RealPage but also any data from a competing property that a landlord might have obtained and entered in the software from a source other than RealPage. Relatedly, Paragraph IV.A.2 requires RealPage to notify landlords that RealPage is not seeking nonpublic, competitively sensitive information from competing properties.

Paragraph IV.C also limits RealPage's use of surrogate data or synthetic curves. Surrogate data refers to data used when a property does not have at least two years of its own transactional history or enough units within a given floor plan to run RealPage's software. Synthetic curves are demand or supply curves created by RealPage without the use of transactional data or nonpublic data of any kind. Surrogate data and synthetic curves are used to construct market response curves—analogous to market demand curves—when a property does not have enough of its own property data. The restrictions in Paragraph IV.C prevent competing properties with different owners from using the same surrogate data or curves to determine

12

prices and thereby prevent a meaningful means of pricing alignment.

The proposed Final Judgment allows for two exceptions to the prohibition of using data from other landlords in the runtime operations of RealPage's revenue management products. First, Paragraph IV.C allows RealPage to use nonpublic data from a property with a different owner as surrogate data only if: (1) a subject property does not have at least two years of its own transactional data and (2) the subject property owner does not have two years' worth of comparable data from a different property it owns. If these conditions are met, RealPage may supplement a floor plan's history with comparable surrogate data from a property with a different owner but only if that property is in a different Core-Based Statistical Area ("CBSA").[2] RealPage may not use the same surrogate data for properties with different owners in the same CBSA. This narrow exception is designed to avoid any anticompetitive effect from competing properties using the same nonpublic data while allowing smaller or less established property owners to use RealPage's revenue management software and borrow surrogate data from properties in a different CBSA.

---

[2] One way that the Complaint defines local rental markets is in terms of "Core-Based Statistical Areas" as used by the federal Office of Management and Budget. (Am. Compl. ¶¶ 212-218, 278).

Paragraph IV.E provides a second exception to RealPage's use of nonpublic data in its runtime operation: data collected through market surveys that were conducted before September 30, 2024. A market survey is a practice whereby RealPage and landlords, through call arounds, emails or other methods, collect potentially competitively sensitive, nonpublic data from competing landlords to use in the software's runtime operation for competing properties. Under Paragraph IV.D, RealPage agrees not to conduct any new market surveys during the duration of the Final Judgment. Before September 30, 2024, RealPage's software used data collected through market surveys to determine a floor plan's market position. The Final Judgment permits limited use of the pre-September 30, 2024, aged, nonpublic data to minimize disruption to the operation of certain aspects of the software that do not pose threats to competition.

The prohibitions in the proposed Final Judgment and described above are designed to ensure that, going forward, use of RealPage's revenue management products will not constrain independent decision making or reduce competition in the conventional multifamily rental housing industry.

## 2. PROHIBITIONS REGARDING USE OF NONPUBLIC DATA IN MODEL TRAINING

Paragraphs IV.A.3-6 set forth restrictions and obligations on what nonpublic data RealPage may use in training its models

for revenue management products. Model training is any process of analyzing data, including by machine learning or regression analysis, to create or adjust a model or algorithm to improve the accuracy of the model's or algorithm's predictions. Models are trained using data to define and refine the rules or instructions by which they operate. The proposed Final Judgment permits limited use of nonpublic, property-specific data in model training.

RealPage relies on three models in AIRM: AI Demand, AI Supply I, and AI Supply II. AI Demand predicts the likelihood that a prospective tenant will apply for a unit at a specific property. The AI Supply models predict the likelihood that an expiring lease will be renewed rather than terminated. AI Supply I predicts the likelihood of renewal before a renewal rent offer has been approved by the landlord, while AI Supply II predicts the likelihood of renewal using an approved renewal rent offer. Each of RealPage's models is one of multiple inputs used to determine, during runtime operation, the supply and demand at a particular property.

Paragraph IV.A.3 prohibits RealPage from using current, forward-looking, or historical nonpublic data in training its revenue management software models, unless the data are at least 12 months old and not from active leases. According to the U.S. Bureau of Labor Statistics, 12 months is the most common lease

Case 1:24-cv-00710-WO-JLW    Document 160    Filed 11/24/25    Page 15 of 35

length with only about 7% of leases being over 12-months.[3] Aging the data for at least 16 months will exclude virtually all active leases to be used in training the model. Working from this premise, under the proposed Final Judgment lease data that has been aged at least 16 months will not be deemed data from an active lease.

