IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA, et al.

<u>Plaintiffs</u>,

vs.                                              No. 1:24-cv-00710-WLO-JLW

REALPAGE, INC., et al.

<u>Defendants</u>.

## <u>RESPONSE OF PLAINTIFF UNITED STATES TO PUBLIC COMMENTS ON THE PROPOSED FINAL JUDGMENT</u>

Pursuant to the requirements of the Antitrust Procedures and Penalties Act (the "APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), the United States submits this response to the five public comments received regarding the proposed Final Judgment as to Defendant Greystar Management Services, LLC (Doc. 152-1).[1]

After careful consideration of the submitted comments, the United States continues to believe that the proposed Final Judgment will provide an effective and appropriate remedy for the antitrust violations alleged in the Complaint.

---

[1] The United States has redacted personally identifiable information from the comments. If the Court requests unredacted versions, the United States will provide unredacted comments under seal.

After this Response has been published in the Federal Register, pursuant to 15 U.S.C § 16(d), the United States will move the Court to enter the proposed Final Judgment. On December 30, 2025, the Court approved the United States' request to publish the public comments on the Antitrust Division's website due to the expense of publishing the comments in the Federal Register and the accessibility to the public of the Division's website.[2] These comments can be accessed at www.justice.gov/atr.

## I.  PROCEDURAL HISTORY

On August 23, 2024, the United States, along with several states ("Plaintiffs"), filed a civil antitrust Complaint against RealPage, Inc. ("RealPage") (Doc. 1). On January 7, 2025, Plaintiffs amended their civil Complaint (the "Complaint") to add Greystar Management Services, LLC[3] ("Greystar") and five other landlords as Defendants (Doc. 47) alleging that Greystar's agreements with RealPage and other landlords to share information and align pricing violate Section 1 of the Sherman Act, 15 U.S.C. § 1. The Complaint seeks to enjoin Defendants from sharing and exploiting competitively sensitive data.

---

[2] Doc. 166.

[3] The Complaint initially named Greystar Real Estate Partners, LLC, as the defendant. By agreement, Greystar Management Services, LLC, was later substituted as the defendant (see Doc. 143).

On August 8, 2025, the United States filed a proposed Final Judgment (Doc. 152-1) as to Greystar, which is designed to remedy the loss of competition alleged in the Complaint due to Greystar's conduct, and a Stipulation and Proposed Order (Doc. 152), in which Greystar consented to entry of the proposed Final Judgment after compliance with the requirements of the Tunney Act.[4] On August 25, 2025, the United States filed a Competitive Impact Statement describing the proposed Final Judgment as to Greystar. (Doc. 155)

The United States arranged for the publication of the Complaint, proposed Final Judgment, and Competitive Impact Statement in the Federal Register on September 9, 2025, see 15 U.S.C. § 16(b)-(c); 90 Fed. Reg. 43,070 (Sept. 9, 2025), and caused notice regarding the same, together with directions for the submission of written comments relating to the proposed Final Judgment, to be published in the Washington Post and the Greensboro News and Record from September 2 to September 8, 2025. The 60-day period for public comment has now ended. The

---

[4] The Stipulation and Proposed Order, and the proposed Final Judgment, pertain only to Greystar's conduct. They do not propose to resolve the anticompetitive conduct alleged in the Complaint against any other Defendant. Nor do they resolve the claims of any other Plaintiff besides the United States.

United States received five comments in response, which are described below and attached as Exhibit 1 hereto.

