The DMP Comments

**Via Federal Register / Tunney Act Comment (15 U.S.C. § 16)**

**Re: United States et al. v. RealPage, Inc., et al. (Proposed Final Judgment as to Greystar)**

**No. 1:24-cv-00710-WLO-JLW (M.D.N.C.)**

**Date: September 9, 2025**

**Public Comment of** ▉▉▉▉▉▉▉▉▉▉▉▉▉▉ *(former MAA employee and resident; whistleblower, 2021–present)*

**Introduction and Background**

**My role and legal context.** My name is ▉▉▉▉▉▉▉▉▉▉▉▉▉▉. I worked for Mid-America Apartment Communities, Inc. (MAA) from 2016 to 2021 and, during most of that time, also lived in an MAA community as a tenant. Beginning in 2021, I submitted extensive whistleblower disclosures to federal agencies concerning various practices I observed at MAA — including, inadvertently, rent-pricing coordination facilitated by RealPage tools and competitor information flows. Those disclosures and related filings eventually placed me in protracted federal litigation in 2023, shortly after the civil lawsuit concerning RealPage and MAA was filed, under the guise of a trademark infringement lawsuit. The discovery requests directed to me in that case sought all documents in my possession related to MAA, but I had already provided those materials to the U.S. government (including the SEC and DOJ) as part of my whistleblower reports. The core federal matters tied to my experience include: ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ concerning registration and enforcement of the Tennessee judgment. I have also pursued a related Judicial Misconduct and Disability Complaint with the Sixth Circuit's Circuit Executive under 28 U.S.C. § 351 (No. 06-23-90121), and separately raised fraud-on-the-court allegations under Federal Rule of Civil Procedure 60(d)(3) in connection with the same underlying matters. All of these appeals and complaints were either ignored or disposed of in a manner that avoided any real review of the evidence I provided. These proceedings have become deeply intertwined with my whistleblowing activity and continue to this day.

**Internal whistleblowing and company response (2021)**

My complaints started internally through MAA's whistleblower hotline in early 2021. Management initially assured me there would be a thorough investigation. Later, I was told that the investigation "did not identify any problems" — a conclusion completely at odds

with the company-wide practices I had observed, which clearly breached ethical codes and may have broken the law. After that perfunctory dismissal, I filed formal reports with the SEC and the IRS. I then stepped back from reporting for a time — until near the end of 2021, when MAA's Senior Vice President of Internal Auditing contacted me, asking if I had submitted another hotline complaint and pressing to speak by phone. It felt like fishing for information. I refused a call and insisted that any communications be in writing. I also asked by email whether I would be provided with the investigation report from my initial complaint. The auditor responded that he was "just working on the proper formatting" to submit it to the board of directors and that a copy would be provided to me, which I suspect was merely an effort to elicit more information from me. I never received that report.

**External reporting timeline and continuing submissions**

After my employment ended, I continued to monitor MAA from the outside. In October 2022, I read a ProPublica article about RealPage's software and its impact on rent increases. I realized I had already provided materials that contained evidence of these practices to regulators — backed by hundreds of internal emails, market surveys, call logs, company policies, presentations, and training materials documenting how competitor information and RealPage pricing recommendations drove rent levels. I do not know whether the Antitrust Division ever received or used that material. I kept submitting a running series of TCR (Tips, Complaints, and Referrals) reports to the SEC, and I also sent detailed complaints with large document sets to the DOJ and the FBI. Whether those were processed or forwarded appropriately, I still do not know. Since April 2021, I have repeatedly reported wrongdoing at MAA and ongoing retaliation. I have documented almost everything publicly in the Tennessee case docket. If something I've described is not in that docket, I have most likely submitted it to DOJ or the SEC in hopes it would be routed to the right place.

