UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 25-93-DLB-CJS

COMMONWEALTH OF KENTUCKY, *ex rel.*
ATTORNEY GENERAL RUSSELL COLEMAN                                PLAINTIFF


v.                              MEMORANDUM ORDER


REALPAGE, INC., et al.                                          DEFENDANTS

* * * * * * * * * * * * * * * *

## I.      INTRODUCTION

This matter is before the Court upon the Motion to Dismiss filed by Defendants RealPage, Inc. ("RealPage"); BH Management Services, LLC ("BH"); First Communities Management, Inc. ("FCM"); Greystar Real Estate Partners, LLC ("Greystar")[1]; Highmark Residential, LLC ("Highmark"); Independence Realty Trust, Inc. ("IRT"); Mid-America Apartment Communities, Inc. and Mid-America Apartments, LP ("MAA"); and Willow Bridge Property Company, LLC ("Willow Bridge") (collectively "Defendants").  (Docs. # 89–91).  Plaintiff Commonwealth of Kentucky, represented by Attorney General Russell Coleman, having filed its Response (Doc. # 118), and Defendants having filed their

---

[1]      Greystar submitted its own Motion to Dismiss on September 15, 2025, claiming that the Complaint failed to allege that Greystar Real Estate Partners, LLC had any wrongdoing and that a parent company cannot be held accountable for the claims of its subsidiaries under the Sherman Act.  (Doc. # 91).  However, on November 14, 2025, the Parties submitted a Proposed Order that would substitute Greystar Management Services, LLC as a Party Defendant in place of Greystar Real Estate Partners.  (Doc. # 116).  The Court entered that Order on January 5, 2026.  (Doc. # 125).

1

Replies (Docs. # 121–22) the Motion is now ripe for the Court's review.  For the following reasons, Defendants' Motion to Dismiss will be **granted in part and denied in part**.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

This case arises from alleged violations of state and federal antitrust and consumer protection laws at the expense of Kentucky consumers.    More specifically, the Commonwealth of Kentucky alleges that, by using Defendant RealPage's software programs that provide landlords with non-public information about rental pricings and availability, Defendants entered a conspiracy to inflate multifamily housing prices in Kentucky.  (Doc. # 1 ¶ 15).  At this stage of the proceedings, the Court pulls the relevant factual allegations from Plaintiff's Complaint and accepts them as true.

The Commonwealth of Kentucky brings this action on behalf of its residents, finding that it is in the public interest to do so.  (*Id*. ¶ 24).  Defendant RealPage, Inc. is a Delaware corporation with its headquarters in Texas that provides real estate software and services to residential apartment managers.  (*Id*. ¶ 25).  RealPage controls a large portion of the commercial revenue management software market.  (*Id*. ¶ 50).  Defendants are various property management companies that own residential rental properties in Kentucky.  (*Id*. ¶ 26–33).  According to the Complaint, between January 2016 and the present day, Defendants contracted with RealPage to use RealPage's software programs to run their respective businesses.  (*Id*. ¶ 16).

RealPage's software programs are at the heart of the Commonwealth's alleged conspiracy.    At all times relevant to this action, RealPage offered several revenue management software systems that its partners could use to advance and maintain their respective properties, collectively called Revenue Management Solutions ("RMS").  (*Id*. ¶

2

7).  RealPage operates a number of data management products, but the three most relevant to this action are called YieldStar, AI Revenue Management ("AIRM"), and Lease Rent Options ("LRO").  (*Id.*).

YieldStar and AIRM collect nonpublic data and use the data to generate price recommendations for subscribing landlords.  (*Id.* ¶ 52).  These programs collect data in a number of fields relevant to its clients' businesses, including information on individual lease transactions, lease renewals, historical lease data, and future tenant demand.  (*Id.* ¶ 71).  YieldStar and AIRM work to align prices of units and floor plans among opted-in landlords in each area or market.  (*Id.* ¶¶ 70, 76).  The programs do this by recommending individualized price recommendations based on data aggregated from other similarly situated RealPage customers in the relevant market area.  (*Id.* ¶¶ 76–77).  Put another way, RealPage turns competitors into collaborators by offering its customers uniform prices based on information provided by those customers.  (*Id.* ¶ 12).

Using the gathered data, YieldStar and AIRM then generate a market range for each floor plan of a given property owner's building.  (*Id.* ¶ 78).  The generated range includes a market minimum effective rent and a market maximum effective rent.  (*Id.*).  The programs would not recommend any rent prices below the "hard floor" market minimum, but they will recommend prices above the "soft ceiling" that is the market maximum.  (*Id.*).  The programs also use the shared data to forecast the number of expected lease vacancies and expected lease applications for a certain period.  (*Id.* ¶ 80).  The programs increase prices when they detect a change in market, indicated by the rise in floor plan prices among other RealPage customers.  (*Id.* ¶ 82).  And as the market demands it, RealPage and its programs recommend that its customers increase prices

across the board.  (*Id*. ¶ 85).  RealPage tells its prospective clients that allowing YieldStar and AIRM to access its data can allow it to outperform its competitors by two to seven percent.  (*Id*. ¶ 57).

