**EXHIBIT A**

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　　　v.<br><br>GREYSTAR MANAGEMENT SERVICES, LLC,<br><br>　　　　Defendant. | No. 1:24-cv-00710-WO-JGM |

## <u>FINAL JUDGMENT</u>

WHEREAS, Plaintiff, United States of America, filed its Complaint on January 7, 2025;

AND WHEREAS, the United States and Defendant, Greystar Management Services, LLC, have consented to entry of this Final Judgment without the taking of testimony, without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party relating to any issue of fact or law;

AND WHEREAS, Defendant agrees to undertake certain actions and refrain from certain conduct to remedy the loss of competition alleged in the Complaint;

AND WHEREAS, Defendant represents that the relief required by this Final Judgment can and will be made and that Defendant

will not later raise a claim of hardship or difficulty as grounds for asking the Court to modify any provision of this Final Judgment;

NOW THEREFORE, it is ORDERED, ADJUDGED, AND DECREED:

## I. JURISDICTION

The Court has jurisdiction over the subject matter of, and each of the parties to, this action. The Complaint states a claim upon which relief may be granted against Defendant under Section 1 of the Sherman Act, 15 U.S.C. § 1.

## II. DEFINITIONS

As used in this Final Judgment:

A. "Greystar" or "Defendant" means Defendant Greystar Management Services, LLC, a Delaware limited liability company with its headquarters in Charleston, South Carolina, and all of its direct and indirect subsidiaries, divisions, groups, affiliates, parents, partnerships, and joint ventures engaged in the management or ownership of multifamily rental properties in the United States and its territories, their successors and assigns, and their directors, officers, managers, agents, and employees.

B. "Competitively Sensitive Information" means property-specific data or information (whether past, present, or prospective) which, individually or when aggregated with such

2

data or information from other properties, (1) could be reasonably used to determine current or future rental supply, demand, or pricing at a property or of any property's units, including but not limited to executed rents, rental price concessions or discounts, guest traffic, guest applications, occupancy or vacancy, lease terms or lease expirations; (2) relates to the Property Owner's or Property Manager's use of settings or user-specified parameters within Revenue Management Products with respect to such property or properties; or (3) relates to the Property Owner's or Property Manager's rental pricing amount, formula, or strategy, including rental price concessions or discounts, in each case, with respect to such property or properties.

C.  "Cooperation Subject Matter" means Greystar's use of RealPage's Revenue Management Products, prohibited conduct described in Paragraph V.A, and the claims alleged in <u>United States et al. v. RealPage et al.</u> (currently docketed as No. 1:24-cv-00710 in the Middle District of North Carolina), and includes conduct as well as the effects of conduct.

D.  "External Nonpublic Data" means all Nonpublic Data from any Person other than Greystar. It does not include data from a Greystar Property.

E.   "Greystar Property" means a multifamily rental property, located within the United States and its territories, owned or managed by Greystar or its agents (collectively referred to as "Greystar Properties").

F.   "Including" means including, but not limited to.

G.   "Model Training" means the process of analyzing data, including by machine learning or regression analysis, to create or adjust the parameters of a model or algorithm to improve the accuracy of the model's or algorithm's predictions. Model Training includes the training of a model or algorithm to predict supply or demand at a particular property, which is then used during Runtime Operation.

H.   "Nonpublic Data" means any Competitively Sensitive Information that is not Public Data.

I.   "Person" means any natural person, corporate entity, partnership, association, joint venture, or trust.

J.   "Property Owner(s)" means any Person who (directly or indirectly) owns or controls a multifamily rental property or that Person's agent; multifamily rental properties have the same Property Owner if they are (directly or indirectly) owned or controlled by the same Person.

K.   "Property Manager(s)" means any Person who manages a multifamily rental property or that Person's agent.

4

L. "Pseudocode" means any description of the steps in an algorithm or other software program in plain or natural language.

