IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| STATE OF NORTH CAROLINA, | ) | |
| STATE OF CALIFORNIA, STATE OF | ) | |
| COLORADO, STATE OF CONNECTICUT, | ) | |
| STATE OF MINNESOTA, STATE OF | ) | |
| OREGON, STATE OF TENNESSEE, | ) | |
| STATE OF ILLINOIS, and | ) | |
| COMMONWEALTH OF MASSACHUSETTS, | ) | 1:24-cv-710 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| REALPAGE, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>FINAL JUDGMENT</u>**

This matter is before the court on the United States'
Unopposed Motion and Memorandum in Support of Entry of Final
Judgment. (Doc. 192.) The United States of America ("United
States") moves the court to enter the proposed Final Judgment
with Defendant RealPage, Inc. ("RealPage"), filed in this civil
antitrust proceeding on November 24, 2025. <u>See</u> Stipulation and
Order. (Doc. No. 159.) After careful review, this Final Judgment
shall be entered as follows:

WHEREAS, Plaintiff, United States of America, filed its
Complaint on August 23, 2024, as amended on January 7, 2025;

AND WHEREAS, the United States and Defendant RealPage,
Inc., have consented to entry of this Final Judgment without the

taking of testimony, without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party relating to any issue of fact or law;

AND WHEREAS, Defendant agrees to undertake certain actions and refrain from certain conduct to remedy the loss of competition alleged in the Complaint;

AND WHEREAS, Defendant represents that the relief required by this Final Judgment can and will be made and that Defendant will not later raise a claim of hardship or difficulty as grounds for asking the Court to modify any provision of this Final Judgment;

**NOW THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED:**

**I.   JURISDICTION**

The Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states claims upon which relief may be granted against Defendant under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2).

**II.  DEFINITIONS**

As used in this Final Judgment:

A.   "RealPage" or "Defendant" means Defendant RealPage,

- 2 -

Inc., a Delaware corporation with its headquarters in Richardson, Texas, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

B. "Active Lease(s)" means the lease agreement that is in effect for a unit on any given date. Whether a lease agreement is an Active Lease is based on its end date as entered by a Property Manager or Property Owner, provided, however, that leases reflected in a snapshot or backup of a database that has been aged at least 16 months prior to the date of implementation of a model will not be deemed Active Leases as defined here.

C. "AIRM" means AI Revenue Management, a RealPage Revenue Management Product.

D. "AI Demand Model" means the model used in AIRM to predict the likelihood that a prospective tenant will apply for a unit at a Subject Property.

E. "AI Supply I Model" means the model used in AIRM to predict the likelihood that an expiring lease at the Subject Property will be renewed, rather than terminated, before a renewal rent offer has been approved by the Property Manager or Property Owner.

- 3 -

F.   "AI Supply II Model" means the model used in AIRM to predict the likelihood that an expiring lease at the Subject Property will be renewed, rather than terminated, after a renewal rent offer has been approved by the Property Manager or Property Owner.

G.   "Auto Accept" means a feature or mechanism of a Revenue Management Product that, when enabled by a user or licensee of a Revenue Management Product, automatically accepts or implements the Revenue Management Product's recommended price if it satisfies a set of pricing parameters (including as to maximum increase or decrease in rent) for a Floor Plan.

H.   "Competitively Sensitive Information" means property-specific data or information (whether past, present, or prospective) that: (i) individually or when aggregated with such data or information from other properties, could be reasonably used to determine current or future rental supply, demand, or pricing for a property or a property's units, including executed rents, rental price concessions or discounts, guest traffic, guest applications, occupancy or vacancy, lease terms or lease expirations; (ii) relates to a Property Owner's or Property Manager's use of settings or user-specified parameters within Revenue Management Products with respect to the Property Owner's or Property Manager's property or properties; or (iii) relates

- 4 -

to a Property Owner's or Property Manager's rental pricing amount, formula, or strategy, including rental price concessions or discounts with respect to the Property Owner's or Property Manager's property or properties.

I. "Cooperation Subject Matter" means the claims alleged in United States et al. v. RealPage et al. (currently docketed as No. 1:24-cv-00710 in the Middle District of North Carolina).

J. "Core-Based Statistical Area" or "CBSA" means a geographic area, as defined by the federal Office of Management and Budget, consisting of the counties or equivalent entities associated with at least one urban center (core) of at least 10,000 individuals, plus adjacent counties having a high degree of social and economic integration with the core as measured through commuting ties.

K. "Floor Plan" means a grouping of units for a Subject Property that share similar characteristics, such as square footage and the number of bedrooms and bathrooms.

