UNITED STATES OF AMERICA,

    Plaintiff,

      v.

WILLOW BRIDGE PROPERTY
COMPANY, LLC,

    Defendant.

No. 1:24-cv-00710-WLO-JGM

## COMPETITIVE IMPACT STATEMENT

In accordance with the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)–(h) (the "APPA" or "Tunney Act"), the United States of America files this Competitive Impact Statement related to the proposed Final Judgment against Defendant Willow Bridge Property Company, LLC, which has been filed in this civil antitrust proceeding (Doc. 200-1).

## I.  NATURE AND PURPOSE OF THE PROCEEDING

On August 23, 2024, the United States, along with co-plaintiff States, filed a civil antitrust Complaint (the "Complaint") against RealPage, Inc. ("RealPage"). On January 7, 2025, the United States and its co-plaintiff

States amended the Complaint to add Willow Bridge Property Company, LLC ("Willow Bridge") and five other property management companies ("property managers") as Defendants. Willow Bridge licenses revenue management products called AI Revenue Management ("AIRM") and YieldStar from RealPage. RealPage also licenses AIRM and YieldStar to Willow Bridge's competitors, including the other property managers or property owners (collectively, "landlords") named as Defendants in the Complaint. Willow Bridge and other landlords use RealPage's revenue management products to determine how to price floor plans and units for the conventional multifamily rental housing that they each manage and lease, in competition with each other in numerous local rental housing markets around the country.

The Complaint alleges that Willow Bridge violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by unlawfully sharing its confidential and competitively sensitive information with RealPage for use in its and competing landlords' pricing. Under their licensing agreements with RealPage, Willow Bridge and competing landlords have provided RealPage with daily, competitively sensitive,

2

nonpublic information relating to their leasing businesses, including details like how many leases have been renewed, on what terms, and at what price. The transactional data that Willow Bridge and other landlords have agreed to provide to RealPage includes current, forward-looking, granular, and highly competitively sensitive information. As reflected in the design, development, and operation of its revenue management products, RealPage has used Willow Bridge's competitively sensitive, nonpublic information to influence rental prices and other leasing recommendations across conventional multifamily rental housing managed by competing landlords. Through RealPage's revenue management products, Willow Bridge's rental prices and related recommendations for conventional multifamily housing rentals were likewise influenced by its competitors' competitively sensitive, nonpublic information. In each relevant market, RealPage and participating landlords, including Willow Bridge, collectively have sufficient market power, as indicated by market and data penetration, to harm renters and the competitive process through their unlawful sharing of confidential and competitively

3

sensitive information with each other.

The Complaint also alleges that Willow Bridge and other landlords, by adopting and using RealPage's revenue management products, have agreed with RealPage to align their pricing, thereby violating Section 1 of the Sherman Act, 15 U.S.C. § 1. RealPage has entered into agreements with Willow Bridge and its competing landlords relating to how to price floor plans and rental units by licensing its revenue management products, AIRM and YieldStar, to landlords, and by training and running its revenue management products using competitively sensitive, nonpublic transactional data shared by landlords. Adoption and use of RealPage's revenue management products by Willow Bridge and other landlords has the likely effect of aligning their pricing processes, strategies, and pricing responses, and Willow Bridge and other landlord users understand this likely effect.

On July 6, 2026, the United States filed a proposed Final Judgment and a Stipulation and Order ("Stipulation and Order"), which are designed to remedy the loss of

competition alleged in the Complaint due to Willow Bridge's conduct.

