**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>PINNACLE PROPERTY MANAGEMENT SERVICES, LLC,<br><br>*Defendant*. | No. 1:24-cv-00710-WLO-JGM |

**PROPOSED FINAL JUDGMENT**

WHEREAS, Plaintiff, United States of America, filed its Complaint on January 7, 2025;

AND WHEREAS, the United States and Defendant, Pinnacle Property Management Services, LLC, have consented to entry of this Final Judgment without the taking of testimony, without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party relating to any issue of fact or law;

AND WHEREAS, Defendant agrees to undertake certain actions and refrain from certain conduct to remedy the loss of competition alleged in the Complaint;

AND WHEREAS, Defendant represents that the relief required

by this Final Judgment can and will be made and that Defendant will not later raise a claim of hardship or difficulty as grounds for asking the Court to modify any provision of this Final Judgment;

NOW THEREFORE, it is ORDERED, ADJUDGED, AND DECREED:

**I. JURISDICTION**

The Court has jurisdiction over the subject matter of, and each of the parties to, this action. The Complaint states a claim upon which relief may be granted against Defendant under Section 1 of the Sherman Act, 15 U.S.C. § 1.

**II. DEFINITIONS**

As used in this Final Judgment:

A. "Defendant" means Defendant Pinnacle Property Management Services, LLC, a Delaware corporation with its headquarters in Dallas, Texas, its successors and assigns, and all of its subsidiaries, divisions, groups, affiliates, parents, partnerships, and joint ventures engaged in the management or ownership of multifamily rental properties in the United States and its territories, and their directors, officers, managers, agents, and employees.

B. "Competitively Sensitive Information" means, in this Final Judgment, property-specific data or information (whether past, present, or prospective) which, individually or when

aggregated with such data or information from other properties, (1) could be reasonably used to determine current or future rental supply, demand, or pricing at a property or of any property's units, including but not limited to executed rents, rental price concessions or discounts, guest traffic, guest applications, occupancy or vacancy, lease terms, or lease expirations; (2) relates to the Property Owner's or Property Manager's use of settings or user-specified parameters within Revenue Management Products with respect to such property or properties; or (3) relates to the Property Owner's or Property Manager's rental pricing amount, formula, or strategy, including rental price concessions or discounts with respect to such property or properties.

C. "Cooperation Subject Matter" means the claims alleged in United States et al. v. RealPage et al. (currently docketed as No. 1:24-cv-00710 in the Middle District of North Carolina), and includes conduct as well as the effects of conduct.

D. "External Nonpublic Data" means all Nonpublic Data from any Third-Party. It does not include data for a Defendant Property.

E. "Including" means including, but not limited to.

F. "Model Training" means the process of analyzing data, including by machine learning or regression analysis, to

create or adjust the parameters of a model or algorithm to improve the accuracy of the model's or algorithm's predictions.

G. "Nonpublic Data" means any Competitively Sensitive Information that is not Public Data.

H. "Person" means any natural person, corporate entity, partnership, association, joint venture, limited liability company, fund, investment vehicle, or any other legal entity or trust.

I. "Property Manager(s)" means any Person, or the Person's agent, who manages a multifamily rental property.

J. "Property Owner(s)" means any Person who (directly or indirectly) owns or controls a multifamily rental property or that Person's agent; multifamily rental properties have the same Property Owner if they are (directly or indirectly) owned or controlled by the same Person.

K. "Public Data" means information on a rental property or unit's asking rental price (including publicly offered concessions), amenities, availability, and other information that is readily accessible to the general public, including but not limited to, on the property's website, at a physical building, in brochures, or on an internet listing service. Public Data also includes information on a rental property or

unit's asking price, concessions, amenities, and availability provided by a Property Manager or a Property Owner to any natural person who reasonably presents himself as a prospective renter. Public Data does not include any Competitively Sensitive Information obtained through communications between competitors, unless such information is also readily accessible to the general public.

L. "RealPage" means RealPage, Inc., a Delaware corporation with its headquarters in Richardson, Texas.

M. "RealPage Final Judgment" means the Final Judgment between the United States and RealPage entered in United States et al. v. RealPage et al. (currently docketed as No. 1:24-cv-00710 in the Middle District of North Carolina).

