**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>PINNACLE PROPERTY MANAGEMENT SERVICES, LLC,<br><br>Defendant. | No. 1:24-cv-00710-WLO-JGM |

## COMPETITIVE IMPACT STATEMENT

In accordance with the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) (the "APPA" or "Tunney Act"), the United States of America files this Competitive Impact Statement related to the proposed Final Judgment against Defendant Pinnacle Property Management Services, LLC, which has been filed in this civil antitrust proceeding (Doc. 213-1).

## I. NATURE AND PURPOSE OF THE PROCEEDING

On August 23, 2024, the United States, along with co-plaintiff States, filed a civil antitrust Complaint (the "Complaint") against RealPage, Inc. ("RealPage"). On January 7, 2025, the United States and its co-plaintiff

States amended the Complaint to add Pinnacle Property Management Services, LLC ("Pinnacle") and five other property management companies ("property managers") as Defendants. Pinnacle licenses revenue management products called AI Revenue Management ("AIRM") and YieldStar from RealPage. RealPage also licenses AIRM and YieldStar to Pinnacle's competitors, including the other property managers or property owners (collectively, "landlords") named as Defendants in the Complaint. Pinnacle and other landlords use RealPage's revenue management products to determine how to price floor plans and units for the conventional multifamily rental housing that they each manage and lease, in competition with each other in numerous local rental housing markets around the country.

The Complaint alleges that Pinnacle violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by unlawfully sharing its confidential and competitively sensitive information with RealPage for use in its and competing landlords' pricing. Under their licensing agreements with RealPage, Pinnacle and competing landlords have provided RealPage with daily, competitively sensitive, nonpublic information

relating to their leasing businesses, including details like how many leases have been renewed, on what terms, and at what price. The transactional data that Pinnacle and other landlords have agreed to provide to RealPage includes current, forward-looking, granular, and highly competitively sensitive information. As reflected in the design, development, and operation of its revenue management products, RealPage has used Pinnacle's competitively sensitive, nonpublic information to influence rental prices and other leasing recommendations across conventional multifamily rental housing managed by competing landlords. Through RealPage's revenue management products, Pinnacle's rental prices and related recommendations for conventional multifamily housing rentals were likewise influenced by its competitors' competitively sensitive, nonpublic information. In each relevant market, RealPage and participating landlords, including Pinnacle, collectively have sufficient market power, as indicated by market and data penetration, to harm renters and the competitive process through their unlawful sharing of confidential and competitively sensitive

information with each other.

The Complaint also alleges that Pinnacle and other landlords, by adopting and using RealPage's revenue management products, have agreed with RealPage to align their pricing, thereby violating Section 1 of the Sherman Act, 15 U.S.C. § 1. RealPage has entered into agreements with Pinnacle and its competing landlords relating to how to price floor plans and rental units by licensing its revenue management products, AIRM and YieldStar, to landlords, and by training and running its revenue management products using competitively sensitive, nonpublic transactional data shared by landlords. Adoption and use of RealPage's revenue management products by Pinnacle and other landlords has the likely effect of aligning their pricing processes, strategies, and pricing responses, and Pinnacle and other landlord users understand this likely effect.

On September 4, 2026, the United States filed a proposed Final Judgment and a Stipulation and Order ("Stipulation and Order"), which are designed to remedy the

loss of competition alleged in the Complaint due to Pinnacle's conduct.

The proposed Final Judgment, which is explained more fully below, imposes several requirements and restrictions on Pinnacle that address the United States' concerns regarding Pinnacle's anticompetitive conduct alleged in the Complaint. Specifically:

i. Pinnacle cannot license or use any third-party revenue management product that uses third-party nonpublic data to recommend or set prices;

ii. Pinnacle cannot license or use any third-party revenue management product that pools information across Pinnacle properties with different owners;

iii. Pinnacle cannot disclose, solicit, or use competitively sensitive information from competitors that can be used to set rental prices or generate pricing;

iv. Pinnacle must cooperate in this civil antitrust proceeding (United States et al. v. RealPage et al.) with respect to the claims against other defendants;

v. Pinnacle must adopt a written antitrust compliance policy and designate a chief antitrust compliance officer who will train Pinnacle employees on the policy, enforce the policy, and perform annual audits for compliance with the policy;

vi. Pinnacle must allow the United States to inspect its documents and to interview its employees to ensure compliance with the Final Judgment;

vii. Pinnacle must allow the United States to inspect documents regarding its proprietary revenue management product and review the relevant code and pseudocode;

viii. If Pinnacle uses a third-party revenue management product, Pinnacle will be subject to the appointment of a monitor unless Pinnacle obtains a certification that meets certain requirements, including affirming, among other things, that the product complies with all required limitations regarding use of competitors' competitively sensitive data in its runtime operation or model training; and

ix. Pinnacle will also be subject to the appointment of a monitor if the Court finds that Pinnacle has violated the terms of the proposed Final Judgment.

