IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF MINNESOTA, STATE OF NORTH CAROLINA, STATE OF OREGON, STATE OF TENNESSEE, STATE OF WASHINGTON, STATE OF ILLINOIS, and COMMONWEALTH OF MASSACHUSETTS, | ) | |
| Plaintiffs, | ) | |
| v. | ) | 1:24-cv-710 |
| REALPAGE, INC., CAMDEN PROPERTY TRUST, CORTLAND MANAGEMENT, LLC, GREYSTAR MANAGEMENT SERVICES, LLC, LIVCOR, LLC, PINNACLE PROPERTY MANAGEMENT SERVICES, LLC, AND WILLOW BRIDGE PROPERTY COMPANY, LLC. | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

Before this court are motions to dismiss the Amended Complaint, (Doc. 47), under Federal Rule of Civil Procedure 12(b)(6). Defendant RealPage, Inc. ("RealPage") moved to dismiss all claims against it. (Docs. 73, 74.) Defendants Camden Property Trust ("Camden"), Pinnacle Property Management

Services, LLC ("Pinnacle"), and Willow Bridge Property Company, LLC ("Willow Bridge") (together, "Defendant Landlords") filed a joint motion, (Docs. 128, 129), and each filed a separate motion raising additional arguments, (Docs. 132, 139 (Willow Bridge); Docs. 133, 134 (Camden); Docs. 137, 138 (Pinnacle)).[1] The United States and Plaintiff States opposed each motion, (Docs. 106, 145), and Defendants individually replied, (Doc. 122, 147, 150, 151).[2] After entering final judgements between either or both Plaintiffs and specific Defendants, this court clarified which Defendants' motions remain. (Doc. 209.) The motions are now ripe for ruling.

This court has subject matter jurisdiction over the federal claims under Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28

---

[1] The joint motion was also filed on behalf of landlord defendants who are no longer parties to the claims at issue. Plaintiffs substituted Pinnacle Property Management Services, LLC for Cushman & Wakefield, Inc. and substituted Greystar Management Services, LLC for Greystar Real Estate Partners, LLC. (See Docs. 143, 144.) The claims against Cortland Management, LLC, Greystar, and LivCor, LLC have since been resolved. (Doc. 209.) To the extent the pending motions were filed by or on behalf of those defendants, this court finds they are moot unless the parties notify this court otherwise.

[2] Plaintiffs are the United States of America ("United States"), the State of North Carolina, the State of California, the State of Colorado, the State of Connecticut, the State of Illinois, the Commonwealth of Massachusetts, the State of Minnesota, the State of Oregon, and the State of Tennessee (the States together, "Plaintiff States"). The State of Washington is no longer a party. (Doc. 105.)

U.S.C. §§ 1331, 1337(a), and 1345. The Plaintiff States assert their Sherman Act claims under Section 16 of the Clayton Act, 15 U.S.C. § 26. (Doc. 47 ¶ 231.)[3] This court has supplemental jurisdiction over the state-law claims, which arise from the same conduct, under 28 U.S.C. § 1367(a). Venue is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391. (Id. ¶¶ 234, 237, 246, 249, 252.)

## I. FACTUAL BACKGROUND

The following allegations are taken from the Amended Complaint ("complaint") and accepted as true. E.I. du Pont de Nemours & Co. v. Kilon Indus., Inc., 637 F. 3d 435, 440 (4th Cir. 2011).

RealPage, a Delaware Corporation headquartered in Texas, sells a range of technology products, among other services, to companies that own or manage multifamily rental housing. Critical to this case are RealPage's revenue management software products: AI Revenue Management ("AIRM") and YieldStar. (Doc. 47 ¶ 14.) Three other software products are also relevant. OneSite is RealPage's property management software, "the central source of data for landlords' leasing activity." (Id. ¶ 22.)

---

[3] All citations in this Memorandum Opinion and Order to documents filed with this court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

Performance Analytics with Benchmarking (PAB) "allows landlords to compare the performance of their properties and floor plans. . . to their competitors." (Id.) Business Intelligence is a data analytics product that draws data directly from a landlord's property management software. (Id.) All three products feed data into AIRM and YieldStar. (Id. ¶ 23.)

Every landlord[4] licensing AIRM or YieldStar agrees to supply RealPage with daily, nonpublic transactional data. (Id. ¶ 18.) The data includes effective rents net of discounts, lease terms, lease status, occupancy, unit characteristics, and information on prospective renters (collectively, "confidential data"). (Id. ¶¶ 18, 21, 23, 34.) Every landlord using OneSite, PAB, or Business Intelligence likewise "agrees to share its proprietary data with RealPage and agrees that RealPage's revenue management software can use the data to generate pricing recommendations," and each license "specifically identif[ies] the shared data, such as pricing information, as confidential, nonpublic information." (Id. ¶ 23.)

The complaint alleges that the resulting pool of data is substantial. Roughly 3 million units are priced with AIRM or YieldStar, but the five products together give RealPage "access

[4] The complaint uses "landlords" to cover both owners and the management companies that set rents. (Doc. 47 ¶ 5 n.1.) This court does the same.

to confidential information from over 16 million units across the country, including many that do not use its revenue management products." (Id. ¶ 24.) The additional agreements "meaningfully multiply the scale of the transactional data used by AIRM and YieldStar," giving RealPage visibility into markets with less AIRM and YieldStar penetration and giving even a landlord newly adopting the software the benefit of its competitors' data. (Id.)

Landlords are alleged to understand the next step: RealPage pools the confidential data and uses it to generate price recommendations both for the contributing landlord and for that landlord's competitors in the same local market. (Id. ¶¶ 5-6, 16, 19-20, 25-26.) If enough landlords use the software, RealPage's Vice President of Revenue Management Advisory Services explains, they would "likely move in unison versus against each other," because "there is greater good in everybody succeeding versus essentially trying to compete against one another in a way that actually keeps the entire industry down." (Id. ¶¶ 2, 32, 128.) In RealPage's words, "a rising tide raises all ships." (Id. ¶¶ 32-33.)

**A. How the Software Operates**

The software does more than recommend. An auto-accept function adopts recommendations automatically within default

parameters of a 3% daily and 8% weekly change. (Id. ¶¶ 66-67.) "Guardrails" override the ordinary operation of the algorithms: a "hard floor" barring recommendations below a blended market minimum derived from competitors' data; a "revenue protection" mode that lowers the target number of leases rather than the price; a "sold out" mode that recommends the maximum rent charged by a property's competitors when the model considers a floor plan sold out, even though it may not be; and a "governor" that limits recommended decreases. (Id. ¶¶ 142-52.)

A landlord who disagrees with a recommendation must take several steps to decline it. Accepting is automatic or simple, (Id. ¶¶ 62, 66), but every recommendation left unaccepted requires "specific business commentary" justifying the divergence. (Id. ¶ 63.) The justification goes to a RealPage pricing advisor, and if the advisor disagrees, the dispute is "escalated for resolution to a landlord's regional manager, who typically supervises the property manager." (Id. ¶¶ 64, 69-70.) The same advisor may serve competing landlords: in at least 683

zip codes across 96 core-based statistical areas[5], ("CBSA"), one advisor has responsibility for properties managed by different landlords. (Id. ¶ 81.) The complaint alleges that the guardrails operate as "one-way ratchets that help landlords, not renters, by increasing price recommendations or limiting a recommended decrease." (Id. ¶ 142.) By RealPage's own definition, which treats a final price within 1% of the recommendation as an acceptance, landlords accept 40-50% of recommendations; but "nearly 60% of final floor plan prices are within 2.5% of RealPage's recommendation, and more than 85% are within 5%." (Id. ¶ 73.)

**B. Coordination Among Landlords**

The complaint alleges that landlords coordinate both through RealPage and directly. (Id. ¶¶ 78, 82-117.) Landlords collect competitors' information through "weekly phone calls, emails, and in-person visits," as well as shared documents, (Id. ¶ 83), and RealPage hosts user group meetings at which landlords

[5] The complaint defines a core-based statistical area as compromising a county or group of counties anchored by a core of at least 10,000 people, plus adjacent counties whose commuting ties reflect a high degree of social and economic integration with the core. Plaintiffs allege that a CBSA so drawn captures the conventional multifamily rental alternatives to which a renter would turn if faced with a small but significant price increase. (Doc. 47 ¶ 212.)

discuss renewal increases, concessions, and acceptance rates. (Id. ¶¶ 102–17.)

The complaint provides numerous examples. Relevant here is the conduct alleged of the remaining Defendant Landlords. Those allegations are set out in detail in Section 3.c.

**C. Alleged Effects**

The alleged effects fall first on renters. Multifamily rental markets are concentrated: in 595 zip codes with at least 1,000 multifamily units, across 125 CBSAs, five or fewer landlords manage more than half the units. (Id. ¶ 79.) In at least 502 zip codes, at least one landlord using AIRM or YieldStar oversees properties with different owners. (Id. ¶ 80.) Combining that concentration with software designed to maximize price increases and minimize decreases, the complaint alleges, renters lose out. One landlord reported that within eleven months of adopting YieldStar, it had raised rents more than 25%, eliminated concessions, and "brought the rest of the Comps rents up with us." (Id. ¶ 130.)

Renters are not the only ones alleged to be harmed. RealPage has internally claimed roughly 80% of the market for commercial revenue management software for conventional multifamily housing, (Id. ¶¶ 14, 164, 219-24), and a RealPage senior vice president described its nonpublic leasing data as a

"data moat" protecting it from competitors, (Id. ¶ 179). RealPage's data reaches roughly 16 million units, while its two principal commercial rivals together have fewer than 250,000, (Id. ¶¶ 24, 176). RealPage understands that "pricing decisions start with data," and tells clients that the data collected each night "captures this competitive landscape for informed pricing." (Id. ¶ 172.) A 2019 planning document describes building the next generation of revenue management on that database, protecting revenue from "emerging competitors," and sunsetting LRO, the RealPage product that relies far less on competitors' data. (Id. ¶ 174.)

