EXHIBIT 2 – JD COMMENT (REDACTED)

**From:** [redacted]
**To:** ATR-Public-Comments-Tunney-Act-MB
**Subject:** [EXTERNAL] Public Comment — Proposed Willow Bridge Final Judgment — U.S. v. RealPage, No. 1:24-cv-00710
**Date:** Friday, September 11, 2026 1:27:48 PM

Dear Ms. Hauck:

I am a [redacted] resident of [redacted] in Chula Vista, California, a multifamily community publicly listed/managed by Willow Bridge Property Company.

I have lived at [redacted] for approximately one year, and Willow Bridge has managed the community throughout my residency. My own tenancy has raised unresolved financial and pricing-related concerns involving Willow Bridge's administration of rent and other housing charges. I do not claim in this comment that those concerns resulted from RealPage, competitor data, or an antitrust violation. They are why the adequacy and verifiability of this decree are concrete questions for me rather than abstract policy concerns. I am willing to provide relevant records through a nonpublic channel if the Department determines that a property-level inquiry is warranted.

I respectfully ask the Antitrust Division to <u>strengthen the proposed Final Judgment with Willow Bridge Property Company LLC</u>, or explain on the public record why the existing provisions are sufficient, before asking the Court to find the settlement in the public interest.

My relationship to a Willow Bridge-managed community explains why the decree matters to me; it is not offered as evidence that the alleged antitrust conduct occurred at [redacted]. This comment relies only on the public record: the amended complaint, proposed Final Judgment, Competitive Impact Statement, Federal Register notice, Willow Bridge's public property listing, and the Department's public case materials. It does not ask the Department to decide any private tenancy dispute. The amended complaint contains allegations, not adjudicated facts, and Willow Bridge's consent to the proposed judgment is not an admission of liability. Those limits make independent verification of future compliance more important, not less.

**<u>Property-specific public-interest question:</u>** [redacted]

My concern is not abstract. Willow Bridge's current public website presents [redacted] as one of its communities. The California Department of Real Estate currently lists the [redacted] address as a branch of Willow Bridge Management Inc., a corporation using the DBAs “Willow Bridge” and “Willow Bridge Property Company.” A 2022 City of Chula Vista staff report described [redacted] as a [redacted] property owned by John Hancock Life Insurance Company (U.S.A.) since 2015. I cite the City report as a dated public representation, not as proof of current title.

DOJ's amended complaint alleges that Willow Bridge used RealPage's AIRM and YieldStar products. It also alleges more broadly that RealPage obtained confidential transactional data through products including OneSite, Performance Analytics with Benchmarking, and Business Intelligence—including data from units that did not necessarily use AIRM or YieldStar—and made such data available for pricing recommendations. The complaint does not identify [redacted] or Chula Vista, and I do not claim that [redacted] used any of these products or that its data entered the challenged system. The absence of property-level public information is precisely why I ask DOJ to examine the question.

I respectfully request that the Department, within its existing investigative, preservation, and compliance authority:

1. determine whether [redacted] used AIRM, YieldStar, LRO, OneSite, Performance Analytics with Benchmarking, Business Intelligence, or another RealPage or third-party revenue-management or data product during the period relevant to the complaint and proposed judgment;

2. determine whether [redacted]'s nonpublic rents, concessions, applications, lease terms, renewals, occupancy, availability, or other competitively sensitive information were transmitted, pooled, benchmarked, used for model training, or made available to generate recommendations for [redacted] or competing properties;
3. determine whether pricing or leasing recommendations used at [redacted] were influenced by competitors' nonpublic information;
4. preserve the relevant property-level contracts, product records, data-flow records, configurations, recommendations, overrides, communications, and audit trails, and ensure that the decree's legacy-data and compliance provisions reach [redacted] and similarly situated properties managed for third-party owners; and
5. to the extent consistent with law-enforcement and confidentiality constraints, explain in DOJ's response to public comments whether potentially affected renters will have any process to learn whether their property or its data was within the investigation or remedial program.

These requests do not assume the answers. They ask DOJ to test a concrete property against the precise data flows, products, owner-manager relationships, and renter harms alleged in its own complaint. They also expose a practical transparency problem: a renter cannot evaluate whether the decree protects that renter if property-level coverage is known only to Willow Bridge, its vendors, and the government.

**Voucher-assisted residents and public funds**

[redacted] makes the property-level pricing question more consequential. In the federal [redacted] program, the public housing agency may not approve the initial rent until it determines that the rent to owner is reasonable, must redetermine reasonableness before an increase, and must compare the requested rent with comparable unassisted units. The payment standard and gross rent also affect the housing-assistance-payment calculation. See 24 C.F.R. §§ 982.505 and 982.507.

