IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>vs.<br><br>WILLOW BRIDGE PROPERTY COMPANY, LLC,<br><br>Defendant. | No. 1:24-cv-00710 |

**RESPONSE OF PLAINTIFF UNITED STATES TO PUBLIC COMMENTS ON THE PROPOSED FINAL JUDGMENT**

Pursuant to the requirements of the Antitrust Procedures and Penalties Act (the "APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), the United States submits this response to the two public comments received regarding the proposed Final Judgment as to Defendant Willow Bridge Property Company, LLC (Doc. 200-1).[1]

After careful consideration of the submitted comments, the United States continues to believe that the proposed Final

[1] The United States has redacted personally identifiable information from the comments prior to filing them with this response. If the Court requests unredacted versions, the United States will provide unredacted comments under seal.

Judgment will provide an effective and appropriate remedy for the antitrust violations alleged in the Complaint.

After this response and the public comments have been published in the Federal Register pursuant to 15 U.S.C § 16(d), the United States will move the Court to enter the proposed Final Judgment.

## I. PROCEDURAL HISTORY

On August 23, 2024, the United States, along with several States ("Plaintiffs"), filed a civil antitrust Complaint against RealPage, Inc. ("RealPage") (Doc. 1). On January 7, 2025, Plaintiffs amended their civil Complaint (the "Complaint") to add Willow Bridge Property Company, LLC ("Willow Bridge") and five other landlords as Defendants (Doc. 47) alleging that Willow Bridge's agreements with RealPage and other landlords to share information and align pricing violate Section 1 of the Sherman Act, 15 U.S.C. § 1. The Complaint seeks to enjoin Defendants from sharing and exploiting competitively sensitive data.

On July 6, 2026, the United States filed a proposed Final Judgment (Doc. 200-1) as to Willow Bridge, which is designed to remedy the loss of competition alleged in the Complaint due to Willow Bridge's conduct, and a Stipulation and Proposed Order (Doc. 200), in which Willow Bridge consented to entry of the

proposed Final Judgment after compliance with the requirements of the Tunney Act.[2] Also on the same date, the United States filed a Competitive Impact Statement describing the proposed Final Judgment as to Willow Bridge. (Doc. 202)

The United States arranged for the publication of the Complaint, proposed Final Judgment, and Competitive Impact Statement in the Federal Register on July 16, 2026, see 15 U.S.C. § 16(b)-(c); 91 Fed. Reg. 43,774 (July 16, 2026), and caused notice regarding the same, together with directions for the submission of written comments relating to the proposed Final Judgment, to be published in the Washington Post and the Greensboro News and Record from July 14 to July 21, 2026. The 60-day period for public comment has now ended. The United States received two comments in response, which are described below and attached as Exhibits 1 & 2 hereto.

## II. THE COMPLAINT AND THE PROPOSED FINAL JUDGMENT

The Complaint alleges that, by unlawfully sharing its confidential and competitively sensitive information with RealPage for use in its and competing landlords' pricing, Willow

[2] The Stipulation and Proposed Order, and the proposed Final Judgment, pertain only to Willow Bridge's conduct. They do not propose to resolve the anticompetitive conduct alleged in the Complaint against any other Defendant. Nor do they resolve the claims of any other Plaintiff besides the United States.

Bridge violated Section 1 of the Sherman Act, 15 U.S.C. § 1. Under their licensing agreements with RealPage, Willow Bridge and competing landlords have provided RealPage with daily, competitively sensitive, nonpublic information for use in RealPage's revenue management software relating to the landlords' leasing businesses, including details like how many leases have been renewed, for what terms, and at what price. The transactional data that Willow Bridge and other landlords have agreed to provide to RealPage includes current, forward-looking, granular, and highly competitively sensitive information. RealPage has used Willow Bridge's competitively sensitive, nonpublic information to influence rental prices and other recommendations across rental properties managed by competing landlords. Willow Bridge's rental prices and related recommendations were likewise influenced by its competitors' competitively sensitive, nonpublic information obtained from RealPage. In each relevant market, RealPage and participating landlords, including Willow Bridge, have sufficient market power, including market and data penetration, to harm renters and the competitive process through this unlawful sharing of confidential and competitively sensitive information. Moreover, Willow Bridge and other landlords can achieve any procompetitive objective of revenue management software without sharing this

kind of information.