The combination of these requirements prevents RealPage from using current, forward-looking, or certain historical nonpublic data in training the models, minimizing any competitive concerns related to the use of this nonpublic information to determine how the models are trained.

Paragraph IV.A.4 of the proposed Final Judgment restricts RealPage from using rental price data in training its model, including a prohibition on using nonpublic data to calculate a market rent or market rank (i.e., the property's relative position to its competitors based on average rent). There is one exception that allows RealPage to use rental prices, subject to these requirements described above, in training its AI Supply II model. The AI Supply II model predicts the likelihood of renewal of an expiring lease at a particular property after a renewal offer has been approved by the landlord. It relies on rent

---

[3] U.S. Bureau of Labor Statistics, <u>Spotlight on Statistics: Housing Leases in the U.S. Rental Market</u> (September 2022), <u>https://www.bls.gov/spotlight/2022/housing-leases-in-the-u-s-rental-market/home.htm.</u>

renewal offers (i.e., rental prices), which are nonpublic by nature.

Paragraph IV.A.5 prohibits RealPage's current or future models from being used in a manner that restricts or filters nonpublic data by geography or that can identify geographic effects that are narrower than nationwide. This will limit RealPage's ability to create new regional, state-wide, or local models by using geographic variables narrower than nationwide. The proposed Final Judgment permits RealPage to continue using state and regional variables in training its current models: AI Demand, AI Supply I, and AI Supply II. Because of the nature of these three models and because states tend to be larger than the largest local market (CBSAs) alleged in the Complaint, the United States determined that anticompetitive conduct in the alleged local markets due to this exception is not likely.

Paragraph IV.A.6 requires RealPage to retrain its models, should it be necessary, in accordance with the restrictions described above.

### B. PROHIBITIONS REGARDING REVENUE MANAGEMENT SOFTWARE FEATURES

The Complaint alleges that some of RealPage's revenue management software features align pricing between competing landlords. Paragraphs V.A–C are designed to address alignment of

17

pricing through use of common nonpublic data or through software design.

Paragraphs V.A-C require RealPage to refrain from implementing existing product features in its revenue management products unless certain conditions are met. Paragraph V.D bars RealPage from implementing in the future any feature that relies on competing landlords' data.

Paragraph V.A.1 requires any auto-accept feature in a RealPage revenue management product (a feature that allows recommended prices to be automatically implemented) to be able to be configured individually by licensees or users. Paragraph V.A.4 requires that RealPage not use data from a particular property's competitors when the sold-out guardrail is active for that property. The sold-out guardrail is an operation in the software that increases the recommended rental price for a floor plan when the property's floor plan reaches its target occupancy. Thus, a landlords' own data—not competitors' nonpublic, competitively sensitive data—will dictate the recommended price for a landlord's units.

Paragraph V.A.3 addresses how RealPage may alter the target number of leases for each floor plan. This feature determines the number of units that should be rented out at a given point in time to reach sustainable capacity—the target number of units per floor plan that a landlord wants to lease—by the end of the

18

leasing window. Therefore, altering the target leases for a floor plan can directly influence the recommended price. Paragraph V.A.3 prohibits RealPage from artificially reducing the number of target leases.

The Complaint alleges that RealPage's software did not recommend prices below a price floor, a value determined by a property's competitors. RealPage allowed price recommendations to go above the price ceiling, a value also determined by competitors' nonpublic, competitively sensitive data. Paragraphs IV.A.1 and V.B address these allegations. Paragraph IV.A.1, discussed above, prohibits RealPage from using nonpublic, competitively sensitive data in runtime operation, including in determining the price ceiling and floor. Paragraph V.B requires RealPage to allow prices to go below the price floor by the same percentage as it allows the price to go above the price ceiling. This eliminates the disparity between the "hard floor" and "soft ceiling" identified in the Complaint. In addition, the maximum percentage by which the price can fluctuate must be set by the landlord, not RealPage. This will promote independent decision making from each landlord based only on the public data available to them. It also allows renters to benefit from market fluctuations, preventing RealPage from favoring price increases over price decreases.

Paragraph V.C prohibits RealPage from requiring landlords, or providing them with any incentives, to accept any recommended rental prices or range of prices. This restriction promotes landlords' independent decision making.

Paragraph V.D prohibits RealPage from implementing additional features that rely on nonpublic, competitively sensitive data that are inconsistent with the terms of the Final Judgment.

### C. ADDITIONAL PROHIBITIONS

Paragraph VI.A specifically prohibits pricing advisors, RealPage employees who consult on software configurations and revenue management, from disclosing nonpublic, competitively sensitive data from other property owners while assisting a user or licensee with setting rental prices or occupancy levels. Paragraph VI.B prohibits RealPage from discussing or facilitating discussions in RMS meetings about market analyses or market trends based on nonpublic data, or about pricing strategies.