## II. THE COMPLAINT AND THE PROPOSED FINAL JUDGMENT

The Complaint alleges that, by unlawfully sharing its confidential and competitively sensitive information with RealPage for use in its and competing landlords' pricing, Greystar violated Section 1 of the Sherman Act, 15 U.S.C. § 1. Under their licensing agreements with RealPage, Greystar and competing landlords have provided RealPage with daily, competitively sensitive, nonpublic information for use in RealPage's revenue management software relating to the landlords' leasing businesses, including details like how many leases have been renewed, for what terms, and at what price. The transactional data that Greystar and other landlords have agreed to provide to RealPage includes current, forward-looking, granular, and highly competitively sensitive information. RealPage has used Greystar's competitively sensitive, nonpublic information to influence rental prices and other recommendations across rental properties managed by competing landlords. Greystar's rental prices and related recommendations were likewise influenced by its competitors' competitively sensitive, nonpublic information obtained from RealPage. In each relevant market, RealPage and participating landlords, including

- 4 -

Greystar, have sufficient market power, including market and data penetration, to harm renters and the competitive process through this unlawful sharing of confidential and competitively sensitive information. Moreover, Greystar and other landlords can achieve any procompetitive objective of revenue management software without sharing this kind of information.

The Complaint also alleges that Greystar and other landlords, by adopting and using RealPage's revenue management software, agreed with RealPage to align their pricing and thereby violate Section 1 of the Sherman Act, 15 U.S.C. § 1. RealPage has entered into agreements with Greystar and its competing landlords relating to how to price rental units, including through the licensing of its revenue management software—AI Revenue Management ("AIRM"), YieldStar, and Lease Rent Options ("LRO")—to landlords, and the provision by landlords of their competitively sensitive, nonpublic transactional data to RealPage for training and running its revenue management software. Adoption and use of RealPage's revenue management software by Greystar and other landlords has the likely effect of causing competing landlords to employ the same or very similar strategies, processes, and decisions relating to their pricing of rental units. Greystar and other landlord users understand this likely effect, which here dampens

- 5 -

the competitive process that benefits renters.

The proposed Final Judgment imposes several requirements and restrictions on Greystar that address the United States' anticompetitive concerns regarding Greystar's conduct alleged in the Complaint. Specifically:

  i.  Greystar must not license or use any revenue management product that uses third-party nonpublic data to recommend or set prices;

 ii.  Greystar must not license or use any revenue management product that pools information from Greystar properties that have different owners;

iii.  Greystar must not disclose, solicit, or use competitively sensitive information from competitors that can be used to set rental prices or generate pricing;

 iv.  Greystar must cooperate in this civil antitrust proceeding (United States et al. v. RealPage et al.);

  v.  Greystar must adopt a written antitrust compliance policy and designate a chief antitrust compliance officer who will train Greystar employees on the policy;

- 6 -

vi.   Greystar must allow the United States to inspect its documents and to interview its employees to ensure compliance with the Final Judgment;

vii.  If Greystar uses a revenue management product, Greystar will be subject to a monitor unless Greystar obtains a certification that meets certain requirements, including an affirmation that the product complies with all required limitations regarding use of competitors' competitively sensitive data; and

viii. If, in the future, the Court finds that Greystar has violated the terms of the proposed Final Judgment, Greystar will be subject to a court-appointed monitor.

Under the terms of the Stipulation and Order, Greystar must abide by and comply with the provisions of the proposed Final Judgment until it is entered by the Court or until the time for all appeals of any Court ruling declining entry of the proposed Final Judgment has expired.

The United States and Greystar have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the APPA. Entry of the proposed Final Judgment will terminate this action with respect to the United States' claims against Greystar, except that the Court will retain

- 7 -

jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof by Greystar.

## III. STANDARD OF JUDICIAL REVIEW

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a 60-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the Court, in accordance with the Tunney Act as amended in 2004, is required to consider:

(A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the Court's inquiry is necessarily a limited one, as

- 8 -

the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." United States v. Microsoft Corp., 56 F.3d 1448, 1461 (D.C. Cir. 1995); United States v. U.S. Airways Grp., Inc., 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (explaining that the "court's inquiry is limited" in Tunney Act settlements); United States v. InBev N.V./S.A., No. 08-1965 (JR), 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that a court's review of a consent judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanism to enforce the final judgment are clear and manageable"); United States v. Keyspan Corp., 763 F. Supp. 2d 633, 637–38 (S.D.N.Y. 2011); see SEC v. Citigroup Global Markets Inc., 673 F.3d 158, 168 (2d Cir. 2012) ("We are bound in such matters to give deference to an executive agency's assessment of the public interest.").