**Insurance practices, earnings management, and disclosure risks**

As part of this long-running stream of disclosures, I also flagged patterns outside of pricing that I observed both in public filings and firsthand. One of the most concerning involved MAA's handling of insurance reimbursements. In 2021, shortly after my internal complaints, MAA reported a $40 million "casualty loss" in connection with Winter Storm Uri and reflected it in SEC filings. Rather than filing and collecting claims through outside insurers in the ordinary course, MAA funneled these losses through its own captive insurance subsidiary — an entity whose name it frequently changed — and then used that subsidiary to pay itself back. These reimbursements were not applied consistently; instead, they were withheld and strategically recognized only when it was financially advantageous, allowing the company to smooth earnings and present stronger results to

investors. Because these internal reimbursements could be controlled and timed at will, it raised concerns that some insurance claims were being manipulated — or even falsified — to serve financial reporting goals, rather than to reflect genuine losses.

In one investor webinar, when asked directly about property insurance rates, an MAA executive even boasted that they had "flown over and spoken with the boys at Lloyd's" to secure favorable terms — underscoring both the coziness of those arrangements and the lack of transparency for residents and shareholders alike.

During my five years with MAA, I never submitted a single insurance claim to an outside company, nor did I see any reimbursement come from a third-party insurer. Renters, on the other hand, were consistently told they had to rely on their own renters' insurance for coverage of personal belongings, hotel stays, or other expenses — even when the damage (such as leaks or floods) stemmed directly from MAA's own property failures. This left residents paying deductibles or discovering that their policies did not cover temporary housing or replacement costs. Meanwhile, MAA leveraged its internal insurance structure to quietly reimburse itself at times most convenient for its earnings reports, with no meaningful internal controls or transparency.

**SEC and IRS implications.** These practices raise serious securities-law and tax questions. Public companies are obligated under SEC rules (including Exchange Act reporting requirements and Sarbanes–Oxley internal control provisions) to maintain accurate books and records, implement effective internal controls, and make truthful disclosures. Using a captive insurance entity to delay and time reimbursements so they can be recognized when results need padding is, in substance, a form of earnings management that misleads investors about the company's true operating performance and risk exposure. Likewise, depending on how reimbursements and reserves were accounted for, there may be tax implications if income was shifted across entities or if recognition was manipulated to minimize liability. I raised these concerns in whistleblower reports to the SEC and IRS because they mirror the sort of accounting abuses that have historically drawn enforcement attention.

**The Enron parallel.** Enron notoriously manipulated the timing of transactions and moved money through affiliates to smooth earnings and present stronger financials. While the specifics differ, the underlying tactic — holding onto reimbursements or funneling money through subsidiaries until it was advantageous to recognize it — is strikingly similar. Both models exploited complex corporate structures and opaque accounting to create an illusion of stability and growth while concealing the real risks borne by customers and investors.

In effect, MAA shifted the burden of property losses onto its tenants while using its captive insurance entity as a financial lever to meet investor expectations. Residents paid out of pocket, while investors were misled by carefully timed reimbursements and vague disclosures. This was not just unfair to renters — it undermined the integrity of financial reporting and accountability expected of a publicly traded REIT.

**Why I am commenting**

From 2016 through 2021, the routine at MAA included systematic collection and use of competitors' pricing and concessions intelligence. This data was gathered through market surveys, "call-arounds," direct emails and calls with rival properties, and even property tours. All of it was then fed into RealPage's revenue management system to steer new lease and renewal pricing. My materials describe regular pricing discussions, direct competitor communications about rent levels, and a heavy reliance on RealPage analytics to align strategy across markets.

In practice, this normalized departing from MAA's own written policies and code of ethics whenever the software's outputs or peer data signals demanded it. This was particularly troubling because the code of ethics had been authored and overseen by the same individual who was also responsible for the whistleblower system, creating a conflict between "paper ethics" and daily reality. At MAA, ethical obligations were disregarded whenever RealPage dictated a different outcome.

What tied all of this together was the company's willingness to exploit residents wherever possible. Even marketing "specials" or concessions were deceptive: base rents were raised to "offset" any advertised discount and the increase was spread over the full lease term, meaning a purported special yielded no real savings to the tenant. Extraordinary late fees were imposed with no grace period unless specifically required by state law. Courtesy waivers for late charges were nonexistent. Early termination penalties were so high they effectively punished tenants for any change in circumstance. Renters' insurance requirements were structured to shift liability onto residents, even when property damage clearly stemmed from MAA's own failures. At the same time, there was no meaningful accountability or compassion for tenants who found themselves in financial or personal distress.