While landlords can choose whether to accept RealPage's price recommendations, the programs make it more difficult to decline the programs' recommendations.  (*Id*. ¶¶ 97, 101).  Specifically, RealPage requires that landlords who do not accept YieldStar and AIRM's recommendations provide a "specific business commentary" for why they did not accept the recommendation, which it says should be a "strong sound business minded approach."  (*Id*. ¶ 97).  These mandatory commentaries are then sent to a RealPage pricing advisor, who reviews the explanation to determine whether there is adequate justification for rejecting RealPage's recommendation.  (*Id*. ¶ 98).  If the advisor disagrees with the property manager's rejection, the dispute is further escalated to the landlord's regional manager to discuss the rejection.  (*Id*. ¶¶ 102–103).  By contrast, LRO also provides pricing recommendations to users, but its recommendations are based on users' direct data inputs.  (*Id*. ¶ 93).

Beginning in January 2016, the Commonwealth alleges Defendants entered into individual, independent contracts with RealPage to begin using RealPage's services.  (*Id*. ¶ 16).  By contracting with RealPage and agreeing to use its services, the individual Defendants share their nonpublic data with RealPage about their properties.  (*Id*. ¶ 108).  Since then, renters in the Commonwealth have seen their rent prices increase significantly, specifically in its three major multifamily housing markets—Greater Cincinnati, Louisville, and Lexington-Fayette.  (*Id*. ¶¶ 42, 45, 49).

4

The Commonwealth claims this is by design. It claims that RealPage's software programs have the effect of eliminating the competitive market for multifamily housing units by allowing landlords to "optimize" their prices based on what their competitors are doing to "maximiz[e] opportunity." (*Id*. ¶¶ 7, 14). Specifically, these programs recommend landlords raise rent prices in sync, limit unit price decreases in dollar amount and frequency, and discourage any negotiation or bargaining tactics that would take unit prices below a certain number. (*Id*. ¶¶ 107, 118, 128). According to the Commonwealth, this scheme amounts to a hub-and-spoke conspiracy that violates Section 1 of the Sherman Act and the Kentucky Consumer Protection Act. (*Id*. ¶¶ 150–179).

The Commonwealth, through Attorney General Russell Coleman, brought this suit on July 2, 2025 (Doc. # 1) and began serving Defendants on July 7, 2025 (Doc. # 12).[2] Defendants filed their Joint Motion to Dismiss on September 15, 2025 (Doc. # 89) and Defendants MAA, IRT, Greystar and Willow Bridge filed a Motion to Dismiss any claims involving LRO (Doc. # 90).[3] The Commonwealth filed its Response on November 14, 2025 (Doc. # 118), and Defendants filed their Replies on December 15, 2025 (Docs. # 121–22). Thus, the Motion is ripe for the Court's review.

---

[2]    The Commonwealth initially named RPM Living, LLC as a Defendant in this action, but voluntarily dismissed them as a named Defendant on September 11, 2025. (Doc. # 86).

[3]    The Court will address both Motions to Dismiss together. Because the Complaint alleges that LRO is part of RealPage's RMS system, the Court does not see the need to conduct an entirely separate analysis for one aspect of the system when the system as a whole is under attack. (Doc. # 1 ¶ 7). While the Court does take LRO Defendants' point that LRO is mentioned significantly less than the other two RealPage products (*see* Doc. # 90 at 3–5), it cannot be disputed that LRO is part of the overall scheme that the Commonwealth challenges in its Complaint.

III.    **ANALYSIS**

A.    **Standard of Review**

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint that fails to state a claim upon which relief can be granted.  To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is deemed facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  This standard asks for "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*

In addressing a motion to dismiss under Rule 12(b)(6), a district court must accept the complaint's factual allegations as true, draw all reasonable inferences in the plaintiff's favor, and only then determine whether those facts and inferences plausibly give rise to an entitlement to relief.  *Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020).  However, the Court will "disregard bare legal conclusions and 'naked assertion[s],' affording the presumption of truth only to genuine factual allegations."  *Dakota Girls, LLC v. Philadelphia Indem. Ins. Co.*, 17 F.4th 645, 648 (6th Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678).  Further, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not state a claim that can survive at the motion to dismiss stage.  *Fritz v. Michigan*, 747 F. App'x 402, 405 (6th Cir. 2018) (quoting *Iqbal*, 556 at 678).  "If it is at all plausible (beyond a wing and a prayer) that a plaintiff would

6

succeed if he proved everything in his complaint, the case proceeds." *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018).

**B.    The Sherman Act**

The Commonwealth's principal allegations are that Defendants took part in a conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  (Doc. # 1 ¶ 151).  Specifically, the Commonwealth alleges that the Defendants entered into an agreement to "fix, raise, stabilize, or maintain at artificially high levels" the prices of multifamily housing units across Kentucky, and that Defendants exchanged competitively sensitive information that produced anticompetitive effects without procompetitive justifications.  (*Id.* ¶¶ 152, 159).