M. "Public Data" means information on a rental unit's asking price (including publicly offered concessions), amenities, and availability that is readily accessible to the general public, such as on the property's website, at a physical building, in brochures, or on an internet listing service. Public Data includes information on a rental unit's asking price, concessions, amenities, and availability provided by a Property Manager or a Property Owner to any natural person who reasonably presents himself as a prospective renter. Public Data does not include any Competitively Sensitive Information obtained through communications between competitors.

N. "RealPage" means RealPage, Inc., a Delaware corporation with its headquarters in Richardson, Texas.

O. "RealPage Meeting(s)" means RealPage steering committees, RealPage subcommittees, RealPage user groups, RealPage Idea Exchange, or any variation of these meetings. For avoidance of doubt, a RealPage Meeting does not include any communications between Greystar and the Property Owner of a Greystar Property or any other Person providing services to that Greystar Property, or any software feedback provided solely to

5

RealPage that is not otherwise shared by Greystar with other Property Managers or Property Owners.

P. "Revenue Management Product(s)" means any software or third-party service, including software as a service, that generates rental prices or rental pricing recommendations for multifamily rental properties. For avoidance of doubt, a Revenue Management Product does not include general purpose spreadsheet software like Microsoft Excel.

Q. "Runtime Operation" means any action taken by a Revenue Management Product while it runs, including generating rental prices or rental pricing recommendations for any unit or set of units at a property. Runtime Operation does not include Model Training.

R. "Settled Antitrust Claims" means any civil federal antitrust claim by the United States arising from Defendant's conduct accruing before the filing of the complaint in this action relating to (1) Revenue Management Products, including RealPage Revenue Management Products that use competitors' Competitively Sensitive Information, as well as (2) communications described by Paragraph V.A.

S. "States" means the states, commonwealths, and territories of the United States of America, as well as the District of Columbia.

6

## III. APPLICABILITY

This Final Judgment applies to Defendant, as defined above, Defendant's officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with Defendant who receive actual notice of this Final Judgment.

## IV. USE OF REVENUE MANAGEMENT SOFTWARE

A. Beginning April 1, 2026 or 180 days after entry of the Stipulation and Order, whichever is earlier, Greystar must not, within the United States and its territories:

1. license or use any Revenue Management Product that: (i) uses External Nonpublic Data (other than Nonpublic Data of the Property Owner of the subject Greystar Property) in its Runtime Operation to generate rental prices or rental pricing recommendations for a Greystar Property; (ii) uses Nonpublic Data from a Greystar Property in its Runtime Operation to generate rental prices or rental pricing recommendations for any other Property Manager or Property Owner (unless the Property Owner of the non-Greystar Property is the same as the Property Owner of the Greystar Property from which the data arises or to which it relates); (iii) discloses in any way Nonpublic Data from a Greystar Property to any other Property Manager or Property Owner (unless the Property Owner of the non-

7

Greystar Property is the same as the Property Owner of the Greystar Property from which the data arises or to which it relates); (iv) pools or combines Nonpublic Data from Greystar Properties that have different Property Owners; or (v) contains or uses a model or algorithm for which Nonpublic Data (other than Nonpublic Data of the Property Owner of the subject Greystar Property) was used during or as a part of Model Training;

2. license or use any commercially available Revenue Management Product that: (i) incorporates a rental price floor or a limit on rental price recommendation decreases (excluding a rental price floor, or limit on rental price decreases, that Greystar or the Property Owner selects and is not based on Nonpublic Data other than Nonpublic Data of the Property Owner of the subject Greystar Property); or (ii) requires Greystar to accept, or provides any economic incentives for Greystar to accept, any recommended rental prices or range of prices; or

3. agree (expressly or tacitly) with any other Property Owner or Non-Greystar Property Manager to use a particular Revenue Management Product (or the utilities or functionalities thereof) or require any other Person to use a particular Revenue Management Product (or the utilities or functionalities thereof). Greystar is not prohibited by the

8

preceding sentence from using a particular Revenue Management Product at a particular property pursuant to an agreement with another Person who is the Property Owner or who, along with Greystar, provides services to that particular property on behalf of the Property Owner, provided that the Revenue Management Product complies with Paragraphs IV.A.1-2.