L. "Governor Guardrail" means a feature or mechanism in the Runtime Operation of RealPage's Revenue Management Product that limits the RealPage Revenue Management Product's increase or decrease of the previous day's Floor Plan price recommendation by a certain percentage.

- 5 -

M. "Including" means including, but not limited to.

N. "Market Range Chart" means a chart or other visual representation that identifies, for a Subject Property's Floor Plan, a market minimum rent and a market maximum rent based on other properties' Floor Plan pricing.

O. "Market Rank" means a Subject Property variable that reflects that property's average rent level compared to distribution of rents in a market.

P. "Market Rent" means any variable that includes rent from Unaffiliated Properties.

Q. "Market Response Curve" means a curve that represents the price elasticity model for a Floor Plan.

R. "Market Surveys" means collections of Nonpublic Data compiled by RealPage including through call arounds, emails, texts, surveys, or similar communicative means from Property Managers or Property Owners.

S. "Model Training" means any process of analyzing data, including by machine learning or regression analysis, to create or adjust a model (including a Random Forest model) or algorithm used in Revenue Management Product(s) to improve the accuracy of the model's or algorithm's predictions. Model Training includes the training of a model or algorithm to predict supply or demand

- 6 -

it a particular property, which is then used during Runtime Operation.

T.     "Nonpublic Data" means any Competitively Sensitive Information that is not Public Data.

U.     "Owner Inputted Data" means any data about an Unaffiliated Property that a licensee or user inputs into a RealPage Revenue Management Product.

V.     "Person" means any natural person, corporate entity, partnership, association, joint venture, or trust.

W.     "Pricing Advisor" means a RealPage employee, contractor, or agent who supports or otherwise works with licensees or users of Revenue Management Product(s) and who participates in any way, including by providing advice or guidance, in (i) a Property Manager or Property Owner's determination of price or desired occupancy for a Floor Plan or unit, (ii) review of or recommendations about the price for a Floor Plan or unit, or (iii) software settings or parameters of Revenue Management Product(s).

X.     "Pricing Ceiling" means, for a Floor Plan, the top of the pricing range as shown on the Market Range Chart or the Market Response Curve.

Y.     "Pricing Floor" means, for a Floor Plan, the bottom of

- 7 -

the pricing range as shown in the Market Range Chart or the Market Response Curve.

Z.  "Property Manager(s)" means any Person, or a Person's agent, who manages (but does not own) a multifamily rental property.

AA.  "Property Owner(s)" means any Person, or a Person's agent (not including Property Managers), that (directly or indirectly) owns or controls a multifamily rental property regardless of whether they also manage that rental property; multifamily rental properties have the same Property Owner if they are (directly or indirectly) owned or controlled by the same Person.

BB.  "Pseudocode" means any plain or natural language description of the steps taken by an algorithm or other software program.

CC.  "Public Data" means information (including information on a rental unit's asking price, publicly offered concessions, amenities, and availability) that is readily accessible to the general public, such as on the property's website, at a physical building, in brochures, or on an internet listing service. Public Data includes information on a rental unit's asking price, concessions, amenities, and availability provided by a Property Manager or a Property Owner to any natural person who

- 8 -

reasonably presents himself as a prospective renter. Public Data does not include any Competitively Sensitive Information obtained through any communication between RealPage and one or more Property Managers or Property Owners or from any other Person, unless such information is also readily accessible to the general public.

DD. "RealPage RMS Meeting(s)" means RealPage steering committees, subcommittees, user groups, or Idea Exchange relating to Revenue Management Products, or variations of or communications related to such meetings, attended by more than one Property Owner or Property Manager that licenses or uses a RealPage Revenue Management Product. For avoidance of doubt, a RealPage RMS Meeting does not include any individualized communications between RealPage and a Property Manager or Property Owner to which RealPage provides products or services.

EE. "Revenue Management Product(s)" means any software or service, including software as a service, that generates rental prices or rental pricing recommendations for multifamily rental properties.

FF. "Runtime Operation" means any action taken by a Revenue Management Product while it runs, including generating rental prices or rental pricing recommendations for any unit or

- 9 -

set of units at a Subject Property. Runtime Operation does not include Model Training.

GG.  "Settled Antitrust Claims" means any civil federal antitrust claim brought by the United States and arising from Defendant's conduct that occurred before the filing of the Complaint in this action and that relates to Revenue Management Products, including RealPage Revenue Management Products that use Competitively Sensitive Information.

HH.  "Sold-out Guardrail" means the operation of RealPage's Revenue Management Product that increases the recommended rental price for a Floor Plan when the Floor Plan reaches its target occupancy.