The proposed Final Judgment, which is explained more fully below, imposes several requirements and restrictions on Willow Bridge that address the United States' concerns regarding Willow Bridge's anticompetitive conduct alleged in the Complaint. Specifically:

i. Any Willow Bridge proprietary revenue management product cannot use any third-party nonpublic data, including in training its models or in the runtime operation;

ii. Any Willow Bridge proprietary revenue management product cannot pool pricing information across its different owners;

iii. Willow Bridge cannot license or use any third-party revenue management product that uses third-party nonpublic data to recommend or set prices;

iv. Willow Bridge cannot license or use any third-party revenue management product that pools information across Willow Bridge properties with different owners;

5

v. Willow Bridge cannot disclose, solicit, or use competitively sensitive information from competitors that can be used to set rental prices or generate pricing;

vi. Willow Bridge must cooperate in this civil antitrust proceeding (United States et al. v. RealPage et al.) with respect to the claims against other defendants;

vii. Willow Bridge must adopt a written antitrust compliance policy and designate a chief antitrust compliance officer who will train Willow Bridge employees on the policy, enforce the policy, and perform annual audits for compliance with the policy;

viii. Willow Bridge must allow the United States to inspect its documents and to interview its employees to ensure compliance with the Final Judgment;

ix. Willow Bridge must allow the United States to inspect documents regarding its proprietary

6

revenue management product and review the relevant code and pseudocode;

x. If Willow Bridge uses a third-party revenue management product, Willow Bridge will be subject to the appointment of a monitor unless Willow Bridge obtains a certification that meets certain requirements, including affirming, among other things, that the product complies with all required limitations regarding use of competitors' competitively sensitive data in its runtime operation or model training; and

xi. Willow Bridge will also be subject to the appointment of a monitor if the Court finds that Willow Bridge has violated the terms of the proposed Final Judgment.

Under the terms of the Stipulation and Order, Willow Bridge must abide by and comply with the provisions of the proposed Final Judgment until it is entered by the Court or until the time for all appeals of any Court ruling declining entry of the proposed Final Judgment has expired.

The United States and Willow Bridge have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the APPA. Entry of the proposed Final Judgment will terminate this action with respect to the United States and Willow Bridge, except that the Court will retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof by Willow Bridge.

## II.  DESCRIPTION OF EVENTS GIVING RISE TO THE ALLEGED SHERMAN ACT VIOLATIONS

Willow Bridge has been a user of commercial revenue management and property management products that RealPage licenses to landlords, and it has used RealPage's revenue management product to help set rental prices for the properties it manages and/or owns. RealPage currently licenses three revenue management products, including AIRM, to landlords. AIRM, which Willow Bridge has been using, leverages confidential, competitively sensitive data collected from competing landlords as a critical input to generate pricing recommendations for competing landlords. This data includes rental applications, executed new leases, renewal offers and acceptances, and occupancy

estimates and projections. The data is pulled from property management software, such as RealPage's OneSite product or Yardi's Voyager, that Willow Bridge and other landlords use to collect and track rental payments, manage leases, property maintenance, accounting, and other property management functions.

When deciding where to live, renters often visit numerous properties that are owned or managed by competing landlords so that they can compare rental offerings and select their best housing option considering price and other terms. When competing landlords do not have access to each other's nonpublic data, or when their recommendations are not informed by competitors' nonpublic data, they are more likely to act independently and compete more vigorously on price and better leasing terms to secure new leases and renewals from renters. RealPage, however, provides landlords who use its revenue management products with pricing recommendations and pricing based on competitors' competitively sensitive data. Widespread adoption and use of RealPage's revenue management products leads to pricing decisions by competing landlords such as

Willow Bridge that are based on recommendations coming from a common pricing model and powered by competitively sensitive, nonpublic data, harming the ability of renters to obtain a competitive price for their housing. The use of competitors' competitively sensitive data in this manner thus harms renters as well as the competitive process itself.

Willow Bridge, headquartered in Dallas, Texas, is one of the largest apartment managers in the United States. Willow Bridge manages over 240,000 units in the United States. As an apartment manager, Willow Bridge makes strategic and competitive decisions for the apartments it manages, including determination of new lease and renewal terms, such as rental price. As of the date of the Complaint, Willow Bridge licensed AIRM and YieldStar from RealPage. Per the licensing agreement, Willow Bridge relied on AIRM and YieldStar to recommend rental prices for its units, which is informed by competitively sensitive data provided by Willow Bridge's competitors. Willow Bridge also provided its competitively sensitive data to RealPage, to be used to inform the rental prices that RealPage's

10

software recommends to Willow Bridge's competitors. Further, Willow Bridge has agreed with RealPage to use AIRM and YieldStar as RealPage designed them. It reviews AIRM and YieldStar floor plan price recommendations daily and uses these revenue management products to set scheduled floor plan rents and even unit-level prices.