N. "RealPage Meeting(s)" means RealPage steering committees, RealPage subcommittees, RealPage user groups, RealPage Idea Exchange, or any variation of these meetings. For avoidance of doubt, a RealPage Meeting does not include any communications between Defendant and the Property Owner of a Defendant Property or any other Person providing services to that Defendant Property, or any software feedback provided solely to RealPage that is not otherwise shared by Defendant with other Property Managers

or Property Owners.

O. "Revenue Management Product(s)" means any software or service, including software as a service, that generates rental prices or rental pricing recommendations for multifamily housing rentals. For avoidance of doubt, a Revenue Management Product does not include general purpose spreadsheet software like Microsoft Excel.

P. "Runtime Operation" means any action taken by a Revenue Management Product while it runs, including generating rental prices or pricing recommendations for any unit or set of units at a property. Runtime Operation does not mean Model Training.

Q. "Settled Civil Claims" means any civil federal antitrust claim by the United States arising from Defendant's conduct accruing before the filing of the complaint in this action relating to (1) Revenue Management Products, including RealPage Revenue Management Products that use competitors' Competitively Sensitive Information, as well as (2) communications described by Paragraph V.A.

R. "Third-Party" means any Person other than Defendant or a Defendant affiliate.

S. "Defendant Property" means a multifamily rental property, located within the United States or its territories,

for which Defendant provides revenue management or related reporting or consulting services (collectively referred to as "Defendant Properties"). Defendant Property does not include student housing, affordable housing, age-restricted or senior housing, or military housing.

## III. APPLICABILITY

This Final Judgment applies to Defendant, as defined above, and all other Persons in active concert or participation with Defendant who receive actual notice of this Final Judgment.

## IV. RESTRICTIONS CONCERNING USE OF REVENUE MANAGEMENT PRODUCT(S)

A. Beginning 180 days after entry of the Stipulation and Order Defendant must not, within the United States and its territories:

1. license or use, for any Defendant Property, any Revenue Management Product that: (1) uses External Nonpublic Data (other than Nonpublic Data of the Property Owner of the subject Defendant Property) in its Runtime Operation to generate rental prices or rental pricing recommendations for a Defendant Property; (2) uses Nonpublic Data from a Defendant Property in its Runtime Operation to generate rental prices or rental pricing recommendations for any other Property Manager or Property Owner (unless the Property Owner of the non-Defendant Property is the same as the Property Owner of the Defendant

Property from which the data arises or to which it relates); (3) discloses in any way Nonpublic Data from a Defendant Property to any Third-Party Property Manager or Third-Party Property Owner (other than a Third-Party Property Owner of the Defendant Property from which the data arises or to which it relates, or to a Third-Party Property Manager that provides services to Defendant Properties); (4) pools or combines Nonpublic Data from Defendant Properties that have different Property Owners; or (5) contains or uses a pricing model or algorithm that has been trained using Nonpublic Data (other than Nonpublic Data of the Property Owner of the subject Defendant Property); or

2. license or use any Revenue Management Product that: (1) incorporates a rental price floor or a limit on rental price recommendation decreases (excluding a rental price floor, or limit on rental price decreases, that Defendant or the Property Owner manually selects and is not based on Nonpublic Data other than Nonpublic Data of the Property Owner of the subject Defendant Property); or (2) requires Defendant to accept, or provides any financial rewards for Defendant to accept, any recommended rental prices.

3. agree (expressly or tacitly) with any Property Owner or Non-Defendant Property Manager to use a particular Revenue Management Product (or the utilities or functionalities

thereof) or require any other Person to use a particular Revenue Management Product (or the utilities or functionalities thereof). Defendant is not prohibited by the preceding sentence from using a particular Revenue Management Product at a particular property pursuant to an agreement with another Person who is the Property Owner or who, along with Defendant, provides services to that particular property on behalf of the Property Owner, provided that the Revenue Management Product complies with Paragraphs IV.A.1-2.

B. If management responsibilities or ownership of a property within the United States or its territories is transferred from another Property Manager or Property Owner to Defendant, then Defendant will have 90 days from the date of transfer to comply with the requirements of Paragraph IV.A. for the transferred property.