Under the terms of the Stipulation and Order, Pinnacle must abide by and comply with the provisions of the proposed Final Judgment until it is entered by the Court or until the time for all appeals of any Court ruling declining entry of the proposed Final Judgment has expired.

The United States and Pinnacle have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the APPA. Entry of the proposed Final Judgment will terminate this action with respect to the United States and Pinnacle, except that the Court will retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof by Pinnacle.

## II. DESCRIPTION OF EVENTS GIVING RISE TO THE ALLEGED SHERMAN ACT VIOLATIONS

Pinnacle has been a user of commercial revenue management and property management products that RealPage licenses to landlords, and it has used RealPage's revenue management product to help set rental prices for the

properties it manages and/or owns. RealPage currently licenses three revenue management products, including AIRM, to landlords. AIRM, which Pinnacle has been using, leverages confidential, competitively sensitive data collected from competing landlords as a critical input to generate pricing recommendations for competing landlords. This data includes rental applications, executed new leases, renewal offers and acceptances, and occupancy estimates and projections. The data is pulled from property management software, such as RealPage's OneSite product or Yardi's Voyager, that Pinnacle and other landlords use to collect and track rental payments, manage leases, property maintenance, accounting, and other property management functions.

When deciding where to live, renters often visit numerous properties that are owned or managed by competing landlords so that they can compare rental offerings and select their best housing option considering price and other terms. When competing landlords do not have access to each other's nonpublic data, or when their recommendations are not informed by competitors' nonpublic data, they are

more likely to act independently and compete more vigorously on price and better leasing terms to secure new leases and renewals from renters. RealPage, however, provides landlords who use its revenue management products with pricing recommendations and pricing based on competitors' competitively sensitive data. Widespread adoption and use of RealPage's revenue management products leads to pricing decisions by competing landlords such as Pinnacle that are based on recommendations coming from a common pricing model and powered by competitively sensitive, nonpublic data, harming the ability of renters to obtain a competitive price for their housing. The use of competitors' competitively sensitive data in this manner thus harms renters as well as the competitive process itself.

Pinnacle, headquartered in Frisco, Texas, is one of the largest apartment managers in the United States. As an apartment manager, Pinnacle makes strategic and competitive decisions for the apartments it manages, including determination of new lease and renewal terms, such as rental price. As of the date of the Complaint, Pinnacle

licensed AIRM and YieldStar from RealPage. Per the licensing agreement, Pinnacle relied on AIRM and YieldStar to recommend rental prices for its units, which is informed by competitively sensitive data provided by Pinnacle's competitors. Pinnacle also provided its competitively sensitive data to RealPage, to be used to inform the rental prices that RealPage's software recommends to Pinnacle's competitors. Further, Pinnacle has agreed with RealPage to use AIRM and YieldStar as RealPage designed them. It reviews AIRM and YieldStar floor plan price recommendations daily and uses these revenue management products to set scheduled floor plan rents and even unit-level prices.

In summary, the Complaint alleges that Pinnacle unlawfully shared its competitively sensitive information for use in pricing by competing landlords that also license RealPage's revenue management products, that Pinnacle benefited from using competitors' sensitive information for its own pricing, and that Pinnacle agreed to align its pricing with that of its competitors by using RealPage's revenue management products in the way the products were designed and with the data it uses. Pinnacle uses

RealPage's revenue management products to inform its setting of rental prices and discounts—such as concessions of a free month of rent—and to make other competitive and strategic decisions relating to rental prices and terms.

## III. EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The relief required by the proposed Final Judgment will remedy the loss of competition in the conventional multifamily rental housing market[1] alleged in the Complaint by precluding Pinnacle from sharing competitively sensitive, nonpublic information, directly or indirectly, with competing landlords and from forming agreements, directly or indirectly, to align prices with its competitors. The terms described below are designed to ensure that Pinnacle ends its anticompetitive conduct and to prevent Pinnacle from engaging in the same or similar conduct in the future.