### D. **Procedural History**

Plaintiffs allege two claims under Section 1 of the Sherman Act, 15 U.S.C. § 1, against RealPage and the Defendant Landlords.[6] The First Claim for Relief ("Claim One") challenges an agreement to share confidential data for use in competitors' pricing. (Id. ¶¶ 259-69.) The Second Claim for Relief ("Claim Two") challenges the agreements between each Defendant Landlord and RealPage to use the software as designed, which Plaintiffs allege aligns competing landlords' pricing. (Id. ¶¶ 270–79.) All

[6] Claims One and Two are asserted by the United States and the Plaintiff States against RealPage, Cushman & Wakefield, Greystar, LivCor, and Pinnacle. Various State Plaintiffs have claims as only to specific Defendants. (Doc. 47 at 101, 104.)

Plaintiffs assert two claims under Section 2 of the Sherman Act, 15 U.S.C. § 2, against RealPage alone: Claim Three alleges a monopolization of the market for commercial revenue management software. (Id. ¶¶ 280-84.) Claim Four, in the alternative, asserts attempted monopolization. (Id. ¶¶ 285–89.) The Plaintiff States also assert claims under their own laws based on the same conduct. (Id. ¶¶ 290–325.)

On May 19, 2026, this court entered a Final Judgment resolving the United States' claims against RealPage. (Doc. 194.) The United States and Plaintiff States have also entered into Final Judgments with Cortland, Greystar, (Docs. 172, 180–81), and LivCor, (Docs. 193, 199). The United States, but not Plaintiff States, have also entered Consent Decrees with Pinnacle, (Doc. 213), and Willow Bridge, (Doc. 204). What remains are the Plaintiff States' claims against RealPage and Pinnacle and all Plaintiffs' claims against Camden and Willow Bridge.

## II. **LEGAL STANDARD**

To survive a Rule 12(b)(6) motion, a complaint must state a claim that is "plausible on its face," with all reasonable inferences drawn in the plaintiff's favor. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. This court is "not asked to consider whether defendants actually violated" the antitrust laws, Robertson v. Sea Pines Real Est. Cos., Inc., 679 F.3d 278, 284 (4th Cir. 2012), or to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses," Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992).

In assessing an antitrust complaint, allegations must be assessed as a whole, not rejected one by one, while the "plausibly suggesting" threshold "remains considerably less than the 'tends to rule out the possibility' standard for summary judgment." SD3, LLC v. Black & Decker (U.S.) Inc., 801 F.3d 412, 424–25 (4th Cir. 2015).[7]

## III. **ANALYSIS**

### A. Mootness

RealPage contends that entry of the Final Judgment with the United States moots the Plaintiff States' Sherman Act claims and

[7] Defendants also argue that the complaint should be held to a higher standard because Plaintiffs had the benefit of a lengthy pre-suit investigation. (Doc. 129 at 12; Doc. 139 at 4.) This court declines to apply a different standard. Robertson observed that the requirement of nonconclusory factual detail "is tempered by the recognition that a plaintiff may only have so much information at his disposal at the outset." 679 F.3d at 291.

their state-law requests for injunctive relief. (Doc. 210 at 2-3.) Camden and Pinnacle press the same contention, (Docs. 211, 212), and their theory extends to Willow Bridge as well. The claims against the other Defendant Landlords have already been found moot because those Defendants reached final judgements with both the United States and the Plaintiff States. (See Doc. 209.)

Article III limits the jurisdiction of federal courts to actual "Cases" and "Controversies." U.S. Const. art. III, § 2. "When a case or controversy ceases to exist—either due to a change in the facts or the law—'the litigation is moot, and the court's subject matter jurisdiction ceases to exist also.'" Porter v. Clarke, 852 F.3d 358, 363 (4th Cir. 2017) (quoting S.C. Coastal Conservation League v. U.S. Army Corps of Eng'rs, 789 F.3d 475, 482 (4th Cir. 2015)). Mootness is therefore a threshold question. Because the Final Judgment reflects RealPage's agreement to stop doing some of what the complaint alleges it did, the question is whether that fact eliminates the live controversy between RealPage, Defendant Landlords, and the Plaintiff States.

**1. Voluntary Cessation**

A defendant's voluntary cessation of challenged conduct "does not deprive a federal court of its power to determine the

legality of the practice." Porter, 852 F.3d at 363 (quoting City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982)). A defendant invoking cessation "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Id. at 364 (quoting Friends of the Earth, Inc. v. Laidlaw Env't Servs.(TOC), Inc., 528 U.S. 167, 190 (2000)).

That standard applies here. A consent decree is an agreement, and its judicial enforceability does not remove it from the doctrine. "[I]t is the parties' agreement that serves as the source of the court's authority to enter any judgment at all," and "it is the agreement of the parties, rather than the force of the law upon which the complaint was originally based, that creates the obligations embodied in a consent decree." Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland, 478 U.S. 501, 522 (1986); see also In re Vizio, Inc., Consumer Priv. Litig., No. 8:16-ml-2693, 2017 WL 11420284, at *4 (C.D. Cal. July 25, 2017) ("Because a consent decree is by its very nature voluntary, the voluntary cessation exception to mootness applies. . ."); iMortgage Servs., LLC v. La. Real Est. Appraisers Bd., 658 F. Supp. 3d 316, 324 (M.D. La. 2023).

The Supreme Court applied the voluntary cessation framework to a judicially enforceable covenant not to sue in Already, LLC

v. Nike, Inc., 568 U.S. 85, 91–93 (2013). In Already, the Court found the action moot because of the covenant's breadth: it was "unconditional and irrevocable," it reached past and future conduct, and it ran to the party claiming injury. Id. at 93. The Final Judgment differs in each respect, and for three corresponding reasons RealPage has not carried its formidable burden.

First, the Final Judgment is neither unconditional nor irrevocable. It expires seven years after entry, and the United States may move to terminate it after four. (Doc. 194 § XIV.) This assumes RealPage does not revoke its commitments either. A decree that will lapse on a fixed date does not make it "absolutely clear" that the challenged conduct "could not reasonably be expected to recur." Porter, 852 F.3d at 364.

Second, the Final Judgment does not reach all of the conduct alleged. Its prohibitions operate on "Revenue Management Product(s)," defined as software or services "that generate[] rental prices or rental pricing recommendations." (Doc. 194 § II.EE.) But the complaint alleges that the exchange also runs through OneSite, Performance Analytics with Benchmarking, and Business Intelligence, products that generate no prices and that reach "over 16 million units across the country, including many that do not use [RealPage's] revenue management products." (Doc.

47 ¶¶ 21–24.) The Final Judgment preserves RealPage's collection of data from landlords, (Doc. 194 § IV.F), and permits continued model training on historical data at least twelve months old, (Id. § IV.A.3). It restrains RealPage at its own user group meetings but not the landlords who attend them. (Id. § VI.B.) Because the voluntary decree leaves in place some of the agreement under which landlords supply confidential data through those other products and permits RealPage to keep and train on the data it has already collected, it is not clear that pooled nonpublic data will not again be used to price competitors' units. That is the conduct at the heart of the First and Second Claims for Relief.

Relatedly, the Final Judgment does not address the Section 2 claims' core. It requires RealPage to "retrain applicable models" on compliant data, (Id. § IV.A.6), but it does not divest RealPage of the accumulated data reservoir that the complaint alleges maintains its monopoly, or open that reservoir to rivals. Divestiture is a form of injunctive relief available in a suit under Section 16 of the Clayton Act. See California v. Am. Stores Co., 495 U.S. 271, 280–82 (1990); see also United States v. E. I. du Pont de Nemours & Co., 366 U.S. 316, 330–31 (1961). RealPage answers in a single sentence, quoting the Competitive Impact Statement's prediction that competing

software providers will be able "to more effectively compete." (Doc. 210 at 3.) A forecast about market effects is not a remedy.

Third, the Final Judgment does not run to the Plaintiff States. The United States alone may enforce the Final Judgment, (Doc. 194 § XIII.B), move to reopen the proceeding, (Id. § XIII.A), or seek its termination, (Id. § XIV). "[A] consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefited by it." Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 750 (1975) (citing United States v. Armour & Co., 402 U.S. 673 (1971) and Buckeye Coal & Ry. Co. v. Hocking Valley Ry. Co., 269 U.S. 42 (1925)).

This court declines to find that Defendant has carried its formidable burden by pointing to a voluntary commitment that the remaining Plaintiffs before the court cannot invoke. Nor does RealPage contend that the Plaintiff States' claims for civil penalties are moot; it argues only that mootness turns on the relief sought. (Doc. 210 at 5; see Doc. 47 ¶¶ 294, 303, 306, 309, 313, 317, 325.)

As to the Defendant Landlords, the Final Judgment applies to RealPage and "all other persons in active concert or participation with Defendant who receive actual notice." (Doc.

194 § III.) That is the language of Rule 65(d)(2), which identifies who may be held in contempt for aiding a violation of RealPage's decree, not who is independently enjoined by it. See Fed. R. Civ. P. 65(d)(2)(C). No relief in that Final Judgment runs against Camden, Pinnacle, or Willow Bridge. Meanwhile, the consent decrees entered into by Pinnacle and Willow Bridge are not yet adopted by this court.

In sum, the Final Judgment resolved the United States' claims against RealPage, and to that extent RealPage's motion is moot. The Plaintiff States' claims against RealPage, Pinnacle and Willow Bridge, and all Plaintiffs' claims against Camden are not moot.

## B. Section 1 of the Sherman Act (First and Second Claims for Relief)

### 1. Framework

Section 1 prohibits "[e]very contract, combination . . . , or conspiracy, in restraint of trade." 15 U.S.C. § 1. To state a claim, a plaintiff must plausibly allege "(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." Dickson v. Microsoft Corp., 309 F.3d 193, 202 (4th Cir. 2002).

### i. <u>First Element: Contract, Combination, or Conspiracy Concerted Action</u>

The concerted action[8] element presents three relevant issues beginning with whether the agreement is alleged. "A horizontal [agreement] is one between competitors, while a vertical [agreement] is one between firms at different levels of distribution." United States v. Brewbaker, 87 F.4th 563, 571 (4th Cir. 2023). The two forms may be combined: in "so-called hub-spoke-and-rim conspiracies, competitors agree to restrain trade and are encouraged to do so by a shared vertical" counterparty. Id. at 577–78. The answer to the agreement question determines the nature of the concerted action that is necessary to consider the challenged agreements' effects collectively or instead whether to assess each agreement standing alone. Dickson, 309 F.3d at 210.