Accordingly, if competitor-informed or algorithmically influenced pricing affected a requested initial rent, renewal increase, comparable-unit submission, concession, or other pricing input for a voucher-assisted unit, the effects could reach the resident's housing cost, the agency's rent-reasonableness process, and the expenditure of public subsidy funds. I do not assert that this occurred in my tenancy. I ask DOJ to determine whether it occurred at [redacted] or other Willow Bridge-managed properties and, if the evidence indicates an effect on assisted units or agency rent determinations, to coordinate as appropriate with HUD and the administering public housing agencies.

The final judgment should also require Willow Bridge to identify whether covered products or data practices were used in connection with voucher-assisted units at otherwise conventional properties. Its exclusion of "affordable housing" must not be interpreted to remove an entire conventional property—or individual units—from the decree merely because some residents use tenant-based rental assistance.

I have separately submitted housing-accountability reports to the HUD Office of Inspector General and VA Office of Inspector General and initiated a housing intake with the California Civil Rights Department. These are distinct processes. I do not represent that any of those agencies has opened an investigation, accepted a formal complaint, or made findings. I identify them only because overlapping voucher, rent, property-management, and communications records may warrant preservation or appropriate interagency referral if DOJ identifies a nexus to the conduct alleged in this case.

The proposed judgment contains meaningful protections. It broadly restricts the use and disclosure of competitors' nonpublic, property-specific information; limits revenue-management products that pool data across different owners; prohibits agreements with other property managers or owners to use a product; restricts price floors, automatic acceptance, and financial incentives tied to accepting recommendations; bars participation in RealPage meetings; preserves Department inspection rights; and provides contempt and cost-shifting remedies. These are material safeguards.

The public-interest question, however, is whether those safeguards can be verified and enforced across Willow Bridge's national operating footprint. The Competitive Impact Statement states that Willow Bridge manages more than 240,000 units. Against that scale, several provisions appear too dependent on self-reporting, vendor assurances, small samples, and nonpublic oversight.

**1. Require independent technical verification and an initial monitoring period**

The proposed judgment permits Willow Bridge to use a third-party revenue-management product if the provider certifies that the product meets the decree's requirements. It also appears to permit use of a RealPage product without a separate certification if a final judgment is entered against RealPage. A monitoring trustee is not automatic: monitoring is principally tied to use of an uncertified product or a judicial finding of a violation.

Vendor certification is useful evidence, but it is not independent verification. The alleged conduct involved data flows, model training, product settings, information exchanges, and operational practices that can change after a certification is issued. Reliance on a separate judgment against RealPage also does not establish that Willow Bridge's configuration and use of a product are compliant in practice.

**<u>I ask the Department to require:</u>**

- independent technical validation before initial use and after material product, model, data-source, or configuration changes;
- testing of actual data inputs, model-training data, access controls, recommendation settings, overrides, and outputs—not only review of a vendor's written representations; and
- an independent monitoring trustee for at least the first two years, with risk-based authority to examine products and practices whether or not a violation has already been proved.

If the Department believes these protections are unnecessary, its response should explain how vendor certification and a contingent monitor provide equivalent assurance.

**2. Scale the audit program to Willow Bridge's footprint and risk**

The proposed judgment requires an annual audit of revenue-management personnel and at least 12 randomly selected local, regional, or supervisory property-operations employees. A minimum sample of 12 employees is difficult to reconcile with a company managing more than 240,000 units. Random selection alone can also miss markets, properties, transition periods, or teams presenting the greatest risk.

The final judgment should require a statistically and operationally meaningful sample tied to the number of properties, units, markets, products, and owners involved. The sample should include risk-based selections, not merely random ones, and should test management transitions, complaints, unusual override patterns, product changes, and markets where multiple competing properties use the same software. The audit should examine owners' instructions and approvals when those instructions affect product use or pricing practices.

**3. Add public, aggregated compliance reporting**

The proposed judgment gives the Department access to significant nonpublic information, but it does not appear to require a public annual compliance report. Monitoring reports are generally protected from disclosure, and the public may never learn whether a monitor was appointed, what products were used, whether violations were detected, or whether corrective action occurred.

Confidential business information should remain protected. But confidentiality does not require complete public opacity. The final judgment should require an annual public report stating, in

aggregated and noncommercial terms:

- the number of properties and units using each category of revenue-management product;
- the number and type of audits, technical tests, complaints, and substantiated violations;
- the general nature and completion status of corrective actions;
- whether a monitoring trustee is serving and the scope of completed review; and
- whether the Department has granted, rejected, or conditioned any request affecting compliance.

Public reporting would allow affected renters and the Court to assess whether the decree is functioning without disclosing rents, algorithms, personal data, or competitively sensitive information.