The Complaint also alleges that Willow Bridge and other landlords, by adopting and using RealPage's revenue management software, agreed with RealPage to align their pricing and thereby violate Section 1 of the Sherman Act, 15 U.S.C. § 1. RealPage has entered into agreements with Willow Bridge and its competing landlords relating to how to price rental units, including through the licensing of its revenue management software—AI Revenue Management ("AIRM"), YieldStar, and Lease Rent Options ("LRO")—to landlords, and the provision by landlords of their competitively sensitive, nonpublic transactional data to RealPage for training and running its revenue management software. Adoption and use of RealPage's revenue management software by Willow Bridge and other landlords have the likely effect of causing competing landlords to employ the same or very similar strategies, processes, and decisions relating to their pricing of rental units. Willow Bridge and other landlord users understand this likely effect, which here dampens the competitive process that benefits renters.

The proposed Final Judgment imposes several requirements and restrictions on Willow Bridge that address the United States' anticompetitive concerns regarding Willow Bridge's conduct alleged in the Complaint. Specifically:

i. Willow Bridge must not license or use any revenue management product that uses third-party nonpublic data to recommend or set prices;

ii. Willow Bridge must not license or use any revenue management product that pools information from Willow Bridge properties that have different owners;

iii. Willow Bridge must not disclose, solicit, or use competitively sensitive information from competitors that can be used to set rental prices or generate pricing;

iv. Willow Bridge must cooperate in this civil antitrust proceeding (United States et al. v. RealPage et al.);

v. Willow Bridge must adopt a written antitrust compliance policy and designate a chief antitrust compliance officer who will train Willow Bridge employees on the policy;

vi. Willow Bridge must allow the United States to inspect its documents and to interview its employees to ensure compliance with the Final Judgment;

vii. If Willow Bridge uses a revenue management product, Willow Bridge will be subject to a monitor unless Willow Bridge obtains a certification that meets certain requirements, including an affirmation that

the product complies with all required limitations regarding use of competitors' competitively sensitive data; and

viii. If, in the future, the Court finds that Willow Bridge has violated the terms of the proposed Final Judgment, Willow Bridge will be subject to a court-appointed monitor.

Under the terms of the Stipulation and Order, Willow Bridge must abide by and comply with the provisions of the proposed Final Judgment until it is entered by the Court or until the time for all appeals of any Court ruling declining entry of the proposed Final Judgment has expired.

The United States and Willow Bridge have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the APPA. Entry of the proposed Final Judgment will terminate this action with respect to the United States' claims against Willow Bridge, except that the Court will retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof by Willow Bridge.

## III. STANDARD OF JUDICIAL REVIEW

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a 60-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the Court, in accordance with the Tunney Act as amended in 2004, is required to consider:

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the Court's inquiry is necessarily a limited one, as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." United States v. Microsoft Corp., 56 F.3d 1448, 1461 (D.C. Cir. 1995);

United States v. Hewlett Packard Enterprise Co., No. 25-CV-00951-PCP, 2026 WL 2349970, at *16 (N.D. Cal. Aug. 12, 2026); United States v. U.S. Airways Grp., Inc., 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (explaining that the "court's inquiry is limited" in Tunney Act settlements); United States v. InBev N.V./S.A., No. 08-1965 (JR), 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that a court's review of a consent judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanism to enforce the final judgment are clear and manageable"); United States v. Keyspan Corp., 763 F. Supp. 2d 633, 637–38 (S.D.N.Y. 2011); see SEC v. Citigroup Global Markets Inc., 673 F.3d 158, 168 (2d Cir. 2012) ("We are bound in such matters to give deference to an executive agency's assessment of the public interest.").