### D. APPOINTMENT OF A MONITOR

The proposal Final Judgment requires that RealPage be subject to an appointed compliance monitor selected by the United States in its sole discretion. The monitor will assess RealPage's compliance with the Final Judgment, in particular RealPage's use of nonpublic data in its revenue management

20

products, RealPage's compliance with the requirements regarding product features in its revenue management products, and RealPage's compliance with discussions using nonpublic data outside of the software.

Paragraph VII.B provides the monitor with authority to investigate RealPage's compliance with the Final Judgment. Per Paragraph VII.C, the monitor will have the authority to take steps necessary to accomplish the monitor's responsibilities. These steps may include interviewing RealPage employees and collecting RealPage documents. The monitor will also provide an annual report to the United States setting forth RealPage's efforts to comply with its obligations under the Final Judgment.

The monitor will serve at RealPage's expense, on such terms and conditions as the United States approves in its sole discretion. RealPage will be required to assist the compliance monitor in fulfilling his or her obligations. The monitor will serve for three years from the approval of the workplan. The United States has the ability, in its sole discretion, to extend the term of the monitor by up to 18 months which need not be consecutive to the original three-year term.

### E. COMPLIANCE TERMS

Pursuant to Paragraph IX.A, RealPage must provide the United States with access to RealPage's books, records, data, and documents, including communications with other property

21

management companies, to enable the United States to assess RealPage's compliance with the terms of the Final Judgment. RealPage must also permit the United States to interview RealPage's officers, employees, or agents relating to any matters contained in this Final Judgment. Additionally, Paragraph IX.A. provides that RealPage must, upon request, provide the United States with documents describing how RealPage's software is trained and how it determines prices for properties, as well as changes to these processes. RealPage must also allow the United States to inspect RealPage's software code and pseudocode of that software for independent verification.

Paragraph VIII.B requires RealPage's antitrust compliance officer to implement and enforce RealPage's antitrust compliance policy and annual training, audit compliance with the software feature requirements, attend any RealPage RMS meetings, and audit the use of surrogate data, per Paragraph IV.C. Paragraph VIII.C requires RealPage to submit an annual certification from its General Counsel that RealPage has established and maintained this annual antitrust compliance policy and training, that pricing advisors have attested under penalty of perjury that they have not shared nonpublic, competitively sensitive data per Paragraph VI.A, and that RealPage has complied with the restrictions regarding use of nonpublic data and with certain product features, described above.

Finally, Paragraph VIII.D requires RealPage to notify the United States and the monitor should anyone during the RealPage RMS meetings discuss pricing strategies or market trends.

### F. COOPERATION

Under the terms of the proposed Final Judgment, and subject to RealPage reaching settlement with certain States, RealPage must cooperate with the United States relating to the United States' claims against the remaining property management company defendants included in the Complaint. This required cooperation includes voluntary interviews with at least 25 RealPage employees for up to 100 hours. In addition, RealPage must provide cooperation to the United States by making witnesses available before trial, providing testimony, proffering evidence, and producing documents and other information.

### G. OTHER PROVISIONS

The proposed Final Judgment also contains provisions designed to promote compliance with and make enforcement of the Final Judgment more effective. Paragraph XIII.A allows the United States to seek additional relief if during the five-year period following the entry of the Final Judgment, the United States determines in its sole discretion that the Final Judgment has failed to fully redress the violations alleged in the Complaint. Paragraph XIII.B provides that the United States retains and reserves all rights to enforce the Final Judgment,

23

including the right to seek an order of contempt from the Court. Under the terms of this paragraph, RealPage has agreed that in any civil contempt action, any motion to show cause, or any similar action brought by the United States regarding an alleged violation of the Final Judgment, the United States may establish the violation and the appropriateness of any remedy by a preponderance of the evidence and that RealPage has waived any argument that a different standard of proof should apply. This provision aligns the standard for compliance with the Final Judgment with the standard of proof that applies to the underlying offense addressed by the Final Judgment.

Paragraph XIII.C provides additional clarification regarding the interpretation of the provisions of the proposed Final Judgment. Pursuant to Paragraph XIII.C of the proposed Final Judgment, RealPage agrees that it will abide by the proposed Final Judgment and that it may be held in contempt of the Court for failing to comply with any provision of the proposed Final Judgment that is stated specifically and in reasonable detail, as interpreted in light of its procompetitive purpose.