As the U.S. Court of Appeals for the District of Columbia Circuit has held, under the APPA, a court considers, among other things, the relationship between the remedy secured and the specific allegations in the government's complaint, whether the proposed Final Judgment is sufficiently clear, whether its enforcement mechanisms are sufficient, and whether it may

- 9 -

positively harm third parties. See Microsoft, 56 F.3d at 1458–62; United States v. Apple, Inc., 889 F. Supp. 2d 623, 631 (S.D.N.Y. 2012) (citing Microsoft, 56 F.3d at 1458, 1461–62). With respect to the adequacy of the relief secured by the proposed Final Judgment, a court may "not make de novo determination of facts and issues." United States v. W. Elec. Co., 993 F.2d 1572, 1577 (D.C. Cir. 1993) (quotation marks omitted); see also Microsoft, 56 F.3d at 1460–62; United States v. Alcoa, Inc., 152 F. Supp. 2d 37, 40 (D.D.C. 2001); United States v. Enova Corp., 107 F. Supp. 2d 10, 16 (D.D.C. 2000); InBev, 2009 U.S. Dist. LEXIS 84787, at *3. Instead, "[t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General." W. Elec. Co., 993 F.2d at 1577 (quotation marks omitted). "The court should bear in mind the flexibility of the public interest inquiry: the court's function is not to determine whether the resulting array of rights and liabilities is one that will best serve society, but only to confirm that the resulting settlement is within the reaches of the public interest." Microsoft, 56 F.3d at 1460 (quotation marks omitted); see also United States v. Deutsche Telekom AG, No. 19-2232 (TJK), 2020 WL 1873555, at *7 (D.D.C. Apr. 14, 2020). More demanding requirements would

- 10 -

"have enormous practical consequences for the government's
ability to negotiate future settlements," contrary to
congressional intent. <u>Microsoft</u>, 56 F.3d at 1456. "The Tunney
Act was not intended to create a disincentive to the use of the
consent decree." <u>Id.</u>[5]

   The United States' predictions about the efficacy of the
remedy are to be afforded deference by the Court. <u>See, e.g.</u>,
<u>Microsoft</u>, 56 F.3d at 1461 (recognizing courts should give "due
respect to the Justice Department's . . . view of the nature of
its case"); <u>United States v. Iron Mountain, Inc.</u>, 217 F. Supp.
3d 146, 152-53 (D.D.C. 2016) ("In evaluating objections to
settlement agreements under the Tunney Act, a court must be
mindful that [t]he government need not prove that the
settlements will perfectly remedy the alleged antitrust harms[;]
it need only provide a factual basis for concluding that the
settlements are reasonably adequate remedies for the alleged
harms.") (internal citations omitted); <u>United States v. Republic
Servs., Inc.</u>, 723 F. Supp. 2d 157, 160 (D.D.C. 2010) (noting

_____

[5] <u>See also United States v. BNS, Inc.</u>, 858 F.2d 456, 464 (9th
Cir. 1988) (holding that the court's "ultimate authority under
the [APPA] is limited to approving or disapproving the consent
decree"); <u>United States v. Gillette Co.</u>, 406 F. Supp. 713, 716
(D. Mass. 1975) (noting that, in this way, the court is
constrained to "look at the overall picture not hypercritically,
nor with a microscope, but with an artist's reducing glass").