I later worked for another property management company that also used RealPage and competitor inputs to inform rent decisions. However, I did not see the same level of aggressiveness or blatant disregard for both ethics and residents' welfare that I saw at MAA. At MAA, the pressure to conform to RealPage's outputs was absolute, and the culture

of revenue maximization was layered on top of fee structures and practices designed to extract as much as possible from residents.

I am commenting now because I lived inside this system, reported it internally and externally, and was retaliated against for doing so. I want the Court and the Department of Justice to understand the full context and stakes of RealPage-facilitated coordination: how it stripped away independent judgment, overrode ethical obligations, and created a framework in which large landlords like MAA could justify coordinated pricing and exploitative fees under the guise of consistency and "Fair Housing." In reality, it was all about taking advantage of the resident.

**DOJ case alignment**

The Justice Department's complaint in *United States et al. v. RealPage, Inc., et al.* states the competitive concern plainly: widespread adoption of RealPage's revenue management products leads competing landlords to base their pricing on common model recommendations powered by non-public, competitively sensitive data from rivals. That erodes independent price-setting and harms renters by inflating prices in unison. The proposed Final Judgment prohibits sharing such data and coordinating pricing with competitors through RealPage's system. This aligns exactly with what I experienced and reported at MAA. The very conduct DOJ identifies — landlords relying on a shared algorithm fed by pooled, non-public data to set rents — is what I witnessed internally.

**Context about MAA's incentives and governance**

It is important to note that MAA is a real estate investment trust (REIT), not simply a property management firm as renters might assume. It has always operated as an investment vehicle designed to deliver net operating income growth and cash distributions for large institutional shareholders such as BlackRock and Vanguard. From the beginning, the company's orientation has been to serve investor returns first, not residents or employees.

MAA's leadership bench has long been dominated by finance professionals, CPAs, and former accountants (including a long-tenured Ernst & Young partner who moved directly into senior leadership without a cooling-off period). Many executives and senior managers lacked experience in the very fields they were supposed to be running — for example, IT and other core operational areas — yet they were placed in charge because of their financial or accounting backgrounds. This structure prioritized financial controls and RealPage-driven uniformity above all else, rather than subject-matter expertise or resident-centered decision-making.

Internally, "compliance with the model" — strict adherence to RealPage's pricing recommendations — was treated as a corporate mandate. Compassion or local judgment was dismissed as inconsistent with "consistency" and was often rationalized under the banner of maintaining "Fair Housing" uniformity. In practice, this reliance on RealPage stripped site teams and managers of discretion and empathy, replacing it with an algorithmic directive to maximize revenue consistently, regardless of individual resident circumstances.

**I. What I observed inside MAA: systematic use of competitor intelligence and RealPage to align pricing**

In my filings, I explained that MAA personnel routinely gathered sensitive competitor information — through "market surveys," competitor property tours and phone calls, direct email exchanges with rival properties, and other channels — and fed that data into RealPage's software, using it to set and coordinate rents across markets. These were not ad hoc or occasional practices; they were built into our regular workflow, including recurring pricing meetings (often referred to internally as "weights and measures" calls) and daily updates to pricing systems. My submissions state that competitor rent figures and concession data were entered every day and used "to fix and artificially inflate rental and renewal prices." When prospective or existing residents questioned a quoted rate or a steep renewal increase, we were instructed to respond that our pricing "matched competitors," that it was the price "our software" generated, and to invoke "Fair Housing" as the reason we could not deviate — effectively framing our uniform adherence to RealPage's output as a compliance requirement for the sake of consistency and nondiscrimination.