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."  15 U.S.C. § 1. To state a claim under Section 1 of the Sherman Act, a plaintiff must show: (1) the existence of a contract, combination, or conspiracy among two or more separate entities; (2) that the contract, combination, or conspiracy among the entities unreasonably restrains trade; and (3) that this restraint of trade affects interstate or foreign commerce. *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 498 (M.D. Tenn. 2023) (citing *Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*, 48 F.4th 656, 663 (6th Cir. 2022)).

Conspiracies under Section 1 can be vertical, horizontal, or a combination of vertical and horizontal.  *Id.* at 499.  A vertical conspiracy is an agreement to limit trade between "combinations of persons at different levels of the market structure, e.g.,

7

manufacturers and distributors[.]" *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972). Conversely, a horizontal conspiracy is one between "competitors at the same level of the market structure . . . in order to minimize competition." *Id.* Relevant to this case, conspiracies with vertical and horizontal elements are more commonly called hub--and-spoke conspiracies. A hub-and-spoke conspiracy involves a central distributor or supplier—the "hub"—contracting with several downstream distributors who agree amongst each other to restrict trade in some way—the "spokes." *Total Benefits Plan. Agency, Inc., v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 435 n.3 (6th Cir. 2008). The agreement amongst horizontal competitors is called the "rim" of the conspiracy. *Id.* at 435. Proving a hub-and-spoke conspiracy requires proving the existence of a vertical relationship between the hub and the spokes, as well as a horizontal relationship between each of the spokes. *Id.* at 436 (holding that the complaint failed to prove a hub-and-spoke conspiracy because it failed to present a connection between the horizontal members).

By nature, conspiracy claims under the Sherman Act must be entered into by two or more parties. *Plymouth Whalers*, 419 F.3d at 469. An agreement to conspire "can be found when the conspirators have a unity of purpose, common understanding, or a 'meeting of minds in an unlawful agreement.'" *Hyland v. HomeServices of America, Inc.*, 771 F.3d 310, 318 (6th Cir. 2014) (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946)). Regardless of whether it is a vertical, horizontal, or hub-and-spoke agreement, a conspiracy agreement can be proven through either direct evidence or circumstantial evidence. *In re RealPage*, 709 F. Supp. 3d at 501. Direct evidence in the Section 1 context is evidence that "is explicit and requires no inferences to establish the

proposition or conclusion being asserted." *Hyland*, 771 F.3d at 318 (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999)).

To survive a motion to dismiss, a plaintiff with Sherman Act claims need only show "a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. Further, the Supreme Court held in *Twombly* that "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id*. The *Twombly* Court further provided that "allegation[s] of lawful parallel conduct and a bare assertion of conspiracy" will not suffice to prove a conspiracy under the Sherman Act. *Id*. at 556–57. To sum it up, at this stage, the Court will be looking to see if the Commonwealth raised a "'plausible inference' of an unlawful agreement to conspire." *In re RealPage*, 709 F. Supp. 3d at 500.

Defendants maintain that the Commonwealth failed to allege any facts proving the first two elements required. Defendants first state that the Commonwealth failed to allege facts that affirmatively plead a showing of a hub-and-spoke conspiracy. (Doc. # 89 at 4–5). Next, Defendants argue that the Commonwealth's argument fails to allege any restraint on trade under either the *per se* standard or the rule of reason standard. (*Id*. at 16–17). Defendants did not address the interstate commerce element in their Motions to Dismiss, and as such, the Court will interpret that element as unchallenged. The Court will now analyze Defendants' arguments in turn.

9

### 1. The Commonwealth's Complaint plausibly alleges a hub-and-spoke conspiracy.

Defendants first assert that the Commonwealth's Complaint should be dismissed because it did not plead enough facts to allege the existence of a conspiracy. (*Id*. at 5). In particular, Defendants claim the Commonwealth did not plead either "'an explicit agreement to restrain trade' or 'sufficient circumstantial evidence tending to exclude the possibility of independent conduct.'" (*Id*. (quoting *Hobart-Mayfield*, 48 F.4th at 664)). Finally, Defendants assert that the Commonwealth failed to assert more than "mere use" of RealPage's products, which they claim is essential to proving a hub-and-spoke conspiracy. (*Id*.).

Upon review of the current record, the Court finds no direct evidence of a conspiracy between RealPage and the Defendants. The Commonwealth identifies a number of statements by RealPage and other Defendants in its Complaint that it contends are direct evidence of a conspiracy. (Doc. # 118 at 13–15; *see also* Doc. #1 ¶¶ 1–2, 57, 63, 72, 102–104, 108–110, 121, 123–24, 128, 133). However, after reviewing each of the statements the Commonwealth identifies in its Response, the Court is not persuaded that any of these statements are enough to directly allege an illegal agreement between the parties. The Court would need to make a series of inferences to conclude a conspiracy directly from the pleadings. *See Hyland*, 771 F.3d at 318. Nevertheless, while the Court does not find these statements to be direct evidence of a conspiracy, the Court considers them significant and will address them *infra* as pieces of circumstantial evidence.