B.   If management responsibilities or ownership of a property within the United States or its territories is transferred from another Property Manager or Property Owner to Greystar, then Greystar will have 90 days from the date of transfer to comply with the requirements of Paragraph IV.A. for the transferred property.

C.   By April 1, 2026 or within 180 days after entry of the Stipulation and Order, whichever is earlier, Defendant must notify the United States, in writing, of any commercially available Revenue Management Product that it licenses or uses at any Greystar Property. Thereafter, if Defendant intends to license or use any other commercially available Revenue Management Product at any Greystar Property, Defendant must first notify the United States, in writing, of its intention to license or use such a commercially available Revenue Management Product 30 calendar days prior to licensing or using the commercially available Revenue Management Product.

9

D.  Notwithstanding Paragraph IV.A, Greystar may license or use a Revenue Management Product that complies with the terms of an agreed Final Judgment between the United States and RealPage in United States et al. v. RealPage et al. (currently docketed as No. 1:24-cv-00710 in the Middle District of North Carolina) ("RealPage Final Judgment").

E.  Beginning April 1, 2026 or 180 days after entry of the Stipulation and Order, whichever is earlier:

1.  After entry by the Court of a RealPage Final Judgment, Defendant may license or use a RealPage Revenue Management Product at any Greystar Property without the need to obtain certification as required in this Paragraph IV.E.

2.  If Defendant licenses or uses a commercially available Revenue Management Product from a Person other than RealPage or a reseller of a RealPage Revenue Management Product at any Greystar Property, or if Defendant licenses or uses a RealPage Revenue Management Product at any Greystar Property after a RealPage Final Judgment is filed but before entry by the Court, Defendant must secure and submit to the United States a certification from the vendor of the Revenue Management Product that the Revenue Management Product complies with the requirements in Paragraphs IV.A.1-2 or complies with the

requirements for Revenue Management Products established in a
RealPage Final Judgment.

3. If Defendant licenses or uses a RealPage Revenue
Management Product at any Greystar Property in the absence of a
RealPage Final Judgment, Defendant must provide to the United
States a certification from a Monitor appointed pursuant to
Section VIII that the RealPage Revenue Management product
complies with the requirements in Paragraph IV.A.1-2. If the
Monitor has not yet been appointed, Defendant will have 90 days
following appointment of the Monitor, subject to extension by
the United States in its sole discretion, to obtain any
certification required pursuant to this Paragraph IV.E.

## V.   OTHER PROHIBITED CONDUCT

A.   Greystar must not, within the United States and its
territories, as part of setting rental prices or generating
rental pricing recommendations for any Greystar Property: (i)
disclose Nonpublic Data to any other Property Manager or
Property Owner; (ii) solicit External Nonpublic Data from any
other Property Manager or Property Owner; or (iii) use External
Nonpublic Data obtained from another Property Manager or
Property Owner. Nothing in this Paragraph shall apply to
communications between Greystar and the Property Owner of a
Greystar Property, or any other Person providing services to

11

that Greystar Property for whom the disclosure of Nonpublic Data is necessary to provide such services. For avoidance of doubt, the restrictions set forth in this Paragraph apply to External Nonpublic Data and Nonpublic Data obtained through any form, whether directly or through an intermediary, including call arounds or market surveys, in-person meetings, calls, text messages, chat communications, emails, surveys, spreadsheets, shared documents (e.g., Google documents and SharePoint documents), industry meetings (e.g., user groups), online fora, private meetings, Revenue Management Product, or information-exchange service.