II.  "States" means the states, commonwealths, and territories of the United States of America, as well as the District of Columbia.

JJ.  "Subject Property" means a property for which a Revenue Management Product provides price recommendations or prices.

KK.  "Surrogate Data" means data from a property other than the Subject Property that is used by the Revenue Management Product to supplement the Transactional Data for a Floor Plan.

LL.  "Synthetic Curve" means a demand or supply curve

created by Defendant or Defendant's agents without the use of Transactional Data or Nonpublic Data of any kind.

MM.   "Third Party" means any Person other than RealPage.

NN.   "Transactional Data" means a Subject Property's current and historical data, including lease data (including lease term, final transacted lease price, and discounts) and tenant demand (including inquiries and applications by potential future tenants).

OO.   "Unaffiliated Property" or "Unaffiliated Properties" means a property or multiple properties whose Property Owner(s) are different than the Property Owner of a Subject Property.

PP.   "Unaffiliated Property Data" means Nonpublic Data (other than Owner Inputted Data) belonging to individual Property Owners of multiple Subject Properties that together constitute Unaffiliated Properties.

## III.  APPLICABILITY

This Final Judgment applies to Defendant, as defined above, Defendant's officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with Defendant who receive actual notice of this Final Judgment.

- 11 -

## IV. PROHIBITIONS REGARDING NONPUBLIC DATA

A.     Within 180 days after entry of the Stipulation and Order, Defendant must:

1.     cease using current or historical Unaffiliated Property Data in the Runtime Operation of any Revenue Management Product, except as provided in Paragraph IV.C and E;

2.     notify all Property Managers and Property Owners that license or use Defendant's Revenue Management Product(s) that Defendant may not seek Unaffiliated Property Data for use in Runtime Operation;

3.     not use current, forward-looking, or historical Unaffiliated Property Data or Owner Inputted Data in Model Training for Revenue Management Products; provided however, that, Defendant may use historical or backward-looking Unaffiliated Property Data that is at least 12 months old and not from Active Leases;

4.     limit any use in Revenue Management Products of Unaffiliated Property Data related to rental prices, subject to Paragraph IV.A.3 and except as provided in IV.C, to training solely of the AI Supply II Model, so that such Unaffiliated Property Data cannot be used in Revenue Management Products for any other purpose, including to calculate a Market Rent or Market Rank;

5.   cease using any models in Revenue Management Products trained on Unaffiliated Property Data that restrict or filter Nonpublic Data by geography or that can identify geographic effects at a granularity more specific than nationwide; provided however, that Defendant may identify geographic effects at a granularity no more specific than statewide in training the AI Demand Model, AI Supply I Model and AI Supply II Model; and

6.   retrain applicable models in its Revenue Management Products so that data used to train all models is restricted to data that complies with Paragraph IV.A.3-5.

B.   Within 180 days after entry of the Stipulation and Order, Defendant must not share, publish, disclose, or otherwise provide or make accessible in a Revenue Management Product (including in Runtime Operation) to any licensee of a Revenue Management Product any Unaffiliated Property Data or Owner Inputted Data inputted by another Property Owner, or a Property Manager acting on the Property Owner's behalf, regardless of form, aggregation, anonymization, or age of the Unaffiliated Property Data or Owner Inputted Data except as permitted in Paragraph IV.E.

C.   Within 180 days after entry of the Stipulation and Order, Defendant must not use the same Synthetic Curve within the same CBSA for Unaffiliated Properties or use Unaffiliated

- 13 -

Property Data to supplement Floor Plan data in Revenue Management Product(s). Provided, however, that Defendant may use Unaffiliated Property Data to supplement a Floor Plan's Transactional Data if, and only if, there is no comparable Surrogate Data available from the same reasonably identifiable Property Owner, and only until the Subject Property has achieved two years of its own Transactional Data. Defendant must obtain the Unaffiliated Property Data used pursuant to this Paragraph IV.C from a property outside of the CBSA of the Subject Property, and Defendant cannot use such data for different Unaffiliated Properties in the same CBSA as the Subject Property. Defendant must not disclose the location or the identity of the Property Owner, Property Manager, or any Unaffiliated Property whose Nonpublic Data is used to supplement a Floor Plan's Transactional Data.

D.     Defendant must not conduct, commission, solicit, or otherwise knowingly accept Nonpublic Data through Market Surveys (i) for use in Revenue Management Product(s) or (ii) otherwise for purposes of recommending a Subject Property's Floor Plan pricing, unit level pricing, or occupancy levels.