In summary, the Complaint alleges that Willow Bridge unlawfully shared its competitively sensitive information for use in pricing by competing landlords that also license RealPage's revenue management products, that Willow Bridge benefited from using competitors' sensitive information for its own pricing, and that Willow Bridge agreed to align its pricing with that of its competitors by using RealPage's revenue management products in the way the products were designed and with the data it uses. Willow Bridge uses RealPage's revenue management products to inform its setting of rental prices and discounts—such as concessions of a free month of rent—and to make other competitive and strategic decisions relating to rental prices and terms.

## III. EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The relief required by the proposed Final Judgment will

remedy the loss of competition in the conventional multifamily rental housing market[1] alleged in the Complaint by precluding Willow Bridge from sharing competitively sensitive, nonpublic information, directly or indirectly, with competing landlords and from forming agreements, directly or indirectly, to align prices with its competitors. The terms described below are designed to ensure that Willow Bridge ends its anticompetitive conduct and to prevent Willow Bridge from engaging in the same or similar conduct in the future.

### A. Willow Bridge's Use of Proprietary Revenue Management Product(s)

The proposed Final Judgment requires Willow Bridge to limit the type of data it uses in its proprietary software, RaMI. Paragraph IV.A of the proposed Final Judgment precludes Willow Bridge's proprietary revenue management product from using other landlords' competitively sensitive data to set rental prices. Paragraph IV.A also prevents

---

[1] As stated in the Complaint, the conventional multifamily rental housing market includes apartments available to the general public in properties that have five or more living units. It does not include student housing, affordable housing, age-restricted or senior housing, or military housing. (Am. Compl. ¶ 183).

Willow Bridge from pooling different property owners' competitively sensitive data even if they are Willow Bridge clients. This prohibition ensures that property owners who compete in the multifamily rental housing industry are not using their relationship with Willow Bridge to gain access to each other's data.

Paragraph IV.B prohibits Willow Bridge from training its revenue management product's models using certain competitively sensitive data from other landlords. A model is a set of rules or instructions that software relies on to calculate a defined output which, in this case, is a recommended rental price for a floorplan or unit. Models are trained using data to define and refine the rules or instructions by which it operates. Paragraph IV.B restricts Willow Bridge from pooling or combining data on rental pricing, concessions, discounts, occupancy rates or capacity, or other rental pricing terms from Willow Bridge properties for different property owners. The restriction on pooling competitors' data thus also prohibits Willow Bridge from training its software models using pricing and occupancy data from competing property owners, therefore

reducing concerns about competitors benefiting from each other's competitively sensitive data to plan their pricing.

Paragraph IV.C prohibits Willow Bridge's proprietary revenue management product from disclosing any of Willow Bridge's property data to any other property management company or property owner.

Paragraph IV.D allows Willow Bridge to license its proprietary product to third parties, as long as the product complies with the restrictions described in Paragraphs V.A.1-2 regarding use of competitively sensitive data and product features. This term could increase competition in revenue management software for multifamily housing.

## B. Restrictions Concerning Use of Third-Party Revenue Management Products

The decree prohibits Willow Bridge from using third-party revenue management products unless certain conditions are met. If Willow Bridge decides to use a third-party revenue management product, Paragraph V.A requires Willow Bridge to select a product that does not (1) use competitively sensitive data from other landlords to set rental prices or generate rental pricing recommendations,

14

(2) use data from different Willow Bridge owners to set rental prices or generate rental pricing recommendations, (3) disclose data from a Willow Bridge property to a rival property management company or property owner, (4) pool or combine data from different owners, or (5) contain or use a pricing algorithm that has been trained using non-Willow Bridge data. Paragraph V.A also prohibits Willow Bridge from selecting and using a third-party revenue management product that has rental floors or limits rental pricing recommendation decreases based on competing properties' rental prices.