C. Within 180 days after entry of the Stipulation and Order, Defendant must first notify the United States, in writing, of its intention to license or use a Revenue Management Product 30 calendar days prior to using a Revenue Management Product. Thereafter, if Defendant intends to license or use any other Revenue Management Product at any Defendant Property, Defendant must first notify the United States, in writing, of its intention to license or use such a Revenue Management Product 30 calendar

days prior to licensing or using the Revenue Management Product.

D. Notwithstanding Paragraph IV.A, Defendant may license or use a Revenue Management Product that complies with the terms of the RealPage Final Judgment.

E. Beginning 180 days after entry of the Stipulation and Order, if Defendant elects to license or use a Revenue Management Product:

1. After entry by the Court of a RealPage Final Judgment, Defendant may license or use a RealPage Revenue Management Product at any Defendant Property without the need to obtain certification as required in this Paragraph IV.E.

2. If Defendant licenses or uses a Revenue Management Product from a Person other than RealPage or a reseller of a RealPage Revenue Management Product at any Defendant Property, Defendant must secure and submit to the United States a certification from the vendor of the Revenue Management Product that the Revenue Management Product complies with the requirements in Paragraph IV.A or complies with the requirements for Revenue Management Products established in a RealPage Final Judgment.

**V. OTHER PROHIBITED CONDUCT**

A. Defendant must not, directly or indirectly, as part of setting rental prices or generating rental pricing recommendations for any Defendant Property (1) disclose

Nonpublic Data to any Third-Party Property Manager or Third-Party Property Owner (except to a Third-Party Property Owner of the particular Defendant Property from which the data arises or to which it relates, or a Third-Party Property Manager that provides services to Defendant Properties); (2) solicit External Nonpublic Data from any Third-Party Property Manager or Third-Party Property Owner (except from a Third-Party Property Owner of the particular Defendant Property from which the data arises or to which it relates, or from a Third-Party Property Manager that provides services to Defendant Properties); or (3) use External Nonpublic Data obtained from any Third-Party Property Manager or Third-Party Property Owner (except from a Third-Party Property Owner of the particular Defendant Property from which the data arises or to which it relates, or from a Third-Party Property Manager that provides services to Defendant Properties). For the avoidance of doubt, the restrictions set forth in this Paragraph include Nonpublic Data obtained through any means, whether directly or through an intermediary, including call arounds or market surveys, in-person meetings, calls, text messages, chat communications, emails, surveys, spreadsheets, shared documents (e.g., Google documents and SharePoint documents), industry meetings (e.g., user groups), online fora, private meetings, Revenue Management Products, or

information-exchange services.

B. Notwithstanding Paragraph V.A, a Defendant employee may (1) disclose or solicit Nonpublic Data about a particular property for the purpose of evaluating or effectuating a bona fide sale or purchase of the property, as long as any Nonpublic Data received is not used to set rental prices or generate rental pricing recommendations, or (2) disclose Nonpublic Data about a particular Defendant Property between a departing Property Manager and replacement Property Manager as part of a bona fide transfer of management responsibilities for that property.

C. Defendant must not, within the United States or its territories, use or access, as part of setting rental prices or generating rental pricing recommendations for any Defendant Property, any External Nonpublic Data (other than Nonpublic Data of the Property Owner of the subject Defendant Property), including such data derived from any RealPage Revenue Management Product, in Defendant's possession, custody, or control as of the Court's entry of the Stipulation and Order in this matter, acquired through any means. Within 180 days of entry of the Stipulation and Order, Defendant must identify to the United States in writing the existence and location of any structured data set containing such External Nonpublic Data. For the

avoidance of doubt, the proscriptions in this Paragraph do not apply to data for Defendant Properties maintained in OneSite or other property management software.

D. Defendant will not attend or participate in any RealPage Meetings. If Defendant attends or participates in a RealPage Meeting it will report such meeting within 30 days to the United States. Defendant must identify the date, time, and location of the meeting, identify all participants in that meeting, provide a description of the content of the meeting, provide a description of any document shown during the meeting, produce all documents received or provided by Defendant during the meeting, and produce any chats, recordings, or documents associated with the meeting.