### A. Restrictions Concerning Use of Third-Party Revenue Management Products

[1] As stated in the Complaint, the conventional multifamily rental housing market includes apartments available to the general public in properties that have five or more living units. It does not include student housing, affordable housing, age-restricted or senior housing, or military housing. (Am. Compl. ¶ 183).

The decree prohibits Pinnacle from using third-party revenue management products unless certain conditions are met. If Pinnacle decides to use a third-party revenue management product, Paragraph IV.A requires Pinnacle to select a product that does not (1) use competitively sensitive data from other landlords to set rental prices or generate rental pricing recommendations, (2) use data from different Pinnacle owners to set rental prices or generate rental pricing recommendations, (3) disclose data from a Pinnacle property to a rival property management company or property owner, (4) pool or combine data from different owners, or (5) contain or use a pricing algorithm that has been trained using non-Pinnacle data. Paragraph IV.A also prohibits Pinnacle from selecting and using a third-party revenue management product that has rental floors or limits rental pricing recommendation decreases based on competing properties' rental prices.

The proposed Final Judgment includes an additional restriction on Pinnacle's ability to make agreements with non-clients regarding revenue management products. Specifically, Paragraph IV.A.3 prohibits Pinnacle from

agreeing with a non-client property owner or a competing property management company to use a particular revenue management product. This provision reduces the risk of competitors agreeing with each other to use the same revenue management product across their clients.

If Pinnacle chooses to use a third-party revenue management product in the future, Paragraph IV.C requires Pinnacle to notify the United States 30 days prior to switching to that product. Paragraph IV.E requires Pinnacle to submit to the United States a certification from the third-party revenue management product vendor that the product complies with the requirements in Paragraph IV.A of the proposed Final Judgment.

**B. Other Prohibited Conduct**

In addition to restrictions and conditions on Pinnacle's use of revenue management products, the proposed Final Judgment also limits Pinnacle's ability to communicate with competitors regarding certain competitively sensitive information for the purpose of setting prices. Paragraph V.A prohibits Pinnacle from disclosing, soliciting, or using any competitively

sensitive data from competitors as part of setting rental prices or generating rental price recommendations, except for the property owner of that particular property. Paragraph V.A clarifies that the restrictions include any data obtained through any form of communication, including call arounds or market surveys, meetings, calls, text messages, emails, or shared documents.

Paragraph V.C prevents Pinnacle from using any competitively sensitive data belonging to other landlords, whether Pinnacle derived that non-Pinnacle data from a revenue management product or obtained it from direct communications with other landlords. Pinnacle must also identify to the United States the existence and location of any such data. This does not apply to any data for Pinnacle properties maintained in OneSite.

In addition, the proposed Final Judgment prohibits Pinnacle from attending or participating in RealPage Meetings, which include steering committees, RealPage subcommittees, RealPage user groups, and RealPage Idea Exchange. Paragraph V.D. provides that if Pinnacle attends a RealPage Meeting, it must notify the United States within

30 days and provide a description of the content and any documents shown during the meeting. Additionally, Pinnacle must produce to the United States any chats or documents associated with the meeting.

**C. Cooperation**

Under the terms of the proposed Final Judgment, and subject to reaching settlement with certain States, Pinnacle must cooperate with the United States relating to the United States' claims against the remaining defendants included in the Complaint. This required cooperation includes voluntary interviews with up to 15 Pinnacle employees for up to 60 hours. In addition, Pinnacle must provide cooperation to the United States by making witnesses available before trial, providing testimony, proffering evidence, and producing documents and other information.

**D. Compliance Terms**

Pursuant to Paragraph IX.A, Pinnacle must provide the United States with access to Pinnacle's books, records, data, and documents, including communications with other property managers, to enable the United States to assess

Pinnacle’s compliance with the terms of the Final Judgment. Pinnacle must also permit the United States to interview Pinnacle’s officers, employees, or agents relating to any matters contained in this Final Judgment. Pinnacle must also provide the United States with documents describing how Pinnacle’s proprietary revenue management product is trained and how it determines prices for properties it manages, as well as changes to these processes. Pinnacle must also allow the United States to inspect Pinnacle’s software code and pseudocode of that software for independent verification.