A second issue is how the agreement is pleaded. A plaintiff need allege only "enough factual matter (taken as true) to suggest that an agreement was made." Twombly, 550 U.S. at 556. It may do so directly or circumstantially. Direct allegations are those from which the agreement follows without inference. Where concerted conduct "is both plainly documented and readily

---

[8] For purposes of this analysis, the court will use "concerted action" to refer to a contract, combination, or conspiracy unless otherwise stated.

available," a plaintiff need not plead further detail about how the agreement was formed, including the times and locations of any meetings. Robertson, 679 F.3d at 290. Where instead a plaintiff asks this court to infer an agreement from the defendants' conduct, it must allege "parallel conduct and something more." SD3, 801 F.3d at 424 (cleaned up). Parallel conduct means the defendants acted "similarly"; it "need not be exactly simultaneous and identical in order to give rise to an inference of agreement." Id. at 427, 429 (cleaned up). Something "more" consists of "further circumstance[s] pointing toward a meeting of the minds." Id. at 427, 430.

Finally, the complaint must plausibly allege each defendant's participation in the agreement, and "vague, non-specific allegations" directed at defendants collectively will not suffice. Id. at 422–23.

**ii. Second Element: Unreasonable Restraint of Trade**

Courts assess the second element, unreasonable restraints of trade, under one of three methods: "(1) per se analysis, for obviously anticompetitive restraints, (2) quick-look analysis, for those with some procompetitive justification, and (3) the full 'rule of reason,' for restraints whose net impact on competition is particularly difficult to determine." Dickson,

309 F.3d at 205 (quoting Cont'l Airlines, Inc. v. United Airlines, Inc., 277 F.3d 499, 508–09 (4th Cir. 2002)).

The parties dispute which method ultimately applies. Plaintiffs do not concede that the rule of reason governs, (Doc. 106 at 12 n.2; Doc. 145 at 28 n.5), while Defendants treat both claims as rule-of-reason claims, (Doc. 74 at 8–9; Doc. 129 at 16). This court need not resolve that dispute now. The rule of reason is the presumptive method of analysis, NCAA v. Alston, 594 U.S. 69, 81 (2021), and the per se rule is reserved for restraints that judicial experience has shown to be devoid of redeeming competitive benefit, see Brewbaker, 87 F.4th at 573–74. Neither category into which these claims might fall is of that kind: exchanges of information among competitors "do not constitute a per se violation of the Sherman Act," United States v. U.S. Gypsum Co., 438 U.S. 422, 441 n.16 (1978). Restraints combining horizontal and vertical features are analyzed under the rule of reason, Brewbaker, 87 F.4th at 573-76. Because the complaint states a claim under the full rule of reason, this court will apply the rule of reason.[9]

[9] This finding should not be understood to establish the law of the case, and Plaintiffs remain free to assert a different mode of analysis. However, Plaintiffs should make clear, by amendment or otherwise, if they intend to rely upon a different mode of analysis.

At the pleading stage, "[i]t is sufficient that the alleged anticompetitive effects are economically plausible in light of the . . . restrictions recounted in the complaint." Robertson, 679 F.3d at 291.

A plaintiff may carry the burden of plausibility alleging the anticompetitive effects directly or indirectly. "Direct evidence of anticompetitive effects would be proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market. Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." Ohio v. Am. Express Co., 585 U.S. 529, 542 (2018) (cleaned up). Plaintiffs contend that the complaint satisfies both approaches. (Doc. 106 at 12-21; Doc. 145 at 20-23.) Because this court concludes that the complaint plausibly alleges anticompetitive effects under the indirect approach, it will not address whether the allegations also constitute direct evidence of actual detrimental effects, deferring that issue to summary judgement under Fed. R. Civ. P. 12(i).

**2. Differentiating the Section 1 Claims**

The two Section 1 claims arise from one course of conduct but challenge different restraints. The difference governs the analysis that follows.

Claim One challenges what licensees put into RealPage's software through the agreement of each landlord to contribute its own nonpublic lease data to a common pool used to generate pricing recommendations for its competitors' units. (Doc. 47 ¶¶ 260–63.) The restraint is the loss of independent decision-makers in the market resulting from disclosing competitively sensitive information to competitors, and the combination alleged includes every landlord that contributes confidential data, whether through AIRM, YieldStar, OneSite, Performance Analytics with Benchmarking, or Business Intelligence. (Id. ¶¶ 23, 261.)

Claim Two challenges what licensees agree to do with the output: the agreement of each AIRM or YieldStar licensee to use the software as designed to set prices, which Plaintiffs allege aligns competing landlords' pricing processes, strategies, and responses. (Id. ¶¶ 271–77.) The restraint is a constraint on the exercise of independent pricing discretion, and the combination alleged is narrower than that alleged in Claim One, reaching only licensees of those two products.

Every AIRM and YieldStar licensee contributes confidential data and agrees to price through the software, (Id. ¶¶ 18, 28, 271), while landlords using OneSite, Business Intelligence, or Performance Analytics with Benchmarking contribute data without

necessarily pricing through AIRM or YieldStar, (Id. ¶¶ 23–24, 261). Because the restraints differ, Claim One asks whether the pooling of competitors' nonpublic lease data unreasonably restrains trade while Claim Two asks whether the agreement to price through AIRM or YieldStar does. This court therefore analyzes each separately.

### 3. Claim One: Agreement to Share Information

#### i. Concerted Action

Concerted action exists where an arrangement joins "separate economic actors pursuing separate economic interests," such that it "deprives the marketplace of independent centers of decision-making." Robertson, 679 F.3d at 285 (quoting Am. Needle, Inc. v. NFL, 560 U.S. 183, 195 (2010)). RealPage does not dispute that the complaint alleges concerted action. (Doc. 74 at 16-21; Doc. 106 at 12 n.1.) Defendant Landlords do. Their argument is that the complaint does not allege that they agreed with one another to license or use RealPage's software. (Doc. 129 at 25–32.) But Claim One does not assert an agreement to purchase the same product from the same vendor; instead, Plaintiffs allege each landlords contributes its own nonpublic lease data for use in pricing its rivals' units through RealPage. (Doc. 47 ¶¶ 260–63.) This is a distinction with a difference as set forth below.

#### a. **The Agreement Alleged**

The complaint alleges a hub-spoke-and-rim arrangement, with RealPage as the hub and the contributing landlords as the spokes. See Kotteakos v. United States, 328 U.S. 750, 755 (1946) (first naming the hub-and-spoke structure). The vertical agreements are not in dispute. The complaint alleges that each AIRM and YieldStar licensee, including each Defendant Landlord, agreed with RealPage to provide nightly, nonpublic lease data for RealPage's use in generating pricing recommendations. (Doc. 47 ¶¶ 18, 23, 238, 244, 253, 260.) These are express agreements between legally distinct entities. The Fourth Circuit has treated software license agreements as sufficient at the pleading stage to allege concerted action between the licensor and each licensee. See Dickson, 309 F.3d at 203–04 (holding that "allegations regarding the commercial license agreements are sufficient for purposes of 12(b)(6) to set forth two separate vertical conspiracies"). Defendant Landlords do not dispute that each entered into such an agreement with RealPage.

The contested question is the rim. Defendant Landlords rely on Dickson for the proposition that separate agreements with a common party do not establish an agreement among the parties to those separate agreements. (Doc. 129 at 26.) That is correct. A rimless wheel is "not a single, general conspiracy but instead

amounts to multiple conspiracies between the common defendant and each of the other defendants." Dickson, 309 F.3d at 203 (citing Kotteakos, 328 U.S. at 755, 768–69).

But Dickson did not hold that parallel agreements with a common party can never supply a rim. The plaintiff there did not argue that it could establish a connection among the spokes; it asked the court to treat a rimless wheel as a single conspiracy. Id. at 203–04 & n.12. The court declined, and it expressly left open what showing would establish a single conspiracy under the Sherman Act. Id. at 204 n.12.

The Supreme Court has long recognized that competitors may form an agreement without communicating directly with one another. In Interstate Circuit, Inc. v. United States, the Court held that "[a]cceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act." 306 U.S. 208, 227 (1939). "It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it." Id. at 226. What's more, "an unlawful conspiracy may be and often is formed without simultaneous

action or agreement on the part of the conspirators." Id. at 227.

The same principle governs information exchanges. In United States v. Container Corp. of America, a case arising in this District, competing manufacturers supplied one another with recent price information on request. 393 U.S. 333, 335 (1969). The exchanges were infrequent and irregular, but each firm "furnished the data with the expectation that it would be furnished reciprocal information when it wanted it." Id. The Court held that this "concerted action is of course sufficient to establish the combination or conspiracy, the initial ingredient of a violation of § 1 of the Sherman Act." Id.

The complaint alleges an arrangement of this kind. RealPage invites each landlord to share its data so that it can be pooled and used to price competitors' units. (Doc. 47 ¶¶ 16, 20, 260.) Each landlord that accepts does so, the Plaintiffs allege, *knowing* that its data will be used to price its rivals' units and that its rivals' data will be used to price its own. (Id. ¶¶ 16, 19–20, 25–26, 260.) That reciprocal understanding distinguishes this arrangement from the conspiracy rejected by Dickson. Here, the value of each landlord's participation depends on the willful participation of its competitors. A landlord that contributes its confidential lease data receives,

in return, recommendations informed by its competitors' own confidential lease data. That exchange works only if competitors also contribute. As the court in the RealPage multidistrict litigation explained, "the contribution of sensitive pricing and supply data for use by RealPage to recommend prices for competitor units is in Defendants' economic self-interest if and only if Defendants know they are receiving in return the benefit of their competitors' data in pricing their own units." In re RealPage, Inc., Rental Software Antitrust Litig. (No.II), 709 F. Supp. 3d 478, 510 (M.D. Tenn. 2023).

This court therefore concludes that the complaint alleges a single combination among RealPage and the landlords to contribute confidential data, including each Defendant Landlord, and not a series of discrete bilateral conspiracies. Since the complaint alleges one combination rather than many, this court may consider the challenged agreements' effects collectively rather than assessing each standing alone. See Dickson, 309 F.3d at 210. That holding governs the market power analysis.