**4. Clarify legacy-data controls and the housing-category exclusions**

The proposed judgment requires Willow Bridge to identify certain structured datasets containing competitors' nonpublic information, but states that the identification provisions do not apply to data maintained in OneSite, Yardi Voyager, or other property-management software. The final judgment should make unmistakably clear that this storage-location language is not permission to access, use, combine, retain without controls, or repurpose prohibited information. It should require documented segregation, access restriction, deletion or defensible inactivation, and testing sufficient to prevent legacy data from entering recommendations or model training.

The definition of "Willow Bridge Property" also excludes student, affordable, age-restricted or senior, and military housing. The public record should explain why residents and owners in those sectors do not require the decree's core protections against competitor data exchange and cross-owner pooling. The judgment should also clarify that an otherwise conventional multifamily property is not excluded merely because individual households use tenant-based rental assistance. If operational differences justify particular exceptions, those exceptions should be narrowly tailored; the core information-sharing prohibitions should apply wherever the competitive risk exists.

**5. Condition any early termination on a public compliance record**

The proposed judgment lasts five years but permits termination after three years upon notice by the United States. Early termination should require a reasoned public determination based on completed independent testing, a record of corrective action, and the absence of unresolved material violations. The Department should provide public notice before early termination and give the Court and the public a meaningful opportunity to assess the compliance record.

**6. Explain the limits of the remedy and cooperation provisions**

The proposed judgment requires cooperation but caps voluntary interviews under that provision at 15 employees and 60 total hours. Formal discovery and civil investigative demands remain available. Even so, given the alleged duration, nationwide scope, and technical nature of the conduct, the Department should explain why those ceilings are appropriate for voluntary cooperation, or replace them with a reasonable-necessity standard.

The Competitive Impact Statement also recognizes that private parties may pursue damages and that the proposed judgment will have no prima facie effect in private litigation. The settlement contains no restitution or monetary relief for renters. I recognize that a Tunney Act review is not an individual claims process and that the Court's role is not to rewrite the government's case. Still, the Department should explain why forward-looking relief without monetary redress is adequate in light of the complaint's allegations and what public compliance information will allow potentially affected renters to understand whether the challenged practices have actually stopped.

**Requested disposition**

I respectfully ask the Department to modify the proposed Final Judgment to include the safeguards above before entry. At minimum, the Department's response to public comments should address each concern with enough specificity for the Court to evaluate whether the decree's verification, transparency, duration, coverage, and cooperation provisions are adequate for a company of Willow Bridge's scale.

The decree should not depend on the public simply trusting the participants and vendors whose future conduct it is designed to constrain. Durable relief requires independent testing, proportionate auditing, limited but meaningful transparency, and a public basis for any early termination.

Respectfully submitted,

[redacted]

**Sources used:**

1. U.S. Department of Justice, Antitrust Division, case page, *U.S. and Plaintiff States v. RealPage, Inc.*, updated Sept. 4, 2026: https://www.justice.gov/atr/case/us-and-plaintiff-states-v-realpage-inc
2. Proposed Final Judgment as to Willow Bridge Property Company LLC, filed July 6, 2026: https://www.justice.gov/atr/media/1451186/dl
3. Competitive Impact Statement as to Willow Bridge Property Company LLC, filed July 6, 2026: https://www.justice.gov/atr/media/1451166/dl
4. Amended Complaint, filed Jan. 7, 2025: https://www.justice.gov/atr/media/1383471/dl
5. Federal Register public-inspection notice, scheduled for publication July 16, 2026: https://public-inspection.federalregister.gov/2026-14345.pdf
6. U.S. Department of Justice, "Justice Department Reaches Proposed Settlement with Willow Bridge, One of America's Largest Landlords," July 7, 2026: https://www.justice.gov/opa/pr/justice-department-reaches-proposed-settlement-willow-bridge-one-americas-largest-landlords
7. Willow Bridge Property Company, [redacted]
8. California Department of Real Estate, Willow Bridge Management Inc., corporation license 01319176 and branch listing: https://www2.dre.ca.gov/publicasp/pplinfo.asp?License_id=01319176
9. City of Chula Vista, 2022 staff report describing [redacted]
10. Electronic Code of Federal Regulations, 24 C.F.R. § 982.505, housing-assistance-payment calculation: https://www.ecfr.gov/current/title-24/subtitle-B/chapter-IX/part-982/subpart-K/section-982.505
11. Electronic Code of Federal Regulations, 24 C.F.R. § 982.507, reasonable rent: https://www.ecfr.gov/current/title-24/subtitle-B/chapter-IX/part-982/subpart-K/section-982.507

--
[redacted]

---

"It is impossible to think of anything at all in the world, or even beyond it, that could be considered *good without limitation* except a **good will**."
 - Immanuel Kant (Groundwork of the Metaphysics of Morals)