As the U.S. Court of Appeals for the District of Columbia Circuit has held, under the APPA, a court considers, among other things, the relationship between the remedy secured and the specific allegations in the government's complaint, whether the proposed Final Judgment is sufficiently clear, whether its enforcement mechanisms are sufficient, and whether it may positively harm third parties. See Microsoft, 56 F.3d at 1458–

62; United States v. Apple, Inc., 889 F. Supp. 2d 623, 631 (S.D.N.Y. 2012) (citing Microsoft, 56 F.3d at 1458, 1461–62). With respect to the adequacy of the relief secured by the proposed Final Judgment, a court may "not make de novo determination of facts and issues." United States v. W. Elec. Co., 993 F.2d 1572, 1577 (D.C. Cir. 1993) (quotation marks omitted); see also Microsoft, 56 F.3d at 1460–62; United States v. Alcoa, Inc., 152 F. Supp. 2d 37, 40 (D.D.C. 2001); United States v. Enova Corp., 107 F. Supp. 2d 10, 16 (D.D.C. 2000); InBev, 2009 U.S. Dist. LEXIS 84787, at *3. Instead, "[t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General." W. Elec. Co., 993 F.2d at 1577 (quotation marks omitted). "The court should bear in mind the flexibility of the public interest inquiry: the court's function is not to determine whether the resulting array of rights and liabilities is one that will best serve society, but only to confirm that the resulting settlement is within the reaches of the public interest." Microsoft, 56 F.3d at 1460 (quotation marks omitted); see also United States v. Deutsche Telekom AG, No. 19-2232 (TJK), 2020 WL 1873555, at *7 (D.D.C. Apr. 14, 2020). More demanding requirements would "have enormous practical consequences for the government's

ability to negotiate future settlements," contrary to congressional intent. Microsoft, 56 F.3d at 1456. "The Tunney Act was not intended to create a disincentive to the use of the consent decree." Id.[3]

"Because enforcement by consent decree is an alternative to enforcement by trial or abandonment of the litigation altogether and often reflects the United States's assessment of litigation risk, a proposed settlement does not need to replicate the full relief that [the] United States sought in its complaint." Hewlett Packard Enter., 2026 WL 2349970, at *17. The United States' predictions about the efficacy of the remedy are to be afforded deference by the Court. See, e.g., Microsoft, 56 F.3d at 1461 (recognizing courts should give "due respect to the Justice Department's . . . view of the nature of its case"); United States v. Iron Mountain, Inc., 217 F. Supp. 3d 146, 152–53 (D.D.C. 2016) ("In evaluating objections to settlement agreements under the Tunney Act, a court must be mindful that [t]he government need not prove that the settlements will

[3] See also United States v. BNS, Inc., 858 F.2d 456, 464 (9th Cir. 1988) (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); United States v. Gillette Co., 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass").

perfectly remedy the alleged antitrust harms[;] it need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms.") (internal citations omitted); United States v. Republic Servs., Inc., 723 F. Supp. 2d 157, 160 (D.D.C. 2010) (noting "the deferential review to which the government's proposed remedy is accorded"); United States v. Archer-Daniels-Midland Co., 272 F. Supp. 2d 1, 6 (D.D.C. 2003) ("A district court must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case"). In determining whether a proposed settlement is in the public interest, a district court "is not permitted to reject the proposed remedies merely because the court believes other remedies are preferable." United States v. Morgan Stanley, 881 F. Supp. 2d 563, 567 (S.D.N.Y. 2012) (quoting United States v. Abitibi-Consol. Inc., 584 F. Supp. 2d 162, 165 (D.D.C. 2008)). The ultimate question is whether "the remedies [obtained by the Final Judgment are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'" Microsoft, 56 F.3d at 1461 (quoting W. Elec. Co., 900 F.2d at 309).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the

United States has alleged in its complaint and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." Microsoft, 56 F.3d at 1459; see also U.S. Airways, 38 F. Supp. 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); United States v. Keyspan Corp., 763 F. Supp. 2d 633 637–38 (S.D.N.Y. 2011) ("The Court's function is not to determine whether the proposed [d]ecree results in the balance of rights and liabilities that is the one that will best serve society, but only to ensure that the resulting settlement is 'within the reaches of the public interest.'" (quoting United States v. Alex. Brown & Sons, Inc., 963 F. Supp. 235, 238 (S.D.N.Y. 1997)); InBev, 2009 U.S. Dist. LEXIS 84787, at *20 ("the 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged"). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the

United States did not pursue. Microsoft, 56 F.3d at 1459-60. See also Heckler v. Chaney, 470 U.S. 821, 832 (1985) (quoting U.S. Const. art. II, § 3) (recognizing that the decision about which claims to bring "has long been regarded as the special province of the Executive Branch.").