Paragraph XIII.D provides that if the Court finds in an enforcement proceeding that RealPage has violated the Final Judgment, the United States may apply to the Court for an extension of the Final Judgment, together with such other relief

24

as may be appropriate. In addition, to compensate American taxpayers for any costs associated with investigating and enforcing violations of the Final Judgment, Paragraph XIII.D provides that in any successful effort by the United States to enforce the Final Judgment against RealPage, whether litigated or resolved before litigation, RealPage must reimburse the United States for attorneys' fees, experts' fees, and other costs incurred in connection with that effort to enforce this Final Judgment, including the investigation of the potential violation.

Paragraph XIII.E states that the United States may file an action against RealPage for violating the Final Judgment for up to four years after the Final Judgment has expired or been terminated. This provision is meant to address circumstances such as when evidence that a violation of the Final Judgment occurred during the term of the Final Judgment is not discovered until after the Final Judgment has expired or been terminated, or when there is not sufficient time for the United States to complete an investigation of an alleged violation until after the Final Judgment has expired or been terminated. This provision therefore makes clear that, for four years after the Final Judgment has expired or been terminated, the United States may still challenge a violation that occurred during the term of the Final Judgment.

Finally, Section XIV of the proposed Final Judgment provides that the Final Judgment will expire seven years from the date of its entry, except that after four years from the date of its entry, the Final Judgment may be terminated upon notice by the United States to the Court and to RealPage that continuation of the Final Judgment is no longer necessary or in the public interest.

## IV.  REMEDIES AVAILABLE TO POTENTIAL PRIVATE PLAINTIFFS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment neither impairs nor assists the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against RealPage.

## V.  PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and RealPage have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions

26

entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least 60 days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within 60 days of the date of publication of this Competitive Impact Statement in the Federal Register, or within 60 days of the first date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the U.S. Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time before the Court's entry of the Final Judgment. The comments and the responses of the United States will be filed with the Court. In addition, the comments and the United States' responses will be published in the Federal Register unless the Court agrees that the United States instead may publish them on the U.S. Department of Justice, Antitrust Division's internet website.

Written comments should be submitted in English to:

27

> Danielle Hauck
> Acting Chief, Technology and Digital Platforms Section
> Antitrust Division
> United States Department of Justice
> 450 Fifth St. NW, Suite 7100
> Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI. ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

As an alternative to the proposed Final Judgment, the United States considered a full trial on the merits against RealPage. The United States could have continued its litigation against RealPage and brought the case to trial, seeking relief including an injunction against RealPage's sharing of competitively sensitive, nonpublic data with competing landlords, an injunction against RealPage imposing product features in its revenue management products that may have the effect of aligning prices, and an injunction preventing RealPage from facilitating communications in RealPage meetings regarding market trends or pricing strategies. The United States concludes that entry of the proposed Final Judgment is in the public

interest insofar as it avoids the time, expense, and uncertainty of a full trial on the merits.

## VII. STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

Under the Clayton Act and APPA, proposed Final Judgments, or "consent decrees," in antitrust cases brought by the United States are subject to a 60-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the Court, in accordance with the statute as amended in 2004, is required to consider:

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the Court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the

29

defendant within the reaches of the public interest." <u>United</u> <u>States v. Microsoft Corp.</u>, 56 F.3d 1448, 1461 (D.C. Cir. 1995); <u>United States v. U.S. Airways Grp., Inc.</u>, 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (explaining that the "court's inquiry is limited" in Tunney Act settlements); <u>United States v. InBev N.V./S.A.</u>, No. 08-1965 (JR), 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that a court's review of a proposed Final Judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanisms to enforce the final judgment are clear and manageable"); <u>United States v. Charleston</u> <u>Area Med. Ctr., Inc.</u>, No. CV 2:16-3664, 2016 WL 6156172, at *2 (S.D.W. Va. Oct. 21, 2016) (explaining that in evaluating whether the proposed final judgment is in the public interest, the inquiry is "a narrow one."); <u>United States v. Mountain</u> <u>Health Care</u>, 1:02-CV-288-T, 2003 WL 22359598, at *7 (W.D.N.C. 2003) ("[W]ith respect to the adequacy of the relief secured by the decree, a court may not 'engage in an unrestricted evaluation of what relief would best serve the public.'") <u>citing</u> <u>United States v. BNS Inc.</u>, 858 F.2d 456, 462-63 (9th Cir. 1988)).