"the deferential review to which the government's proposed remedy is accorded"); United States v. Archer-Daniels-Midland Co., 272 F. Supp. 2d 1, 6 (D.D.C. 2003) ("A district court must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case"). In determining whether a proposed settlement is in the public interest, a district court "is not permitted to reject the proposed remedies merely because the court believes other remedies are preferable." United States v. Morgan Stanley, 881 F. Supp. 2d 563, 567 (S.D.N.Y. 2012) (quoting United States v. Abitibi-Consol. Inc., 584 F. Supp. 2d 162, 165 (D.D.C. 2008)). The ultimate question is whether "the remedies [obtained by the Final Judgment are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'" Microsoft, 56 F.3d at 1461 (quoting W. Elec. Co., 900 F.2d at 309).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." Microsoft, 56 F.3d at 1459; see also U.S. Airways, 38 F. Supp. 3d at 75

- 12 -

(noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); United States v. Keyspan Corp., 763 F. Supp. 2d 633 637–38 (S.D.N.Y. 2011) ("The Court's function is not to determine whether the proposed [d]ecree results in the balance of rights and liabilities that is the one that will best serve society, but only to ensure that the resulting settlement is 'within the reaches of the public interest.'" (quoting United States v. Alex. Brown & Sons, Inc., 963 F. Supp. 235, 238 (S.D.N.Y. 1997)); InBev, 2009 U.S. Dist. LEXIS 84787, at *20 ("the 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged"). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. Microsoft, 56 F.3d at 1459–60. See also Heckler v. Chaney, 470 U.S. 821, 832 (1985) (quoting U.S. Const. art. II, § 3) (recognizing that the decision about which

- 13 -

claims to bring "has long been regarded as the special province of the Executive Branch.").

In its 2004 amendments to the APPA, Congress made clear its intent to preserve the practical benefits of using consent judgments proposed by the United States in antitrust enforcement, Pub. L. 108-237 § 221, and added the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); see also U.S. Airways, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). This language explicitly wrote into the statute what Congress intended when it first enacted the Tunney Act in 1974. As Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). "A court can make its public interest determination based on the competitive impact statement and response to public comments alone." U.S. Airways, 38 F. Supp. 3d at 76 (citing Enova Corp., 107 F. Supp. 2d at 17).

**IV. SUMMARY OF PUBLIC COMMENTS AND THE UNITED STATES' REPSONSE**

The United States received five public comments from three commenters in response to the proposed Final Judgment. These comments were submitted by private individuals, whom the United States will refer to by each individual's initials: AB ("AB Comment"), DMP ("DMP Comment" and "DMP Supplemental Comment"), and JP ("JP Comment" and "JP Supplemental Comment")[6].

### a. The AB Comment

AB comments that Greystar and other private equity groups were able to raise prices between 2018 and 2024 by 26% in Denver, Colorado, due to what she characterizes as price-fixing achieved through RealPage.[7] AB does not believe that preventing Greystar from using certain software is enough; rather, she suggests that Greystar should divest the majority of its properties in the United States and pay restitution to

---

[6] The JP Supplemental Comment also includes comments about the proposed Final Judgment between the United States and RealPage, Inc. See Doc. 159-1. The United States will address JP's comments about its proposed Final Judgment with RealPage in the United States' response to the public comments on the RealPage Final Judgment.

[7] AB Comment.

Americans.[8] AB adds that price fixing through RealPage should be outlawed.[9]

As the Complaint explains, the claims the United States asserted against Greystar arise from Greystar's sharing of nonpublic data with RealPage and its use of RealPage revenue management software that uses shared nonpublic data from Greystar and its competitors. The alleged violations relating to Greystar, i.e., its use of its competitors' nonpublic data and its alignment of pricing through the use of RealPage's software, are properly remedied through the proposed Final Judgment, which prohibits Greystar's use of nonpublic data and of software that would align Greystar's pricing with competitors.

As to AB's comments related to price-fixing, the United States did not allege in the Complaint that Greystar engaged in price-fixing, and thus price-fixing is outside the scope of Tunney Act review.