The company's cadence and incentive structure reinforced this alignment. We received daily reports on renewal and rent increase percentages, ran internal contests keyed to achieving higher rent growth, and were constantly drilled on minimizing "lost opportunity" (defined as the revenue difference between RealPage's recommended price and any lower price a site might actually accept). "Lost opportunity" wasn't just a management catchphrase; it was a visible metric posted on property goal boards and included in daily printouts that our teams were expected to review. I personally received numerous emails from my Regional Vice President (RVP) instructing me and my team not to go against RealPage pricing. Employees who deviated too often — particularly if they did so out of compassion for a resident's situation — were reprimanded and, in some cases, terminated. Any departure from the software's recommended rent required strict approvals by upper management (a regional vice president and sometimes a senior vice president), and those controls were justified internally as necessary to keep "Fair Housing" standards

intact. In practice, however, they functioned as a deviation-deterrence system to keep pricing locked to RealPage's outputs and competitor-driven signals.

As the Department of Justice has described in its Competitive Impact Statement for this case, RealPage collected daily, granular, non-public transactional data from competing landlords and used that pooled data to shape its pricing recommendations. Widespread adoption and use of those tools by landlords thereby aligned pricing processes and responses across rivals. That description matches the mechanism I saw inside MAA: daily ingestion of competitors' rate information; algorithmic "recommendations" treated as presumptively binding; and organizational pressure — up to and including disciplinary action — to keep site-level decisions within the algorithm's lane. In short, RealPage provided a common platform for competitors to coordinate pricing, and MAA enthusiastically participated in that system, prioritizing the model's outputs over independent judgment.

## II. Why the proposed decree matters — and where it should go further

The proposed Final Judgment as to Greystar prohibits the use of revenue management products that rely on third-party, non-public data, bans call-arounds and "market survey" exchanges of competitively sensitive information for use in pricing, and imposes compliance and monitoring measures. Those provisions squarely target the conduits I experienced firsthand — daily manual entry of competitor rents and "special" concessions, reliance on pooled non-public competitor data within RealPage's ecosystem, and user-group or "idea exchange" interactions among property managers that normalized industry alignment.

**Legal significance.** Under the Sherman Act, agreements among competitors to fix or stabilize prices are *per se* unlawful. Courts also condemn certain "facilitating practices" that predictably reduce uncertainty about rivals' pricing — such as the exchange of granular, current, non-public price and demand data — especially when those exchanges are paired with a common decision-making tool that steers participants toward the same pricing outcomes. What I witnessed at MAA fits that framework exactly: systematic competitor data collection; a shared algorithm translating that pooled data into "recommended" rents; and internal compliance mechanisms that made any divergence from those recommendations rare and costly. The decree's bans and monitoring provisions, therefore, are not mere paperwork formalities — they target the precise information pipelines and governance features that enabled industry-wide price alignment.

**Where the decree should go further** (informed by how the coordination actually occurred in practice):

- **Prohibit manual competitor inputs.** The decree should bar any manual entry of competitor pricing or concessions into rent-setting systems, not just automated data feeds. At MAA, the manual input of competitors' rent and special-offer data was a daily practice and a direct lever for alignment. If automated sharing is banned but old-fashioned "call-around" entries are still allowed, the anticompetitive effect will continue under a different guise.

- **Bar contemporaneous "survey" exchanges for pricing.** A clear line should be drawn between legitimate market research and real-time, unit-specific price sharing among competitors. The routine "market surveys" in which rival property managers swap current pricing and occupancy information should be explicitly prohibited for use in pricing decisions. These surveys are not benign research; in my experience, they were essentially real-time price coordination tools.

- **Require certifications on data usage (with verification).** The Final Judgment should require both revenue-management software vendors and their landlord clients to certify that no pricing algorithms or models are trained on non-public data from other landlords without each landlord's independent input or consent. It should also require documentation sufficient to verify that claim (for example, descriptions of training data sources, feature lists, and change logs for algorithm updates). This creates accountability and allows enforcers or monitors to test whether any "hidden" data sharing is occurring behind the scenes.

- **Maintain default monitoring for revenue management tools.** The decree currently contemplates a compliance monitor for Greystar. I would urge that a monitor be the default whenever a commercial revenue management tool (like RealPage's, or any similar product) is used by a large landlord, unless and until the vendor provides verifiable certifications of completely siloed data and the client demonstrates a compliance program that actively tracks and audits any deviations from recommended pricing. In my experience, even well-intentioned compliance programs can be undermined by internal pressure metrics like "lost opportunity." A monitor can ensure that whatever replaces RealPage does not become "RealPage 2.0" under a different name, and that internal practices (like manual data entry or punishing deviation) don't simply recreate the same effects.