The Court now turns to whether the Complaint alleges circumstantial evidence of a conspiracy. Circumstantial evidence requires a showing of parallel conduct between

10

defendants, combined with factual enhancements known as "plus factors" that indicate the conspirators entered the agreement to restrain trade. *Hobart-Mayfield*, 48 F.4th at 665. When analyzing parallel conduct, the main inquiry is whether "the factual allegations point to nothing more than parallel conduct of the sort that is the product of independent action, or do they plausibly raise an inference of unlawful agreement[.]" *Erie Cnty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 869 (6th Cir. 2012).

In addition to parallel conduct, a plaintiff must allege at least one plus factor to state a claim for relief under the Sherman Act. *In re RealPage*, 709 F. Supp. 3d at 502. The Sixth Circuit has identified four "plus factors" that are important when evaluating whether parallel conduct rises to the level of an actionable conspiracy. *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 907 (6th Cir. 2009). Those are: (1) whether the defendants' actions, if taken independently, would be contrary to their own economic self-interest; (2) whether defendants have been uniform in their actions; (3) whether defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and (4) whether defendants have a common motive to conspire. *Id*. Courts review plus factors holistically, as opposed to one-by-one or in isolation. *In re Real Page*, 709 F. Supp. 3d at 502.

The Commonwealth maintains that RealPage's system demonstrates parallel conduct because Defendants opted into adopting RealPage's pricing systems through agreements to share their nonpublic, competitively sensitive data for revenue management purposes. (Doc. # 1 ¶¶ 52, 65). Further, after Defendants give their nonpublic data to RealPage's products and allow RealPage to use their data to develop daily pricing recommendations, the Commonwealth alleges that Defendants use the

11

recommendations that RealPage's products generate to set the prices of their respective units and floor plans. (*Id.* ¶¶ 91, 108, 116). This system, the Commonwealth claims, is parallel conduct among the spokes (Defendants) at the behest of the hub (RealPage). (*Id.* ¶¶ 52–53, 106). To support its point, the Commonwealth points to increases in rent across Kentucky's largest rental markets and quotes from RealPage employees indicating how landlords who use RealPage's programs have changed their protocols when setting and establishing rents. (*Id.* ¶¶ 42, 45, 49, 121–22). The Commonwealth alleges that such a scheme has landlords raise prices or maintain high prices, "even though the model has determined such deviations may contravene the landlord's individual economic interest." (*Id.* ¶¶ 125–126).

For their part, Defendants contend that the Commonwealth did not make a plausible showing of parallel conduct. (Doc. # 89 at 9). Defendants first assert that there cannot be parallel conduct because the Commonwealth admitted that the Defendants used different products in RealPage's RMS system, claiming that "[t]here is no parallel conduct if Defendants were not even using the same algorithm." (*Id.* at 10). Next, they maintain that the Complaint does not allege when Defendants started using RealPage's products, which Defendants claim undercuts the idea that they could ever have been working in tandem. (*Id.*). Thirdly, Defendants maintain that the Complaint does not allege specific facts that any Defendant delegated its pricing authority to RealPage, even conceding that Defendants have "individual pricing freedom" to accept RealPage's recommendations. (*Id.* at 10–11). Finally, Defendants contend that there are no valid allegations of parallel pricing because the Complaint is not specific to Defendants and is based on market-wide average data. (*Id.* at 11–12). Defendants further maintain that the

12

Complaint alleges no plus factors excluding the possibility of independent conduct because the facts pled are more consistent with self-interested conduct than conspiracy. (*Id.* at 13).

At this stage, the Court finds that the Commonwealth plausibly alleged the existence of a hub-and-spoke conspiracy between RealPage and Defendants. The Court first finds that the Complaint alleges the necessary vertical elements of a hub-and-spoke conspiracy through the written contracts each of Defendants entered with RealPage. (Doc. # 1 ¶¶ 25–33). The Complaint alleges that each named Defendant entered a written contract with RealPage and paid to use RealPage's services as part of its business. (*Id.*). At this stage, where the Court construes all allegations of fact as true, that is enough to allege a vertical agreement between RealPage and Defendants.

Additionally, the Commonwealth's allegations that each Defendant voluntarily gave RealPage its data so RealPage could provide it to direct competitors to recommend higher rental prices describe the kind of parallel conduct that signifies a horizontal agreement that Section 1 of the Sherman Act is designed to thwart. *In re RealPage*, 709 F. Supp. 3d at 512–13. Assuming the Commonwealth's alleged facts as true, the individual Defendants worked with RealPage to undercut the volatility of the market by providing their granular, nonpublic data to a common source through RealPage's pricing algorithms (YieldStar and AIRM), other RealPage software, and even monthly phone calls from RealPage. (Doc. # 1 ¶¶ 54–64). With the data, RealPage provides pricing recommendations that Defendants are expected to accept more often than not. (*Id.* ¶ 95). Clients further agree that they will use AIRM and/or YieldStar's recommendations when giving quotes to potential renters. (*Id.* ¶ 104). Through the implementation of

13

"guardrails" and the elimination of "concessions," RealPage pushes Defendants to raise prices when the market may dictate otherwise. (*Id*. ¶ 106). Further, Defendants agree to "revenue growth" as the official metric to evaluate RealPage's programs, as opposed to traditional methods like occupancy rates. (*Id*. ¶ 104).