B.    Defendant will not attend or participate in any RealPage Meetings. If Greystar attends or participates in a RealPage Meeting it will report such meeting within 30 days to the United States. Defendant must identify the date, time, and location of the meeting, identify all participants in that meeting, provide a description of the content of the meeting, provide a description of any document shown during the meeting, produce all documents received or provided by Defendant during the meeting, and produce any chats, recordings, or documents associated with the meeting.

C.    Except for the rental prices set at any Greystar Property while that Property used a RealPage Revenue Management

Product, Greystar must not, within the United States and its territories, use or access, as part of setting rental prices or generating pricing recommendations for any Greystar Property, any Nonpublic Data (other than Nonpublic Data of the Property Owner of the subject Greystar Property), or data derived from RealPage that used or relied on such Nonpublic Data, in Greystar's possession, custody, or control as of entry of the Stipulation and Order, acquired through any means. Within 30 days of entry of the Stipulation and Order, Defendant must identify to the United States in writing the existence and location of any structured data set containing such data. For avoidance of doubt, the proscriptions in this Paragraph do not apply to data for Greystar Properties maintained in OneSite.

## VI. ANTITRUST COMPLIANCE

A. Within 30 days of entry of the Stipulation and Order, Defendant must submit a written antitrust compliance policy for approval by the Division in its sole discretion, that complies with the obligations set forth in this Final Judgment, including the prohibitions in Sections IV and V. Defendant must annually train all employees on this written policy.

B. Within 30 days of entry of the Stipulation and Order, Defendant must designate an antitrust compliance officer, who will be responsible for implementing and enforcing Defendant's

13

antitrust compliance policy and annual training required by Paragraph VI.A. Defendant must identify to the United States the antitrust compliance officer's name, business address, telephone number, and email address. Within forty-five (45) days of a vacancy in Defendant's antitrust compliance officer position, Defendant must appoint a replacement and must identify to the United States the replacement's name, business address, telephone number, and email address. Defendant's initial and replacement appointment of an antitrust compliance officer is subject to the approval of the United States in its sole discretion. Defendant is responsible for all costs and expenses related to the antitrust compliance officer.

C.   On an annual basis beginning April 1, 2026 or 180 calendar days after entry of the Stipulation and Order, whichever is earlier, Defendant must:

1.    submit to the Antitrust Division a certification from the General Counsel of Defendant's U.S. property management business attesting under penalty of perjury that (i) Defendant has established and maintained the antitrust compliance policy and annual training required by Paragraph VI.A; (ii) Defendant has complied with the attestation requirement in Paragraph VI.C.2; and (iii) the vendors of any Revenue Management Products

14

licensed or used by Greystar Properties have provided the certification from the vendor as required by Paragraph VI.C.3;

    2.   require all Defendant's employees engaged in or overseeing Greystar's revenue or property management of multifamily rental properties in the United States and its territories to attest under penalty of perjury that they have complied with Paragraphs IV.A.3, V.A, and V.B;

    3.   if required under this Final Judgment, including Paragraph IV.E, obtain and submit to the Antitrust Division a certification, as described in Paragraph IV.E, that each Revenue Management Product that Greystar licenses or uses complies with Paragraphs IV.A.1–2; and

    4.   provide the Antitrust Division a report that identifies for each Greystar Property that uses a commercially available Revenue Management Product: (1) the name of the Property Owner, (2) any Revenue Management Product used within the preceding twelve months for that Greystar Property, (3) whether Greystar or the Property Owner is responsible for setting rental prices for that Greystar Property, and (4) whether Greystar provides revenue management services for that Greystar Property.