E.     Defendant must not use, share, publish, disclose or otherwise provide to Unaffiliated Properties, (i) in Revenue Management Product(s) or (ii) otherwise for purposes of

- 14 -

recommending a Subject Property's Floor Plan pricing, unit level pricing, or occupancy levels, data or information on rental occupancy, availability, or prices collected through Market Surveys conducted, commissioned, or otherwise obtained by Defendant after September 30, 2024.

F.    Nothing in this Final Judgment prohibits or limits Defendant's collection of data or information from a Property Owner, or a Property Manager on behalf of the Property Owner, for use that is consistent with the terms of this Final Judgment.

## V.    PROHIBITIONS REGARDING REVENUE MANAGEMENT PRODUCT FEATURES

A.    Within 180 days after entry of the Stipulation and Order, Defendant must not offer any Revenue Management Product that:

1.    includes any Auto Accept feature that does not require a licensee or user to individually set parameters (including as to a maximum increase or decrease in rent);

2.    includes any Governor Guardrail that does not have symmetrical upper and lower bounds for the recommended change in rental price, by a percentage to be determined and adjusted by the licensee or user;

3.    reduces the target number of leases, except to

- 15 -

round up or down to the nearest whole number of leases when calculating expected revenue;

4.    generates rental price recommendations under the Sold-out Guardrail using anything other than the Subject Property's own information, including historical position; or

5.    prohibits, disincentivizes, or impedes in any way a user's or licensee's ability to reject or override any price recommendation; provided, however, that nothing in this Final Judgment prohibits a Property Owner or a Property Manager from maintaining records within Defendant's Revenue Management Product(s) regarding decisions for rejecting or overriding any price recommendation.

B.    Beginning 180 days after entry of the Stipulation and Order, any Revenue Management Product Defendant offers must allow the licensee or user to set parameters that permit pricing recommendations to go below the Pricing Floor to the same extent such pricing recommendations exceed the Pricing Ceiling.

C.    Upon entry of the Stipulation and Order, Defendant may not require or provide any incentives, including economic incentives, to any licensee or user of RealPage's Revenue Management Products to accept any recommended rental prices or range of prices or incentivize any RealPage employee or agent to

solicit, request, or get a licensee or user to accept any recommended rental prices or range of prices.

D.    Upon entry of the Stipulation and Order, Defendant may not implement any Revenue Management Product feature that uses or relies on Unaffiliated Property Data in a manner inconsistent with this Final Judgment.

## VI.  ADDITIONAL PROHIBITIONS

A.    Within 60 days of the entry of the Stipulation and Order, Pricing Advisors must not disclose, share with, or otherwise disseminate Unaffiliated Property Data or Owner Inputted Data (i) in Revenue Management Product(s) or (ii) otherwise for purposes of recommending a Subject Property's Floor Plan pricing, unit level pricing, or occupancy levels.

B.    Defendant must not through RealPage RMS Meetings discuss or facilitate discussions about market analysis or trends based on Nonpublic Data or Owner Inputted Data or pricing strategies. Provided, however, and for avoidance of doubt, this Paragraph VI.B does not prohibit (i) RealPage from discussing its products' functionality or software-related technical issues, or (ii) Pricing Advisors from having individualized discussions with individual licensees or users of RealPage Revenue Management Products about setting rental prices and

- 17 -

software settings if those discussions are based solely on Public Data or that licensee's or user's Nonpublic Data.

## VII.   APPOINTMENT OF A MONITOR

A.   Upon application of the United States, which Defendant may not oppose, the Court will appoint a Monitor selected by the United States in its sole discretion and approved by the Court. Defendant may propose a pool of three candidates for the Monitor appointment to the United States and the United States may consider Defendant's perspectives on the proposed candidates or any other candidates identified by the United States. The United States will retain the right, in its sole discretion, either to select the Monitor from among the three candidates proposed by Defendant or to select a different candidate. Once approved, the court-appointed Monitor should be considered by the United States and Defendant to be an arm and representative of the Court.

B.   The Monitor will have the power and authority to monitor Defendant's compliance with the terms of this Final Judgment and the Stipulation and Order entered by the Court and will have other powers as the Court deems appropriate. The Monitor will have no responsibility or obligation for the operation of Defendant's business. No attorney-client relationship will be formed between Defendant and the Monitor.

- 18 -

C.   The Monitor will have the authority to take such steps as, in the judgment of the Monitor and the United States, may be necessary to accomplish the Monitor's responsibilities. The Monitor may seek information from Defendant's personnel, including in-house counsel, compliance personnel, and internal auditors. Defendant must establish a policy, annually communicated to all employees, that employees may disclose any information to the Monitor without reprisal for such disclosure. Defendant must not retaliate against any employee or Third Party for disclosing information to the Monitor.