The proposed Final Judgment includes an additional restriction on Willow Bridge's ability to make agreements with non-clients regarding revenue management products. Specifically, Paragraph V.A.3 prohibits Willow Bridge from agreeing with a non-client property owner or a competing property management company to use a particular revenue management product. This provision reduces the risk of competitors agreeing with each other to use the same revenue management product across their clients.

If Willow Bridge chooses to use a third-party revenue management product in the future, Paragraph V.C requires Willow Bridge to notify the United States 30 days prior to switching to that product. Paragraph V.E requires Willow Bridge to submit to the United States a certification from the third-party revenue management product vendor that the product complies with the requirements in Paragraph V.A of the proposed Final Judgment.

## C. Other Prohibited Conduct

In addition to restrictions and conditions on Willow Bridge's use of revenue management products, the proposed Final Judgment also limits Willow Bridge's ability to communicate with competitors regarding certain competitively sensitive information for the purpose of setting prices. Paragraph VI.A prohibits Willow Bridge from disclosing, soliciting, or using any competitively sensitive data from competitors as part of setting rental prices or generating rental price recommendations, except for the property owner of that particular property. Paragraph VI.A clarifies that the restrictions include any data obtained through any form of communication, including

16

call arounds or market surveys, meetings, calls, text messages, emails, or shared documents.

Paragraph VI.C prevents Willow Bridge from using any competitively sensitive data belonging to other landlords, whether Willow Bridge derived that non-Willow Bridge data from a revenue management product or obtained it from direct communications with other landlords. Willow Bridge must also identify to the United States the existence and location of any such data. This does not apply to any data for Willow Bridge properties maintained in OneSite.

In addition, the proposed Final Judgment prohibits Willow Bridge from attending or participating in RealPage Meetings, which include steering committees, RealPage subcommittees, RealPage user groups, and RealPage Idea Exchange. Paragraph VI.D. provides that if Willow Bridge attends a RealPage Meeting, it must notify the United States within 30 days and provide a description of the content and any documents shown during the meeting. Additionally, Willow Bridge must produce to the United States any chats or documents associated with the meeting.

### D. Cooperation

Under the terms of the proposed Final Judgment, and subject to reaching settlement with certain States, Willow Bridge must cooperate with the United States relating to the United States' claims against the remaining defendants included in the Complaint. This required cooperation includes voluntary interviews with up to 15 Willow Bridge employees for up to 60 hours. In addition, Willow Bridge must provide cooperation to the United States by making witnesses available before trial, providing testimony, proffering evidence, and producing documents and other information.

### E. Compliance Terms

Pursuant to Paragraph X.A, Willow Bridge must provide the United States with access to Willow Bridge's books, records, data, and documents, including communications with other property managers, to enable the United States to assess Willow Bridge's compliance with the terms of the Final Judgment. Willow Bridge must also permit the United States to interview Willow Bridge's officers, employees, or agents relating to any matters contained in this Final Judgment. Willow Bridge must also provide the United States

18

with documents describing how Willow Bridge's proprietary revenue management product is trained and how it determines prices for properties it manages, as well as changes to these processes. Willow Bridge must also allow the United States to inspect Willow Bridge's software code and pseudocode of that software for independent verification.

Additionally, Paragraph VII.A requires Willow Bridge's chief antitrust compliance officer to audit Willow Bridge's operations. The annual audits must, at a minimum, include employees in Willow Bridge's revenue management group and a randomly selected group of employees who manage property operations. Paragraph VII.B requires Willow Bridge to submit an annual certification from its General Counsel that Willow Bridge has established and maintained the annual antitrust compliance policy and training, that Willow Bridge identified the audited individuals to the United States, and that any revenue management product used by Willow Bridge continues to satisfy the requirements in the proposed Final Judgment.

Finally, VII.B.2 requires Willow Bridge employees engaged in or overseeing Defendant's revenue management of

multifamily rental properties or overseeing multiple multifamily rental properties to attest, under penalty of perjury, that they have not (i) agreed with any non-Willow Bridge landlord to use a particular revenue management product; (ii) disclosed, solicited or used non-Willow Bridge competitively sensitive data as part of setting or generating pricing information; or (iii) attended RealPage meetings.