## VI. ANTITRUST COMPLIANCE

A. Within 30 days of entry of the Stipulation and Order, Defendant must adopt a written antitrust compliance policy, to be approved by the United States in its sole discretion, that complies with the obligations set forth in this Final Judgment. Defendant must annually train all employees on this written policy. As part of that policy, Defendant must designate a chief antitrust compliance officer, who will be responsible for implementing and enforcing Defendant’s antitrust compliance policy and annual training. Defendant must identify to the

United States the chief antitrust compliance officer’s name, business address, telephone number, and email address. Within forty-five (45) days of a vacancy in Defendant’s chief antitrust compliance officer position, Defendant must appoint a replacement and must identify to the United States the replacement’s name, business address, telephone number, and email address. Defendant’s initial and replacement appointment of a chief antitrust compliance officer is subject to the approval of the United States in its sole discretion. Defendant is responsible for all costs and expenses related to the chief antitrust compliance officer. The chief antitrust compliance officer will conduct an annual antitrust compliance audit. The annual audits must, at a minimum, cover: (1) employees (including supervisors) engaged in or overseeing Defendant’s revenue management of multifamily rental properties in the United States and its territories; and (2) randomly selected, local, regional, or supervisory employees who manage property operations (at least 8 each year). The chief antitrust compliance officer will provide the United States with an annual report identifying all individuals audited.

B. On an annual basis beginning 180 calendar days after entry of the Stipulation and Order during the term of this Final Judgment, Defendant must:

1. submit to the Antitrust Division a certification from the General Counsel of Defendant attesting under penalty of perjury that (1) Defendant has established and maintained the annual antitrust compliance policy and training required by Paragraph VI.A; (2) Defendant has complied with the attestation requirements in Paragraph VI.C.2; (3) Defendant has provided the Antitrust Division with an annual report identifying the individuals audited pursuant to Paragraph VI.A; (4) if required under this Final Judgment, the vendors of any Revenue Management Products licensed or used by Defendant have provided the certification(s) required by Paragraph IV.E; and (5) Defendant has complied with Paragraph V.D.

2. require all of Defendant's employees (a) engaged in or overseeing Defendant's revenue management of multifamily rental properties in the United States and its territories, and/or (b) having director-level and above responsibility for overseeing property management for multiple of Defendant's multifamily rental properties in the United States and its territories to attest under penalty of perjury that they have complied with Paragraphs IV.A, and IV.B;

3. if required under this Final Judgment, including Paragraph IV.E, obtain and submit to the Antitrust Division a certification, as described in Paragraph IV.E, that each

Revenue Management Product that Defendant licenses or uses complies with Paragraph IV.A or complies with the requirements for Revenue Management Products established in a proposed RealPage Final Judgment; and

4. if applicable, provide the Antitrust Division a report that identifies for each Defendant Property for which Defendant uses a Revenue Management Product: (1) the name of the Property Owner(s) and (2) any Revenue Management Product used within the preceding twelve months for that Defendant Property.

**VII. COOPERATION**

A. Subject to reaching a settlement with all States that, as of the entry of the Stipulation and Order, are plaintiffs in United States et al. v. RealPage et al. (currently docketed as No. 1:24-cv-00710 in the Middle District of North Carolina), Defendant must cooperate fully and truthfully with the United States relating to the Cooperation Subject Matter in any civil investigation or civil litigation the United States brings or has brought. Defendant must use its best efforts to ensure that all current and former officers, directors, agents, and employees also fully and promptly cooperate with the United States relating to the Cooperation Subject Matter in any civil investigation or civil litigation the United States brings or

has brought. Defendant's cooperation must include:

1. as requested on reasonable notice by the Antitrust Division, making up to 15 employees available for voluntary interviews for up to 40 hours total regarding the Cooperation Subject Matter;

2. providing full and truthful written or oral testimony in any deposition, trial, or other proceeding relating to the Cooperation Subject Matter and making witnesses available to the United States upon reasonable notice before any such testimony;

3. providing proffers, which may be made by counsel for Defendant, describing Defendant's knowledge of and evidence relating to the Cooperation Subject Matter ;

4. within 30 days of receiving a written request (whether formal process or informal request) from the United States for documents, information, or other material relating to the Cooperation Subject Matter (or whatever additional time the Antitrust Division grants in its sole discretion), producing to the United States all responsive documents, information, and other materials, wherever located, not protected under the attorney-client privilege or the work-product doctrine, in the possession, custody, or control of Defendant, as well as a log of any responsive documents,

information, or other materials that were not provided, including an explanation of the basis for withholding such materials;

5. authenticating or otherwise assisting with establishing the evidentiary foundation of any documents Defendant produced or produces to the United States; and

6. taking all necessary steps to preserve all documents, information, and other materials relating to the Cooperation Subject Matter until the United States provides written notice to Defendant that its obligation to do so has expired.