Additionally, Paragraph VI.A requires Pinnacle’s chief antitrust compliance officer to audit Pinnacle’s operations. The annual audits must, at a minimum, include employees in Pinnacle’s revenue management group and a randomly selected group of employees who manage property operations. Paragraph VI.B requires Pinnacle to submit an annual certification from its General Counsel that Pinnacle has established and maintained the annual antitrust compliance policy and training, that Pinnacle identified the audited individuals to the United States, and that any

revenue management product used by Pinnacle continues to satisfy the requirements in the proposed Final Judgment.

Finally, VI.B.2 requires Pinnacle employees engaged in or overseeing Defendant's revenue management of multifamily rental properties or employees having director-level and above responsibility for overseeing multiple multifamily rental properties to attest, under penalty of perjury, that they have not (i) agreed with any non-Pinnacle landlord to use a particular revenue management product; (ii) disclosed, solicited or used non-Pinnacle competitively sensitive data as part of setting or generating pricing information; or (iii) attended RealPage meetings.

**E. Compliance Monitor**

The proposal Final Judgment requires that Pinnacle be subject to an appointed compliance monitor in certain circumstances.

First, Paragraph VIII.B requires that a monitor be appointed if the Court determines that Pinnacle has violated the proposed Final Judgment.

Second, Paragraph VIII.B requires that Pinnacle be subject to a monitor unless Pinnacle obtains a

certification, as required by Paragraph IV.E, for a non-RealPage revenue management product. The product's vendor must certify that the product does not use competitors' competitively sensitive data to determine rental prices and satisfies other software requirements.

In the event a monitor is appointed, which selection shall be in the United States' sole discretion, the monitor will assess Pinnacle's compliance with the Final Judgment, in particular, its use of a revenue management product and its communications with other landlords. Paragraph VIII.D provides the monitor with authority to investigate Pinnacle's compliance with the Final Judgment, including by selecting up to 15 Pinnacle employees to interview and giving the monitor access to review those employees' files. Further, per Paragraph VIII.E, the monitor will have the authority to take steps necessary to ensure compliance with the Final Judgment. These steps may include interviewing Pinnacle employees and collecting Pinnacle documents. The monitor will also provide an annual report to the United States setting forth Pinnacle's efforts to comply with its obligations under the Final Judgment.

If appointed, the monitor will serve at Pinnacle's expense, on such terms and conditions as the United States approves in its sole discretion. Pinnacle will be required to assist the monitor in fulfilling his or her obligations. The monitor will serve for the remainder of the term of the Final Judgment or until Pinnacle obtains the certification required by the proposed Final Judgment, as described above.

**F. Other Provisions**

The proposed Final Judgment also contains provisions designed to promote compliance with and make enforcement of the Final Judgment as effective as possible. Paragraph XII.A provides that the United States retains and reserves all rights to enforce the Final Judgment, including the right to seek an order of contempt from the Court. Under the terms of this paragraph, Pinnacle has agreed that in any civil contempt action, any motion to show cause, or any similar action brought by the United States regarding an alleged violation of the Final Judgment, the United States may establish the violation and the appropriateness of any remedy by a preponderance of the evidence and that Pinnacle

has waived any argument that a different standard of proof should apply. This provision aligns the standard for compliance with the Final Judgment with the standard of proof that applies to the underlying offense addressed by the Final Judgment.

Paragraph XII.B provides additional clarification regarding the interpretation of the provisions of the proposed Final Judgment. Pursuant to Paragraph XII.B of the proposed Final Judgment, Pinnacle agrees that it will abide by the proposed Final Judgment and that it may be held in contempt of the Court for failing to comply with any provision of the proposed Final Judgment that is stated specifically and in reasonable detail, as interpreted in light of its procompetitive purpose.

Paragraph XII.C provides that if the Court finds in an enforcement proceeding that Pinnacle has violated the Final Judgment, the United States may apply to the Court for an extension of the Final Judgment, together with such other relief as may be appropriate. In addition, to compensate American taxpayers for any costs associated with investigating and enforcing violations of the Final

Judgment, Paragraph XII.C provides that in any successful effort by the United States to enforce the Final Judgment against Pinnacle, whether litigated or resolved before litigation, Pinnacle must reimburse the United States for attorneys' fees, experts' fees, and other costs incurred in connection with that effort to enforce this Final Judgment, including the investigation of the potential violation.