**b. Whether the Agreement Is Plausibly Pleaded**

Given the terms of the arrangement as pled and construed by this court, no further inference is required since the agreement is directly alleged. An agreement to participate in a reciprocal exchange, entered with knowledge of its reciprocal character, is

itself an agreement among the participants. See Container Corp., 393 U.S. at 335; see also Interstate Cir., 306 U.S. at 226–27. Defendant Landlords' demand for further pleading detail is misplaced. They argue that the complaint fails to identify when each of them began using RealPage's software or when the alleged agreement formed. (Doc. 129 at 21-25; Doc. 134 at 13–15; Doc. 139 at 7.) SD3 found that allegations about the "time, place, and manner" of a group boycott's formation supplied the requisite "more" beyond parallel conduct. 801 F.3d at 429–30. It did not hold that such allegations are necessary in every Section 1 case; they are merely sufficient. Id. at 430. And Robertson rejected a demand for the "times and locations" of conspiratorial meetings where the concerted conduct was documented. 679 F.3d at 290. The complaint identifies who participated (each Defendant Landlord, RealPage, and other licensees); what they agreed to (the nightly contribution of nonpublic lease data for use in pricing competitors' units); and how the arrangement operated to the benefit of the participants, that is, the object of the combination. The date on which a particular landlord first licensed a RealPage product is therefore of limited significance at this stage. See Interstate Cir., 306 U.S. at 227; cf. Cornish-Adebiyi v. Caesars Ent., Inc., 184 F.4th 172, 187 n.91 (3d Cir. 2026) (observing that

"because AI-driven tools can adapt and adjust based on new data, collusive conduct may occur at later points in time when other competitors begin to share their non-public commercial data with the software").

The same conclusion follows under the framework the Fourth Circuit applies when a plaintiff relies on circumstantial allegations of agreement. See SD3, 801 F.3d at 424.

The complaint alleges parallel conduct. Each Defendant Landlord contributes its nonpublic lease data to RealPage nightly and prices its units using software that draws on the pooled data. (Doc. 47 ¶¶ 18, 42–58, 238, 244, 253.) Defendant Landlords respond that they licensed the same RMS products at different, unspecified times and used them in different ways. (Doc. 129 at 28–32.) But the relevant parallel conduct is not the moment of licensing or the choice of settings; it is the ongoing contribution of confidential data to a common pool used to price competitors' units through AIRM and YieldStar. (Doc. 47 ¶¶ 19, 260.)

Several plus factors accompany that conduct. See SD3, 801 F.3d at 425 (emphasizing a wholistic approach to assessing plus factors). The most significant is conduct that would be against each landlord's independent interest absent an agreement. A firm acting independently in a competitive market has no reason to

give, directly or indirectly, its rivals access to its most sensitive pricing and supply data. (Doc. 47 ¶¶ 15, 19-20.) Defendant Landlords answer that licensing the market's leading revenue management software is in any firm's independent interest. (Doc. 129 at 36-37.) A firm might well choose the best software available. Yet that does not explain why a firm would do so when it must contribute its own confidential, non-public data—distinguishing this case from those Defendant Landlords cite—for use in pricing its rivals' units. One plausible explanation is that it expected to receive the benefit of its rivals' data in return. See RealPage, 709 F. Supp. 3d at 510. And Plaintiffs allege that less restrictive revenue management alternatives exist that do not depend on competitors' nonpublic data, (Doc. 47 ¶ 269), so contributing sensitive data is not the unavoidable cost of doing business.

The complaint also alleges direct communications among competing landlords, including Defendant Landlords, about pricing plans, concessions, and their use of RealPage's software. (Id. ¶¶ 82-117.) Defendant Landlords argue that most of these communications do not involve RealPage and that attendance at industry meetings does not suggest conspiracy. (Doc. 129 at 24-25, 37-39.) This court is not treating these communications as separate restraints, and mere attendance at

trade meetings is a circumstance that adds only a little to the analysis. Instead, many of the alleged communications concern the software directly: executives compared auto-accept settings, organized calls about their use of YieldStar, exchanged practices for accepting YieldStar recommendations, and, at a RealPage user group, discussed whether to accept the software's recommended increases. (Doc. 47 ¶¶ 87–90, 95, 108–10.) Taken with the data exchange itself, these communications make it more plausible that the participants understood the exchange as a shared undertaking. See SD3, 801 F.3d at 432 ("Allegations of communications and meetings among conspirators can support an inference of agreement because they provide the means and opportunity to conspire.").

Finally, Plaintiffs allege a market structure conducive to coordination. In this case, Plaintiffs allege demand for housing is inelastic and local markets are concentrated. (Doc. 47 ¶¶ 75–81.) Structure alone would not suffice. But a market in which coordination is both feasible and profitable gives each participant a reason to join a common scheme, and a defendant's motive to join a common scheme "is a key circumstantial fact." SD3, 801 F.3d at 431 (cleaned up).

The Third Circuit reached a similar conclusion on comparable allegations, applying the same parallel-conduct-and-

plus-factors framework. See Cornish-Adebiyi, 184 F.4th at 190 (holding that a complaint adequately alleged a horizontal agreement where each defendant "understood" that the recommended rates it received "were based on real-time, non-public pricing and occupancy data [that] they and their co-defendants all were providing to the platform," and understood that its competitors knew the same); Id. at 186 (relying on allegations that defendants adhered to the platform's recommendations even when their independent economic interests favored price reductions). The court distinguished those allegations - nonpublic information supplied by the spokes, consolidated by the hub, and returned as recommendations that set prices - from the industry-wide use of common software. Id. at 192; see also Platkin v. RealPage, Inc., No. CV 25-3057, 2026 WL 2056350, at *7 (D.N.J. Mar. 31, 2026) (outlining numerous plus factors applicable against Defendant Landlords).

**c. Allegations Specific to Each Defendant Landlord**

Section 1 liability is individual, so the complaint must plausibly allege that each Defendant Landlord joined the agreement. SD3, 801 F.3d at 422–23. This court therefore does not attribute to any Defendant Landlord what the complaint says unnamed "landlords" said, did, or understood. (See, e.g., Doc. 47 ¶¶ 10, 33, 37–38, 130, 139.) Two categories of allegations

are not of that generic kind. The complaint describes the standard terms every licensee accepts, (id. ¶¶ 18, 28), and RealPage's uniform representations to its clients about how the software uses competitors' data. (Id. ¶¶ 16, 20.) Plaintiffs allege an invitation was extended on the same terms to every participant, and each Defendant Landlord is separately alleged to be a party. (Id. ¶¶ 238, 244, 253.) The question as to each, then, is whether the complaint plausibly alleges that it participated knowing the exchange was reciprocal.

**(A) Willow Bridge**

The allegations against Willow Bridge are the most extensive. A Willow Bridge executive described the advantage of using YieldStar where others in a submarket also used it, because "the shared data between the models at different communities can be a benefit in getting accurate transactional data on a timely basis." (Id. ¶ 19.) Another Willow Bridge executive sought RealPage's assurance that YieldStar would "leverage actual transactional data behind the scenes and not just look at offered rents for their comps." (Id. ¶ 26.) Willow Bridge chose AIRM over a cheaper competitor in part because of the "market data that AIRM uses." (Id. ¶ 169.) Willow Bridge also participated in AIRM's design as a beta tester. (Id. ¶ 28 n.2.) And at a May 2021 user group meeting, after another

participant said it was pushing rents above YieldStar's recommendations, a Willow Bridge representative asked, "Are we deciding as a group to remove hesitation? :)." (Id. ¶ 110.)

Willow Bridge characterizes these allegations as unilateral business conduct and occasional communications with industry peers. (Doc. 139 at 3–6.) While that characterization may prevail at trial, it does not render Plaintiffs allegations implausible. An executive's repeatedly alleged understanding that the software draws on shared transactional data from competing properties is not unilateral conduct; it is an expression which makes participation in the exchange concerted. Similarly, asking a room of competitors whether "We" are "deciding as a group to remove hesitation," (Doc. 47 ¶ 110), is not a communication about market trends. Plausibly read, is a proposal that competitors act in common.

**(B) Camden**

The complaint alleges numerous examples of Camden's understanding of the exchange and its willingness to participate in it. Camden owns or manages at least one property using AIRM in this District, (Id. ¶ 238), and was a beta tester for AIRM, (Id. ¶ 28 n.2). In September 2020, Camden's director of revenue management asked Greystar about its recent renewal increases and offered Camden's own; Greystar responded with its plans for the

coming quarter and its practices for accepting YieldStar recommendations. (Id. ¶ 90.) The same director asked LivCor about its renewal increases, explaining that Performance Analytics, a RealPage benchmarking product, provided useful data but that it was "hard to see what our competitors are signing today." (Id. ¶ 91.) After receiving LivCor's figures, Camden raised a renewal cap "to get to the same renewal gains as LivCor." (Id.) Camden gathered similar information from at least four competitors, (Id. ¶ 92), and later discussed "renewal philosophy" with LivCor, (Id. ¶ 94).[10]

Camden's argument that its communications involved information it also disclosed publicly raises a legitimate consideration under the rule of reason. (Doc. 134 at 16-19); see also Todd v. Exxon Corp., 275 F.3d 191, 213 (2d Cir. 2001). But the complaint alleges that the information exchanged was nonpublic, (Doc. 47 ¶¶ 90-93), and whether it matched Camden's public disclosures is a factual question this court cannot resolve now. More fundamentally, the core of Claim One is the nightly contribution of lease-level transaction data to RealPage, and Camden does not contend that data is public.

---

[10] Camden's motion relies heavily on facts outside the complaint. This court generally cannot consider them in resolving a Rule 12(b)(6) motion. See Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 165-67 (4th Cir. 2016).

Camden also argues that it "cannot give Plaintiffs the relief they seek," because the relief sought is changes to RealPage's software. (Doc. 134 at 5.) Yet Plaintiffs seek to enjoin each Defendant's participation in the alleged exchange. (Doc. 47 ¶ 332(c).) Camden can be ordered to stop participating.

Together with Camden's status as a party to the standard data-sharing agreement, these allegations plausibly suggest that Camden participated in the exchange knowing its reciprocal character.