In its 2004 amendments to the APPA, Congress made clear its intent to preserve the practical benefits of using consent judgments proposed by the United States in antitrust enforcement, Pub. L. 108-237 § 221, and added the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); see also U.S. Airways, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). This language explicitly wrote into the statute what Congress intended when it first enacted the Tunney Act in 1974. As Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). "A court can make its public interest determination based on the

competitive impact statement and response to public comments alone." U.S. Airways, 38 F. Supp. 3d at 76 (citing Enova Corp., 107 F. Supp. 2d at 17).

## IV. SUMMARY OF PUBLIC COMMENTS AND THE UNITED STATES' RESPONSE

The United States received two public comments in response to the proposed Final Judgment. The comments were submitted by private individuals, whom the United States will refer to by each individual's initials: MC ("MC Comment") and JD ("JD Comment").

### A. The MC Comment

MC's comment requests that the United States consider whether the proposed Final Judgment adequately addresses the role of pricing algorithms in renewal pricing, including situations where renewal prices offered are materially higher than prices quoted to prospective tenants for the same apartment unit, and "whether monitoring under the decree should examine the differences between renewal and new-tenant prices."[4] The terms of the proposed Final Judgment with Willow Bridge do not make a distinction between renewal pricing and new-tenant pricing. Therefore, the limitations imposed on the use, disclosure, pooling, combination, or training of Nonpublic Data

[4] MC Comment at 2 (requests nos. 1, 2, and 5).

apply equally to recommendations regarding renewal pricing and new-tenant pricing generated by revenue management software.[5]

Furthermore, the Complaint did not allege anticompetitive conduct related to differences between renewal pricing and new-tenant pricing. (See, e.g., Doc. 47, ¶ 62 ("Every morning, the landlord's property manager chooses whether to accept the floor plan price recommendation, keep the previous day's rent, or override the recommendation. These options are the same for new leases and renewal leases.") & ¶ 107 ("Specifically, he urged the group to 'push up new and renewal pricing where demand [is] solid' and warned against over-relying on concessions. They were instead to 'trust the science' of YieldStar.").) MC's requests therefore are not relevant to the United States' claims and not germane to Tunney Act review.

The fact that Willow Bridge may choose to price its apartment units differently to existing tenants and prospective tenants does not, in of itself, present a competitive concern, absent evidence that such a pricing strategy uses Nonpublic Data shared by Willow Bridge's competitors or aligns with the pricing strategy used by Willow Bridge's competitors in a local rental

[5] Willow Bridge Proposed Final Judgment, ¶¶ IV.A-C and V.A.1 (Doc. 200-1).

market. The terms of the proposed Final Judgment ensure that any differential pricing of renewals and new leases by Willow Bridge is not a result of the types of anticompetitive conduct alleged in the Complaint.

MC further requests that the United States consider whether the proposed Final Judgment should require Willow Bridge to provide notification to tenants on a property's use of "automated revenue management systems."[6] Such a requirement would go beyond addressing the United States' claims regarding the sharing of competitively sensitive data among landlords and the use of revenue management software to align their pricing. The use of an "automated revenue management system" or software with a rental property, standing alone, does not raise competitive concerns. What matters is whether such a system or software is being trained on or otherwise uses Nonpublic Data shared by Willow Bridge's competitors and whether such a system or software, during operation, "automates" pricing recommendations and/or decision-making for Willow Bridge and its competitors who are also using the system or software. The proposed Final Judgment effectively addresses such scenarios associated with

[6] MC Comment at 2 (request no. 3).

Willow Bridge's use of an "automated revenue management system." More is therefore not required.