As the United States Court of Appeals for the D.C. Circuit has held, under the APPA a court considers, among other things,

the relationship between the remedy secured and the specific allegations in the government's Complaint, whether the proposed Final Judgment is sufficiently clear, whether its enforcement mechanisms are sufficient, and whether it may positively harm third parties. See Microsoft, 56 F.3d at 1458-62; United States v. Math Works, No. 02-888-A, 2003 WL 1922140, *17 (E.D. Va. 2003). With respect to the adequacy of the relief secured by the proposed Final Judgment, a court may not "make de novo determination of facts and issues." United States v. W. Elec. Co., 993 F.2d 1572, 1577 (D.C. Cir. 1993) (quotation marks omitted); see also Microsoft, 56 F.3d at 1460-62; United States v. Alcoa, Inc., 152 F. Supp. 2d 37, 40 (D.D.C. 2001); United States v. Enova Corp., 107 F. Supp. 2d 10, 16 (D.D.C. 2000); InBev, 2009 U.S. Dist. LEXIS 84787, at *3. Instead, "[t]he balancing of competing social and political interests affected by a proposed antitrust decree must be left, in the first instance, to the discretion of the Attorney General." W. Elec. Co., 993 F.2d at 1577 (quotation marks omitted). "The court should also bear in mind the *flexibility* of the public interest inquiry: the court's function is not to determine whether the resulting array of rights and liabilities is the one that will *best* serve society, but only to confirm that the resulting settlement is within the *reaches* of the public interest." Microsoft, 56 F.3d at 1460 (quotation marks omitted); see also

31

United States v. Deutsche Telekom AG, No. 19-2232 (TJK), 2020 WL 1873555, at *7 (D.D.C. Apr. 14, 2020); Math Works, 2003 WL 1922140 at *18; Mountain Health Care, 2003 WL 22359598, at *7. More demanding requirements would "have enormous practical consequences for the government's ability to negotiate future settlements," contrary to congressional intent. Microsoft, 56 F.3d at 1456. "The Tunney Act was not intended to create a disincentive to the use of the consent decree." Id.

The United States' predictions about the efficacy of the remedy are to be afforded deference by the Court. See, e.g., Microsoft, 56 F.3d at 1461 (recognizing courts should give "due respect to the Justice Department's . . . view of the nature of its case"); United States v. Iron Mountain, Inc., 217 F. Supp. 3d 146, 152-53 (D.D.C. 2016) ("In evaluating objections to settlement agreements under the Tunney Act, a court must be mindful that [t]he government need not prove that the settlements will perfectly remedy the alleged antitrust harms[;] it need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." (internal citations omitted)); United States v. Republic Servs., Inc., 723 F. Supp. 2d 157, 160 (D.D.C. 2010) (noting "the deferential review to which the government's proposed remedy is accorded"); United States v. Archer-Daniels-Midland Co., 272 F. Supp. 2d 1, 6 (D.D.C. 2003) ("A district court must

accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case."). The ultimate question is whether "the remedies [obtained by the Final Judgment are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'" Microsoft, 56 F.3d at 1461.

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." Microsoft, 56 F.3d at 1459; see also U.S. Airways, 38 F. Supp. 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); InBev, 2009 U.S. Dist. LEXIS 84787, at *20 ("[T]he 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged"); Math Works, 2003 WL 1922140 at *18; Mountain Health Care 2003 WL 22359598, at *8. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows

33

that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. Microsoft, 56 F.3d at 1459-60.

In its 2004 amendments to the APPA, Congress made clear its intent to preserve the practical benefits of using judgments proposed by the United States in antitrust enforcement, Pub. L. 108-237 § 221, and added the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); see also U.S. Airways, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). This language explicitly wrote into the statute what Congress intended when it first enacted the Tunney Act in 1974. As Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). "A court can make its public interest determination based on the competitive impact statement and response to public comments alone." U.S.

<u>Airways</u>, 38 F. Supp. 3d at 76 (citing <u>Enova Corp.</u>, 107 F. Supp. 2d at 17).

## VIII.   DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated: November 24, 2025

Respectfully submitted,

FOR PLAINTIFF
UNITED STATES OF AMERICA:


<u>/s/ Henry C. Su</u>

Henry C. Su
David A. Geiger
Danielle G. Hauck
John J. Hogan
Kris A. Perez Hicks

Attorneys
United States Department of
Justice
Antitrust Division
Technology and Digital
Platforms Section
450 Fifth St. NW, Suite 7100
Washington DC 20530
Telephone: (202) 307-6200
Email: henry.su@usdoj.gov

35