### b. The DMP Comments

DMP is a former employee of Mid-America Apartment Communities, Inc. ("MAAC"), a real estate investment trust. DMP's comment states that the proposed Final Judgment should (1)

---

[8] AB Comment.

[9] AB Comment.

prohibit manual input of competitor pricing or concessions into revenue management systems; (2) bar contemporaneous market survey exchanges for pricing; (3) require certifications on data usage in revenue management software; (4) require a monitor be appointed whenever a large landlord uses a commercial revenue management tool like RealPage's software; and (5) prevent landlords like Greystar from retaliating against staff or tenants who raise antitrust or compliance concerns.[10]

The proposed Final Judgment already includes most of these suggested remedies. While the proposed Final Judgment does not prohibit manual input of data into revenue management software, it bars Greystar from using revenue management software that uses any competitor data in either the runtime operation or model training, regardless of whether the data was inputted manually, through a data feed, or any other way.[11]

The DMP Comment also suggests that "market surveys in which rival property managers swap current pricing and occupancy information" should be explicitly prohibited. The proposed Final Judgment also includes this remedy. Section V.A of the proposed Final Judgment prohibits Greystar from disclosing, soliciting,

---

[10] DMP Comment at 15-16.

[11] Greystar Proposed Final Judgment § IV.A (Doc. 152-1).

or using nonpublic data from any competing property manager or property owner in setting rental prices or generating pricing recommendations.[12] The restriction applies to nonpublic data obtained through market surveys.[13]

The DMP Comment suggests requiring both software vendors and landlords to certify that relevant software does not use "pricing algorithms or models … trained on non-public data from other landlords without each landlord's independent input or consent."[14] The proposed Final Judgment requires Greystar to obtain certifications from its revenue management vendors that the software complies with the agreed upon terms, including not using nonpublic data from competing properties.[15]

The DMP Comment also suggests that a monitor should be implemented "unless and until the vendor provides verifiable certifications of completely siloed data and client demonstrates a compliance program that actively tracks and audits any deviations from recommended pricing."[16] While the proposed Final Judgement requires that a monitor be appointed only in certain

---

[12] Greystar Proposed Final Judgment § V.A (Doc. 152-1).

[13] Greystar Proposed Final Judgment § V.A (Doc. 152-1).

[14] DMP Comment at 8.

[15] Greystar Proposed Final Judgment § IV.E (Doc. 152-1).

[16] DMP Comment at 8.

circumstances, it contains alternative mechanisms to ensure compliance, including: (1) an antitrust compliance program and training;[17] (2) certifications from revenue management software vendors;[18] (3) certifications from Greystar's General Counsel regarding compliance with sections of the proposed Final Judgment;[19] and (4) attestations under penalty of perjury from employees engaged in or overseeing Greystar's revenue or property management of multifamily rental properties that they have complied with the prohibitions regarding the use of competitors' nonpublic data.[20] Additionally, the proposed Final Judgment provides the United States with inspection capabilities to ensure compliance with the consent decree.[21] Finally, the proposed Final Judgment requires that a monitor be appointed if Greystar violates any provision in the proposed Final Judgment.[22]

DMP also includes allegations regarding MAAC's conduct. The Complaint does not name MAAC as a defendant or involve MAAC's conduct, and this proposed Final Judgment resolves only the

---

[17] Greystar Proposed Final Judgment § VI.A-B (Doc. 152-1).

[18] Greystar Proposed Final Judgment § IV.E (Doc. 152-1).

[19] Greystar Proposed Final Judgment § VI.C (Doc. 152-1).

[20] Greystar Proposed Final Judgment § VI.C (Doc. 152-1).

[21] Greystar Proposed Final Judgment § IX (Doc. 152-1).

[22] Greystar Proposed Final Judgment § VIII.B.2 (Doc. 152-1).

- 19 -

United States' claims against Greystar. Therefore, DMP's comments about MAAC are outside the scope of the Tunney Act review.