These additions would close the very gaps we used daily — manual competitor inputs, survey call-arounds, and pressure metrics like "lost opportunity" — to keep pricing aligned. In essence, they would attack not only the algorithmic hub of coordination but also the human and manual practices that fed that hub with data and reinforced its dictates.

### III. Retaliation and litigation irregularities that chill reporting

After I began reporting MAA's conduct to federal authorities in 2021, MAA responded by filing a lawsuit in 2023 (ostensibly a trademark infringement case) that quickly became a vehicle for retaliation against me. As I documented in court filings, the litigation was rife with procedural irregularities and misconduct designed to harass and silence me:

- **Pre-service subpoenas and alterations.** MAA's counsel issued subpoenas before formally serving me with the lawsuit — indeed, before I was even named as a defendant, when they initially labeled me a "witness." They later altered the court-approved subpoena content by adding my personal email addresses, and then used that altered version to pull my records directly from third parties, bypassing what the court had authorized. These deviations from Rule 45 were documented in real time. I detailed the timing, content changes, and improper sequence in my appellate filings and a sworn affidavit, including exhibits that show the subpoena issued by the court versus the modified version that was used in the wild.

- **Conflicted law clerk and scrubbed metadata.** Multiple adverse orders issued against me in the case contained document metadata revealing that the primary author was a judicial law clerk, ███████████, who had previously worked at MAA's law firm ████████████████ (the firm representing MAA in the case). After I raised this conflict and requested the judge's recusal, subsequent orders from the court appeared with the author metadata "scrubbed" or removed. The judge declined to recuse despite this undisputed overlap. This sequence — a conflicted court staff member apparently drafting opinions in my case, followed by a sudden concealment of metadata — is part of the record in my Rule 60(d)(3) motion as evidence of fraud on the court.

- **Deletion of my internal whistleblower complaint.** During the litigation, I discovered that MAA had deleted my original 2021 whistleblower hotline complaint from its records (this is documented as Exhibit H to a filing in my Sixth Circuit appeal). Destroying that record not only suggests an intent to obstruct any investigation into the reported wrongdoing, but it likely violates SEC record-retention rules and SEC Rule 21F-17, which prohibits actions that impede an individual's ability to communicate with the SEC about potential violations. In other words, MAA erased the very complaint I had made through its mandated internal system, undermining the integrity of the whistleblower process and potentially breaking federal law designed to protect whistleblowers.

In the end, this retaliatory lawsuit led to a default judgment of over $627,000 against me and a contempt proceeding in which I was jailed for six days. During my brief incarceration, opposing counsel (in coordination with a member of the judge's chambers) conveyed in a recorded phone call to my wife that I would need to sign a settlement agreement as a condition of getting out of jail. This coercive "deal" even attempted to bind my wife — who was not a party to the case — to its terms. I refused to sign upon being released, but the entire episode exemplified how the judicial process was manipulated to punish my whistleblowing.

These examples and outcomes illustrate a broader pattern.

**Why this matters under the Tunney Act:** The Court's public-interest inquiry into the proposed antitrust settlement is not conducted in a vacuum. It must consider not just the text of the decree but also the practical realities of enforcement and compliance. When the true record of industry price coordination is filtered through processes that intimidate whistleblowers and distort discovery (as happened in my case), the risk that anticompetitive conduct will persist unchallenged is much higher — because insiders and employees learn that speaking up leads to personal and professional ruin. My experience shows how easily an enforcement effort can be derailed or chilled by retaliation.

**Legal framework for the retaliation I experienced** (context for why such tactics undermine enforcement):

- **Antitrust laws do not permit retaliation.** The Sherman Act and other antitrust laws prohibit conspiracies to restrain trade; nothing in them allows a company to retaliate against an employee or witness who reports such a conspiracy. On the contrary, efforts by a company to silence or punish someone for reporting possible antitrust violations can themselves constitute obstruction of justice or illegal interference with law enforcement.