As stated by the Middle District of Tennessee in *In re RealPage*, this scheme of increasing rent prices based on other data "is in Defendants' economic self-interest if and only if Defendants know they are receiving in return the benefit of their competitors' data in pricing their own units." *In re RealPage*, 709, F. Supp. 3d at 510. As the Commonwealth pleads it, there are factual allegations that plausibly allege an agreement between RealPage and Defendants to engage in a system that moderates rents of multifamily housing units. The Commonwealth further alleges requisite plus factors, namely that the agreement is against the regular business interests of the individual Defendants, the agreement consists of exchange of commercially sensitive information from Defendants, and the agreement is driven by Defendants' common motive of making as much money as possible. *In re RealPage*, 709 F. Supp. 3d at 512; *see also Gibson v. MGM Resorts Int'l*, No. 2:23-CV-00140-MMD-DJA, 2023 WL 7025996, at *4 (D. Nev. Oct. 24, 2023) ("[A] successful hub and spoke theory of Sherman Act liability based on the use of algorithmic pricing depends in part on the exchange of nonpublic information between competitors through the algorithm."). At this stage, the Commonwealth's pleadings support "a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 545.

### 2. The Commonwealth's Complaint plausibly alleges unreasonable restraint of trade.

Defendants next contend that the Commonwealth's Complaint does not allege a conspiracy that restrained trade under either the *per se* rule or the "rule of reason."[4] (Doc. # 89 at 18). In particular, Defendants allege that the Complaint alleges neither a *per se* unlawful price fixing agreement nor an information exchange in furtherance of a price fixing agreement. (*Id*.). Further, Defendants contend that the Complaint does not allege that RealPage or the Defendants possess market power necessary to state a "rule of reason" claim. (*Id*.).

Claims under Section 1 of the Sherman Act must be deemed unreasonable restraints of trade under either the *per se* rule or the "rule of reason*.*" *Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 469 (6th Cir. 2005). Sherman Act claims, under both the *per se* rule and the rule of reason, can be proven through direct or indirect evidence as well. *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018). Given that the Commonwealth alleges Defendants violated the Sherman Act on both bases, the Court will analyze the Complaint's claims under both *per se* and rule of reason frameworks.

---

[4]      In its Complaint, the Commonwealth claims that Defendants' conduct is unlawful under the *per se* rule, the rule of reason and a third rule known as the "quick look" rule. (Doc. # 1 ¶¶ 155, 160). The "quick look" rule is described as a "third type of category arising from the blurring of the line between *per se* and rule of reason cases[,]" and is considered a "less rigid" method of analyzing a situation where it is particularly obvious the agreement is anticompetitive in nature. *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 274 (6th Cir. 2014). In this case, the Court does not interpret the issue as the obvious kind that would necessitate "quick look" review, so it will decline to review this case under the "quick look" rule.

### a.    *Per se* Rule

The *per se* rule is reserved for a class of violations that are deemed anticompetitive by nature, such that no further inquiry is needed to determine whether a violation took place. *In re Se. Milk*, 739 F.3d at 270–71. "The per se rule should only be used when the restraint has 'such predictable and pernicious anticompetitive effects,' that there is 'limited potential for procompetitive benefit.'" *Id*. at 271. Examples of conduct that are illegal under the *per se* rule include horizontal price fixing agreements and market allocation agreements, because they are "so inherently anticompetitive that each is illegal per se without inquiry into the harm [the agreements] actually caused." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984).

Here, the Commonwealth has not pled sufficient facts to allege a *per se* violation of Section 1. While the Court does conclude that there is evidence of a conspiracy detailed *supra*, there are not the specific factual allegations of side agreements between Defendants to set the unit prices at a specific dollar amount. Further, there are no allegations of any agreements between RealPage and individual Defendants that mandate Defendants accept any of RealPage's offers. Indeed, the Complaint concedes that Defendants do not have to accept all of RealPage's suggested offers. (Doc. # 1 ¶ 66). There is not enough in the Complaint for this Court to conclude the sort of straightforward anticompetitive behavior that the *per se* rule is in place to snuff out. *In re Se. Milk*, 739 F.3d at 271. As such, the Court will not apply the *per se* rule to the Commonwealth's Complaint.