15

## VII. COOPERATION

A. Subject to reaching a settlement with all States that, as of the entry of the Stipulation and Order, are plaintiffs in United States et al. v. RealPage et al. (currently docketed as No. 1:24-cv-00710 in the Middle District of North Carolina), Defendant must cooperate fully and truthfully with the United States in any civil investigation or civil litigation the United States brings or has brought relating to the Cooperation Subject Matter. Defendant must use its best efforts to ensure that all current and former officers, directors, employees, and agents also fully and promptly cooperate with the United States. Defendant's cooperation must include:

1. making up to 10 employees available for voluntary interviews for up to 40 hours total at the request of the United States relating to Section 2 claims alleged in United States et al. v. RealPage et al. (currently docketed as No. 1:24-cv-00710 in the Middle District of North Carolina) and considering reasonable requests for interviews of additional employees;

2. providing full and truthful written or oral testimony in deposition, trial, or other proceeding relating to the Cooperation Subject Matter and making witnesses available to the United States upon reasonable notice before any such testimony; and

16

3. providing proffers, which may be made by counsel for Defendant, describing Defendant's knowledge of, and evidence relating to, the Section 2 claims alleged in <u>United States et. al. v. RealPage et.al.</u> (currently docketed as No. 1:24-cv-00710 in the Middle District of North Carolina).

B. Defendant must:

1. within 30 days of receiving a written request (whether formal or informal) from the United States for documents, information, or other material relating to the Cooperation Subject Matter (or whatever additional time the Division grants in its sole discretion), produce to the United States all responsive documents, information, and other materials, wherever located, not protected under the attorney-client privilege or the work-product doctrine, in the possession, custody, or control of Defendant or its agents, as well as a log of any responsive documents, information, or other materials that were not provided, including an explanation of the basis for withholding such materials, and authenticating or otherwise assisting with establishing the evidentiary foundation of any documents Defendant produced or produces to the United States; and

2. take all necessary steps to preserve all documents, information, and other materials relating to the

Cooperation Subject Matter until the United States provides written notice to Defendant that its obligation to do so has expired.

C. Subject to Defendant's full, truthful, and continuing cooperation, as required under Paragraphs VII.A-B, Greystar is fully and finally discharged and released from Settled Antitrust Claims.

D. Nothing in Paragraphs VII.A–B affects Defendant's obligation to respond to any formal discovery requests in litigation or a civil investigative demand issued by the United States.

## VIII. APPOINTMENT OF MONITOR

A. Defendant will not be subject to a Monitor if by April 1, 2026, all commercially available Revenue Management Products that Defendant licenses or uses at Greystar Properties have been certified pursuant to, or are otherwise compliant with, Paragraph IV.E.

B. However, upon application of the United States, which Defendant may not oppose, the Court will appoint a Monitor selected by the United States and approved by the Court if:

1. Defendant licenses or uses any commercially available Revenue Management Product that has not been certified

18

pursuant to, or is not otherwise compliant with, Paragraph IV.E, at any Greystar Property after April 1, 2026, or

   2. a Court finds that Greystar has violated any other term of the Final Judgment.

  C. Defendant may propose a pool of three candidates for the Monitor appointment to the United States and the United States may consider Defendant's perspectives on the proposed candidates or any other candidates identified by the United States. The United States will retain the right, in its sole discretion, either to select the Monitor from among the three candidates proposed by Defendant or to select a different candidate. Once approved, the Monitor should be considered by the United States and Defendant to be an arm and representative of the Court. The Monitor will have no responsibility for operation of the Defendant's business. No attorney-client relationship will be formed between Defendant and the Monitor.

  D. The Monitor will have the authority to take such steps as, in the Monitor's discretion and the United States' view, may be necessary to accomplish the Monitor's responsibilities set forth in Paragraph VIII.G. The Monitor may seek information from Defendant's personnel, including in-house counsel, compliance personnel, and internal auditors. Defendant will establish a policy, annually communicated to all employees, that employees

may disclose any information to the Monitor without reprisal for such disclosure. Defendant must not retaliate against any employee or third party for disclosing information to the Monitor.