D.   Defendant may not object to actions taken by the Monitor in fulfillment of the Monitor's responsibilities under any Order of the Court on any ground other than malfeasance by the Monitor. Disagreements between the Monitor and Defendant related to the scope of the Monitor's responsibilities do not constitute malfeasance. Objections by Defendant must be conveyed in writing to the United States and the Monitor within 20 calendar days of the Monitor's action that gives rise to Defendant's objection, or the objection is waived.

E.   The Monitor will serve at the cost and expense of Defendant pursuant to a written agreement, on terms and conditions, including confidentiality requirements and conflict of interest certifications, approved by the United States in its

- 19 -

sole discretion. If the Monitor and Defendant are unable to reach such a written agreement within 14 calendar days of the Court's appointment of the Monitor, or if the United States, in its sole discretion, declines to approve the proposed written agreement, the United States, in its sole discretion, may take appropriate action, including making a recommendation to the Court, which may set the terms and conditions for the Monitor's work, including compensation, costs, and expenses.

F.    The Monitor may hire, at the cost and expense of Defendant, any agents and consultants that are reasonably necessary in the Monitor's judgment to assist with the Monitor's duties. These agents or consultants will be directed by, and solely accountable to, the Monitor and will serve on terms and conditions, including confidentiality requirements and conflict-of-interest certifications, approved by the United States in its sole discretion. Within three business days of hiring any agents or consultants, the Monitor must provide written notice of the hiring and the rate of compensation to Defendant and the United States.

G.    The compensation of the Monitor and agents or consultants retained by the Monitor must be on reasonable and customary terms commensurate with the individuals' experience and responsibilities.

- 20 -

H.    The Monitor must account for all costs and expenses incurred.

I.    Defendant's failure to promptly pay the Monitor's accounted-for costs and expenses, including for agents and consultants, will constitute a violation of this Final Judgment and may result in sanctions ordered by the Court. If Defendant makes a timely objection in writing to the United States to any part of the Monitor's accounted-for costs and expenses, Defendant must establish an escrow account into which Defendant must pay the disputed costs and expenses until the dispute is resolved.

J.    Defendant must use best efforts to cooperate fully with the Monitor and to assist the Monitor to monitor Defendant's compliance with its obligations under this Final Judgment and the Stipulation and Order. Subject to reasonable protection for trade secrets, other confidential research, development, or commercial information, or any applicable privileges, Defendant must provide the Monitor and agents or consultants retained by the Monitor with full and complete access to all personnel (current and former), agents, consultants, books, records, and facilities. Defendant may not take any action to interfere with or to impede accomplishment of the Monitor's responsibilities.

- 21 -

K.   The Monitor must investigate and report on Defendant's compliance with this Final Judgment and the Stipulation and Order, including as follows, and will have other powers as the Court deems appropriate: (i) to obtain and review Defendant's books, records, and documents relating to Defendant's compliance with the Final Judgment; (ii) to interview Defendant's officers, employees, and agents; (iii) to obtain, or inspect at a location chosen by the United States in its sole discretion, the code and Pseudocode for RealPage's Revenue Management Products;  (iv) to obtain documents showing how the models for RealPage's Revenue Management Products are trained; (v) to obtain documents showing how RealPage's Revenue Management Products determine prices for multifamily rental property units during its Runtime Operation; (vi) to obtain documents showing whether Nonpublic Data is being used or shared, including compliance with Paragraph IV.A ; and (vii) to make annual written reports to the United States, with the first report due six months after the Monitor's work plan is approved under Paragraph VII.L, which process will include such monitoring and verification throughout the monitorship period as necessary to establish that Defendant has complied with the obligations in this Final Judgment.

L.   Within 30 calendar days after appointment of the Monitor by the Court, and on a yearly basis thereafter, the

Monitor must provide to the United States and Defendant a proposed written work plan. Defendant may provide comments on the proposed written work plan to the United States and the Monitor within 14 calendar days after receipt of the proposed written work plan, after which the Monitor must produce a final work plan to the United States and Defendant, for approval by the United States in its sole discretion. Any disputes between Defendant and the Monitor with respect to any written work plan will be decided by the United States in its sole discretion. The United States retains the right, in its sole discretion, to require changes or additions to a work plan at any time.

M. The Monitor may communicate <u>ex</u> <u>parte</u> with the Court when, in the Monitor's judgment, such communication is reasonably necessary to the Monitor's duties under this Final Judgment, including if Defendant fails to pay the Monitor's costs and expenses in a timely manner or otherwise violate this Final Judgment.