## F. Compliance Monitor

The proposal Final Judgment requires that Willow Bridge be subject to an appointed compliance monitor in certain circumstances.

First, Paragraph IX.B requires that a monitor be appointed if the Court determines that Willow Bridge has violated the proposed Final Judgment.

Second, Paragraph IX.B requires that Willow Bridge be subject to a monitor unless Willow Bridge obtains a certification, as required by Paragraph V.E, for a non-RealPage revenue management product. The product's vendor must certify that the product does not use competitors'

competitively sensitive data to determine rental prices and satisfies other software requirements.

In the event a monitor is appointed, which selection shall be in the United States' sole discretion, the monitor will assess Willow Bridge's compliance with the Final Judgment, in particular, its use of a revenue management product and its communications with other landlords. Paragraph IX.D provides the monitor with authority to investigate Willow Bridge's compliance with the Final Judgment, including by selecting up to 15 Willow Bridge employees to interview and giving the monitor access to review those employees' files. Further, per Paragraph IX.E, the monitor will have the authority to take steps necessary to ensure compliance with the Final Judgment. These steps may include interviewing Willow Bridge employees and collecting Willow Bridge documents. The monitor will also provide an annual report to the United States setting forth Willow Bridge's efforts to comply with its obligations under the Final Judgment.

If appointed, the monitor will serve at Willow Bridge's expense, on such terms and conditions as the United States

21

approves in its sole discretion. Willow Bridge will be required to assist the monitor in fulfilling his or her obligations. The monitor will serve for the remainder of the term of the Final Judgment or until Willow Bridge obtains the certification required by the proposed Final Judgment, as described above.

### G. Other Provisions

The proposed Final Judgment also contains provisions designed to promote compliance with and make enforcement of the Final Judgment as effective as possible. Paragraph XIII.A provides that the United States retains and reserves all rights to enforce the Final Judgment, including the right to seek an order of contempt from the Court. Under the terms of this paragraph, Willow Bridge has agreed that in any civil contempt action, any motion to show cause, or any similar action brought by the United States regarding an alleged violation of the Final Judgment, the United States may establish the violation and the appropriateness of any remedy by a preponderance of the evidence and that Willow Bridge has waived any argument that a different standard of proof should apply. This provision aligns the

22

standard for compliance with the Final Judgment with the standard of proof that applies to the underlying offense addressed by the Final Judgment.

Paragraph XIII.B provides additional clarification regarding the interpretation of the provisions of the proposed Final Judgment. Pursuant to Paragraph XIII.B of the proposed Final Judgment, Willow Bridge agrees that it will abide by the proposed Final Judgment and that it may be held in contempt of the Court for failing to comply with any provision of the proposed Final Judgment that is stated specifically and in reasonable detail, as interpreted in light of its procompetitive purpose.

Paragraph XIII.C provides that if the Court finds in an enforcement proceeding that Willow Bridge has violated the Final Judgment, the United States may apply to the Court for an extension of the Final Judgment, together with such other relief as may be appropriate. In addition, to compensate American taxpayers for any costs associated with investigating and enforcing violations of the Final Judgment, Paragraph XIII.C provides that in any successful effort by the United States to enforce the Final Judgment

against Willow Bridge, whether litigated or resolved before litigation, Willow Bridge must reimburse the United States for attorneys' fees, experts' fees, and other costs incurred in connection with that effort to enforce this Final Judgment, including the investigation of the potential violation.

Paragraph XIII.D of the proposed Final Judgment states that the United States may file an action against Willow Bridge for violating the Final Judgment for up to four years after the Final Judgment has expired or been terminated. This provision is meant to address circumstances such as when evidence that a violation of the Final Judgment occurred during the term of the Final Judgment is not discovered until after the Final Judgment has expired or been terminated, or when there is not sufficient time for the United States to complete an investigation of an alleged violation until after the Final Judgment has expired or been terminated. This provision therefore makes clear that, for four years after the Final Judgment has expired or been terminated, the United States

24

may still challenge a violation that occurred during the term of the Final Judgment.