B. Subject to Defendant's full, truthful, and continuing cooperation, as required under Paragraph VII.A, Defendant is fully and finally discharged and released from Settled Civil Claims.

C. Nothing in this Section VII affects Defendant's obligation to respond to any formal discovery requests in litigation or a civil investigative demand issued by the United States.

## VIII. APPOINTMENT OF MONITOR

A. Defendant will not be subject to a Monitor if all Revenue Management Products that Defendant licenses or uses at Defendant Properties have been certified pursuant to, or are

otherwise compliant with, Paragraph IV.E.

B. However, if Defendant elects to license or use a Revenue Management Product that has not been certified pursuant to, or is not otherwise compliant with, Paragraph IV.E, at any Defendant Property, or if a Court finds that Defendant has violated any other term of the Final Judgment, upon application of the United States, which Defendant may not oppose, the Court will appoint an independent Third-Party antitrust monitor (the "Monitor") selected by the United States and approved by the Court.

C. Defendant may propose to the United States a pool of three candidates to serve as the Monitor, and the United States may consider Defendant's perspectives on the proposed candidates or any other candidates identified and considered by the United States. The United States will retain the ultimate right, in its sole discretion, either to select the Monitor from among the three candidates proposed by Defendant or to select a different candidate. Once approved, the Monitor should be considered by the United States and Defendant to be an arm and representative of the Court.

D. The Monitor will have the power and authority to monitor Defendant's compliance with Paragraphs IV.A, V.A, V.D, VI.A, and VI.B of this Final Judgment, including by determining

whether employees (including supervisors) in Defendant's residential-property revenue management group have complied with their obligations set forth in those Sections. As part of its monitoring duties, the Monitor may also choose, in consultation with the United States, a yearly selection of other local, regional, or supervisory employees of Defendant who manage property operations (not to exceed 15 annually) and investigate whether those individuals have complied with the obligations set forth in Paragraphs IV.B and V.A. The Monitor will have other powers as the Court deems appropriate. The Monitor will have no responsibility for the operation of the Defendant's business. No attorney-client relationship will be formed between Defendant and the Monitor.

E. The Monitor will have the authority to take such steps as, in the Monitor's discretion and the United States' view, may be necessary to accomplish the Monitor's responsibilities. The Monitor may seek information from Defendant's personnel, including in-house counsel, compliance personnel, and internal auditors. Defendant will annually communicate to all employees that employees may disclose any information to the Monitor without reprisal for such disclosure. Defendant must not retaliate against any employee or Third-Party for disclosing information to the Monitor.

F. Defendant may not object to actions taken by the Monitor in fulfillment of the Monitor's responsibilities under any Order of the Court on any ground other than malfeasance by the Monitor. Disagreements between the Monitor and Defendant related to the scope of the Monitor's responsibilities do not constitute malfeasance. Objections by Defendant must be conveyed in writing to the United States and the Monitor within 10 calendar days of the Monitor's action that gives rise to Defendant's objection, or else Defendant will have waived any such objections.

G. The Monitor will serve at the cost and expense of Defendant pursuant to a written agreement, on terms and conditions, including confidentiality requirements and conflict of interest certifications, approved by the United States in its sole discretion. If the Monitor and Defendant are unable to reach such a written agreement within 14 calendar days of the Court's appointment of the monitor, or if the United States, in its sole discretion, declines to approve the proposed written agreement, the United States, in its sole discretion, may take appropriate action, including making a recommendation as to the Monitor's costs and expenses to the Court, which may set the terms and conditions for the Monitor's costs and expenses.

H. The Monitor may hire, at the cost and expense of

Defendant, any agents and consultants, including investment bankers, attorneys, and accountants, that are reasonably necessary in the Monitor's judgment to assist with the Monitor's duties. These agents or consultants will be directed by and solely accountable to the Monitor and will serve on terms and conditions, including confidentiality requirements and conflict-of-interest certifications, approved by the United States in its sole discretion. Within three business days of hiring any agents or consultants, the Monitor must provide written notice of the hiring and the rate of compensation to Defendant and the United States.