Paragraph XII.D of the proposed Final Judgment states that the United States may file an action against Pinnacle for violating the Final Judgment for up to four years after the Final Judgment has expired or been terminated. This provision is meant to address circumstances such as when evidence that a violation of the Final Judgment occurred during the term of the Final Judgment is not discovered until after the Final Judgment has expired or been terminated, or when there is not sufficient time for the United States to complete an investigation of an alleged violation until after the Final Judgment has expired or been terminated. This provision therefore makes clear that, for four years after the Final Judgment has expired or been terminated, the United States may still challenge a

violation that occurred during the term of the Final Judgment.

Finally, Section XIII of the proposed Final Judgment provides that the Final Judgment will expire five years from the date of its entry, except that after three years from that date, the Final Judgment may be terminated upon notice by the United States to the Court and to Pinnacle that continuation of the Final Judgment is no longer necessary or in the public interest.

**IV. REMEDIES AVAILABLE TO POTENTIAL PRIVATE PLAINTIFFS**

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment neither impairs nor assists the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no

prima facie effect in any subsequent private lawsuit that may be brought against Pinnacle.

## V. PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and Pinnacle have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least 60 days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within 60 days of the date of publication of this Competitive Impact Statement in the Federal Register, or within 60 days of the first date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the U.S. Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any

time before the Court's entry of the Final Judgment. The comments and the responses of the United States will be filed with the Court. In addition, the comments and the United States' responses will be published in the Federal Register unless the Court agrees that the United States instead may publish them on the U.S. Department of Justice, Antitrust Division's internet website.

Written comments should be submitted in English to:

> Danielle Hauck
> Acting Chief
> Technology and Digital Platforms Section
> Antitrust Division
> United States Department of Justice
> 450 Fifth St. NW, Suite 7100
> Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI. ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

As an alternative to the proposed Final Judgment, the United States considered a full trial on the merits against Pinnacle. The United States could have continued its

litigation against Pinnacle and brought the case to trial, seeking relief including an injunction against Pinnacle's sharing of its competitively sensitive, nonpublic data with RealPage and other landlords, an injunction against Pinnacle using AIRM, YieldStar, or similar revenue management products that use competing properties' nonpublic data to recommend prices, and an injunction preventing any communication with competitors that leads to alignment of prices. Under the circumstances present here, however, the United States concludes that entry of the proposed Final Judgment is in the public interest insofar as it avoids the time, expense, and uncertainty of a full trial on the merits.

## VII. STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

Under the Clayton Act and APPA, proposed Final Judgments, or "consent decrees," in antitrust cases brought by the United States are subject to a 60-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the

Court, in accordance with the statute as amended in 2004, is required to consider:

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the Court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." United States v. Microsoft Corp., 56 F.3d 1448, 1461 (D.C. Cir. 1995); United States v. Hewlett Packard Enterprise Co., No. 25-CV-00951-PCP, 2026 WL 2349970, at *16 (N.D. Cal. Aug. 12, 2026; United States v. US Airways Grp., Inc., 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (explaining that the "court's inquiry is limited" in

Tunney Act settlements); United States v. InBev N.V./S.A., No. 08-1965 (JR), 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that a court's review of a proposed Final Judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanisms to enforce the final judgment are clear and manageable"); United States v. Charleston Area Med. Ctr., Inc., No. CV 2:16-3664, 2016 WL 6156172, at *2 (S.D.W. Va. Oct. 21, 2016) (explaining that in evaluating whether the proposed final judgment is in the public interest, the inquiry is "a narrow one"); United States v. Mountain Health Care, 1:02-CV-288-T, 2003 WL 22359598, at *7 (W.D.N.C. 2003) ("[W]ith respect to the adequacy of the relief secured by the decree, a court may not 'engage in an unrestricted evaluation of what relief would best serve the public.'") citing United States v. BNS Inc., 858 F.2d 456, 462-63 (9th Cir. 1988)).