**(C) Pinnacle**

As an initial matter, most allegations relevant to Pinnacle refer to "Cushman & Wakefield." The complaint alleges that Cushman & Wakefield operates its multifamily rental property business through its subsidiary Pinnacle, "and also under the Cushman & Wakefield name since acquiring Pinnacle in March 2020." (Id. ¶ 244.) Pinnacle's motion proceeds on the same reading. (Doc. 138 at 13 n.2, 19–20 & n.6.) This court does the same.

So read, the complaint alleges that Pinnacle owns or manages multiple properties using YieldStar in this District, (Doc. 47 ¶ 244), and that it was a beta tester for AIRM, (Id. ¶ 28 n.2). Pinnacle's director of revenue management described YieldStar as collecting "about 14 MILLION transactional lease

data across the US" and called that data "a window into the market and the shifts we are going to experience." (Id. ¶ 168.) The same director explained that RealPage anonymizes its benchmarking data "due [to] the potential pricing collusion," data drawn from the same pool that AIRM and YieldStar use without anonymization. (Id. ¶ 140.) Pinnacle's revenue management director proposed a call among revenue management executives at competing landlords to discuss market conditions, their use of YieldStar, and strategy, (Id. ¶ 88), and received Willow Bridge's COVID-19 plans, which recommended working closely with YieldStar and LRO to preserve rent integrity, (Id. ¶ 89). Pinnacle property managers in Minnesota discussed future pricing and concessions with a Greystar manager. (Id. ¶ 98.)

Pinnacle first argues that it is a property manager rather than a landlord, so that allegations about landlords do not apply to it and it lacks a landlord's incentives. (Doc. 138 at 20–21.) The complaint defines "landlord" to include "entities that are responsible for setting rents and other lease terms at multifamily properties, including owners, operators, and managers." (Doc. 47 ¶ 5 n.1.) Pinnacle is alleged to own or manage properties using YieldStar and to be a party to its own agreement with RealPage. (Id. ¶ 244.) Any difference between Pinnacle's incentives and an owner's goes to motive, and co-

conspirators "need not share the same motive or goal; it is sufficient to allege that the co-conspirators 'acquiesc[ed] in an illegal scheme.'" Dickson, 309 F.3d at 205 (quoting United States v. Paramount Pictures, Inc., 334 U.S. 131, 161 (1948)).

Pinnacle's remaining arguments do not change the analysis. It relies on an antitrust compliance policy attached to its motion, which it says the complaint incorporates by reference. (Doc. 138 at 22-23.) Even if the policy may be considered, Plaintiffs do not rely on it for the truth of its contents, and it will not be used to contradict the complaint's allegation that market surveys involve nonpublic information. (Doc. 47 ¶¶ 82–84); see Fed. Trade Comm'n v. Syngenta Crop Pro. AG, 711 F. Supp. 3d 545, 568-69 (M.D.N.C. 2024) (declining, at the motion-to-dismiss stage, to accept defendants' interpretation of judicially noticed public records where the records raised fact questions); see also Goines, 822 F.3d at 167–68. Pinnacle also notes that the complaint does not allege that the call proposed in paragraph 88 took place. (Doc. 138 at 26; see also Doc. 139 at 5 & n.3). That limits the weight of the allegation without eliminating Pinnacle's documented coordination proposal to a competitor. And even though no relevant market is alleged in Minnesota, those communications bear on whether Pinnacle

*participated* in the agreement rather than on effects in a relevant market. (Doc. 138 at 26–27.)

Therefore, the Pinnacle-specific allegations plausibly allege that Pinnacle knew YieldStar's recommendations drew on a nationwide pool of competitors' transactional data, understood that data to be sensitive enough to raise concerns about collusion, and participated in AIRM's design. Combined with its alleged participation in the standard data-sharing agreement, that is enough at this stage. SD3, 801 F.3d at 424.

**ii. Unreasonable Restraint of Trade**

Having established the concerted action element of a Section 1 claim, this court turns to the second element, examining whether the agreements between Defendant Landlords and Realpage "imposed an unreasonable restraint on trade." Robertson, 679 F.3d at 290. An exchange of information among competitors is not unlawful per se. Gypsum Co., 438 U.S. at 441 n.16. But "[e]xchanges of current price information, of course, have the greatest potential for generating anticompetitive effects and although not per se unlawful have consistently been held to violate the Sherman Act." Id. Courts evaluating an exchange consider "most prominently the structure of the industry involved and the nature of the information exchanged." Id.; see also Todd, 275 F.3d at 199, 211–13. The concern is that

an exchange reduces the uncertainty that otherwise keeps competitors' prices in check. See, e.g., Container Corp., 393 U.S. at 337.

**a. Relevant Market and Market Power**

The complaint alleges relevant product markets for conventional multifamily rentals, including markets by bedroom count, (Doc. 47 ¶¶ 183-99), and relevant geographic markets consisting of RealPage-defined submarkets and CBSAs, (Id. ¶¶ 200-17). RealPage does not challenge these definitions for purposes of the pending motions. (See Doc. 74 at 19 n.7.)

Defendant Landlords argue that the complaint alleges no Defendant Landlord's own market share and that the shares it does allege include landlords who are not co-conspirators. (Doc. 129 at 43-44.) Both arguments depend on treating the alleged agreement as a series of separate agreements between RealPage and individual landlords, a characterization this court rejected in Section 3.i. The question under the Sherman Act § 1 is "whether the combination or conspiracy, not each individual conspirator, has the [market] power to hurt competition in the relevant market." Dickson, 309 F.3d at 210 (quoting Spectators' Commc'n Network Inc. v. Colonial Country Club, 253 F.3d 215, 225 (5th Cir. 2001)).

That also answers RealPage's objection to counting OneSite users. RealPage argues the combination consists only of RealPage and AIRM or YieldStar users, citing paragraphs 260 and 277 of the complaint. (Doc. 74 at 21-22; Doc. 122 at 11 n.5.) But paragraph 277 addresses the agreements "between landlords using AIRM or YieldStar and RealPage," which is Claim Two's narrower combination. Claim One's membership appears in complaint paragraphs 260 and 261 together: the latter alleges that landlords using OneSite, Business Intelligence, or Performance Analytics with Benchmarking likewise agree to supply daily nonpublic data, understanding RealPage will use it in the products that price competing landlords' units. Paragraph 267 describes the combination as "RealPage and participating landlords." RealPage's remaining point — that OneSite is not revenue management software — would matter if the relevant market were commercial revenue management software, which is the market alleged for the Section 2 claims. Claim One's relevant product market is conventional multifamily rental housing, and share is calculated within it. Syngenta, 711 F. Supp. 3d at 560.

What matters is how many rental units the combination's members control, not which product carried their data into the pool.

On that measure, the complaint alleges penetration of roughly 30% to over 80% in the submarkets identified in Appendices A and B, (Doc. 47 ¶¶ 209, 211), and roughly 33% to 45% in the CBSA markets identified in Tables 1 and 2, (Id. ¶¶ 214, 216). RealPage argues that a share of 30% or less cannot establish market power as a matter of law, and that the weight of authority requires 40%. (Doc. 74 at 18-19 & n.6; Doc. 122 at 10-12.) First, the Dickson footnote on which it relies addressed a different point. The plaintiff there had alleged only that the defendants were the "largest" manufacturers, which the court explained "says nothing of a firm's ability to affect competition in that market." Dickson, 309 F.3d at 209 n.20. The footnote's parenthetical description of Jefferson Parish Hospital District No. 2 v. Hyde does not carry the weight RealPage places on it. Id. Jefferson Parish held that a hospital's 30% share did not warrant per se condemnation of a tying arrangement, and the Court went on to assess the arrangement under the rule of reason. 466 U.S. 2, 26-29 (1984). Neither case sets a numerical floor for market power in a rule-of-reason challenge to an information exchange. Dickson itself framed the question as one of degree rather than threshold. A court first identifies the ways in which a challenged restraint might impair competition, then determines "whether that harm is

not only possible but likely and significant," which requires "examination of market circumstances" including market power and share. Dickson, 309 F.3d at 206. Here, the complaint alleges that participants in the exchange control at least 30% of the units in every alleged market and more than 80% in some. (Doc. 47 ¶ 211.)

Share is one indicator of power, and courts have inferred it from combined shares in concentrated markets. See United States v. Visa U.S.A., Inc., 344 F.3d 229, 239–40 (2d Cir. 2003) (sustaining a finding that MasterCard possessed market power with a 26% share of a highly concentrated market, where merchants could not refuse the cards despite repeated fee increases). The complaint alleges structural features supporting the inference here: demand for housing is inelastic, (Doc. 47 ¶¶ 75–77); local markets are concentrated, (Id. ¶ 79); the software makes units more readily comparable, (Id. ¶¶ 118–19); and entry requires the time and capital to build new housing. (Id. ¶ 218); see also Todd, 275 F.3d at 211.

RealPage also argues that Plaintiffs calculated precise shares from data RealPage produced and withheld them, alleging only whether each market meets 30%. (Doc. 122 at 11–12.) A plaintiff need not allege a precise share at this stage, cf. du Pont, 637 F.3d at 452 n.12 (declining to reject a counterclaim

for failure to allege a specific percentage of market foreclosure at the pre-discovery stage), and this court draws reasonable inferences in Plaintiffs' favor rather than against them, Iqbal, 556 U.S. at 678. The complaint plausibly alleges that the participants in the exchange collectively hold market power in the alleged markets.

**b. Harm to Competition**

The complaint also alleges "some evidence that the challenged restraint harms competition." Am. Express, 585 U.S. at 542. The information exchanged falls within a category the Supreme Court has identified as concerning. "Genuine competitors do not make daily, weekly, and monthly reports of the minutest details of their business to their rivals." Am. Column & Lumber Co. v. United States, 257 U.S. 377, 410 (1921). The data provided is current and granular, reaching individual leases and prospective-renter traffic, (Doc. 47 ¶¶ 18, 262); it is in part forward-looking, reaching future supply, (Id. ¶¶ 18, 157); it is nonpublic; and it is shared daily, (Id. ¶¶ 15, 18, 34). As in Todd, "[t]he characteristics of the data exchange in this case are precisely those that arouse suspicion of anticompetitive activity under the rule of reason." 275 F.3d at 213.