Finally, MC requests that the United States consider whether the proposed Final Judgment should require Willow Bridge to provide "meaningful human review" of renewal prices.[7] Similar to MC's other requests, this request questions whether a landlord like Willow Bridge should be allowed to use revenue management software, and specifically software that may automatically generate pricing recommendations for renewals and new leases. As explained above, the United States' Complaint does not allege that Willow Bridge's use of a revenue management system or software, standing alone, is anticompetitive. What matters is whether such a system or software is being trained on or otherwise uses Nonpublic Data shared by Willow Bridge's competitors and whether such a system or software, during operation, "automates" pricing recommendations and/or decision-making for Willow Bridge and its competitors who are also using the system or software. The proposed Final Judgment effectively addresses such scenarios associated with Willow Bridge's use of revenue management software, and a requirement of "meaningful

---

[7] Id. at 2 (request no. 4).

human review" is neither relevant nor necessary to address the competitive concerns raised by the Complaint.

### B. The JD Comment

JD first requests that the United States investigate whether their specific rental property uses a RealPage or other third-party revenue management product and whether their specific property's rental prices were calculated with the use of competitively sensitive information.[8] JD further requests that the United States explain "whether potentially affected renters will have any process to learn whether their property or its data was within the investigation or remedial program."[9] A renter can "evaluate whether the decree protects that renter."[10] In the United States' judgment, the type of process requested by JD is not necessary. The proposed Final Judgment applies to all conventional multifamily rental properties, located within the United States or its territories, that are serviced by Willow Bridge (defined as "Willow Bridge Properties").[11] It therefore would apply to JD's specific rental property if it is a Willow

---

[8] JD Comment at 1–2.

[9] Id. at 2.

[10] Id.

[11] Willow Bridge Proposed Final Judgment ¶ II.T (Doc. 200-1); Willow Bridge Competitive Impact Statement at 12 (Doc. 202).

Bridge Property. As for JD's request for any investigative information specific to their rental property, the United States is prohibited by statute from disclosing these materials.[12] The United States notes, however, that the Complaint identifies multiple geographic markets in Appendices A & B, which the public may consult to understand the scope and extent of the competitive harms being addressed by the proposed Final Judgment.

JD also requests that the proposed Final Judgment require independent technical verification of third-party revenue management products.[13] Although the proposed Final Judgment does not require independent technical verification, it requires third-party revenue management providers to provide certifications that the software complies with the terms of the proposed Final Judgment.[14] Furthermore, the United States has the right to obtain and inspect the code and pseudocode of Willow Bridge's proprietary revenue management software.[15]

JD recommends that the United States require Willow Bridge's internal annual audit to include a "statistically and

---

[12] See 15 U.S.C. § 1313(c)(3).

[13] JD Comment at 3.

[14] Willow Bridge Proposed Final Judgment ¶ V.E (Doc. 200-1).

[15] Willow Bridge Proposed Final Judgment ¶ X.D (Doc. 200-1).

operationally meaningful sample."[16] The proposed Final Judgment requires an internal audit of employees "engaged in or overseeing Willow Bridge's revenue management of multifamily rental properties in the United States and its territories," and at least 12 "randomly selected, local, regional, or supervisory employees who manage property operations."[17] This is sufficient to capture the scope and diversity of Willow Bridge's revenue management operations, and there is no need to expand or otherwise modify the audit requirement. Importantly, the proposed Final Judgment provides the United States broad rights to ensure compliance with the Final Judgment. These include access to "electronic copies of all books, ledgers, accounts, records, data, and documents" and to Willow Bridge's employees for interviews relating to any matters contained in the Final Judgment.[18]

JD also requests that Willow Bridge be required to provide a public annual compliance report. The compliance report should include, according to the commenter, "the number of properties and units under each category of revenue-management product" and

---

[16] JD Comment at 3.

[17] Willow Bridge Proposed Final Judgment ¶ VII.A (Doc. 200-1).

[18] Willow Bridge Proposed Final Judgment ¶ X.A (Doc. 200-1).

information regarding compliance and corrective actions.[19] An annual compliance report of this nature is not necessary. Moreover, such a report would be at odds with the proposed Final Judgment's prohibitions against public disclosure of information and documents obtained pursuant to any of its provisions.[20] Disclosure would also create a risk that competitively sensitive information relating to Willow Bridge will be made public which could lead to coordination among competing landlords.