### c. The JP Comments

JP describes himself as a resident of a Greystar property in Atlanta, Georgia. JP alleges that Greystar "systematically perpetrates document forgeries, housing discrimination, denial of due process, environmental and health hazards, financial exploitation, and evidence suppression."[23] Additionally, JP's supplemental comment expresses a concern that the proposed Final Judgment does not address the "public authority fraud where government-owned properties are operated for private profit using these algorithms."[24] JP expresses concern that the "prohibition on algorithmic pricing coordination" did not include financial penalties, a victim compensation fund, or an admission of wrongdoing.

Many of JP's concerns are not relevant to the alleged claims in the Complaint. The Tunney Act applies only to final judgments or decrees in civil proceedings brought by the United States under the antitrust laws. See 15 U.S.C. § 16(b). JP's

---

[23] JP Comment at 4.

[24] JP Supplemental Comment at 2-3.

allegations regarding forgeries, discrimination, denial of due process, environmental and health hazards, financial exploitation, evidence suppression, wrongful eviction actions, and public authority fraud are not relevant to the allegations in the Complaint against Greystar or the proposed Final Judgment and are thus outside the scope of the Tunney Act review.

Restitution is not one of the remedies sought by the United States, and hence it is outside the scope of the Tunney Act review.

JP also comments that the Greystar settlement does not include admission of wrongdoing. The Tunney Act, however, does not require a settlement to include an admission of wrongdoing as a prerequisite to judicial approval. See United States v. Morgan Stanley, 881 F. Supp. 2d 563, 568 (S.D.N.Y. 2012). On the contrary, the statute specifically excepts consent judgments from being prima facie evidence or having a collateral estoppel effect in another action or proceeding. See 15 U.S.C. 16(a)("A final judgment or decree heretofore or hereafter rendered in any civil or criminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any action or proceeding brought by any other party against such defendant under said laws as to all

- 21 -

matters respecting which said judgment or decree would be an estoppel as between the parties thereto: Provided, That this section shall not apply to consent judgments or decrees entered before any testimony has been taken.") Congress has designed the remedial provisions of the antitrust laws to encourage consent judgments, which allow the government to obtain relief without the "time, expense and inevitable risk of litigation." United States v. Armour and Co., 402 U.S. 673, 681 (1971). See also United States v. Nat'l Ass'n of Broadcasters, 553 F. Supp. 621, 623 (D.D.C. 1982) ("Congress apparently enacted this proviso in order to encourage defendants to settle promptly government-initiated antitrust claims and thereby to save the government the time and expense of further litigation."). To insist on more is to impose substantial resource costs on government antitrust enforcement, to risk the possibility of litigation resulting in no relief, and to establish a precedent that could impede enforcement of the antitrust laws in the future.

***

To the extent that commenters wish to raise the possibility of additional unlawful conduct not addressed by the Complaint brought in this matter, members of the public are encouraged to submit information about any antitrust violation, including potentially unlawful exchanges of information between

- 22 -

competitors, to the Department of Justice Antitrust Division's Citizen Complaint Center (https://www.justice.gov/atr/webform/pcsf-citizen-complaint).

## V.   CONCLUSION

After careful consideration of the public comments, the United States continues to believe that the proposed Final Judgment provides an effective and appropriate remedy for the antitrust violations alleged in the Complaint and is therefore in the public interest. The United States will move this Court to enter the proposed Final Judgment after the comments and this response are published in a manner approved by the Court, as required by 15 U.S.C. § 16(d).

Dated: February 4, 2026        Respectfully submitted,

By:  /s/ Henry C. Su

_____

Henry C. Su
David A. Geiger
Danielle Hauck
John J. Hogan
Kris A. Perez Hicks

Attorneys
United States Department of Justice
Antitrust Division
450 Fifth Street N.W., Suite 7100
Washington, DC 20530
Telephone: (202) 307-6200
Email: henry.su@usdoj.gov