- **Sarbanes–Oxley Act § 806 (18 U.S.C. § 1514A).** As an employee of a public company, I engaged in protected activity by reporting what I reasonably believed to be fraud and securities law violations (for example, material misstatements in MAA's public disclosures related to rent practices, insurance accounting, or internal controls). Under Sarbanes–Oxley, a public company may not retaliate against an employee for such disclosures. The threats, litigation, and career damage I faced in response to my reports exemplify the kind of retaliation that this law forbids.

- **Dodd–Frank Act (15 U.S.C. § 78u-6(h)).** Providing information to the SEC about potential securities law violations (which I did repeatedly through TCR submissions) is protected activity under federal law. Any retaliation for those disclosures —

whether termination, legal intimidation, or other harassment — violates the Dodd–Frank Act's whistleblower protection provisions.

- **Obstruction of justice and witness retaliation statutes.** Federal law broadly prohibits tampering with a witness or informant, and retaliating against any person for providing truthful information to law enforcement about the commission of a possible federal offense. This includes information about antitrust crimes and securities violations. Federal law also criminalizes falsifying or altering documents that may be used in an official proceeding. These provisions are directly implicated when, for example, subpoenas are secretly altered after issuance to obtain someone's records, or when litigation is weaponized to punish someone for reporting misconduct. (Indeed, I have reported the subpoena alteration and related events to law enforcement as potential obstruction.)

- **Judicial integrity and due process.** Court processes themselves have safeguards that were bypassed in my situation. Subpoenas are an extension of the court's authority; altering them post-issuance undermines due process and the rule of law. Likewise, if a judge's staff has a conflict of interest (such as a prior association with one party's law firm), the judge is obligated to address it — continued participation by a conflicted clerk taints the fairness of proceedings. The concept of "fraud on the court" (Fed. R. Civ. P. 60(d)(3)) exists for egregious situations like mine, where the impartial functioning of the judiciary is corrupted by undisclosed conflicts or deceptive practices. These are not just procedural issues; they strike at the heart of a litigant's right to a fair hearing and, by extension, they discourage others from coming forward with evidence if they fear the courts will be misused to attack them.

Taken together, these legal protections exist to ensure that people with direct knowledge of market-wide wrongdoing can come forward without being crushed by the very entities they report. In antitrust enforcement, the government often relies on insiders and whistleblowers to shed light on clandestine coordination; if those individuals are met with lawsuits, jail, or character assassination, others will be deterred from speaking up. The stronger and clearer the Court's decree is in prohibiting collusive practices and mandating oversight, the more it will empower insiders to step forward. By the same token, I urge the Court and DOJ to recognize that effective antitrust enforcement and whistleblower protection go hand-in-hand. Without safeguards against retaliation and corruption, even the best antitrust remedies can be undermined by a lack of reporting and compliance.

**IV. Why this is a REIT-level problem for renters**

MAA is not a typical property management company as a renter might assume; it is a REIT — a financial vehicle, with operations layered through subsidiaries, designed to produce income for investors. What I observed (and later reported) was essentially an investment machine that moved money among affiliates (including its captive insurance entity, Brighter View) and "paid itself back" through internal transfers, all while extracting maximum revenue from residents on the front end. In short, the corporate structure and culture prioritized revenue capture over resident well-being. RealPage-driven pricing discipline was one major component of that model, but it was accompanied by other practices that hurt renters.

At the site level, fees and penalties were treated as core revenue lines, not incidental charges. For example, late fees were applied aggressively — with no grace period unless state law specifically required one. In Virginia, I witnessed an "early termination" policy where a resident who needed to end their lease was charged a fee equal to one month's rent. In effect, that meant a tenant could be billed for all the remaining rent due *plus* an extra charge of the same amount, creating a double-rent penalty under the label of an early termination fee. The consistent theme was to find every possible lever to increase collections, while reducing any discretion that local staff might otherwise exercise in favor of a tenant. When residents questioned these practices, management's response was that "consistency" and "the model" required the strict approach, and that granting exceptions would be unfair or even a violation of Fair Housing principles of uniform treatment. In reality, this supposed uniformity was simply the justification for eliminating compassion, flexibility, and basic human judgment in dealing with renters' individual circumstances.