16

### b.    Rule of Reason

Conversely, the rule of reason looks at "the actual effect on competition in a relevant market to determine whether the conduct unreasonably restrains trade." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008). To allege a violation under the rule of reason, a plaintiff must show: (1) that the defendants contracted, combined, or conspired; (2) that the scheme produced anticompetitive effects; (3) that the restraint affected relevant product and geographic markets; (4) that the object of the scheme and the conduct resulting from it was illegal; and (5) that the scheme was a proximate cause of the plaintiff's antitrust injury.[5] *Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1014 (6th Cir. 2005). If the plaintiff can make that showing, the burden then shifts to the defendant to prove that the questioned restraint of trade has "procompetitive effects" that "justif[y] the otherwise anticompetitive injuries." *Plymouth Whalers*, 325 F.3d at 718. If the defendant makes that showing, the plaintiff can still proceed if they show that the defendant's stated objectives could be proven in a substantially less restrictive manner. *Id*. At the motion to dismiss phase, "[f]ull analysis under the rule of reason [is] not [ ] appropriate . . . given the fact intensive nature of that analysis." *In re RealPage*, 709 F. Supp. 3d at 521 (quoting *Churchill Downs Inc. v. Thoroughbred Horsemen's Grp., LLC*, 605 F. Supp. 2d 870, 887 (W.D. Ky. 2009).

In going through the necessary framework, the Court determines the Commonwealth's Complaint plausibly alleges an unreasonable restraint of trade in violation of Section 1 of the Sherman Act. Taken as true, there are facts that plausibly

---

[5]    As outlined *supra*, the Complaint alleges a valid contract or conspiracy between RealPage and Defendants, which satisfies element one.

17

allege a restraint of trade between Defendants and RealPage at the expense of the Commonwealth's residents.

The Court begins its analysis at the relevant product and geographic market. *Stratmore v. Goodbody*, 866 F.2d 189, 194 (6th Cir. 1989). The Complaint alleges that "conventional multifamily rental housing is the relevant product market." (Doc. # 1 ¶ 137). Defendants do not dispute the Commonwealth's product market allegation or even address it in their Motion to Dismiss. (Doc. # 89 at 20).

Defendants do, however, dispute the Commonwealth's proffered geographic market. Throughout the Complaint, the Commonwealth broadly alleges that Defendants' scheme impacts the Commonwealth of Kentucky with specific impact in the submarkets, specifically Greater Cincinnati, Louisville, and Lexington-Fayette. (Doc. # 1 ¶¶ 16, 37–39, 149). More explicitly, the Commonwealth alleges that the relevant geographic markets are "those property locations close enough for [Defendants'] apartments to be considered reasonable substitutes[,]" which makes the focus "inherently local." (*Id*. ¶ 148).

Defendants take issue with the Commonwealth's broad depiction of the relevant geographic market. (Doc. # 89 at 21). Defendants first claim that the Commonwealth's geographic market definition is "impermissibly vague, even under the forgiving standard of Rule 12." (*Id*. at 21 n. 10). Defendants further stress that the Complaint does not allege facts that fully established Defendants have market power in Kentucky as a whole or in the respective submarkets the Complaint lists. (*Id*. at 21–22). Defendants allege that the Complaint lacks facts that would allow the requisite factual analysis of the geographic markets to take place. (*Id*. at 21).

18

*In re RealPage* is instructive here. In that case, the multifamily housing plaintiffs' complaint listed the entire United States as the geographic market for the defendants' conspiracy, but focusing on several submarkets called Metropolitan Statistical Areas ("MSAs") that plaintiffs allege were specifically impacted. *In re RealPage*, 709 F. Supp. 3d at 523. The Middle District of Tennessee ruled that, despite the defendants' objections that the plaintiffs' geographic markets were too broad, the multifamily housing plaintiffs had pled sufficient facts to plausibly allege relevant geographic markets in the form of the smaller, more demonstrative MSAs. *Id.* at 525. The court rejected the notion that the plaintiffs' use of submarkets was inappropriate at the motion to dismiss stage of the proceedings, instead holding that they were "certainly not facially implausible." *Id.*

The Commonwealth's pleadings here mirror those of the multifamily housing plaintiffs in *In re RealPage*, but on a smaller scale. In this case, the Commonwealth alleges a widescale operation across a large geographic market—the Commonwealth of Kentucky. (Doc. # 1 ¶ 16). The Commonwealth further alleges that this pattern is easier demonstrated and more apparent in smaller, more localized submarkets—Greater Cincinnati, Lexington-Fayette, and Louisville, among others. (*Id.* ¶¶ 37–39). Specific nuances of the markets—the kinds of details Defendants expect the Complaint to contain—are better suited for discovery. But from the facts alleged, it is plausible that Kentucky and the stated submarkets are "the market area[s] in which the [Defendants] operate[ ]", and at this stage the Court finds this breakdown to be sufficient to allege a relevant geographic market. *White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 501 (6th Cir. 1983).

Next, the Court looks to whether the Complaint alleges plausible anticompetitive effects of Defendants' alleged conspiracy on the Kentucky multifamily housing market. "Market power and the anticompetitive nature of the restraint are sufficient to show the potential for anticompetitive effects under a rule-of-reason analysis[.]" *Realcomp II, Ltd. V. F.T.C.*, 635 F.3d 815, 828 (6th Cir. 2011). However, "[i]f [direct evidence] of adverse effects are clear, inquiry into market power is unnecessary." *In re RealPage*, 709 F. Supp. 3d at 525 (citing *Realcomp II*, 635 F.3d at 827). Further, "[s]ince the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, 'proof of actual detrimental effects, such as a reduction of output,' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'" *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986). Courts will not "infer competitive injury from price and output data absent some evidence that tends to prove that output was restricted or prices were above a competitive level." *Am. Express*, 585 U.S. at 549.