E.   Defendant may not object to actions taken by the Monitor in fulfillment of the Monitor's responsibilities under any Order of the Court on any ground other than malfeasance by the Monitor. Disagreements between the Monitor and Defendant related to the scope of the Monitor's responsibilities do not constitute malfeasance. Objections by Defendant must be conveyed in writing to the United States and the Monitor within 10 calendar days of the Monitor's action that gives rise to Defendant's objection, or else Defendant will have waived any such objections.

F.   Defendant must use best efforts to cooperate fully with the Monitor and to assist the Monitor with its responsibilities under this Final Judgment. Subject to reasonable protection for trade secrets, other confidential research, development, or commercial information, or any applicable privileges, Defendant must provide the Monitor and agents or consultants retained by the Monitor with full and complete access to all personnel (current and former), agents, consultants, books, records, and facilities. Defendant may not

20

take any action to interfere with, or to impede accomplishment of, the Monitor's responsibilities.

    G.   The Monitor will have the power and authority to monitor Defendant's compliance with the terms of this Final Judgment entered by the Court, as follows, and will have other powers as the Court deems appropriate: (i) to obtain and review Defendant's books, records, and documents relating to Defendant's compliance with the Final Judgment; (ii) to interview Defendant's officers, employees, and agents; and (iii) to make annual written reports to the Division, with the first report due six months after the Monitor's work plan is approved under Paragraph VIII.N, which process will include such monitoring and verification throughout the monitorship period as necessary to establish, that:

        1.   Defendant has complied with the obligations set forth in Paragraphs IV.A-B and V.A;

        2.   employees (including supervisors) functioning as internal revenue managers have complied with the obligations set forth in Paragraphs IV.A.3, V.A, and V.B; and

        3.   a selection of other local, regional, or supervisory employees of Defendant who manage property operations (not to exceed 15 annually), as designated by the

21

Monitor, have complied with the obligations set forth in
Paragraphs IV.A.3, V.A, and V.B.

H.   If the Monitor learns of any potential violation of
the Final Judgment by Defendant's officers, employees, or
agents, the Monitor must promptly disclose to the United States
the nature and extent of the potential violation and the United
States may require, at its sole discretion and without prejudice
to any other remedy available for any violation of this Final
Judgment, that the Monitor conduct additional investigation and
verification of compliance with this Final Judgment beyond any
limits otherwise provided by this Section.

I.   The Monitor will serve at the cost and expense of
Defendant pursuant to a written agreement with Defendant, on
terms and conditions, including confidentiality requirements and
conflict of interest certifications, approved by the United
States in its sole discretion. If the Monitor and Defendant are
unable to reach such a written agreement within 14 calendar days
of the Court's appointment of the Monitor, or if the United
States, in its sole discretion, declines to approve the proposed
written agreement, the United States, in its sole discretion,
may take appropriate action, including making a recommendation
as to the Monitor's costs and expenses to the Court, which may

22

set the terms and conditions for the Monitor's costs and expenses.

J.   The Monitor may hire, at the cost and expense of Defendant, any agents and consultants that are reasonably necessary in the Monitor's judgment to assist with the Monitor's duties. These agents or consultants will be directed by, and solely accountable to, the Monitor and will serve on terms and conditions, including confidentiality requirements and conflict-of-interest certifications, approved by the United States in its sole discretion. Within three business days of hiring any agents or consultants, the Monitor must provide written notice of the hiring and the rate of compensation to Defendant and the United States.

K.   The compensation of the Monitor and agents or consultants retained by the Monitor must be on reasonable and customary terms commensurate with the individuals' experience and responsibilities.

L.   The Monitor must account for all costs and expenses incurred.

M.   Defendant's failure to promptly pay the Monitor's accounted-for costs and expenses, including for agents and consultants, will constitute a violation of this Final Judgment and may result in sanctions imposed by the Court. If Defendant

23

disputes any part of the Monitor's accounted-for costs and
expenses, Defendant must establish an escrow account into which
Defendant must pay the disputed costs and expenses until the
dispute is resolved.