N. The Monitor will serve for a term of three years beginning on the date that the Monitor's written work plan is finalized pursuant to Paragraph VII.L, unless the United States, in its sole discretion, determines a different period—not to exceed an additional 18 months (which need not be consecutive to the original three-year monitor term)—is appropriate.

- 23 -

O.    If the United States determines that the Monitor is not acting diligently or in a reasonably cost-effective manner, or if the Monitor resigns or becomes unable to accomplish the Monitor's duties, the United States may recommend that the Court appoint a substitute.

P.    To the extent there are multiple monitors in related Final Judgments against other defendants in United States v. RealPage et al. (currently docketed as 1:24-cv-00710 in the Middle District of North Carolina), the United States, in its sole discretion, will consider whether it is appropriate for efficiency purposes to appoint the same monitor in related Final Judgments.

## VIII.    ANTITRUST COMPLIANCE PROGRAM

A.    Within 30 days of entry of the Stipulation and Order, Defendant must submit a written antitrust compliance policy for approval by the United States in its sole discretion that complies with the obligations set forth in this Final Judgment. Defendant must annually train all employees with responsibility for developing, implementing, maintaining, selling, advising on, or otherwise involved in Revenue Management Product(s)or features in the United States, including Pricing Advisors, on this written policy.

- 24 -

B.   Within 30 days of entry of the Stipulation and Order, Defendant must designate an antitrust compliance officer. Defendant must identify to the United States the antitrust compliance officer's name, business address, telephone number, and email address. Within forty-five (45) days of a vacancy in Defendant's antitrust compliance officer position, Defendant must appoint a replacement and must identify to the United States the replacement's name, business address, telephone number, and email address. Defendant's initial and replacement appointments of an antitrust compliance officer are subject to the approval of the United States in its sole discretion. Defendant is responsible for all costs and expenses related to the antitrust compliance officer. The antitrust compliance officer will be responsible for:

1.   auditing on a bi-annual basis compliance with Paragraph V.A-B;

2.   attending and monitoring, or arranging for the attendance or monitoring by another individual trained in antitrust law, any RealPage RMS Meeting;

3.   performing bi-annual audits to ensure that Surrogate Data has been eliminated from a Subject Property's database if the Subject Property has achieved at least two years of historical Transactional Data, pursuant to Paragraph IV.C;

- 25 -

4. implementing and enforcing Defendant's antitrust compliance policy and annual training required by Paragraph VIII.A; and

5. reporting any communication regarding RealPage RMS Meetings pursuant to Paragraph VIII.D.

C. On an annual basis beginning 180 calendar days after entry of the Stipulation and Order, Defendant must:

1. submit to the United States a certification from Defendant's General Counsel attesting under penalty of perjury that (i) Defendant has established and maintained the antitrust compliance policy and annual training required by Paragraph VIII.A; (ii) Defendant has complied with the attestation requirement in Paragraph VIII.C.3; (iii) Defendant has complied with the requirements in Sections IV and V;

2. submit to the United States a certification from the antitrust compliance officer attesting under penalty of perjury that (i) Defendant has taken reasonable steps to comply with Paragraph IV.A.3; (ii) the antitrust compliance officer has attended, or arranged the attendance of another individual trained in antitrust law at, all RealPage RMS Meetings; (iii) RealPage RMS Meetings have complied with the restrictions described in Paragraph VI.B; (iv) the antitrust compliance officer has reported all communications pursuant to Paragraph

- 26 -

VIII.D; and (v) the antitrust compliance officer has performed bi-annual audits to ensure compliance with Paragraphs VIII.B; and

3.    require all Pricing Advisors to attest under penalty of perjury that they have complied with the requirements in Paragraph VI.A.

D.    If any participant in a RealPage RMS Meeting discusses or facilitates discussions regarding topics prohibited by Section VI.B, the antitrust compliance officer, designated pursuant to Paragraph VIII.B, must provide to the United States and to the Monitor the following information about the RealPage RMS Meeting within 30 days:

1.    the date, time, location, and a description of the meeting's content;

2.    all participants, including denoting all participants who discussed or facilitated discussion of present or future market conditions, pricing, discounts, occupancy, renewal rates, or use of concessions;

3.    a description of any document shown at the meeting, which Defendant must also produce to the United States;

4.    a description of all documents received or provided by Defendant during the meeting, which Defendant must also produce to the United States; and

- 27 -

5. a description of all chats, recordings, or documents associated with the meeting, including agendas and meeting minutes, which Defendant must also produce to the United States.