Finally, Section XIV of the proposed Final Judgment provides that the Final Judgment will expire five years from the date of its entry, except that after three years from that date, the Final Judgment may be terminated upon notice by the United States to the Court and to Willow Bridge that continuation of the Final Judgment is no longer necessary or in the public interest.

## IV.  REMEDIES AVAILABLE TO POTENTIAL PRIVATE PLAINTIFFS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment neither impairs nor assists the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no

25

prima facie effect in any subsequent private lawsuit that may be brought against Willow Bridge.

## V.  PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and Willow Bridge have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least 60 days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within 60 days of the date of publication of this Competitive Impact Statement in the Federal Register, or within 60 days of the first date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the U.S. Department of Justice, which remains free to

26

withdraw its consent to the proposed Final Judgment at any time before the Court's entry of the Final Judgment. The comments and the responses of the United States will be filed with the Court. In addition, the comments and the United States' responses will be published in the <u>Federal Register</u> unless the Court agrees that the United States instead may publish them on the U.S. Department of Justice, Antitrust Division's internet website.

Written comments should be submitted in English to:

Danielle Hauck
Acting Chief, Technology and Digital Platforms Section
Antitrust Division
United States Department of Justice
450 Fifth St. NW, Suite 7100
Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI. ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

As an alternative to the proposed Final Judgment, the United States considered a full trial on the merits against

Willow Bridge. The United States could have continued its litigation against Willow Bridge and brought the case to trial, seeking relief including an injunction against Willow Bridge's sharing of its competitively sensitive, nonpublic data with RealPage and other landlords, an injunction against Willow Bridge using AIRM, YieldStar, or similar revenue management products that use competing properties' nonpublic data to recommend prices, and an injunction preventing any communication with competitors that leads to alignment of prices. Under the circumstances present here, however, the United States concludes that entry of the proposed Final Judgment is in the public interest insofar as it avoids the time, expense, and uncertainty of a full trial on the merits.

## VII. STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

Under the Clayton Act and APPA, proposed Final Judgments, or "consent decrees," in antitrust cases brought by the United States are subject to a 60-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the

28

Court, in accordance with the statute as amended in 2004, is required to consider:

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the Court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." United States v. Microsoft Corp., 56 F.3d 1448, 1461 (D.C. Cir. 1995); United States v. US Airways Grp., Inc., 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (explaining that the "court's inquiry is limited" in Tunney Act settlements); United States v. InBev N.V./S.A., No. 08-1965 (JR), 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug.

29

11, 2009) (noting that a court's review of a proposed Final Judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanisms to enforce the final judgment are clear and manageable"); United States v. Charleston Area Med. Ctr., Inc., No. CV 2:16-3664, 2016 WL 6156172, at *2 (S.D.W. Va. Oct. 21, 2016) (explaining that in evaluating whether the proposed final judgment is in the public interest, the inquiry is "a narrow one"); United States v. Mountain Health Care, 1:02-CV-288-T, 2003 WL 22359598, at *7 (W.D.N.C. 2003) ("[W]ith respect to the adequacy of the relief secured by the decree, a court may not 'engage in an unrestricted evaluation of what relief would best serve the public.'") citing United States v. BNS Inc., 858 F.2d 456, 462-63 (9th Cir. 1988)).

As the U.S. Court of Appeals for the D.C. Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations in the government's Complaint, whether the proposed Final Judgment is sufficiently clear, whether