I. The Monitor must provide yearly reports to the United States, with the first report due six months after the Monitor is appointed and subsequent reports due yearly thereafter, setting forth Defendant's efforts to comply with its obligations under this Final Judgment. If the Monitor learns of any potential violation of the Final Judgment by Defendant's officers, agents, or employees, the Monitor must promptly disclose to the Antitrust Division the nature and extent of any such potential violation and the Antitrust Division may require, in its sole discretion and without prejudice to any other remedy available for any violation of the Final Judgment, that the Monitor conduct additional investigation of compliance with this

Final Judgment beyond any limits set forth in Paragraph VIII.D.

J. The Monitor must account for all costs and expenses incurred.

K. The compensation of the Monitor and agents or consultants retained by the Monitor must be on reasonable and customary terms commensurate with the individuals' experience and responsibilities.

L. Defendant's failure to promptly pay the Monitor's accounted-for costs and expenses, including for agents and consultants, will constitute a violation of this Final Judgment and may result in sanctions imposed by the Court. If Defendant disputes any part of the Monitor's accounted-for costs and expenses, Defendant must establish an escrow account into which Defendant must pay the disputed costs and expenses until the dispute is resolved.

M. Defendants must use best efforts to cooperate fully with the Monitor and to assist the Monitor to monitor Defendant's compliance with its obligations under this Final Judgment. Subject to reasonable protection for trade secrets, other confidential research, development, or commercial information, or any applicable privileges, Defendant must provide the Monitor and agents or consultants retained by the Monitor with full and complete access to all personnel (current

and former), agents, consultants, books, records, and facilities. Defendant may not take any action to interfere with or to impede accomplishment of the Monitor's responsibilities.

N. If the United States determines that the Monitor is not acting diligently or in a reasonably cost-effective manner, or if the Monitor becomes unable to continue in its role for any reason, the United States may recommend that the Court appoint a substitute.

O. Once appointed by the Court, the Monitor will serve until (1) the expiration of the Final Judgment; or (2) if a Monitor has been appointed pursuant to Paragraph VIII.B, the United States will move the Court to terminate the monitorship upon the United States' determination that Defendant complies with the requirements in Paragraph IV.E.

## IX. COMPLIANCE INSPECTION

A. For the purposes of determining or securing compliance with this Final Judgment or of related orders such as the Stipulation and Order entered in this matter or of determining whether this Final Judgment should be modified or vacated, upon written request of an authorized representative of the Assistant Attorney General for the Antitrust Division, and reasonable notice to Defendant, Defendant must permit, from time to time and subject to legally recognized privileges, authorized

representatives, including agents retained by the United States:

1. to have access during Defendant's office hours to inspect and copy, or at the option of the United States, to require Defendant to provide, no later than 30 days after receiving a written request (whether formal or informal) from the United States, electronic copies of all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Defendant relating to any matters contained in this Final Judgment; and

2. to interview, either informally or on the record, Defendant's officers, agents, or employees, who may have their individual counsel present, relating to any matters contained in this Final Judgment. The interviews must be subject to the reasonable convenience of the interviewee and without restraint or interference by Defendant.

B. For the purposes of determining or securing compliance with this Final Judgment or related orders or determining whether this Final Judgment should be modified or vacated, upon the written request of an authorized representative of the Assistant Attorney General for the Antitrust Division, Defendant must submit written reports or respond to written interrogatories, under oath if requested, relating to any matters contained in this Final Judgment.

## X. PUBLIC DISCLOSURE

A. No information or documents obtained pursuant to any provision or this Final Judgment, including reports the Monitor provides to the United States pursuant to Paragraph VIII.I, may be divulged by the United States or the Monitor to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party, including grand-jury proceedings, or as otherwise required by law.

B. In the event that the Monitor should receive a subpoena, court order, or other court process seeking production of information or documents obtained pursuant to any provision in this Final Judgment, including reports the Monitor provides to the United States pursuant to Paragraph VIII.I, the Monitor must notify Defendant immediately and prior to any disclosure, so that Defendant may address such potential disclosure and, if necessary, pursue alternative legal remedies, including intervention in the relevant proceedings.