As the U.S. Court of Appeals for the D.C. Circuit has held, under the APPA a court considers, among other things,

the relationship between the remedy secured and the specific allegations in the government's Complaint, whether the proposed Final Judgment is sufficiently clear, whether its enforcement mechanisms are sufficient, and whether it may positively harm third parties. See Microsoft, 56 F.3d at 1458-62; United States v. Math Works, No. 02-888-A, 2003 WL 1922140, *17 (E.D. Va. 2003). With respect to the adequacy of the relief secured by the proposed Final Judgment, a court may not "make de novo determination of facts and issues." United States v. W. Elec. Co., 993 F.2d 1572, 1577 (D.C. Cir. 1993) (quotation marks omitted); see also Microsoft, 56 F.3d at 1460-62; United States v. Alcoa, Inc., 152 F. Supp. 2d 37, 40 (D.D.C. 2001); United States v. Enova Corp., 107 F. Supp. 2d 10, 16 (D.D.C. 2000); InBev, 2009 U.S. Dist. LEXIS 84787, at *3. Instead, "[t]he balancing of competing social and political interests affected by a proposed antitrust decree must be left, in the first instance, to the discretion of the Attorney General." W. Elec. Co., 993 F.2d at 1577 (quotation marks omitted). "The court should also bear in mind the flexibility of the public interest inquiry: the court's

function is not to determine whether the resulting array of rights and liabilities is the one that will best serve society, but only to confirm that the resulting settlement is within the reaches of the public interest.” Microsoft, 56 F.3d at 1460 (quotation marks omitted); see also United States v. Deutsche Telekom AG, No. 19-2232 (TJK), 2020 WL 1873555, at *7 (D.D.C. Apr. 14, 2020); Math Works, 2003 WL 1922140 at *18; Mountain Health Care, 2003 WL 22359598, at *7. More demanding requirements would “have enormous practical consequences for the government’s ability to negotiate future settlements,” contrary to congressional intent. Microsoft, 56 F.3d at 1456. “The Tunney Act was not intended to create a disincentive to the use of the consent decree.” Id.

The United States’ predictions about the efficacy of the remedy are to be afforded deference by the Court. See, e.g., Microsoft, 56 F.3d at 1461 (recognizing courts should give “due respect to the Justice Department’s . . . view of the nature of its case”); United States v. Iron Mountain, Inc., 217 F. Supp. 3d 146, 152–53 (D.D.C. 2016) (“In evaluating objections to settlement agreements under the

Tunney Act, a court must be mindful that [t]he government need not prove that the settlements will perfectly remedy the alleged antitrust harms[;] it need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." (internal citations omitted)); United States v. Republic Servs., Inc., 723 F. Supp. 2d 157, 160 (D.D.C. 2010) (noting "the deferential review to which the government's proposed remedy is accorded"); United States v. Archer-Daniels-Midland Co., 272 F. Supp. 2d 1, 6 (D.D.C. 2003) ("A district court must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case."). The ultimate question is whether "the remedies [obtained by the Final Judgment are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'" Microsoft, 56 F.3d at 1461 (quoting W. Elec. Co., 900 F.2d at 309).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does

not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." Microsoft, 56 F.3d at 1459; see also US Airways, 38 F. Supp. 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); InBev, 2009 U.S. Dist. LEXIS 84787, at *20 ("[T]he 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged"); Math Works, 2003 WL 1922140 at *18; Mountain Health Care, 2003 WL 22359598, at *8. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. Microsoft, 56 F.3d at 1459–60.

In its 2004 amendments to the APPA, Congress made clear its intent to preserve the practical benefits of using judgments proposed by the United States in antitrust enforcement, Pub. L. 108-237 § 221, and added the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); see also US Airways, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). This language explicitly wrote into the statute what Congress intended when it first enacted the Tunney Act in 1974. As Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). "A court can make its public interest determination based on the competitive impact statement and response to public comments alone." US

Airways, 38 F. Supp. 3d at 76 (citing Enova Corp., 107 F. Supp. 2d at 17).

**VIII. DETERMINATIVE DOCUMENTS**

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated: September 4, 2026

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA:

STANLEY E. WOODWARD, JR.
Associate Attorney General

EMILY CLAIRE MIMNAUGH
Deputy Associate Attorney General

NICOLE A. SARRINE
Deputy Assistant Attorney General

DANIELLE G. HAUCK
Acting Chief, Technology & Digital Platforms Section

DAVID A. GEIGER
Assistant Section Chief, Anti-Monopoly and Collusion Enforcement Section

/s/ Henry C. Su
HENRY C. SU
U.S. Department of Justice
Antitrust Division
450 Fifth St. NW, Suite 7100
Washington DC 20530
Telephone: (202) 307-6200
Email: henry.su@usdoj.gov

*Counsel for the United States*