Defendant Landlords argue that no landlord receives any competitor's individual data, pointing to the market range

chart, which shows a user only its own rents against a smoothed market minimum and maximum. (Doc. 129 at 23; Doc. 47 ¶ 45.) They invoke Maple Flooring Manufacturers' Ass'n v. United States, 268 U.S. 563, 582-83 (1925), which upheld an exchange of aggregated information. (Doc. 129 at 36; Doc. 134 at 16.) The argument misapprehends the alleged mechanism. The complaint alleges that the software itself uses "the nonpublic data from competitors' executed leases" to generate the market range for each floor plan, and that the resulting market minimum operates as a hard floor on what price the software will recommend. (Doc. 47 ¶¶ 43–44, 143.) The landlord need not see a competitor's data for that data to shape its specific prices; the algorithm does the work.

RealPage further argues that the complaint concedes that its software recommends competitive, "market" prices, pointing to allegations that recommendations track the top and bottom of the market and that the hard floor prevents recommendations from falling below "[t]he market minimum." (Doc. 122 at 7–9.) Those allegations are not the concessions RealPage takes them to be. The "market" to which the software anchors its recommendations is a range computed from the pooled confidential data of competing landlords, (Doc. 47 ¶¶ 43–44), and the floor prevents a landlord from pricing below a figure derived from its competitors' leases, (Id. ¶ 143). Whether a price that tracks

that benchmark is "competitive" is the effects question the claim presents, not a concession that answers it.

Plaintiffs allege how the exchange harms competition. Using competitors' nonpublic data, the software predicts "with more certainty the highest price that the market will bear," reducing landlords' willingness to negotiate. (Id. ¶ 126.) It recommends increases when competitors' rents rise and will not recommend a price below the market minimum derived from competitors' leases. (Id. ¶¶ 127, 143.) In "revenue protection" mode, it responds to weak demand by reducing the number of units a landlord seeks to lease rather than lowering price, (Id. ¶¶ 144–48), and it uses competitors' future supply to raise unit-level prices for lease terms that would otherwise expire into a crowded market, (Id. ¶¶ 157–62). According to RealPage's own description, the software "helps curb [landlords'] instincts to respond to down-market conditions by either dramatically lowering price or by holding price when they are losing velocity and/or occupancy." (Id. ¶ 1; see also id. ¶ 137.) These allegations describe economically plausible anticompetitive effects flowing from the exchange. See Robertson, 679 F.3d at 291. Although Defendants argue these allegations show harm is possible, not "likely and significant," (Doc. 74 at 22; Doc 122 at 12 (quoting Dickson,

309 F.3d at 206)), the harm alleged by Plaintiffs at this stage are plausible rather than merely conceivable.

Thus, Claim One states a claim against RealPage and each Defendant Landlord.

#### 4. Claim Two: Agreements to Align Pricing

Claim Two presents a different theory. Plaintiffs allege that each licensee's agreement to use AIRM or YieldStar as designed is itself a restraint of trade, because the software aligns licensees' pricing processes, strategies, and responses. (Doc. 47 ¶¶ 271-77.) Plaintiffs press that theory broadly in their brief, arguing that the alignment lies "in the process by which landlord users price their rental units, not necessarily in the ultimate prices they set," so that the degree of discretion landlords retain over final prices "is not the focus." (Doc. 145 at 72-73 (citing FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 459, 461-62 (1986)).) This court need not and does not decide whether alignment of the pricing process would restrain trade where licensees remained genuinely free to price as they chose. The complaint alleges agreements that substantially constrain how licensees set prices, as discussed below, and that narrower ground presents a plausible claim.

i. **Concerted Action**

a. **The Agreement Alleged**

As with Claim One, the vertical agreements are not in dispute. The complaint alleges that each licensee of AIRM or YieldStar agreed with RealPage to use the software as designed, which "includes providing nonpublic, competitively sensitive transactional data to RealPage, but more broadly is an agreement to use AIRM or YieldStar as the means to price the landlord's rental units." (Doc. 47 ¶ 271.) These are express agreements between distinct entities, sufficient at this stage to allege concerted action between the licensor and each licensee. See Dickson, 309 F.3d at 203–04. The combination is narrower than Claim One's, reaching only licensees of those two products for the reasons given in Section 3 above.

Defendant Landlords' central argument here is against the rim. Defendant Landlords argue that Claim Two alleges only separate vertical agreements between RealPage and each licensee, whose effects Dickson forbids the court to aggregate. (Doc. 129 at 44–46; Doc. 138 at 21–22.) In Dickson, the Fourth Circuit explained:

> The SAC, however, did not allege a conspiracy among Microsoft and all OEMs; it alleged discrete conspiracies between Microsoft and Compaq and Microsoft and Dell. Consequently, the district court correctly determined that it could not consider the cumulative harm of Microsoft's agreements with all OEMs but instead was

> required to consider — individually — Microsoft's agreements with Compaq and Dell to evaluate each agreement's potential for anticompetitive effects.

309 F.3d at 210.

In Dickson, the plaintiffs abandoned any claim of a single conspiracy and were therefore required to show that each discrete agreement, standing alone, was likely to harm competition. Id. at 210–11.

Claim Two is pleaded differently from Dickson. Plaintiff alleges that each licensee understands its competitors are using the same software, desires the resulting alignment, and that this expectation is part of why licensees sign up. (Doc. 47 ¶¶ 30, 33, 273.) RealPage markets the software on the premise that "a rising tide raises all ships," explaining that "there is greater good in everybody succeeding versus essentially trying to compete against one another." (Id. ¶ 32.) Landlords echo it: one used the phrase to explain that AIRM would move prices in a "similar manner" to the top and bottom of the market, a Willow Bridge employee used it to explain how AIRM would amplify market trends, and "[m]ultiple landlords have expressed their preference that their competitors use YieldStar and AIRM because widespread use would benefit them all." (Id. ¶ 33.) A RealPage executive testified that participating landlords "likely move in unison versus against each other," and that in 2020 the

performance of subject sites and their comparison sets became "eerily similar," which he took as evidence that the software was "r[a]ising the entire tide." (Id. ¶ 128.)

According to Plaintiffs, operation of the software matches that understanding. AIRM applies the same learned parameters to every client, so the model uses the same method to generate recommendations for competing landlords. (Id. ¶¶ 132–33.) As two properties' surrogate sets converge, the software generates increasingly similar prices for both. (Id. ¶ 51.) And as adoption increases among peers, recommended increases feed on one another. (Id. ¶ 128.) RealPage's user group meetings and its certification program, which trains licensees' revenue managers to use the software the same way, are alleged to facilitate that alignment. (Id. ¶¶ 72, 275.) The complaint alleges the agreements' effect collectively: "Taken together, the agreements between each AIRM or YieldStar landlord and RealPage to use AIRM or YieldStar, respectively, harm or are likely to harm the competitive process and renters." (Id. ¶ 276.)

Claim Two therefore alleges a single combination, not the set of "discrete conspiracies" Dickson addressed. This court will accordingly consider the challenged agreements' collective effect. See Dickson, 309 F.3d at 210. That holding governs the market power analysis in Section 4.ii.b below.

### b. **Whether the Agreement is Plausibly Pleaded**

The reasoning of Section 3.i.a. applies here. As with Claim One, these allegations describe an arrangement in which each participant's adherence is premised on, and derives its value from, the participation of its competitors, so no separate inference of a meeting of the minds is required. See Interstate Cir., 306 U.S. at 226–27 ("It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it. Each distributor was advised that the others were asked to participate; each knew that cooperation was essential to successful operation of the plan.").

And as with Claim One; each licensee operates and prices through software it knows its competitors use, the arrangement is against each licensee's independent interest absent the expectation of reciprocal adherence, and the licensees communicated with one another about their use of the software. (Doc. 47 ¶¶ 87–90, 95, 102–17.)

Each of the three Defendant Landlords in this claim licenses AIRM or YieldStar and is therefore alleged to be a party to the agreements Claim Two challenges. (Id. ¶¶ 238, 244, 253.) For the reasons given in Section 3.i.c, the complaint plausibly alleges that each joined the combination.

### ii. Unreasonable Restraint of Trade

#### a. The Agreements Constrain Independent Pricing

Defendant Landlords argue that the licensing agreements do not restrain trade, because licensees remain free to override the software's recommendations and, on average, decline about half of them. (Doc. 129 at 40–42 (citing Gibson v. Cendyn Grp., LLC, No. 2:23-CV-140, 2024 WL 2060260, at *9 (D. Nev. May 8, 2024)("Gibson II"), aff'd, 148 F.4th 1069 (9th Cir. 2025), cert. denied, 146 S. Ct. 2562 (2026). An agreement under which one party offers purely optional suggestions that the other freely accepts or rejects may not restrain trade.

However, the complaint alleges more than simply optional suggestions. Licensees agree to use the software to set scheduled floor plan rents and unit-level prices. (Doc. 47 ¶¶ 28–29, 271.) Clients using RealPage's advisory services agree to use AIRM or YieldStar exclusively to quote prices to prospective renters, to restructure leasing-agent commissions to reward revenue growth, and to adopt revenue growth rather than occupancy as the metric for evaluating the software. (Id. ¶ 71.) The software is designed to make declining suggested prices costlier than accepting because overrides require written justification and can be escalated to a supervisor, and RealPage configures auto-accept by default and trains its advisors to

widen it. (Id. ¶¶ 62–70.) Some unit-level adjustments that rely on competitors' data apply whether or not the landlord accepts the floor plan recommendation. (Id. ¶¶ 57, 74, 157–60.) The alleged results reflect the software's influence as nearly 60% of final floor plan prices fall within 2.5% of the recommendation, and more than 85% fall within 5%. (Id. ¶ 73.) This circumstantial evidence sufficiently reflects "a unity of purpose or a common design and understanding, or a meeting of the minds." N.C. State Bd. Of Dental Exam'rs v. FTC, 717 F.3d 359, 372 (4th Cir. 2013).