JD recommends that the proposed Final Judgment make "unmistakably clear" that structured datasets containing competitors' nonpublic information may not be accessed, used, combined, retained without controls, and require "documented segregation, access restriction, deletion or defensible inaction, and testing to prevent legacy data from entering recommendations or model training."[21] The proposed Final Judgment already includes such a provision. Paragraph VI.C. of states that Willow Bridge must not "use or access, as part of setting rental prices or generating rental pricing recommendations for any Willow Bridge property, any External Nonpublic Data ...

[19] JD Comment at 3-4.

[20] Willow Bridge Proposed Final Judgment ¶ XI (Doc. 200-1).

[21] JD Comment at 4.

including such data derived from any RealPage Revenue Management Product."[22]

JD also points to the definition of "Willow Bridge Property" and notes that it excludes "student, affordable, age-restricted or senior, and military housing."[23] The commenter requests that if "operational differences justify particular exceptions, those exceptions should be narrowly tailored." The United States' Complaint alleges a product market for conventional multifamily conventional housing that does not include student, age-restricted, and military housing (Doc. 47, ¶ 183). This portion of the commenter's request is therefore outside the scope of the Complaint and is not subject to Tunney Act consideration.

JD proposes that early termination of the Final Judgment by the United States should be based on a "reasoned public determination," and involve a process that includes "public notice."[24] The proposed Final Judgment already provides that a request for early termination would involve a public notice to

---

[22] Willow Bridge Proposed Final Judgment ¶ VI.C (Doc. 200-1).

[23] JD Comment at 4.

[24] Id.

the Court (and to Willow Bridge) that continuation of the Final Judgment is no longer necessary or in the public interest.[25]

JD questions the proposed Final Judgment's cap of 15 employees and 60 total hours for cooperation with the litigation.[26] This comment fails to recognize that cooperation is not the only way that the United States can develop evidence. In any investigation or litigation, the United States always has procedural tools to compel the production of documents and testimony.[27] The cap in the proposed Final Judgment, which is the product of a negotiated settlement, does not in any way hamstring the United States' ability to obtain discovery in its litigation against any other defendant in this action.

Finally, JD asks why the proposed Final Judgment does not include any monetary relief.[28] The proposed Final Judgment does not provide for restitution because it is not one of the remedies sought by the United States in its Complaint.

***

---

[25] Willow Bridge Proposed Final Judgment ¶ XIV (Doc. 200-1).

[26] JD Comment at 4.

[27] See 15 U.S.C. § 1312, Fed. R. Civ. P. 30, 34 & 45.

[28] JD Comment at 4.

To the extent that commenters wish to raise the possibility of additional unlawful conduct not addressed by the Complaint brought in this matter, members of the public are encouraged to submit information about any antitrust violation, including potentially unlawful exchanges of information between competitors, to the Department of Justice Antitrust Division's Citizen Complaint Center (https://www.justice.gov/atr/webform/pcsf-citizen-complaint).

## V. CONCLUSION

After careful consideration of the public comments, the United States continues to believe that the proposed Final Judgment provides an effective and appropriate remedy for the antitrust violations alleged in the Complaint against Willow Bridge and is therefore in the public interest. The United States will move this Court to enter the proposed Final Judgment after the comments and this response are published in a manner approved by the Court, as required by 15 U.S.C. § 16(d).

Dated: November 5, 2026 Respectfully submitted,

By: /s/ Henry C. Su

Henry C. Su
David A. Geiger
Danielle G. Hauck

Attorneys
United States Department of Justice
Antitrust Division
450 Fifth Street N.W.,
Suite 7100
Washington, DC 20530
Telephone: (202) 307-6200
Email: henry.su@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on November 5, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

By: /s/ Henry C. Su
Henry C. Su

## **CERTIFICATE OF WORD COUNT**

I hereby certify that, based on the word count tool in Microsoft Word, the foregoing document contains 4,814 words, exclusive of the caption, signature lines, certificate of service, and any cover page or index, and it therefore complies with the limitation on length set forth in Local Civil Rule 7.3(d).

Dated: November 5, 2026

By: /s/ Henry C. Su
Henry C. Su