From the top down, the incentives were aligned to maintain this posture. A REIT exists to maximize distributable earnings and return cash to shareholders. With large institutional holders on the shareholder register, the internal pressure was constant: drive NOI growth, hit renewal rent-increase targets, minimize "lost opportunity," and stick to the algorithm. That is why the RealPage regime took such deep root at MAA — because it eliminated on-site discretion and translated investor demands into daily, enforceable rent directives that every property had to follow. And when any discretion did surface (for example, a site manager wanting to grant a one-time concession to help a resident in distress), the central approval and discipline systems yanked everything back to the model.

I have relayed these facts and concerns to MAA's board and senior leadership multiple times since 2021. I have done so despite severe personal consequences: a $627,000 judgment entered against me, six days of incarceration under the conditions described above, and unrelenting efforts by the company and its counsel to discredit me. During the litigation, opposing counsel even leveled a series of bizarre criminal accusations against

me — allegations that I categorically deny and that, to my knowledge, were never substantiated by any police report or investigation. These included claims that I supposedly opened a credit card in the name of opposing attorney ▮▮▮▮▮▮▮ and her husband and fraudulently spent $30,000, accessed a former supervisor's mail, posted a harassing ice cream shop review aimed at an attorney, engaged in stalking or cyber-stalking, 'bugged' company computers, hacked company systems, and even impersonated a senior vice president on social media to contact that person's family. I believe these accusations were concocted to intimidate me and to poison the well against me as a witness. I have documented my formal denials of each allegation, and I have noted the absence of any supporting law enforcement evidence, in the court record. This backdrop is important because it illustrates the lengths to which a large landlord like MAA may go to silence a whistleblower — which in turn underscores why robust public enforcement is so necessary in this industry.

In summary, what this means for renters is the following:

- **Higher, "stickier" rents and less real competition.** The REIT structure and its incentives — when paired with RealPage's pricing discipline — lead to consistently higher rents that are less responsive to typical competitive pressures. Instead of competing to offer lower prices, large landlords using a common pricing tool tend to push rents up in unison. Renters encounter a take-it-or-leave-it market, because the major players are all following the same algorithm-driven strategy.

- **Additional fees effectively raise prices further.** Fee practices such as steep late fees with no grace period, double-charge "early termination" penalties, and other tacked-on charges operate as additional rent by another name. These practices significantly increase the effective cost of housing for tenants. A renter might budget carefully for the base rent, only to find that a single misstep or life event — a payment a few days late, or the need to move for a job or family emergency — triggers punitive charges that make their housing dramatically more expensive.

    MAA also appeared to take advantage of military service members who needed to break their leases. Instead of granting flexibility and allowing the 30-day notice period to begin on the actual date notice was given, management required it to begin only on the first day of the following month. For example, if a service member provided notice on September 3rd, the 30-day period would not begin until October 1st. Whether that interpretation of the military leasing clause was technically correct I cannot say, but it struck me as petty and disrespectful to those serving our country. The prevailing attitude was, "the military will pay for it, no questions asked, so why should we care."

When I worked at the Pentagon Row complex (now called National Landing), management absolutely loved short-term military leases — not because they wanted to accommodate or support service members, but because the higher rents attached to those short-term leases drove up average rent levels across the property. The military's willingness to cover the expense without dispute made these leases especially profitable. At the same time, at this community, service members were not offered even modest rent discounts, unlike what many other apartment communities or retailers extend as a basic courtesy. This revealed the company's true focus: inflating rents and extracting revenue, rather than honoring obligations to or showing respect for those in uniform

- **Elimination of local discretion and human judgment.** Large landlords like MAA use "uniformity" as a mantra to strip local property managers of the ability to be flexible or empathetic. Residents are left dealing with an algorithm or a rigid corporate policy, backed by a company-wide enforcement mechanism. There is no room to negotiate or to explain unique hardships; the answer is always, "This is our policy and we can't make exceptions." While this is often justified internally as ensuring equal treatment, it in fact means that even reasonable, compassionate adjustments (like giving a short grace period for a late payment, or waiving a minor fee due to an emergency) are off the table. This dynamic not only harms renters directly, but it can also mask discriminatory effects — a seemingly neutral policy can disproportionately hurt certain groups even if it is applied to everyone. In my own case, after I came forward as a whistleblower, I personally experienced what I consider to be discriminatory and retaliatory treatment as an MAA tenant, which further motivates me to advocate for change.