The Commonwealth's Complaint hinges almost entirely on showing direct evidence of anticompetitive effects by Defendants. (Doc. # 118 at 30–33). It principally claims that the increases in rent prices in Kentucky, coupled with RealPage's products' stated goals of reducing Defendants' numbers of available apartments at a given point in time, constitute direct evidence of RealPage's detrimental effects on the market by restricting output. (*Id*. at 31). The Commonwealth also points to RealPage's declarations that their products can raise revenues and "outperform the market." (*Id*.). Finally, the Commonwealth points to data from the three largest housing submarkets—Greater Cincinnati, Louisville, and Lexington-Fayette—that shows inconsistent spikes in the

market that the Commonwealth alleges are a result of the conspiracy. (Doc. # 1 ¶¶ 37–49). Defendants, for their part, claim that the Commonwealth's data does not prove the existence of a conspiracy because it shows multifamily housing output expanding in parallel with housing prices rising, which Defendants claim is "consistent with growing product demand." (Doc. # 89 at 23 (quoting *Am. Express*, 585 U.S. at 549)).

At this stage, where the Court must construe allegations in the Complaint as true, the Court finds the Commonwealth has plausibly alleged direct evidence of anticompetitive effects. Taken as true, the Commonwealth claims that rental prices have increased in Kentucky over a multi-year span. (Doc. # 1 ¶¶ 42, 46, 49). The Commonwealth also claims that RealPage's programs limit what listings and floorplans its clients should show at any given time, determined by whether the programs deemed the listings or plans to be profitable. (*Id*. ¶¶ 108, 113, 116–18). Defendants and RealPage take these actions by way of the agreements Defendants enter to share their competitively sensitive information with RealPage. (*Id*. ¶ 109). These allegations of price-raising and output-limiting are the kind of direct evidence that allow courts to "infer competitive injury from price and output data." *Am. Express*, 585 U.S. at 549. Put another way, it is plausible that the alleged agreements between Defendants and RealPage to raise rent prices while limiting the numbers of units offered produced an anticompetitive effect on the multifamily housing market in Kentucky.

Defendants object to the notion that multifamily housing output is being restricted in Kentucky. They claim that the Commonwealth actually alleges that housing output *increased* during the alleged conspiracy timeline because Kentucky experienced a significant increase in multifamily home construction. (Doc. # 89 at 23 (quoting Doc. # 1

¶ 38)).  The Court reads the Complaint differently.  The Complaint alleges that the number of multifamily housing spaces available for occupancy grew because more facilities were built.  (Doc. # 1 ¶ 38).  Indeed, the Commonwealth confirms this in its Response.  (Doc. # 118 at 32).  Discovery will show whether the housing output, as opposed to the market, did or did not increase, but at this stage, there is enough in the Complaint to plausibly allege anticompetitive effects from RealPage and Defendants' conduct.

Defendants did not address elements four or five in their pleadings, so the Court will treat them as unchallenged.  Regardless, the Court finds that, as alleged, the scheme the Commonwealth alleges would be a restraint of trade or commerce that is illegal under Section 1 of the Sherman Act.  15 U.S.C. § 1.  Further, the Complaint plausibly alleges that Defendants' scheme was the proximate cause of Kentuckians' inflated rent payments because Defendants set the heightened rent prices recommended by RealPage that Kentuckians ultimately ended up paying.  *Ezzo's Investments, Inc. v. Royal Beauty Supply, Inc.*, 423 F.3d 980, 990 (6th Cir. 2001).

Because the Complaint plausibly alleges a restraint of trade under the rule of reason, the burden shifts to Defendants to show any pro-competitive justifications for the conduct.  *Plymouth Whalers*, 325 F.3d at 718.  The Court cannot ascertain any pro-competitive justifications in Defendants' pleadings that would shift the burden back to the Commonwealth.  Because Defendants have not made the required showing of pro-competitive justifications for their conduct, the Court concludes the Commonwealth has plausibly alleged an unreasonable restraint of trade under the rule of reason at this stage of the proceedings.

22

Having plausibly alleged the requisite requirements, the Court further concludes the Commonwealth has plausibly alleged a claim under Section 1 of the Sherman Act. Accordingly, Defendants' Motion to Dismiss Counts I and II of the Complaint is **denied**.

### C.    Kentucky State Law Claims

Defendants also seek to dismiss the Commonwealth's three Kentucky state law claims.  The Commonwealth brings two claims for violations of the Kentucky Consumer Protection Act ("KCPA") and one claim for unjust enrichment under Kentucky common law.  (Doc. # 1 ¶¶ 162–187).  The Court will address the Commonwealth's state law claims in turn.