N.  Within 30 days after appointment of the Monitor by the
Court, and on a yearly basis thereafter, the Monitor must
provide to the United States and Defendant a proposed written
work plan. Defendant may provide comments on the proposed
written work plan to the United States and the Monitor within 14
calendar days after receipt of the proposed written work plan,
after which the Monitor must produce a final work plan to the
United States and Defendant, for approval by the United States
in its sole discretion. Any disputes between Defendant and the
Monitor with respect to any written work plan will be decided by
the United States in its sole discretion. The United States
retains the right, in its sole discretion, to request changes or
additions to a work plan at any time. If the United States
determines that the Monitor is exceeding its authority, not
acting diligently or in a reasonably cost-effective manner, or
if the Monitor becomes unable to continue in its role for any
reason, the United States may recommend that the Court appoint a
substitute.

O.  Once appointed, the Monitor will serve until:

1. the expiration of the Final Judgment; or

2. if a Monitor has been appointed pursuant to Paragraph VIII.B.1, the United States will move the Court to terminate the monitorship upon the United States' determination that Defendant complies with the requirements in Paragraph IV.E.

## IX. COMPLIANCE INSPECTION

A. For the purposes of determining or securing compliance with this Final Judgment or related orders or determining whether this Final Judgment should be modified or vacated, upon written request of an authorized representative of the Assistant Attorney General for the Antitrust Division, and reasonable notice to Defendant, Defendant must permit, from time to time and subject to legally recognized privileges, authorized representatives, including agents retained by the United States:

1. to have access during Defendant's office hours to inspect and copy, or at the option of the United States, to require Defendant to provide, no later than 30 days after receiving a written request (whether formal or informal) from the United States, electronic copies of all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Defendant relating to any matters contained in this Final Judgment; and

2. to interview, either informally or on the record, Defendant's officers, employees, or agents, who may have their individual counsel present, relating to any matters contained in this Final Judgment. The interviews must be subject to the reasonable convenience of the interviewee and without restraint or interference by Defendant.

B. For the purposes of determining or securing compliance with this Final Judgment or related orders or determining whether this Final Judgment should be modified or vacated, upon the written request of an authorized representative of the Assistant Attorney General for the Antitrust Division, Defendant must submit written reports or respond to written interrogatories, under oath if requested, relating to any matters contained in this Final Judgment.

C. If Greystar uses an internal Revenue Management Product, the United States will have the right for the duration of the Term of this Final Judgment to:

1. obtain documents sufficient to show how Greystar's internal Revenue Management Product is trained and how it determines prices for Greystar Properties during its Runtime Operation and changes to these processes.

2. obtain and inspect at an Antitrust Division office, or at another location at the Division's discretion, the

code and Pseudocode of the internal Revenue Management Product to ensure compliance with Paragraph IV.A.1. Greystar will be responsible for the costs and expenses associated with said inspection once annually.

**X.    PUBLIC DISCLOSURE**

A.    No information or documents obtained pursuant to any provision or this Final Judgment, including reports the Monitor provides to the United States pursuant to Paragraph VIII.G, may be divulged by the United States or the Monitor to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party, including grand-jury proceedings, or as otherwise required by law.

B.    In the event that the Monitor should receive a subpoena, court order, or other court process seeking production of information or documents obtained pursuant to any provision in this Final Judgment, including reports the Monitor provides to the United States pursuant to Paragraph VIII.G, the United States must notify Defendant prior to any disclosure.

C.    In the event of a request by a third party, pursuant to the Freedom of Information Act, 5 U.S.C. § 552, for disclosure of information obtained pursuant to any provision of this Final Judgment, the Antitrust Division will act in

27

accordance with that statute, and the Department of Justice regulations at 28 C.F.R. part 16, including the provision on confidential commercial information, at 28 C.F.R. § 16.7. Defendant, when submitting information to the Antitrust Division, should designate the confidential commercial information portions of all applicable documents and information under 28 C.F.R. § 16.7. Designations of confidentiality expire 10 years after submission, "unless the submitter requests and provides justification for a longer designation period." *See* 28 C.F.R. § 16.7(b).