## IX. COMPLIANCE INSPECTION

A. For the purposes of determining or securing compliance with this Final Judgment or related orders such as the Stipulation and Order or determining whether this Final Judgment should be modified or vacated, upon written request of an authorized representative of the Assistant Attorney General for the Antitrust Division and reasonable notice to Defendant, Defendant must permit, from time to time and subject to legally recognized privileges, authorized representatives, including agents retained by the United States:

1. to have access during Defendant's business hours to inspect and copy, or at the option of the United States, to require Defendant to provide electronic copies of all books, ledgers, accounts, records, data, and documents wherever located, in the possession, custody, or control of Defendant relating to any matters contained in this Final Judgment; and

2. to interview, either informally or on the record, Defendant's officers, employees, or agents, wherever located, who may have their individual counsel present, relating to any

- 28 -

matters contained in this Final Judgment. The interviews must be subject to the reasonable convenience of the interviewee and without restraint or interference by Defendant;

3. to obtain documents sufficient to show how RealPage's Revenue Management Product is trained and how it determines prices for multifamily rental property units during its Runtime Operation; and

4. to obtain, or inspect at a location at the Division's discretion and subject to necessary safeguards to protect confidentiality, the code and Pseudocode of RealPage's Revenue Management Product.

B. Upon the written request of an authorized representative of the Assistant Attorney General for the Antitrust Division, Defendant must submit written reports or respond to written interrogatories, under oath if requested, relating to any matters contained in this Final Judgment.

## X. COOPERATION

A. Subject to reaching a settlement with all States that, as of the entry of the Stipulation and Order, are plaintiffs in United States et al. v. RealPage et al. (currently docketed as No. 1:24-cv-00710 in the Middle District of North Carolina), Defendant must cooperate fully and truthfully with the United States in any civil investigation or civil litigation the United

- 29 -

States brings or has brought relating to the Cooperation Subject Matter. Defendant must use its best efforts to ensure that all current and former officers, directors, employees, and agents also fully and promptly cooperate with the United States. Defendant's cooperation must include:

1.    making up to 25 employees available for voluntary interviews for up to 100 hours total at the request of the United States relating to the Cooperation Subject Matter and considering reasonable requests for interviews of additional employees;

2.    providing full and truthful written or oral testimony in deposition, trial, or other proceeding relating to the Cooperation Subject Matter and making witnesses available to the United States upon reasonable notice before any such testimony;

3.    providing proffers, which may be made by counsel for Defendant, describing Defendant's knowledge of, and evidence relating to, the Cooperation Subject Matter;

4.    within 30 days of receiving a written request (whether formal or informal) from the United States for documents, information, or other material relating to the Cooperation Subject Matter (or whatever additional time the Division grants in its sole discretion), produce to the United

- 30 -

States all responsive documents, information, and other materials, wherever located, not protected under the attorney-client privilege or the work-product doctrine, in the possession, custody, or control of Defendant or its agents, as well as a log of any responsive documents, information, or other materials that were not provided, including an explanation of the basis for withholding such materials, and authenticating or otherwise assisting with establishing the evidentiary foundation of any documents Defendant produced or produces to the United States; and

5.    taking all steps necessary to preserve all documents, information, and other materials relating to the Cooperation Subject Matter until the United States provides written notice to Defendant that its obligation to do so has expired.

B.    Subject to Defendant's full, truthful, and continuing cooperation, as required under Paragraph X.A, Defendant is fully and finally discharged and released from the Settled Antitrust Claims.

C.    Nothing in this Section affects Defendant's obligation to respond to any formal discovery requests in litigation or a civil investigative demand issued by the United States.

- 31 -

## XI. PUBLIC DISCLOSURE

A. No information or documents obtained pursuant to any provision in this Final Judgment, including reports the Monitor provides to the United States pursuant to Paragraph VII.K, may be divulged by the United States or the Monitor to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party, including grand-jury proceedings, or as otherwise required by law.

B. In the event that the Monitor receives a subpoena, court order, or other court process seeking production of information or documents obtained pursuant to any provision in this Final Judgment, including reports the Monitor provides to the United States pursuant to Paragraph VII.K, the Monitor must notify the United States and Defendant immediately and prior to any disclosure, so that Defendant may address such potential disclosure and, if necessary, pursue alternative legal remedies, including if deemed appropriate by Defendant, intervention in the related proceedings.