30

its enforcement mechanisms are sufficient, and whether it may positively harm third parties. See Microsoft, 56 F.3d at 1458-62; United States v. Math Works, No. 02-888-A, 2003 WL 1922140, *17 (E.D. Va. 2003). With respect to the adequacy of the relief secured by the proposed Final Judgment, a court may not "make de novo determination of facts and issues." United States v. W. Elec. Co., 993 F.2d 1572, 1577 (D.C. Cir. 1993) (quotation marks omitted); see also Microsoft, 56 F.3d at 1460-62; United States v. Alcoa, Inc., 152 F. Supp. 2d 37, 40 (D.D.C. 2001); United States v. Enova Corp., 107 F. Supp. 2d 10, 16 (D.D.C. 2000); InBev, 2009 U.S. Dist. LEXIS 84787, at *3. Instead, "[t]he balancing of competing social and political interests affected by a proposed antitrust decree must be left, in the first instance, to the discretion of the Attorney General." W. Elec. Co., 993 F.2d at 1577 (quotation marks omitted). "The court should also bear in mind the flexibility of the public interest inquiry: the court's function is not to determine whether the resulting array of rights and liabilities is the one that will best serve society, but only to confirm that the resulting settlement

31

is within the <u>reaches</u> of the public interest." <u>Microsoft</u>, 56 F.3d at 1460 (quotation marks omitted); <u>see also United States v. Deutsche Telekom AG</u>, No. 19-2232 (TJK), 2020 WL 1873555, at *7 (D.D.C. Apr. 14, 2020); <u>Math Works</u>, 2003 WL 1922140 at *18; <u>Mountain Health Care</u>, 2003 WL 22359598, at *7. More demanding requirements would "have enormous practical consequences for the government's ability to negotiate future settlements," contrary to congressional intent. <u>Microsoft</u>, 56 F.3d at 1456. "The Tunney Act was not intended to create a disincentive to the use of the consent decree." <u>Id.</u>

The United States' predictions about the efficacy of the remedy are to be afforded deference by the Court. <u>See, e.g.</u>, <u>Microsoft</u>, 56 F.3d at 1461 (recognizing courts should give "due respect to the Justice Department's . . . view of the nature of its case"); <u>United States v. Iron Mountain, Inc.</u>, 217 F. Supp. 3d 146, 152–53 (D.D.C. 2016) ("In evaluating objections to settlement agreements under the Tunney Act, a court must be mindful that [t]he government need not prove that the settlements will perfectly remedy the alleged antitrust harms[;] it need only provide a

32

factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." (internal citations omitted)); United States v. Republic Servs., Inc., 723 F. Supp. 2d 157, 160 (D.D.C. 2010) (noting "the deferential review to which the government's proposed remedy is accorded"); United States v. Archer-Daniels-Midland Co., 272 F. Supp. 2d 1, 6 (D.D.C. 2003) ("A district court must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case."). The ultimate question is whether "the remedies [obtained by the Final Judgment are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'" Microsoft, 56 F.3d at 1461 (quoting W. Elec. Co., 900 F.2d at 309).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." Microsoft, 56 F.3d at 1459; see also US Airways, 38

33

F. Supp. 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); InBev, 2009 U.S. Dist. LEXIS 84787, at *20 ("[T]he 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged"); Math Works, 2003 WL 1922140 at *18; Mountain Health Care, 2003 WL 22359598, at *8. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. Microsoft, 56 F.3d at 1459–60.

In its 2004 amendments to the APPA, Congress made clear its intent to preserve the practical benefits of using judgments proposed by the United States in antitrust enforcement, Pub. L. 108-237 § 221, and added the

unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); see also US Airways, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). This language explicitly wrote into the statute what Congress intended when it first enacted the Tunney Act in 1974. As Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). "A court can make its public interest determination based on the competitive impact statement and response to public comments alone." US Airways, 38 F. Supp. 3d at 76 (citing Enova Corp., 107 F. Supp. 2d at 17).

## VIII. DETERMINATIVE DOCUMENTS

There are no determinative materials or documents

35

within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated: July 6, 2026

Respectfully submitted,

FOR PLAINTIFF
UNITED STATES OF AMERICA:


/s/ Henry C. Su
Henry C. Su
David A. Geiger
Danielle Hauck
Kris A. Perez Hicks

Attorneys
United States Department of
Justice
Antitrust Division
Technology and Digital
Platforms Section
450 Fifth St. NW, Suite
7100
Washington DC 20530
Telephone: (202) 307-6200
Email: henry.su@usdoj.gov

36