C. In the event of a request by a Third-Party, pursuant to the Freedom of Information Act, 5 U.S.C. § 552, for disclosure of information obtained pursuant to any provision of this Final Judgment, the Antitrust Division will act in accordance with that statute, and the Department of Justice

regulations at 28 C.F.R. part 16, including the provision on confidential commercial information, at 28 C.F.R. § 16.7. Defendant, when submitting information to the Antitrust Division, should designate the confidential commercial information portions of all applicable documents and information under 28 C.F.R. § 16.7. Designations of confidentiality expire 10 years after submission, "unless the submitter requests and provides justification for a longer designation period." *See* 28 C.F.R. § 16.7(b).

D. If at the time that Defendant furnishes information or documents to the United States pursuant to any provision of this Final Judgment, Defendant represents and identifies in writing information or documents for which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and the Defendant marks each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," the United States must give Defendant 10 calendar days' notice before divulging the material in any legal proceeding (other than a grand-jury proceeding).

## XI. RETENTION OF JURISDICTION

The Court retains jurisdiction to enable any party to this Final Judgment to apply to the Court at any time for further

orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

**XII. ENFORCEMENT OF FINAL JUDGMENT**

A. The United States retains and reserves all rights to enforce the provisions of this Final Judgment, including the right to seek an order of contempt from the Court. Defendant agrees that in a civil contempt action, a motion to show cause, or a similar action brought by the United States relating to an alleged violation of this Final Judgment, the United States may establish a violation of this Final Judgment and the appropriateness of a remedy therefor by a preponderance of the evidence, and Defendant waives any argument that a different standard of proof should apply.

B. This Final Judgment should be interpreted to give full effect to the procompetitive purposes of the antitrust laws and to restore the competition the United States alleges was harmed by the challenged conduct. Defendant agrees that it may be held in contempt of, and that the Court may enforce, any provision of this Final Judgment that, as interpreted by the Court in light of these procompetitive principles and applying ordinary tools of interpretation, is stated specifically and in reasonable

detail, whether or not it is clear and unambiguous on its face. In any such interpretation, the terms of this Final Judgment should not be construed against either party as the drafter.

C. In an enforcement proceeding in which the Court finds that Defendant has violated this Final Judgment, the United States may apply to the Court for an extension of this Final Judgment, together with other relief that may be appropriate. In connection with a successful effort by the United States to enforce this Final Judgment against Defendant, whether litigated or resolved before litigation, Defendant agrees to reimburse the United States for the fees and expenses of its attorneys, as well as all other costs including experts' fees, incurred in connection with that effort to enforce this Final Judgment, including in the investigation of the potential violation.

D. For a period of four years following the expiration of this Final Judgment, if the United States has evidence that Defendant violated this Final Judgment before it expired, the United States may file an action against Defendant in this Court requesting that the Court order: (1) Defendant to comply with the terms of this Final Judgment for an additional term of at least four years following the filing of the enforcement action; (2) all appropriate contempt remedies; (3) additional relief needed to ensure Defendant complies with the terms of this Final

Judgment; and (4) fees or expenses as called for by this Section.

**XIII. EXPIRATION OF FINAL JUDGMENT**

Unless the Court grants an extension, this Final Judgment will expire five years from the date of its entry, except that after three years from the date of its entry, this Final Judgment may be terminated upon notice by the United States to the Court and Defendant that the continuation of this Final Judgment is no longer necessary or in the public interest.

**XIV. RESERVATION OF RIGHTS**

The Final Judgment relates only to the resolution of the Settled Civil Claims. The United States reserves all rights for any other claims against Defendant that may be brought in the future. The entry of the Final Judgment does not limit the ability of any non-settling attorney general of any State to bring or maintain any action under federal or state law against Defendant.

**XV. PUBLIC INTEREST DETERMINATION**

Entry of this Final Judgment is in the public interest. The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b-h), including by making available to the public copies of this Final Judgment and the Competitive Impact Statement, public comments thereon, and

any response to comments by the United States. Based upon the record before the Court, which includes the Competitive Impact Statement and, if applicable, any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.

Date: _______________
[Court approval subject to procedures of Antitrust Procedures and Penalties Act, 15 U.S.C. § 16]

_____________________________
United States District Judge