Gibson does not compel a different result. First, the plaintiffs there did not allege that the provider pooled one hotel's confidential data to generate recommendations for a competing hotel and the Ninth Circuit indicated that its analysis might have differed had they done so. Gibson v. Cendyn Grp., LLC, 148 F.4th 1069, 1078 (9th Cir. 2025)("Gibson II") ("Plaintiffs, however, do not allege that Cendyn pools, shares, or uses the confidential information provided by a given Hotel Defendant into the pricing recommendations it generates for any *other* Hotel Defendant.")

What's more, the underlying complaint there alleged recommendations the defendants were free to disregard, Gibson I, 2024 WL 2060260, at *6-7. This complaint alleges an agreement to

price *through* the software, reinforced by exclusive-quoting commitments, override friction, and compensation restructured around the software's objectives. The Third Circuit rejected the same argument on comparable allegations, observing that "[p]rices are fixed when they are agreed upon," irrespective of whether participants always adhere to them, and that allegations of high compliance rates support an inference of agreement, "especially . . . given the alleged practical difficulties of deviating," including override permissions restricted to select staff. Cornish-Adebiyi, 184 F.4th at 190–91 (quoting United States v. Masonite Corp., 316 U.S. 265, 276 (1942)). It acknowledged that a claim "may well fail if the alleged colluders routinely varied from recommended prices." Id. at 190. Whether these licensees did is a factual question.

Taken together, these allegations plausibly describe agreements that constrain how licensees set prices.

**b. Relevant Market and Market Power**

Because Plaintiffs rely, in part, on indirect evidence of anticompetitive effects, they must plausibly allege market power

in a relevant market. See Am. Express, 585 U.S. at 542.[11] The relevant markets are those described in Section 3.ii.a.

For Claim Two, the complaint measures market power by the share of units priced with AIRM or YieldStar. It alleges penetration on that measure of roughly 26% to 69% in the submarkets identified in Appendix A, (Doc. 47 ¶ 209); roughly 26% to 79% in the submarkets by bedroom count identified in Appendix B, (Id. ¶ 211); roughly 26% to 37% in the CBSAs identified in Table 1, (Id. ¶ 214); and roughly 27% to 42% in the CBSAs by bedroom count identified in Table 2, (Id. ¶ 216). Table 1 identifies the CBSAs in which AIRM and YieldStar alone reach 30%, including both CBSAs in this District. (Id. ¶ 214 & tbl. 1.) That measure is appropriate because only AIRM and YieldStar licensees are parties to the alleged alignment agreements; unlike Claim One, Claim Two does not reach landlords who contribute data only through OneSite or RealPage's other products.

Although the lower end of the range falls below 30%, the market power analysis in Section 3.ii. applies here as well. Share is one indicator among several, and the structural

[11] Plaintiffs also allege direct evidence of anticompetitive conduct. (See Doc. 47 ¶¶ 120-62.) While plausible, at this point there is sufficient indirect evidence to allege market power in the multifamily housing market that harms competition.

features the complaint alleges support the inference of collective market power. Whether the evidence will bear that inference in each alleged market is not resolved on the pleadings. See Kolon, 637 F.3d at 442–43 (collecting cases that find determining a relevant market is a question of fact.)

#### c. **Harm to Competition**

The complaint also alleges how the agreements harm competition. Their effect is to remove the downward pressure competition would otherwise supply: price reductions become less likely, (Doc. 47 ¶¶ 142–52); concessions to renters are discouraged, (Id. ¶¶ 153–56); and competing landlords no longer "react in distinctive ways to changing market conditions," because each prices using the same learned model parameters, (Id. ¶ 133). Higher rents and fewer concessions among landlords who collectively price a substantial share of the units in the alleged markets are economically plausible effects of agreements that operate that way. See Robertson, 679 F.3d at 291.

For the reasons outlined, Claim Two states a claim against RealPage and each Defendant Landlord.

### C. **Section 2 of the Sherman Act (Third and Fourth Claims for Relief)**

Claims Three and Four allege that RealPage has monopolized, or attempted to monopolize, a national market for commercial

revenue management software for conventional multifamily housing. (Doc. 47 ¶¶ 219–29, 280–89.) After entry of Final Judgment with the United States, these claims are pressed by the Plaintiff States only, and against RealPage alone.

### 1. **Framework**

Section 2 makes it unlawful to "monopolize, or attempt to monopolize, . . . any part of the trade or commerce among the several States." 15 U.S.C. § 2. Unlike Section 1, Section 2 reaches unilateral conduct, so no agreement is required.

Monopolization requires "(1) that the defendant possessed monopoly power in the relevant market, and (2) that the defendant willfully acquired or maintained or maintained that power through anticompetitive conduct, as opposed to gaining its monopoly status as a consequence of a superior product, business acumen, or historic accident." Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC, 111 F.4th 337, 353 (4th Cir. 2024) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570–71 (1966)) (cleaned up).

RealPage argues that this court "should dismiss Plaintiffs' Section 2 claims because they had failed to plead exclusionary conduct and actual or dangerously probable monopoly power". (Doc. 74 at 23.)

2. **Relevant Market**

The analysis begins with the relevant market. Kolon, 637 F.3d at 441 ("In analyzing Sherman Act Section 2 claims such as the ones Kolon makes here, courts begin with a preliminary inquiry into market definition, which serves as a tool to determine the defendant's market power.") "The market definition has two components—the relevant product market and the relevant geographic market." Id.

A relevant product market can be defined numerous ways. Courts can examine "(1) the Defendants' own conduct; (2) the "hypothetical monopolist test"; and (3) the factors set out in Brown Shoe, 370 U.S. 294." Syngenta,711 F. Supp. 3d at 567. Courts generally consider a defendant's "own conduct and recognition of the market — under the assumption that 'economic actors usually have accurate perceptions of economic realities.'" Id. (quoting Todd, 275 F.3d at 205). Plaintiffs rely principally on the Brown Shoe factors, (Doc. 106 at 22), which ask this court to consider "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962).

In conducting the analysis, the Fourth Circuit emphasizes market definition is "a fact-intensive exercise centered on the

commercial realities of the market and competition," and "dismissal of an antitrust claim for failure to adequately plead the relevant market can be problematic." Kolon, 637 F.3d at 442–43. At the pleading stage, the question is whether the complaint plausibly alleges a market, not whether Plaintiffs will prove it. See Syngenta, 711 F. Supp. 3d at 569 (conducting a plausibility analysis).

The complaint alleges a product market for commercial revenue management software for conventional multifamily housing, national in scope. (Doc. 47 ¶¶ 219–29.) It supports that market with the practical indicia Brown Shoe identifies. RealPage describes itself as "the market leader in commercial revenue management for multifamily," in internal documents (Id. ¶ 222), and its employees describe it as dominating the next two largest commercial providers, (Id. ¶ 225). Landlords recognize the category: one described RealPage's "monopoly on a product category," and another testified that manual pricing does not compete with AIRM and "cannot solve at the level a revenue management tool can." (Id. ¶¶ 227–28.) The complaint also alleges distinct pricing and insensitivity to price: AIRM costs three times a competing product, (Id. ¶ 179); RealPage raised one landlord's annual revenue management costs by 400% over five years in the face of minimal alternatives, (Id. ¶ 228), and a

rival could not win customers away from RealPage even by offering its product for free, (Id. ¶ 179).

RealPage argues that the market must include landlords' in-house software and manual pricing, and that the complaint's own allegations show that most units are priced without commercial software. (Doc. 74 at 30–32; Doc. 122 at 17–18.) The argument rests on an inference this court cannot draw at the pleading stage as inferences must be drawn in favor of the non-moving party. RealPage reasons that because its data reaches roughly 16 million units, while only about 4.8 million use RealPage's revenue management software, at least 11 million units must be priced by non-commercial substitutes. (Doc. 74 at 31–32 (citing Doc. 47 ¶¶ 24, 173, 176).) That subtraction - which RealPage concedes rests on a figure "far from true", (Doc. 74 at 31; Doc 122 at 17) - establishes only that some units are not priced with commercial revenue management software. It does not establish in-house or manual pricing as a reasonable substitute for commercial revenue management software. See Brown Shoe, 370 U.S. at 325. RealPage is correct that self-supply may belong in a relevant market. See Epic Games, Inc. v. Apple, Inc., 67 F.4th 946, 978 (9th Cir. 2023); United States v. Sungard Data Sys.,

Inc., 172 F. Supp. 2d 172, 186 (D.D.C. 2001); (Doc. 122 at 17.)[12] Whether it does here is a question of fact and commercial reality, but for now the complaint plausibly alleges that the market's participants do not treat them as substitutes. (Doc. 47 ¶¶ 227-28; Doc. 106 at 27 n.8.) The complaint also alleges facts that track two of Brown Shoe's practical indicia: industry recognition and sensitivity to price changes. See Brown Shoe, 370 U.S. at 325. As to industry recognition, RealPage's own strategy materials describe it as "the market leader in commercial revenue management for multifamily," and a RealPage sales executive told a prospective customer that its revenue management product had no "true competitors." (Doc. 47 ¶¶ 11, 180, 222.) RealPage's internal competitive analysis measured its position against the next two commercial software providers, not against manual pricing. (Id. ¶ 225.) The pricing allegations point the same way. Faced with RealPage's push to raise its revenue management costs 400% over five years, one landlord did not consider returning to manual pricing; they lamented the lack of competing software and planned to "incubate a viable

[12] RealPage's reliance on the proposed final judgment with Cortland, which references Cortland's in-house software, (Doc. 74 at 31), asks this court to draw factual inferences from a document outside the complaint, and one landlord's in-house product would not establish that self-supply is a reasonable substitute for others in any event.

alternative to AIRM." (Id. ¶ 228.) Taken as true, these allegations support an inference that landlords treat commercial revenue management as a distinct product for which manual pricing is not a ready substitute. Whether the evidence bears that out is a question for a later stage. The complaint plausibly alleges a relevant product and geographic market.[13]

### 3. Monopoly Power

Once a relevant market is identified, courts must examine whether monopoly power is plausibly alleged. "Monopoly power is the power to control prices or exclude competition." United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956). A defendant possesses monopoly power in the relevant market if it is "truly predominant in the market." White Bag Co. v. Int'l Paper Co., 579 F.2d 1384, 1387 (4th Cir. 1974). No fixed percentage share conclusively resolves the question, but the Fourth Circuit has observed that "when monopolization has been found the defendant controlled seventy to one hundred percent of the relevant market." Kolon Indus. Inc. v. E.I.