I do not know why MAA — one of the nation's largest residential landlords — has not yet been publicly named in the government's enforcement actions related to RealPage. Based on what I saw and reported, it absolutely should be. Whether through this Tunney Act proceeding or through a separate enforcement action, the same information flows and alignment mechanisms that the Department has identified with other landlords exist at REIT scale in companies like MAA. The remedy must reach those levels in order to fully protect renters and re-establish genuine competition.

### Conclusion

The mechanisms that the Department of Justice has described in this case — pooled, non-public competitor data feeding RealPage's rent-setting algorithm, coupled with communication channels like market surveys, call-arounds, and user forums that allow rival landlords to coordinate their strategies — match what I witnessed inside MAA. The

proposed Greystar consent decree is a strong first step. To truly safeguard renters and restore competition, however, the remedy needs to be extended and strengthened wherever these same pipelines and practices exist, and it must be enforced with rigor. In particular, I respectfully urge the Court and the Department to consider the following enhancements and complementary measures:

- **Prohibit manual competitor inputs and real-time "survey" exchanges for pricing purposes**, not just automated data feeds. If a practice results in sharing current pricing information — whether through software or through informal calls — it should be off-limits for rent setting.

- **Require verifiable assurances that no pricing model is trained on cross-owner, non-public data, and retain documentation sufficient to audit those assurances.** If RealPage or any similar platform claims its algorithm is independent and not fueled by competitors' data, it should be able to prove what data goes into it (and what does not).

- **Maintain default monitoring of pricing practices** for any large landlord using a commercial pricing tool, unless both the vendor and the client meet strict certification and compliance benchmarks. The oversight of a monitor can deter subtle or hidden forms of coordination that might otherwise go unnoticed.

- **Pair antitrust compliance with explicit whistleblower protections and non-retaliation commitments.** Employees and even residents must feel safe to report potential violations. The consent decree (and any related public guidance) should reinforce that participating landlords will not retaliate against staff or tenants who raise antitrust or compliance concerns. I would encourage coordination between DOJ and agencies like HUD (which oversees Fair Housing) to ensure that tenants who speak up about potential collusion or unfair practices do not face eviction or other retribution.

- **Coordinate antitrust remedies with securities law and consumer protection oversight for public REITs.** Many major landlords are publicly traded REITs, meaning they are subject to SEC reporting and internal control requirements, as well as consumer protection laws regarding fair practices. Collusive pricing schemes and exploitative fee practices should not be allowed to hide behind complex corporate structures or misleading disclosures. I urge collaboration with the SEC (to address any investor deception or internal control failures related to these pricing practices) and with agencies like the CFPB or FTC (to address any unfair or deceptive fee practices that harm tenants). Ensuring that anticompetitive

strategies are not being camouflaged through captive insurance arrangements or opaque accounting will strengthen the overall enforcement effort.

I submit this comment in the hope of assisting the Court in its public-interest review of the proposed Final Judgment. The conduct I have described is not a series of isolated missteps or the work of a few rogue actors; it is a coordinated system. RealPage provided the algorithmic backbone, and corporate incentives and controls provided the muscle to enforce it. Without a remedy that addresses both the data flows and the governance practices that give those data flows their power, renters will remain vulnerable to what is essentially synchronized, algorithm-driven rent inflation presented under the guise of "consistent" and "fair" pricing.

*Respectfully submitted,*
/s/ ███████████████

███████████████
███████████████
███████████████

Defendant–Appellant, Pro Se
Former MAA Employee/Resident; Whistleblower, Renter Advocate