#### 1.    *Kentucky Consumer Protection Act*

Counts III and IV of the Commonwealth's Complaint seek relief under KCPA §§ 367.175 and 367.170.  (Doc. # 1 ¶¶ 162–179).  Defendants seek to have these claims dismissed for the same reasons as the Commonwealth's Sherman Act claims because, in their words, "'[i]f a plaintiff cannot establish a conspiracy necessary to support a restraint of trade claim under § 1 of the Sherman Act, the defendant would also be entitled to dismissal on the [KCPA] claim.'"  (Doc. # 89 at 24 (quoting *KASP, Inc. v. Adesa Lexington, LLC*, 2006 WL 385310, at *10 (E.D. Ky. Feb. 17, 2006))).  Unfortunately for Defendants, their logic cuts both ways.  Because the Court determined *supra* that the Commonwealth *did* plausibly allege a conspiracy under § 1 of the Sherman Act, the Court concludes that the Commonwealth also plausibly alleged claims under the KCPA.  As such, Defendants' Motion to Dismiss as to Counts III and IV of the Complaint is **denied**.

23

### 2. *Unjust Enrichment*

In Count V of the Complaint, the Commonwealth seeks relief under the Kentucky common law principle of unjust enrichment. (Doc. # 1 ¶¶ 180–187). The Commonwealth claims that as a direct result of Defendants' conduct, Kentucky residents paid "artificially inflated rental prices that exceed any amount they would have paid if such prices had been determined by a free and competitive market[,]" and that Defendants have been and will continue to be unjustly enriched by the high rent prices without the requested relief. (*Id.* ¶¶ 182, 186–87). Defendants reject this claim, stating that the Commonwealth has not shown that a plaintiff—here, the citizens of Kentucky—conferred a benefit on Defendants because Defendants conferred a benefit on themselves. (Doc. # 89 at 24–25). Further, Defendants claim that unjust enrichment should not be available as a remedy because the tenants' leases serve as express contracts that govern. (*Id.* at 25).

Unjust enrichment is "a legal fiction created to permit recovery where contract does not provide for it, but equity fairly calls for compensation for a conferred benefit." *Firestar Energy Res., LLC v. WestRock MWV, LLC*, No. 6:23-CV-162-REW-HAI, 2025 WL 2637666 (E.D. Ky. Sept. 12, 2025) (citing *Perkins v. Daugherty*, 722 S.W.2d 907, 909 (Ky. Ct. App. 1987)). To make a showing of unjust enrichment in Kentucky, a plaintiff must establish three elements: "(1) [a] benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of that benefit without payment for its value." *Simpson v. Champion Petfoods USA, Inc.*, 397 F. Supp. 3d 952, 973 (E.D. Ky. 2019) (quoting *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 778 (Ky. 2017)). Kentucky courts have consistently held that where an express contract applies and covers the subject matter of

24

the unjust enrichment claim, the unjust enrichment claim will generally be dismissed.  *See GPH Louisville Hillcreek LLC v. Redwood Holdings, LLC*, No. 3:21-CV-63-RGJ, 2023 WL 3083596 (W.D. Ky. Apr. 25, 2023); *Superior Steel*, 540 S.W.3d at 778; *see also Shane v. Bunzl Distrib. USA, Inc.*, 200 F. App'x 397, 404 (6th Cir. 2006) ("Under Kentucky law, '[t]he doctrine of unjust enrichment has no application in a situation where there is an explicit contract which has been performed.'").

The parties' dueling arguments regarding the first element present the Court with a chicken-or-egg situation.  The question is whether the residents of Kentucky first conferred the benefit of increased rent payments on the Defendants, or whether Defendants conferred the benefit of increased rent on themselves by setting rent prices high in the first place.  Based on the Complaint and common sense, the Court concludes the latter to be the case.  First, in its Complaint, the Commonwealth alleges that "[a]s a direct result of the Defendant Landlords' unlawful conduct, renters in Kentucky paid artificially inflated rental prices. . . ."  (Doc. # 1 ¶ 182).  The "unlawful conduct" that the Commonwealth describes is the practice of Defendants artificially setting *their own* rent prices high based on RealPage's suggestions.  (*See generally* Doc. # 1).  Thus, the benefit that the Commonwealth alleges is of Defendants' making.  Defendants set their prices high, and Kentucky residents pay the higher prices that Defendants set.  Thus, as alleged, Defendants receive the benefits of their scheme from their own initial conduct, which does not allow for relief under Kentucky law.  Accordingly, because the Commonwealth failed to plausibly allege unjust enrichment in accordance with Kentucky law, Defendants' Motion to Dismiss as to Count V of the Complaint is **granted**.

IV.    **CONCLUSION**

Thus, for the reasons set forth herein,

**IT IS ORDERED** that Defendants' Motion to Dismiss the Commonwealth's Complaint (Doc. # 89 & 90) is **GRANTED IN PART** with regard to the Commonwealth's unjust enrichment claim, and **DENIED IN PART** with regard to the Commonwealth's Sherman Act and Kentucky Consumer Protection Act claims.   The latter claims may proceed to discovery.

This 2nd day of February, 2026.



Signed By:

*David L. Bunning*

Chief United States District Judge

G:\Judge-DLB\DATA\ORDERS\Cov2025\25-93 MOO re MTD.docx