D.  If at the time that Defendant furnishes information or documents to the United States pursuant to any provision of this Final Judgment, Defendant represents and identifies in writing information or documents for which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and the Defendant marks each pertinent page of such material "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," the United States must give Defendant 10 calendar days' notice before divulging the material in any legal proceeding (other than a grand jury proceeding).

## XI.  RETENTION OF JURISDICTION

The Court retains jurisdiction to enable any party to this Final Judgment to apply to the Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XII. ENFORCEMENT OF FINAL JUDGMENT

A.    The United States retains and reserves all rights to enforce the provisions of this Final Judgment, including the right to seek an order of contempt from the Court. Defendant agrees that in a civil contempt action, a motion to show cause, or a similar action brought by the United States relating to an alleged violation of this Final Judgment, the United States may establish a violation of this Final Judgment and the appropriateness of a remedy therefor by a preponderance of the evidence, and Defendant waives any argument that a different standard of proof should apply.

B.    This Final Judgment should be interpreted to give full effect to the procompetitive purposes of the antitrust laws and to restore the competition the United States alleges was harmed by the challenged conduct. Defendant agrees that it may be held in contempt of, and that the Court may enforce, any provision of

29

this Final Judgment that, as interpreted by the Court in light of these procompetitive principles and applying ordinary tools of interpretation, is stated specifically and in reasonable detail, whether or not it is clear and unambiguous on its face. In any such interpretation, the terms of this Final Judgment should not be construed against either party as the drafter.

C.    In an enforcement proceeding in which the Court finds that Defendant has violated this Final Judgment, the United States may apply to the Court for an extension of this Final Judgment, together with other relief that may be appropriate. In connection with a successful effort by the United States to enforce this Final Judgment against Defendant, whether litigated or resolved before litigation, Defendant agrees to reimburse the United States for the fees and expenses of its attorneys, as well as all other costs including experts' fees, incurred in connection with that effort to enforce this Final Judgment, including in the investigation of the potential violation.

D.    For a period of four years following the expiration of this Final Judgment, if the United States has evidence that Defendant violated this Final Judgment before it expired, the United States may file an action against Defendant in this Court requesting that the Court order: (1) Defendant to comply with the terms of this Final Judgment for an additional term of at

30

least four years following the filing of the enforcement action;
(2) all appropriate contempt remedies; (3) additional relief
needed to ensure Defendant complies with the terms of this Final
Judgment; and (4) fees or expenses as called for by this
Section.

## XIII.    EXPIRATION OF FINAL JUDGMENT

Unless the Court grants an extension, this Final Judgment
will expire 5 years from the date of its entry except that after
two years from the date of its entry, this Final Judgment may be
terminated upon notice by the United States to the Court and
Defendant that continuation of this Final Judgment is no longer
necessary or in the public interest.

## XIV. RESERVATION OF RIGHTS

The Final Judgment relates only to the resolution of the
Settled Antitrust Claims. The United States reserves all rights
for any other claims against Defendant that may be brought in
the future. The entry of the Final Judgment does not limit the
ability of any non-settling attorney general of any State to
bring or maintain any action under federal or state law against
Defendant.

## XV.   PUBLIC INTEREST DETERMINATION

Entry of this Final Judgment is in the public interest. The
parties have complied with the requirements of the Antitrust

31

Procedures and Penalties Act, 15 U.S.C. § 16, including by

making available to the public copies of this Final Judgment and

the Competitive Impact Statement, public comments thereon, and

any response to comments by the United States. Based upon the

record before the Court, which includes the Competitive Impact

Statement and, if applicable, any comments and response to

comments filed with the Court, entry of this Final Judgment is

in the public interest.

Date: _____

_____
United States District Judge

32