C. In the event of a request by a Third Party, pursuant to the Freedom of Information Act, 5 U.S.C. § 552, for disclosure of information obtained pursuant to any provision of this Final Judgment, the United States will act in accordance

with that statute and the Department of Justice regulations at 28 C.F.R. part 16, including the provision on confidential commercial information, at 28 C.F.R. § 16.7. Defendant, when submitting information to the Antitrust Division, should designate the confidential commercial information portions of all applicable documents and information under 28 C.F.R. § 16.7. Designations of confidentiality expire 10 years after submission, "unless the submitter requests and provides justification for a longer designation period." See 28 C.F.R. § 16.7(b).

D. If at the time that Defendant furnishes information or documents to the United States pursuant to any provision of this Final Judgment, Defendant represents and identifies in writing information or documents for which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Defendant marks each pertinent page of such material "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," the United States must give Defendant 10 calendar days' notice before divulging the material in any legal proceeding (other than a grand jury proceeding).

## XII. RETENTION OF JURISDICTION

The Court retains jurisdiction to enable any party to this Final Judgment to apply to the Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XIII. ENFORCEMENT OF FINAL JUDGMENT

A. If at any time during the five-year period following entry of this Final Judgment, the United States determines in its sole discretion that the Final Judgment has failed to fully redress the violations alleged in the Complaint, then the United States may re-open this proceeding to seek additional relief. Such additional relief may be ordered by this Court upon a finding by a preponderance of the evidence that there is a reasonable probability that the proposed Final Judgment did not fully redress the violations alleged in the Complaint.

B. The United States retains and reserves all rights to enforce the provisions of this Final Judgment, including the right to seek an order of contempt from the Court. In a civil contempt action, a motion to show cause, or a similar action brought by the United States relating to an alleged violation of this Final Judgment, the United States may establish a violation

- 34 -

of this Final Judgment and the appropriateness of a remedy therefor by a preponderance of the evidence, and Defendant waives any argument that a different standard of proof should apply.

C.   This Final Judgment should be interpreted to give full effect to the procompetitive purposes of the antitrust laws and to restore the competition the United States alleges was harmed by the challenged conduct. Defendant may be held in contempt of, and the Court may enforce, any provision of this Final Judgment that, as interpreted by the Court in light of these procompetitive principles and applying ordinary tools of interpretation, is stated specifically and in reasonable detail, whether or not it is clear and unambiguous on its face. In any such interpretation, the terms of this Final Judgment should not be construed against either party as the drafter.

D.   In an enforcement proceeding in which the Court finds that Defendant has violated this Final Judgment, the United States may apply to the Court for an extension of this Final Judgment, together with other relief that may be appropriate. In connection with a successful effort by the United States to enforce this Final Judgment against Defendant, whether litigated or resolved before litigation, Defendant must reimburse the United States for the fees and expenses of its attorneys, as

- 35 -

well as all other costs including experts' fees, incurred in connection with that effort to enforce this Final Judgment, including in the investigation of the potential violation.

E.   For a period of four years following the expiration of this Final Judgment, if the United States has evidence that Defendant violated this Final Judgment before it expired, the United States may file an action against Defendant in this Court requesting that the Court order: (1) Defendant to comply with the terms of this Final Judgment for an additional term of at least four years following the filing of the enforcement action; (2) all appropriate contempt remedies; (3) additional relief needed to ensure Defendant complies with the terms of this Final Judgment; and (4) fees or expenses as called for by this Section.

## XIV. EXPIRATION OF FINAL JUDGMENT

Unless the Court grants an extension, this Final Judgment will expire seven years from the date of its entry, except that after four years from the date of its entry, this Final Judgment may be terminated upon notice by the United States to the Court and Defendant that continuation of this Final Judgment is no longer necessary or in the public interest.

## XV.  RESERVATION OF RIGHTS

This Final Judgment terminates only the claims stated in the Complaint against Defendant and does not affect other charges or claims the United States may file. The United States retains all rights to investigate or prosecute, under all applicable laws, any other claims against the Defendant that may be brought in the future. The entry of this Final Judgment does not limit the ability of any non-settling attorney general of any State to bring or maintain any action under federal or state law against Defendant.

Nothing in this Final Judgment impairs or limits any authority of a State or local government to impose different or additional requirements on the use of Nonpublic Data by statute, regulation, or ordinance, or affects Defendant's obligations under state or local law.

## XVI. PUBLIC INTEREST DETERMINATION

Entry of this Final Judgment is in the public interest. The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including by making available to the public copies of this Final Judgment and the Competitive Impact Statement, public comments thereon, and any response to comments by the United States. Based upon the record before the Court, which includes the Competitive Impact

Statement and, if applicable, any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.

**IT IS SO ORDERED.**

This the 19th day of May, 2026.

_____
United States District Judge

- 38 -