[13] RealPage contests the alleged geographic market to the extent the alleged market is national in § 2 while the alleged § 1 violations are local. (Doc. 74 at 28 n.11, Doc. 122 at 14.) That observation goes to whether RealPage's conduct is exclusionary, not to the market boundaries. In any event, the complaint plausibly alleges that RealPage sells its software and sets subscription prices nationwide, that landlords set revenue management policy through centralized, national teams but that effects are local. (Doc 47 ¶ 229.)

DuPont de Nemours & Co., 748 F.3d 160, 174 (4th Cir. 2014)(quoting White Bag, 579 F.2d at 1387). Beyond share, courts consider the durability of the defendant's power, "particularly with an eye toward other firms' [in]ability to enter the market." Id.

The complaint alleges that RealPage has held roughly 80% of commercial revenue management software since at least 2019, and 80% to 85% as recently as 2023. (Doc. 47 ¶ 224; see also id. ¶ 223 (95% of the top fifty owners and operators).) It alleges barriers to entry in the form of RealPage's data scale, which rivals cannot match and which grows as RealPage adds users. (Id. ¶¶ 172-79, 181, 226.) The complaint also alleges direct evidence of power over price. (Id. ¶¶ 179, 228.) A durable share at that level, protected by entry barriers, is sufficient at the pleading stage. See Kolon, 637 F.3d at 450-51 (monopoly power adequately alleged where the complaint alleged a durable share of about 70% and barriers to entry).

RealPage's response depends on its market-definition argument. It contends that its true share is below 30% once in-house and manual pricing are counted, (Doc. 74 at 33), and that the units priced without commercial software are "ripe targets" for rivals, (Id. at 33-34). Because this court finds the alleged market plausible, those arguments fail at this stage. RealPage

also argues that its data advantage is not a barrier because rivals can collect their own data. (Id. at 34.) The complaint alleges otherwise: rivals lack comparable data, (Doc. 47 ¶¶ 176-78), and could obtain it on the scale RealPage enjoys only through similar unlawful agreements with landlords, (Id. ¶¶ 166, 182). At this stage, the complaint plausibly alleges that RealPage possesses monopoly power.

**4. Willful Acquisition or Maintenance**

The second element under § 2 requires the use of monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." Kolon, 637 F.3d at 441 (quoting Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 482-83 (1992)). Included in this is a competitor using its position to exclude rivals "on some basis other than efficiency," Duke Energy, 111 F.4th at 353 (quoting Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605 (1985)). Not included is conduct that reflects "a superior product, business acumen, or historic accident." Grinnell, 384 U.S. at 571.

RealPage's threshold objection is that the complaint pleads none of the recognized forms of Section 2 misconduct. (Doc. 74 at 24-25 (citing Novell, Inc. v. Microsoft Corp., 731 F.3d 1064, 1072 (10th Cir. 2013)).) The Fourth Circuit has rejected that

framing. "Section 2 focuses on anticompetitive conduct, not on court-made subcategories of that conduct." Duke Energy, 111 F.4th at 354. Where the conduct alleged is complex or atypical, like algorithmic price setting, category-specific tests "would prove too rigid," because "the means of illicit exclusion, like the means of legitimate competition, are myriad." Id. at 354-55 (quoting Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 414 (2004)). The conduct should be assessed as alleged and as a whole. Id. ("a firm's exclusionary efforts be considered in their totality. . .").

So assessed, the conduct alleged is the unreasonable restraint in trade from Section 1. Landlords license RealPage's software and, in exchange, supply their nonpublic lease transaction data to a pool RealPage controls. (Doc. 47 ¶¶ 21-24, 167, 172-75.) RealPage uses that pool to generate prices for each contributing landlord's competitors and presses a standardized process. (Id. ¶¶ 24, 41, 173, 175.) Thus, the same pool is what RealPage sells against competing software vendors. (Id. ¶¶ 176-80.)

The complaint alleges the effect of that conduct in the software market. RealPage's two principal rivals together hold data on fewer than 250,00 units, against RealPage's 16 million. (Id. ¶¶ 24, 176.) RealPage pitches the difference as decisive,

telling prospective clients that a rival product lacking the data is a "Ferrari without an engine" and notably, that new entrants struggle to enter the market given the "data moat" RealPage has assembled. (Id. ¶ 177.) Rivals cannot compete at half price, at a third of the price, or for free. (Id. ¶¶ 169, 179, 228.) Meanwhile, RealPage's share has remained at or above 80%. (Id. ¶ 224.) These are allegations of impairment of rivals in the monopolized market.

What makes that impairment exclusionary rather than the reward of efficiency, Plaintiffs contend, is the source of the advantage. RealPage does not merely happen to hold a large dataset. The feature it markets as decisive is the aggregation of competing landlord's confidential, lease-level data, (Id. ¶¶ 167, 174-80). That advantage is alleged to exclude rivals rather than merely outperform them because a rival can only obtain data at comparable scale by entering agreements like the ones challenged here. (Id. ¶¶ 166, 182.) A monopolist that maintains its position through agreements that plausibly violate Section 1 has conceivably not maintained it through "a superior product, business acumen, or historic accident." Grinnell, 384 U.S. at 571. RealPage cites Dreamstine.com, LLC v. Google LLC, 54 F.4th 1130 (9th Cir. 2022), to argue data collection arrangements are not unlawful. Dreamstine.com held that data

collection standing alone reflects a superior product or effective service infrastructure and dismissed because the plaintiff failed to allege "how Google's data collection techniques are improper or unlawful." Id. at 1142. RealPage plausibly alleges that illegality alone is not per se exclusionary; a § 1 violation that leaves rivals free to compete for the same customers excludes no one. See Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 336 (1990); see also Areed & Hovenkamp, Fundamentals of Antitrust Law § 6.04(i) at 6-45 (4th ed., 2025-1 Supp. 2011). As this court reads it, the complaint alleges something different: landlords choose AIRM over rival software because of the coordinated pricing with competitors alleged under § 1 and higher rents that follow. On these allegations, RealPage wins customers not with a better software but an anticompetitive process. That is exclusion "on some basis other than efficiency". Duke Energy, 111 F.4th at 353. The alleged illegality does not supply the exclusion; it explains why customers preference for RealPage is not a merit-based one. It also explains why RealPage's minimum pricing analogy misses the mark. (See Doc. 122 at 15-16.) Rivals are not invited to undercut a cartel raising prices because that assumes the cartels customers (e.g. the landlords) act competitively rather than collusively. This court, at this stage, finds the complaint

plausibly alleges anticompetitive conduct by sufficiently alleging both that rivals are impaired in the monopolized market and that the advantage producing that impairment is Section 1's unreasonable restraint. See Aspen Skiing, 472 U.S. at 605 ("If a firm has been 'attempting to exclude rivals on some basis other than efficiency,' it is fair to characterize its behavior as predatory.") (quoting R. Bork, The Antitrust Paradox, 138 (1978)).

### 5. **Attempted Monopolization**

The attempted monopolization claim survives for the same reasons. Attempted monopolization requires "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993); see Kolon, 637 F.3d at 441, 453-54. The complaint alleges anticompetitive conduct, as discussed above. Specific intent "may be inferred from the defendant's anticompetitive practices," Kolon, 637 F.3d at 453, and RealPage's argument that such an inference renders the intent element redundant, (Doc. 74 at 34 n.12), is foreclosed by that holding at this stage. The complaint also alleges intent directly: RealPage's planning documents describe building its next-generation product on its database to protect revenue from

"emerging competitors," (Doc. 47 ¶ 174); a senior vice president described the data as a "data moat," (Id. ¶ 179); and an executive described migrating clients from LRO to AIRM as "critical to reducing the risk" posed by a new entrant, (Id. ¶ 181). A share of roughly 80%, protected by the barriers alleged, establishes a dangerous probability of achieving monopoly power. See Kolon, 637 F.3d at 453–54. The complaint states claims under Section 2 against RealPage.

**D. State-Law Claims**

Defendants' principal argument for dismissal of the state-law claims is that they fail along with the federal claims. (Doc. 74 at 34-35; Doc. 129 at 46-48; Doc. 134 at 20; Doc. 138 at 29.) "[E]ach state law statute instructs courts to dismiss those claims when their federal analogues fail." (Doc. 129 at 46-47, citing each state law statute). Correspondingly, because the federal claims survive, the state claims do as well. RealPage separately argues that the Tennessee Trade Practices Act applies only to tangible goods. (Doc. 74 at 35 (citing Bennett v. Visa U.S.A., Inc., 198 S.W.3d 747, 751 (Tenn. Ct. App. 2006)).) Plaintiffs respond that the statute, as amended, reaches services. (Doc. 106 at 37 (citing Tenn. Code Ann. § 47-25-101).) RealPage did not respond to that point in reply, and

this court declines to dismiss the Tennessee claim on this ground.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, this court finds that the complaint states claims under Sections 1 and 2 of the Sherman Act and the related state-law claims.

**IT IS THEREFORE ORDERED** that Defendant RealPage, Inc.'s Motion to Dismiss, (Doc. 73), is **DENIED.**

**IT IS FURTHER ORDERED** that the Joint Motion to Dismiss, (Doc. 128), is **DENIED** as to Defendants Camden Property Trust, Pinnacle Property Management Services, LLC, and Willow Bridge Property Company, LLC.

**IT IS FURTHER ORDERED** that Defendant Willow Bridge Property Company, LLC's Motion to Dismiss, (Doc. 132), is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant Camden Property Trust's Motion to Dismiss, (Doc. 133), is **DENIED.**

**IT IS FURTHER ORDERED** that the Motion to Dismiss filed by Defendants Pinnacle Property Management Services, LLC, (Doc. 137), is **DENIED.**

**IT IS FURTHER ORDERED** that the motions to dismiss filed by Greystar Real Estate Partners, LLC, (Doc. 130), and LivCor, LLC, (Doc. 135), are **DENIED AS MOOT.**

This the 30th day of September, 2026.

William L. Osteen, Jr.
United States District Judge